**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **EUGENE A. FISHER, Trustee,**<br>**Seymour P. Nagan Irrevocable Trust,** | } | |
| **v.** | } | **No. 04-1726 T** |
| **THE UNITED STATES OF AMERICA**<br>**Defendant** | } | **Judge Francis M. Allegra** |

**MEMORANDUM OF CONTENTIONS**
**OF FACT AND LAW**

**Overview**

The Seymour P. Nagan Irrevocable Trust (the "Trust"), the plaintiff herein, purchased a life insurance policy from Sun Life Assurance Company ("Sun Life"), a Canadian mutual life insurance and financial services company, on June 28, 1990. The policy was a "participating policy" that entitled the holder to receive dividends from Sun Life out of its surplus as, if, and when declared by Sun Life's Board of Directors. In addition to dividends, participating policyholders, and only participating policyholders, were entitled to vote in the elections of Sun Life's directors and on certain other matters and were entitled to Sun Life's net assets on its liquidation or demutualization.

The life insurance contract purchased by the Trust thus contained a death benefit, ownership rights (to dividends, distributions in liquidation or on demutualization, and to vote for the election of Sun Life's directors and on certain other corporate matters), and a right to surrender the contract for its cash surrender value or to borrow the amount of that cash surrender value. Each of those rights was an inseparable part of the one contract and the premium charged to keep that contract alive was not negotiated between the Trust and Sun Life by either valuing or pricing each of the

inseparable elements of the contract. The component rights embraced within the contract did have value but did not have separately ascertainable fair market values as of June 28, 1990.

On October 20, 1999, the eligible participating policyholders of Sun Life voted to transfer Sun Life's non-life assets and activities plus controlling interest in Sun Life itself to a new holding company, Sun Life Financial Services ("Financial Services"). In exchange, Sun Life received stock in Financial Services having an estimated value equal to the full value of Sun Life. Sun Life then distributed that stock, or the proceeds of its sale, to those eligible participating policyholders entitled thereto under the approved plan of demutualization. Eligible policyholders were offered the option of receiving cash in lieu of Financial Services stock.

The demutualization transactions were implemented on March 22, 2000. After the demutualization, the shareholders of Financial Services were entitled to vote for the directors of Financial Services, and were entitled to receive distributions of dividends from the earnings of all of the entities controlled by Financial Services, as, if, and when declared by the Board of Directors of Financial Services. These rights were embraced within the life insurance contracts of the participating policyholders prior to the demutualization and were severed from the life insurance contracts in the demutualization. The participating policyholders, as such, also retained certain of the ownership rights they had previously had. After the demutualization, for a five-year period they were guaranteed policy dividends from Sun Life, but based on historic dividend payments not Sun Life's actual earnings. After the five-year guarantee expired, policyholders retained the right to receive additional dividends as, if, and when declared by the Board of Directors of Sun Life. The policyholders were also entitled, as a group, to elect three of the directors of Sun Life. Financial

Services was entitled to receive dividends from Sun Life, once the policy dividends had been paid, to the extent declared by the directors of Sun Life.

Pursuant to the approved plan of demutualization, the Trust elected to receive cash rather than Financial Services stock. To implement that election, Sun Life, as the agent for the Trust and the other policyholders electing to receive cash, sold their stock for them on March 22, 2000, and had the sales proceeds remitted to them. The Trust received $31,579. It reported that amount on its federal income tax return for 2000, unreduced by any basis adjustment, pursuant to advice it had received from Sun Life. On February 11, 2004, the Trust filed a timely claim for refund of the $5,725 of income tax it had paid on its 2000 return. On that claim being denied by the government, the Trust filed the instant suit.

Most of the above facts are not in dispute and will be covered by a joint stipulation to which the parties have agreed and that the government is finalizing. Others will be brought out in the testimony of two valuation expert witnesses, a mutual life insurance industry expert witness, and the testimony of a Sun Life officer as to its procedures, the demutualization, and what the company's files show regarding the Sun Life policy that was owned by the Nagan Trust. The primary factual difference between the Trust and the government, as the Court emphasized in its Order of November 15, 2006, relates to valuation. The government maintains that the ownership rights that were separated from the policy contract as a result of the demutualization had a zero fair market value as of the June 28, 1990, date of policy issuance. The Trust first contends that it is the date of demutualization, March 22, 2000, and not June 28, 1990, that is relevant. It then further maintains that the fair market value of those ownership rights at all times prior to the demutualization was not ascertainable but was not zero.

**Issues of Fact and Law for Resolution by the Court**

The ultimate issue for resolution by the Court is a mixed issue of fact and law. The Court is being asked to determine the portion of the tax basis of the policy contract that should be allocated to those ownership rights acquired by the Trust on its purchase of the policy in 1990. The contract (and the included rights) was kept in force by annual premium payments. In 2000, certain of the ownership rights were separated from the policy as a result of the demutualization and reorganization of Sun Life. Once the portion of the tax basis of the policy contract allocable to the separated ownership rights has been determined, the amount of tax that was due for 2000 from the Trust, if any, can be calculated and the amount of any refund due can be determined.

**Positions of the Parties**

The Trust's position is and has been that the policy contract is a unitary and indivisible asset and that the tax basis of that contract cannot be allocated to its various elements prior to the separation of the rights from the contract in the demutualization distribution. The portions of the premiums paid that might represent the fair market value of, for example, the death benefit portion of the contract, or the policy loan provisions of the contract, or the ownership rights of the policyholder to vote for directors, or to receive dividends when declared by the directors, or receive distributions in the liquidation or demutualization of the company, are unascertainable and indeterminable.

The government's initial position in its denial of the Trust's refund claim and then in its cross-motion for summary judgment in this proceeding was that the tax basis of the policy contract allocable to those ownership rights was zero. That position was based on the contention that the controlling law was Rev. Rul. 71-233, 1971-1 C.B. 113, which contention and conclusion was

rejected by the Court in its unpublished order of November 15, 2006, denying defendant's cross-motion for summary judgment (see fn. 4 of the Order).

In Private Letter Ruling 200020048 (Feb. 22, 2000), the government's Internal Revenue Service issued a ruling to Sun Life relating to this very demutualization transaction. At para. 27 of the Tax Analyst's print of that ruling, the Service noted:

> Any Ownership Rights in a mutual insurance company which arise from the purchase of an insurance contract are inextricably tied to the contract from the time of the purchase. These Ownership Rights are created by operation of law solely as a result of the policyholder's acquisition of the underlying contract from a mutual insurance company and cannot be transferred separately from that contract. Prior to conversion, the Ownership Rights have no determinable value apart from the insurance contract itself.

The key phrase in the above quote is "no determinable value" in the last sentence. The Trust asks the Court to find, as the Service itself explained in the PLR, that the ownership rights have no determinable value prior to the demutualization. The Trust's expert witness will testify that the fair market value of the rights separated from the policy contract in the demutualization was unascertainable and indeterminable when the policy was purchased and at all times prior to the demutualization. The testimony of the industry expert retained by the government is expected to support that same conclusion, as does the written report of that expert furnished to the Trust pursuant to the Court's scheduling order. The fair market value of the Financial Services stock received by the Trust in the demutualization is the amount for which those shares were sold in the initial public offering and that amount will be stipulated to in the joint stipulation. The tax basis of the life insurance contract is the total of the premiums paid. The dividends received on the policy were reinvested in the policy and increased the amount of the policy death benefits. The information

regarding the premiums and dividends is in Plaintiff's Exh. 1 which will be filed with the court at the time of trial.

**Basis Recovery**

If the Court concludes that, indeed, the value of the ownership rights was unascertainable and not determinable at any time prior to the demutualization, the Trust then asks the Court to hold that the portion of the tax basis in the policy contract allocable at the time of demutualization to the Financial Services stock received in exchange for those rights is the fair market value of that stock as of the date of the demutualization. Under this basis recovery approach, the simultaneous sale of the stock for this same amount would result in neither gain nor loss. Rather, the ultimate gain or loss on the life insurance contract, including the severed ownership rights, would be determined on disposition of that contract.

Use of the basis recovery approach is supported by three alternative legal arguments:

(1) The basis recovery approach is the proper approach when the constituent elements in a package of assets are acquired for one consideration, it is not feasible or practical to ascertain the portion of that consideration (the tax basis) allocable to the separate elements, and thereafter one of those constituent elements is sold. The precedent in this Court is *Estate of Henry Hill Pierce v. United States*, 99 Ct. Cl. 355, 49 F. Supp. 324 (1943). In that case, a bank had created a securities company to invest in securities in which the bank itself could not legally invest. Each bank stock certificate contained an endorsement giving bank stockholders interests in the securities company. Interests in the securities company could not be transferred separately from the bank stock, nor could bank stock be transferred without also transferring the related interest in the securities company.

The Court was faced with determining what portion of the tax basis of the bank stock should be allocated to the securities company interests when, due to the requirements of the Federal Banking Act of 1933, the securities company was dissolved and transferable declarations of interest in the distribution of the proceeds of its liquidation were distributed to the bank shareholders. The decedent was one of those shareholders, and he sold his declaration of interest the month after he received it. The decedent's estate argued that the basis of the interest should be an amount that would produce a loss and filed a suit for refund based on that theory. The government argued that the cost of the bank stock was not allocable between the bank stock and the securities stock because the bank stock and the securities stock could not be separated until the law change. Concluded the Court, at 49 F. Supp. 367:

> In order to determine, as plaintiffs would have us do, that the interest in the Security Company was sold for less than it cost, it would be necessary to apportion a part of the price plaintiff's testator paid for his bank stock with the Security Company indorsement on it, to the interest in the Security Company represented by the indorsement. We could then say that the interest in the Security Company cost so much. We know how much it sold for in 1934, and could determine the amount of the loss or gain. . . .

The government disagreed, arguing that whether a profit or a loss had been derived from the investment in the bank stock from which the Security Company interest had been severed could not be determined until the interests in both the Security Company and the bank had been sold. The Court then discussed, at 49 F. Supp. 367-68, the implications of that argument for the plaintiffs:

> We take this argument [of the government] to mean that no particular value could be assigned to the interest in the Security Company represented by the indorsement of the bank stock, with any degree of assurance that that assignment of value was correct, or even approximately so. If that is true, the apportionment should not be attempted, since the exact answer to the question of profit or loss may be obtained by waiting till the bank stock is sold. 49 F. Supp. 367, 368.

Pointing out that other courts had reached the same result in comparable cases, the Court dismissed the plaintiffs' claim for refund.

The basis recovery approach is still accepted by the courts for reporting the gain or loss from the sale of property where it is impracticable or impossible to ascertain the cost or other tax basis of the property that is sold. In *Inaja Land Co., Ltd. v. Commissioner*, 9 T.C. 727 (1947), acq. 1948-1 C..B. 2, for example, the taxpayer was paid an amount by the City of Los Angeles for the grant of certain easements and rights of way. The IRS considered that the total amount was income, but the Tax Court found that there was no gain to be currently recognized, noting in its final opinion paragraph (9 T.C. at 736):

> Apportionment with reasonable accuracy of the amount realized not being possible, and this amount being less than petitioner's cost basis for the property, it can not be determined that petitioner has, in fact, realized gain in any amount. Applying the rule as above set out, no portion of the payments in question should be considered as income, but the full amount must be treated as a return of capital and applied in reduction of petitioner's cost basis. Burnet v. Logan, 283 U.S. 404.

*Inaja Land* is still good law. In *Gladden v. Commissioner*, 262 F. 3d 851 (9th Cir. 2001), owners of land acquired water rights several years after they purchased the land, and for no consideration. The water rights were subsequently sold. The taxpayers contended that the consideration received for the water rights should be a return of their tax basis in the land and should reduce the tax basis of that land rather than be recognized as current income. The appeals court remanded *Gladden* to the Tax Court to determine "what portion of the cost of the land may have been a premium paid for the water rights later acquired by the partnership, or whether it is 'impracticable or impossible' to determine what that premium may have been." In the latter situation, the appeals court noted, the pertinent rule would be that of *Inaja Land* where "the taxpayer

need not recognize any capital gain until the entire cost of the property has been recovered." 262 F. 3d at 855-856.

(2) An alternative argument for basis recovery is based on section 301.[1] That section provides that distributions of property by a corporation with respect to its stock are valued at their fair market value and any portion of the distribution which is not a dividend is applied to and reduces the basis of the stock on which it was distributed. Section 301(d) provides that the basis of property received in the distribution is the fair market value of that property.

Prior to demutualization, life insurance contracts were the common stock of Sun Life.[2] Pursuant to those contracts, and solely as a result of their owning those contracts, stock of Financial Services, a separate corporation, was distributed to policyholders. Stock other than of the distributing corporation is property. Thus, and based on section 301(d), the tax basis of the Sun Financial Services stock should be its fair market value when distributed.

(3) Another alternative argument would acknowledge the economic substance of what occurred. Sun Life did not distribute stock in Sun Financial Services to all policyholders. It gave the United States participating policyholders the election to take cash. That option was provided to policyholders in the material Sun Life sent to the policyholders preparatory to their vote on the

---

[1]Unless otherwise specified, all section references herein are to the Internal Revenue Code of 1986, as in effect for the years involved.

[2]"Common stock" is defined in Black's Law Dictionary, 6th Edition, p. 278, as that "Class of corporate stock which represents the residual ownership of the corporation." The ownership rights herein involved are the residual ownership of the corporation. Further, those rights have routinely been deemed to be stock by the Internal Revenue Service for federal income tax purposes in issuing both private letter rulings and in published rulings, including the private letter ruling issued in this demutualization, PLR 200020048 (Feb. 22, 2000).

demutualization. See Joint Exhibit 1, Dx1 SL0154.[3] PLR 200020048 (Feb. 22, 2000) recognized that this option existed but nevertheless ruled that the transaction was tax-free to Sun Life. Thus, the demutualization transaction was in reality a cash distribution as to the Trust – and, if that view is accepted, it should be treated as a basis recovery under section 72(e).

In its order of November 15, 2006, the Court rejected the proposition that the return of capital treatment provided life insurance policy distributions not received as an annuity should apply to the $31,579 received by the Trust as the result of the demutualization of Sun Life. The Court stated that the Trust "received those proceeds on an entirely unrelated sale of the stock it received in the demutualization." However, the option to take cash rather than Financial Services stock was offered to the Trust pursuant to its rights under the life insurance contract. Note the distinction in PLR 200020048, paras. 9(iv) and (v), between"Resale Shareholders" and "Retained Share Policyholders. In para. 9(v), the ruling states that "Holding [Financial Services] will issue Common Stock ("Retained Shares") to the following Eligible Policyholders ("Retained Share Policyholders") who will retain that stock in connection with the conversion and IPO: (1) Eligible Policyholders who reside in . . . the United States and who do not elect to receive cash . . . . " Thus once the election to take cash had been made by the Trust, it was never contemplated that it would even receive stock in Financial Services. The Trust respectfully requests that the Court reconsider its prior conclusion, which was reached without the above information regarding the cash election having been placed squarely before the Court.

---

[3]Citation is to Bates number of page in material that will be provided the Court in Joint Exhibit 1 of Stipulation to be separately filed with the Court.

**Basis Allocation**

If the Court rejects the applicability of the basis recovery approach, the Trust then respectfully contends that the proper approach is still not to accept the "zero basis" argument of the defendant. Rather it should be to apply the rules relating to corporate reorganizations and distributions and allocate the tax basis of the policy contract between the two component parts into which it was split in the demutualization based on the relative values of those parts immediately following the demutualization.

The demutualization can be viewed as a classic divisive reorganization under section 355. The policy contract still is a unitary contract that gives the policyholder ownership rights in Sun Life comparable to those of a preferred stockholder, including the right to vote for three policyholder directors and the right to receive policyholder dividends that are guaranteed not to be changed for five years but that may be changed by Sun Life's Board of Directors thereafter (SL-0298) . The common stock ownership of Sun Life rests with Financial Services, which is a holding company. In the demutualization reorganization, Financial Services received all of the Sun Life common stock, in exchange for which Financial Services issued its own stock to Sun Life in the amount necessary to make the required distributions of cash and stock to the Sun Life policyholders.

It is thus not literally true that all of what had been the participating policyholders' ownership rights in Sun Life were transferred to Financial Services. The policyholders retained rights to a preferred dividend and to elect three directors to the Sun Life Board. Viewed as a separation of the ownership rights into the "preferred stock rights" retained by the policyholders as part of the insurance contract and the ownership rights represented by the common stock of Financial Services, the demutualization recapitalization would be a transaction described in section 355(a) in which the

corporation (Sun Life) distributed to its shareholders (the participating policyholders), with respect to its stock, an amount of stock in the controlled corporation (Financial Services) constituting control within the 80 percent definition of "control" contained in section 368(c).

Section 1.358-2(a)(iv) of the Treasury Regulations provides that if a shareholder receives stock in a divisive reorganization, "the basis of each share of stock or security of the distributing corporation . . . shall be allocated between the share of stock or security of the distributing corporation with respect to which the distribution is made and the share or shares of stock or security or securities (or allocable portions thereof) received with respect to the share of stock or security of the distributing corporation in proportion to their fair market values."

This use of relative fair market values at the time of the demutualization distribution to allocate basis is not limited to section 355 divisive reorganizations. The same result also is dictated by sections 305(a) and 307(a). Section 305(a) provides that "gross income does not include the amount of any distribution of the stock of a corporation made by such corporation to its shareholders with respect to its stock." Section 307(a) provides that if a shareholder of a corporation [the policyholder in Sun Life] receives stock in a section 305(a) distribution, the basis of such stock is determined by allocating between the old and the new the adjusted basis of the old. In turn, section 305(a) covers distributions of stock by a corporation to its shareholders with respect to its stock.

**Summary and Conclusion**

The Trust received cash in exchange for its surrender of certain of its ownership rights in Sun Life in a demutualization reorganization of Sun Life. The rights the Trust surrendered were an inseparable part of a life insurance contract and consisted of voting rights, rights to receive dividends, and rights to receive distributions in liquidation. The question before the Court is the

income tax treatment to be accorded the Trust as the result of its disposition of those rights. More specifically, the question is, "What portion of the tax basis of the life insurance contract should be allocated to the severed ownership rights and what portion to the reconstituted life insurance contract?"

Viewed as a distribution of a previously inseparable element of a life insurance contract, the severance from that contract of a hitherto inseparable element of the contract would be viewed as a recovery of premiums paid and not a gain-recognition transaction. The tax basis of what was received for that right, whether cash or stock, would be the amount of its fair market value at the time the ownership rights, in the form of the stock, were distributed to Plaintiff. This result can be reached under three different approaches:

(1) The analysis and conclusion that was adopted by the predecessor of this Court in *Estate of Henry Hill Pierce*.

(2) Focusing on the fact that the ownership rights in the life insurance contract prior to the demutualization made that contract common stock in Sun Life for federal income tax purposes. The distribution of the Financial Services stock then would fall under section 301, with the result that the basis of the Financial Services stock under section 301(d) would be its fair market value when distributed.

(3) Recognizing the economic reality of the transaction and ignoring the form that Sun Life adopted. The evidence establishes that Sun Life offered the Trust, as a participating policyholder, an election to take cash rather than stock, that the Trust elected to take cash, and that the Trust then received the fair market value of the stock as the result of its election as a policyholder and of Sun Life's resulting disposition of that stock in the initial public offering. That distribution

to the contract holder as the result of ownership of a life insurance contract should be treated as a basis recovery transaction in the amount of the fair market value of that which was distributed under section 72(e).

Even if the basis recovery approach is rejected, the question still remains of the tax basis of the Financial Services stock. The logical alternative to a basis recovery approach is to allocate the tax basis of the life insurance contract as of the date of demutualization between the life insurance contract stripped of the ownership rights represented by the Financial Services stock and the Financial Services stock itself based on the relative fair market values of the contract and the Financial Services stock. That is the approach of Treas. Reg. sec. 1.358-2(a)(iv) for a divisive reorganization, which is what the Sun Life reorganization represented to the Sun Life policyholders. It is the approach of sections 305(a) and 307(a).

The government will argue that the ownership rights had no value, attempting to equate “no ascertainable value” to “zero fair market value.” The Trust contends that the evidence clearly establishes that the ownership rights had value but that their fair market value was not ascertainable because they were an inseparable part of the life insurance contract and could be neither bought nor sold separate and apart from that contract.

At the point of demutualization in 2000, certain ownership rights were severed from the life insurance contract. At that point they could be bought and sold and at that point their fair market value became ascertainable. The question of allocation of basis in 2000 should be resolved as of that date and not as of the 1990 date of contract purchase. The zero basis approach should be rejected, and the recovery of basis approach adopted. The result would be a decision ordering a refund to the Trust of $5,725 of income tax for 2000.

Respectfully submitted,

May 2, 2007

/s/ Burgess J. W. Raby
Burgess J. W. Raby
2164 E. Broadway, Suite 280
Tempe, Arizona 85282
Tel: 480-967-1501 Fax: 480-967-0975