(iii) if Financial Services and Sun Life of Canada do not assume control as provided for in section 4.14(f)(ii), then they shall pay the expenses incurred by the policyholder to investigate, negotiate, settle and defend the claim.

In addition, Financial Services and Sun Life of Canada shall not seek, and shall use their reasonable commercial efforts to negotiate that the Underwriting Agreements provide that the Underwriters shall not seek, contribution from Eligible Policyholders whose Financial Services Shares are sold in the Initial Public Offering.

(g) Any proceeds to Financial Services from the sale of Additional Primary Shares in the Initial Public Offering may be retained by Financial Services to pay the expenses of the Initial Public Offering and for general corporate purposes. As soon as reasonably practicable after the closing of the Initial Public Offering, the proceeds to Financial Services from the sale of the Primary Shares, other than the Primary Shares relating to the Buy-back Shares, shall be used by Financial Services to invest in Sun Life of Canada.

(h) Subject to sections 4.9 and 4.10, Financial Services shall arrange for the proceeds from the purchase of the Buy-back Shares and from the sale of the Resale Shares and Mandatory Sale Shares (without deduction for underwriting fees but net of applicable Resale Shares Transfer Fees and withholding taxes, including withholding taxes attributable to payment of underwriting fees) to be paid to the relevant Eligible Policyholders as soon as reasonably practicable after the closing of the Initial Public Offering.

(i) Financial Services shall use its reasonable commercial efforts to arrange for the listing of the Financial Services Shares on The Toronto Stock Exchange, the Montreal Exchange (except as provided below), the New York Stock Exchange, the London Stock Exchange and the Philippine Stock Exchange (collectively, the "Stock Exchanges") on the first trading day after the Effective Date. Financial Services shall use its reasonable commercial efforts to keep the Financial Services Shares listed on the Stock Exchanges for at least the remainder of the two years after the Effective Date. Such listings and efforts shall satisfy any duty Sun Life of Canada or Financial Services may have to ensure that Eligible Policyholders who receive Financial Services Shares will be able to sell the shares on a public market. If a proposed reorganization of Canadian stock exchanges occurs before the Effective Date, with the result that equity shares of large issuers will no longer be listed on the Montreal Exchange, the Financial Services Shares will not be listed on that exchange and that exchange will not be a "Stock Exchange".

(j) Subject to receipt of satisfactory regulatory approvals and the feasibility of offering the service on a commercially reasonable basis in each jurisdiction, as determined by Financial Services, acting reasonably, Financial Services shall arrange for the Shareholding Nominees to provide a service (the "Share Selling Service") to assist Eligible Policyholders to whom Financial Services Shares are issued to sell their Financial Services Shares. Financial Services may decide that the Share Selling Service in certain jurisdictions will only be available to policyholders who hold their shares through the Shareholding Nominee. The Share Selling Service shall be available from the thirtieth day after the date scheduled for the closing of the Initial Public Offering or from such other date as may be selected by Financial Services. The Share Selling Service may only be terminated in any jurisdiction upon 90 days' written notice to the address in the Records of the Company of all persons who are eligible to use the Share Selling Service in that jurisdiction. Under the Share Selling Service, an Eligible Policyholder may sell Financial Services Shares by instructing the Shareholding Nominee to do so. The Shareholding Nominee will arrange for the sale of shares through a dealer on one of the Stock Exchanges.

### 4.15 Alternative Arrangements

Notwithstanding any other provision of this Conversion Plan, in the event that the closing of the Initial Public Offering does not occur within the period provided for in the Underwriting Agreements (or by such

later date as the Financial Services Board may in its discretion agree to in accordance with the Underwriting Agreements), then the following rules shall govern the manner of the distribution of the Demutualization Benefits.

(a) Financial Services shall continue to use its reasonable commercial efforts to keep the Financial Services Shares listed and posted for trading on the Stock Exchanges in accordance with section 4.14(i).

(b) Cash Elections shall be cancelled and Financial Services shall issue to Designated Canadian Policyholders the Financial Services Shares allocated to such policyholders in respect of which the Cash Election was made. Eligible Policyholders entitled to make the Share Election who did not make the election in respect of some or all of the Financial Services Shares allocated to them shall not be entitled to a cash payment in respect of those shares but rather shall retain those shares. Financial Services shall instruct the Transfer Agent to transfer the Buy-back Shares and the Resale Shares to the applicable Shareholding Nominee in the relevant jurisdiction on behalf of the Eligible Policyholders or, in jurisdictions where there is not a Shareholding Nominee, instruct the Transfer Agent or the applicable Co-Transfer Agent to register the shares in the names of the policyholders and issue a share certificate to the policyholders.

(c) Policy Credits will be credited and cash will be paid in accordance with sections 4.6 and 4.7(b).

(d) Promptly following the time scheduled for the closing of the Initial Public Offering, Financial Services shall arrange for the Mandatory Sale Shares to be sold on the Stock Exchanges through a broker. Such sale of Financial Services Shares shall be on the following basis:

(i) the Mandatory Sale Shares shall be sold as soon as reasonably practicable and, in any event, within 60 days from the day on which the closing of the Initial Public Offering was scheduled to occur;

(ii) reasonable commercial efforts shall be made to sell the shares at the best available prices; and

(iii) the broker making the sales shall exercise its discretion in respect of the timing of each sale, the amount of shares to be sold under each sale and the Stock Exchange over which each sale will be made.

After all of the Mandatory Sale Shares have been sold, Financial Services shall determine the price payable to Eligible Policyholders for each share sold by dividing the total proceeds from the sale of the shares by the number of the shares. The payments to Eligible Policyholders shall be made by cheque as soon as reasonably practicable after calculation of the price payable for each share. The payments shall be net of applicable withholding tax and all reasonable expenses of the sale, including brokerage commissions.

### 4.16 Effect of Additional Share Issuances on Access to Financial Markets

The obligation of Financial Services to list the Financial Services Shares on the Stock Exchanges will not be affected by the issuance of additional Financial Services Shares or any other shares in the capital of Financial Services during the two years following the Effective Date.

### 4.17 Valuation of the Company

(a) The Company retained Morgan Stanley & Co. Incorporated and RBC Dominion Securities Inc. to prepare a valuation of the Company. Their report, which is attached as Exhibit C, sets out the estimated range of market values of the Company on the basis that it is the same as the range of estimated public equity market values for Financial Services based solely on estimated prices at which the Financial Services Shares could have been expected to be offered as of September 24, 1999 in an initial public offering conducted in a manner consistent with the Initial Public Offering, as if the Effective Date were September 24, 1999.

(b) The actual public equity market value of Financial Services as of the Effective Date will be determined through the Initial Public Offering and this will represent the aggregate value of Financial Services at that date. All of that value will be distributed to Eligible Policyholders pursuant to this Conversion Plan as Demutualization Benefits.



SL-0270

## ARTICLE 5.

## RESTRUCTURING AND OPERATION OF PARTICIPATING ACCOUNT

### 5.1 Interpretation

(a) As used in this Article 5, the following terms and expressions shall have the following meanings:

**"Continuing Branch"** means, as the context requires:

(a) the business units of the Post-Conversion Company that transact insurance in Canada and Bermuda (collectively, the **"Canadian Branch"**);

(b) the business unit of the Post-Conversion Company that transacts insurance in the United States of America (the **"U.S. Branch"**); and

(c) the business unit of the Post-Conversion Company that, prior to the Conversion, transacted insurance within the Philippines (the **"Philippines Branch"**).

**"Deposit Liabilities"** means, in respect of a Territorial Participating Account, the liabilities for amounts on deposit with the Company in respect of Pre-Conversion Individual Participating Policies.

**"Individual Participating Asset Segment"** means, in respect of each Territorial Participating Account, prior to the Effective Time, the assets within the account which were allocated by the Company in respect of Pre-Conversion Individual Participating Liabilities and, from and after the Effective Time, (i) in respect of the Territorial Participating Account maintained in respect of each of the Canadian Branch, the U.S. Branch and the Philippines Branch, the assets within the account which are allocated by the Post-Conversion Company in the manner contemplated by this Article 5 in respect of Pre-Conversion Individual Participating Policies and Post-Conversion Individual Participating Policies; and (ii) in respect of the Territorial Participating Account maintained in respect of the Philippines Branch, that portion of the assets held by Sun Life of Canada (Philippines), Inc., a Subsidiary of the Post-Conversion Company, which are notionally allocated in the manner contemplated by this Article 5 in respect of Pre-Conversion Individual Participating Policies, Post-Conversion Individual Participating Policies, if any, and individual participating policies issued by Sun Life of Canada (Philippines), Inc.

**"Operating Rules"** means the rules contained in Part 1 and Part 2 of Exhibit D relating to the operation of Pre-Conversion Participating Sub-Accounts.

**"Post-Conversion Individual Participating Policy"** means, at any time, a Participating Policy other than a Group Insurance Policy or a Pension Policy, for which a signed application was dated on or after the Effective Date and which was issued by the Post-Conversion Company and which remains In Force at such time.

**"Post-Conversion Individual Participating Sub-Account"** has the meaning specified in section 5.2(c).

**"Pre-Conversion Ancillary Participating Sub-Fund"** has the meaning specified in section 5.2(d)(ii).

**"Pre-Conversion Individual Participating Adjusted Liabilities"** means, in respect of a Territorial Participating Account, the Pre-Conversion Individual Participating Liabilities in such account, other than: (i) provisions for adverse deviation in respect of the Policies in the Pre-Conversion Individual Participating Closed Sub-Fund; (ii) Deposit Liabilities; and (iii) liabilities in respect of Market Conduct Settlements.

**"Pre-Conversion Individual Participating Closed Sub-Fund"** has the meaning specified in section 5.2(d)(i).

**"Pre-Conversion Individual Participating Liabilities"** means, in respect of a Territorial Participating Account, that portion of Pre-Conversion Participating Liabilities in the account referable to Pre-Conversion Individual Participating Policies.

**"Pre-Conversion Individual Participating Policy"** means, at any time, a Pre-Conversion Participating Policy other than a Group Insurance Policy, a Pension Policy, a Policy constituted by a certificate issued to an insured pursuant to a Group Insurance Policy or a Pension Policy, or a Policy not issued by a Continuing Branch, notwithstanding that a Continuing Branch may administer it.

**"Pre-Conversion Participating Liabilities"** means, in respect of a Territorial Participating Account, all liabilities in respect of Pre-Conversion Participating Policies in the account.

**"Pre-Conversion Participating Policy"** means, at any time, a Participating Policy In Force and recorded in the Worldwide Participating Account at the Effective Time, or in respect of which a signed application was dated prior to the Effective Time and the Policy was issued by the Post-Conversion Company, and which remains In Force at such time.

**"Pre-Conversion Participating Sub-Account"** has the meaning specified in section 5.2(b).

**"Reporting Period"** means, in respect of the Post-Conversion Company, a three-month period ending on any of March 31, June 30, September 30 or December 31 in any year, or such other period as may be determined by the Post-Conversion Company.

**"Seed Capital"** has the meaning specified in section 5.5(a).

**"Shareholders' Account"** has the meaning specified in section 5.2(e).

**"Territorial Participating Account"** means, in respect of a Continuing Branch, a sub-account of the Worldwide Participating Account maintained by Sun Life of Canada in respect of Participating Policies issued or administered by the Continuing Branch and, in the case of the Canadian Branch, also includes Participating Policies issued in Malta.

**"Worldwide Participating Account"** means, prior to the Effective Time, the participating account of the Company and, from and after the Effective Time, the participating account of the Post-Conversion Company, in each case as maintained pursuant to section 456 of the ICA.

(b) Unless otherwise specified, for the purposes of any provision of this Article 5 which requires assets and liabilities to be valued, such assets and liabilities shall be valued in accordance with generally accepted accounting principles in Canada, and for the purposes of any provision which contemplates or requires actuarial liabilities to be valued, such amounts shall be valued using methods and assumptions which are consistent with generally accepted actuarial practice in Canada, with such changes as may be determined by the Superintendent, and any additional directions that may be made by the Superintendent.

**5.2 Establishment of Sub-Accounts**

As of the Effective Time, in accordance with section 2.2, and, in particular, after giving effect to completed transfers contemplated by sections 2.2(a)(i) and 6.3(b) and (c), the Post-Conversion Company shall:

(a) continue to maintain the Worldwide Participating Account and each Territorial Participating Account;

(b) establish and maintain, within the Territorial Participating Account of each Continuing Branch, a separate sub-account (a "Pre-Conversion Participating Sub-Account") in respect of all Pre-Conversion Participating Policies in the Territorial Participating Account;

(c) establish and maintain, within the Territorial Participating Account of each Continuing Branch, a separate sub-account (a "Post-Conversion Individual Participating Sub-Account") in respect of all Post-Conversion Individual Participating Policies in the Territorial Participating Account;

(d) establish and maintain, within the Pre-Conversion Participating Sub-Account in each Territorial Participating Account, the following sub-funds:

(i) a sub-fund in respect of all Pre-Conversion Individual Participating Policies in the Territorial Participating Account (the "Pre-Conversion Individual Participating Closed Sub-Fund"); and

(ii) a sub-fund (the "Pre-Conversion Ancillary Participating Sub-Fund") in respect of the following in each Territorial Participating Account:

(A) the provisions for adverse deviation in respect of the policies in the Pre-Conversion Individual Participating Closed Sub-Fund;.

(B) Deposit Liabilities; and

(C) Pre-Conversion Participating Policies that are not Pre-Conversion Individual Participating Policies;

(e) establish and maintain an account from which, subject to the ICA, payments can be made to the Post-Conversion Company's shareholders (the "Shareholders' Account"), which shall include accounts maintained prior to the Effective Time by the Company in respect of its Policies which are not Participating Policies;

(f) maintain separate accounting records in respect of the Worldwide Participating Account, each Territorial Participating Account and each of the foregoing sub-accounts and sub-funds thereof;

(g) make the allocations of policies, assets and liabilities from the Worldwide Participating Account specified in sections 5.3 and 5.4; and

(h) subject to section 5.10(d), transfer from the Worldwide Participating Account to the Shareholders' Account all assets in the Worldwide Participating Account immediately prior to the Effective Time that have not been allocated in accordance with section 5.4.

Nothing herein shall prevent the Post-Conversion Company from establishing additional participating accounts or from establishing further separate sub-accounts or sub-funds within each Pre-Conversion Individual Participating Closed Sub-Fund or Pre-Conversion Ancillary Participating Sub-Fund or within each Post-Conversion Individual Participating Sub-Account.

### 5.3 Recording of Policies and Allocation of Liabilities as of the Effective Date

As of the Effective Date:

(a) (i) all Pre-Conversion Individual Participating Policies recorded in a Territorial Participating Fund shall be recorded in the Pre-Conversion Individual Participating Closed Sub-Fund of the Territorial Participating Account; and

(ii) all Pre-Conversion Participating Policies recorded in a Territorial Participating Account, other than Pre-Conversion Individual Participating Policies, shall be recorded in the Pre-Conversion Ancillary Participating Sub-Fund of the Territorial Participating Account;

(b) the following allocations shall be made from the Worldwide Participating Account to the Pre-Conversion Participating Sub-Account of each Territorial Participating Account:

(i) Pre-Conversion Individual Participating Adjusted Liabilities in the Territorial Participating Account shall be allocated to the Pre-Conversion Individual Participating Closed Sub-Fund of the Territorial Participating Account; and

(ii) Pre-Conversion Participating Liabilities in a Territorial Participating Account, other than Pre-Conversion Individual Participating Adjusted Liabilities and liabilities in respect of Market Conduct Settlements, shall be allocated to the Pre-Conversion Ancillary Participating Sub-Fund of the Territorial Participating Account; and

(c) liabilities in respect of Market Conduct Settlements shall be allocated to the Shareholders' Account.

### 5.4 Allocation of Assets to the Pre-Conversion Participating Sub-Accounts as of the Effective Date

(a) As of the Effective Date, the following allocations shall be made from the Worldwide Participating Account in respect of the Pre-Conversion Participating Sub-Account of each Territorial Participating Account:

(i) assets in the Individual Participating Asset Segment of the Territorial Participating Account which are loans on the security of Policies shall be allocated to the Pre-Conversion Individual Participating Closed Sub-Fund of the Territorial Participating Account;

(ii) assets in the Individual Participating Asset Segment of the Territorial Participating Account equal to the excess of the Pre-Conversion Individual Participating Adjusted Liabilities in the Territorial Participating Account over the value of the assets allocated pursuant to section 5.4(a)(i) shall be allocated to the Pre-Conversion Individual Participating Closed Sub-Fund of the Territorial Participating Account;

(iii) assets in the Individual Participating Asset Segment equal to the Pre-Conversion Individual Participating Liabilities in the Territorial Participating Account, other than Pre-Conversion Individual Participating Adjusted Liabilities and liabilities in respect of Market Conduct Settlements, shall be allocated to the Pre-Conversion Ancillary Participating Sub-Fund of the Territorial Participating Account; and

(iv) assets within the Territorial Participating Account which were allocated by the Company prior to the Effective Time in respect of the Pre-Conversion Participating Liabilities other than Pre-Conversion Individual Participating Liabilities of the Territorial Participating Account, shall be allocated to the Pre-Conversion Ancillary Participating Sub-Fund of the Territorial Participating Account.

(b) Pre-Conversion Participating Liabilities shall be calculated in accordance with methods and assumptions which are consistent with those used in the calculation of the Company's actuarial liabilities as at the last day of the Reporting Period immediately prior to the Effective Date. The allocations of assets specified in this section 5.4 are expected to be adequate to meet contractual obligations under the policies in respect of which the Pre-Conversion Participating Sub-Accounts of each Territorial Participating Account is maintained, and to meet the reasonable expectations of the holders of those policies in respect of future dividends and other non-guaranteed policy benefits. Part 4 of Exhibit D sets out an explanation of the basis for this expectation.

(c) Based upon the foregoing, it is estimated that, if the Effective Date had occurred on December 31, 1998, after giving effect to the allocations specified in this section 5.4, assets with an approximate value of Can.$3.5 billion would have been transferred to the Shareholders' Account pursuant to section 5.2(h).

**5.5 Transfer of Assets from the Shareholders' Account to Certain Post-Conversion Sub-Accounts as of the Effective Date**

(a) On completion of the allocations specified in section 5.3 and section 5.4, as of the Effective Date, the Post-Conversion Company shall transfer from the Shareholders' Account, assets with an approximate value of Can.$40 million to the Post-Conversion Individual Participating Sub-Account of the Territorial Participating Account maintained in connection with the Canadian Branch, and assets with an approximate value of U.S.$30 million to the Post-Conversion Individual Participating Sub-Account of the Territorial Participating Account maintained in connection with the U.S. Branch ("collectively, the Seed Capital").

(b) The Seed Capital is expected to be adequate to support the Post-Conversion Individual Participating Policies which the Post-Conversion Company expects to issue for at least five years following the Conversion. The aggregate surplus in the Post-Conversion Individual Participating Sub-Accounts at the end of the five-year period following the Effective Date is expected by the Company to be approximately Can.$57 million. In this regard, transfers of assets specified in section 5.9(d) may be made.

**5.6 Operating Rules for Pre-Conversion Participating Sub-Accounts**

With effect from and after the Effective Date, the Post-Conversion Company shall operate the Pre-Conversion Participating Sub-Accounts in accordance with the Operating Rules and the applicable provisions of the ICA. The Operating Rules may be revised by the Post-Conversion Company with the prior approval of the Superintendent and any other regulatory authorities whose approval may be required by applicable law. To the extent that any proposed revision to the Operating Rules would affect the Pre-Conversion Individual Participating Closed Sub-Fund in the Territorial Participating Account maintained in connection with the U.S. Branch, such revision shall require the prior approval of the Michigan Commissioner.

### 5.7 Transfers and Pre-Conversion Participating Sub-Accounts

Except as permitted by section 462(b) of the ICA or the Operating Rules, transfers of assets from any Pre-Conversion Participating Sub-Account shall be limited on the basis provided for in this section 5.7.

(a) No transfers shall be made from any Pre-Conversion Individual Participating Closed Sub-Fund, except as provided in section 5.11.

(b) If, on review by the Appointed Actuary of financial information in respect of any Reporting Period, the Appointed Actuary determines that the value of the Pre-Conversion Individual Participating Adjusted Liabilities in a Pre-Conversion Individual Participating Closed Sub-Fund of a Territorial Participating Account exceeds the value of the assets allocated to such sub-fund then, to the extent that there are assets in the Pre-Conversion Ancillary Participating Sub-Fund of the Territorial Participating Account which exceed the liabilities in such sub-fund, such assets shall be transferred to the Pre-Conversion Individual Participating Closed Sub-Fund to the extent necessary to eliminate the deficit in the Pre-Conversion Individual Participating Closed Sub-Fund as of the end of that Reporting Period.

(c) Subject to section 5.7(b), if as of the end of any Reporting Period, there is an excess of assets over liabilities in a Pre-Conversion Ancillary Participating Sub-Fund of a Territorial Participating Account, then, subject to the approval of the Appointed Actuary, assets with a value equal to such surplus may be transferred therefrom to the Shareholders' Account. The actual amount of assets which the Company will transfer from the Pre-Conversion Ancillary Participating Sub-Funds to the Shareholders' Account at the end of any Reporting Period will not be known precisely until financial statements are available for such Reporting Period and will be dependent on a number of factors. However, based upon the financial statements of the Company for the year ended December 31, 1998 and upon the expected future experience of the Post-Conversion Company, the amount which the Company will transfer during the first twelve months after the Effective Date is Can.$52 million, after tax. In subsequent years, the amount will vary with experience. By the twenty-fifth year, the annual amount so transferred is expected to be about Can.$60 million, and thereafter declines.

(d) Notwithstanding section 462(b) of the ICA in the case of the Pre-Conversion Individual Closed Sub-Fund maintained in connection with the U.S. Branch, Sun Life of Canada may not reinsure a material part of the fund without the prior approval of the Michigan Commissioner.

For greater certainty, nothing in this section 5.7 shall be deemed to limit the payment of amounts from any Pre-Conversion Participating Sub-Account in accordance with the Operating Rules.

### 5.8 Transfers from Post-Conversion Individual Participating Sub-Accounts

(a) Assets may be transferred from any Post-Conversion Individual Participating Sub-Account, or any other account that may be established by the Post-Conversion Company in respect of Participating Policies issued by it, as permitted by the ICA. For purposes of such transfers, the "portion of the profits of the participating account" specified in section 461 of the ICA shall not include the profits attributable to Pre-Conversion Individual Participating Policies.

(b) Subject to the limitation specified in section 5.8(c), as of the end of any Reporting Period that is at least five years after the Effective Date, the Post-Conversion Company may, from time to time, subject in each instance to the prior approval of the Superintendent and any other regulatory authorities whose approval may be required by applicable law, transfer assets from the Post-Conversion Individual Participating Sub-Account of a Territorial Participating Account to the Shareholders' Account if the Appointed Actuary determines that such assets are no longer required to support the Post-Conversion Individual Participating Policies in the Territorial Participating Account.

(c) The amount of Seed Capital allocated to a Territorial Participating Account shall be deemed to be adjusted daily to reflect any additional amount transferred to the Post-Conversion Individual Participating Sub-Account of the Territorial Participating Account from the Shareholders' Account or any amount transferred out of the Post-Conversion Individual Participating Sub-Account as permitted by this Conversion Plan, and the adjusted daily amount shall be deemed to accrue interest at a rate

equal to the daily after-tax investment return earned on the Individual Participating Asset Segment of that Territorial Participating Account (such amount to be known, at any time, as the "Notional Amount"); the amount of assets proposed to be transferred from a Post-Conversion Individual Participating Sub-Account at any time in accordance with section 5.8(b) may not exceed the Notional Amount calculated in respect of that sub-account at the time of the proposed transfer.

**5.9 Mandatory Transfers from the Shareholders' Account**

(a) If, on review by the Appointed Actuary of financial information in respect of any Reporting Period, the Appointed Actuary determines that a Pre-Conversion Ancillary Participating Sub-Fund of a Territorial Participating Account does not have available assets with sufficient value to transfer to the corresponding Pre-Conversion Individual Participating Closed Sub-Fund of that Territorial Participating Account in order to cover a deficit as required by section 5.7(b), then additional assets with a value equal to the remaining balance of such deficit shall be transferred from the Shareholders' Account to the Pre-Conversion Individual Participating Closed Sub-Fund as of the end of that Reporting Period.

(b) If, on review by the Appointed Actuary of financial information in respect of any Reporting Period, the Appointed Actuary determines that the value of the liabilities in the Pre-Conversion Ancillary Participating Sub-Fund of a Territorial Participating Account exceeds the value of the assets allocated to such Pre-Conversion Ancillary Participating Sub-Fund, then assets with a value equal to such deficit shall be transferred to the Pre-Conversion Ancillary Participating Sub-Fund from the Shareholders' Account as of the end of that Reporting Period.

(c) If, on review by the Appointed Actuary of financial information in respect of any Reporting Period, the Appointed Actuary determines that the satisfaction of claims under Market Conduct Settlements results in an increase in Pre-Conversion Individual Participating Adjusted Liabilities in any Territorial Participating Account, assets with a value equal to such increase shall be transferred to the Pre-Conversion Individual Participating Closed Sub-Fund from the Shareholders' Account as of the end of that Reporting Period.

(d) If, on review by the Appointed Actuary of financial information in respect of any Reporting Period that is at, or within five years after, the Effective Date, the Appointed Actuary determines that the value of the liabilities in a Post-Conversion Individual Participating Sub-Account exceeds the value of the assets in that sub-account, then assets with a value equal to such deficit shall be transferred to that sub-account from the Shareholders' Account as of the end of that Reporting Period.

**5.10 Provisions in Respect of Subsidiaries of the Post-Conversion Company**

(a) Pursuant to the indemnity reinsurance arrangement specified in section 6.3(a), Sun Life of Canada (Philippines), Inc. shall agree to manage the Pre-Conversion Participating Policies of the Philippines Branch in all respects in accordance with the provisions of this Article 5 of this Conversion Plan.

(b) Notwithstanding the foregoing, the Post-Conversion Company is bound by the provisions of this Conversion Plan in all respects with regard to the Pre-Conversion Participating Policies of the Philippines Branch, except that the Post-Conversion Company shall be deemed to have complied with the requirements hereof to the extent that Sun Life of Canada (Philippines), Inc. complies therewith. In the event of the termination of the agreement specified in section 6.3(a), the Post-Conversion Company shall ensure that the Territorial Participating Account maintained in respect of the Philippines Branch and the Shareholders' Account properly reflect all Policies, liabilities and assets of the Philippines Branch in accordance with the provisions of this Conversion Plan.

(c) For greater certainty, the foregoing shall apply to any such Pre-Conversion Participating Policies that may be novated to Sun Life of Canada (Philippines), Inc. in accordance with Philippines law.

(d) Participating Policies which are transferred to subsidiaries of the Company on or before the Effective Date in accordance with sections 6.3(b) and 6.3(c) shall not be included in the Worldwide Participating Account. In the event that the transfer of a business of the Company specified in section 6.3(b) or 6.3(c) shall not be completed on or before the Effective Date, the

Post-Conversion Company shall continue to record the Participating Policies forming part of such business in the Worldwide Participating Account and, in connection therewith, shall establish such accounts and make such allocations of assets and liabilities as the Appointed Actuary, with the approval of the Superintendent, shall deem necessary and appropriate pending the completion of the transfer of business, and which, in any event, shall be expected to be adequate to meet contractual obligations under such policies and to meet reasonable expectations of the holders of those policies in respect of future dividends and other non-guaranteed policy benefits.

**5.11 Amalgamation of Pre-Conversion and Post-Conversion Individual Participating Sub-Accounts**

(a) Subject to section 5.11(b), the Post-Conversion Company, with the prior approval of the Superintendent, of any other regulatory authority whose approval may be required by applicable law and, in the case of the Territorial Participating Account maintained in connection with the U.S. Branch, of the Michigan Commissioner, may cease to maintain such Pre-Conversion Individual Participating Closed Sub-Fund as a separate sub-fund of the applicable Pre-Conversion Participating Sub-Account in the Territorial Participating Account and may amalgamate that Pre-Conversion Individual Participating Closed Sub-Fund with the Post-Conversion Individual Participating Sub-Account in the Territorial Participating Account if in the opinion of the Appointed Actuary:

(i) the cost to the Post-Conversion Company of maintaining a Pre-Conversion Individual Participating Closed Sub-Fund in a Territorial Participating Account outweighs the benefit to the holders of the Policies included in such sub-fund; or

(ii) it is otherwise appropriate to do so.

(b) Notwithstanding section 5.11(a), the Post-Conversion Company may cease to maintain a Pre-Conversion Individual Participating Closed Sub-Fund in a Territorial Participating Account as a separate sub-fund of the Pre-Conversion Participating Sub-Account in the Territorial Participating Account and may amalgamate the Pre-Conversion Individual Participating Closed Sub-Fund with the Post-Conversion Individual Participating Sub-Account in the Territorial Participating Account, on terms to be approved by the Superintendent, any other regulatory authority whose approval may be required by applicable law and, in the case of the Territorial Participating Account maintained in connection with the U.S. Branch, the Michigan Commissioner, when the number of Pre-Conversion Individual Participating Policies in the sub-fund falls below:

(i) in the case of the Pre-Conversion Individual Participating Closed Sub-Fund maintained in the Territorial Participating Account in respect of the Canadian Branch, 25,000 policies;

(ii) in the case of the Pre-Conversion Individual Participating Closed Sub-Fund maintained in the Territorial Participating Account in respect of the U.S. Branch, 10,000 policies; or

(iii) in the case of the Pre-Conversion Individual Participating Closed Sub-Fund maintained in the Territorial Participating Account in respect of the Philippines Branch, 15,000 policies.

(c) Upon any amalgamation permitted by this section 5.11, the Pre-Conversion Individual Participating Liabilities in the Territorial Participating Account and an amount of assets equal to the value of such liabilities shall be transferred to the Post-Conversion Individual Participating Sub-Account of the Territorial Participating Account. In any such case, section 5.8(a) of this Article 5 shall continue to apply following the amalgamation.

**5.12 Dividend Policy**

Dividends on Pre-Conversion Individual Participating Policies and Post-Conversion Individual Participating Policies shall be paid when declared by the Board from time to time, at its discretion, in accordance with the dividend policy established with effect on and from the Effective Date, as amended from time to time. During the first five years following the Effective Date, the dividend policy that will apply to Pre-Conversion Individual Participating Policies and Post-Conversion Individual Participating Policies is set forth in Part 3 of Exhibit D.

### 5.13 Reports by the Appointed Actuary

The Appointed Actuary shall provide the Superintendent from time to time with such reports and opinions as the Superintendent may require relating to the compliance by the Post-Conversion Company with this Conversion Plan. The Appointed Actuary shall also provide the Michigan Commissioner from time to time with such reports and opinions as are provided to the Superintendent, as well as any additional reports and opinions as the Michigan Commissioner may require relating to the compliance by the Post-Conversion Company with this Conversion Plan, in each case relating to the Territorial Participating Account maintained in respect of the U.S. Branch.

### 5.14 Amendments to Article 5

Financial Services and the Company may amend this Article 5 at any time with the prior approval of the Superintendent, the Michigan Commissioner (to the extent that the proposed amendment may have any effect on the policyholders resident in the United States), and any regulatory authorities whose approval may be required by applicable law.

## ARTICLE 6.

## FINANCIAL SERVICES AND CORPORATE REORGANIZATION

### 6.1 Creation of Financial Services

Sun Life of Canada has incorporated Financial Services under the ICA as a Life Company and Financial Services has issued to Sun Life of Canada one Financial Services Share and preferred shares of Financial Services for an aggregate consideration of Can.$10,000,001. The sections of the by-law of Financial Services providing for the issuance of Financial Services Shares are attached as Exhibit E. Pursuant to section 2.2(a), at the Effective Time, Sun Life of Canada shall become a wholly-owned Subsidiary of Financial Services.

### 6.2 Proposed Activities of Financial Services

Financial Services currently proposes to hold assets which include all of the Common Shares and, directly or indirectly, the shares of Sun Life of Canada's Subsidiaries and the voting shares or other ownership interests of such other entities as may be permitted for Financial Services to hold under the ICA or other applicable legislation. Financial Services may also raise capital, borrow money and provide services to its Subsidiaries. Financial Services may carry on other activities as the Financial Services Board may approve from time to time and as may be permitted pursuant to the ICA or other applicable law. Financial Services has no present intention to issue insurance policies or otherwise to directly insure risks.

### 6.3 Corporate Reorganization Related to the Conversion

(a) Prior to, or as soon as reasonably practicable after, the Conversion, but subject to receipt of satisfactory regulatory approval, the assets of the Philippines Branch (other than its policies) shall be transferred to Sun Life of Canada (Philippines), Inc., a wholly-owned Subsidiary of Sun Life of Canada, and the policies which have been issued by that branch shall be reinsured by Sun Life of Canada (Philippines), Inc., pursuant to indemnity reinsurance.

(b) Simultaneously with, or as soon as reasonably practicable after, the Conversion, but subject to receipt of satisfactory regulatory and court approvals in all relevant jurisdictions, either:

(i) the businesses of the Company conducted in the Republic of Ireland and the Channel Islands shall be transferred to the U.K. Company pursuant to schemes under the applicable insurance regulatory regimes; or

(ii) the assets of those businesses shall be transferred to the U.K. Company and the policies issued by those businesses shall be reinsured by the U.K. Company pursuant to indemnity reinsurance.

(c) Simultaneously with, or as soon as practicable after, the Conversion, but subject to receipt of satisfactory regulatory and court approval, the business of the Company conducted through the

Company's Hong Kong branch shall be transferred pursuant to a scheme under section 24 of the Insurance Companies Ordinance (Chapter 41 of the Laws of Hong Kong) to Sun Life of Canada (International) Limited, a wholly-owned Subsidiary of Sun Life of Canada.

## ARTICLE 7.

## CONDITIONS

**7.1 Effectiveness of Conversion Plan**

The effectiveness of this Conversion Plan is subject to the following conditions:

(a) this Conversion Plan, the amended and restated by-laws of Sun Life of Canada, as set out in Exhibit A, and the making of an application to the Minister for approval of this Conversion Plan and the issuance of the Letters Patent of Conversion shall have been approved by a special resolution of not less than two-thirds of the votes cast by the Eligible Policyholders voting on the resolution in person or by proxy at the Special Meeting;

(b) the following regulatory approvals shall have been obtained:

(i) the Minister and the Superintendent shall have provided all necessary approvals for or in respect of the U.K. 2C Scheme;

(ii) the High Court of Justice in England shall have made an Order under section 49 of and Schedule 2C to the *Insurance Companies Act 1982* sanctioning the U.K. 2C Scheme;

(iii) following a public hearing, this Conversion Plan shall have been approved by the Michigan Commissioner under section 500.5915 of the Michigan Insurance Code; and

(iv) this Conversion Plan shall have been approved by the Minister under section 237(1) of the ICA and the Minister shall have issued the Letters Patent of Conversion to the Company under section 237(1) of the ICA; and

(c) the Underwriting Agreements shall have been entered into in respect of the Initial Public Offering.

## ARTICLE 8.

## ADDITIONAL PROVISIONS

**8.1 Notices**

If Sun Life of Canada and/or Financial Services complies substantially and in good faith with the terms of this Conversion Plan in respect of the giving of any required notice to policyholders, its failure in any case to give the notice to any Person entitled thereto shall not impair the validity of the actions and proceedings taken pursuant to this Conversion Plan or entitle the Person to any injunctive or other equitable relief with respect thereto.

**8.2 Authority to Remedy Errors**

(a) Subject to the terms of this Conversion Plan, Financial Services may issue additional Financial Services Shares and Sun Life of Canada or Financial Services may take any other action it deems appropriate to remedy errors or miscalculations made in connection with this Conversion Plan, including errors or miscalculations in respect of the allocation or distribution of Demutualization Benefits and the restructuring of the accounts provided for in Article 5.

(b) Following prior written notice to the Superintendent and the Michigan Commissioner, Sun Life of Canada or Financial Services may make modifications to this Conversion Plan of a formal, minor or technical nature or to correct or rectify any ambiguities, defective provisions or omissions provided that, in the opinion of the Board, the rights of Eligible Policyholders are not prejudiced thereby.

### 8.3 Amendments to or Withdrawal of Conversion Plan

The Board may amend this Conversion Plan at any time before the vote of the Eligible Policyholders at the Special Meeting, if measures approved by the Superintendent and the Michigan Commissioner are taken by the Company in respect of the amendment. The Board may withdraw this Conversion Plan at any time prior to the issuance of the Letters Patent of Conversion.

### 8.4 Payment of Interest

All amounts paid to Eligible Policyholders pursuant to this Plan of Conversion shall be paid without interest, unless otherwise specified.

### 8.5 Governing Law

The terms of this Conversion Plan shall be governed by and construed in accordance with the laws of Ontario and the laws of Canada applicable therein.

**IN WITNESS WHEREOF,** Sun Life Assurance Company of Canada and Sun Life of Canada Holdings Corp. have executed this Conversion Plan this 28th day of September, 1999.

**SUN LIFE ASSURANCE COMPANY OF CANADA**

By: ______________________________
Name:
Title:

By: ______________________________
Name:
Title:

**SUN LIFE OF CANADA HOLDINGS CORP.**

By: ______________________________
Name:
Title:

By: ______________________________
Name:
Title:

**EXHIBIT A – FORM OF AMENDED AND RESTATED BY-LAWS OF THE COMPANY**

SUN LIFE ASSURANCE COMPANY OF CANADA

BY-LAW NO. 1

An Amended and Restated By-Law relating generally to the conduct of the business and affairs of Sun Life Assurance Company of Canada

BE IT ENACTED AND IT IS HEREBY ENACTED as a by-law of Sun Life Assurance Company of Canada as follows:

## SECTION 1.

## DEFINITIONS

1.1 Definitions

In this By-law No. 1:

(a) "Act" means the *Insurance Companies Act* (Canada), S.C. 1991, c. 47, as amended from time to time, and every statute that may be substituted therefor;

(b) "Company" means Sun Life Assurance Company of Canada;

(c) "Policyholders' Directors" means the directors of the Company elected by the policyholders of the Company entitled to vote at an annual meeting of shareholders and policyholders of the Company;

(d) "Shareholders' Directors" means the directors of the Company elected by the shareholders of the Company; and

(e) words and expressions that are defined in the Act have the same meanings when used in this by-law and any other by-laws of the Company.

## SECTION 2.

## BOARD OF DIRECTORS

2.1 Manage the Business and Affairs of the Company

The Board of Directors shall manage or supervise the management of the business and affairs of the Company in accordance with and subject to the Act.

The Board of Directors may, in accordance with and subject to the Act, declare a dividend, bonus or ›ther benefit on participating policies in accordance with the dividend or bonus policy established by the Board of Directors.

:.2 Number of Directors

The Company shall have a minimum of 12 directors and a maximum of 24 directors, of which a ninimum of 4 and a maximum of 16 shall be Shareholders' Directors and a minimum of 4 and a maximum of 8 hall be Policyholders' Directors, provided that at all times at least one-third of the directors must be 'olicyholders' Directors and at least one-third must be Shareholders' Directors. The number of directors to be lected at each annual meeting of policyholders and shareholders shall be such number as is fixed by the irectors prior to the annual meeting. The Shareholders' Directors may appoint one or more additional irectors, and the Policyholders' Directors may appoint one or more additional directors, to hold office for a ːrm expiring not later than the close of the next annual meeting of shareholders and policyholders, provided ıat: (a) the total number of directors so appointed shall not exceed one third of the number of directors lected at the previous annual meeting of shareholders and policyholders; and (b) the maximum number of irectors is not exceeded.

3 Term of Office

Each director shall be elected for a term of 3 years, but if the result of electing each director for a term 3 years would be that one-third, as nearly as may be, of the directors would not retire each year, then a ımber of directors may be elected for a term of two years and a number of directors may be elected for a

term of 1 year in order that one-third, as nearly as may be, of the directors shall retire each year. A person is not eligible to be elected a director if that person has reached the age of 72 years or such lesser age as may be established from time to time by the Board of Directors.

2.4 Meetings of the Board of Directors

The Board of Directors shall meet regularly without notice on such dates, at such times and at such places as shall be determined from time to time by the directors. Special meetings of the Board of Directors may be called at any time upon 24 hours' notice by either the Chairman of the Board of Directors or any 3 directors.

The number of directors constituting a quorum at any meeting of the Board of Directors shall be 7, but a majority of the number of directors then in office shall constitute a quorum at any meeting of the directors at which by-laws are made, amended or repealed or at which policy dividends are declared.

2.5 Meetings of Committees of the Board of Directors

Committees of the Board of Directors shall determine their own procedures, including notice requirements, if any, for the calling and conduct of meetings, subject to any regulations imposed by the Board of Directors.

## SECTION 3.

## REMUNERATION OF DIRECTORS

3.1 Remuneration of Directors

The aggregate of all amounts that are to be paid to all directors of the Company in respect of directors' remuneration during a financial year of the Company is hereby fixed at a maximum of $950,000. The directors are also entitled to such additional amounts as may be necessary to reimburse them for their reasonable expenses properly incurred in respect of their services as directors.

## SECTION 4.

## INDEMNIFICATION OF DIRECTORS AND OFFICERS

4.1 Indemnification of Directors and Officers

Subject to any limitations contained in the Act, the Company shall indemnify a director or an officer, a former director or officer or any person who acts or acted at the Company's request as a director or officer of an entity of which the Company is or was a shareholder or creditor, and each such person's heirs and personal representatives, against all costs, charges and expenses, including an amount paid to settle an action or satisfy a judgment reasonably incurred by such person in respect of any civil, criminal or administrative action or proceeding to which such person is made a party by reason of being or having been a director or officer of the Company or such entity, if

(a) such person acted honestly and in good faith with a view to the best interests of the Company, and

(b) in the case of a criminal or administrative action or proceeding enforced by a monetary penalty, such person had reasonable grounds for believing that the impugned conduct was lawful.

The Company may enter into agreements evidencing its indemnity in favour of the foregoing persons to the full extent permitted by law.

## SECTION 5.

## MEETINGS OF SHAREHOLDERS AND/OR POLICYHOLDERS

5.1 Chairman

The chairman at all meetings of shareholders and/or policyholders of the Company shall be:

(a) the Chairman of the Board of Directors, or

(b) in the absence of the Chairman of the Board of Directors or at the latter's request, the President, or

(c) in the absence of the Chairman of the Board of Directors and the President, a director chosen as the chairman of the meeting by the directors who are present.

SECTION 6.

CORPORATE MATTERS

6.1 Financial Year

The financial year of the Company shall end on the expiration of the 31st day of December in each year.

6.2 Corporate Seal

The seal of the Company shall be such as the Board of Directors may adopt.

6.3 Execution of Documents

Documents to be executed by the Company shall be executed by such persons and in such manner as may be determined by the Board of Directors.

SECTION 7.

TRANSITIONAL MATTERS

7.1 Effective Date

This by-law shall come into force on the effective date specified in the Company's letters patent of conversion.

SUN LIFE ASSURANCE COMPANY OF CANADA

BY-LAW NO. 2

An Amended and Restated By-law creating classes of shares of Sun Life Assurance Company of Canada

BE IT ENACTED AND IT IS HEREBY ENACTED as a by-law of Sun Life Assurance Company of Canada as follows:

SECTION 1.

DEFINITIONS

1.1 Definitions

In this By-law No. 2:

(a) "Act" means the *Insurance Companies Act* (Canada), S.C. 1991, c.47, as amended from time to time, and every other statute that may be substituted therefor;

(b) "Board" means the Board of Directors of the Company;

(c) "Company" means Sun Life Assurance Company of Canada; and

(d) words and expressions that are defined in the Act have the same meanings when used in this by-law and any other by-laws of the Company.

SECTION 2.

AUTHORIZED CAPITAL

The authorized capital of the Company consists of:

(a) an unlimited number of Class A Shares without nominal or par value, issuable in series, (the "Class A Shares");

(b) an unlimited number of Class B Shares without nominal or par value, issuable in series, (the "Class B Shares");

(c) an unlimited number of Class C Shares without nominal or par value, issuable in series, (the "Class C Shares");

(d) an unlimited number of Class D Shares without nominal or par value, issuable in series, (the "Class D Shares"); and

(e) an unlimited number of common shares without nominal or par value (the "Common Shares").

SECTION 3.

CLASS A SHARES

The Class A Shares, as a class, have attached thereto the following rights, privileges, restrictions and conditions:

3.1 Board's Authority to Issue in One or More Series

The Board may issue the Class A Shares at any time or from time to time in one or more series. Before any shares of a series are issued, the Board shall fix the number of shares that will form the series and shall, subject to any limitations set out in the by-laws of the Company or in the Act, determine the designation, rights, privileges, restrictions and conditions to be attached to the Class A Shares of the series. Before the issue of any shares of a series, the particulars of the series, including the rights, privileges, restrictions and conditions determined by the Board, shall be sent to the Superintendent of Financial Institutions (Canada).

3.2 Ranking of the Class A Shares

No rights, privileges, restrictions or conditions attached to a series of Class A Shares confer on the series a priority in respect of dividends or return of capital over any other series of Class A Shares.

The Class A Shares:

(a) rank equally with the Class B Shares and the Class C Shares; and

(b) are entitled to a preference over the Class D Shares, the Common Shares and any other shares ranking junior to the Class A Shares

with respect to priority in the payment of dividends and in the distribution of assets in the event of the liquidation, dissolution or winding-up of the Company, whether voluntary or involuntary, or any other distribution of the assets of the Company among its policyholders and shareholders for the specific purpose of winding up its affairs.

If any cumulative dividends, whether or not declared, or declared non-cumulative dividends or amounts payable on return of capital are not paid in full in respect of any series of Class A Shares, then the Class A Shares of all series participate rateably in respect of such dividends in accordance with the sums that would be payable on such shares if all such dividends were declared and paid in full, and in respect of such return of capital in accordance with the sums that would be payable on such return of capital if all sums so payable were paid in full; provided, however, that if there are insufficient assets to satisfy in full all such claims as aforesaid, then the claims of the holders of the Class A Shares with respect to return of capital shall be paid and satisfied first and any assets remaining thereafter shall be applied towards the payment and satisfaction of claims in respect of dividends. The Class A Shares of any series may also be given such other preferences not inconsistent with the rights, privileges, restrictions and conditions attached to the Class A Shares as a class over the Class D Shares, the Common Shares and any other shares ranking junior to the Class A Shares as may be determined in the case of such series of Class A Shares.

3.3 Voting Rights

Except as hereinafter referred to or as required by law or as specified in the rights, privileges, restrictions and conditions attached from time to time to any series of Class A Shares, the holders of the Class A Shares as a class are not entitled as such to receive notice of, to attend or to vote at any meeting of the shareholders or policyholders of the Company.

3.4 Amendment with Approval of the Holders of Class A Shares

The rights, privileges, restrictions and conditions attached to the Class A Shares as a class may be added to, changed or removed but only with the approval of the holders of the Class A Shares given as hereinafter specified.

3.5 Approval of the Holders of the Class A Shares

The approval of the holders of the Class A Shares to add to, change or remove any right, privilege, restriction or condition attaching to the Class A Shares as a class or in respect of any other matter requiring the consent of the holders of the Class A Shares may be given in such manner as may then be required by law, subject to a minimum requirement that such approval be given by resolution passed by the affirmative vote of at least two-thirds (⅔) of the votes cast at a meeting of the holders of the Class A Shares duly called for that purpose at which the holders of a majority of the outstanding Class A Shares are present in person or represented by proxy. If at any such meeting, the holders of at least a majority of the outstanding Class A Shares are not present in person or represented by proxy within 30 minutes after the time appointed for the meeting, then the meeting shall be adjourned to such date not less than 15 days thereafter and to such time and place as may be appointed by the chairman of the meeting and not less than 7 days notice shall be given of the adjourned meeting. At such adjourned meeting the holders of the Class A Shares present or represented by proxy may transact the business for which the meeting was originally called and a resolution passed thereat by not less than two-thirds (⅔) of the votes cast constitutes the approval of the holders of the Class A Shares referred to above.

The formalities to be observed with respect to the giving of notice of any such meeting or any adjourned meeting and the conduct thereof are those from time to time prescribed by the by-laws or the administrative resolutions of the Company passed by the Board with respect to meetings of shareholders or as required by the Act. On every poll taken at every meeting of the holders of the Class A Shares as a class, or at any joint meeting of the holders of two or more series of Class A Shares, each holder of Class A Shares entitled to vote thereat has one vote in respect of each Class A Share held.

SECTION 4.

CLASS B SHARES

The Class B Shares, as a class, have attached thereto the following rights, privileges, restrictions and conditions:

4.1 Board's Authority to Issue in One or More Series

The Board may issue the Class B Shares at any time or from time to time in one or more series. Before any shares of a series are issued, the Board shall fix the number of shares that will form the series and shall, subject to any limitations set out in the by-laws of the Company or in the Act, determine the designation, rights, privileges, restrictions and conditions to be attached to the Class B Shares of the series. Before the issue of any shares of a series, the particular of the series, including the rights, privileges, restrictions and conditions determined by the Board, shall be sent to the Superintendent of Financial Institutions (Canada).

4.2 Ranking of the Class B Shares

No rights, privileges, restrictions or conditions attached to a series of Class B Shares confer on the series a priority in respect of dividends or return of capital over any other series of Class B Shares.

The Class B Shares:

(a) rank equally with the Class A Shares and the Class C Shares; and

(b) are entitled to a preference over the Class D Shares, the Common Shares and any other shares ranking junior to the Class B Shares

with respect to priority in the payment of dividends and in the distribution of assets in the event of the liquidation, dissolution or winding-up of the Company, whether voluntary or involuntary, or any other distribution of the assets of the Company among its policyholders and shareholders for the specific purpose of winding up its affairs.

If any cumulative dividends, whether or not declared, or declared non-cumulative dividends or amounts payable on return of capital are not paid in full in respect of any series of the Class B Shares, then the Class B Shares of all series participate rateably in respect of such dividends in accordance with the sums that would be payable on such shares if all such dividends were declared and paid in full, and in respect of such return of capital in accordance with the sums that would be payable on such return of capital if all sums so payable were paid in full; provided, however, that if there are insufficient assets to satisfy in full all such claims as aforesaid, then the claims of the holders of the Class B Shares with respect to return of capital shall be paid and satisfied first and any assets remaining thereafter shall be applied towards the payment and satisfaction of claims in respect of dividends. The Class B Shares of any series may also be given such other preferences not inconsistent with the rights, privileges, restrictions and conditions attached to the Class B Shares as a class over the Class D Shares, the Common Shares and any other shares ranking junior to the Class B Shares as may be determined in the case of such series of Class B Shares.

4.3 Voting Rights

Except as hereinafter referred to or as required by law or as specified in the rights, privileges, restrictions and conditions attached from time to time to any series of Class B Shares, the holders of the Class B Shares as a class are not entitled as such to receive notice of, to attend or to vote at any meeting of the shareholders or policyholders of the Company.

4.4 Amendment with Approval of the Holders of Class B Shares

The rights, privileges, restrictions and conditions attached to the Class B Shares as a class may be added to, changed or removed but only with the approval of the holders of the Class B Shares given as hereinafter specified.

4.5 Approval of the Holders of the Class B Shares

The approval of the holders of the Class B Shares to add to, change or remove any right, privilege, restriction or condition attaching to the Class B Shares as a class or in respect of any other matter requiring the consent of the holders of the Class B Shares may be given in such a manner as may then be required by law, subject to a minimum requirement that such approval be given by resolution passed by the affirmative vote of

at least two-thirds (⅔) of the votes cast at a meeting of the holders of the Class B Shares duly called for that purpose at which the holders of a majority of the outstanding Class B Shares are present in person or represented by proxy. If at any such meeting the holders of at least a majority of the outstanding Class B Shares are not present in person or represented by proxy within 30 minutes after the time appointed for the meeting, then the meeting shall be adjourned to such date not less than 15 days thereafter and to such time and place as may be appointed by the chairman of the meeting and not less than 7 days notice shall be given of the adjourned meeting. At such adjourned meeting the holders of the Class B Shares present or represented by proxy may transact the business for which the meeting was originally called and a resolution passed thereat by not less than two-thirds (⅔) of the votes cast constitutes the approval of the holders of the Class B Shares referred to above.

The formalities to be observed with respect to the giving of notice of any such meeting or any adjourned meeting and the conduct thereof are those from time to time prescribed by the by-laws or the administrative resolutions of the Company passed by the Board with respect to meetings of shareholders or as required by the Act. On every poll taken at every meeting of the holders of the Class B Shares as a class, or at any joint meeting of the holders of two or more series of Class B Shares, each holder of Class B Shares entitled to vote thereat has one vote in respect of each Class B Share held.

## SECTION 5.

## CLASS C SHARES

The Class C Shares, as a class, have attached thereto the following rights, privileges, restrictions and conditions:

### 5.1 Board's Authority to Issue in One or More Series

The Board may issue the Class C Shares at any time or from time to time in one or more series. Before any shares of a series are issued, the Board shall fix the number of shares that will form the series and shall, subject to any limitations set out in the by-laws of the Company or in the Act, determine the designation, rights, privileges, restrictions and conditions to be attached to the Class C Shares of the series. Before the issue of any shares of a series, the particulars of the series, including the rights, privileges, restrictions and conditions determined by the Board, shall be sent to the Superintendent of Financial Institutions (Canada).

### 5.2 Ranking of the Class C Shares

No rights, privileges, restrictions or conditions attached to a series of Class C Shares confer on the series a priority in respect of dividends or return of capital over any other series of Class C Shares.

The Class C Shares:

(a) rank equally with the Class A Shares and the Class B Shares; and

(b) are entitled to a preference over the Class D Shares, the Common Shares and any other shares ranking junior to the Class C Shares

with respect to priority in the payment of dividends and in the distribution of assets in the event of the liquidation, dissolution or winding-up of the Company, whether voluntary or involuntary, or any other distribution of the assets of the Company among its policyholders and shareholders for the specific purpose of winding up it affairs.

If any cumulative dividends, whether or not declared, or declared non-cumulative dividends or amounts payable on return of capital are not paid in full in respect of any series of the Class C Shares, then the Class C Shares of all series participate rateably in respect of such dividends in accordance with the sums that would be payable on such shares if all such dividends were declared and paid in full, and in respect of such return of capital in accordance with the sums that would be payable on such return of capital if all sums so payable were paid in full; provided, however, that if there are insufficient assets to satisfy in full all such claims as aforesaid, then the claims of the holders of the Class C Shares with respect to return of capital shall be paid and satisfied first and any assets remaining thereafter shall be applied towards the payment and satisfaction of claims in respect of dividends. The Class C Shares of any series may also be given such other preferences not inconsistent with the rights, privileges, restrictions and conditions attached to the Class C Shares as a class over the Class D Shares, the Common Shares and any other shares ranking junior to the Class C Shares as may be determined in the case of such series of Class C Shares.

5.3 Voting Rights

Except as hereinafter referred to or as required by law or as specified in the rights, privileges, restrictions and conditions attached from time to time to any series of Class C Shares, the holders of the Class C Shares as a class are not entitled as such to receive notice of, to attend or to vote at any meeting of the shareholders or policyholders of the Company.

5.4 Amendment with Approval of the Holders of Class C Shares

The rights, privileges, restrictions and conditions attached to the Class C Shares as a class may be added to, changed or removed but only with the approval of the holders of the Class C Shares given as hereinafter specified.

5.5 Approval of the Holders of the Class C Shares

The approval of the holders of the Class C Shares to add to, change or remove any right, privilege, restriction or condition attaching to the Class C Shares as a class or in respect of any other matter requiring the consent of the holders of the Class C Shares may be given by resolution passed by the affirmative vote of at least two-thirds (⅔) of the votes cast at a meeting of the holders of the Class C Shares duly called for that purpose at which the holders of a majority of the outstanding Class C Shares are present in person or represented by proxy. If at any such meeting the holders of at least a majority of the outstanding Class C Shares are not present in person or represented by proxy within 30 minutes after the time appointed for the meeting, then the meeting shall be adjourned to such date not less than 15 days thereafter and to such time and place as may be appointed by the chairman of the meeting and not less than 7 days notice shall be given of the adjourned meeting. At such adjourned meeting the holders of the Class C Shares present or represented by proxy may transact the business for which the meeting was originally called and a resolution passed thereat by not less than two-thirds (⅔) of the votes cast constitutes the approval of the holders of the Class C Shares referred to above.

The formalities to be observed with respect to the giving of notice of any such meeting or any adjourned meeting and the conduct thereof are those from time to time prescribed by the by-laws or the administrative resolutions of the Company passed by the Board with respect to meetings of shareholders or as required by the Act. On every poll taken at every meeting of the holders of the Class C Shares as a class, or at any joint meeting of the holders of two or more series of Class C Shares, each holder of Class C Shares entitled to vote thereat has one vote in respect of each Class C Share held.

SECTION 6.

CLASS D SHARES

The Class D Shares, as a class, have attached thereto the following rights, privileges, restrictions and conditions:

6.1 Board's Authority to Issue in One or More Series

The Board may issue the Class D Shares at any time or from time to time in one or more series. Before any shares of a series are issued, the Board shall fix the number of shares that will form the series and shall, subject to any limitations set out in the by-laws of the Company or in the Act, determine the designation, rights, privileges, restrictions and conditions to be attached to the Class D Shares of the series. Before the issue of any shares of a series, the particulars of the series, including the rights, privileges, restrictions and conditions determined by the Board, shall be sent to the Superintendent of Financial Institutions (Canada).

6.2 Ranking of Class D Shares

No rights, privileges, restrictions or conditions attached to a series of Class D Shares confer on the series a priority in respect of dividends or return of capital over any other series of Class D Shares.

The Class D Shares:

(a) rank junior with the Class A Shares, the Class B Shares and the Class C Shares; and

(b) are entitled to a preference over the Common Shares and any other shares ranking junior to the Class D Shares

with respect to priority in the payment of dividends and in the distribution of assets in the event of the liquidation, dissolution or winding-up of the Company, whether voluntary or involuntary, or any other distribution of the assets of the Company among its policyholders and shareholders for the specific purpose of winding up it affairs.

If any cumulative dividends, whether or not declared, or declared non-cumulative dividends or amounts payable on return of capital are not paid in full in respect of any series of the Class D Shares, then the Class D Shares of all series participate rateably in respect of such dividends in accordance with the sums that would be payable on such shares if all such dividends were declared and paid in full, and in respect of such return of capital in accordance with the sums that would be payable on such return of capital if all sums so payable were paid in full; provided, however, that if there are insufficient assets to satisfy in full all such claims as aforesaid, then the claims of the holders of the Class D Shares with respect to return of capital shall be paid and satisfied first and any assets remaining thereafter shall be applied towards the payment and satisfaction of claims in respect of dividends. The Class D Shares of any series may also be given such other preferences not inconsistent with the rights, privileges, restrictions and conditions attached to the Class D Shares as a class over the Common Shares and any other shares ranking junior to the Class D Shares as may be determined in the case of such series of Class D Shares.

6.3 Voting Rights

Except as hereinafter referred to or as required by law or as specified in the rights, privileges, restrictions and conditions attached from time to time to any series of Class D Shares, the holders of the Class D Shares as a class are not entitled as such to receive notice of, to attend or to vote at any meeting of the shareholders or policyholders of the Company.

6.4 Amendment with Approval of the Holders of Class D Shares

The rights, privileges, restrictions and conditions attached to the Class D Shares as a class may be added to, changed or removed but only with the approval of the holders of the Class D Shares given as hereinafter specified.

6.5 Approval of the Holders of the Class D Shares

The approval of the holders of the Class D Shares to add to, change or remove any right, privilege, restriction or condition attaching to the Class D Shares as a class or in respect of any other matter requiring the consent of the holders of the Class D Shares may be given by resolution passed by the affirmative vote of at least two-thirds (⅔) of the votes cast at a meeting of the holders of the Class D Shares duly called for that purpose at which the holders of a majority of the outstanding Class D Shares are present in person or represented by proxy. If at any such meeting the holders of at least a majority of the outstanding Class D Shares are not present in person or represented by proxy within 30 minutes after the time appointed for the meeting, then the meeting shall be adjourned to such date not less than 15 days thereafter and to such time and place as may be appointed by the chairman of the meeting and not less than 7 days notice shall be given of the adjourned meeting. At such adjourned meeting the holders of the Class D Shares present or represented by proxy may transact the business for which the meeting was originally called and a resolution passed thereat by not less than two-thirds (⅔) of the votes cast constitutes the approval of the holders of the Class D Shares referred to above.

The formalities to be observed with respect to the giving of notice of any such meeting or any adjourned meeting and the conduct thereof are those from time to time prescribed by the by-laws or the administrative resolutions of the Company passed by the Board with respect to meetings of shareholders or as required by the Act. On every poll taken at every meeting of the holders of the Class D Shares as a class, or at any joint meeting of the holders of two or more series of Class D Shares, each holder of Class D Shares entitled to vote thereat has one vote in respect of each Class D Share held.

SECTION 7.

COMMON SHARES

The Common Shares shall have attached thereto the following rights, privileges, restrictions and conditions:

7.1 Dividends

(a) Subject to the prior rights of the holders of the Class A Shares, the Class B Shares, the Class C Shares, the Class D Shares and any other shares ranking senior to the Common Shares with respect to priority in payment of dividends, the holders of Common Shares shall be entitled to receive dividends as and when declared by the Board out of moneys properly applicable to the payment of

dividends, in such amount and in such forms as the Board may from time to time determine and all dividends which the Board may declare on the Common Shares shall be declared and paid in equal amounts per share on all Common Shares outstanding at the time.

(b) Any dividend (other than a stock dividend) unclaimed after a period of six years from the date on which the same has been declared to be payable shall be forfeited and shall revert to the Company.

7.2 Dissolution

In the event of the liquidation, dissolution or specific winding up of the Company, whether voluntary or involuntary, or any other distribution of the assets of the Company among its policyholders and shareholders for the specific purpose of winding up its affairs, subject to the prior rights of the holders of the Class A Shares, the Class B Shares, the Class C Shares, the Class D Shares and any other shares ranking senior to the Common Shares with respect to priority in the distribution of assets in the event of the liquidation, dissolution or winding up of the Company, the holders of the Common Shares shall be entitled to receive the remaining property of the Company that pertains to shareholders in equal amounts per share, without preference or priority of one share or another.

7.3 Voting Rights

The holders of Common Shares shall be entitled to receive notice of and to attend all meetings of the shareholders or policyholders of the Company and shall have one vote for each Common Share held at all meetings of the shareholders or policyholders of the Company, except for meetings at which only holders of another specified class or series of shares of the Company are entitled to vote separately as a class or series and meetings at which only policyholders of the Company are entitled to vote separately as policyholders.

7.4 Notice of Meeting

The formalities to be observed with respect to the giving of notice of any such meeting or any adjourned meeting, the quorum required therefor and the conduct thereof shall be those from time to time required by the Act as in force at the time of the meeting and those, if any, prescribed by the by-laws or the administrative resolutions of the Company with respect to meetings of shareholders.

SECTION 8.

EFFECTIVE DATE

8.1 Effective Date

This by-law shall come into force on the effective date specified in the Company's letters patent of conversion.

## EXHIBIT B – ALLOCATION OF VALUE

1. For the purposes of section 4.2, the applicable rates of exchange to the Canadian dollar, as of the Eligibility Day, are:

| | | | |
|---|---|---|---|
| Bermudian dollar | 1.4561 | Netherlands guilder | 0.7228 |
| Cuban peso | 1.4561 | Pakistan rupee | 0.0331 |
| East Caribbean (WI) dollar | 0.5393 | Philippine peso | 0.0344 |
| Hong Kong dollar | 0.1882 | South African rand | 0.2972 |
| Indian rupee | 0.0383 | Trinidad and Tobago dollar | 0.2341 |
| Irish punt (Eire) | 2.0369 | United Kingdom pound sterling | 2.3912 |
| Jamaican dollar | 0.0414 | United States dollar | 1.4561 |
| Maltese lira | 3.6678 | Zimbabwe dollar | 0.0770 |

2. (a) For the purposes of this section 2 of Exhibit B:

   (i) the term "Special Policy" means any Eligible Policy:

   (A) which was issued by the Company in Canada, Bermuda or Hong Kong and recorded on the Records of the Company, in the case of a policy issued in Canada or Bermuda, under Sun 100 policy (plan codes 013 or 014) or Sun 250 policy (plan codes 033 or 034), or, in the case of a policy issued in Hong Kong, under an Excel Life Special policy (plan codes 0B0 or 0B1 (ALIS) or XLS (Abacus)) or Excel Life Combo policy (plan codes 0C0 or 0C1 (ALIS) or XLC (Abacus)); and

   (B) which has a Duration which is not greater than 20 years;

   (ii) the term "Base Cash Value" means the Cash Value of a Special Policy calculated in the manner prescribed in section 4.3(a) of the Conversion Plan, but excluding the amounts specified in section 4.3(a)(i)(A) and 4.3(a)(i)(B); and

   (iii) the term "Base Annual Premium Measure" means the Annual Premium Measure of a Special Policy calculated in the manner prescribed in section 4.3(c) of the Conversion Plan but excluding any amounts in respect of any policy riders or options specified in section 3 of this Exhibit B as well as Extra Premiums paid in respect of the policy and the policy riders or options specified in section 3 of this Exhibit B.

   (b) If the Base Cash Value of any Special Policy is less than the amount obtained when the product of 0.9 and the Base Annual Premium Measure of the policy is multiplied by the difference which results when six is subtracted from the Duration of the policy (such product being known as the "Adjusted Base Cash Value") then the Cash Value of the Special Policy calculated in accordance with section 4.3(a)(i) of the Conversion Plan shall be increased by adding to it the difference between the Adjusted Base Cash Value and the Base Cash Value.

3. For the purposes of section 4.3(a)(i)(A) and section 4.3(c)(i) of the Conversion Plan and section 2(a)(iii) of this Exhibit B, the following are the Policy riders and options:

   (a) Enhancement Feature (offered in Canada);

   (b) Enhanced Life rider (offered in the United States);

   (c) Low Cost Endowment, Low Start Endowment, Build up Endowment and Life Plus (offered in the United Kingdom);

   (d) Enhanced Whole Life Plan (offered in the Philippines);

   (e) Plus rider (United States), other than single premium payments made by a policyholder under the terms of any such rider in connection with any reinstatement of the policy initiated by the policyholder after the Eligibility Day;

(f) Plus Premium rider (Canada), other than single premium payments made by a policyholder under the terms of any such rider in connection with any reinstatement of the policy initiated by the policyholder after the Eligibility Day;

(g) Inflation Shield Options that have been exercised; and

(h) Readjustment income rider (pertaining to United States individual health Eligible Policies).

4. For the following Policies, using actuarial principles consistent with those generally employed in the calculation of a cash surrender value:

(a) Settlement options (Canada and United States only), Pensions (Canada and United States only): the Cash Value will be calculated using the following assumptions:

Mortality: 1983 Individual Annuity Basic Table without projection
Interest: 4%

(b) Annuities in course of payment (United Kingdom only): the Cash Value will be equal to the actuarial reserve held in the Company's annual statement as at December 31, 1997;

(c) Individual Transfer Plan (United Kingdom only): the Cash Value will be equal to the account balance of the deposit administration portion of the Policy;

(d) Family Insurance Benefit, Children's Insurance Benefit and Spousal Insurance Benefit (Canada only): the Cash Value will be calculated using the following assumptions:

Mortality: 1958 CSO
Interest: 4%

(e) Individual disability claims in the course of payment (all countries): the Cash Value will be equal to that amount that would have been calculated as the Cash Value of the Policy if the claim were not in effect.

5. For the purposes of section 4.3(c)(v)(A) of the Conversion Plan:

YRT Rates for Group Paid-Up Insurance
Rates per $1,000

| Age Nearest Birthday as at January 27, 1998 | Males | Females | Age Nearest Birthday as at January 27, 1998 | Males | Females |
|---|---|---|---|---|---|
| 15 | 1.27673 | 0.42575 | 58 | 12.53827 | 6.68143 |
| 16 | 1.27673 | 0.42575 | 59 | 13.35015 | 7.07667 |
| 17 | 1.27673 | 0.42575 | 60 | 14.94240 | 7.98812 |
| 18 | 1.27673 | 0.42575 | 61 | 15.51355 | 8.30961 |
| 19 | 1.27673 | 0.42575 | 62 | 16.16975 | 8.80121 |
| 20 | 1.27722 | 0.42575 | 63 | 17.44552 | 9.65173 |
| 21 | 1.27722 | 0.42575 | 64 | 18.97644 | 10.67234 |
| 22 | 1.27770 | 0.42575 | 65 | 20.59133 | 11.81763 |
| 23 | 1.27773 | 0.42576 | 66 | 22.73999 | 13.33960 |
| 24 | 1.27776 | 0.42628 | 67 | 25.06770 | 14.95109 |
| 25 | 1.02314 | 0.51134 | 68 | 27.66400 | 16.83117 |
| 26 | 1.02317 | 0.51136 | 69 | 30.52888 | 18.89030 |
| 27 | 1.02373 | 0.51190 | 70 | 33.66234 | 21.12849 |
| 28 | 1.02379 | 0.51193 | 71 | 37.06439 | 23.54573 |
| 29 | 1.02439 | 0.51252 | 72 | 40.64549 | 26.23156 |
| 30 | 1.02501 | 0.51257 | 73 | 44.40564 | 29.27549 |
| 31 | 1.02510 | 0.51261 | 74 | 48.16580 | 32.58801 |
| 32 | 1.02575 | 0.51324 | 75 | 51.92595 | 36.07958 |
| 33 | 1.02588 | 0.51333 | 76 | 56.04422 | 40.01879 |
| 34 | 1.02602 | 0.51341 | 77 | 60.61012 | 44.40564 |
| 35 | 1.11182 | 0.68423 | 78 | 65.89224 | 49.59824 |
| 36 | 1.19764 | 0.68497 | 79 | 71.89058 | 55.32800 |
| 37 | 1.28350 | 0.77014 | 80 | 78.24704 | 61.59492 |
| 38 | 1.36965 | 0.85613 | 81 | 85.23018 | 68.48854 |
| 39 | 1.54091 | 0.94220 | 82 | 93.01907 | 76.18790 |
| 40 | 1.71299 | 1.02833 | 83 | 101.70324 | 84.78254 |
| 41 | 1.88521 | 1.11453 | 84 | 110.92457 | 93.82482 |
| 42 | 2.05756 | 1.28585 | 85 | 121.04118 | 103.85190 |
| 43 | 2.40172 | 1.45855 | 86 | 132.14259 | 114.86378 |
| 44 | 2.66121 | 1.63152 | 87 | 144.22880 | 127.12905 |
| 45 | 3.00615 | 1.80371 | 88 | 157.38935 | 140.64770 |
| 46 | 3.43760 | 1.97714 | 89 | 171.53469 | 154.79305 |
| 47 | 3.86958 | 2.23705 | 90 | 186.93342 | 170.19178 |
| 48 | 4.30522 | 2.49799 | 91 | 203.76459 | 187.29153 |
| 49 | 4.91352 | 2.75951 | 92 | 222.11773 | 206.00278 |
| 50 | 5.44133 | 3.10985 | 93 | 242.17189 | 226.59410 |
| 51 | 6.14123 | 3.37455 | 94 | 263.92707 | 249.24456 |
| 52 | 6.84497 | 3.72705 | 95 | 287.65186 | 274.13321 |
| 53 | 7.62014 | 4.20547 | 96 | 357.90973 | 349.08507 |
| 54 | 8.59083 | 4.60785 | 97 | 421.67347 | 413.35767 |
| 55 | 9.59882 | 5.11540 | 98 | 582.58886 | 575.88127 |
| 56 | 10.76471 | 5.65955 | 99 and above | 1,150.00000 | 1,150.00000 |
| 57 | 11.92303 | 6.29127 | | | |

## EXHIBIT C – VALUATION REPORT

**[For convenience, the Valuation Report is reproduced as Schedule E to Part 1 of this Policyholder Information Circular.]**