### 2.4.3 Consideration of Other Formulas

A number of different formulas were considered and tested before selecting the recommended formula. This formula was chosen because it met the allocation principles and it provided the best results when performing the reasonableness tests.

In particular, the Contribution to Surplus ("CTS") approach, which has been used as the basis for allocating the variable component of shares in most U.S. demutualizations, has not been used by Sun Life of Canada. The fairness of the method across different territories is questionable because of the significant differences in the type of products written in various countries. Moreover, it is an extremely complicated method and would have been very difficult to explain to eligible policyholders. Further, analysis performed by the Company shows that the contribution made by current eligible policyholders to the value of the Company at the end of 1997 is a very small proportion of the total value. In particular, about a third of eligible policyholders would have received no variable component if a CTS approach had been used. This would have been unacceptable.

## 2.5 Other Lines Of Business

### 2.5.1 Application of Formula to Other Lines of Business

As noted in the introduction, after developing a formula for Individual Life, the formula was reviewed to see if it could be applied to other lines of business. In the case of group insurance, a separate formula was considered appropriate.

Although it would have been preferable to use the same formula for all lines of business in all countries, there are fundamental differences in the nature of the Company's different lines of business, particularly group insurance. Group insurance policies generally have no cash values. The use of the formula for individual life insurance would therefore have given no recognition to how long a group policy had been in force. I considered this unsatisfactory. In addition, group insurance policies do not participate in the same manner as individual participating policies, because the basis and methods used to share profits (e.g. experience rating refunds) are quite different than for participating individual life policies, in particular they are generally based on contractual formulas and are not at the discretion of the board of directors.

### 2.5.2 Variable Component (Group Insurance Policies)

The *formula for allocating shares to eligible group insurance policies* is 4.7 shares for each Can.$1,000 of premium times duration ("time-weighted premium").

I endorse this formula. It meets the major principles described earlier and also results in an appropriate allocation of shares to group insurance policies, both in aggregate and individually.

*The use of premium* recognises the size of the policy and, in most cases, is readily available to policyholders. It is a good measure of a policy's contribution to the value of the Company, both retrospectively and prospectively. The weighting of premium by duration ("time weighted premium") provides greater credit to policyholders of long standing.

*The definition of premium* is generally the 1997 billed premium, excluding any premiums paid for health insurance and Accidental Death and Dismemberment ("A.D.& D."). I consider the exclusion of these premiums to be appropriate since, in all countries except the U.K., if either health insurance or A.D.&D. were sold on a stand-alone basis, the policy would be non-participating and therefore ineligible to receive demutualization benefits. In the U.K. there are a very small number of participating health insurance policies. Credit is given for health insurance premiums only if paid under a participating health insurance policy. To recognise contributions made for paid-up coverages, a deemed annual premium is calculated, roughly equal to the annual premium that would be payable if the coverage was being paid for with annual premiums. Premiums that are reinsured with an insurance company owned or controlled by the policyholder are excluded. In these situations, the net premium is a better reflection of the financial interest of the policyholder in the Company.

*The definition of duration* is the period of continuous participating coverage that a group insurance policyholder has had with Sun Life of Canada (subject to a maximum of 15 years) plus five years. The addition of five years gives recognition to the expected future contribution to value. The maximum of 15 years results in a reasonable balance between policies in force for many years and recent issues – consistent with the formula for individual life. As is the case for individual policies, if business was acquired from another company, the period the policy has been in force is measured from the date of acquisition by Sun Life of

Canada. The only policies affected by this are a small number of policies acquired from The Prudential Group Assurance Company of England (Canada) on January 1, 1995. I consider the definition of duration to be appropriate.

#### 2.5.3 Tests of Reasonableness (Group Insurance)

In addition to confirming that the formula for group insurance policies met the principles described earlier, two tests were performed to see if it produced reasonable results.

Firstly, the number of shares allocated to group insurance policies in aggregate was reviewed. Eligible group policyholders will receive about 26 million shares or about 6.5% of the total value of the Company. This is similar to the ratio of group life par surplus to total surplus at December 31, 1997. Secondly, the number of shares allocated to group policyholders is about the same in aggregate as the number that would have been allocated if the formula for individual life had been applied.

The use of a different formula for group insurance therefore does not result in a significant change to the total number of shares allocated to eligible group policyholders, but does result in a distribution among eligible policyholders that is more equitable.

#### 2.5.4 Annuities, Pensions, Individual Health and Supplementary Contracts

Except for one modification, it was not considered necessary to change the individual life formula for these product lines, as the individual life formula provides a reasonable allocation to these policies. The one modification is for corporate owned pension policies (other than the U.K. individual money purchase plan), where duration will be limited to 15 years. I consider this limitation to be appropriate. It is consistent with the definition of duration for group insurance, and in addition, the irregular and generally increasing pattern of premium[(1)] payments under such plans justifies a differentiation with individually owned policies where premiums are normally level.

### 2.6 Form of Benefits

In general, benefits will be distributed in the form of shares of Financial Services (with an option to receive cash). In some cases benefits must be distributed in the form of cash or policy credits.

In those cases where eligible policyholders receive cash, either voluntarily or involuntarily, the amount of cash received will be the value (at the IPO price) of the shares allocated. These policyholders will therefore receive a consideration equal in value at the date of conversion to that given to those policyholders who are allocated shares and elect not to sell them. I am explicitly relying on the opinion of the valuation expert that the cash amount to be distributed in lieu of shares is an appropriate substitute for those shares.

When policyholders receive policy credits, the first step will be to calculate the value of the shares allocated, using the IPO price. Policy benefits will then be increased, with the value of the increase in benefits being equal to the IPO value of the shares allocated. The form of policy credits depends upon the nature of the contract.

## 3. RESTRUCTURING AND FUTURE OPERATIONS OF THE PARTICIPATING ACCOUNT

### 3.1 Current Structure

Sun Life of Canada is required under section 456 of the *Insurance Companies Act* (ICA) to maintain and report accounts for its participating business that are separate from those for its non-participating policies and other businesses. Within the worldwide participating account, Sun Life of Canada also maintains separate participating accounts for each major territory. Similarly, non-participating accounts are maintained separately for each major territory.

These participating and non-participating accounts contain the policies, assets and liabilities of the insurance business of Sun Life of Canada. The major territories for which separate accounts are maintained are Canada (including Bermuda), the U.S., the U.K., Hong Kong, and the Philippines.

---

(1) Premiums in the case of such corporate pension policies are also called "deposits".



SL-0312

### 3.2 Corporate Reorganization of the Insurance Businesses

At the time of demutualization, Sun Life of Canada will transfer its U.K. insurance business to Sun Life Assurance Company of Canada (U.K.) Limited ("Sun Life U.K."), a wholly owned subsidiary of Sun Life of Canada. At the same time, Sun Life of Canada will transfer its insurance businesses in Ireland and the Channel Islands to Sun Life U.K. These transfers require local regulatory and court approval and Canadian regulatory approval, including the report and opinion of both a local and Canadian independent actuary on the impact on the interests of policyholders. Copies of those reports are available to policyholders. Court approval for the U.K. transfer was obtained on September 21, 1999. After the transfers, Sun Life U.K. will replace Sun Life of Canada as the insurer for the transferred policies. These transfers will only occur if demutualization is completed.

Subject to regulatory approval and approval at a Hong Kong court hearing (expected to take place in November or December 1999), at the time of or as soon as reasonably practicable after demutualization, Sun Life of Canada will transfer its Hong Kong insurance business to Sun Life of Canada (International) Limited ("Sun Life International"), a newly created wholly owned subsidiary of Sun Life of Canada. This transfer requires both local and Canadian regulatory approval and local court approval, including a report and opinion of both a local and Canadian independent actuary on the impact on the interests of policyholders. Copies of those reports will be made available to policyholders. After that transfer, Sun Life International will replace Sun Life of Canada as the insurer for the transferred policies. That transfer will only occur if demutualization is completed.

Shortly before or as soon as reasonably practicable after demutualization, Sun Life of Canada will transfer its Philippine insurance business (other than its policies) to Sun Life of Canada (Philippines), Inc. ("Sun Life Philippines"), a wholly owned subsidiary of Sun Life of Canada. At the time of the transfer, Sun Life of Canada will arrange for its policy obligations in the Philippines to be reinsured by Sun Life Philippines through indemnity reinsurance. The transfer and reinsurance require regulatory approval, including a report and opinion of a Canadian independent actuary on the impact on the interests of policyholders. Copies of those reports will be made available to policyholders. Sun Life of Canada will continue to be ultimately responsible for all policies issued in the Philippines and outstanding before the transfer. Any policies issued in the Philippines after the transfer will be issued by Sun Life Philippines and it and not Sun Life of Canada will be the insurer under those policies.

The corporate reorganization of the insurance business will leave Sun Life of Canada's Canadian and U.S. insurance businesses largely unchanged.

See section 3.4 for alternative arrangements if such transfers do not occur.

### 3.3 Restructuring of the Participating and Non-Participating Accounts

As noted earlier, the primary objective of the restructuring of the participating account is to protect contractual obligations and reasonable expectations in respect of future dividends and other non-guaranteed policy benefits for Sun Life of Canada's participating policyholders, and to make adequate support for any future participating policies expected to be allocated to those accounts.

The remainder of this section is a description of the main elements of that restructuring and of how those protections are provided in respect of the business in each major territory.

#### 3.3.1 Sun Life of Canada (Canada, U.S.)

After demutualization, Sun Life of Canada will continue to maintain the worldwide participating account and the Canadian and U.S. territorial participating accounts. Sun Life of Canada will also establish and maintain the "Shareholders' Account", which will include the accounts in respect of the Canadian and U.S. non-participating businesses.

Within each of the Canadian and U.S. territorial participating accounts, Sun Life of Canada will establish and maintain two separate sub-accounts as follows:

i) A sub-account in respect of pre-demutualization participating policies in the Canadian and U.S. territorial participating accounts, called the "Pre-Conversion Participating Sub-Account", and

ii) A sub-account in respect of all post-demutualization participating policies in the Canadian and U.S. territorial participating accounts, called the "Post-Conversion Individual Participating Sub-Account".

Furthermore, within each of the Canadian and U.S. Pre-Conversion Participating Sub-Accounts, Sun Life of Canada will establish and maintain two separate sub-funds as follows:

i) A sub-fund to manage and protect reasonable expectations in respect of future dividends on pre-demutualization individual participating policies, called the "Pre-Conversion Individual Participating Closed Sub-Fund".

ii) A sub-fund, called the "Pre-Conversion Ancillary Participating Sub-Fund", in respect of the remaining obligations associated with participating policies written prior to demutualization. These include:

- provisions for adverse deviations on policies in the Pre-Conversion Individual Participating Closed Sub-Fund,
- amounts on deposit for policies in the Pre-Conversion Individual Participating Closed Sub-Fund, and
- group participating policies written prior to demutualization.

At demutualization, assets from the Canadian and U.S. territorial participating accounts will be allocated to the Canadian and U.S. Pre-Conversion Participating Sub-Accounts to provide for the contractual obligations and reasonable expectations with respect to future dividends and other non-guaranteed policy benefits for the policies in the sub-accounts. The remaining assets of the Canadian and U.S. territorial participating accounts will be transferred to the Shareholders' Account. Then assets from the Shareholders' Account will be transferred to the Canadian and U.S. Post-Conversion Individual Participating Sub-Accounts to support future participating business expected to be written in those sub-accounts.

The Conversion Plan outlines procedures and controls on the future operation of the restructured accounts which are designed to protect contractual obligations and reasonable expectations in respect of future dividends and other non-guaranteed policy benefits, for participating policies in force at demutualization. The objective of these provisions is that, for those policies, the policy benefits and future dividends will be similar to what they would have been had the demutualization not occurred. The following is an explanation of how this objective is accomplished.

#### 3.3.1.1 Protecting Future Dividends

The Pre-Conversion Individual Participating Closed Sub-Funds are specially designed to protect future dividend levels. The sub-funds will include all policies that require protection of future dividend levels, which are the individual participating life insurance policies with discretionary dividends that are in force at demutualization. A small number of other participating policies will also be included in the sub-funds for practical reasons.

The initial amount of assets to be allocated to the Pre-Conversion Individual Participating Closed Sub-Funds will be determined to be sufficient to provide for all contractual obligations (other than deposit liabilities which are provided for in the Pre-Conversion Ancillary Participating Sub-Fund) and reasonable expectations in respect of future dividends and other non-guaranteed policy benefits on the policies in the sub-funds.

The Company's dividend policy for the Pre-Conversion Individual Participating Closed Sub-Funds will specify that dividends will reflect the emergence of earnings in the Pre-Conversion Individual Participating Closed Sub-Funds, so as to exhaust the assets over the lifetime of the business while avoiding a material surplus or deficiency in those sub-funds. This is consistent with past dividend setting practices, where dividends change with changes in experience.

All profits earned by the Pre-Conversion Individual Participating Closed Sub-Funds will accrue exclusively to the benefit of the policies in those sub-funds. The Company will not be permitted to transfer assets out of the Pre-Conversion Individual Participating Closed Sub-Funds for reasons other than to pay policy benefits, expenses, and taxes of the sub-fund.

As an additional protection, the Conversion Plan will stipulate that the Pre-Conversion Individual Participating Closed Sub-Funds not be allowed to fall into a deficit position. That is, if the Appointed Actuary determines that the best estimate liabilities of a Pre-Conversion Individual Participating Closed Sub-Fund are greater than the assets in the sub-fund, then sufficient assets will be transferred into the sub-fund to make up the difference.

The Conversion Plan also sets out rules for the future allocations of investment income, expenses and taxes to the Pre-Conversion Individual Participating Closed Sub-Funds. The allocation methods are essentially the same as those used prior to Conversion for investment income, and taxes. Expenses will be set at their pre-demutualization levels and indexed with inflation as measured by an appropriate index. These rules have been developed to ensure that these sub-funds receive a fair and equitable proportion of total Company investment income, expenses and taxes.

After demutualization, provisions for future costs associated with claims under the Market Conduct Settlements will be held in the Shareholders' Account. This ensures that the risk that actual costs are different from estimated costs will be borne by the shareholders, and not the participating policyholders.

The separation of pre-demutualization individual participating policies in the Pre-Conversion Individual Participating Closed Sub-Funds protects those policies by ensuring that future dividend levels will not be affected by profits or losses on any other business outside the sub-funds.

Assets equal to the actuarial provision for adverse deviations on pre-demutualization individual participating policies will be allocated to the Pre-Conversion Ancillary Participating Sub-Funds. These assets provide an additional layer of protection in the participating account to support the policies in the Pre-Conversion Individual Participating Closed Sub-Funds.

#### 3.3.1.2 Protecting Other Policy Benefits

The Conversion Plan specifies that amounts on deposit for pre-demutualization individual participating policies will accrue interest in a manner consistent with the past practices of Sun Life of Canada for setting credited rates of interest on amounts on deposit.

Pre-demutualization participating policies which do not require the dividend protections of the Pre-Conversion Individual Participating Closed Sub-funds (primarily participating group policies) will be allocated to the Pre-Conversion Ancillary Participating Sub-Funds. These sub-funds will be allocated assets equal to the associated actuarial liabilities on the policies in the sub-funds.

#### 3.3.1.3 Support for Post-Demutualization Participating Policies

The Conversion Plan also contains provisions to support participating policies sold by Sun Life of Canada after demutualization.

The initial amount of assets to be allocated to the Canadian and U.S. Post-Conversion Individual Participating Sub-Accounts is based on assumptions of future experience (such as mortality, lapses, expenses, dividends, taxes, and investment income) and the estimated level of sales of participating business according to the Company's most recent business plan. Testing shows that the initial amount will be sufficient to support at least five years' of new participating business under various realistic scenarios of future experience and future levels of sales.

### 3.3.2 Philippines

The pre-demutualization policies in Sun Life of Canada's Philippines branch will be reinsured, on an indemnity reinsurance basis, with Sun Life Philippines. However, the nature of indemnity reinsurance is such that the ceding company (Sun Life of Canada) continues to be the primary obligor to the policyholders. Accordingly, the indemnity reinsurance agreement requires Sun Life Philippines to set up the same participating account structure as for Sun Life of Canada in respect of pre-demutualization policies in Sun Life of Canada's Philippines branch, namely accounts to mirror the Pre-Conversion Individual Participating Closed Sub-Fund and Pre-Conversion Ancillary Participating Sub-Fund.

The establishment and future operations of the Pre-Conversion Individual Participating Closed Sub-Fund and the Pre-Conversion Ancillary Participating Sub-Fund are subject to the same rules and requirements as the analogous sub-funds in Canada and the U.S.. Expense charges to the closed fund will be limited when

cumulative inflation increases exceed the cumulative pre-tax investment return on the portfolio of assets backing those liabilities. Therefore, future dividends and other policy benefits are protected as described under Sun Life of Canada (Canada, U.S.) above.

3.3.3 United Kingdom

The transfer of the U.K. and related insurance business of Sun Life of Canada to Sun Life U.K. is subject to regulatory and court approval in the United Kingdom and elsewhere and the approval of the Canadian Minister of Finance. Court approval has been obtained for the U.K. transfer. The transfer incorporates provisions to protect reasonable expectations in respect of future bonuses and other non-guaranteed policy benefits for those policies written prior to demutualization.

A separate "with-profit" sub-fund will be established for participating business, and a set of "Principles of Financial Management" have been agreed which stipulates how future bonuses will be determined for transferred policies.

Sun Life's U.K. branch business currently includes a separate sub-fund comprising the participating business transferred from Confederation Life under a separate transfer on December 31, 1994. This business will be maintained as a separate sub-fund in Sun Life U.K., on the same terms and with the same assets as currently held in Sun Life of Canada's U.K. branch.

3.3.4 Hong Kong

The transfer of the Hong Kong business of Sun Life of Canada to Sun Life International requires Hong Kong and Canadian regulatory approval and the approval of the Hong Kong High Court. The transfer will incorporate provisions to protect reasonable expectations in respect of future bonuses and other non-guaranteed policy benefits, and to meet contractual obligations, for those policies written prior to demutualization.

Sun Life International will contain a long-term business fund for its insurance business, and a shareholder account. A separate part of the long-term business fund will be established to protect the transferred participating policies.

### 3.4 Alternative Arrangements

If at the time of demutualization, the planned transfer to a subsidiary of Sun Life of Canada of insurance business in Hong Kong, Ireland or the Channel Islands has not taken place, Sun Life of Canada, rather than the subsidiary, will establish and maintain the special arrangements designed to protect reasonable expectations of future policy dividends and other non-guaranteed policy benefits, and to meet contractual obligations, under participating policies issued before demutualization in the jurisdiction. Those arrangements will be structured on a basis determined by the Appointed Actuary with the approval of OSFI and will remain in place pending completion of the transfer of insurance business.

## 4. FINANCIAL STRENGTH AND VITALITY OF THE COMPANY AND POLICYHOLDER SECURITY

### 4.1 Introduction

In reviewing the effect of the conversion on the future financial strength and vitality of the company, I examined the capital of the company and the ratio of the company's available capital to the required capital (the "MCCSR" ratio), as projected over a suitable period under a variety of adverse scenarios. The security of policyholders can be gauged by examining the financial strength and vitality of the company that is the primary obligor to the policyholders.

Such a review is similar to the annual Dynamic Capital Adequacy Testing ("DCAT") performed by Sun Life of Canada, and therefore a good starting point is the most recent DCAT testing performed by Sun Life of Canada.

### 4.2 DCAT and Company Strength

In performing the required annual DCAT testing, the Company has developed actuarial and financial models of each business unit in each territory. These models are used to project the Company's future financial condition under a number of different scenarios. The "base case" scenario projections are consistent with the most

recent Company business plans presented to the Board. In addition, a variety of adverse scenarios are tested, in order to gain insight into the sensitivity of the Company's capital position to various plausible adverse events.

The most recent DCAT testing was presented to the Board in December 1998. That testing confirmed that in its current form as a mutual company, Sun Life of Canada is a strong, well-capitalised financial institution capable of withstanding significant adversity. The Company's MCCSR ratio stood at 285% at December 31, 1998, and was shown under a wide variety of plausible adverse scenarios to remain well above the internal minimum of 175% which is documented in the Company's Capital Management Policy.

### 4.3 Conversion Plan Features

Following demutualization, Financial Services will in effect inherit directly or indirectly all the assets and liabilities of Sun Life of Canada, and therefore Financial Services will inherit Sun Life of Canada's financial strengths and attributes. Therefore, there is no need to repeat the adverse scenario testing for Financial Services.

However, "base case" scenario projections of Financial Services were carried out, to take into account the effects of the reorganization and conversion, including:

- the development of a holding company structure and associated capitalisation and ongoing expenses,
- projected shareholder dividends,
- changes in taxes when changing from a mutual company to a stock company,
- the corporate reorganization of the insurance business (see sections 3.2 and 4.4),
- the restructuring of the participating and non-participating accounts, and
- estimated costs of the demutualization itself.

The base case projections show that for the Sun Life of Canada group as a whole, financial strength and security will not be materially changed by the conversion. In particular, the MCCSR ratio of Financial Services is projected to be 257% at Dec 2001, which compares well against the 280% as projected in the prior DCAT testing for Sun Life of Canada, when one allows for the difference in starting point of the two projections and the subsequent events between the two. I consider the change in the MCCSR ratio to be immaterial for the Sun Life of Canada group as a whole. Moreover, financial strength and security is enhanced by the increased ability of the converted company to raise new capital as a stock company.

#### 4.3.1 Allocation and Distribution of Demutualization Benefits

Demutualization benefits distributed to eligible policyholders will be primarily in the form of common shares of Financial Services. This has the advantage of not reducing the Company's surplus, and therefore the issuance of such common shares is neutral to the financial strength of the company and the security of policyholders.

For policyholders who receive demutualization benefits in cash or policy credits, common shares in the amount of their allocation will either be sold directly in the IPO or re-purchased by Financial Services with a corresponding amount to be sold in the IPO. If there is insufficient demand for those shares in the IPO, there are "scale back" rules in the plan that ensure that the funds required to provide necessary cash payments and policy credits do not exceed the cash raised in the IPO. The net result is that those cash payments and policy credits will not have a material impact on financial strength and security.

### 4.4 Reorganization of the Insurance Businesses

In this section we examine the effect of the reorganization of the insurance businesses (see section 3.2) on policyholder security.

#### 4.4.1 Policyholders Remaining in Sun Life of Canada

Sun Life of Canada is currently the obligor to policyholders in respect of all policies it has issued in all jurisdictions.

After the transfers of business and related assets to Sun Life U.K. and Sun Life International, Sun Life of Canada will cease to be the obligor to the transferred policyholders, and the assets of Sun Life of Canada will no longer be available to meet the obligations under those policies. The remaining assets of Sun Life of Canada, including the shares of its subsidiaries, will continue to be available to meet the obligations of Sun Life of Canada under the policies that have not been transferred (primarily the Canadian, the United States and "other"[(2)] business). In fact, the position of policyholders remaining in Sun Life of Canada will be slightly improved, in that their interest in the transferred business will be more liquid than before conversion.

### 4.4.2 Policyholders Transferring to Sun Life U.K.

Sun Life U.K., a wholly-owned subsidiary of Sun Life of Canada, is a domestic United Kingdom company and has as its principal solvency regulator the United Kingdom insurance regulator.

The transfers of businesses to Sun Life U.K. has been reviewed by Sun Life of Canada's local U.K. appointed actuary and the U.K. and Canadian independent actuaries. The reports of those actuarial reviews are available to policyholders. The reports include discussion of the impact of the transfer on the interests of those policyholders transferring to Sun Life U.K. I have reviewed the actuarial reports and concur with the opinions therein regarding the security of policyholders transferring to Sun Life U.K.

In support of the opinion of Sun Life of Canada's local U.K. appointed actuary, I observe that from a Canadian perspective, the policyholders being transferred from Sun Life of Canada to Sun Life U.K. will become policyholders of a company with a similar MCCSR ratio to that of Sun Life of Canada.

### 4.4.3 Policyholders Transferring to Sun Life International

Sun Life International, a newly created wholly-owned subsidiary of Sun Life of Canada, has as its principal solvency regulator the Hong Kong insurance regulator.

The proposed transfer of business to Sun Life International has been reviewed by a local independent actuary and a Canadian independent actuary, and in each case copies of those reports will be made available to policyholders. The reports include discussion of the impact of the transfer on the interests of those policyholders transferring to Sun Life International.

I am also the local appointed actuary under the Hong Kong Insurance Ordinance for Sun Life of Canada for the purposes of reporting to the Hong Kong Insurance Authority on solvency matters in accordance with the local Hong Kong accounting and actuarial practice and regulatory guidelines. In that capacity, I concur with the conclusions the two independent actuaries have drawn in relation to the security of the transferring Hong Kong policyholders.

Pro-forma modelling of what Sun Life International's position would have been had the demutualization and transfers taken place December 31, 1998 indicates that Sun Life International would have had a higher MCCSR ratio than that for Sun Life of Canada ignoring the demutualization and transfers. Projections show that under the current business plan for the Hong Kong business and under a variety of plausible adverse scenarios, Sun Life International is expected to be able to meet the Hong Kong solvency requirements without any recourse to capital from Sun Life of Canada for many years into the future.

### 4.4.4 Policyholders Indemnity Reinsured to Sun Life Philippines

Shortly before or as soon as reasonably practicable after demutualization, Sun Life of Canada will transfer the assets of its insurance business in the Philippines (other than its policies) to Sun Life Philippines. At the time of the transfer, Sun Life of Canada will arrange for its policy obligations in the Philippines to be reinsured by Sun Life Philippines through indemnity reinsurance. After that transfer, all new insurance business in the Philippines will be issued by Sun Life Philippines.

Such arrangement does not alter the fact that Sun Life of Canada is a direct obligor to such policyholders. Therefore, the impact of conversion on the security of the Philippine policyholders is identical to that for policyholders who remain in Sun Life of Canada (see section 4.4.1).

---

(2) The "other" territories consist of over 30 jurisdictions, including primarily Bermuda and Malta.

SCHEDULE D

OPINION OF INDEPENDENT ACTUARY

ECKLER PARTNERS LTD.
Actuaries and Consultants

28 September, 1999

Board of Directors
Sun Life Assurance Company of Canada
Sun Life Centre
150 King Street West
Toronto, Ontario
Canada M5H 1J9

Ladies and Gentlemen:

This is the opinion which the *Insurance Companies Act* requires pursuant to subsections 5(1)(a) and (c) of the *Mutual Company (Life Insurance) Conversion Regulations* (the "Regulations") from an independent actuary. This opinion is addressed to the Board of Directors and is also provided for the benefit of Eligible Policyholders.

Unless otherwise indicated, capitalized expressions in this opinion have their meaning in the Conversion Plan of Sun Life Assurance Company of Canada dated 28 September, 1999.

In my opinion, the Conversion Plan

1. provides for Demutualization Benefits and a method to apportion the value of Sun Life of Canada among the Eligible Policyholders which are fair and equitable to Eligible Policyholders,
2. allocates assets to each Pre-Conversion Individual Participating Closed Sub-Fund and to each Pre-Conversion Ancillary Participating Sub-Fund which are expected to be adequate to meet both the contractual obligations under the policies in respect of which it is maintained and the reasonable expectations of their policyholders for dividends and other non-guaranteed benefits,
3. allocates assets to each Post-Conversion Individual Participating Sub-Account which are adequate to support the Participating Policies expected to be allocated to that Post-Conversion Individual Participating Sub-Account after the Effective Date,
4. does not materially adversely affect Sun Life of Canada's future financial strength and vitality or the security of its policyholders, and
5. provides Policy Credits which, as of the date that the Initial Share Price is determined, will be appropriate substitutes for Financial Services Shares.

The following pages are my summary report in respect of the Conversion Plan required by the *Insurance Companies Act*.

Respectfully submitted,

NICHOLAS BAUER
Fellow, Canadian Institute of Actuaries



SL-0319

# 1. SCOPE AND QUALIFICATIONS

## 1.1 The Author

I am an independent consulting actuary in the firm of Eckler Partners Ltd. Neither I nor any of my colleagues has any direct or indirect interest in Sun Life of Canada, nor in any of its subsidiaries.

I am a Fellow of the Canadian Institute of Actuaries. I have been qualified as an actuary for 32 years and have been a consulting actuary for 12 years. My principal consulting activity has always been with respect to insurance and insurance companies. I have been engaged on several occasions to write opinions as independent actuary on corporate transactions, including demutualizations, or to assist in the implementation of such transactions. My firm is being paid a fee for the work supporting this opinion and is entitled to certain rights of indemnification in the event of any litigation that may arise in relation to this opinion.

D

## 1.2 Intended Users

The intended users of this opinion are the Board, the Eligible Policyholders, the Michigan Commissioner, and the Superintendent.

## 1.3 Intended Use

This opinion is written for inclusion in a document called the "Policyholder Information Circular." It is intended to assist users in assessing the Conversion Plan. It should be read in its entirety and with the rest of the Policyholder Information Circular.

## 1.4 Use of the Work of Colleagues

I have been assisted in my work by colleagues in my own firm and, in respect of Sun Life of Canada's U.S. operations, our affiliate firm, Milliman & Robertson, Inc. Neither I nor any of these colleagues own any Eligible Policies.

## 1.5 Use of Sun Life of Canada's Data

In doing my work, I had unrestricted access to management of Sun Life of Canada and to their files and records. The data which I used for my work consist of information, oral and written, which management communicated to me and my colleagues during the course of my work and of the calculations and records supplied to me. I satisfied myself that I could use and rely upon those data.

Formulation and implementation of the Conversion Plan requires massive special research and calculations. Two notable examples are the territorial contribution to surplus analysis – i.e., the analysis of Sun Life of Canada's surplus by territory – and the funding calculations of each Pre-Conversion Individual Participating Closed Sub-Fund (collectively the "Pre-Conversion Individual Participating Closed Sub-Funds") – i.e., the identification of the assets needed to assure that contractual obligations to policyholders and their reasonable expectations for dividends and other non-guaranteed benefits after demutualization will be met. Much of that is fortunately based on data which are regularly used in financial reporting, policy and investment administration, and dividend scale formulation, which are subject to audit committee review, external audit, and regulatory review, and which have stood the test of time.

I can report that the data upon which I relied are sufficient. As to their reliability, I can report that my colleagues and I broadly reviewed the special research and calculations with respect to each territory. I satisfied myself that I could use those data but I did not verify them. I can, however, report that my colleagues and I noticed no defect in them and have no reason to suspect any defect. I can also report that in my opinion the resources, skill, and care which management dedicated to the research and calculations were appropriate.

## 1.6 Currency

Unless otherwise stipulated, all amounts are in Canadian dollars (Can.$). Conversion to or from another currency to Canadian dollars is done at

- exchange rates prevailing on the Eligibility Day, for purposes of allocation of Demutualization Benefits (explained in section 3 of this report), and
- exchange rates prevailing on the relevant date, for all other purposes.

## 2. RELATED TRANSACTIONS

The corporate structure of Sun Life of Canada will be reorganized as part of the demutualization. The Conversion Plan sets out, in section 2.2 of Article 2 and in Article 6, the steps involved in the planned reorganization. It is further explained in Section 8 of the Policyholder Information Circular. Briefly:

- Financial Services has been incorporated under the *Insurance Companies Act* as a wholly owned subsidiary of Sun Life of Canada. At the Effective Time, Financial Services will become the owner of 100% of Sun Life of Canada and in turn will issue common shares which the Conversion Plan allocates to Eligible Policyholders.
- All business of Sun Life of Canada conducted in the U.K., including the business carried on in the Isle of Man, whether through a branch or a subsidiary (other than Sun Life Assurance Company of Canada (U.K.) Limited ("Sun Life of Canada (U.K.)")), will be transferred to Sun Life of Canada (U.K.). Regulatory requirements to effect those transfers include reports from the appointed actuary of Sun Life of Canada (U.K.), and from independent actuaries in each of Canada and the U.K., all recommending that the transfers be approved, and the approval of the High Court of Justice in the U.K. The High Court has now granted its approval. In the case of transfers of business from Ireland, Jersey and Guernsey, the approval of the appropriate court in those jurisdictions is also required.
- The business of Sun Life of Canada, conducted in the Hong Kong branch, will be transferred to a newly created subsidiary of Sun Life of Canada called Sun Life of Canada (International) Limited. That transfer will also require reports of independent actuaries in each of Canada and Hong Kong recommending that the transfer be approved, as well as regulatory approval and the approval of the High Court of Hong Kong. While not a statutory requirement, the Hong Kong appointed actuary has prepared and submitted a commentary on the transfer to the Hong Kong regulator.
- New business in the Philippines will be issued through a newly incorporated subsidiary, Sun Life of Canada (Philippines), Inc. That subsidiary will also take responsibility for the management and administration of the in force business of Sun Life of Canada's Philippines branch as well as service to its policyholders, but in force policies in that branch will continue to be policies of Sun Life of Canada.

The transfers of Sun Life of Canada's policies and business to subsidiaries in the U.K. and Hong Kong will only take place if the demutualization takes place. The ownership rights and interests of the transferring policyholders are thus fully protected. If the proposed demutualization is implemented, then all transferring policyholders who were Eligible Policyholders remain so and fully participate in the distribution of Demutualization Benefits. If not, then there will be no transfers and their current ownership and policyholder rights in Sun Life of Canada as a mutual company continue without change.

The Philippines subsidiary has been incorporated. The reorganization of the Philippines business will occur, subject to regulatory approval, whether or not demutualization takes place, but existing policyholders of Sun Life of Canada in the Philippines are unaffected: they continue as policyholders of Sun Life of Canada.

Consequently, my opinion below that the apportionment of Demutualization Benefits is fair and equitable to Eligible Policyholders applies to all such policyholders, whether or not their policies are transferred to a subsidiary as part of the reorganization.

As to the protection of the contractual obligations to, and reasonable expectations for dividends and other non-guaranteed benefits of, holders of policies that are transferred to subsidiaries, I rely on the favourable opinions of the appointed and independent actuaries and the approval of the transfers by the relevant courts and regulators. The same is true with respect to the overall security of all those policyholders, both eligible and non-eligible, and ongoing service to them.

## 3. ALLOCATION OF DEMUTUALIZATION BENEFITS

Allocation of Demutualization Benefits – which determines how many Financial Services Shares each Eligible Policyholder is allocated – is the most difficult actuarial aspect of demutualization. Everyone agrees on the allocation's goal – fairness and equity – but there is no unique "right" answer. Allocation is moreover a zero-sum game. One cannot say, "this policyholder should get more" without also identifying another policyholder to get less.



D

SL-0321

I have established the criteria listed in subsection 3.1 of this report to test the fairness and equity of the allocation of a demutualizing life insurance company's value among its policyholders. In subsection 3.2 of this report, I explain the criteria and give my opinion on how the Conversion Plan conforms to them.

My opinion does not consider which policyholders should be entitled to an allocation, because the *Insurance Companies Act* determines which policyholders are eligible to participate in the allocation of Demutualization Benefits based upon the Eligibility Date. My opinion considers only the allocation among them.

## 3.1 Criteria

Here are the criteria by which I test the fairness and equity of the allocation of Demutualization Benefits in the Conversion Plan:

A. An insurance company's board of directors, advised by its management, should determine the allocation according to an articulated policy, and with due skill, care, and objectivity.

B. The allocation should be of the insurance company's entire value.

C. The allocation should fairly compensate for what policyholders lose in the demutualization; namely, voting control of the insurance company and the right to share in the insurance company's residual value if it is wound-up. As a corollary, the allocation need provide no compensation for what policyholders do *not* lose in the demutualization; namely, their policyholder reasonable expectations (as set out in section 4 of this report).

D. The allocation should be consistent with the insurance company's established practices for

- territorial or business unit management of its operations,
- attribution of its income and capital among those territorial or business units, and
- determination of policyholder dividends.

E. The allocation should take appropriate account of similarities and differences among policies and their policyholders. As a corollary, the allocation should not unfairly discriminate among policies or policyholders.

F. The allocation should take account of international precedents for life insurance company demutualization to the extent that their satisfactory outcome has created regulatory or policyholder expectation.

G. The allocation formula should be as simple and as uniform among territories and business units as is practical.

H. If the insurance company's value is much greater than what those receiving an allocation have contributed to it, then it is desirable that the allocation in respect of a particular group of similar policies should at least equal what that group has contributed.

## 3.2 Application of the Criteria

Criterion A: *An insurance company's board of directors, advised by its management, should determine the allocation according to an articulated policy, and with due skill, care, and objectivity.*

Sun Life of Canada's articulated policy, embodied in a set of major principles is set forth in section 2.2 of the Appointed Actuary's report (please see Schedule C of the Policyholder Information Circular) and is, in my opinion, reasonable.

Sun Life of Canada engaged me on 23 March, 1998 to serve as Independent Actuary, as required by the Regulations. My colleagues and I have communicated continually with its management since then, so I was able to observe the preparation of the Conversion Plan for consideration by the Board. The research and calculations needed in each territory and in the corporate office were in my opinion adequately resourced and carried out appropriately. Senior management in my opinion considered the policy issues thoughtfully and objectively. I conclude that the Conversion Plan was prepared in accordance with the criterion.

Criterion B: *The allocation should be of the insurance company's entire value.*

"Policyholder reasonable expectations", and what funds need to be retained to meet them, are set out in section 4 of this report.

The Conversion Plan provides that all Eligible Policyholders and only Eligible Policyholders are entitled to an allocation of Financial Services Shares on demutualization. Financial Services Shares are the common shares of Financial Services and collectively represent the ownership of Financial Services.

In the case of a relatively small proportion of Eligible Policyholders, the actual issue of Financial Services Shares would cause tax problems or violate insurance or securities laws. They will receive the equivalent in cash or Policy Credits instead. While Financial Services Shares will be issued to some of them, those shares must be sold on their behalf; they may not retain them. It is expected that those Financial Services Shares will be sold in the Initial Public Offering (also referred to as "IPO") at the Initial Share Price, failing which they will be sold at their market value.

The other Eligible Policyholders may decide among Financial Services Shares, the equivalent in cash or, in the case of Eligible Policyholders whose allocation equals or exceeds 1,000 Financial Services Shares, partly shares and partly cash equivalent. It is expected that the needed cash will be available from the Initial Public Offering, but that is not assured. If the needed cash is not available, then Financial Services Shares will be issued to those policyholders.

The Conversion Plan provides that the equivalent in cash of a Financial Services Share will be equal to the Initial Share Price. Investment bankers retained by Sun Life of Canada have given their opinion on the appropriateness of that equivalent. I have relied on that opinion in giving my opinion in section 7 of this report on the appropriateness of the Policy Credits as a substitute for Financial Services Shares.

The Conversion Plan therefore distributes value to Eligible Policyholders in the form of either Financial Services Shares or an appropriate substitute for Financial Services Shares. When value is distributed as an appropriate substitute, the Financial Services Shares which would otherwise have been issued to Eligible Policyholders may be sold to investors at the Initial Share Price.

In the IPO, Financial Services may issue shares in addition to those allocated to Eligible Policyholders. So long as those additional shares do not exceed ten percent of the Financial Services Shares allocated to Eligible Policyholders, in my opinion no material dilution of the value to be distributed to Eligible Policyholders is likely to occur. Such is expected to be the case.

The Conversion Plan thus allocates the entire value of Sun Life of Canada to the Eligible Policyholders.

Criterion C: *The allocation should fairly compensate for what the policyholders lose in the demutualization; namely voting control of the insurance company and the right to share in the insurance company's residual value if it is wound-up. As a corollary, the allocation need provide no compensation for what the policyholders do not lose in the demutualization; namely, their policyholder reasonable expectations.*

Eligible Policyholders may vote in the election of the Board. Each Eligible Policyholder has one vote, regardless of how many policies he or she owns. In the demutualization, the non-transferred Eligible Policyholders do not lose their votes, but they may vote in the election of only one-third of the Board. The compensation is therefore for loss of voting control, not for loss of vote. That is also true for the transferred policyholders, although they do lose all voting rights on transfer of their policies to a subsidiary of Sun Life of Canada. As noted in section 2 of this report, however, in the opinion of Canadian and local independent actuaries who reviewed and approved the transfers, the interests of transferring policyholders have been appropriately protected despite the loss of voting rights, so that the loss of those minority voting rights is not a material loss to them.

If Sun Life of Canada were wound-up, the Eligible Policyholders would share in its residual value. In the demutualization, they lose that right.

The section of the Policyholder Information Circular entitled "Your Demutualization Benefits" and Article 4 of the Conversion Plan address the allocation of Financial Services Shares.

The Conversion Plan provides for a fixed allocation of 75 Financial Services Shares to each Eligible Policyholder, regardless of the number of policies held, and for a variable allocation to each Eligible Policy of a number of Financial Services Shares which depends on its Cash Value, the number of years it has been in force and its annual premium.

I regard the fixed allocation as compensation for loss of voting control and the variable allocation as compensation for loss of the right to share in residual value. It is appropriate that the fixed allocation be the same to each Eligible Policyholder, since each has one vote and all the votes should be treated as equal. It is appropriate that the variable allocation differ among Eligible Policyholders because they have different customer attachments to, different financial interests in, and different rights to receive surplus distributions from, Sun Life of Canada.

The Conversion Plan allocates about 20% of the shares – hence 20% of value – as fixed, with the remaining 80% being allocated as variable. Is that 20%/80% split appropriate? There is no theoretically correct answer to the question.

There appears, however, to be a consensus among those who have considered the question that the variable allocation, which reflects financial ownership interest, should comprise the larger part and the fixed allocation should comprise the smaller part of the total allocation. I agree with that consensus and the Conversion Plan conforms to it. Among previous international demutualizations the percentage for the fixed allocation has generally ranged from 10% to 30%, so that Sun Life of Canada's 20% is comfortably within that range. There have been two recently completed demutualizations in Canada so far, and altogether three companies (Mutual Life (since renamed Clarica), Manulife and Canada Life) have published their allocation formulae. All three also fall within the indicated range. I conclude that the 20% fixed allocation in the Conversion Plan is appropriate.

For the variable allocation, the Conversion Plan allocates Financial Services Shares to each Eligible Policy as follows:

1. All policies other than Group Insurance Policies

   1.32 shares for each Can.$1,000 of Time-Weighted Cash Value, and

   64 shares for each Can.$1,000 of Annual Premium Measure.

   Time-Weighted Cash Value is the Cash Value multiplied by the number of years, including fractional years, that the policy has been in force in Sun Life of Canada from its issue until the Eligibility Day. For corporate owned Pension Policies only (other than the U.K. individual money purchase pension plan), the number of years that the policy has been in force, taken into account for this purpose, is limited to fifteen. For policies issued by and transferred from another insurer to Sun Life of Canada, the number of years in force is limited to the number of years the policy has been in force in Sun Life of Canada (for a discussion of the reason for this, please see subsection 3.3 of this report).

   Cash Value generally includes everything that the policyholder is entitled to receive on termination of the policy, including dividends on deposit and without deducting any policy loan, but excluding any special maturity dividends or terminal bonuses. For certain plans that do not allow the receipt of a cash value or possess unusually low cash values, an actuarially calculated or increased value will be used as the Cash Value (as set out in Exhibit B of the Conversion Plan).

   Annual Premium Measure is the annual premium stipulated in the policy for the base coverage and those riders that attract dividends (regardless of whether the premium is actually paid annually or more frequently), and is nil if the policy is paid up.

2. Group Insurance Policies

   4.70 shares for each Can.$1,000 of Time-Weighted Annual Premium Measure.

   Time-Weighted Annual Premium Measure is the annual premium paid for life insurance coverages in 1997 (or, if the policy was issued in 1997, what that annual premium would have been had the average monthly premium paid during the period that the policy has been in force in 1997 been paid for all of 1997) multiplied by: five plus the number of years the policy (or a predecessor policy that was participating) has been continuously in force in Sun Life of Canada, including fractional years, but not more than twenty in total.

If the Appointed Actuary of Sun Life of Canada is of the view in any particular case that the Duration, Cash Value or Annual Premium Measure cannot be equitably determined under the rules set out in the Conversion Plan, then the Appointed Actuary will determine a fair and equitable substitute.

The variable allocation description above is simplified. For detail, see Article 4 of the Conversion Plan.

The remainder of this subsection 3.2 sets out my reasons for the view that the allocation formula is fair and equitable to all Eligible Policyholders.

Individual life insurance policies account for 98% of Eligible Policies.

The Conversion Plan allocates 50% of the total distribution based on Time-Weighted Cash Value and 30% based on annual premiums (the balance of 20% being the fixed allocation). Time-Weighted Cash Value takes into account both the current financial interest of the policyholder in Sun Life of Canada and how long that relationship has endured. It is logical to attach greater weight to it than to the annual premium, which relates to the future financial interest that the policyholder is expected to build in Sun Life of Canada.

Since individual insurance policies represent the overwhelming majority of Eligible Policies, it was logical to try to apply the same allocation formula to other policies so long as the resulting allocations conformed to the principles governing the allocation and met the tests of reasonableness applied to the allocation. A variation of the formula was found desirable only in the case of group insurance and group pensions. Here is why:

> Since group insurance has no cash values, direct application of the individual insurance formula would have resulted in failure to recognise the durability of the relationship of the policyholder with the company. Basing the allocation on time-weighted premium overcomes that drawback.
>
> The relationship of group insurance and group pension policyholders to a company is, in general, weaker than that of individual holders of participating policies, because it is more in the nature of customer to supplier than of a sharing of fortunes. Also, premiums tend to grow year by year under in force group policies, contrary to policies purchased by individuals. It is therefore logical to limit the number of years taken into account in the allocation to group policies. It is also logical to reflect future financial interests that the policyholder is expected to build. In my opinion, the limitation of 15 years on past duration and the addition of five years to recognise future financial interests of group insurance policies, are reasonable, fair and equitable in light of the nature of this business.

I conclude that the Conversion Plan strikes a fair balance in compensating Eligible Policyholders for their loss of voting control and their loss of right to participate in Sun Life of Canada's residual value on wind-up.

Criterion D: *The allocation should be consistent with the insurance company's established practices for*

- *territorial or business unit management of its operations,*
- *the attribution of its income and capital among those territorial or business units, and*
- *determination of policyholder dividends.**

That criterion is the most important criterion because the insurance company's established practices have met the test of time and define expectations of the insurance company's future treatment of its policyholders.

Sun Life of Canada's policies are concentrated in the territories of Canada, the U.S.A., the U.K., Hong Kong, and the Philippines. The businesses within each territory include individual life insurance, which consists of participating life insurance (and which includes the vast bulk of Eligible Policies) and non-participating life insurance. Sun Life of Canada's other businesses in the territories consist of individual health insurance, group life and health insurance, individual and group annuities, and non-insurance businesses. They are generally managed by local managements in each of those jurisdictions. Most of the other businesses are non-participating, but there are a few participating (that is, eligible) annuity, group insurance, individual health and group pension policies among them.

---

**References to dividends include references to bonuses, where applicable*

Surplus generated by each territory and, at a more refined level, each business within each territory, is tracked. In addition, a pool of surplus called "core" or corporate surplus is also maintained. Its purpose is to fund new or non-insurance ventures, and to provide additional security and stability to Sun Life of Canada as a whole. The businesses in each territory are expected to make regular contributions to core surplus. In turn, core surplus is available and has been used to support operations in territories when needed due to adverse business conditions or to fund rapid growth.

Sun Life of Canada's primary historical sources of surplus have been its individual participating policies, both those in force and those no longer in force. More recently, successful investment of part of that surplus in other businesses, including non-insurance (mostly asset management) businesses, has produced considerable additional surplus growth.

The allocation formula produces aggregate allocations by territory that are consistent primarily with the proportions of surplus accumulated by the individual participating businesses in those territories, but which also take modest account the proportions of total surplus generated by each territory. The table below compares those proportions with the proportions of total allocations by territory. The last column in the table is weighted territorial surplus, applying weights of 80% and 20% respectively to the individual participating and total territorial surplus proportions.

| | Allocation Formula | Individual Par Territorial Surplus as at Dec 31, 1997 | Total Territorial Surplus as at Dec 31, 1997 | Weighted Territorial Surplus as at Dec 31, 1997 |
|---|---|---|---|---|
| Canada | 35% | 34% | 44% | 36% |
| USA | 31% | 33% | 22% | 31% |
| U.K. | 23% | 19% | 28% | 21% |
| Others | 11% | 13% | 5% | 11% |
| Total | 100% | 100% | 100% | 100% |

Note: columns may not add due to rounding

Sun Life of Canada's dividend policy distributes surplus generated by in force Participating Policies partly in the form of annual dividends and partly in the form of special maturity dividends or terminal bonuses (the practice differs by territory).

The formulae for special maturity dividends and terminal bonuses, which reflect the surplus accumulated during the lifetime of the policy and not distributed in the form of annual dividends, are similar to the Time-Weighted Cash Value component of the variable allocation. They depend on the cash value of the policy at time of termination and on the number of years the policy has been in force. The Time-Weighted Cash Value component of the variable allocation is therefore consistent with Sun Life of Canada's historical dividend practices.

Because the special maturity dividends and terminal bonuses themselves reflect a distribution of accumulated surplus it is logical to exclude them from the Cash Value used in the allocation formula.

In my opinion, the allocation formula proposed by Sun Life of Canada is consistent with its established practices for the management of its businesses in the territories, with the way it has allocated and managed its surplus, and with the way it has determined policy dividends, including special maturity dividends or terminal bonuses.

Criterion E: *The allocation should take appropriate account of similarities and differences among policies and their policyholders. As a corollary, the allocation should not unfairly discriminate among policies or policyholders.*

One would expect, for example, a similar allocation to two policies in a territory or business unit having similar policy characteristics, such as plan of insurance, size, and duration in force. One would likewise expect a larger allocation to a larger, or older, or more expensive policy than to an otherwise similar smaller, newer, or less expensive policy.

In the Conversion Plan, the variable allocation to an individual Eligible Policy is determined with reference to its Time-Weighted Cash Value, and its Annual Premium Measure. The variable allocation to a

group Eligible Policy is consistent with that to an individual policy, with the formula having been modified to the extent necessary to preserve fairness. The Conversion Plan therefore plainly distinguishes among policies in a way which is fair and logical.

Criterion F: *The allocation should take account of international precedents for life insurance company demutualization to the extent that their satisfactory outcome has created regulatory or policyholder expectation.*

Precedents are relevant if they define policyholder or regulatory expectation. There were no Canadian precedents when Sun Life of Canada was developing its allocation formula. Four Canadian based demutualizations were going forward concurrently with Sun Life of Canada's, so none was a precedent for the others. Three of them have now published their allocation formula (shortly before Sun Life of Canada) and two have actually completed their demutualizations. All three have adopted the "policy metrics" method for allocation of value.

In the last ten years, there have been several demutualizations in the U.S.A., the U.K., Australia, and, most recently, South Africa. They are precedents.

The fixed allocation in those precedents similar to the fixed allocation under the Conversion Plan has ranged from 10% to 30% of total value. At 20%, the Conversion Plan conforms to precedent.

The variable allocation in those precedents is by the so-called "contribution method" for U.S. based insurance companies and according to policy metrics for U.K., Australian, or South African based insurance companies. The explanation for the difference in method may be that a mutual life insurance company based in the U.S.A. tends to operate differently from a mutual life insurance company in the other countries.

A U.S. based mutual life insurance company tends not to do business outside the U.S.A. and not to sell non-participating policies. Its sale of non-participating policies is forbidden or limited in many states.

A U.K., Australian or South African based mutual life insurance company is the opposite. It tends to do business internationally. It sells non-participating policies. In recent years especially, sales of non-participating policies exceed sales of participating policies in many mutual life insurance companies.

In those respects, Sun Life of Canada and other Canadian mutual life insurance companies are unlike U.S. mutual life insurance companies and like mutual life insurance companies in the other countries, so that the latter precedents are relevant, and the former precedents are much less relevant, for a Canadian demutualization.

In the U.S. contribution method, the variable allocation to a policy is proportional to that policy's contribution to the insurance company's capital, or alternatively, to the sum of that policy's contribution to the insurance company's capital plus the present value of its expected future contribution to the insurance company's capital if the insurance company does not demutualize.

In the non-U.S. method, the variable allocation is proportional to policy metrics. Policy metrics are simple, accessible policy attributes like cash value, premium, death benefit, and number of years in force. Policy metrics measure the policyholder's financial interest in the insurance company - for example, the policyholder relies on the insurance company for eventual payment of death benefit or cash value. They also measure the policyholder's attachment to the insurance company as a customer. Allocation by policy metrics is a logical choice when the insurance company's capital and value are materially larger than the contribution thereto by its Eligible Policies. This is the case for Sun Life of Canada.

The variable allocation in the Conversion Plan is according to policy metrics and takes appropriate account of relevant (non-U.S.) international precedents. One feature of Sun Life of Canada's variable allocation that is relatively new is the use of Time-Weighted Cash Value, a combination policy metric. As noted previously, however, it is consistent with Sun Life of Canada's dividend and surplus management practices.

Sun Life of Canada has also calculated the historical and expected future contributions to surplus of groups of Eligible Policies, in a manner similar to the U.S. contribution method, and found that the proposed allocation is expected to exceed the contribution for all but a small number of policies. This is explained below, under criterion H.

In my opinion, the Conversion Plan takes proper account of international precedents for life company demutualization.

Criterion G: *The allocation formula should be as simple and as uniform among territories and business units as is practical.*

Fairness and equity do not inherently require a simple or a uniform allocation formula, but simplicity and uniformity help policyholders to understand the allocation and to form a perception of its fairness and equity.

The Conversion Plan's fixed allocation is truly simple. It is uniform among Eligible Policyholders and will be seen to conform to the one-person-one-vote precept.

The Conversion Plan's variable allocation is essentially according to policy metrics, and therefore inherently simple - much simpler than the inherently complicated U.S. contribution method for a variable allocation. The allocation formula is uniform among territories and as uniform as possible by type of policy.

In my opinion, therefore, the Conversion Plan's allocation is as simple and as uniform as considerations of fairness and equity permit.

Criterion H: *If the insurance company's value is much greater than what those receiving an allocation have contributed to it, then it is desirable that the allocation in respect of a particular group of like policies should at least equal what that group has contributed.*

I list this criterion last because I consider it desirable but not essential.

I begin by noting an important practical constraint in the application of the criterion. To calculate what a policy "has contributed to the insurance company's value" can be done only for groups of policies and then only approximately. The calculation is moreover complicated, time-consuming, and demanding of resources. The practical constraints must therefore be accepted.

Sun Life of Canada has carried out the contribution calculations as accurately as possible. It was found that the individual Eligible Policies have contributed less than 10% of Sun Life of Canada's total book value. No calculation was done to ascertain the corresponding contribution of eligible group insurance, group pension and individual health policies, but it can easily be inferred by inspection of the volume of such Eligible Policies that their aggregate contribution is small compared to that of individual Eligible Policies. Consequently, the condition for the criterion applies.

A detailed comparison of those contributions to the expected value of the corresponding Financial Services Shares allocated shows that the value of the allocations is expected to exceed the contributions for over 98% of Eligible Policies. That comparison is based on an Initial Share Price of Can.$14, which is at the lower end of the valuation range described in the Policyholder Information Circular. Therefore, based on this price, I conclude that even though Sun Life of Canada did not include this criterion among the principles governing its allocation, nonetheless the criterion has been met.

### 3.3 Acquisitions

Sun Life of Canada's Eligible Policies comprise mainly those issued on its own paper but also include policies resulting from the acquisitions of blocks of business from other insurers. We have to consider the question: should the allocation formula for Eligible Policies be modified for those originally issued by another insurer? The Conversion Plan makes one, and only one, such modification by recognising only the number of years the policy has been in force in Sun Life of Canada (as opposed to from its original date of issue) for purposes of the time-weighted factors in the variable component of the allocation formula.

There were three transactions concluded before the Eligibility Day, that resulted in the transfer of policies that are Eligible Policies (as well as other policies) from other companies to Sun Life of Canada. The transactions related to the acquisition of:

- the U.K. branch of Confederation Life Insurance Company ("Confederation Life"), acquired in 1994,
- the Canadian group life and health business of The Prudential Group Assurance Company of England (Canada) ("Prudential"), and
- the Canadian business of Teachers Insurance and Annuity Association ("TIAA").

*Policies acquired from Confederation Life*

The acquired policies contributed no surplus to Sun Life of Canada. In the words of the U.K. independent actuary, commenting in 1994 on the transaction: "The transferred assets will be held by the U.K. branch of Sun Life of Canada within a separately identified account (the "Fund"). All the surplus within the Fund will accrue to the benefit of the transferred policyholders." The Fund, which holds the assets of the Confederation Life policyholders, will continue unaffected when those policies are transferred to Sun Life of Canada (U.K.).

Because all assets transferred to Sun Life of Canada must be used exclusively for the benefit of the acquired policies, any contribution of those policies to the value of Sun Life of Canada (or Sun Life of Canada (U.K.) after demutualization) has arisen and will arise only from realised expense efficiencies. There have been no commitments of any kind made to the transferred Confederation Life policyholders beyond the safeguarding of their guaranteed obligations and policyholder reasonable expectations.

Since these policies contributed no surplus to Sun Life of Canada at time of their acquisition, it is entirely reasonable that the time that they have been in force be calculated from the date of their transfer to Sun Life of Canada. I therefore conclude that the treatment of the transferred Confederation Life policyholders who are Eligible Policyholders is fair and equitable.

*Other transferred policies*

Policies acquired from TIAA and from Prudential were acquired in commercial arm's-length transactions. No surplus was transferred to Sun Life of Canada in connection with them.

Since these policies contributed no surplus to Sun Life of Canada at the time of their acquisition, it is entirely reasonable that the time that they have been in force be calculated from the date of their transfer to Sun Life of Canada. I therefore conclude that the treatment of the transferred Prudential and TIAA policyholders who are Eligible Policyholders is fair and equitable.

### 3.4 Conclusion

In my opinion, the Conversion Plan conforms to the criteria and therefore provides for Demutualization Benefits and a method to apportion the value of Sun Life of Canada which are fair and equitable to Eligible Policyholders.

## 4. PARTICIPATING ACCOUNTS

Participating policyholders are both owners and customers of their mutual life insurance company. Both the ownership and customer interest terminate at termination of the policy. The intent of demutualization is to separate those interests, by converting the ownership interest to shareholding, but leaving the customer interest – that is, the policy – unchanged.

The customer interest is defined by "policyholder reasonable expectations", which are that the demutualized insurance company will meet its guaranteed obligations under all of its policies and, in the case of participating policies, also pay policy dividends and other non-guaranteed benefits which are expected to be as favourable as what it would have paid if it had not demutualized. In section 6 of this report, I opine on Sun Life of Canada's ability to meet those guaranteed obligations. In this section, I deal with policy dividends.

Payment of policy dividends in a mutual life insurance company is governed by regulation and accepted actuarial practice, but is largely at the discretion of its board of directors. The policyholders, however, elect the board. After demutualization, the shareholders elect the majority of the board. In the case of subsidiary companies, the shareholders elect all of the directors. Formal structure, which helps assure policyholder reasonable expectations, therefore seems desirable in the demutualized insurance company, and in any subsidiaries to which Eligible Policies and non-eligible participating policies (those issued or reinstated after the Eligibility Day but before Conversion) have been transferred.

The Conversion Plan separately earmarks funds within each territory where Sun Life of Canada continues to operate called the Pre-Conversion Individual Participating Closed Sub-Fund and the Pre-Conversion Ancillary Participating Sub-Fund, and establishes formal rules for their operation and relationship to the rest of the organization.

At the time of Conversion, and only if Conversion takes place, Sun Life of Canada's business in the U.K. will be transferred to a wholly owned subsidiary, namely to Sun Life of Canada (U.K.) At the time of Conversion, or as soon thereafter as possible, Sun Life of Canada's businesses in the Republic of Ireland,