# EXHIBIT D – RESTRUCTURING AND OPERATION OF PARTICIPATING ACCOUNT

## PART 1 - OPERATING RULES

### 1.1 Allocations to Pre-Conversion Individual Participating Closed Sub-Funds

In order to ensure that the actual experience in respect of mortality, lapse, premium, policy dividends, expenses and taxes is reflected by each Pre-Conversion Individual Participating Closed Sub-Fund, the Post-Conversion Company shall allocate to the Pre-Conversion Individual Participating Closed Sub-Fund in a Territorial Participating Account all amounts in respect of Pre-Conversion Individual Participating Policies in that Territorial Participating Account only, including premiums, payment of policy benefits, payment of cash surrender values, policy dividends, related reinsurance cash flows, expenses and taxes. For greater certainty, the foregoing excludes amounts in respect of Deposit Liabilities. Policies issued by the Post-Conversion Company shall not be recorded in, and the cash flows and liabilities in respect thereof shall not be allocated to, any Pre-Conversion Participating Sub-Account. Sun Life of Canada will provide to the Michigan Commissioner a report prepared by the Independent Actuary confirming that Sun Life of Canada has allocated assets to the Pre-Conversion Individual Participating Closed Sub-Fund maintained in connection with the U.S. Branch in accordance with the requirements of the Plan and in a manner consistent with Actuarial Standard of Practise No. 33. Sun Life of Canada will seek the approval of the Michigan Commissioner to that allocation prior to making it, which approval may only be withheld if the allocation has not been made in a manner consistent with Actuarial Standard of Practise No. 33, as determined by the Michigan Commissioner, and in accordance with the requirements of the Conversion Plan.

### 1.2 Allocation of Investment Income to Pre-Conversion Individual Participating Closed Sub-Funds

(a) The Post-Conversion Company shall allocate to each Pre-Conversion Individual Participating Closed Sub-Fund in each Territorial Participating Account, at the end of each Reporting Period, that proportion of the investment income generated by assets (other than loans on the security of policies) in the Individual Participating Asset Segment of the Territorial Participating Account represented by the ratio of A to B where:

(i) A is equal to the sum of (x) the value of assets (other than loans on the security of policies) allocated to such Pre-Conversion Individual Participating Closed Sub-Fund at the beginning of the Reporting Period, (y) one-half of the aggregate net amount of cash flows and allocations in respect of Pre-Conversion Individual Participating Policies in the sub-fund for the Reporting Period in question, and (z) one-half of the difference, if any, which results when the amount of advances on loans allocated to the Pre-Conversion Individual Participating Closed Sub-Fund during the Reporting Period are subtracted from repayments of such loans during the Reporting Period; and

(ii) B is equal to the sum of (x) the value of all such assets (other than loans on the security of policies) in the Individual Participating Asset Segment of that Territorial Participating Account at the beginning of such Reporting Period, (y) one-half of the aggregate net amount of cash flows and allocations in respect of the Individual Participating Asset Segment for the Reporting Period in question, and (z) one-half of the difference, if any, which results when the amount of advances on loans on the security of Pre-Conversion Individual Participating Policies and Post-Conversion Individual Participating Policies in the Territorial Participating Account during the Reporting Period are subtracted from repayments of such loans during the Reporting Period.

(b) Subject to paragraph (c) below, the Post-Conversion Company shall, at the end of each Reporting Period, allocate to each Pre-Conversion Individual Participating Closed Sub-Fund in each Territorial Participating Account all the investment income generated by loans allocated to the Pre-Conversion Individual Participating Closed Sub-Fund during such Reporting Period.

(c) The Post-Conversion Company shall, at the end of each Reporting Period, with the approval of the Appointed Actuary, adjust the allocation of investment income between the Pre-Conversion Individual Participating Closed Sub-Fund and the Pre-Conversion Ancillary Participating Sub-Fund of each Territorial Participating Account. Such adjustment shall be made in order to offset any

disproportionate investment returns accruing to the sub-funds by reason of the allocation to the Pre-Conversion Individual Participating Closed Sub-Fund, in accordance with section 5.4(a)(i) of the Conversion Plan, for practical reasons, of all assets which are loans on the security of policies.

(d) Should the Post-Conversion Company in future be capable of allocating, and determine to so allocate, assets which are loans on the security of policies between the Pre-Conversion Ancillary Participating Sub-Fund and the Pre-Conversion Individual Participating Closed Sub-Fund of that Territorial Participating Account, then investment income on such assets shall be allocated accordingly, and section 1.2(c) shall not apply.

1.3 Allocation of Expenses

As used in this Part, the following terms and expressions shall have the following meanings:

"acquisition expenses" means the expenses incurred in respect of the sale and servicing of policies consisting of commissions that are paid as a percentage of first year and renewal premiums to agents, brokers and other intermediaries, other agency and brokerage expenses and other expenses directly or indirectly associated with the sale of policies including head office expenses related to the selection and issue of policies and head office marketing and product development expenses; and

"maintenance expenses" means expenses directly or indirectly associated with the servicing and maintenance of policies, such as billing, collection, accounting, actuarial, death claims, and customer service.

The Post-Conversion Company shall allocate to the Pre-Conversion Individual Participating Closed Sub-Fund of each Territorial Participating Account only those acquisition expenses related to the Pre-Conversion Individual Participating Policies in that sub-fund, and no other acquisition expenses will be allocated to the Pre-Conversion Individual Participating Closed Sub-Fund.

The Post-Conversion Company shall initially allocate maintenance expenses to the Pre-Conversion Individual Participating Closed Sub-Fund of each Territorial Participating Account based on the best estimate maintenance expense assumptions used in the calculation of the Company's actuarial liabilities as at the last day of the Reporting Period immediately prior to the Effective Date, except that allocations for per policy maintenance expenses will be increased or decreased periodically to reflect inflation in accordance with a recognized index of inflation that the Appointed Actuary deems to be appropriate for such Territorial Participating Account, which index shall initially be the United States Consumer Price Index in the case of the Pre-Conversion Individual Participating Closed Sub-Fund maintained in respect of the U.S. Branch; provided, however, that, in the case of the Pre-Conversion Individual Participating Closed Sub-Fund of the Territorial Participating Account maintained in connection with the Philippines Branch, the allocations for per policy maintenance expenses, determined in accordance with the foregoing, shall not, at any time, be permitted to exceed the lesser of:

(a) the per policy maintenance expenses initially allocated to the sub-fund, as adjusted at that time by the then applicable inflation index; and

(b) the greater of:

(i) the per policy maintenance expenses allocated to the sub-fund immediately prior to that time; and

(ii) an amount calculated at that time as the amount which would result if the per policy maintenance expenses initially allocated to the sub-fund were increased or decreased by a percentage equal to the cumulative pre-tax portfolio investment return of the sub-fund measured from the Effective Date and calculated based on investment allocations to the sub-fund made in accordance with the Operating Rules.

1.4 Allocation of Taxes

(a) The Post-Conversion Company shall allocate current income taxes to each Pre-Conversion Individual Participating Closed Sub-Fund based on the taxable income of such sub-fund and the tax rates in effect at the time.

(b) The Post-Conversion Company shall allocate premium taxes and investment income taxes to each Pre-Conversion Individual Participating Closed Sub-Fund only to the extent such taxes are related to the Pre-Conversion Individual Participating Policies in that sub-fund.

(c) Part I.3 (Tax on Large Corporations) of the Income Tax Act (Canada) shall not be allocated to any Pre-Conversion Individual Participating Closed Sub-Fund.

1.5 Interest Rates on Deposit Liabilities

The Post-Conversion Company shall ensure that Deposit Liabilities accrue interest that is credited in a manner consistent with the practices of the Company prior to the Effective Date.

PART 2 – INVESTMENT POLICIES

The investment policies of the Post-Conversion Company in respect of each Individual Participating Asset Segment of any Territorial Participating Account shall initially be those of the Company for that Individual Participating Asset Segment immediately prior to the Effective Time, as set forth in this Part 2 of Exhibit D. The Post-Conversion Company may revise these policies, from time to time, as it deems appropriate.

2.1 Investment Policy for the Canadian Participating Individual Asset Segment

| | | |
|---|---|---|
| Investment Objectives: | To maximize long-term after-tax investment earnings subject to constraints on asset quality and liquidity, while supporting a market competitive dividend payment and surplus level, with a focus on portfolio total return. | |
| Asset Mix Target: | Cash | 1% |
| | Canada Bonds | 20% |
| | Public Bonds | 19% |
| | Private Bonds | 11% |
| | Mortgages NHA | 3% |
| | Mortgages Conventional | 12% |
| | Real Estate | 18% |
| | Stock | 15% |
| | Non-Canadian Bonds/Equities | 1% |
| | Total | 100% |
| Target Equity Content: | 25-35% | |
| Fixed Income Duration: | | |
| Target: | 7.0 years | |
| Allowable Range: | 5.0-9.0 years | |
| Liquidity: | Moderate liquidity requirements to meet potential withdrawals of amounts on deposit and/or policy surrenders/lapses.<br>Minimum of 10% in cash and liquid bonds. | |
| Credit Risk: | Minimum fixed income quality standard is 1.00 (equivalent to provincial bond rated BBB+ or public/private bond rated A–, A, or A+). | |
| Other: | Foreign investments should match the internal reserves for Bermuda and U.S. dollar liabilities. | |

2.2 Investment Policy for the U.S. Participating Individual Asset Segment

| | |
|---|---|
| Investment Objective: | To maximize the total return on a diversified portfolio over the long term, while providing and maintaining the return necessary to achieve competitive and relatively stable net cost insurance and profitability in the short term. |

| | | |
|---|---|---|
| Asset Mix Target: | Short Term Funds | 1% |
| | Public Bonds | 24% |
| | Private Bonds | 28% |
| | Mortgages | 30% |
| | Synthetic Convertibles | 2% |
| | Real Estate/REIT | 15% |
| | Total | 100% |

Target Equity Content: 17%

Fixed Income Duration:
Target: 6.5 years
Allowable Range: 5.5 to 7.5 years

Liquidity: Moderate liquidity requirements to meet potential withdrawal of amounts on deposit and potential for policy loans.

Credit Risk: Minimum fixed income quality standard is 1.65 (for example, a value of 2 is applied for bonds rated BBB and 1 for bonds rated A).

Other: Forward commitments will be made to manage liquidity, subject to expectations of prospective interest rate levels.

2.3 Investment Policy for Philippines Participating Individual Asset Segment

Investment Objectives: To maximize long-term after-tax investment earnings subject to constraints on asset quality and liquidity, while supporting a market competitive dividend payment and surplus level, with a focus on portfolio total return.

| | | | |
|---|---|---|---|
| Asset Mix Target: | Bonds | Govt. Peso | 42% |
| | | Govt. U.S.$ | 7% |
| | | Corporate Peso | 12% |
| | | Corporate U.S. | 4% |
| | Real Estate | | 5% |
| | Common Stock | | 19% |
| | Cash | Peso | 12% |
| | Total | | 100% |

Target Equity Content: 20%

Fixed Income Duration
Target: 10 years

Liquidity: Minimum of 10% in cash and liquid bonds to meet potential withdrawals and to offset interest rate and political risk.

Credit Risk: Minimum fixed income quality is A or better.

Other: Investments must be eligible under the rules of the Philippine Insurance Commission.

Up to 15% can be held in eligible long-term U.S.$ bonds.

PART 3 - DIVIDEND POLICY FOR PARTICIPATING POLICYHOLDERS

Sun Life Assurance Company of Canada (the "Company") is a company governed by the *Insurance Companies Act* of Canada that was converted from a mutual company into a company with common shares (the "Conversion"). This Dividend Policy applies to individual participating policies issued by the Company before the Conversion in Canada (including Bermuda), the United States of America, and the Philippines, and to individual participating policies issued by the Company after the Conversion.

Participating policyholders of the Company are eligible to receive distributions in respect of their policies, commonly referred to as policy dividends, as declared from time to time by the Board of Directors of the Company in accordance with applicable law.

Individual participating policies issued by the Company before the Conversion in Canada (including Bermuda), the United States of America, and the Philippines are accounted for separately, by territory, from policies issued by the Company after the Conversion. The assets and earnings of this pre-Conversion individual participating business in each territory, as specified by the terms of the Conversion, enure exclusively to the aforesaid individual participating policies in that territory. Distributions of such earnings to shareholders of the Company are not permitted. Dividends on these policies generally reflect changes in the experience of this pre-Conversion individual participating business, by territory, over time, as adjusted to maintain consistency in distribution from one period to another, with the objective of minimizing tontine effects and exhausting the assets of this business over the lifetime of the business.

Dividends on policies issued by the Company after the Conversion are distributed from the earnings of the post-Conversion participating business consisting of those policies. The amount of dividends distributed at any time depends on a number of factors including the experience of the post-Conversion participating business, as adjusted to maintain consistency in distribution from one period to another, the growth of that business, the need to retain a portion of earnings to support that business, and the overall capital adequacy position of the Company. The distribution of any earnings of the post-Conversion participating business to shareholders of the Company is limited by applicable law.

The dividend allocation process followed by the Company in respect of participating policies recognizes the contributions made by the policies to the pre-Conversion or post-Conversion participating business to which they belong. Not all policies contribute to the same extent or at the same time, and there are certain practical limits, legal constraints and prevailing local practices that apply to the allocation in some circumstances. This process seeks to achieve reasonable equity between classes of policies and between generations of policies. In order to determine the contribution of policies, policies are grouped into classes with common experience factors such as mortality, investment return, taxes and administrative expenses.

The dividend scales of the Company are established by the Board of Directors of the Company from time to time, and reviewed at least once each year. Generally, dividends are credited to policies on the anniversary date of a policy. Other dividends called terminal or special maturity dividends may be credited to a policy upon surrender or maturity of the policy, or upon death of the insured. The type of policy, the amount of time it has been in force and the manner of its termination will affect eligibility for, and the amount of, the terminal or special maturity dividend.

The Company may, from time to time, acquire individual participating business from other insurers. This Dividend Policy is intended to apply to such acquired business, subject to the terms and conditions applying to the acquisition.

This Dividend Policy may not be changed for five years following the date of the Conversion. Thereafter, it is subject to change from time to time by the Board of Directors of the Company, subject to applicable law.

PART 4 - ADEQUACY OF PLAN TO MEET CONTRACTUAL OBLIGATIONS AND REASONABLE EXPECTATIONS IN RESPECT OF FUTURE DIVIDENDS AND OTHER NON-GUARANTEED BENEFITS

The provisions of the Conversion Plan are expected to be adequate to meet contractual obligations under the Pre-Conversion Participating Policies and the expectations of the holders of such Policies in respect of future dividends and other non-guaranteed policy benefits for the reasons set forth below.

The Pre-Conversion Individual Participating Closed Sub-Funds are specifically designed to protect future dividend levels. All policies that require protection of future dividend levels will be included in these sub-funds. This includes all individual participating life insurance Policies with discretionary dividends that are In Force up to the day before the Effective Date.

The initial amount of assets to be allocated to the Pre-Conversion Individual Participating Closed Sub-Funds will be determined on a basis expected to be sufficient to provide for all contractual obligations (other than deposit liabilities which are provided for in the Pre-Conversion Ancillary Participating Sub-Fund) and reasonable expectations in respect of future dividends and other non-guaranteed policy benefits on the Policies in the sub-funds (the Pre-Conversion Individual Participating Policies). The starting point for this amount is the present value of future benefits (including annual dividends and terminal dividends) and expenses minus the present value of future gross premiums, assuming that current dividend scales and the experience underlying those scales persists without change. To this a margin has been added, which provides increased confidence that reasonable expectations in respect of future dividends and other non-guaranteed policy benefits on Pre-Conversion Individual Participating Policies will continue to be met.

The Company's dividend policy for the Pre-Conversion Individual Participating Policies will specify that dividends will reflect the emergence of earnings in the Pre-Conversion Individual Participating Closed Sub-Funds, so as to exhaust the assets over the lifetime of the business while avoiding a material surplus or deficiency in those sub-funds. This is consistent with past dividend-setting practices, where dividends change with changes in experience.

All profits earned by the Pre-Conversion Individual Participating Closed Sub-Funds will accrue exclusively to the benefit of the Pre-Conversion Individual Participating Policies. The Company will not be permitted to transfer assets out of the Pre-Conversion Individual Participating Closed Sub-Funds over the lifetime of those sub-funds for reasons other than to pay policy benefits (including policy dividends), expenses, and taxes of the sub-fund.

Furthermore, the Pre-Conversion Individual Participating Closed Sub-Funds will not be allowed to fall into a deficit position. That is, if the Appointed Actuary determines that the best estimate liabilities of a Pre-Conversion Individual Participating Closed Sub-Fund are greater than the assets in the sub-fund, then sufficient assets will be transferred into the sub-fund to make up the difference.

The Conversion Plan also sets out rules for the future allocations of investment income, expenses and taxes to the Pre-Conversion Individual Participating Closed Sub-Funds. These rules have been developed to ensure that these sub-funds receive a fair and equitable proportion of total Post-Conversion Company investment income, expenses and taxes. The allocation methods are essentially the same as those used prior to Conversion for investment income and taxes. Expenses will generally be set based on best estimate assumptions used in the calculation of Sun Life of Canada's actuarial liabilities as at the last day of the Reporting Period immediately prior to the Effective Date and indexed to inflation as measured by a recognized index of inflation which the Appointed Actuary deems to be appropriate. Moreover, the Conversion Plan requires that the Appointed Actuary shall provide from time to time opinions and reports to the regulators as may be required to demonstrate compliance with the Conversion Plan.

Sun Life of Canada has made the commitment that policy dividends will not be adjusted to absorb future costs associated with claims under the Market Conduct Settlements. Therefore, after demutualization, provisions for these costs will be held in the Shareholders' Account. This ensures that the risk that actual costs are different from estimated costs will be borne by the shareholders, and not the Pre-Conversion Individual Participating Policies. When the settlement of a claim under the Market Conduct Settlements involves enhancing future policy benefits or dividends on a Pre-Conversion Individual Participating Policy, sufficient assets will be transferred from the Shareholders' Account into the applicable Pre-Conversion Individual Participating Closed Sub-Fund to cover the resulting increase in the liabilities.

The separation of Pre-Conversion Individual Participating Policies in the Pre-Conversion Individual Participating Closed Sub-Funds protects these policies by ensuring that future dividend levels will not be affected by the pricing or dividend management on Post-Conversion Individual Participating Policies. Furthermore, dividends on Pre-Conversion Individual Participating Policies will not be affected by mortality or lapse experience on Post-Conversion Individual Par Policies, nor by profits or losses on any other business outside the sub-funds.

Pooling of investment experience between Pre-Conversion Individual Participating Policies and Post-Conversion Individual Participating Policies will continue. This is consistent with past dividend setting practices, and helps achieve the objective that future dividends on Pre-Conversion Individual Participating Policies be similar to what they would have been had the Conversion not occurred.

Assets equal to the actuarial provision for adverse deviations on Pre-Conversion Individual Participating Policies are allocated to the Pre-Conversion Ancillary Participating Sub-funds. These assets provide an additional layer of protection in the participating account to support the Pre-Conversion Individual Participating Policies.

The Conversion Plan specifies that Deposit Liabilities associated with Pre-Conversion Individual Participating Policies will accrue interest in a manner consistent with the past practices of Sun Life of Canada for setting credited rates of interest on amounts on deposits. The assets allocated to the Pre-Conversion Ancillary Participating Sub-funds in respect of such Deposit Liabilities will be expected to be sufficient to provide for a continuation of current practices, plus a margin equal to the excess of earned rates over credited rates.

Pre-Conversion Participating Policies which do not require the dividend protections of the Pre-Conversion Individual Participating Closed Sub-funds (primarily Pre-Conversion Participating Policies which are Group Insurance Policies) will be allocated to the Pre-Conversion Ancillary Participating Sub-Funds. These sub-funds will be allocated assets equal to the associated actuarial liabilities on the Policies in the sub-funds. This is sufficient to provide for contractual obligations on such Policies, plus a provision for adverse deviations.

# EXHIBIT E – EXCERPTS FROM BY-LAW OF FINANCIAL SERVICES RELATING TO ISSUANCE OF SHARES

## SECTION 1.

## DEFINITIONS

1.1 Definitions

In this By-law No. 2:

(a) "Act" means the *Insurance Companies Act* enacted by the Parliament of Canada, as amended or replaced from time to time;

(b) "Board" means the Board of Directors of the Corporation;

(c) "Cancellation Time" means 11:59 p.m., Toronto time, on the thirty-fifth month anniversary of the Effective Date;

(d) "Class A Shares" means the Class A Shares of any series in the capital of the Corporation, without nominal or par value, now existing or hereafter created;

(e) "Class B Shares" means the Class B Shares of any series in the capital of the Corporation, without nominal or par value, now existing or hereafter created;

(f) "Common Shares" means the common shares in the capital of the Corporation, without nominal or par value, now existing or hereafter created;

(g) "Conversion Plan" means the conversion proposal of Sun Life as approved by the Minister which constitutes a Conversion Proposal as contemplated by the Act;

(h) "Corporation" means Sun Life of Canada Holdings Corp.;

(i) "Effective Date" means the effective date specified in the Letters Patent of Conversion issued to Sun Life;

(j) "Letters Patent of Conversion" has the meaning ascribed thereto in the Conversion Plan;

(k) "Lost Policyholder" has the meaning ascribed thereto in the Conversion Plan;

(l) "Regulations" means the regulations made under the Act, as amended or replaced from time to time;

(m) "Share Constraint Regime" means the provisions of the Act and the Regulations, if any, which establish rules restricting the purchase or other acquisition, issue, transfer and voting of shares of the Corporation, as those provisions may be amended from time to time; and

(n) "Sun Life" means Sun Life Assurance Company of Canada.

1.2 Interpretation

In this By-law No. 2, the terms "control", "entity", "person" and "significant interest" and all other terms which are not defined herein shall have the meanings ascribed to those terms in the Act.

## SECTION 2.

## AUTHORIZED CAPITAL

2.1 Authorized Capital

The authorized capital of the Corporation consists of:

(a) an unlimited number of Class A Shares issuable in series;

(b) an unlimited number of Class B Shares issuable in series; and

(c) an unlimited number of Common Shares.

SECTION 5.

COMMON SHARES

The Common Shares shall have attached thereto the following rights, privileges, restrictions and conditions:

5.1 Dividends

(a) Subject to the prior rights of the holders of the Class A Shares, the Class B Shares and any other shares ranking senior to the Common Shares with respect to priority in payment of dividends, the holders of Common Shares shall be entitled to receive dividends as and when declared by the Board out of monies properly applicable to the payment of dividends, in such amount and in such forms as the Board may from time to time determine and all dividends which the Board may declare on the Common Shares shall be declared and paid in equal amounts per share on all Common Shares outstanding at the time.

(b) Any dividend (other than a stock dividend) unclaimed after a period of six years from the date on which the same has been declared to be payable shall be forfeited and shall revert to the Corporation.

5.2 Dissolution

In the event of the liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, or any other distribution of the assets of the Corporation among its shareholders for the specific purpose of winding up its affairs, subject to the prior rights of the holders of the Class A Shares, the Class B Shares and any other shares ranking senior to the Common Shares with respect to priority in the distribution of assets in the event of the liquidation, dissolution or winding up of the Corporation, the holders of the Common Shares shall be entitled to receive the remaining property of the Corporation that pertains to shareholders, in equal amounts per share, without preference or priority of one share over another.

5.3 Voting Rights

The holders of Common Shares shall be entitled to receive notice of and to attend all meetings of the shareholders of the Corporation and shall have one vote for each Common Share held at all meetings of the shareholders of the Corporation, except for meetings at which only holders of another specified class or series of shares of the Corporation are entitled to vote separately as a class or series.

5.4 Constrained Shares

(a) On and after the date upon which the Corporation becomes the holding body corporate of a company that has converted from a mutual company into a company with common shares, the Corporation shall not issue or allot any Common Shares to any person, or any entity controlled by a person, the Corporation shall refuse to allow the entry in the securities register of the Corporation of an issue or transfer of any Common Shares to any person, or any entity controlled by a person, and no person, or any entity controlled by a person, shall purchase or otherwise acquire any Common Shares, if such issue, transfer or purchase or other acquisition would cause the person to have a significant interest in the Common Shares. No person who has a significant interest in any class of shares of the Corporation, or entity controlled by a person who has a significant interest in any class of shares of the Corporation, shall, in person or by proxy, exercise any voting rights attached to Common Shares beneficially owned by, or that are subject to agreement pertaining to the exercise of voting rights entered into by, that person, or entity. In accordance with the authority granted to the Board under the Act and the Regulations, the Board is hereby authorized to make such arrangements as the Board deems necessary to carry out the intent of the acquisition, issue, transfer and voting restrictions contained in the Act, the Regulations and the by-laws.

(b) If the purchase or other acquisition, issue, transfer or voting of any Common Shares would be permitted under the Act and the Regulations, notwithstanding the provisions of subsection 5.4(a),

the Board is hereby authorized, in its discretion, to permit by resolution of the Board, any such purchase or other acquisition, issue, transfer or exercise of voting rights with respect to such Common Shares.

(c) Subject to subsection 5.4(d), if, after the date of incorporation of the Corporation, the Share Constraint Regime is amended, replaced or deleted, such that the provisions of subsection 5.4(a) are inconsistent with the Share Constraint Regime resulting from such amendment, replacement or deletion, then the Board is hereby authorized to amend, replace or delete subsection 5.4(a) such that it will be consistent with the Share Constraint Regime then in effect. The action of the Board to amend, replace or delete subsection 5.4(a) shall be by resolution of the Board and such amendment, replacement or deletion of subsection 5.4(a) shall be effective without the approval of the holders of any of the Class A Shares, the Class B Shares or the Common Shares. Promptly following any amendment, replacement or deletion of subsection 5.4(a) by the Board, the Corporation shall give notice to the holders of the Common Shares of the amendment, replacement or deletion thereto.

(d) If, after the date of incorporation of the Corporation, the Share Constraint Regime is amended or replaced and the Share Constraint Regime then in effect allows the Corporation to determine the application to it and its shareholders of all or any part of such Share Constraint Regime then the provisions of subsection 5.4(a) may only be amended or replaced with approval of the holders of the Class A Shares, the Class B Shares and the Common Shares as provided in the Act.

5.5 Amendment With Approval of Holders of Common Shares

The rights, privileges, restrictions and conditions attached to the Common Shares as a class may be added to, changed or removed but only with the approval of the holders of the Common Shares given as hereinafter specified.

5.6 Approval of Holders of Common Shares

The approval of the holders of the Common Shares to add to, change or remove any right, privilege, restriction or condition attaching to the Common Shares as a class may be given in such manner as may then be required by law, subject to a minimum requirement that such approval be given by resolution signed by all the holders of the Common Shares or passed by the affirmative vote of at least two-thirds (⅔) of the votes cast at a meeting of the holders of the Common Shares duly called for that purpose. Notwithstanding anything else in this Section 5, the approval of the holders of the Common Shares, voting separately as a class, is not required on a proposal to amend the by-laws of the Corporation to:

(a) increase or decrease the maximum number of authorized Common Shares, or increase the maximum number of authorized shares of a class of shares having rights or privileges equal or superior to the Common Shares;

(b) effect the exchange, reclassification or cancellation of all or any part of the Common Shares; or

(c) create a new class of shares equal to or superior to the Common Shares.

The formalities to be observed with respect to the giving of notice of any such meeting or any adjourned meeting, the quorum required therefor and the conduct thereof shall be those from time to time required by the Act as in force at the time of the meeting and those, if any, prescribed by the by-laws or the administrative resolutions of the Corporation with respect to meetings of shareholders. On every poll taken at every meeting of the holders of the Common Shares as a class, each holder of Common Shares entitled to vote thereat shall have one vote in respect of each Common Share held.

5.7 Notice to the Holders of the Common Shares

Any notice, cheque or other communication from the Corporation herein provided for shall be sent to the holders of the Common Shares by mail, postage prepaid at their respective addresses appearing on the securities register of the Corporation or, in the event of the address of any such holder not so appearing, then at the last address of such holder known to the Corporation. Accidental failure to give any such notice or other communication to one or more holders of Common Shares shall not affect the validity thereof, but, upon such failure being discovered, a copy of the notice or other communication, as the case may be, shall be sent or

delivered forthwith to such holder or holders. Unless otherwise provided herein, any notice, request, certificate or other communication from a holder of Common Shares herein provided for shall be either sent to the Corporation by mail, postage prepaid, or delivered by hand to the Corporation at its head office.

SECTION 6.

LOST POLICYHOLDERS

6.1 Restriction on Voting Rights

(a) Subject to subsection 6.1(b), no Lost Policyholder shall, in person or by proxy, exercise any voting rights that are attached to the Common Shares issued to such Lost Policyholder.

(b) Subsection 6.1(a) shall cease to apply in respect of a Lost Policyholder once such Lost Policyholder ceases to be a Lost Policyholder in accordance with Section 6.2.

6.2 Confirmation Criteria

A Lost Policyholder shall cease to be a Lost Policyholder at any time from the Effective Date up to and including the Cancellation Time if such Lost Policyholder confirms the current address at which he or she may be reached by mail by: (i) responding to a letter from Sun Life or the Corporation requesting confirmation of the current address; (ii) contacting Sun Life or the Corporation and confirming the current address; (iii) informing Sun Life or the Corporation of a change of address; or (iv) otherwise confirming the current address with Sun Life or the Corporation, in a manner satisfactory to Sun Life or the Corporation.

6.3 Securities Register

From the Effective Date up to and including the Cancellation Time, the Corporation shall record in its securities register the status of a person as a Lost Policyholder. If a Lost Policyholder ceases to be a Lost Policyholder in accordance with Section 6.2, the Corporation shall amend its securities register accordingly.

6.4 Dividends and Distributions

No payments in respect of dividends or distributions declared by the Corporation in respect of the Common Shares issued pursuant to the Conversion Plan shall be made in respect of a Lost Policyholder. However, the Corporation shall pay to a person who ceases to be a Lost Policyholder, in accordance with Section 6.2, all dividends and distributions, without interest and net of any applicable withholding taxes, to which such person was otherwise entitled as a shareholder of record of the Corporation, while such person was a Lost Policyholder. The payment of such dividends or distributions shall be in accordance with the other provisions of this By-law No. 2.

6.5 Cancellation of Shares and Dividends and Subsequent Reissuance

Upon the Cancellation Time, the Corporation shall, for no consideration, cancel all Common Shares issued to Lost Policyholders who remain as such at the Cancellation Time, and all such Common Shares shall be deemed to have been surrendered to the Corporation, together with all entitlements to dividends and distributions thereon, including any proceeds of dissolution pursuant to the Act. Notwithstanding the foregoing, the Corporation shall, from time to time in accordance with the Conversion Plan, subsequent to the Cancellation Time reissue Common Shares and pay an amount in respect of dividends or issue securities or pay cash or other property to a person, as the case may be, whose Common Shares were cancelled in accordance with this Section 6.5.

No amount shall be deducted from, or added to, the stated capital account maintained for Common Shares in respect of the Common Shares cancelled or reissued, respectively, pursuant to this Section 6.5.

# SCHEDULE B

## DEMUTUALIZATION RESOLUTION

## SUN LIFE ASSURANCE COMPANY OF CANADA

## SPECIAL RESOLUTION OF ELIGIBLE POLICYHOLDERS

**Eligible policyholders will be asked to pass the following resolution at the Special Meeting of Sun Life of Canada to be held on December 15, 1999 or any later date to which the meeting may be continued after an adjournment.**

**RECITALS:**

1. Sun Life Assurance Company of Canada proposes to convert from a mutual company to a company with common shares pursuant to the provisions of the *Insurance Companies Act* (Canada) and the regulations under that Act.
2. In order to implement the conversion, Sun Life of Canada has prepared the Conversion Plan, which is described in the Policyholder Information Circular and which is set out in Schedule A to Part 1 of the Policyholder Information Circular.
3. In order to implement the Conversion Plan, Sun Life of Canada is proposing to amend and restate its by-laws to provide, among other things, for the issuance of common shares.
4. For the Conversion Plan to become effective, eligible policyholders of Sun Life of Canada must approve the Conversion Plan and the Minister of Finance of Canada must approve the Conversion Plan and issue Letters Patent of Conversion to effect the Conversion Plan under subsection 237(1) of the *Insurance Companies Act* (Canada).
5. The Conversion Plan, the amended and restated by-laws and the application to the Minister of Finance of Canada for his approval and the issuance of Letters Patent of Conversion must be approved by a special resolution, being at least two-thirds of the votes cast in person or by proxy by eligible policyholders, at a special meeting of Sun Life of Canada called for that purpose.

**RESOLVED** as a special resolution of eligible policyholders of Sun Life Assurance Company of Canada that:

1. The conversion of Sun Life of Canada from a mutual company to a company with common shares, substantially in the manner set forth in the Conversion Plan, is approved.
2. The amended and restated by-laws of Sun Life of Canada, substantially in the form set out in Exhibit A to the Conversion Plan, are confirmed and will take effect on the written approval of the amended and restated by-laws by the Superintendent of Financial Institutions (Canada) and the issuance of Letters Patent of Conversion to effect the Conversion Plan.
3. The board of directors of Sun Life of Canada is authorized to make an application on behalf of Sun Life of Canada to the Minister of Finance of Canada for the approval of the Conversion Plan and the issuance of Letters Patent of Conversion to effect the Conversion Plan.
4. The proper officers of Sun Life of Canada are authorized to execute and deliver any documents and instruments and to do any other acts and things that they may determine to be necessary or desirable to give effect to the Conversion Plan.
5. Notwithstanding that this resolution has been passed, the board of directors of Sun Life of Canada is authorized to withdraw or not to proceed with the Conversion Plan at any time before Letters Patent of Conversion are issued to effect the Conversion Plan.

## SCHEDULE C

## OPINION OF SUN LIFE OF CANADA'S APPOINTED ACTUARY

Sun Life Assurance Company of Canada

**Robert W. Wilson,** FCIA, FSA, MAAA
Vice-President & Appointed Actuary

I, Robert Wilson, am the Appointed Actuary of Sun Life Assurance Company of Canada ("Sun Life of Canada" or the "Company"). I am also the owner of six participating life insurance policies issued by the Company and expect to receive a number of shares in connection with my ownership of these policies upon demutualization.

This is a summary of my report on the Conversion Plan of Sun Life of Canada from a mutual to a stock company required pursuant to Section (5)(1)(a) of the *Mutual Company (Life Insurance) Conversion Regulations* (the "Regulations"). The full version of my report has been filed with the Office of Superintendent of Financial Institutions ("OSFI").

In this report, the terms "conversion" and "demutualization" are used interchangeably.

As required by the Regulations my report addresses three areas: (i) the equity and fairness of the approach to the allocation of demutualization benefits, (ii) the adequacy of the funds in the participating policyholder account to meet contractual obligations and reasonable expectations in respect of future dividends, and (iii) the impact of the conversion on the financial strength of the company and the security of policyholders.

In my opinion:

- the benefits to be provided to eligible policyholders and the method used to apportion the value of the Company among eligible policyholders are fair and equitable to those policyholders;
- the assets which will be allocated to the participating accounts of the Company upon the conversion of the Company are expected to be adequate to:
  - i) meet contractual obligations under the policies in respect of which the participating accounts are maintained,
  - ii) meet the reasonable expectations of the holders of those policies in respect of future dividends and other non-guaranteed policy benefits, and
  - iii) support future participating policies expected to be allocated to those accounts; and
- the future financial strength and vitality of the Company and the security of policyholders will not be materially adversely affected by the conversion.

The following pages comprise my summary report as required by the *Insurance Companies Act* (Canada).

Robert Wilson

Robert W. Wilson
Vice-President & Appointed Actuary

Date: September 28, 1999

TABLE OF CONTENTS


| | Page |
|---|---|
| 1. Scope | 156 |
| 2. Allocation of Benefits to Policyholders | 156 |
| 2.1 Introduction | 156 |
| 2.2 Allocation Principles | 157 |
| 2.3 Fixed Component | 157 |
| 2.4 Individual Life Insurance | 157 |
| 2.4.1 Variable Component | 157 |
| 2.4.2 Tests of Reasonableness | 158 |
| 2.4.3 Consideration of Other Formulas | 159 |
| 2.5 Other Lines of Business | 159 |
| 2.5.1 Application of Formula to Other Lines of Business | 159 |
| 2.5.2 Variable Component (Group Insurance Policies) | 159 |
| 2.5.3 Tests of Reasonableness (Group Insurance) | 160 |
| 2.5.4 Annuities, Pensions, Individual Health and Supplementary Contracts | 160 |
| 2.6 Form of Benefits | 160 |
| 3. Restructuring and Future Operations of the Participating Account | 160 |
| 3.1 Current Structure | 160 |
| 3.2 Corporate Reorganization of the Insurance Businesses | 161 |
| 3.3 Restructuring of the Participating and Non-Participating Accounts | 161 |
| 3.3.1 Sun Life of Canada (Canada, U.S.) | 161 |
| 3.3.1.1 Protecting Future Dividends | 162 |
| 3.3.1.2 Protecting Other Policy Benefits | 163 |
| 3.3.1.3 Support for Post-Demutualization Participating Policies | 163 |
| 3.3.2 Philippines | 163 |
| 3.3.3 United Kingdom | 164 |
| 3.3.4 Hong Kong | 164 |
| 3.4 Alternative Arrangements | 164 |
| 4. Financial Strength and Vitality of the Company and Policyholder Security | 164 |
| 4.1 Introduction | 164 |
| 4.2 DCAT and Company Strength | 164 |
| 4.3 Conversion Plan Features | 165 |
| 4.3.1 Allocation and Distribution of Demutualization Benefits | 165 |
| 4.4 Reorganization of the Insurance Businesses | 165 |
| 4.4.1 Policyholders Remaining in Sun Life of Canada | 165 |
| 4.4.2 Policyholders Transferring to Sun Life U.K. | 166 |
| 4.4.3 Policyholders Transferring to Sun Life International (Hong Kong) | 166 |
| 4.4.4 Policyholders Indemnity Reinsured to Sun Life Philippines | 166 |

## 1. SCOPE

As a Fellow of the Canadian Institute of Actuaries, my report is limited to actuarial matters. Accordingly, my report does not address any legal, accounting, financial, share valuation, commercial or other aspect of the Conversion Plan which is outside the scope of actuarial practice.

Upon the conversion of the Company into a company owned by shareholders, the value of the Company will be allocated among eligible policyholders in the form of common shares of Sun Life of Canada Holdings Corp. ("Financial Services") or cash or policy credits. This report reviews the allocation of these benefits to eligible policyholders, and examines the equity and fairness of the approach used. This report does not consider which policies are eligible, or who is the owner of eligible policies.

This report also reviews the restructuring and future operation of the participating account that will take effect on demutualization. Demutualization separates a participating policyholder's ownership rights in the Company from his or her rights to receive policy benefits and dividends when declared. The primary objective of the restructuring of the participating account is to ensure that contractual obligations and reasonable expectations in respect of future dividends and other non-guaranteed policy benefits are protected for Sun Life of Canada's participating policyholders, and to make adequate support for any future participating policies expected to be allocated to those accounts.

My review of the restructuring of the participating account is limited to consideration of the impact of the demutualization itself on policy benefits and dividends. Policy benefits and dividends could also be affected by other factors unrelated to demutualization, such as changes to the taxes paid by the Company, and these are outside the scope of this report.

Finally, this report reviews the impact of the Conversion Plan on the future financial strength and vitality of the Company and on the security of all policyholders. This review takes place in the context of the corporate reorganization and restructuring that is taking place in conjunction with the demutualization.

## 2. ALLOCATION OF BENEFITS TO POLICYHOLDERS

### 2.1 Introduction

The Regulations require that eligible policyholders receive demutualization benefits in return for giving up their mutual company ownership rights and interests. This section of the report describes the recommended formula for allocating benefits to eligible policies and the reasons why I support that formula.

The description of the allocation formula in this report is simplified. For precise details, see Article 4 of the Conversion Plan.

Sun Life of Canada is a large company, with business in a number of different countries. Although about 98% of the eligible policies are individual life, there are also eligible individual health and annuity policies, and eligible pension and group insurance policies. The nature of the eligible business differs in each country. Given the diversity of eligible policies, the following approach was followed.

1. A set of principles was developed to provide the foundation for the allocation basis.
2. A formula was developed for individual life that both met those principles and also produced results that met a series of reasonableness tests.
3. The formula was then reviewed to see if it could be applied to lines of business other than individual life. This proved to be possible except in the case of group insurance. A second formula was developed for group insurance that also met the principles and passed a set of reasonableness tests.

The formula allocates a certain number of shares of Financial Services to each eligible policyholder. The fairness and equity of the allocation of shares is discussed in sections 2.2 to 2.5. In some cases, shares will not be issued to the policyholder but instead the policyholder will receive demutualization benefits in the form of cash or policy credits. A discussion of the fairnesss of these different forms of demutualization benefits is in section 2.6.

### 2.2 Allocation Principles

The following major principles form the foundation of the formula for the allocation of shares. I consider these principles to be sound. I have satisfied myself that the proposed allocation basis meets these principles.

1. The allocation of value amongst eligible policyholders should be fair and equitable (recognising that there is more than one equitable way of allocating value), and should be perceived to be fair and equitable by as many of those policyholders as practical.
2. As far as is practical and consistent with the other principles, the same allocation formula should apply in all countries, for all types of eligible policies.
3. The allocation of value should comprise:
   - a fixed component (i.e. the same amount for all eligible policyholders) – to compensate for loss of voting control in Sun Life of Canada as a mutual company, and
   - a variable component – to recognize the loss of any other ownership rights in Sun Life of Canada as a mutual company, reflecting the varying financial interests of eligible policies, including their size, length of time in force, contribution to the value of the Company, and their differing rights to receive surplus.
4. The allocation of value should recognize the Company's history and philosophies of conducting business.
5. The allocation formula should be simple, practical to implement, and easy to understand.

### 2.3 Fixed Component

The fixed component of the allocation is 75 shares per eligible policyholder, regardless of the number, size or type of the policies owned. This is to compensate for the loss of voting control in Sun Life of Canada as a mutual company.

In aggregate, this component represents about 20% of the total distribution. I consider this to be satisfactory compensation for the loss of voting control. The fixed component is consistent with the current distribution of voting rights – one vote per voting policyholder, no matter how many or what size or what type eligible policies are owned. Moreover, it is consistent with demutualizations in other countries where this part of the allocation has generally been between 10% and 30% of total shares. The existence of a fixed component also results in each eligible policyholder receiving a reasonable minimum value.

### 2.4 Individual Life Insurance

#### 2.4.1 Variable Component

The formula for allocating shares for all eligible policies other than group insurance policies is:

- 1.32 shares per Can.$1,000 of cash value times duration ("time-weighted cash value"), plus
- 64 shares per Can.$1,000 of annual premium.

I endorse this formula. It meets the principles listed above. Together with the fixed component, it also meets a series of reasonableness tests that are described later. I also describe later (see section 2.5) why a different formula for the variable component for group insurance is appropriate.

***The use of cash value*** provides a good measure of the size of a policy. A policy's cash value is also readily accessible to policyholders. The weighting of cash value by duration provides greater credit to policyholders of long standing, and reflects the past contribution to value made by policies. About 50% of the total shares will be allocated in proportion to time-weighted cash value.

***The use of annual premium*** provides another measure of the size of the policy. Whereas cash value is a retrospective measure, annual premium reflects the ongoing commitment of the policyholder to pay premiums in future years and the future contribution to value. Like cash value, annual premium is also readily available to policyholders. About 30% of all shares will be allocated in proportion to annual premiums (including those of group insurance).

*The 50/30 distribution* of shares between time weighted cash value and annual premium provides a reasonable balance between recently issued policies and those in force for many years, and also results in a good fit with the overall reasonableness tests described later.

*The definition of cash value* is generally the amount the policyholder would have received if the policy had been terminated. It includes dividends on deposit and the cash value of paid up additions, but excludes the cash value of special maturity dividends (SMDs or terminal bonuses). The exclusion is appropriate because these dividends and bonuses would not be considered if a special distribution of surplus was being contemplated. In addition, the amounts are not vested or guaranteed, and their exclusion results in a fairer allocation among countries and among individuals.

*The definition of annual premium* is generally the annual premium for the base policy and those riders that attract dividends. Premiums for other riders are excluded for consistency with the Company's dividend practices – the regular annual dividend does not recognise whether a policy includes these riders or not. Single premiums are also excluded. By their nature, these are contractually non-recurrent, and recognition for past single premiums is given in the time-weighted cash value component. I consider these exclusions to be appropriate.

*The definition of duration* is generally the period of time that the policy has been in force. If business has been acquired from another company, recognition is given only to the period since acquisition by Sun Life of Canada. I consider this to be appropriate because the Company did not earn profits during the period that the policy was in force with the previous company. There are two cases where this has occurred. The largest is a group of about 24,000 U.K. eligible policies acquired from Confederation Life Insurance Company in 1994. There is also a much smaller group of about 180 Canadian eligible policies acquired from Teachers Insurance and Annuity Association of America at the beginning of 1996.

*The effective date for policy values* (cash value, annual premium and duration) is generally January 27, 1998 – the same as the eligibility date. Similarly, any conversion of policy values into Canadian dollars is done using currency exchange rates at the close of business on January 27, 1998. The effect is as if the entire process of allocating shares was done on the night of January 27, 1998, immediately after the announcement that the Board of Directors had instructed management to develop a demutualization plan.

### 2.4.2 Tests of Reasonableness

In addition to confirming that the formula met the principles described earlier, a number of tests were made to check that the results of applying the formula are reasonable.

Firstly, tests were made to *see how the value of shares allocated compared with the contribution to past and future surplus made by groupings of individual life policies*. The groupings were generally by country and year of issue. If each share is assumed to have a value of Can.$14, then the value of shares allocated exceeds the contribution to past and future surplus for over 98% of eligible policies. I consider this a satisfactory result.

Secondly, no significant inequities resulted when performing a series of reasonableness tests for *sample eligible policies*, in particular a comparison of the relative benefits received by:

- policies with different issue ages,
- policies with different issue years,
- different policy types,
- policies with different dividend options,
- different size policies, and
- similar policies issued in different countries.

Thirdly *a comparison was made of the results by country with the distribution of actual surplus* as at December 31, 1997. The allocation of shares by territory is broadly consistent with the distribution of actual surplus in the Company's accounts.

### 2.4.3 Consideration of Other Formulas

A number of different formulas were considered and tested before selecting the recommended formula. This formula was chosen because it met the allocation principles and it provided the best results when performing the reasonableness tests.

In particular, the Contribution to Surplus ("CTS") approach, which has been used as the basis for allocating the variable component of shares in most U.S. demutualizations, has not been used by Sun Life of Canada. The fairness of the method across different territories is questionable because of the significant differences in the type of products written in various countries. Moreover, it is an extremely complicated method and would have been very difficult to explain to eligible policyholders. Further, analysis performed by the Company shows that the contribution made by current eligible policyholders to the value of the Company at the end of 1997 is a very small proportion of the total value. In particular, about a third of eligible policyholders would have received no variable component if a CTS approach had been used. This would have been unacceptable.

## 2.5 Other Lines Of Business

### 2.5.1 Application of Formula to Other Lines of Business

As noted in the introduction, after developing a formula for Individual Life, the formula was reviewed to see if it could be applied to other lines of business. In the case of group insurance, a separate formula was considered appropriate.

Although it would have been preferable to use the same formula for all lines of business in all countries, there are fundamental differences in the nature of the Company's different lines of business, particularly group insurance. Group insurance policies generally have no cash values. The use of the formula for individual life insurance would therefore have given no recognition to how long a group policy had been in force. I considered this unsatisfactory. In addition, group insurance policies do not participate in the same manner as individual participating policies, because the basis and methods used to share profits (e.g. experience rating refunds) are quite different than for participating individual life policies, in particular they are generally based on contractual formulas and are not at the discretion of the board of directors.

### 2.5.2 Variable Component (Group Insurance Policies)

The *formula for allocating shares to eligible group insurance policies* is 4.7 shares for each Can.$1,000 of premium times duration ("time-weighted premium").

I endorse this formula. It meets the major principles described earlier and also results in an appropriate allocation of shares to group insurance policies, both in aggregate and individually.

*The use of premium* recognises the size of the policy and, in most cases, is readily available to policyholders. It is a good measure of a policy's contribution to the value of the Company, both retrospectively and prospectively. The weighting of premium by duration ("time weighted premium") provides greater credit to policyholders of long standing.

*The definition of premium* is generally the 1997 billed premium, excluding any premiums paid for health insurance and Accidental Death and Dismemberment ("A.D.& D."). I consider the exclusion of these premiums to be appropriate since, in all countries except the U.K., if either health insurance or A.D.&D. were sold on a stand-alone basis, the policy would be non-participating and therefore ineligible to receive demutualization benefits. In the U.K. there are a very small number of participating health insurance policies. Credit is given for health insurance premiums only if paid under a participating health insurance policy. To recognise contributions made for paid-up coverages, a deemed annual premium is calculated, roughly equal to the annual premium that would be payable if the coverage was being paid for with annual premiums. Premiums that are reinsured with an insurance company owned or controlled by the policyholder are excluded. In these situations, the net premium is a better reflection of the financial interest of the policyholder in the Company.

*The definition of duration* is the period of continuous participating coverage that a group insurance policyholder has had with Sun Life of Canada (subject to a maximum of 15 years) plus five years. The addition of five years gives recognition to the expected future contribution to value. The maximum of 15 years results in a reasonable balance between policies in force for many years and recent issues – consistent with the formula for individual life. As is the case for individual policies, if business was acquired from another company, the period the policy has been in force is measured from the date of acquisition by Sun Life of