Guernsey and Jersey will also be transferred to Sun Life of Canada (U.K.), and Sun Life of Canada's Hong Kong business will be transferred to Sun Life of Canada (International) Limited. Those transfers are subject to approval by the relevant court in each of those jurisdictions, as well as Canadian regulatory approval. Requests for regulatory approval must be supported by formal opinions of the appointed actuary and of independent actuaries. If any of these approvals has not been received by the Effective Date, the Conversion Plan stipulates that Sun Life of Canada will put alternative arrangements in place to ensure equivalent protection of policyholder reasonable expectations, until such time as the transfers can be effected. The approval of the U.K. court has been obtained. Each of the local and Canadian regulators require independent actuarial reports prepared in accordance with their requirements.

The regulators require, and all reports must confirm, that the security of transferred policyholders and their policyholder reasonable expectations are fully protected. I rely on those regulatory approvals and opinions of independent and appointed actuaries. Therefore, the remainder of this summary report deals only with the interests of policyholders who remain with Sun Life of Canada.

Those policyholders include the Philippines policyholders, whose policies will be administered by a new subsidiary of Sun Life of Canada, Sun Life of Canada (Philippines), Inc. This new subsidiary will undertake to comply fully with the requirements of the Conversion Plan. Moreover, policies issued by Sun Life of Canada in the Philippines continue to be policies of Sun Life of Canada, so the remainder of this summary report fully applies to them.

### 4.1 Pre-Conversion Individual Participating Closed Sub-Funds

The Pre-Conversion Individual Participating Closed Sub-Fund for each territory will be allocated the individual dividend-paying Eligible Policies which will be in force in the territory at the Effective Date and their supporting assets. It will also be allocated individual participating policies issued or reinstated by Sun Life of Canada in the territory after the Eligibility Day but before Conversion and their supporting assets. The territories are Canada (including Bermuda), the U.S.A. and the Philippines.

The amount of supporting assets at the Effective Date is determined so as to meet the contractual obligations to the holders of the policies allocated to the particular Pre-Conversion Individual Participating Closed Sub-Fund, as well as their reasonable expectations with respect to dividends and other non-guaranteed benefits.

After the Effective Date, each of the Pre-Conversion Individual Participating Closed Sub-Funds will be separately accounted for. It will be charged with its benefits, taxes, and dividends, and credited with its premiums and investment income. It will also be charged with expenses fixed at Conversion equal to the best estimate assumptions set by the Appointed Actuary to determine the actuarial liabilities at the end of the immediately prior Reporting Period, except that per policy administration charges will be increased periodically to reflect inflation in accordance with the inflation index generally accepted in each territory. In the Philippines, inflation indexation will be limited so that the cumulative inflation adjustment will not exceed the cumulative investment return on the Philippines Pre-Conversion Individual Participating Closed Sub-Fund.

In the past, depending on territory, policy administration expenses tended to increase in line with or somewhat faster than the applicable rate of inflation, so that fixing the policy administration expense charges, as described, does not cause a reduction in policyholder reasonable expectations.

If (which is unlikely) the actual experience is the same as the assumed experience underlying the current dividend scale, then future dividends can be expected to be at least as high as would have been paid under the current scale of dividends. If the actual experience differs from that assumed experience, then the scale of dividends will be adjusted from time to time, upward or downward, to compensate. Ultimately, all of the funds in each closed sub-fund must be used to pay policy benefits (including dividends) or expenses and taxes properly allocated to them.

Finally, in the unlikely event that at any future time the then closed sub-fund should prove insufficient to fully protect the reasonable expectations of holders of policies allocated to that closed sub-fund, the Conversion Plan mandates that sufficient funds be transferred to it to eliminate the deficiency. As set out in the Conversion Plan, such funds will be transferred first from the corresponding Pre-Conversion Participating Ancillary Sub-Fund, to the extent available, and then from the Shareholders' Account.

In my opinion, therefore, the Pre-Conversion Individual Participating Closed Sub-Funds provide appropriate assurance for policyholder reasonable expectations for dividends and other non-guaranteed benefits.

### 4.2 Pre-Conversion Ancillary Participating Sub-Funds

The Conversion Plan requires that Sun Life of Canada create, in each territory, a sub-account of its participating account which is referred to as the "Pre-Conversion Ancillary Participating Sub-Fund".

The assets of each Pre-Conversion Ancillary Participating Sub-Fund consist of those which

- support participating group policies, dividends and other policy amounts on deposit, which do not require protection by a Pre-Conversion Individual Participating Closed Sub-Fund,
- support, in the case of the Canadian Pre-Conversion Ancillary Participating Sub-Fund, small blocks of participating individual policies of residents in Other Jurisdictions, and
- provide additional security to the Pre-Conversion Individual Participating Closed Sub-Fund policies

but which, to the extent not needed to preserve policyholder reasonable expectations, would not have enhanced dividends in the past and so are not needed in the Pre-Conversion Individual Participating Closed Sub-Fund and may appropriately revert to the shareholders.

Participating Policyholders resident in Other Jurisdictions, whose policies are consequently not included in closed sub-funds, will have their reasonable expectations protected in one of two ways:

- where the nature and circumstances of those policies in a particular territory are sufficiently similar to one of the Principal Jurisdictions, future dividend distributions to them will be directly linked to the dividend scales in the particular jurisdiction, and
- in the few remaining cases the current scale of dividends will be fixed and guaranteed.

The determinations of dividends for group participating policies are contractually stipulated and thus do not require the protection afforded by a closed sub-fund.

Section 1.5 of Exhibit D to the Conversion Plan asserts that past practices in the setting of interest rates paid on amounts on deposit will be continued after demutualization. This affords additional protection to policyholders with dividends or other amounts on deposit.

The Pre-Conversion Ancillary Participating Sub-Funds provide additional assurance that policyholder reasonable expectations will be met, because their assets will revert to shareholders only as they are not needed to meet those expectations.

### 4.3 Operating Rules

The Conversion Plan establishes formal rules for the operations of the Pre-Conversion Individual Participating Closed Sub-Funds (including in particular rules that determine what expenses and taxes may be allocated to each Pre-Conversion Individual Participating Closed Sub-Fund and how the investment income credited to it must be determined) and Pre-Conversion Ancillary Participating Sub-Funds in the years following the Effective Date. The intent of those rules is to safeguard participating policyholder reasonable expectations. The rules are in my opinion appropriate.

The Appointed Actuary will have to report annually to the Superintendent on the operation of the Pre-Conversion Individual Participating Closed Sub-Funds and confirm that they have fully complied with the operating rules.

### 4.4 Conclusion

In my opinion, the Conversion Plan allocates assets to each Pre-Conversion Individual Participating Closed Sub-Fund and to each Pre-Conversion Ancillary Participating Sub-Fund which are expected to be adequate to meet both the contractual obligations under the policies in respect of which it is maintained and the reasonable expectations of their policyholders for contractual obligations, dividends and other non-guaranteed benefits.

## 5. NEW PARTICIPATING POLICIES

Participating Policies sold by Sun Life of Canada after the Effective Date will be allocated to Post-Conversion Individual Participating Sub-Accounts. The *Insurance Companies Act* requires that "seed capital" assets be allocated to each Post-Conversion Individual Participating Sub-Account at the Effective Date in an amount adequate to support policies expected to be allocated to that sub-account. The requirement

applies only to Sun Life of Canada and not to the subsidiaries. The "seed capital", together with interest earned thereon, is expected to revert gradually to the shareholders as the policies in the Post-Conversion Individual Participating Sub-Account become self-supporting.

In my opinion, the Conversion Plan allocates assets to the Post-Conversion Individual Participating Sub-Account which are adequate to support the Participating Policies expected to be allocated to the Post-Conversion Individual Participating Sub-Account after the Effective Date.

## 6. STRENGTH AND VITALITY

Sun Life of Canada is among the highest rated Canadian life insurers by various rating agencies as follows: A. M. Best Company rating of A++, a Moody's rating of Aa2, a Standard & Poor's rating of AA+ and a Duff & Phelps rating of AAA. Its available surplus was about 270% of the minimum regulatory required surplus at the end of June, 1999 and is not expected to be materially different at the end of 1999.

Each year, the Appointed Actuary produces a financial projection over the next five year period and tests Sun Life of Canada's ability to withstand plausible adverse scenarios. These projections have shown that Sun Life of Canada's financial position is expected to continue to be strong over the entire projection period.

As noted above in the commentary on criterion B in subsection 3.2 of this report, there are Eligible Policyholders to whom the issue of Financial Services Shares would cause tax problems or violate securities laws, and who will receive cash or Policy Credits instead. The reduction in Sun Life of Canada's capital through payment of cash or granting of Policy Credits to those policyholders will be offset by sale, at the Initial Share Price, of the Financial Services Shares allocated to them. If the sale is impractical (which is thought to be unlikely), then Sun Life of Canada's capital is reduced, but the reduction is less than 0.5% of capital.

As also noted above, other Eligible Policyholders may, as a result of their own decisions, receive cash instead of Financial Services Shares. The shares thus forgone will be offered for sale in the same way. If the sale is impractical (which again is thought to be unlikely), then a decision in favour of cash is inoperative. Either way, Sun Life of Canada pays no cash of its own to those policyholders and so suffers no loss of capital from a decision in favour of cash.

The expense in connection with Sun Life of Canada's demutualization will decrease its capital, but that expense is not material when compared with the capital.

The shareholder dividends which Sun Life of Canada declares to Financial Services after demutualization will be subject to the usual standards for prudent management of a life insurance company, and to the limitations imposed by the *Insurance Companies Act*, and therefore should not impair Sun Life of Canada's capitalization.

There is no other decrease in Sun Life of Canada's capital as a result of demutualization. In arriving at that conclusion, I note that no cash or assets, and in particular no non-insurance or insurance subsidiaries of Sun Life of Canada, will be transferred by way of dividend or otherwise to Financial Services in connection with or as part of the demutualization. I further rely on there being no current plans for such "dividending" to take place.

Demutualization will enable Sun Life of Canada to raise additional capital, if it is needed, in the stock markets.

In my opinion, therefore, the Conversion Plan does not materially adversely affect Sun Life of Canada's future financial strength and vitality or the security of its policyholders.

## 7. POLICY CREDITS

I noted above that Eligible Policyholders who may not be issued Financial Services Shares will receive their equivalent either in cash or as Policy Credits. There are about 150 such policyholders who will receive Policy Credits. Their aggregate allocation is about 62,500 shares.

The Conversion Plan provides that the cash equivalent of a Financial Services Share is the Initial Share Price, and that the Policy Credit equivalent is policy benefits having a value equal to the cash equivalent. I assume that the cash equivalent is an appropriate substitute for Financial Services Shares at the date the Initial Share Price is determined, and I note that in the Policyholder Information Circular are opinions from investment bankers to that effect. Based on that assumption, my opinion is that the Policy Credit equivalent is also an appropriate substitute for Financial Services Shares at that date.

SCHEDULE E

VALUATION REPORT

*MORGAN STANLEY DEAN WITTER* RBC DOMINION SECURITIES

September 28, 1999

The Boards of Directors of Sun Life Assurance Company of Canada
and Sun Life of Canada Holdings Corp.
150 King Street West
Toronto, Ontario
Canada M5H IJ9

Members of the Boards:

## I. Valuation Overview

We understand that Sun Life Assurance Company of Canada ("Sun Life") intends to submit to the Superintendent of Financial Institutions of Canada ("OSFI"), the Commissioner of Insurance of the State of Michigan and certain other regulators a Conversion Plan under the *Insurance Companies Act* (Canada), dated September 28, 1999 (the "Plan"). Under the Plan, Sun Life will convert from a mutual life insurance company into a life insurance company with common shares (the "Conversion") and will become a wholly-owned subsidiary of Sun Life of Canada Holdings Corp. ("Financial Services"). The Plan also provides, among other things, that: (i) all Eligible Policyholders will have issued to them common shares ("Common Shares") of Financial Services or will receive cash proceeds or be credited with Policy Credits in exchange for their rights with respect to, or any interest in, Sun Life as a mutual company, including their Ownership Rights; and (ii) Financial Services and those Eligible Policyholders who have so elected or are deemed to have so elected (to the extent such elections are given effect under the Plan), together with those who are so required by the terms of the Plan, will offer Common Shares pursuant to or in connection with an initial public offering of the Common Shares, as provided for in the Plan (the "Initial Public Offering"). Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan.

As required by sections 4(l)(a) and 7(1)(f) of the *Mutual Company (Life Insurance) Conversion Regulations* (the "Regulations") under the *Insurance Companies Act* (Canada), this report will form a part of the Plan that will be included in the Policyholder Information Circular of Sun Life to be dated October 20, 1999 (the "Policyholder Information Circular"). As required by the Regulations, this report sets out the estimated range of market values of Sun Life on the basis that it is the same as the Range of Values as defined below. This report contains a range of estimated public equity market values for Financial Services based solely on estimated prices at which the Common Shares could have been expected to be offered as of September 24, 1999 (the "Valuation Date") in an initial public offering conducted in a manner consistent with the Initial Public Offering (the "Range of Values"), as if the effective date of the Conversion (the "Effective Date") were the Valuation Date, and a description of how the Range of Values was estimated, the methods used and assumptions made in estimating the Range of Values.

Our estimate of the Range of Values in this report is an opinion. An opinion is an expression of professional judgment on the issues explicitly addressed. By rendering a professional opinion, we do not become an insurer or guarantor of the expression of professional judgment, of any transaction or of any future performance. In particular, an opinion is not a prediction of future events and the rendering of this opinion does not guarantee the outcome of the matters opined upon.

## II. Valuation Assumptions and Limitations on the Methods

The estimation of the Range of Values is a complex process involving various judgments as to the most appropriate and relevant methods of financial analyses and the application of those methods to Financial Services' particular circumstances. This report does not purport to be a complete description of the processes, judgments and determinations underlying the Range of Values.

In estimating the Range of Values, qualitative judgments were made as to the significance and relevance of each analysis and factor considered. Accordingly, the report must be considered as a whole and considering portions of the report in isolation could create a misleading or incomplete view of the basis upon which we

have estimated the Range of Values. Numerous judgments and estimations were made with respect to Financial Services, industry performance, regulatory, general business, economic, market and financial considerations and other matters, many of which are beyond the control of Financial Services. No company, business segment or historical demutualization used in such analyses as a comparison is identical to Financial Services, its businesses or the Conversion and the evaluation of the results of such analyses is not entirely mathematical; rather, it involves complex considerations and judgments, both quantitative and qualitative, concerning financial and operating characteristics and other factors that could affect the public equity market values of the companies, business segments or historical demutualizations being analyzed. The estimates contained in such analyses and the range of estimated public equity market values resulting from any particular analysis are not necessarily indicative of actual values or predictive of future results or values, which may be significantly more or less favourable than those suggested by such analyses. In addition, analyses relating to the value of businesses or securities do not purport to be appraisals or to reflect the prices at which businesses or securities actually may be sold. Accordingly, such analyses and estimates are inherently subject to substantial uncertainty.

You have asked us to prepare the Range of Values on the basis that:

(i) there will be no new equity capital raised by Financial Services in excess of the cash proceeds to be distributed to Eligible Policyholders who are to receive cash proceeds or to fund Policy Credits as part of the Conversion, although Financial Services may in fact decide to raise such additional equity capital;

(ii) the dividend yield on the Common Shares will be comparable to the dividend yield of other North American public financial services companies;

(iii) the Initial Public Offering will be a minimum of 10% of the total market capitalization of Financial Services;

(iv) the Initial Public Offering will not be so large as to negatively impact the Initial Share Price;

(v) the distribution and redistribution of the Common Shares following the Initial Public Offering would be expected to result in a reasonable level of market liquidity in the Common Shares; and

(vi) the closing of the Initial Public Offering will occur approximately five business days after the Effective Date and in accordance with the Plan.

The Initial Public Offering, if it occurs, will occur at least five months after the date of this report. Changes in economic and market conditions and other events and developments, including but not limited to legal, tax and regulatory changes, changes in Sun Life's operating performance and changes in the factors described in the preceding paragraphs after the Valuation Date, may have a material effect on the business, operations, financial condition or prospects of Sun Life or Financial Services or on the prices at which the Common Shares may initially be offered and sold to the public and otherwise trade. We assume no obligation to update, revise, reaffirm or withdraw this report as a result of any subsequent events or developments or otherwise.

The limitations on the assumptions and methodologies used to determine the Range of Values include the following:

a) **The unknown supply-demand dynamics:** (i) it cannot be determined how many of Sun Life's approximately 1,058,243 Eligible Policyholders will elect to receive cash proceeds rather than retain their Common Shares at the time of the Initial Public Offering; (ii) institutional investors usually have greater demand for common shares available in large blocks if there is some assurance of liquidity, (iii) Eligible Policyholders choosing to sell their Common Shares in the early aftermarket may create an excess supply of Common Shares; and (iv) anticipation of excess supply, excess demand or lack of availability may impact the Initial Share Price.

b) **The lack of companies directly comparable to Financial Services:** (i) although a number of companies which share various characteristics with Financial Services were included in our analysis ("Comparable Companies"), no company, including the few other large publicly traded Canadian life insurance companies, is directly comparable to Financial Services; (ii) other Canadian financial institutions that may be considered to be comparable to Financial Services have substantially different businesses and business compositions than those of Financial Services; and

(iii) computations and analysis of operating earnings of Comparable Companies that are U.S. life insurers are based on U.S. GAAP (as defined below), while such computations and analysis for Financial Services are based on Canadian GAAP (as defined below).

c) **Unicover Controversy:** Sun Life is involved in a controversy concerning certain health reinsurance contracts arranged on behalf of Sun Life with Unicover Managers, Inc. There is uncertainty as to the ultimate financial impact on Sun Life that will result from this matter, but there is a risk that Sun Life may suffer material losses. In conducting our analyses relating to the Range of Values set out below, we have relied upon the information and analysis included in the Policyholder Information Circular and otherwise provided to us by Sun Life and its advisors with respect to this matter.

d) **Canadian vs. U.S. GAAP:** (i) Sun Life reports its financial results under generally accepted accounting principles in Canada ("Canadian GAAP"); (ii) Canadian GAAP differs from generally accepted accounting principles in the United States ("U.S. GAAP") and the two methodologies can generate very different earnings results in any specific year; and (iii) although Sun Life generally manages its business under Canadian GAAP, certain U.S. investors may value Financial Services on a U.S. GAAP basis, which may result in a different valuation for Financial Services.

e) **Historical volatility:** (i) shares of North American publicly traded Comparable Companies have shown considerable price volatility over time; and (ii) this volatility underscores the fact that the Range of Values is estimated at a point in time and the public equity market value of Financial Services can be expected to vary significantly over time.

f) **Other Considerations:** (i) Sun Life operates with a level of capital (that is, a Minimum Continuing Capital and Surplus Requirements ratio of 269% as of June 30, 1999) that is considerably in excess of regulatory requirements and that of many Comparable Companies; (ii) the Government of Canada has announced a policy that no merger or acquisition of a demutualized life insurance company may take place during the two-year period following its demutualization, and that certain large demutualized life insurance companies including Sun Life will be required to remain widely held indefinitely; (iii) Sun Life has informed us of its current business strategy as at the Valuation Date. We understand that Sun Life is currently undergoing a strategic review, which it undertakes periodically, and that revisions to Sun Life's strategy or operations could occur as a result. Such changes or developments occurring after the Valuation Date and prior to the Initial Public Offering may impact the Range of Values; and (iv) circumstances in the future may dictate that it would be appropriate to apply different valuation methodologies for all or a portion of Financial Services' operations.

For purposes of this report, we have relied on the accuracy and completeness of all information supplied or otherwise made available, discussed with or reviewed by or for us, and we have not assumed any responsibility for independently verifying such information or undertaken an independent evaluation or appraisal of any of the assets or liabilities of Sun Life or Financial Services or been furnished with any such evaluation or appraisal. In addition, we have not conducted any physical inspection of the properties or facilities of Sun Life. With respect to information relating to the prospects of Financial Services, this report has been prepared on the basis that such information reflects the best currently available estimates and judgments of management of Sun Life as to the likely future financial performance of Financial Services and that the pro forma condensed consolidated financial statements of Financial Services forming part of such information present fairly the effects of the Conversion and the reorganization provided for in the Plan had the Conversion and the reorganization occurred on the dates indicated. We understand that Nicholas Bauer, the independent actuary you have retained in connection with the Plan, and Sun Life's appointed actuary have each provided an opinion to the Board as of the date of this report that the benefits and method used to apportion the value of Sun Life among Eligible Policyholders are fair and equitable to those policyholders and on other matters as set forth in the Policyholder Information Circular. We are not actuaries and our services did not include any actuarial determination or evaluations or any attempt to evaluate actuarial assumptions. We have relied upon Sun Life and the independent actuary and the appointed actuary with respect to all actuarial-related information. In addition, we have been advised as to certain tax and legal matters by counsel to Sun Life and, with respect to such tax and legal matters, we have relied upon such counsel. We are not legal advisors, accountants or tax experts and our services did not include any legal, accounting or tax determination or evaluation or any attempt to evaluate legal, accounting or tax assumptions.

## III. Scope of Review

The following information was reviewed in connection with this report:

(i) audited Canadian GAAP financial statements for Sun Life for each of the five years ended December 31, 1998 and certain U.S. GAAP information included therein for each of the two years ended December 31, 1998, including the reports of the auditors thereon;

(ii) certain financial projections of Sun Life and Financial Services prepared and supplemented by management of Sun Life;

(iii) certain interim financial reports of Sun Life;

(iv) certain internal financial analyses of Sun Life and Financial Services prepared and supplemented by management of Sun Life;

(v) the market prices and other financial information for Comparable Companies based on publicly available information;

(vi) the results of operations of Comparable Companies for the most recent fiscal period based on publicly available information;

(vii) selected historical demutualizations and their public offerings;

(viii) the Policyholder Information Circular in the form approved by the Board for mailing to all Eligible Policyholders in connection with the Special Meeting;

(ix) a copy of the Plan and related documents;

(x) the opinions of each of the independent actuary and the appointed actuary referred to above;

(xi) the financial terms of the transactions contemplated by the Plan and the Exhibits thereto, which we compared with the financial terms of other transactions we deemed to be relevant;

(xii) such other financial studies and analyses and such other matters as we deemed necessary, including our assessment of general economic, market and monetary conditions; and

(xiii) information obtained from discussions with members of the senior management of Sun Life and Financial Services regarding the operations, financial condition and future prospects of Sun Life and Financial Services including the effect of the Plan, as well as with internal and external legal, accounting and actuarial advisors of Sun Life and Financial Services;

No historical information in respect of periods or dates after September 24, 1999 was taken into account in preparing this report.

In estimating the Range of Values, we used primarily the comparable company valuation methodology to estimate the range of fully distributed trading values for Financial Services. This methodology involves comparing Sun Life to publicly traded companies. The principal trading multiples used in our analysis included price-to-earnings multiples and price-to-book multiples.

We used two approaches in estimating the range of fully distributed trading values for Financial Services: the consolidated company approach and the sum-of-the-parts approach. To arrive at the Range of Values, we then applied an initial public offering discount to the estimated range of fully distributed trading values.

## IV. Range of Values versus Initial Share Price

The Range of Values is not necessarily the same as the valuation of Financial Services which will result from the actual Initial Public Offering process. In the actual Initial Public Offering process, important market information, including information relating to demand and pricing levels, will be solicited and received by the Underwriters from prospective investors. This information may be material to the determination of the Initial Share Price. Such information also may lead to revision of the Initial Share Price during the marketing period. For the purposes of this report it has not been possible to undertake a typical marketing process with respect to the Common Shares (which will only take place in the period immediately prior to Conversion) and such information is therefore not available. While the Initial Share Price will be determined through negotiations involving the Board of Directors of Financial Services and the Underwriters, and no such negotiations have

been undertaken as of yet, we note that the Board of Directors of Financial Services will approve the Initial Share Price for the purposes of the issuance and sale of the Common Shares in the Initial Public Offering at the time of the Initial Public Offering.

Furthermore, our experience with large distributions of equity securities, such as the proposed offering and sale of the Common Shares, leads us to believe that the proposed offering would require a discount from the expected range of fully distributed trading values for Financial Services. In pricing the Initial Public Offering, the following factors, among others, could cause the Initial Share Price to differ from the expected fully distributed trading value: (i) the lack of a public market trading record; (ii) the lack of equity investors' familiarity with Financial Services; (iii) the absolute size of the offering; (iv) the size of the offering relative to the overall capitalization of Financial Services; (v) the performance of Sun Life and expectations as to Financial Services' performance; (vi) marketing considerations; (vii) timing considerations; and (viii) prevailing market conditions in the overall market, as well as the new issue market, at the time of the Initial Public Offering.

The actual price at which the Common Shares will trade may be higher or lower than the Range of Values per Common Share set forth in Section VI of this report. In the course of actual trading of the Common Shares following the Initial Public Offering, other factors may influence the actual public equity market value of Financial Services including, among others: (i) certain financial information and data of Financial Services; (ii) the history of, and the prospects for, Financial Services and the industry in which it competes; (iii) an assessment of Financial Services' management, management compensation and other incentives; (iv) Sun Life's and Financial Services' past and present operations; (v) Sun Life's investment policies and the quality of its assets; (vi) the prospects for, and timing of, future revenues and earnings of Financial Services; (vii) the state of Financial Services' development; (viii) the impact of any acquisitions or divestitures by Sun Life or Financial Services; (ix) the geographic focus of its operations; (x) its product and services mix; (xi) its channels of distribution for such products and services; (xii) its dividend rate and yield; (xiii) its return on equity and earnings growth rates; (xiv) prevailing industry, economic and equity and debt market conditions and expectations with respect thereto, including the number and size of the equity financings and initial public offerings that may be completed around the time of the Initial Public Offering; and (xv) the length of time which Eligible Policyholders receiving Common Shares on Conversion retain such Common Shares, and the other matters referred to in Sections II and III above relating to factors relevant to the valuation of Financial Services. The valuation of non-publicly traded securities, and the estimation of the Range of Values for Financial Services, is inherently imprecise and subject to numerous uncertainties and contingencies, all of which are difficult to predict. Accordingly, the actual public equity market values for Financial Services from time to time after the Initial Public Offering could differ substantially from the Range of Values.

## V. Other Relationships

As you are aware, Sun Life has retained us to provide investment banking and other financial advice in respect of the Conversion, including this report and certain opinions included in the Policyholder Information Circular, for which we will receive a fee. In addition, we have in the past performed and continue to perform other investment banking and financial advisory services for Sun Life and certain of its affiliates. In the ordinary course of our business as a broker/dealer, we may from time to time purchase securities and interests in loans from, and sell securities and interests in loans to, Sun Life, Financial Services and their subsidiaries, as a market-maker or otherwise. We may from time to time have a long or a short position in, and buy or sell, securities of Financial Services, Sun Life or their subsidiaries for our own account and for the account of our customers. In this regard, as you are aware, we, as Underwriters, expect to enter into the Underwriting Agreements providing for, upon the terms and subject to the conditions set forth therein, the issuance and sale by Financial Services, the sale by certain Eligible Policyholders and, in exchange for a fee, the purchase by the Underwriters, of Common Shares at the Initial Share Price.

## VI. Range of Values

You have not asked for and we express no opinion or recommendation as to and this report should not be relied upon as to:

(i) the Initial Share Price;

(ii) the price at which the Common Shares to be issued in connection with the Plan or pursuant to the Initial Public Offering will trade;

(iii) the fairness of the Initial Share Price;

(iv) the fair market value of any of the Common Shares to be issued in connection with the Plan or pursuant to the Initial Public Offering;

(v) the adequacy or sufficiency of the Policyholder Information Circular or any other document to be sent or disclosure to be made to Eligible Policyholders in connection with the Conversion;

(vi) which of Sun Life's policyholders are appropriately included among the Eligible Policyholders;

(vii) the fairness of the Plan including its fairness to any individual Eligible Policyholder or to any class of Eligible Policyholders or the fairness of any provisions of the Plan relating to which Eligible Policyholders receive any particular form of the Demutualization Benefits or other provisions of the Plan which distinguish among Eligible Policyholders;

(viii) any matters relating to the reorganization of Sun Life described in the Policyholder Information Circular or the restructuring or operation of the Worldwide Participating Account;

(ix) the likelihood of consummation of the Plan or any other aspect of the Plan;

(x) the appropriateness of the Conversion relative to any other transaction Sun Life could undertake; or

(xi) how Eligible Policyholders should vote in connection with the Plan or whether or not they should elect to receive cash in lieu of some or all of their allocated Common Shares or buy or sell Common Shares.

We note the following:

(i) we do not know the circumstances of any Eligible Policyholders and therefore are not in a position to advise any Eligible Policyholders; and

(ii) the opinions expressed herein are subject to the assumptions, qualifications, limitations and uncertainties described herein.

Based upon and subject to the methods, assumptions, qualifications and limitations discussed herein, in our opinion as investment bankers, the estimated Range of Values as of the Valuation Date is approximately Can.$5.6 billion to Can.$8.4 billion and, based on your advice that approximately 400 million Common Shares will be outstanding as of such date, approximately Can.$14 to Can.$21 per Common Share.

This report is provided to the boards of directors of Sun Life and Financial Services in connection with the Plan and, without our prior written consent, this report is not to be quoted, summarized, paraphrased, excerpted or referred to, in whole or in part, in any prospectus, registration statement, policyholder information circular or proxy statement, or in any other report, document, filing, release or other written or oral communication prepared, issued or transmitted by Financial Services or Sun Life, except the Plan and the Policyholder Information Circular to be mailed to Eligible Policyholders.

Morgan Stanley & Co. Incorporated RBC Dominion Securities Inc.

## SCHEDULE F

## OPINION OF FINANCIAL ADVISORS ON VALUATION REPORT

*MORGAN STANLEY DEAN WITTER* RBC DOMINION SECURITIES

September 28, 1999

The Boards of Directors of Sun Life Assurance Company of Canada
and Sun Life of Canada Holdings Corp.
150 King Street West
Toronto, Ontario
Canada M5H IJ9

Members of the Boards:

We understand that Sun Life Assurance Company of Canada ("Sun Life") intends to submit to the Superintendent of Financial Institutions of Canada ("OSFI"), the Commissioner of Insurance of the State of Michigan and certain other regulators a Conversion Plan under the *Insurance Companies Act* (Canada), dated September 28, 1999 (the "Plan"). Under the Plan, Sun Life will convert from a mutual life insurance company into a life insurance company with common shares (the "Conversion") and will become a wholly-owned subsidiary of Sun Life of Canada Holdings Corp. ("Financial Services"). The Plan also provides, among other things, that: (i) all Eligible Policyholders will have issued to them common shares ("Common Shares") of Financial Services or will receive cash proceeds or be credited with Policy Credits in exchange for their rights with respect to, or any interest in, Sun Life as a mutual company, including their Ownership Rights; and (ii) Financial Services and those Eligible Policyholders who have elected or are deemed to have elected (to the extent such elections are given effect under the Plan) together with those who are so required by the terms of the Plan will offer Common Shares pursuant to or in connection with an initial public offering of the Common Shares, as provided for in the Plan (the "Initial Public Offering"). Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan.

We refer you to the valuation report attached at Exhibit C to the Plan (the "Valuation Report") which sets out the range of values of Sun Life on the basis that it is the same as the Range of Values as defined in the Valuation Report. Section 5(1)(b) of the *Mutual Company (Life Insurance) Conversion Regulations* (the "Regulations") under the *Insurance Companies Act* (Canada) requires Sun Life to submit to OSFI an opinion from a valuation expert that the methods used and assumptions made to estimate the Range of Values are appropriate and that the Range of Values reasonably reflects prevailing market conditions as at the date it was estimated. In connection with this requirement, you have asked us, as investment bankers, to provide our opinion to you as of the Valuation Date (as defined in the Valuation Report) as to: (i) whether the Range of Values reasonably reflects prevailing market conditions as at the Valuation Date; and (ii) the appropriateness of the methods and assumptions employed to estimate the Range of Values. The Valuation Report, including, without limitation, the limitations and qualifications in it, is incorporated in its entirety by reference into, and forms part of, this letter. In addition, we have relied on the documentation and other information discussed in the Valuation Report as set forth therein in preparing this letter.

An opinion is an expression of professional judgment on the issues explicitly addressed. By rendering a professional opinion, we do not become an insurer or guarantor of the expression of professional judgment, of any transaction or of any future performance. In particular, an opinion is not a prediction of future events and the rendering of this opinion does not guarantee the outcome of the matters opined upon.

As you are aware, Sun Life has retained us to provide investment banking and other financial advice in respect of the Conversion, including the Valuation Report and this and certain other opinions, each of which is included in the Policyholder Information Circular, for which we will receive a fee. In addition, we have in the past performed and continue to perform other investment banking and financial advisory services for Sun Life and certain of its affiliates. In the ordinary course of our business as a broker/dealer, we may from time to time purchase securities and interests in loans from, and sell securities and interests in loans to, Sun Life, Financial Services and their subsidiaries, as a market-maker or otherwise. We may from time to time have a long or a short position in, and buy or sell, securities of Financial Services, Sun Life or their subsidiaries for our own account and for the account of our customers. In this regard, as you are aware, we, as Underwriters,

expect to enter into the Underwriting Agreements providing for, upon the terms and subject to the conditions set forth therein, the issuance and sale by Financial Services, the sale by certain Eligible Policyholders and, in exchange for a fee, the purchase by the Underwriters, of Common Shares.

You have not asked for and we express no opinion or recommendation as to and this opinion should not be relied upon as to:

(i) the Initial Share Price;

(ii) the price at which the Common Shares to be issued in connection with the Plan or pursuant to the Initial Public Offering will trade;

(iii) the fairness of the Initial Share Price;

(iv) the fair market value of any of the Common Shares to be issued in connection with the Plan or pursuant to the Initial Public Offering;

(v) the adequacy or sufficiency of the Policyholder Information Circular of Sun Life to be dated October 20, 1999 (the "Policyholder Information Circular") or any other document to be sent or disclosure to be made to Eligible Policyholders in connection with the Conversion;

(vi) which of Sun Life's policyholders are appropriately included among the Eligible Policyholders;

(vii) the fairness of the Plan, including its fairness to any individual Eligible Policyholder or to any class of Eligible Policyholders or the fairness of the Plan relating to which Eligible Policyholders receive any particular form of the Demutualization Benefits or other provisions of the Plan which distinguish among Eligible Policyholders;

(viii) any matters relating to the reorganization of Sun Life described in the Policyholder Information Circular or the restructuring or operation of the Worldwide Participating Account;

(ix) the likelihood of consummation of the Plan or any other aspect of the Plan;

(x) the appropriateness of the Conversion relative to any other transaction Sun Life could undertake; or

(xi) how Eligible Policyholders should vote in connection with the Plan or whether or not they should elect to receive cash in lieu of some or all of their allocated Common Shares or buy or sell Common Shares.

The Initial Public Offering, if it occurs, will occur at least five months after the date of this letter. Changes in economic and market conditions and other events and developments, including but not limited to legal, tax and regulatory changes, changes in Sun Life's operating performance and changes in the factors described in the preceding paragraphs after the Valuation Date, may have a material effect on the business, operations, financial condition or prospects of Sun Life or Financial Services or on the prices at which the Common Shares may initially be offered and sold to the public and otherwise trade. We assume no obligation to update, revise, reaffirm or withdraw this letter as a result of any subsequent events or developments or otherwise.

The opinions expressed herein are provided to the boards of directors of Sun Life and Financial Services in connection with the Plan and, without our prior written consent, such opinions are not to be quoted, summarized, paraphrased, excerpted or referred to, in whole or in part, in any prospectus, registration statement, policyholder information circular or proxy statement, or in any other report, document, filing, release or other written or oral communication prepared, issued or transmitted by Financial Services or Sun Life, except the Plan and the Policyholder Information Circular to be mailed to Eligible Policyholders.

The opinions expressed herein are being provided to the boards of directors of Sun Life and Financial Services for their benefit and for the benefit of Eligible Policyholders as a group, as required by the Regulations. The opinions expressed herein should be read in light of all of the information provided in the Policyholder Information Circular.

We note the following:

(i) we do not know the circumstances of any Eligible Policyholders and therefore are not in a position to advise any Eligible Policyholders; and

(ii) the opinions expressed herein are subject to the assumptions, qualifications, limitations and uncertainties described herein.

Based upon and subject to the limitations, qualifications and assumptions discussed herein, in our opinion as investment bankers from a financial point of view, as of the Valuation Date: (i) the Range of Values reasonably reflects prevailing market conditions as at the Valuation Date; and (ii) the methods used and assumptions made to estimate the Range of Values are appropriate.

Very truly yours,

Morgan Stanley & Co. Incorporated

RBC Dominion Securities Inc.

SCHEDULE G

OPINION OF FINANCIAL ADVISORS AS TO CASH IN LIEU OF COMMON SHARES

*MORGAN STANLEY DEAN WITTER* RBC DOMINION SECURITIES

The Boards of Directors of Sun Life Assurance Company of Canada
and Sun Life of Canada Holdings Corp.
150 King Street West
Toronto, Ontario
Canada M5H IJ9

September 28, 1999

Members of the Boards:

We understand that Sun Life Assurance Company of Canada ("Sun Life") intends to submit to the Superintendent of Financial Institutions of Canada ("OSFI"), the Commissioner of Insurance of the State of Michigan and certain other regulators a Conversion Plan under the *Insurance Companies Act* (Canada), dated September 28, 1999 (the "Plan"). Under the Plan, Sun Life will convert from a mutual life insurance company into a life insurance company with common shares (the "Conversion") and will become a wholly-owned subsidiary of Sun Life of Canada Holdings Corp. ("Financial Services"). The Plan also provides, among other things, that: (i) all Eligible Policyholders will have issued to them common shares ("Common Shares") of Financial Services or will receive cash proceeds or be credited with Policy Credits in exchange for their rights with respect to, or any interest in, Sun Life as a mutual company, including their Ownership Rights; and (ii) Financial Services and those Eligible Policyholders who have so elected or are deemed to have so elected (to the extent such elections are given effect under the Plan) together with those who are so required by the terms of the Plan will offer Common Shares pursuant to or in connection with an initial public offering of the Common Shares, as provided for in the Plan (the "Initial Public Offering"), at a price per share for the Common Shares (the "Initial Share Price") to be specified in the underwriting agreement (the "Underwriting Agreement") with the Underwriters for the Initial Public Offering (for greater certainty, without regard to any commission or other fee payable to the Underwriters by Financial Services or any other person in respect of such Initial Public Offering). Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan.

The amount of cash per Common Share to which an Eligible Policyholder may be entitled under the Plan, prior to the deduction of any applicable withholding taxes, will be equal to the Initial Share Price.

Sun Life is required by Section 5(1)(c) of the *Mutual Company (Life Insurance) Conversion Regulations* (the "Regulations") under the *Insurance Companies Act* (Canada) to submit to OSFI an opinion from an independent actuary, or from a valuation expert, that where, in respect of a conversion, other benefits are to be provided in lieu of shares, those benefits are appropriate substitutes for the shares as at the date the value of Sun Life was estimated. In connection with this requirement, you have asked us, as investment bankers, to provide our opinion as at the date hereof to you as to whether the cash that is to be paid to certain Eligible Policyholders under the Plan in lieu of Common Shares will be, at the time of the determination of the Initial Share Price, an appropriate substitute for those Common Shares.

An opinion is an expression of professional judgment on the issues explicitly addressed. By rendering a professional opinion, we do not become an insurer or guarantor of the expression of professional judgment of any transaction or of any future performance. In particular, an opinion is not a prediction of future events and the rendering of this opinion does not guarantee the outcome of the matters opined upon.

We understand that Nicholas Bauer, as independent actuary (the "Independent Actuary"), will provide an opinion to the Board that, among other things, the Plan provides Policy Credits which, as of the date the Initial Share Price is determined, will be appropriate substitutes for the Common Shares.

We note that the term "appropriate substitute" is not defined in the *Insurance Companies Act* (Canada) or in the Regulations. After consultation with you and your advisors and OSFI and its advisors, for the purposes of this opinion, we have applied, with your consent, the following definition of the term "appropriate substitute". The term "appropriate substitute" means, as applied to the relationship between (i) the cash payments to be made to Eligible Policyholders who request or are required to receive cash under the Plan in lieu of Common Shares, and (ii) such Common Shares, that such cash payments are equal, at the

time of the determination of the Initial Share Price of the Common Shares, to the cash value of such Common Shares determined solely by reference to the Initial Share Price of the Common Shares multiplied by the number of Common Shares allocated to such Eligible Policyholders.

In connection with rendering our opinion herein, we have:

(i) reviewed the Policyholder Information Circular of Sun Life to be dated October 20, 1999 (the "Policyholder Information Circular") in the form approved by the Board for mailing to all Eligible Policyholders in connection with the Special Meeting;

(ii) reviewed a copy of the Plan and related documents;

(iii) reviewed the opinion of the Independent Actuary referred to above; and

(iv) taken into account such other matters as we deemed necessary;

We have assumed that:

(i) the closing of the Initial Public Offering will occur approximately five business days after the Effective Date and in accordance with the Plan;

(ii) Financial Services will apply for listing on the Stock Exchanges;

(iii) Financial Services will meet the initial and continuing listing requirements of the Stock Exchanges;

(iv) the Common Shares will be listed and permitted to be traded on the Stock Exchanges not later than the first trading day after the Effective Date and will remain listed on the Stock Exchanges indefinitely after such date; and

(v) not later than the first trading day following the Effective Date, Financial Services will become and will remain indefinitely following such date a reporting issuer in good standing (or equivalent status) such that the Common Shares may be traded without restriction in the jurisdictions in which the Stock Exchanges are situated.

As you are aware, Sun Life has retained us to provide investment banking and other financial advice in respect of the Conversion, including a report and this and certain other opinions, each of which is included in the Policyholder Information Circular, for which we will receive a fee. In addition, we have in the past performed and continue to perform other investment banking and financial advisory services for Sun Life and certain of its affiliates. In the ordinary course of our business as a broker/dealer, we may from time to time purchase securities and interests in loans from, and sell securities and interests in loans to, Sun Life, Financial Services and their subsidiaries, as a market-maker or otherwise. We may from time to time have a long or a short position in, and buy or sell, securities of Financial Services, Sun Life or their subsidiaries for our own account and for the account of our customers. In this regard, as you are aware, we, as Underwriters, expect to enter into the Underwriting Agreements providing for, upon the terms and subject to the conditions set forth therein, the issuance and sale by Financial Services, the sale by certain Eligible Policyholders and, in exchange for a fee, the purchase by the Underwriters, of Common Shares.

For purposes of this opinion, we have relied on the accuracy and completeness of all the information supplied or otherwise made available, discussed with or reviewed by or for us, and we have not assumed any responsibility for independently verifying such information. We are not actuaries and our services did not include any actuarial determination or evaluations or any attempt to evaluate actuarial assumptions. We have relied upon Sun Life and the Independent Actuary with respect to all actuarial-related information. In addition, we have been advised as to certain legal matters by counsel to Sun Life and, with respect to such legal matters, we have relied upon such counsel. We are not legal advisors, accountants or tax experts and our services did not include any legal, accounting or tax determination or evaluation or any attempt to evaluate legal, accounting or tax assumptions.

You have not asked for and we express no opinion or recommendation as to and this opinion should not be relied upon as to:

(i) the Initial Share Price;

(ii) the price at which the Common Shares to be issued in connection with the Plan or pursuant to the Initial Public Offering will trade;

(iii) the fairness of the Initial Share Price;

(iv) the fair market value of any of the Common Shares to be issued in connection with the Plan or pursuant to the Initial Public Offering;

(v) the adequacy or sufficiency of the Policyholder Information Circular or any other document to be sent or disclosure to be made to Eligible Policyholders in connection with the Conversion;

(vi) which of Sun Life's policyholders are appropriately included among the Eligible Policyholders;

(vii) the fairness of the Plan, including its fairness to any Eligible Policyholder or to any class of Eligible Policyholders or the fairness of the Plan relating to which Eligible Policyholders receive any particular form of the Conversion Benefits or other provisions of the Plan which distinguish among Eligible Policyholders;

(viii) any matters relating to the reorganization of Sun Life described in the Policyholder Information Circular or the restructuring or operation of the Worldwide Participating Account;

(ix) the likelihood of consummation of the Plan or any other aspect of the Plan;

(x) the appropriateness of the Conversion relative to any other transaction Sun Life could undertake;

(xi) how Eligible Policyholders should vote in connection with the Plan or whether or not they should elect to receive cash in lieu of some or all of their allocated Common Shares or buy or sell Common Shares;

(xii) whether a cash amount and the Common Shares are equal in value at any time other than at the time of determination of the Initial Share Price; or

(xiii) whether the cash amount to be paid under the Plan in respect of Common Shares would be sufficient to enable a person to purchase the Common Shares in the market at any time, including on the Effective Date, the date of closing of the Initial Public Offering or in the market following the completion of the Initial Public Offering.

G

Without limiting the foregoing, we note that the Initial Share Price and the subsequent market prices of the Common Shares will be a function of, among other things, market conditions and the recent performance of and outlook for Financial Services and its subsidiaries, including Sun Life, from time to time. The Initial Share Price and the subsequent market prices for the Common Shares for a period following the Initial Public Offering will reflect the expected redistribution of the Common Shares distributed to Eligible Policyholders in accordance with the Plan. Accordingly, the market prices of Common Shares may be greater or less than the Initial Share Price.

The opinion expressed herein is provided to the boards of directors of Sun Life and Financial Services in connection with the Plan and, without our prior written consent, such opinion is not to be quoted, summarized, paraphrased, excerpted or referred to, in whole or in part, in any prospectus, registration statement, information circular or proxy statement, or in any other report, document, filing, release or other written or oral communication prepared, issued or transmitted by Financial Services or Sun Life, except the Plan and the Policyholder Information Circular to be mailed to all Eligible Policyholders.

The opinion expressed herein is being provided to the boards of directors of Sun Life and Financial Services for their benefit and for the benefit of Eligible Policyholders as a group, as required by the Regulations. This opinion should be read in light of all of the information provided in the Policyholder Information Circular. We assume no obligation to update, revise, reaffirm or withdraw this letter as a result of any subsequent events or developments or otherwise.

We note the following:

(i) we do not know the circumstances of any Eligible Policyholders and therefore are not in a position to advise any Eligible Policyholders;

(ii) it would be inappropriate for any Eligible Policyholder to conclude, on the basis of the views set forth in this letter or without consulting his or her own advisors, whether or not the Eligible Policyholder should make a request to receive cash in lieu of, or to sell, some or all of their allocated Common Shares under the Plan;

(iii) the opinion expressed herein is subject to the numerous assumptions, qualifications, limitations and uncertainties described herein.

In addition, we have not taken into consideration the tax or other consequences to Eligible Policyholders of selling their Common Shares under the Plan or receiving cash rather than other Demutualization Benefits, including (i) the deduction of withholding taxes from the cash being paid to Eligible Policyholders resident outside of Canada; (ii) the time value of money; (iii) currency exchange rates, including those available to Sun Life in respect of amounts payable under the Plan, or fluctuations therein; (iv) the impact on Eligible Policyholders' entitlement to social benefits arising from the receipt of Demutualization Benefits; or (v) any dividends payable on the Common Shares that Eligible Policyholders receiving cash would have otherwise received.

Based upon and subject to the limitations, qualifications and assumptions discussed herein, in our opinion as investment bankers, cash paid to Eligible Policyholders in lieu of Common Shares in an amount equal to the Initial Share Price multiplied by the number of Common Shares allocated to such Eligible Policyholders will be, at the time of the determination of the Initial Share Price, an appropriate substitute for those Common Shares.

Very truly yours,

Morgan Stanley & Co. Incorporated

RBC Dominion Securities Inc.

G

## SCHEDULE H

## OPINION OF FINANCIAL ADVISORS ON ACCESS TO FINANCIAL MARKETS

*MORGAN STANLEY DEAN WITTER* RBC DOMINION SECURITIES

The Boards of Directors of Sun Life Assurance Company of Canada
and Sun Life of Canada Holdings Corp.
150 King Street West
Toronto, Ontario
Canada M5H IJ9

September 28, 1999

Members of the Boards:

We understand that Sun Life Assurance Company of Canada ("Sun Life") intends to submit to the Superintendent of Financial Institutions of Canada ("OSFI"), the Commissioner of Insurance of the State of Michigan and certain other regulators a Conversion Plan under the *Insurance Companies Act* (Canada), dated September 28, 1999 (the "Plan"). Under the Plan, Sun Life will convert from a mutual life insurance company into a life insurance company with common shares (the "Conversion") and will become a wholly-owned subsidiary of Sun Life of Canada Holdings Corp. ("Financial Services"). The Plan also provides, among other things, that: (i) all Eligible Policyholders will have issued to them common shares ("Common Shares") of Financial Services or will receive cash proceeds or be credited with Policy Credits in exchange for their rights with respect to, or any interest in, Sun Life as a mutual company, including their Ownership Rights; and (ii) Financial Services and those Eligible Policyholders who have so elected or are deemed to have so (to the extent such elections are given effect under the Plan) together with those who are so required by the terms of the Plan will offer Common Shares pursuant to or in connection with an initial public offering of the Common Shares, as provided for in the Plan (the "Initial Public Offering"). Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan.

As required by section 4(1)(l) of the *Mutual Company (Life Insurance) Conversion Regulations* (the "Regulations") under the *Insurance Companies Act* (Canada), the Plan describes the measures to be taken by Financial Services, in the two years following the Effective Date, to ensure that the Eligible Policyholders who receive Common Shares will be able to sell those shares on a public market. These measures (the "Measures") are the requirement that Financial Services use its reasonable commercial efforts to arrange for the listing of the Common Shares on the Stock Exchanges on the first trading day after the Effective Date and use reasonable commercial efforts to keep the Common Shares listed on the Stock Exchanges for at least the remainder of the two years following the Effective Date. Section 5(1)(d) of the Regulations requires Sun Life to submit to OSFI an opinion from a financial market expert that the Measures are likely to ensure that the Eligible Policyholders who receive shares will be able to sell those shares, within the two years following the Effective Date, on a public market. In connection with this requirement, you have asked us, as investment bankers, to provide our opinion to you as to whether the Measures are likely to ensure that the Eligible Policyholders who receive Common Shares will be able to sell these shares, within the two years following the Effective Date, on a public market.

An opinion is an expression of professional judgment on the issues explicitly addressed. By rendering a professional opinion, we do not become an insurer or guarantor of the expression of professional judgment, of any transaction or of any future performance. In particular, an opinion is not a prediction of future events and the rendering of this opinion does not guarantee the outcome of the matters opined upon.

In connection with rendering our opinion herein, we have:

(i) reviewed the Policyholder Information Circular of Sun Life to be dated October 20, 1999 (the "Policyholder Information Circular") in the form approved by the Board for mailing to all Eligible Policyholders in connection with the Special Meeting;

(ii) reviewed a copy of the Plan and related documents; and

(iii) taken into account such other matters as we deemed necessary.

As you are aware, Sun Life has retained us to provide investment banking and other financial advice in respect of the Conversion, including a report and this and certain other opinions, each of which is included in

the Policyholder Information Circular, for which we will receive a fee. In addition, we have in the past performed and continue to perform other investment banking and financial advisory services for Sun Life and certain of its affiliates. In the ordinary course of our business as a broker/dealer, we may from time to time purchase securities and interests in loans from, and sell securities and interests in loans to, Sun Life, Financial Services and their subsidiaries, as a market-maker or otherwise. We may from time to time have a long or a short position in, and buy or sell, securities of Financial Services, Sun Life or their subsidiaries for our own account and for the account of our customers. In this regard, as you are aware, we, as Underwriters, expect to enter into the Underwriting Agreements providing for, upon the terms and subject to the conditions set forth therein, the issuance and sale by Financial Services, the sale by certain Eligible Policyholders and, in exchange for a fee, the purchase by the Underwriters, of Common Shares.

For purposes of this opinion, we have relied on the accuracy and completeness of all the information supplied or otherwise made available, discussed with or reviewed by or for us, and we have not assumed any responsibility for independently verifying such information. In addition, we have been advised as to certain legal matters by counsel to Sun Life and, with respect to such legal matters, we have relied upon such counsel. We are not legal advisors, accountants or tax experts and our services did not include any legal, accounting or tax determination or evaluation or any attempt to evaluate legal, accounting or tax matters.

We have assumed that:

(i) Financial Services will apply for listing on the Stock Exchanges;

(ii) Financial Services will meet the initial and continuing listing requirements of the Stock Exchanges;

(iii) the Common Shares will be listed and permitted to be traded on the Stock Exchanges not later than the first trading day after the Effective Date and will remain listed on the Stock Exchanges indefinitely after such date; and

(iv) not later than the first trading day following the Effective Date, Financial Services will become, and will remain indefinitely following such date, a reporting issuer in good standing (or have equivalent status) in the jurisdictions in which the Stock Exchanges are situated such that the Common Shares may be traded without restriction in such jurisdictions.

You have not asked for and we express no opinion or recommendation as to and this opinion should not be relied upon as to:

(i) whether the Common Shares will be listed on the Stock Exchanges;

(ii) whether Financial Services will become, and will remain indefinitely, a reporting issuer (or have equivalent status) in the jurisdictions in which the Stock Exchanges are situated so as to permit the Common Shares to trade without restriction in such jurisdictions;

(iii) whether the market for the Common Shares on such Stock Exchanges will be a liquid market;

(iv) the Initial Share Price;

(v) the price at which the Common Shares to be issued in connection with the Plan or pursuant to the Initial Public Offering will trade;

(vi) the fairness of the Initial Share Price;

(vii) the fair market value of any of the Common Shares to be issued in connection with the Plan or pursuant to the Initial Public Offering;

(viii) the adequacy or sufficiency of the Policyholder Information Circular or any other document to be sent or disclosure to be made to Eligible Policyholders in connection with the Conversion;

(ix) which of Sun Life's policyholders are appropriately included among the Eligible Policyholders;

(x) the fairness of the Plan, including its fairness to any individual Eligible Policyholder or to any class of Eligible Policyholders or the fairness of the Plan relating to which Eligible Policyholders receive any particular form of the Conversion Benefits or other provisions of the Plan which distinguish among Eligible Policyholders;

(xi) any matters relating to the reorganization of Sun Life described in the Policyholder Information Circular or the restructuring or operation of the Worldwide Participating Account;