imposed, have not been recognized. MFS has filed a response protesting the proposed adjustments. If such adjustments are sustained, MFS could face similar adjustments for years subsequent to 1993, which have not been provided for. Management estimates that the maximum amount of such adjustments would aggregate U.S. $275 million for the period from January 1992 to December 31, 1998, of which U.S. $213 million has been provided for by MFS in future income taxes.

### *Dependence on Third Party Relationships*

The Company distributes its wealth management and protection products through a variety of distribution channels, including broker-dealers, banks, wholesalers, its own internal sales force and other third party marketing organizations. In connection with the distribution or investment management of these products, certain third party service providers have materially contributed to the growth of the Company. The Company periodically negotiates renewal terms for these relationships and there can be no assurance that such renewal terms will remain acceptable to the Company or such service providers. An interruption in the Company's continuing relationship with certain of these third parties or the impairment of their reputation or creditworthiness could materially and adversely affect the Company's ability to market its products. There can be no assurance that the Company would be able to find alternate sources of distribution in a timely manner.

### *Regulatory and Related Matters*

#### *Wealth Management Industry*

The Wealth Management Business subsidiaries of the Company are subject to extensive regulatory oversight in the jurisdictions in which they do business. Canadian securities legislation imposes restrictions on the types of portfolio investments that may be made by a mutual fund, the type of sales incentives that may be offered to dealers and the forms of advertising that may be used. The Company's Wealth Management Business in the United States is subject to extensive regulation, at the federal and state level, including regulation by the Securities and Exchange Commission.

The ability of the Company's subsidiaries to carry on their respective investment management businesses may also be dependent upon their continued registration under the applicable laws or regulations in the jurisdictions in which they do business.

With respect to those jurisdictions in which the Company carries on its Wealth Management Business, changes in laws or regulations, or in governmental policies, could materially and adversely affect the business and operations of the Company. See also "– United Kingdom Operations – United Kingdom Pension Sales Practice Liabilities".

#### *Insurance Industry*

##### Highly Regulated Industry

The Company and its insurance subsidiaries are subject to extensive regulatory oversight in the jurisdictions in which they do business. This regulatory oversight is vested in government agencies having broad administrative power with respect to, among other things, capital adequacy and risk-based capital requirements, asset and reserve valuation requirements, permitted investments, policy rates and forms and dividend payments. These regulations are primarily intended to protect policyholders and beneficiaries rather than investors. See "Regulatory Matters". Recently, insurance regulation in Canada, the United States, the United Kingdom and other jurisdictions in which the Company does business has been subject to increased scrutiny by legislative and regulatory bodies. The Company's business could be adversely affected by changes in applicable law or regulation or the interpretation or enforcement thereof.

##### Increasing Levels of Taxation

The Company's results are further subject to fluctuations as a result of the level of income, premium, capital and other taxes levied by tax authorities in those jurisdictions in which the Company conducts business. From time to time, governments, particularly in Canada, the U.S. and the U.K., have pursued policies aimed at increasing the level of tax revenue derived from the life insurance industry and its policyholders. These measures have tended in Canada towards methods of taxation based on capital employed and in the U.S. towards assessment of tax based on minimum imputed levels of investment income. There can be no assurance that such policies, if pursued further, will not have an adverse effect on the Company and the returns generated from its annuity and life insurance products. In Canada, proposals intended to be effective in January 1999 will extend the capital tax and are expected to result in increased income tax payable by the Company.

##### Sales Practice Regulation

Insurance regulators in Canada and the United States have given greater emphasis in recent years to the investigation of allegations of improper life insurance pricing and sales practices by life and annuity insurers, including

"churning" and misleading sales presentations by insurance agents. In the United States, state insurance regulator authorities regularly make inquiries, hold investigations and administer market conduct examinations with respect tc insurers' compliance with applicable insurance laws and regulations. There can be no assurance that any non-compliance with such applicable laws and regulations would not have a material adverse effect on the Company. In the United States, the NAIC has adopted a model law and regulation which would standardize the form and content of any illustrations provided to prospective purchasers of individual life insurance products. The model law has been enacted in a number of states, and is currently under consideration in a number of other states. Management expects that similar legislation will eventually be enacted in additional states in which the Company's subsidiaries sell individual life insurance products. There can be no assurance as to whether this reform will adversely affect sales of such products by the industry as a whole or by the Company's U.S. subsidiaries.

Changes in U.K. Regulation

The Company may be adversely affected by changes in U.K. government policy or legislation applying to companies in the financial services industry. These include possible changes to the taxation treatment of financial services and products, retirement income policy, the regulation of products, pricing and selling practices and solvency standards and the introduction of so called "stakeholder pensions". They may affect the Company's existing and future business by, for example, causing customers to cancel existing policies or requiring the Company to change its existing range of products and services, redesign its technology or other systems, retrain staff, pay increased tax, pay compensation or incur other costs.

***Investment Portfolio***

The surplus and earnings of the Company are affected by, among other things, the investment results, carrying value and levels of allowances for losses on, and write-downs of, the Company's investment portfolio. The Company's investment portfolio consists of, in order of relative magnitude, bonds, commercial and residential mortgages, equity securities, real estate, cash and short term securities and policy loans. The market value of the Company's investments varies depending upon prevailing economic and market conditions, including interest rates and the strength of the stock markets. Recent stock and bond market appreciation has left the Company with substantial realized gains on its investment portfolio, which are being amortized into income over time. A reversal of these trends could adversely affect future investment income. For a variety of reasons, the Company may, on occasion, sell an investment at a price that is less than the book value of that investment. During periods of rising interest rates, the value of bonds and stocks will generally decline. During periods of declining interest rates, bond calls and mortgage loan prepayments generally increase, necessitating the reinvestment of these funds at lower prevailing rates. Mortgage loans and real estate investments are relatively illiquid compared to investment grade bonds. If the Company were to require significant amounts of cash on short notice, the Company could have difficulty selling these loans and investments at attractive prices, in a timely manner, or both. These loans and investments also carry a greater risk of investment loss than investment grade bonds. In the past, commercial real estate markets have undergone periods of significant declining values. There can be no assurance that such conditions will not affect the Company's bond, mortgage loan or real estate portfolios in the future. While management believes its valuation allowances for mortgage loans were adequate as of June 30, 1999, no assurance can be given that further valuation allowances will not be required. See "Investments of the Company – Mortgage Portfolio Surveillance".

The Company is also subject to credit risk relating to the uncertainty associated with the continued ability of debtors to make timely payments pursuant to the contractual terms underlying such loans and investments. Although almost all of the Company's bonds are investment-grade and the Company believes that it maintains prudent issuer diversification, a major economic downturn could result in issuer default. Any such defaults could materially adversely affect the Company's business, financial condition and results of operations.

Strong stock market performance in recent years has contributed significantly to the market value of the Company's general fund equity portfolio. Under Canadian GAAP, 15% of unrealized and realized stock market gains or losses is included in investment income each year. A pronounced and sustained decline in the Canadian or U.S. stock markets would reduce the market value of the Company's general fund equity portfolio and result in any unrealized and realized losses being brought into investment income at a rate of 15% each year. As at June 30, 1999, the carrying value of the Company's general fund equity portfolio constituted approximately 8.9% of its general fund invested assets. See "Risk Management — Investment Policies".

***Currency Exchange Rate Fluctuations***

As an international provider of financial services, the Company operates in a number of countries, with revenues and expenses denominated in several local currencies. The United States, Canada and the United Kingdom currently account for almost all of the Company's revenues, representing 50%, 27% and 19% of total revenues, respectively, in 1998. In each territory in which it operates, it is the Company's policy to invest in sufficient local-currency assets to

match its aggregate liabilities and minimum surplus requirements in that territory. This approach provides an operational hedge against disruptions in local operations caused by currency fluctuations. However, changes in exchange rates can affect the Company's net income and surplus when results in local currency are translated into Canadian dollars. For example, in 1998 the weakening of the Canadian dollar against the U.S. dollar and the pound sterling resulted in an increase in the Company's consolidated general fund assets of $2.8 billion, an increase in surplus of $312 million and an increase in net income of $16 million when all foreign currencies of jurisdictions in which the Company operates were converted into Canadian dollars. A strengthening of the Canadian dollar against the U.S. dollar and the pound sterling in the future could adversely affect the Company's reported net income.

### *Variations in Claims Experience*

An insurance company's earnings depend significantly upon the claims paid under its insurance contracts and will vary from period to period depending on the amount of claims incurred in the relevant periods. Therefore, there is a limited predictability of claims experience within any given month or year. As a result, it is anticipated that the Company's financial results (and, accordingly, the trading price of the Financial Services Shares) may vary from period to period and that such variations may be material in any given period. The Company uses certain assumptions in pricing its products, including assumptions relating to guaranteed payments or levels of expenses associated with these products. There can be no assurance that actual experience will match the assumptions made for pricing purposes and, to the extent they differ, the Company's operating results could be materially adversely affected.

### *Expiration of Surrender Penalties with Respect to Certain Annuities*

The Company typically imposes surrender charges or market value adjustments on certain annuities sold by it to enable the Company to recover unamortized policy acquisition costs in the event that the annuity is surrendered before the policy acquisition costs are fully amortized and to discourage contract surrenders, which could require the Company to dispose of assets prematurely at a loss. These surrender charges typically decline to zero over a period of time established in the individual annuity contract. As surrender charges expire, it is likely that surrenders of certain annuities will increase. An increase in surrenders could have a material adverse effect on the Company's financial position and results of operations.

### *Year 2000 Issues*

There is a high level of uncertainty associated with the Year 2000 preparedness of the Company and the Company's service providers, distributors and customers, and as such, the Company may experience material problems and costs that may have a material and adverse impact on the Company's results of operations, liquidity and financial condition. See "Management's Discussion and Analysis of Financial Condition and Results of Operations – Year 2000 Issues".

### *Ratings*

Ratings with respect to claims-paying ability and financial strength have become an increasingly important factor in establishing the competitive position of insurance companies. Insurers compete with other insurance companies, financial intermediaries and other financial institutions on the basis of a number of factors, including the ratings assigned by nationally-recognized statistical ratings organizations. Any lowering of the ratings of Sun Life Assurance or the Company's other life insurance subsidiaries could have a material adverse effect on Sun Life of Canada's ability to market its products and could increase the surrender of Sun Life of Canada's annuity products. In December, 1998, Moody's Investors Services announced that it reduced its unsolicited financial strength rating of Sun Life Assurance from Aa1 to Aa2. Moody's expressed concern over continuing pension and annuity problems in the United Kingdom, specifically the uncertainties regarding the timing of a definitive resolution and possible future provision and expenses in respect of these problems, and over the Company's loss of relative market presence in Canada due mostly to heightened acquisition activity by competitors. In August, 1999, Standard & Poor's announced that it had reduced its financial strength and counterparty credit ratings for Sun Life of Canada to AA+ from AAA. Standard & Poor's stated that the downgrade reflected the performance of, and challenges facing, Sun Life of Canada's U.K. businesses. Standard & Poor's also lowered its subordinated debt rating on Sun Life of Canada's Capital Debentures and Subordinated Notes to AA- from AA, and its rating on Sun Life of Canada's Cumulative Capital Securities to A+ from AA-.

The ratings described under "Ratings" reflect each rating agency's current opinion of Sun Life of Canada's claims-paying ability, financial strength, operating performance and ability to meet its obligations to policyholders and are not evaluations directed toward the protection of investors in the Financial Services Shares. Such factors are of concern to policyholders, agents and intermediaries. Such ratings are not ratings of securities and should not be relied upon when making a decision to buy, hold or sell Financial Services Shares or any other security.

### Potential Tax Legislation

The attractiveness to customers of many of the Company's U.S. products is due in part to favorable tax treatment. The U.S. Congress has, from time to time, considered possible tax legislation changes that would affect the relative attractiveness of the Company's products, including elimination of the tax deferral on the accretion of value within certain annuities and life insurance products, adoption of a simplified "flat tax" income tax structure with an exemption from taxation for investment income, reductions in U.S. capital gains tax rates, reduction or elimination of the federal estate tax and expansion of the availabililty of 401(k) accounts and individual retirement accounts. There can be no assurance that tax legislation will not be enacted which would contain provisions with possible adverse effects on the Company's U.S. annuity and life insurance products.

### Competition

The Wealth Management and Protection Businesses in which the Company engages are, for the most part, highly competitive. The Company's products compete not only with those offered by other insurance companies, but with those offered by mutual fund companies, banks, financial planners and other providers. Frequently, competition is on the basis of pricing and service provided to distribution channels. Many of the Company's competitors are better capitalized and have greater access to resources than the Company. Among other things, the competition in these industries throughout the world has resulted in a trend towards the global consolidation of the financial services industry including, in particular, the insurance, banking and investment management sectors. To the extent that consolidation continues, the Company will increasingly face more competition from large, well capitalized financial services companies in each jurisdiction in which it operates. There can be no assurance that this increasing level of competition will not adversely affect the Company's businesses in certain countries.

In the United States, national banks, with their pre-existing customer bases for financial services products, may, in the future, provide increased competition to insurers selling annuities, including the Company, as a result of a United States Supreme Court decision in 1994. This decision permitted national banks to sell annuity products of life insurance companies in certain circumstances. In addition, in the United States several proposals to repeal or modify the *Bank Holding Company Act of 1956*, as amended, have been made by members of Congress and the Clinton Administration. Currently, the *Bank Holding Company Act of 1956* restricts banks from being affiliated with insurance companies. None of these proposals has yet been enacted, and it is not possible to predict whether any of these proposals will be enacted or, if enacted, their potential effect on the Company.

### Shares Eligible for Future Sale

Substantially all of the Financial Services Shares distributed in the demutualization will be eligible for immediate resale in the public market without restriction. Moreover, following demutualization, the Share Selling Service will be established to facilitate the sale, at market prices, of Financial Services Shares held in book-entry form by eligible policyholders. As a result of the volume of sell orders, these sales may be made at relatively low costs. No prediction can be made as to the effect, if any, such future sales of shares, or the availability of shares for such future sales, will have on market price of the Financial Services Shares prevailing from time to time. Sales of substantial amounts of Financial Services Shares, or the perception that such sales could occur, could adversely affect prevailing market prices for all the Financial Services Shares. See "Your Demutualization Benefits – Share Selling Service" in Part 1 of this Policyholder Information Circular.

### No Prior Market for Financial Services Shares

Prior to the demutualization and the initial public offering of Financial Services Shares, there will have been no public market through which the Financial Services Shares could be sold and there can be no assurance that a significant public market will develop or be sustained after the demutualization and initial public offering or that the market price for the Financial Services Shares will not decline below the Initial Share Price. The Initial Share Price will be determined by negotiation between the Company and the Underwriters and may not be indicative of the market price for the Financial Services Shares following the demutualization and the initial public offering.

### Environmental Considerations

As the owner and operator of real property, the Company is subject to extensive federal, provincial, state and municipal environmental laws and regulations. Inherent in such ownership and operation is the risk that there may be potential environmental liabilities and costs in connection with any required remediation of such properties. In addition, the Company holds equity stakes in companies that could potentially be subject to environmental liabilities. While the Company routinely conducts environmental assessments for real estate being acquired for investment or on foreclosure, there can be no assurance that unexpected environmental liabilities will not arise.

# REGULATORY MATTERS

The Company is subject to regulation and supervision of its Wealth Management Business and Protection Business by governmental authorities in the jurisdictions in which it does business. In Canada, the Company is subject to both federal and provincial regulation. In the United States, the Company is primarily regulated by each of the states in which it conducts business and by federal securities laws. In the United Kingdom, the Company is subject to national regulation, primarily by the FSA. The Company's Asia operations are similarly subject to a variety of regulatory and supervisory regimes in each of the jurisdictions in which the Company operates, and which vary in degree of regulation and supervision.

## Canada

### *General*

The Company is governed by the Canadian Insurance Act. The Canadian Insurance Act is administered, and the activities of the Company are supervised, by OSFI. The Canadian Insurance Act permits insurance companies to offer, directly or through subsidiaries or through networking arrangements, a broad range of financial services, including banking services, investment counselling and portfolio management, mutual funds, trust services, real property brokerage and appraisal and merchant banking services.

The Canadian Insurance Act requires the filing of annual and other reports on the financial condition of the Company, provides for periodic examinations of the Company's affairs, imposes restrictions on transactions with related parties, and sets forth requirements governing reserves for actuarial liabilities and other matters, and the safekeeping of assets.

### *Regulation of Financial Services*

Like Sun Life of Canada, Financial Services has all the powers and restrictions applicable to life insurance companies governed by the Canadian Insurance Act. Based on the understanding, however, that holding companies like Financial Services will not write insurance, will not have dealings with the public in a client service relationship, and will envisage activities limited to raising capital and borrowing, holding shares of subsidiaries and providing services to subsidiaries, OSFI and the Canadian Department of Finance have worked with a life insurance industry task force to review the application of the Canadian Insurance Act to such holding companies rather than full service life insurance companies. Prior to 1999, no such holding companies had been permitted under the Canadian Insurance Act.

As a result of the review, OSFI has determined that, in general, the regulatory regime for such holding companies will include the principal aspects of the regulatory regime for full service life insurance companies. However, the application of the regulatory regime may vary for such holding companies, depending on their actual activities, corporate structure and further analysis. OSFI also recognized that the regulatory regime for such holding companies is an interim measure pending implementation by the Government of Canada of its Policy Paper entitled "Reforming Canada's Financial Services Sector: A Framework for the Future" which would create a new regulatory regime for holding companies of demutualized insurance companies. See "– Canadian Government's Proposed Reforms to the Canadian Financial Services Sector".

### *Investment Powers*

Under the Canadian Insurance Act, a life insurance company must maintain a prudent portfolio of investments, subject to certain overall limitations on the amount it may invest in certain classes of investments, such as commercial loans, real estate and stocks. Additional restrictions (and, in some cases, the need for regulatory approvals) limit the type of investments which the Company can make in excess of 10% of the voting rights or 25% of the equity of any entity.

### *Minimum Continuing Capital and Surplus Requirements*

The Canadian Insurance Act requires Financial Services and Sun Life Assurance to maintain adequate capital and adequate and appropriate forms of liquidity in relation to their operations. In furtherance of this requirement, OSFI has established its MCCSR. Under MCCSR, a life insurance company is required to maintain an amount of capital which is calculated by reference to, and which varies with, the risk characteristics of each category of on and off balance sheet assets and liabilities held by it. The MCCSR calculation involves applying quantitative factors to specific assets and liabilities, as well as to certain off-balance sheet items, based on four risk components: (i) asset default risk, (ii) mortality/morbidity and lapse risk, (iii) interest margin pricing risk and (iv) changes in interest rate environment risk. The total capital required is the sum of the capital required calculated for each of the four risk components. OSFI uses this total, in conjunction with the amount calculated as available capital and together with other considerations, in assessing the capital adequacy of a life insurance company. OSFI has advised the Company that it will require Financial Services to maintain a minimum MCCSR of 150% or greater, based on the risk profile of the Company.

The principal elements of available capital include common shares, contributed surplus, retained earnings, reported surplus, unamortized deferred realized and unrealized gains and certain losses on investments not taken into account in the valuation of liabilities, preferred shares and subordinated debt. The amount of available capital is then reduced by the Company's goodwill and controlling interests in non-life financial corporations, a portion of negative policy reserves and cash value deficiencies and reserves on reinsurance ceded to unregistered reinsurers. In addition, prior to 1996, certain unamortized gains and losses on investments taken into account in the valuation of liabilities were included in available surplus. Under transition rules, these gains and losses are being phased out of available capital over the four year period ending December 31, 1999. OSFI may require that a higher amount of capital be available for an insurance company, taking into account such factors as the company's operating experience and diversification of asset or insurance portfolios. MCCSR may be adjusted by OSFI in the future, as experience with it develops, as the risk profile of Canadian life insurers changes, and in order to reflect other risks, such as foreign exchange risk.

### *Restrictions on Dividends and Capital Transactions*

The Canadian Insurance Act prohibits the declaration or payment of any dividend on shares if there are reasonable grounds for believing a company subject to the Canadian Insurance Act is, or the payment of the dividend would cause the company to be, in contravention of MCCSR. The Canadian Insurance Act also requires an insurance company to notify the Superintendent of the declaration of a dividend at least 10 days prior to the date fixed for its payment. Similarly, the Canadian Insurance Act prohibits the purchase for cancellation of any shares issued by an insurance company or the redemption of any redeemable shares or other similar capital transactions, if there are reasonable grounds for believing that the company is, or the payment would cause the company to be, in contravention of its MCCSR. These latter transactions would also require the prior approval of the Superintendent.

### *Appointed Actuary*

In accordance with the Canadian Insurance Act, the board of directors of Sun Life Assurance has appointed a Fellow of the Canadian Institute of Actuaries as the Appointed Actuary. The Appointed Actuary is required to value the policy liabilities of Sun Life of Canada as at the end of each financial year in accordance with accepted actuarial practices, including selection of appropriate assumptions and methods, and provide an opinion as to whether the amount of policy liabilities makes appropriate provisions for all obligations to policyholders and whether the valuation of liabilities is fairly presented in the consolidated financial statements. At least once in each financial year, the Appointed Actuary is also required to report to the chief executive officer and the chief financial officer of Sun Life Assurance if the Appointed Actuary identifies any matters which, in the Appointed Actuary's opinion, have material adverse effects on the financial condition of the Company.

### *CompCorp*

CompCorp is a federally incorporated private company established in 1988. CompCorp's objective is to protect, within certain limits, and subject to certain exclusions, Canadian policyholders against loss of benefits should a member of CompCorp become insolvent and be wound up. CompCorp is funded by its member insurance companies, including Sun Life Assurance.

Member companies of CompCorp are primarily assessed on an after-the-fact basis according to a formula based on Canadian premium income from covered policies. There are two principal forms of assessment: (i) specific assessments to cover funding made in connection with an insolvent member, to a maximum of 0.85% per annum of a company's Canadian premium income from covered policies averaged over the previous five years with certain exclusions, including segregated fund premiums and (ii) loan assessments, but in no circumstances will loan assessments result in loans outstanding from a member being in excess of 3.0% of that member's five-year average premium income from covered policies.

### *Provincial Insurance and Trust Company Regulation*

Sun Life Assurance and its subsidiaries are also subject to provincial regulation and supervision in the provinces of Canada and other jurisdictions in which they conduct business. Various subsidiaries of Financial Services engage in other federally regulated types of business, such as the trust business, which are also subject to similar provincial regulation. Provincial insurance regulation is concerned primarily with insurance contracts and supervision of insurance agents.

### *Securities Laws*

Sun Life Assurance and certain of its subsidiaries, including Spectrum United, McLean Budden and Sun Life Securities Inc., certain of their employees and certain policies and contracts offered by such subsidiaries are registered with provincial securities commissions and are subject to regulation and supervision under provincial securities laws in each of the provinces of Canada. Such registrations may be terminated or suspended for failure to adhere to certain

regulatory requirements. The Company's Canadian mutual fund operations are governed by a national policy of Canadian securities regulators which is administered by the provincial securities commissions. This policy regulates, among other things, the nature and extent of investments by mutual funds, the relationship between mutual funds and their managers, advisors and distributors, and mutual funds sales practices. In addition, this policy imposes significant disclosure obligations on mutual funds and their managers, and imposes fiduciary duties, as well as recordkeeping and operational requirements, on the managers and advisors to these funds.

### *Canadian Government's Proposed Reforms to the Financial Services Sector*

In June 1999, the Canadian government released a policy paper entitled "Reforming Canada's Financial Sector: A Framework for the Future" (the "Policy Paper"). This Policy Paper was primarily a response to the Report of the Task Force on the Future of the Canadian Financial Services Sector which was delivered in September 1998 to the Canadian government and contained numerous recommendations aimed at, among other things, encouraging greater competition in the financial services industry, providing a framework for industry mergers and protecting consumers. This Task Force was established by the government in 1996 to recommend changes to the public policy framework that would govern the Canadian financial services industry into the 21st century.

One of the principal proposals contained in the Policy Paper is a modification to the current ownership limits which restrict ownership to 10% of any class of shares of a demutualized insurance company, or its holding body corporate. In the Policy Paper, the government has stated that it will allow an investor to hold up to 20% of any class of voting shares and up to 30% of any class of non-voting shares of a demutualized insurance company having shareholders' equity in excess of $5 billion, subject to a fit and proper test. This fit and proper test is stated to include an examination of the proposed investor's past business record, the soundness of its business plan and the reasons for the proposed investment and would also seek to assess whether the proposed investor has the necessary integrity and fitness of character. The test will be designed to ensure that key shareholders are not a source of weakness to regulated institutions such as Financial Services.

In addition, during a two year transition period following demutualization, the demutualized insurance companies must remain widely-held and no mergers among, or acquisitions of, demutualized insurance companies would be permitted and the ownership restrictions that are proposed to apply to demutualized insurance companies having shareholders' equity in excess of $5 billion would also apply to smaller demutualized insurance companies. After the transition period, demutualized insurance companies with less than $5 billion in shareholders' equity may request the Minister of Finance of Canada to permit them to be acquired by another institution, subject to certain restrictions. However, under the proposals, insurance companies or their holding body corporate, such as Financial Services, with more than $5 billion of shareholders' equity must remain widely held.

The Policy Paper also proposes that demutualized insurance companies be permitted to organize under a non-operating regulated holding company structure. The regulated holding company's activities could include raising capital, investing and managing its cash flow and liquidity and investing in fixed assets related to its operations. It would also be permitted to provide certain common services to other entities in the group, but would not be permitted to undertake any core financial services functions for the group.

The government also proposes to expand the permitted types of subsidiaries so that both a regulated holding company and an insurance company would be permitted to make a broader range of strategic investments than is currently the case for insurance companies and other federally regulated financial institutions ("FRFIs"). This expansion of permitted investment activities would give insurance companies and other FRFIs additional choice and flexibility regarding their organizational structures.

The ability to have additional subsidiaries would also permit the creation of new special-purpose entities and facilitate alliances and joint ventures through these entities. This could enhance flexibility for FRFIs to meet technological and competitive changes from sources such as unregulated and "monoline" firms specializing in a single line of business. These new rules will be based on defined categories of eligible investments and a number of key parameters. There will be five categories of permitted investments: (i) regulated financial institutions (such as banks, trust companies and insurance companies); (ii) firms primarily engaged in providing financial services (such as credit cards, small business loans and consumer loans); (iii) entities acting in the capacity of a financial agent, advisor or administrator (such as investment counselling, payroll administration); (iv) entities undertaking ancillary, complementary or incidental activities; and (v) certain other activities not primarily related to financial services but specifically enumerated (such as certain information services and real property brokerage corporations). Control requirements, approvals and other rules will be based on the category of investment.



SL-0481

Under the proposals, Financial Services would be required to own more than 50% of the voting shares of Sun Life Assurance. Any shares of Sun Life Assurance which are not owned by Financial Services would be required to meet the new widely held criteria. The government will apply the 20% limit on voting share ownership and 30% limit on non-voting share ownership to the direct and indirect cumulative ownership of Sun Life Assurance, with the effect that no single investor will be able to use the holding company structure to exceed these ownership restrictions.

OSFI will supervise Financial Services on a consolidated basis (including from a capital adequacy perspective) to ensure that it has an overview of the group's activities. This consolidated regulation will include the ability to review both insurance and non-insurance activities conducted by subsidiaries of Financial Services and have adequate supervisory power to bring about corrective action.

OSFI will use its supervisory authority over Financial Services and its subsidiaries on a discretionary basis and as events warrant. For example, if Financial Services places certain activities such as administrative services only arrangements in affiliates outside Sun Life Assurance itself, regulation of such affiliates will generally be lighter, overall, than that applied to Sun Life Assurance itself. Sun Life Assurance, however, will continue to be subject to the full supervisory regime.

The Policy Paper also includes proposals to expand certain business powers of FRFIs in order to increase competition. In particular, the Policy Paper proposes to grant access by life insurance companies, among others, to the Canadian payments system used by banks and other deposit-taking FRFIs (which includes the cheque payment systems, the credit card payment systems, automated teller machines and debit card networks and clearance systems for debt, equity and mutual fund securities). In addition, the Policy Paper rejects the recommendation of the Task Force to allow banks and other deposit-taking FRFIs to sell insurance through their branch networks.

In support of the various initiatives to promote greater competition in the financial services sector, the Superintendent will be granted additional supervisory powers to deal with the potential for increased risk in the system. These powers would increase the consequences for any institution that fails to meet certain regulatory or supervisory requirements. In particular, the measures proposed include: (i) a new authority to remove directors and senior officers from office in certain circumstances such as instances of misconduct; (ii) a system of administrative penalties on both financial institutions and individuals that fail to comply with undertakings and cease and desist orders or violate the financial institutions legislation or regulations and (iii) measures to enhance the Superintendent's power to deal with related party transactions.

It is uncertain when the necessary amendments to the Act and similar legislation governing other FRFI's that are required to implement these proposals will be made.

## United States

### *General Regulation at the State Level*

In the United States, each state and the District of Columbia have insurance laws that apply to companies licensed to carry on an insurance business in the jurisdiction. However, the state of domicile of the insurer is the primary regulator of the company. Jurisdictions in which a company is licensed will apply their solvency standards, product and sales compliance requirements as well as agent appointments and policy form approvals. The National Association of Insurance Commissioners ("NAIC") is a voluntary organization through which industry representatives and consumer advocates assist regulators in drafting proposed model legislation and regulations for enactment or adoption by state legislatures or insurance departments, respectively. The NAIC has also established accounting standards that have been enacted into law by states for the filing of insurer annual statements that are filed in all jurisdictions where the insurer is licensed. States may impose certain special reporting requirements not found in the NAIC models.

Financial Services is not regulated as an insurance company but will, as the direct or indirect owner of the capital stock of Sun Life Assurance and other U.S. insurance subsidiaries, be subject to the insurance holding company acts of the states in which Sun Life Assurance and its other U.S. insurance subsidiaries are domiciled (or deemed to be commercially domiciled). Most states have enacted legislation that requires each insurance holding company and each insurance company in a holding company system to register with the insurance regulatory authority of the insurance company's state of domicile and, annually, to furnish financial and other information concerning the operations of companies within the holding company system that may materially affect the operations, management or financial condition of the insurers within such system. Michigan is Sun Life Assurance's "state of entry", and, as such, it is treated as Sun Life Assurance's state of domicile in the United States for purposes of the insurance holding company laws. Under such laws, all transactions within a holding company system affecting insurers must be fair and equitable and each insurer's policyholder surplus following any such transaction must be both reasonable in relation to its outstanding liabilities and adequate for its needs. The Michigan holding company laws also require prior notice or regulatory approval of the change of control of an insurer or its holding company and of material intercorporate transfers of assets or other material transactions within the holding company structure. The laws of the states in which



SL-0482

the Company's U.S. insurance subsidiaries are domiciled contain similar provisions with respect to such subsidiaries and their affiliates. Generally, under such laws, a state insurance authority must approve in advance the direct or indirect acquisition of 10% or more of the voting securities of an insurance company domiciled in its state.

Sun Life Assurance is licensed to transact business in every state in the U.S. and in the District of Columbia. Sun Life Assurance's insurance subsidiaries are, collectively, licensed to transact business in all states except Vermont and the District of Columbia. The laws of the various states establish state insurance departments with broad administrative powers to approve policy forms and, for certain lines of insurance, rates, grant and revoke licenses to transact business, regulate trade practices, license agents, require statutory financial statements and prescribe the type and amount of investments permitted. The primary purpose of such regulation by the state insurance departments is for the benefit of policyholders, rather than shareholders.

Insurance companies are required to file detailed annual and quarterly financial statements with state insurance regulators in each of the states in which they do business, and their business and accounts are subject to examination by such agencies at any time. The U.S. branch of Sun Life Assurance, which has selected Michigan as its "state of entry" into the United States, prepares such statutory financial statements in accordance with accounting practices and procedures prescribed or permitted by the Michigan Insurance Bureau, and each of the Company's U.S. insurance subsidiaries prepares such statutory financial statements in accordance with accounting practices prescribed or permitted by the insurance departments of their respective states of domicile. Such practices include publications of the National Association of Insurance Commissioners ("NAIC"), as well as state laws, regulations and general administrative rules.

In addition, as part of their routine oversight process, state insurance departments conduct detailed examinations periodically (generally every three years) of the books, records, accounts and market conduct of insurance companies domiciled in their states. Such examinations are generally conducted in cooperation with the departments of two or three other states under guidelines published by the NAIC. The Michigan Insurance Bureau conducts such examinations of Sun Life Assurance's U.S. branch. Applicable state insurance laws, rather than federal bankruptcy laws, apply to the liquidation or restructuring of insurance companies.

In recent years, a number of life and annuity insurers have been the subject of regulatory proceedings and litigation relating to alleged improper life insurance pricing and sales practices. Some of these insurers have incurred or paid substantial amounts in connection with the resolution of such matters. See "Legal Matters". In addition, state insurance regulatory authorities regularly make inquiries, hold investigations and administer market conduct examinations with respect to insurers' compliance with applicable insurance laws and regulations. In addition, state regulatory authorities, industry groups and rating agencies have developed several initiatives regarding market conduct. For example, the NAIC has adopted the NAIC Model Illustration Regulation, which applies to group and individual life insurance policies and certificates, and the Market Conduct Handbook. State regulators have imposed significant fines on various insurers for improper market conduct. The American Council of Life Insurance has established the Insurance Marketplace Standards Association ("IMSA"), a self-regulatory organization, to implement its Principles and Code of Ethical Life Insurance Market Conduct, which includes a third-party assessment procedure. Sun Life Assurance's U.S. branch is a member of IMSA. Market conduct also has become one of the criteria used to establish the ratings of an insurance company. For example, A.M. Best's ratings analysis now includes a review of the insurer's compliance program. Sun Life Assurance and its insurance subsidiaries continuously monitor sales, marketing and advertising practices and related activities of their agents and personnel and provide continuing education and training in an effort to ensure compliance with applicable insurance laws and regulations.

In recent years, the insurance regulatory framework has been placed under increased scrutiny by various states, the U.S. federal government and the NAIC. A number of state legislatures have considered or enacted legislative proposals that alter, and in many cases increase, the authority of state agencies to regulate insurance companies and holding company systems. Over the past few years, the NAIC has approved and recommended to the states for adoption and implementation several regulatory initiatives designed to reduce the risk of insurance company insolvencies, including initiatives with respect to new investment reserve requirements, risk-based capital standards and restrictions on an insurance company's ability to pay dividends to its shareholders. These initiatives may be adopted by the various states in which Sun Life Assurance and the Company's U.S. insurance subsidiaries are licensed, but the ultimate content and timing of any statutes and regulations adopted by the states or their effect on the Company cannot be determined at this time.

In particular, the NAIC has adopted a model regulation called "Valuation of Life Insurance Policies Model Regulation," which would establish new minimum statutory reserve requirements for individual life insurance policies written in the future. Before the new reserve standards can become effective, individual states must enact the model regulation. If these reserve standards were adopted in their current form, companies selling certain individual life insurance products such as term life products with guaranteed premium periods and universal life products with no-lapse guarantees would be required to adjust reserves to be consistent with the new minimum standards. It is impossible to predict whether any states will promulgate the model regulation and, if promulgated, when it will become applicable.

***Restrictions on Dividends and Capital Transactions***

The insurance holding company laws and regulations of various states regulate the amount of dividends that a domestic insurance company may pay to its parent without prior regulatory approval. Under relevant insurance laws and regulations, prior regulatory approval is required for any dividends or other distributions that are paid other than from earned surplus or that, together with any other dividends or distributions made within the preceding 12 months, exceed the greater of (a) 10% of the insurance company's surplus as of the preceding December 31 or (b) its net gain from operations for the preceding year. The Michigan Insurance Bureau has advised the Company that it currently takes the position that these restrictions on dividends apply to the U.S. branches of foreign insurance companies operating in the United States pursuant to Michigan's "state of entry" statute.

***NAIC IRIS Ratios***

The NAIC has developed a set of financial relationships or "tests" known as the Insurance Regulatory Information System ("IRIS") that were designed for early identification of companies which may require special attention or action by insurance regulatory authorities. Insurance companies submit data annually to the NAIC, which in turn analyzes the data by utilizing, in the case of life insurance companies, 12 ratios, each with defined "usual ranges". Generally, an insurance company will become subject to regulatory scrutiny if it falls outside the usual ranges of four or more of the ratios, and regulators may then act, if the company has insufficient capital, to constrain such company's underwriting capacity. Neither Sun Life Assurance nor any of its U.S. insurance subsidiaries were outside the "usual ranges" on any of the ratios for the year ended December 31, 1998.

***Statutory Investment Valuation Reserves***

Under NAIC rules, life insurance companies must maintain an asset valuation reserve ("AVR"), supplemented by an interest maintenance reserve ("IMR"). These reserves are recorded for purposes of statutory accounting practices; they are not recorded under the provisions of Canadian GAAP and therefore have no impact on the Company's reported results of operations or financial position. These reserves affect the determination of statutory surplus, and changes in such reserves may impact the ability of Sun Life of Canada to pay dividends or other distributions to the Company. The impact of the AVR will depend upon future composition of the investment portfolios of Sun Life Assurance and the Company's U.S. life insurance subsidiaries.

***Risk-Based Capital Requirements***

In order to enhance the regulation of insurer solvency, the NAIC has adopted a model law to implement risk-based capital ("RBC") requirements for life insurance companies, including foreign life insurance companies operating through a U.S. branch. The requirements are designed to monitor capital adequacy, to facilitate identification by insurance regulators of inadequately capitalized insurance companies based upon type and mixture of risks inherent in the insurer's operations, and to raise the level of protection that statutory surplus provides for policyholders. The formulas for determining the amount of risk-based capital specify various weighting factors that are applied to financial balances or various levels of activity based on the perceived level of risk. Regulatory compliance is determined by a ratio of the company's regulatory total adjusted capital, as defined by the NAIC, to its authorized control level risk based capital, as defined by the NAIC. The model law measures four major areas of risk facing life insurers: (i) the risk of loss from asset defaults and asset value fluctuations; (ii) the risk of loss from adverse mortality and morbidity experience; (iii) the risk of loss from mismatching of asset and liability cash flow due to changing interest rates and (iv) business risks. Insurers having less statutory surplus than required by the RBC model formula will be subject to varying degrees of regulatory action depending on the level of capital inadequacy.

The RBC formula provides a mechanism for the calculation of an insurance company's Authorized Control Level RBC and its total adjusted capital. The model law sets forth the points at which a state insurance regulator is authorized and expected to take regulatory action. The first level is known as the Company Action Level RBC, which is set at twice the Authorized Control Level RBC. The second level is the Regulatory Action Level RBC, set at 1.5 times the Authorized Control Level RBC. The third is the Authorized Control Level RBC, and the fourth is the Mandatory Control Level, set at 70% of the Authorized Control Level RBC.

If an insurance company's adjusted capital is higher than the Regulatory Action Level but below the Company Action Level, the insurance company must submit to its insurance regulator a comprehensive financial plan. If an insurance company's adjusted capital is higher than the Authorized Control level but lower than the Regulatory Action Level, the insurance regulator is required to perform such examination or analysis as he or she deems necessary of the insurer's business and operations and issue any appropriate corrective orders to address the insurance company's financial problems. If an insurer's adjusted capital is higher than the Mandatory Control Level but lower than the Authorized Control Level, the regulator may place the insurer under regulatory control. If the insurance company's adjusted capital falls below the Mandatory Control Level, the regulator will be required to place the insurer under

regulatory control. Based on the formula adopted by the NAIC, Sun Life Assurance and each of its U.S. insurance subsidiaries exceeded the Company Action Level as of December 31, 1998.

The Company's U.S. branch is required to maintain a certain amount of assets in trust with a financial institution acceptable to the Michigan Insurance Commissioner in an amount at all times at least equal to the sum of the U.S. branch's reserves and other liabilities, the minimum required capital and surplus and any additional amounts considered necessary by the Michigan Insurance Commissioner to cover the Company's liabilities plus a portion of its surplus in the United States. These assets are generally only available to meet the policyholder obligations of the Company to its U.S. policyholders, claimants and other U.S. branch creditors. Any amendment to the trust agreement must be approved by the Michigan Insurance Commissioner. As at June 30, 1999, the Company had assets in trust in excess of Michigan's requirements that are applicable to branches of alien insurers including the RBC requirements referred to above.

### *Minimum Statutory Surplus and Capital*

Sun Life Assurance and the Company's U.S. life insurance subsidiaries are required to have minimum statutory surplus and capital of various amounts, depending on the state in which they are licensed and the types of business they transact.

### *Regulation of Investments*

Sun Life Assurance and its U.S. insurance subsidiaries are subject to state laws and regulations that require diversification of their investment portfolios and limit the amount of investments in certain investment categories such as below investment grade fixed income securities, equity real estate and equity investments. Failure to comply with these laws and regulations would cause investments exceeding regulatory limitations to be treated as non-admitted assets for purposes of measuring surplus, and, in some instances, would require divestiture of such non-qualifying investments.

### *Assessments Against Insurers*

Insurance guaranty association laws exist in all states, the District of Columbia and Puerto Rico. Insurers doing business in any of these jurisdictions can be assessed for policyholder losses incurred by insolvent insurance companies. Recent regulatory actions against certain large life insurers encountering financial difficulty have prompted the various state insurance guaranty associations to begin assessing life insurance companies for the deemed loss. Most of these laws do provide, however, that an assessment may be excused or deferred if it would threaten an insurer's solvency and further provide for annual limits on such assessments. A large part of the assessments paid by the Company pursuant to these laws may be used as credits for a portion of the Company's premium taxes. Based on the best information presently available, the Company believes the total assessments will not be material to its operating results or financial position.

### *General Regulation of Insurance at Federal Level*

Although the U.S. federal government does not directly regulate the insurance business, federal legislation and administrative policies in several areas, including pension regulation, age and sex discrimination, investment company regulation, financial services regulation and federal taxation, do affect the insurance business. For example, Congress has from time to time considered legislation related to the deferral of taxation on the accretion of value within certain annuities and life insurance products, limitations on antitrust immunity, the removal of barriers preventing banks from engaging in the insurance business, the alteration of the federal income tax structure and the availability of Section 401(k) or individual retirement accounts. In addition, legislation has been introduced from time to time in recent years which, if ever enacted, could result in the federal government assuming a more direct role in the regulation of the insurance industry.

### *Securities Laws*

The Company, certain of its subsidiaries and certain policies and contracts offered by such subsidiaries are subject to various levels of regulation under the federal securities laws administered by the Securities and Exchange Commission (the "SEC") and under certain state securities laws.

All aspects of the Company's subsidiaries' investment advisory activities are subject to various federal and state laws and regulations in jurisdictions in which they conduct business. These laws and regulations are primarily intended to benefit investment advisory clients and investment company shareholders. MFS and certain of the Company's other subsidiaries are investment advisors registered under the Investment Advisers Act of 1940, as amended (the "Investment Advisers Act") and, as such, are regulated by and subject to examination by the SEC. The Investment

Advisers Act imposes numerous obligations on registered investment advisers, including fiduciary duties, recordkeeping and reporting requirements, operational requirements, and disclosure obligations. The SEC is authorized to institute proceedings and impose sanctions for violations of the Investment Advisers Act, ranging from censure to limitations on the investment adviser's activities to termination of an investment adviser's registration. Certain investment companies managed by such subsidiaries, including the MFS mutual funds, are registered with the SEC under, and subject to, the Investment Company Act of 1940, as amended, and the shares of certain of these entities are qualified for sale in certain states in the United States and the District of Columbia.

Certain annuity contracts and insurance policies issued by the Company's U.S. subsidiaries are registered under the Securities Act of 1933, as amended. Sun Life of Canada (U.S.) files periodic reports with the SEC under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Certain other subsidiaries of the Company are registered as broker-dealers under the Exchange Act, are subject to the SEC's net capital rules, and are members of, and subject to regulation by, the National Association of Securities Dealers.

### *ERISA Considerations*

Certain assets in the Company's U.S. insurance operations attributable to participating group annuity contracts may be considered "plan assets" within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"). In that event, the Company would be a "fiduciary" of the plans that purchased those contracts and would be subject to the fiduciary provisions of ERISA with respect to those assets. In 1993, the Supreme Court held in *John Hancock Mutual Life Insurance Company v. Harris Trust & Savings Bank* that a portion of the funds held in an insurer's general account constituted "plan assets" under ERISA. In 1996, Congress passed the Small Business Job Protection Act which, among other things, provided relief from the *Harris Trust* holding. Specifically, Congress directed the United States Department of Labor ("DOL") to promulgate regulations exempting certain group annuity contracts from the "plan asset" provisions of ERISA. In December 1997, DOL issued proposed regulations which provide that when an employee benefit plan purchases an insurance policy issued on or before December 31, 1998 that is supported by the assets of the insurer's general account, the assets of the general account will not be deemed to be "plan assets" (and the insurer will not be subject to the fiduciary provisions of ERISA in dealing with those assets), provided certain conditions are met. The regulation is still pending, but is expected to be promulgated in final form some time in 1999. A review of Sun Life Assurance's and the Company's U.S. insurance subsidiaries' procedures with respect to its general account contracts will be required to ensure compliance with the regulations. If the final regulations are adopted in a form substantially similar to the proposed regulations, the Company anticipates that it would be able to comply with such regulations in a manner that will not have a material impact on its operations.

## United Kingdom

### *Insurance Regulation*

The Company's U.K. life insurance subsidiaries are subject to the Insurance Companies Act 1982 (the "U.K. Insurance Companies Act"), administered for the most part by the FSA. All U.K. insurance companies are required to conduct their affairs in accordance with the principles of sound and prudent management set out in Schedule 2A of the U.K. Insurance Companies Act which includes the conduct of their business with due regard to the interests of policyholders and potential policyholders.

The U.K. Insurance Companies Act also requires insurance companies to file audited financial statements and related reports and to file audited accounts and other prescribed documents with the FSA.

### *Long-term Assets and Liabilities*

The Company's U.K. life insurance subsidiary will be required to maintain its life and pension assets separate from the assets attributable to non-life insurance business or to shareholders. Separate accounting and other records must be maintained and one or more separate funds to hold receipts of money applicable to insurance business must be established. Sun Life of Canada (U.K.) intends to maintain separate sub-funds for assets and liabilities representing participating policies and non-participating policies. See "Restructuring of Participating and Other Accounts on Demutualization". The U.K. Insurance Companies Act also restricts the extent to which life fund assets may be used for other purposes.

### *Margin of Solvency*

The U.K. Insurance Companies Act requires that insurance companies maintain a margin of solvency, the calculation of which in any particular case depends upon the type and amount of insurance business a company writes. Failure to maintain the margin required is one of the grounds on which wide powers of intervention provided for in the U.K. Insurance Companies Act may be exercised.

For the purpose of determining the amount of the required margin of solvency, among other things, a company must determine the amount of its long term liabilities including contingent and prospective liabilities, in accordance with the U.K. Insurance Companies Regulations. Long term liabilities are liabilities arising under or in connection with contracts for long term business. Their determination must be made on actuarial principles which have due regard to the reasonable expectations of policyholders and make proper provision for all liabilities on prudent assumptions.

The regulatory solvency position of the long term fund of a life insurance company in the U.K. is generally measured in two ways. The first is the "free asset ratio", or the ratio of the free assets (the excess of the long term admissible assets over the total of actuarial liabilities and other liabilities) to total liabilities. The second is the "cover ratio", or the ratio of free assets to the minimum margin of solvency which the Company is required to maintain.

Fluctuations in the levels of financial markets have led to some volatility in the free asset ratios and cover ratios of most U.K. life companies, since assets are valued broadly at market value, while liabilities are not so directly affected. In particular, in valuing liabilities, the appointed actuary is required to exercise his judgment about future economic conditions, demographic experience and operating costs of Sun Life of Canada (U.K.). Currently, all solvency margin requirements for the Company's United Kingdom insurance operations are being met.

***Restrictions on Dividends***

Insurance companies are subject to the provisions of the Companies Act 1985 in the payment of dividends, which prevents any distribution by a company except out of profits available for this purpose. In addition, under the U.K. Insurance Companies Act, a life insurance company and any parent company of a life insurance company cannot declare a dividend at any time when the assets of the long term business fund do not exceed the liabilities of the long term business. The U.K. Insurance Companies Act also requires that once an allocation of surplus in the long term fund in which policyholders are eligible to participate has been made to policyholders, no transfer of assets representing a subsequent part of such surplus can be made to shareholders unless the "relevant minimum" (as defined in the U.K. Insurance Companies Act) of such surplus has been allocated to policyholders or a statutory notification procedure has been carried out. Calculation of the relevant minimum is based upon the percentage of the relevant surplus previously allocated to the eligible policyholders. Under the statutory insurance scheme pursuant to which the United Kingdom branch business of Sun Life will be transferred to Sun Life of Canada (U.K.), Sun Life of Canada (U.K.) will be prohibited from transferring assets maintained in the account for participating policies to the shareholders' account. See "Restructuring of Participating and Other Accounts on Demutualization".

***Other Regulation***

Most long term insurance products are considered to be investments for the purposes for the Financial Services Act 1986 (the "Financial Services Act"). Firms carrying on investment business are regulated under the Financial Services Act. Many firms are regulated by one of the self-regulating organizations relating to the financial services industry. For example, the PIA is the main regulator for the retail marketing of investment products and the Investment Management Regulatory Organization is the regulator for investment management business.

The rules of these self-regulatory organizations impose a duty on the staff representatives of regulated firms to offer best advice to customers in respect of the range of products offered by the firm, having regard to the circumstances and aspirations of the customer. Advertisements, disclosure requirements and complaints procedures are also regulated and it is necessary for firms to comply with prescribed requirements in respect of pre-contractual information. The PIA rules contain stringent training and competence standards for staff. In addition, PIA rules impose what is known as "polarization" pursuant to which directly employed or "tied" sales staff can usually only sell the product of one company or group, while independent advisers must offer "best advice" across the wide range of products offered by companies in the relevant sector.

Sun Bank plc is authorized to take deposits in the U.K. under the Banking Act 1987 and is subject to the rules and regulations of the FSA in relation to its deposit taking business.

***Policyholders Protection Scheme***

The Policyholders Protection Scheme was established under the Policyholders Protection Act 1975 (the "Policyholders Protection Act"). It provides for the protection of certain individual U.K. policyholders who may be affected by the inability of established insurance companies carrying on business in the United Kingdom to meet their liabilities. The Policyholders Protection Scheme is administered by the Policyholders' Protection Board.

In addition, the Policyholders' Protection Board has the power to take measures for securing the transfer of all or any part of the insurance business carried on by a company in financial difficulties (but not in liquidation).