The Policyholders Protection Scheme is funded by statutory levies, calculated by reference to premium income, on authorized insurance companies. Separate levies are imposed on long term and general insurance business.

Once it has been brought into force, the Policyholders Protection Act 1997, which received Royal Assent in March 1997, will have a significant impact on the scope of protection afforded by the scheme.

### *Intervention*

The FSA (or, in some cases, the Treasury) has extensive powers to intervene in the affairs of an insurance company. Powers of intervention include the power to limit an insurance company's premium income, to restrict the range of investments in which insurance funds are placed, to impose requirements for the submission of quarterly management accounts and powers relating to investigation, information and search and the power to require the company to take appropriate actions for the fulfilment of the criteria of sound and prudent management.

### *Changes in Law*

In May 1997, the Government announced a proposal to establish the FSA as a single regulator for all financial services businesses, including supervision of insurance companies. It is expected that the FSA will assume full responsibility for insurance supervision in 2000. As a transitional measure, responsibility for insurance supervision was transferred from the Department of Trade and Industry to the Treasury with effect from January 5, 1998. While day-to-day responsibility for supervision of insurance companies has now passed (by way of delegation by the Treasury's Insurance Directorate) to the FSA, certain powers and duties have been retained by the Treasury.

On February 10, 1999, the Welfare Reform and Pensions Bill was published. This Bill contains proposals for: (i) the introduction of stakeholder pension schemes and (ii) changes to the regulatory framework for occupational and personal pensions.

Stakeholder pension schemes are intended to ensure participants have access to high quality, low cost, secure second pensions which meet specified standards. Schemes will have to allow members to make contributions either on a regular or intermittent basis and will have to accept transfers of pension rights from other schemes (unless this would prejudice its tax-approved status).

The FSA has recently published consultation papers, setting out its proposals for handling consumer complaints and compensating consumers in financial services including proposals for a single scheme to replace current compensation schemes.

The European Council formally adopted directive 99/78/EC on the supplementary supervision of insurance companies within an insurance group (the "Insurance Groups Directive") in October 1998. Currently, under European law, insurance regulation (including in respect of solvency) is directed at individual insurance companies, disregarding any connection they may have with other group companies (so-called "solo supervision"). The Insurance Groups Directive introduces certain additional measures to strengthen supervision of insurance companies which are part of a group ("solo-plus supervision") including the following:

(a) an additional solvency calculation is designed to eliminate "double-gearing", or the use of the same capital to cover different risks within a group;

(b) the insurance holding company test is intended to allow supervisory authorities to assess the potential effect of the holding company's capital structure on the solvency of the insurance company;

(c) member states will be required to monitor intra-group transactions; and

(d) further provisions are included to ensure that supervisory authorities can receive, and exchange with each other, the information needed to fulfil their functions under the directive.

The Insurance Groups Directive must be implemented by member states into national law by June 2000, to apply first to accounts for financial years beginning on January 1, 2001 or during that calendar year. The Company believes that implementation of the Insurance Groups Directive will not have a material effect on the Company's U.K. operations.

## Asia

In each of the countries in which Sun Life of Canada operates in Asia, local insurance authorities supervise and monitor the Company's business and financial condition. In a number of countries, Sun Life of Canada is required to meet specific minimum working and regulatory capital requirements.

## Philippines

### Insurance Regulation

Foreign-owned domestic insurance companies carrying on business in the Philippines are subject to the Insurance Code of 1978 (the "Insurance Code"). The Insurance Code is administered by the Insurance Commission whose main functions are to regulate and supervise the insurance industry and to protect policyholders and the public. Insurance companies in the Philippines must obtain an annual certificate of authority from the Insurance Commission. In order to obtain a renewal certificate of authority, insurance companies are required to have filed an annual report, financial statement and other filings with the Insurance Commission, and must not otherwise be in default of any other requirements of the Insurance Code. In addition, insurance companies must report any changes of control or changes of management to the Insurance Commission.

### Long-term Assets and Liabilities

Assets relating to Sun Life of Canada (Philippines)'s long term business are not required to be maintained separately from the assets relating to its general (non-life) insurance business.

### Restrictions on Dividends

An insurance company is prohibited from declaring or distributing dividends from its profits unless it retains unimpaired: (i) its entire paid-up capital stock; (ii) the margin of solvency required; (iii) the legal reserves required; and (iv) a sum sufficient to pay all net losses reported, or in the course of settlement, and all liabilities for expenses and taxes. All dividends declared or distributed must be reported to the Insurance Commission within 30 days from such declaration or distribution.

### Margin of Solvency Requirements

Following the subsidiarization of the Company's Philippines operations, Sun Life of Canada (Philippines) must maintain a margin of solvency in excess of the value of its admitted assets in the Philippines, exclusive of its paid-up capital, over the amount of its liabilities, unearned premium, and reinsurance reserves in the Philippines, of at least two Philippine Pesos per 1,000 Philippine Pesos of the total amount of its insurance in force as of the preceding year on all insurance policies, except term insurance. Currently, all solvency requirements for the Company's Philippines operations are being met.

### Powers of Intervention

The Insurance Commission has wide discretionary powers to intervene, audit, inspect and direct insurance companies doing business in the Philippines. The Insurance Commission may, among other things, direct insurance companies to comply with the Insurance Code, restrict the investments or business of insurance companies and revoke, suspend or refuse to renew an insurance company's certificate of authority.

## Hong Kong

### Insurance Regulation

The regulatory framework for insurance companies carrying on business in or from Hong Kong is prescribed by the Insurance Companies Ordinance (the "ICO") and subsidiary legislation.

The Insurance Authority is responsible for the regulation and supervision of the insurance industry, including compliance with the ICO, although to a large extent the insurance regime in Hong Kong is self-regulatory. The main functions of the Insurance Authority are to promote the general stability of the insurance industry and to protect existing and potential policyholders.

Insurance companies are required to file audited accounts, financial statements and other documents with the Insurance Authority each year, within six months after the end of their financial year.

### Long-term Assets and Liabilities

The assets relating to an insurance company's long-term business must be maintained in a separate fund from the assets relating to the company's general (non-life) insurance business. Separate accounting and other records must also be kept. The assets in the long term fund must be used exclusively to support and satisfy the liabilities of the long term business, although, except as provided under the statutory scheme of transfer pursuant to which the Hong Kong branch business is proposed to be transferred to Sun Life of Canada (International), there are no restrictions on withdrawing

surplus, that is, assets over the prescribed margin of solvency. See "Restructuring of Participating and Other Accounts on Demutualization". Under the Hong Kong statutory scheme, Sun Life of Canada (International) will be prohibited from withdrawing assets maintained for the benefit of Hong Kong Transferred Participating Policies.

The ICO requires that insurance companies maintain a prescribed margin of solvency. If an insurance company fails to maintain the required margin of solvency, the Insurance Authority may require it to submit a plan for the restoration of a sound financial position or may exercise any of its other powers of intervention under the ICO. Compliance with the solvency margin requirements is reported annually to the Insurance Authority. Currently, all solvency requirements for the Company's Hong Kong operations are being met.

*Restrictions on Dividends*

Provided that there is sufficient surplus in the relevant fund (that is, sufficient excess of assets over the prescribed solvency margin), there are no restrictions under the ICO on the amount of dividends distributable either to policyholders or shareholders.

*Supervision of Management and Change of Control*

Insurance companies which are authorized to carry on business in Hong Kong, but are incorporated outside Hong Kong, are required to obtain the Insurance Authority's prior approval to any proposed change of managing director or chief executive responsible for the business carried on in Hong Kong. The Insurance Authority must also be notified of changes in other directors and controllers of such companies, including changes in shareholders who (alone or with any associate) are entitled to exercise, or control the exercise of, 15% or more of the voting power at any general meeting of the company.

*Powers of Intervention*

The Insurance Authority has extensive powers to intervene in the carrying on of an insurance company's business in Hong Kong. These powers are exercisable if, among other things, it appears to the Insurance Authority that the insurance company has failed to satisfy any of its obligations under the ICO, or if the Insurance Authority considers it desirable to exercise its powers in order to protect policyholders against the risk that the insurance company may be unable to meet its liabilities or to fulfil policyholders' reasonable expectations.

The Insurance Authority's powers include restricting the insurance company from effecting new business, prohibiting it from making investments of a particular class or description and requiring it to maintain assets in Hong Kong. Its ultimate sanction is to withdraw the insurance company's authorization, or to petition for its winding-up.

## DIRECTORS AND EXECUTIVE OFFICERS OF FINANCIAL SERVICES

### Directors

The by-laws of Financial Services provide that the Financial Services Board will consist of a minimum of 8 directors and a maximum of 20 directors. The exact number of directors to be elected at any annual meeting of shareholders of Financial Services will be fixed by the Financial Services Board prior to the meeting. Each director will be elected for a term of not more than three years, with terms staggered so that one third, as nearly as may be, of the Financial Services Board is elected at the annual meeting each year. The name, municipality of residence, positions with Financial Services and principal occupation of each of the directors of Financial Services are as follows:

| Name and Municipality of Residence | Positions with Financial Services | Principal Occupation |
|---|---|---|
| Dian N. Cohen, C.M., LL.D. Ayer's Cliff, Quebec | Director | President, Dian Cohen Productions Ltd. |
| Prof. M. Colyer Crum Weston, Massachusetts | Director | Company Director |
| Stanley H. Hartt, O.C., Q.C. Toronto, Ontario | Director | Chairman, Salomon Smith Barney Canada Inc. |
| The Hon. Donald S. Macdonald, P.C., C.C. Toronto, Ontario | Director | Counsel, McCarthy Tetrault |
| John M. MacLeod Calgary, Alberta | Director | Corporate Director |

| Name and Municipality of Residence | Positions with Financial Services | Principal Occupation |
|---|---|---|
| Angus A. MacNaughton . . . . . . . . . . . . . . Danville, California | Director | President, Genstar Investment Corporation |
| John D. McNeil, C.F.A. . . . . . . . . . . . . . . . Toronto, Ontario | Director | Company Director |
| Bertin F. Nadeau . . . . . . . . . . . . . . . . . . . . Montreal, Quebec | Director | Chairman and Chief Executive Officer, GescoLynx Inc. |
| Ronald W. Osborne, F.C.A. . . . . . . . . . . . . . Toronto, Ontario | Director | President and Chief Executive Officer, Ontario Power Generation Inc. |
| Alfred Powis, O.C. . . . . . . . . . . . . . . . . . . . Toronto, Ontario | Director | Company Director |
| Sir Bob Reid . . . . . . . . . . . . . . . . . . . . . . London, England | Director | Deputy Governor, Bank of Scotland |
| Donald A. Stewart, F.I.A., F.C.I.A. . . . . . . . . Mississauga, Ontario | Chairman of the Board and Chief Executive Officer | Chairman and Chief Executive Officer, Sun Life Assurance |
| William W. Stinson . . . . . . . . . . . . . . . . . . Calgary, Alberta | Director | Chairman Executive Committee, United Dominion Industries |
| W. Vickery Stoughton . . . . . . . . . . . . . . . . Los Angeles, California | Director | Chairman and Chief Executive Officer, Careside, Inc. |
| David G. Vice . . . . . . . . . . . . . . . . . . . . . Mississauga, Ontario | Director | Company Director |
| Jeannine Guillevin Wood, O.C. . . . . . . . . . Montreal, Quebec | Director | Chairman of the Board, Laurentian Bank of Canada |

## Committees of the Board

It is expected that Financial Services will have the same committees of the board of directors as those of Sun Life Assurance. The board of directors of Sun Life Assurance fulfils its responsibilities directly and through the work of six committees.

The Executive Committee considers general policy issues affecting the Company on a worldwide basis. Of particular importance is the responsibility to review the investment policies and the invested assets of the Company each year, and to review and recommend approval of dividends to policyholders.

The Audit Committee oversees the system of internal controls and financial reporting of the Company. It also reviews compliance with legislative and regulatory requirements, and monitors compliance with the Code of Business Conduct of the Company.

The Nominating and Corporate Governance Committee is responsible for corporate governance matters and makes recommendations on Board meeting processes, new Board nominees, Committee mandates and membership, and Directors' compensation.

The Management Resources Committee is responsible for the compensation policies of the Company, the succession planning process, review of senior management performance and remuneration, and overseing the staff and agents' pension plans.

The Conduct Review Committee reviews the "related party" procedures and practices of the Company in accordance with statutory requirements.

The Risk Review Committee is responsible for overseeing the major areas of business risk facing the Company as well as approving, and reviewing compliance with, policies implemented by the Company for the management and control of risk.

## Executive Officers

The name and positions with Financial Services of each of the executive officers of Financial Services are as follows:

| Name | Positions with Financial Services |
|---|---|
| Thomas A. Bogart | Senior Vice-President and Chief Legal Officer |
| Gregory W. Gee | Vice-Chairman |
| Marcel M. Gingras | Senior Vice-President and General Manager for Canada |
| Michael A. Hasley | Senior Vice-President, Finance |
| John S. Lane | Senior Vice-President, Investments |
| Yves Laneuville | Senior Vice-President, Asia |
| James A. McNulty III | Senior Vice-President and General Manager for the United States |
| A. Stephen Melcher | Senior Vice-President and General Manager for the United Kingdom |
| C. James Prieur | President and Chief Operating Officer |
| Robert J. Sharkey | Senior Vice-President |
| Donald A. Stewart | Chairman of the Board and Chief Executive Officer |
| C.L.F. Watchorn | Senior Vice-President, Strategic Development |
| John R. Wright | Senior Vice-President and Chief Information Officer |

Each of the directors and executive officers of Financial Services has been engaged for more than five years in his or her present principal occupation or in other capacities with the company or organization (or predecessor thereof) in which he or she currently holds his or her principal occupation except: Professor Crum, who prior to July 1996 was Professor of Investment Management, Harvard University Graduate School of Business Administration; Mr. Hartt, O.C., Q.C., who prior to October 1996 was Chairman, President and Chief Executive Officer of Camdev Corporation; Mr. Osborne, who prior to March 1998 was President and Chief Executive Officer of Bell Canada, prior to September 1997 was President of BCE Inc., prior to May 1996 was Executive Vice President and Chief Financial Officer of BCE Inc. and prior to January 1995 was President and Chief Executive Officer of Maclean Hunter Limited; Mr. Powis, O.C., who prior to April 1995 was Chairman of Noranda Inc.; Sir Bob Reid, who prior to March 1995 was Chairman of British Railways and from 1995 to 1997 was Chairman of London Electricity; Mr. Stinson, who prior to May 1996 was Chairman and Chief Executive Officer of Canadian Pacific Limited; Mr. Stoughton, who prior to July 1996 was President of SmithKline Beecham Diagnostic Systems and prior to October 1995 was President of SmithKline Beecham Clinical Laboratories; Ms. Wood, O.C., whose principal occupation prior to December 1997 was chairman of Guillevin International Inc., a position which she continues to hold; Mr. Bogart, who prior to August 1998, was a Partner with Tory Tory DesLauriers & Binnington, a law firm; Mr. McNulty, who prior to April 1998, was President, Reinsurance Division, of Union Mutual Life Insurance Company; Mr. Melcher, who prior to December 1998, was a Senior Executive Advisor with Marsh & McLennan Securities Corp., prior to 1997 was Chief Executive of Allied Dunbar Assurance PLC/ Eagle Star Life Assurance Co. and prior to 1996 was Chief Executive of Eagle Star Holdings; and Mr. Wright, who prior to October 1996 was Vice-President, Systems, with The New England, a life insurance company.

# DIRECTORS' AND OFFICERS' REMUNERATION

## Directors' Compensation

Directors of Financial Services receive a retainer of $11,000 per annum. Retainers are also paid to the members of certain Committees of the Board of Directors as follows: members of the Executive Committee – $2,250 per annum; members of the Audit Committee – $1,750 per annum; and members of the Nominating and Corporate Governance Committee, Risk Review Committee, and Management Resources Committee – $1,250 per annum. The Chairs of the Executive Committee and the Audit Committee each receive an additional retainer of $1,750 per annum; the Chairs of the Nominating and Corporate Governance Committee, Risk Review Committee and Management Resources Committee receive an additional retainer of $1,250 per annum. In addition, the director appointed to serve as spokesperson for the outside directors of the Company shall receive an additional annual retainer of $5,000. Directors receive an attendance fee of $1,200 for each Board meeting, Committee meeting and Directors' Education Seminar that they attend. Directors who are officers of Financial Services or Sun Life of Canada do not receive fees for serving as directors. Directors are reimbursed for travel and other out of pocket expenses incurred in connection with meetings of the Board of Directors or any committee of the Board of Directors. The by-laws of Financial Services provide that the annual appropriation for the compensation of all directors shall not exceed $600,000, plus reimbursement for reasonable expenses. Directors of Financial Services who also serve as directors of Sun Life Assurance will be

compensated by Sun Life Assurance for services performed in their capacity as directors of that company, on the same basis as which they are compensated for serving as directors of Financial Services. Where meetings of the Financial Services Board are held concurrently with meetings of the board of directors of Sun Life Assurance, attendance fees and expenses for such meetings will be shared equally between Financial Services and Sun Life Assurance.

## Executive Compensation

Financial Services was incorporated on August 5, 1999 for purposes of the demutualization and, prior to the demutualization, will be a wholly-owned subsidiary of Sun Life Assurance. Securities laws require that an issuer of securities disclose the compensation of certain of its senior officers. As, prior to the date hereof, Financial Services had no operations and its officers had not received any compensation for serving in such capacities, except where otherwise indicated, information relating to the compensation of the applicable senior officers of Sun Life Assurance has been included in this Policyholder Information Circular.

The Summary Compensation Table sets forth, for the periods indicated, the compensation of the Chief Executive Officer ("CEO"), and the four other most highly compensated executive officers of Sun Life Assurance, measured by base salary and incentive bonuses pertaining to the year ended December 31, 1998. The CEO and these four officers are referred to collectively as the "Named Executives". Donald A. Stewart succeeded John D. McNeil as CEO on April 9, 1998, following which Mr. McNeil continued to hold the office of Chairman of the Board until his retirement on April 8, 1999. Mr. Stewart was appointed Chairman on April 8, 1999.

### Summary Compensation Table

| | | Annual Compensation | | | Long-Term Compensation | | |
|---|---|---|---|---|---|---|---|
| | | | | | Awards | Payouts | |
| Name & Principal Position | Year | Salary $ | Bonus[1] $ | Other Annual Compensation[2] $ | Units granted under LTIP[3] | LTIP Payouts $ | All other Compensation $ |
| John D. McNeil<br>Chairman (Retired) | 1998<br>1997 | 875,000<br>829,327 | –<br>625,000 | –<br>– | 250,000<br>– | –<br>– | –<br>– |
| Donald A. Stewart<br>Chairman & Chief Executive Officer | 1998<br>1997 | 588,077<br>474,077 | –<br>300,000 | –<br>– | 185,500<br>– | –<br>– | –<br>– |
| Gregory W. Gee[4]<br>Vice-Chairman | 1998 | 308,308 | 215,200 | – | 72,000 | – | – |
| Michael A. Hasley<br>Senior Vice-President, Finance | 1998<br>1997 | 300,000<br>297,600 | 207,000<br>140,500 | –<br>– | 53,000<br>– | –<br>– | –<br>– |
| C. James Prieur[5]<br>President & Chief Operating Officer | 1998 | 342,789(U.S.) | 136,700(U.S.) | 50,722(U.S.) | 107,000 | – | – |

1. Named Executives participate in an incentive compensation program, which provides for annual cash payments to participants, based on the achievement of predetermined corporate, group and individual results. The Board of Directors determines actual awards at the March meeting following completion of the fiscal year. A special bonus was paid to each of Mr. Gee and Mr. Hasley in December 1998 for exceptional efforts on critical projects undertaken in 1998.

2. The amounts in this column represent taxable benefits for automobile costs, club memberships, spousal travel and other employee benefit costs.

3. Represents Value Appreciation Units which were granted effective January 1, 1998 for 1998 and 1999 under the Company's Unit Value Application Plan. See "Description of Long Term Incentive Plan" and "Long Term Incentive Plan – Awards in Most Recently Completed Financial Year".

4. Mr. Gee was appointed Executive Vice President on April 9, 1998 and Vice-Chairman on April 8, 1999.

5. Mr. Prieur was appointed General Manager, U.S. on November 13, 1997 and President and Chief Operating Officer on April 8, 1999. The other annual compensation for Mr. Prieur includes U.S. $17,907 for travel expenses and U.S. $19,550 for tuition expenses. During 1998, Mr. Prieur was resident in the United States.

### *Change of Control Contracts*

In 1998, Sun Life Assurance introduced change of control contracts for the CEO and seven Senior Vice Presidents. In the event of a change of control, which results in the termination of the employment of the executive, the contracts provide for up to 24 months of base pay and target incentive compensation from the date of actual termination. Most benefits and perquisites are continued throughout the severance period and the early retirement reduction factors in the pension plan may be improved. On a change of control, outstanding Value Appreciation Units awarded under the Unit Value Appreciation Plan will become vested.

### *Long Term Incentive Compensation*

Effective January 1, 1998, Sun Life Assurance introduced a long term incentive compensation plan for certain officers of Sun Life Assurance holding positions at the level of Vice President or higher. The Unit Value Appreciation Plan (the "UVA Plan") provides eligible officers with value appreciation units ("Value Appreciation Units") designed to reward management for growth in the value of the Company over a multi-year period. For purposes of the UVA Plan, the value of the Company is determined by applying predefined multiples to the net income earned in the Company's various businesses. When the UVA Plan was introduced, participants were awarded two allotments of Value Appreciation Units – a three-year grant and a four-year grant, representing grants for 1998 and 1999, respectively. The three-year grant will reward increases in the value of the Company from January 1, 1998 to December 31, 2000. The four-year grant will reward increases in the value of the Company from January 1, 1998 to December 31, 2001. The starting value of the Value Appreciation Units at the time of these grants was established by reference to the Company's 1997 financial results, adjusted for certain items. Awards are payable in cash and are based on the increase in the value of Value Appreciation Units over the performance period. The UVA Plan does not establish minimum thresholds, targets or maximum payouts.

### *Long-term Incentive Plan – Awards in Most Recently Completed Financial Year*

The following table sets forth information concerning the award of Value Appreciation Units under the Company's UVA Plan in the year ended December 31, 1998 in respect of the Named Executive Officers:

| Name | Units | Performance Period |
|---|---|---|
| John D. McNeil | 125,000<br>125,000 | 3 years<br>4 years |
| Donald A. Stewart | 85,500<br>100,000 | 3 years<br>4 years |
| Gregory W. Gee | 32,000<br>40,000 | 3 years<br>4 years |
| Michael A. Hasley | 26,500<br>26,500 | 3 years<br>4 years |
| C. James Prieur | 42,500<br>64,500 | 3 years<br>4 years |

## Pension Plan Table

Executive officers of the Company are eligible to participate in the pension plans available in their country of residence. The following describes the pension arrangements in effect in Canada and the United States.

### *Retirement Benefits for Executive Officers in Canada*

The following table illustrates the total pension calculated according to the Alternate Pension Formula for principal officers of Sun Life Assurance. Average pensionable earnings for this purpose are calculated as the highest average of the basic salary and target bonus over the best consecutive 36 month period of the last 120 months. The pension benefit is determined as years of service multiplied by the sum of 1.3% of pensionable earnings up to the average of the last three years' maximum pensionable earnings ("YMPE") and 1.65% of average pensionable earnings over the average YMPE, without regard to the maximum pension limit for registered pension plans imposed by Revenue Canada. In no event can the pension exceed 85% of the participant's highest average base salary. The credited years of service are limited to 35.

The pension is payable to Canadian Named Executives from a combination of the Company's Canadian Staff Pension Plan (a non-contributory defined benefit pension plan) and the Company's Canadian Staff Non-Registered

Pension Plan. Upon retirement, income is payable for the life of the executive officer with a 60% survivor option for married employees and a life only benefit for single employees.

### Annual Pension – Canada

| Average Pensionable Earnings | Years of Service | | | | |
|---|---|---|---|---|---|
| | 15 | 20 | 25 | 30 | 35 |
| $ 200,000 | $ 47,608 | $ 63,478 | $ 79,347 | $ 95,217 | $ 111,086 |
| 250,000 | 59,983 | 79,978 | 99,972 | 119,967 | 139,961 |
| 300,000 | 72,358 | 96,478 | 120,597 | 144,717 | 168,836 |
| 400,000 | 97,108 | 129,478 | 161,847 | 194,217 | 226,586 |
| 600,000 | 146,608 | 195,478 | 244,347 | 293,217 | 342,086 |
| 800,000 | 196,108 | 261,478 | 326,847 | 392,217 | 457,586 |
| 1,000,000 | 245,608 | 327,478 | 409,347 | 491,217 | 573,086 |
| 1,200,000 | 295,108 | 393,478 | 491,847 | 590,217 | 688,586 |
| 1,500,000 | 369,358 | 492,478 | 615,597 | 738,717 | 861,836 |
| 1,800,000 | 443,608 | 591,478 | 739,347 | 887,217 | 1,035,086 |

***Retirement Benefits for Executive Officers in the United States***

The following table illustrates the total annual pension for employees in the United States who are eligible to participate in the U.S. Employees' Retirement Income Plan and accompanying Trust (the "Plan"). Under the Plan, income is payable for the life of the eligible officer. The normal form of pension for single employees is a life annuity; for married individuals it is an actuarially reduced 50% joint and survivor benefit.

Pensionable earnings for this purpose are calculated using the highest average of base earnings and officer incentive payment, up to target, earned over the highest consecutive 36 month period in the last 120 months. The pension benefit is determined by years of service (maximum of 30) multiplied by 1.67% of the pensionable earnings, plus 0.5% of pensionable earnings for service in excess of 30 years (to a maximum of 40).

In no event can the annual pension benefit exceed U.S. $125,000 at the normal retirement age as defined by the United States Social Security Office. The maximum pensionable earnings that can be used to determine this benefit is U.S. $160,000. Benefits attributable to pensionable earnings over the U.S. $160,000 maximum are accounted for under the United States Excess Plan, a pension plan with terms similar to the Plan, which provides for earnings in excess of the U.S. $160,000 maximum. The following table shows combined benefits under both the Plan and the U.S. Excess Plan.

### Annual Pension – United States (U.S. $)

| Average Pensionable Earnings (U.S.$) | Years of Service | | | | |
|---|---|---|---|---|---|
| | 15 | 20 | 25 | 30 | 35 |
| $200,000 | $ 50,000 | $ 66,667 | $ 83,333 | $100,000 | $105,000 |
| 225,000 | 56,250 | 75,000 | 93,750 | 112,500 | 118,125 |
| 250,000 | 62,500 | 83,333 | 104,167 | 125,000 | 131,250 |
| 300,000 | 75,000 | 100,000 | 125,000 | 150,000 | 157,500 |
| 400,000 | 100,000 | 133,333 | 166,667 | 200,000 | 210,000 |
| 600,000 | 150,000 | 200,000 | 250,000 | 300,000 | 315,000 |

***Years of Credited Service***

Mr. J.D. McNeil retired with 35 years credited service under the Company's Canadian pension plan. The projected years of credited service under their respective pension plans, at their normal retirement date for the Named Executives, are as follows: Mr. D.A. Stewart, 35 years; Mr. G.W. Gee, 35 years; Mr. M.A. Hasley, 32 years; and Mr. C.J. Prieur, 37 years.

## Indebtedness of Directors, Executive Officers and Senior Officers

As at August 31, 1999, the aggregate indebtedness entered into in connection with the purchase of securities of the Company or any of its subsidiaries by all directors, officers, employees and former directors, officers and employees of the Company or any of its subsidiaries was $132,977,629. Of this aggregate indebtedness, $132,207,453 relates to financing provided by MFS to eligible MFS employees for purchases of common shares of MFS under the MFS Equity

Purchase and Participation Plan. The balance is related to loans provided by McLean Budden to eligible McLean Budden officers for purchases of common shares of McLean Budden. No indebtedness was incurred by directors and executives of Sun Life of Canada for the purchase of securities of the Company or its subsidiaries.

As at August 31, 1999, the aggregate indebtedness entered into for purposes other than in connection with the purchase of securities, by directors, officers employees and former directors, officers and employees of the Company or any of its subsidiaries was $113,934,071. The majority of this indebtedness relates to housing loans to employees, secured by their principal residences. No senior officers of the Company were indebted to the Company or any of its subsidiaries, other than for "routine indebtedness".

## OWNERSHIP OF SHARES

After giving effect to demutualization, the directors and senior officers of Financial Services will own beneficially, as a group, less than one-tenth of 1% of the Financial Services Shares outstanding. All of these Financial Services Shares will be issued to directors and senior officers or certain persons or entities affiliated with them as eligible policyholders under the Conversion Plan.

## STOCK OPTION AND EMPLOYEE SHARE PURCHASE PLANS

The Canadian Demutualization Regulations provide that neither a demutualized life insurance company nor its holding company may, prior to the listing of its shares on a recognized stock exchange in Canada and for a period of one year after such a listing, issue or provide shares, share options or rights to acquire shares of the company to any director, officer or employee of the company or any person who was a director, officer or employee of the company during the year preceding the effective date of demutualization of the company and who ceased to be a director, officer or employee of the company, other than shares issued to that person as an eligible policyholder.

The Financial Services Board intends to establish a stock option plan (the "Option Plan") for key officers and employees of Financial Services and certain of its subsidiaries. The Option Plan will not become effective until the one year restriction period imposed by the Canadian Demutualization Regulations has ended. The Option Plan will be designed to align the interests of shareholders and plan participants, and will reward participants for the creation of shareholder value. Shareholder approval of the option plan will be required. The Financial Services Board will administer the Option Plan in compliance with applicable law and the rules of stock exchanges on which the shares are listed. The Financial Services Board will determine the exercise price and option term at the time of grant. The exercise price of an option will not be less than the market price of Financial Services Shares at the time of grant and the options will be for a term not exceeding 10 years. The options will be exercisable by a holder subject to a vesting schedule to be established by the Financial Services Board at the time of grant.

Financial Services also intends to establish a voluntary employee share purchase plan (the "Purchase Plan") on demutualization to facilitate employee ownership of Financial Services Shares. No shareholder approval is required for the Purchase Plan. Eligible employees of Financial Services and its subsidiaries will be permitted to purchase Financial Services Shares through payroll deductions up to a maximum percentage of their base salary. All purchases of Financial Services Shares under the Purchase Plan will be made in the open market.

Initially, purchases of Financial Services Shares by employees under the Purchase Plan will not be made with a financial contribution from Financial Services. However, at a date following the one year restriction period imposed by the Canadian Demutualization Regulations, Financial Services may amend the Purchase Plan to provide for contributions by Financial Services towards the purchase price of Financial Services Shares.

## DESCRIPTION OF SHARE CAPITAL OF FINANCIAL SERVICES

The authorized capital of Financial Services consists of an unlimited number of common shares, an unlimited number of Class A Shares, issuable in series, and an unlimited number of Class B Shares, issuable in series, the share conditions of which are summarized below. As of the date hereof, one common share is issued and outstanding and 100,000 Class A Shares are issued and outstanding. No Class B Shares are issued and outstanding. All of the issued and outstanding common shares and Class A Shares are currently held by Sun Life Assurance. The common share and Class A Shares held by Sun Life Assurance will be repurchased by Financial Services and Financial Services Shares will be issued to certain eligible policyholders on the date of demutualization. See "Financial Services and Corporate Reorganization" in Part 1 of this Policyholder Information Circular.

### *Common Shares*

Each common share of Financial Services is entitled to one vote at meetings of the shareholders of Financial Services, except for meetings at which only holders of another specified class or series of shares of Financial Services are

entitled to vote separately as a class or series. Each common share of Financial Services is also entitled to receive dividends if, as and when declared by the Financial Services Board. All dividends that the Financial Services Board may declare and pay will be declared and paid in equal amounts per share on all common shares of Financial Services, subject to the rights of holders of the Class A Shares and the Class B Shares. Holders of common shares will participate in any distribution of the net assets of Financial Services upon its liquidation, dissolution or winding-up on an equal basis per share, subject to the rights of the holders of the Class A Shares and the Class B Shares. There are no pre-emptive, redemption, purchase or conversion rights attaching to the common shares.

***Class A Shares***

The Class A Shares may be issued at any time or from time to time in one or more series as may be determined by the Financial Services Board. The Financial Services Board is authorized to fix before issue the number, the consideration per share and the designation of and, subject to the special rights and restrictions attached to all Class A Shares, the rights and restrictions attached to the Class A Shares of each series. The Class A Shares of each series rank on a parity with the Class A Shares of each other series with respect to the payment of dividends and the return of capital on the liquidation, dissolution or winding-up of the Company. The Class A Shares are entitled to preference over the Class B Shares, the common shares and any other shares ranking junior to the Class A Shares with respect to the payment of dividends and the return of capital. The special rights and restrictions attaching to the Class A Shares as a class may not be amended without such approval as may then be required by law, subject to a minimum requirement of approval by the affirmative vote of at least two-thirds of the votes cast at a meeting of the holders of Class A Shares to be called and held for that purpose. The holders of Class A Shares are not entitled to any voting rights except as provided by law.

***Class B Shares***

The Class B Shares may be issued at any time or from time to time in one or more series as may be determined by the Financial Services Board. The Financial Services Board is authorized to fix before issue the number, the consideration per share and the designation of and, subject to the special rights and restrictions attached to all Class B Shares, the rights and restrictions attached to the Class B Shares of each series. The Class B Shares of each series rank on a parity with the Class B Shares of each other series with respect to the payment of dividends and the return of capital on the liquidation, dissolution or winding-up of Financial Services. The Class B Shares are entitled to preference over the common shares and any other shares ranking junior to the Class B Shares with respect to the payment of dividends and the return of capital, but are subordinate to the Class A Shares and any other shares ranking senior to the Class B Shares with respect to the payment of dividends and return of capital. The special rights and restrictions attaching to the Class B Shares as a class may not be amended without such approval as may then be required by law, subject to a minimum requirement of approval by the affirmative vote of at least two-thirds of the votes cast at a meeting of the holders of Class B Shares to be called and held for that purpose. The holders of Class B Shares are not entitled to any voting rights except as provided by law.

## DIVIDEND POLICY OF FINANCIAL SERVICES

Financial Services intends to consider paying dividends to shareholders in a range that is comparable to that of shareholder dividends paid by other publicly traded North American financial services companies. The dividend policy will be reviewed periodically by the Financial Services Board. The declaration and payment of dividends are at the sole discretion of the Financial Services Board and will be dependent upon the Company's earnings, financial condition and capital requirements, and dividends may be adjusted or eliminated at the discretion of the Financial Services Board on the basis of these or other considerations.

As a holding company, Financial Services' ability to meet its cash requirements and pay dividends on the Financial Services Shares will depend in large part upon the receipt of dividends and other payments from its subsidiaries. The payment of dividends to Financial Services by certain of its subsidiaries is regulated under corporate, insurance and securities laws. See "Regulatory Matters" and "Risk Factors – Holding Company Structure and Restrictions on Dividends".

Subject to regulatory approval, Financial Services intends to adopt a dividend reinvestment plan (the "Dividend Reinvestment Plan"), which is not expected to be implemented by the Board of Financial Services until at least 12 months after the date of demutualization. Pursuant to the Dividend Reinvestment Plan, holders of Financial Services Shares in certain jurisdictions will be able to elect to have all dividends paid on Financial Services Shares held by them automatically reinvested in additional Financial Services Shares at a price per Financial Services Share calculated by reference to the weighted average of the trading price for Financial Services Shares on a stock exchange on which the Financial Services Shares are listed for the five trading days immediately preceding the date the relevant dividend is paid by Financial Services. No brokerage commissions will be payable in connection with the purchase of Financial Services

Shares under the Dividend Reinvestment Plan and all administrative costs will be borne by Financial Services. Proceeds received by Financial Services upon the issuance of additional Financial Services Shares under the Dividend Reinvestment Plan will be used by Financial Services for working capital.

## CONSTRAINTS ON OWNERSHIP OF FINANCIAL SERVICES SHARES

The Canadian Insurance Act and the regulations thereunder contain restrictions on the purchase or other acquisition, issue, transfer and voting of the shares of a demutualized insurance company or, when a holding company structure is used, its holding body corporate. Pursuant to these restrictions, no person is permitted to acquire any shares of Financial Services if the acquisition would cause the person to have a "significant interest" in any class of shares of Financial Services. In addition, Financial Services is not permitted to record any transfer or issue of its shares if the transfer or issue would cause the person to have a significant interest in Financial Services. No such person who has a significant interest in Financial Services may exercise any voting rights attached to the shares held by such person. For these purposes, a person has a significant interest in a class of shares of Financial Services where the aggregate of any shares of that class beneficially owned by that person, any entity controlled by that person and by any person acting jointly or in concert with that person exceeds 10% of all the outstanding shares of that class of shares of Financial Services. If a person contravenes any of these restrictions, the Minister of Finance of Canada may, by order, direct such person to dispose of all or any portion of those shares.

In June 1999 the Canadian government announced its intention to change the ownership regime described above to allow an investor to hold up to 20% of any class of voting shares, and up to 30% of any class of non-voting shares, for a demutualized insurance company having shareholders' equity in excess of $5 billion, or its holding body corporate, subject to a "fit and proper" test. The government also indicated that the fit and proper test would include an examination of the proposed investor's past business record, the soundness of its business plan and the business reasons for the investment and would seek to assess whether the proposed investor has the necessary integrity and fitness of character. The government indicated that this test would be designed to help ensure that key shareholders are not a source of weakness to regulated institutions such as Financial Services.

In addition, the government announced that during a two-year transitional period following demutualization no mergers with or acquisition of another demutualized insurance company will be permitted. After this two-year transition period, Financial Services would be permitted, subject to obtaining necessary regulatory approval, to merge with another demutualized insurance company and, in certain circumstances, to acquire a demutualized insurance company with less than $5 billion in shareholders' equity, subject to a requirement that 35% of the acquired company's voting shares be held by the public. However any demutualized insurance company, or its holding body corporate, such as Financial Services, with more than $5 billion in shareholders' equity would not be permitted to be acquired.

No legislation has been passed or tabled by the Canadian government to implement these proposals.

## CORPORATE GOVERNANCE OF SUN LIFE ASSURANCE

The corporate governance rights of Sun Life Assurance will be shared between Financial Services, as the holder of all of the outstanding common shares of Sun Life Assurance, and participating policyholders of Sun Life Assurance. See "Ongoing Rights of Participating Policyholders – Voting Rights" in Part 1 of this Policyholder Information Circular. The participating policyholders will be entitled to elect at least one-third of the board of directors of Sun Life Assurance and Financial Services will be entitled to elect the remaining members of the board of directors of Sun Life Assurance. The board of directors of Sun Life Assurance will continue to have a fiduciary duty to act in the best interests of Sun Life Assurance and may only consider the interests of particular stakeholders if they do not conflict with those of the company. In most cases, amendments to the letters patent or the by-laws of Sun Life Assurance will be required to be approved by the participating policyholders and Financial Services, voting together. Participating policyholders will have the right to vote as a separate class on certain significant corporate transactions, including: (i) any proposal to amend its by-laws to add, change or remove the rights of policyholders, other than participating policyholders, to vote at meetings of policyholders or shareholders, (ii) any amalgamation agreement, (iii) any proposed agreement of Sun Life Assurance to transfer all or substantially all of its policies, reinsure all or substantially all of its risks or sell all or substantially all of its assets and (iv) any proposal to mutualize Sun Life Assurance. As a result, Sun Life Assurance's participating policyholders may have an effective veto right on certain transactions which Financial Services, the sole shareholder of Sun Life Assurance, may otherwise approve. Each participating policyholder is entitled to one vote on such matters, irrespective of the number or size of policies owned, both before and after demutualization. Financial Services will be entitled to one vote for each common share of Sun Life Assurance that it holds.

## AUDITORS

The auditors of the Company are Deloitte & Touche LLP, Chartered Accountants, Suite 1400, BCE Place, 181 Bay Street, Toronto, Ontario, Canada M5J 2V1.

## TRANSFER AGENTS AND REGISTRARS

The transfer agents and registrars for the Financial Services Shares are set out below:

| | |
|---|---|
| **Canada:** | CIBC Mellon Trust Company<br>320 Bay Street, 3rd Floor<br>Toronto, Ontario<br>Canada M5H 4A6 |
| **United States:** | ChaseMellon Shareholder Services, L.L.C.<br>Overpeck Centre<br>85 Challenger Road<br>Ridgefield Park, New Jersey 07660<br>U.S.A. |
| **United Kingdom:** | IRG plc<br>Bourne House<br>34 Beckenham Road<br>Beckenham<br>Kent BR3 4TU<br>United Kingdom |
| **Philippines:** | The Hongkong and Shanghai Banking Corporation<br>33/F Philippine Stock Exchange Centre<br>West Tower, Exchange Road<br>Ortigas Centre, Pasig City<br>Philippines |
| **Hong Kong:** | Central Registration Hong Kong Limited<br>Room 1901-5, 19th Floor<br>Hopewell Centre<br>183 Queen's Road East<br>Wanchai<br>Hong Kong |
| **Bermuda:** | The Bank of N.T. Butterfield & Son Ltd.<br>65 Front Street<br>Hamilton HM 12<br>Bermuda |

## AVAILABILITY OF CERTAIN DOCUMENTS

Copies of the following documents may be examined by eligible policyholders between the hours of 9:00 a.m. and 5:00 p.m. (local time), Monday through Friday, at the principal office of Sun Life of Canada in each of Canada, the United States, Hong Kong and the Philippines: (i) the Letters Patent of Financial Services; (ii) the by-laws of Financial Services; (iii) the current Letters Patent of Sun Life Assurance; (iv) the current by-laws of Sun Life Assurance; (v) the Letters Patent of Conversion for Sun Life Assurance to be issued in order to effect the Conversion Plan; (vi) the by-laws of Sun Life Assurance as they are proposed to be amended upon demutualization; and (vii) the Conversion Plan. The address of the head office of Sun Life Assurance in Canada is 150 King Street West, Toronto. The Company's principal office in the United States is One Sun Life Executive Park, Wellesley Hills, Massachusetts, its principal office in the United Kingdom is Basing View, Basingstoke, Hampshire, its principal office in Hong Kong is 11/F Paliburg Plaza, 68 Yee Wo Street, Causeway Bay and its principal office in the Philippines is 11 Paseo de Roxas, Makati, Metro Manila. Copies of any of the above-noted documents may be requested by contacting Sun Life Assurance at one of the above addresses.

## ENFORCEABILITY OF CIVIL LIABILITIES

Each of Sun Life Assurance and Financial Services is a corporation incorporated under the laws of Canada. A majority of each of its directors and officers, as well as certain experts named herein, are residents of Canada and all or a substantial portion of their assets are located in Canada. Most of the assets owned by Sun Life Assurance and Financial Services are located in Canada. The assets of Sun Life Assurance located in the United States, the United Kingdom, the Philippines and Hong Kong (each a "Jurisdiction") are owned principally by subsidiaries. As a result, it may be difficult for holders of Financial Services Shares to effect service within a Jurisdiction upon directors, officers and experts who are not residents of such Jurisdiction or to realize in a Jurisdiction upon judgements of courts of such Jurisdiction predicated upon civil liability under the securities laws of the Jurisdiction or any smaller relevant jurisdiction. Financial Services has been advised by Tory Tory DesLauriers & Binnington, its Canadian counsel, that there is some doubt as to the enforceability in Canada against Financial Services or against its directors, officers and experts who are not residents of a Jurisdiction, in original actions or in actions for enforcement of judgements of such Jurisdiction's courts, of liabilities predicated solely upon such Jurisdiction's securities laws or the securities laws of any jurisdiction within that Jurisdiction.



SL-0500