STATE OF MICHIGAN
DEPARTMENT OF CONSUMER & INDUSTRY SERVICES
INSURANCE BUREAU

Before the Commissioner of Insurance

| | |
|---|---|
| In the matter of the proposed conversion of Sun Life Assurance Company of Canada from a mutual to a stock insurer | No. 99-169-M |

## STATEMENT OF ROBERT W. WILSON, APPOINTED ACTUARY

### Introduction and Background

My name is Robert W. Wilson. I am Vice President and Appointed Actuary of Sun Life Assurance Company of Canada ("Sun Life" or the "Company"). I have been with Sun Life since May, 1971. I have been Vice President and Actuary of Sun Life since 1995 and Appointed Actuary since June 1, 1998. As Vice President and Actuary, my duties include establishing appropriate policy liabilities, recommending appropriate policyholder dividends, solvency testing, financial projections, asset/liability management, and pricing policy. I have been a Fellow of the Canadian Institute of Actuaries since 1975, a fellow of the Society of Actuaries since 1975 and a member of the American Academy of Actuaries since 1995.

I am submitting this statement in support of Sun Life's request that the Commissioner of Insurance of the State of Michigan (the "Commissioner") approve the Conversion Plan (the "Plan"), which was unanimously adopted by Sun Life's Board of Directors (the "Sun Life Board") on September 28, 1999.[1] Under the Plan, the Company proposes to reorganize from a mutual company to a company owned by shareholders by means of

---

[1] Except as otherwise defined herein, capitalized terms used in this statement have the meanings set forth in my opinion letter, in the Plan, or in the Policyholder Information Circular, which have all been pre-filed and made a part of the record in this proceeding.

JOINT EXHIBIT 3

~~DEFENDANT'S EXHIBIT 3~~

demutualization. The Plan also provides that Sun Life Financial Services of Canada Inc. ("Financial Services")[2/] will be the parent holding company of Sun Life after demutualization.

As the Appointed Actuary of Sun Life, I have had the responsibility of supervising the actuarial work involved in developing the Plan. I have also delivered an opinion dated September 28, 1999 addressing various actuarial issues relating to the Plan, a copy of which has been submitted to the Commissioner to be made part of the record of this proceeding.

Allocation of Demutualization Benefits

Upon the conversion of the Company into a company owned by shareholders, the entire value of the Company will be distributed among Eligible Policyholders in the form of Financial Services Shares, cash or Policy Credits. However, every Eligible Policyholder will have Financial Services Shares allocated to him, irrespective of the form of Demutualization Benefits he will ultimately receive. The total number of Financial Services Shares to be allocated to the Eligible Policyholders will be approximately 400 million and will represent the entire value of the Company. The allocation of shares to each Eligible Policyholder will vary based upon the application of the formula explained below. Each Eligible Policyholder has been sent a Share Allocation Statement, which sets forth the number of Financial Services Shares that have been allocated to that policyholder, a list of the policyholder's Eligible Policies, whether Sun Life requires specific information from the policyholder such as a confirmation of the policyholder's address or a United States Tax Identification Number, and any special information that applies to

---

2/ Financial Services is currently known as Sun Life of Canada Holdings Corp. On November 10, 1999, Financial Services applied to the Minister of Finance of Canada to change its name to Sun Life Financial Services of Canada Inc.

the policyholder, including whether there are any title restrictions affecting the policyholder's Eligible Policies.

Broad Principles Underlying the Allocation Formula

Prior to the determination of the allocation formula itself, the following major principles were established as a foundation for the allocation basis. I consider these principles to be sound.

- The allocation of value among Eligible Policyholders should be fair and equitable (recognizing that there is more than one equitable way of allocating value), and should be perceived to be fair and equitable by as many of those policyholders as practical.
- As far as is practical and consistent with the other principles, the same allocation formula should apply in all countries, for all types of Eligible Policies.
- The allocation of value should comprise a fixed component (i.e., the same amount for all Eligible Policyholders) - to compensate for the loss of voting control in Sun Life as a mutual company; and a variable component - to recognize the loss of any other ownership rights in Sun Life as a mutual company, reflecting the varying financial interests of Eligible Policies, including their size, length of time in force, contribution to the value of the Company, and their differing rights to receive surplus.
- The allocation of value should recognize the Company's history and philosophies of conducting business.
- The allocation formula should be simple, practical to implement and easy to understand.

Determination of the Allocation Formula

In determining the allocation formula, we considered not only that Sun Life is a large company, with business in a number of different countries, but also the types of policies written. Although about 98% of the Eligible Policies are individual life insurance policies, there are also eligible individual health and annuity policies, and eligible pension and group insurance

policies. The nature of the Eligible Policies differs in each country in which the Company does business.

In addition to confirming that the formula met the principles described earlier, a number of tests were made to check that the results of applying the formula are reasonable. While Sun Life did not use the contribution to surplus ("CTS") approach (which has been used as the basis for allocating the variable component of shares in most United States demutualizations), tests were made to examine how the allocation of value compared with the contribution to past and future surplus generated by different groups of individual life policies. This analysis was done in a manner consistent with the United States CTS method. Additional tests of reasonableness which were performed for sample Eligible Policies of differing type, size, duration, dividend options and jurisdiction resulted in no significant inequities. Finally, a test of the allocation of shares by territory was found to be broadly consistent with the distribution of actual surplus in the Company's accounts. I consider these to be satisfactory results that confirm the reasonableness of the allocation formula. Moreover, I believe that the allocation formula fairly and equitably balances the interests of Eligible Policyholders.

Allocation Formula

The allocation formula is made up of two parts, a fixed component and a variable component.

Fixed Component

The fixed component of the allocation is intended to compensate Eligible Policyholders for the loss of voting control of Sun Life as a mutual company. Currently, each Eligible Policyholder is entitled to one vote at meetings of Sun Life, regardless of the number or size of Eligible Policies owned. After demutualization, Sun Life voting policyholders for whom

Sun Life continues to be the insurer will have voting rights, but on most matters Financial Services, the sole shareholder of Sun Life, will control any vote. Each Eligible Policyholder will therefore be allocated 75 Financial Services Shares, regardless of the number, size or type of the policies owned, to recognize this loss of voting control. The total number of Financial Services Shares distributed as the fixed portion of the Demutualization Benefits represents about 20% of the total number of Financial Services Shares allocated to Eligible Policyholders. In other international demutualizations, the proportion of the distribution in respect of the fixed allocation has generally been in the range of 10% to 30%.

Variable Component

The variable allocations determined for Eligible Policies reflect the varying financial interests of Eligible Policies, including their size, length of time in force with Sun Life, contribution to the value of Sun Life and their differing rights to receive surplus.

The variable component in the aggregate makes up approximately 80% of the total allocation of Financial Services Shares.

For each Eligible Policy (other than group insurance policies) in force on January 27, 1998, the share allocation for the variable component is as follows:

- 1.32 Financial Services Shares per Can. $1,000 of cash value times the number of years the policy was in force with Sun Life with the number of years limited to 15 for corporate owned pension policies. Cash value includes dividends on deposit and the cash value of paid up additions, but excludes any amount for special maturity dividends and is not reduced by any policy loan.

- 64 Financial Services Shares per $1,000 of annual premium. Annual premium is the annual premium for the base policy and those riders that attract dividends. Single premiums and premiums for other riders are excluded.

A separate variable allocation formula was established for eligible group insurance policies because the group insurance policies generally have no cash values and,

therefore, the time-weighted cash value element of the formula described above would not recognize how long a group policy has been in force. In addition, group insurance policies do not participate in the same manner as individual Participating Policies. Therefore, the allocation formula for eligible group insurance policies is as follows:

- 4.7 shares for each Can. $1,000 of premium times duration. The definition of premium is generally the 1997 billed premium, excluding any premiums paid for health insurance and accidental death and dismemberment. Duration is the period of continuous participating coverage that a group insurance policyholder has had with Sun Life (subject to a maximum of 15 years) plus five years. The addition of five years gives recognition to the expected future contribution to value. The maximum of 15 years results in a reasonable balance between policies in force for many years and recent issues - consistent with the formula for individual life policies.

Approximately 89% of the total number of Financial Services Shares allocated under the variable allocation will be allocated in respect of individual life insurance policies, approximately 8% will be allocated in respect of group insurance policies, and the remaining approximately 3% will be allocated in respect of individual annuity, group pension and other policies.

About 50% of the total Financial Services Shares will be allocated in proportion to time weighted cash value and about 30% of all Financial Services Shares will be allocated in proportion to annual premiums (including those of group insurance). The remaining approximate 20% represents the fixed component.

It is my opinion, as well as that of the Independent Actuary, Nicholas Bauer of Eckler Partners Ltd., that the allocation formula is fair and equitable to all Eligible Policyholders.

Alternative Allocation Methods Considered

A number of different formulas were considered and tested before selecting the recommended formula. This formula was chosen because it met the allocation principles and it provided the best results when performing the reasonableness tests. In particular, the CTS approach, which has been used as the basis for allocating the variable component of shares in most United States demutualizations, has not been used by Sun Life. This method was not considered to be appropriate for Sun Life because:

- The fairness of the method across different territories is questionable because of the significant differences in the type of products written in various countries.
- It is an extremely complicated method and would have been very difficult to explain to Eligible Policyholders.
- Analysis performed by the Company shows that the contributions made by current Eligible Policyholders to the value of the Company at the end of 1997 is a very small proportion of the total value. In particular, about a third of Eligible Policyholders would have received no variable component if a CTS approach had been used.

Protection of Participating Policyholders' Reasonable Expectations

Under the Plan, Sun Life and its subsidiaries will put in place special arrangements designed to protect reasonable expectations of future policy dividends and other non-guaranteed policy benefits, and to meet contractual obligations, under Participating Policies issued before demutualization. As required by Canadian law, Sun Life maintains separate accounts to record the policies, assets, liabilities and any surplus for participating and non-participating policies. In addition Sun Life maintains such accounts in each major territory in which it does business. After demutualization, Sun Life of Canada will continue to maintain its worldwide participating account and, among others, the Canadian and United States territorial participating accounts. Sun Life will also establish and maintain the "Shareholders' Account,"

which will include the accounts in respect of the Canadian and United States non-participating businesses.

Within each of Sun Life's Canadian and United States territorial participating accounts, Sun Life will establish and maintain two separate sub-accounts:

- A sub-account in respect of pre-demutualization Participating Policies in the Canadian and United States territorial participating accounts, called the "Pre-Conversion Participating Sub-Account;" and
- A sub-account in respect of all post-demutualization Participating Policies in the Canadian and United States territorial participating accounts, called the "Post-Conversion Individual Participating Sub-Account."

Furthermore, within each of the Canadian and United States Pre-Conversion Participating Sub-Accounts, Sun Life will establish and maintain two separate sub-funds as follows:

- A sub-fund to manage and protect reasonable expectations in respect of future dividends on pre-demutualization individual Participating Policies, called the "Pre-Conversion Individual Participating Closed Sub-Fund."
- A sub-fund, called the "Pre-Conversion Ancillary Participating Sub-Fund," in respect of the remaining obligations associated with Participating Policies written prior to demutualization. These include: (i) provisions for adverse deviations on policies in the Pre-Conversion Individual Participating Closed Sub-Fund; (ii) amounts on deposit for policies in the Pre-Conversion Individual Participating Closed Sub-Fund; and (iii) group Participating Policies written prior to demutualization.

The Pre-Conversion Individual Participating Closed Sub-Funds are specially designed to protect future dividend levels. The initial amount of assets to be allocated to the Pre-Conversion Individual Participating Closed Sub-Funds will be determined to be sufficient to provide for all contractual obligations (other than deposit liabilities which are provided for in the Pre-Conversion Ancillary Participating Sub-Funds) and reasonable expectations in respect of future dividends and other non-guaranteed policy benefits on the policies in the sub-funds.

Further, Sun Life has established restrictions to ensure that all profits earned by the Pre-Conversion Individual Participating Closed Sub-Funds will accrue exclusively to the benefit of the policies in those sub-funds. The Company will not be permitted to transfer assets out of the Pre-Conversion Individual Participating Closed Sub-Funds for reasons other than to pay policy benefits, expenses, and taxes of the sub-fund.

As an additional protection, the Plan will stipulate that the Pre-Conversion Individual Participating Closed Sub-Funds not be allowed to fall into a deficit position. Thus, if the Appointed Actuary determines that the best estimate liabilities of a Pre-Conversion Individual Participating Closed Sub-Fund are greater than the assets in the sub-fund, then sufficient assets will be transferred into the sub-fund to make up the difference.

The Plan also sets out the rules for the future allocations of investment income, expenses and taxes to the Pre-Conversion Individual Participating Closed Sub-Funds. The allocation methods are essentially the same as those used prior to the demutualization for investment income, and taxes. Expenses will be set at their pre-demutualization levels and indexed with inflation as measured by an appropriate index. These rules have been developed to ensure that these sub-funds receive a fair and equitable proportion of total Company investment income, expenses and taxes.

After demutualization, provisions for future costs associated with claims under the Market Conduct Settlements will be held in the Shareholders' Account. This ensures that the risk the actual costs are different from estimated costs will be borne by the shareholders, and not the Participating Policyholders.

Assets equal to the actuarial provision for adverse deviations on pre-demutualization individual Participating Policies will be allocated to the Pre-Conversion

Ancillary Participating Sub-Funds. These assets provide an additional layer of protection in the participating account to support the policies in the Pre-Conversion Individual Participating Closed Sub-Funds.

The Plan also contains provisions to support Participating Policies sold by Sun Life after demutualization. The initial amount of assets to be allocated to the Canadian and United States Post-Conversion Individual Participating Sub-Accounts is based on assumptions of future experience (such as mortality, lapses, expenses, dividends, taxes, and investment income) and the estimated level of sales of participating business according to the Company's most recent business plan. Testing shows that the initial amount will be sufficient to support at least five years of new participating business under various realistic scenarios of future experience and future levels of sales.

It is my opinion that the assets which will be allocated to the participating accounts of the Company upon demutualization are expected to be adequate to (i) meet the contractual obligations under the policies in respect of which the participating accounts are maintained, (ii) meet the reasonable expectations of the holders of those policies in respect of future dividends and other non-guaranteed benefits; and (iii) support future Participating Policies expected to be allocated to those accounts.

Future Financial Strength of the Company

As Appointed Actuary, I examined the capital of the Company and the ratio of the Company's available capital to the required capital (the "MCCSR" ratio), as projected over a suitable period under a range of adverse scenarios. Such a review is similar to the annual Dynamic Capital Adequacy Testing ("DCAT") performed by Sun Life, and therefore a good starting point is the most recent DCAT testing performed. The most recent DCAT testing was

presented to the Sun Life Board in December 1998. That testing confirmed that in its current form as a mutual company, Sun Life is a strong, well-capitalized financial institution capable of withstanding significant adversity.

Following the demutualization process, Financial Services will in effect inherit directly or indirectly all the assets and liabilities of Sun Life, and therefore Financial Services will inherit Sun Life's financial strengths and attributes. "Base case" scenario projections of Financial Services were carried out to take into account the effects of the reorganization and conversion. The base case projections show that for the Sun Life group as a whole, financial strength and security will not be materially changed by the conversion.

Demutualization Benefits distributed to Eligible Policyholders will be primarily in the form of Financial Services Shares. This has the advantage of not reducing the Company's surplus, and therefore the issuance of such Financial Services Shares is neutral to the financial strength of the Company and the security of policyholders. For policyholders who will receive Demutualization Benefits in cash or Policy Credits, Financial Services Shares in the amount of their allocation will either be sold directly in the Initial Public Offering or re-purchased by Financial Services with a corresponding amount to be sold in the Initial Public Offering. If there is insufficient demand for those shares in the Initial Public Offering, there are "scale back" rules in the Plan that ensure that the funds required to provide necessary cash payments and Policy Credits do not exceed the cash raised in the Initial Public Offering. The net result is that those cash payments and Policy Credits will not have a material impact on the Company's financial strength and security.

Summary of Opinions

I have previously submitted to Sun Life my "Opinion of Sun Life of Canada's Appointed Actuary." In that opinion, I conclude that:

- the benefits to be provided to Eligible Policyholders and the method used to apportion the value of the Company among Eligible Policyholders are fair and equitable to those policyholders;
- the assets which will be allocated to the participating accounts of the Company upon demutualization are expected to be adequate to (i) meet the contractual obligations under the policies in respect of which the participating accounts are maintained, (ii) meet the reasonable expectations of the holders of those policies in respect of future dividends and other non-guaranteed benefits; and (iii) support future Participating Policies expected to be allocated to those accounts; and
- the future financial strength and vitality of Sun Life and the security of policyholders will not be materially adversely affected by the demutualization.

A copy of my opinion was included in the Policyholder Information Circular, Part 1, dated September 28, 1999 at pages 154-166. Sun Life provided a copy of the Policyholder Information Circular to the Commissioner for review and approval and subsequently sent a copy to each Eligible Policyholder on or about October 20, 1999.

The Independent Actuary, Nicholas Bauer, has reached similar conclusions, which are set forth in his opinion at pages 167-180 of the Policyholder Information Circular, Part 1. It is Mr. Bauer's opinion that the Plan:

- provides for Demutualization Benefits and a method to apportion the value of Sun Life among the Eligible Policyholders which are fair and equitable to Eligible Policyholders;
- allocates assets to each Pre-Conversion Individual Participating Closed Sub-Fund and to each Pre-Conversion Ancillary Participating Sub-Fund which are expected to be adequate to meet both the contractual obligations under the policies in respect of which it is maintained and the reasonable expectations of the policyholders for dividends and other non-guaranteed benefits;

- allocates assets to each Post-Conversion Individual Participating Sub-Account which are adequate to support the Participating Policies expected to be allocated to that Post-Conversion Individual Participating Sub-Account after the Effective Date;

- does not materially adversely affect Sun Life's future financial strength and vitality or the security of its policyholders; and

- provides Policy Credits which, as of the date that the Initial Share Price is determined, will be appropriate substitutes for Financial Services Shares.

I understand that my opinion and the opinion of Mr. Bauer are on file with the Commissioner and will be made part of the record in this proceeding.

Conclusion

For the reasons set forth above, we respectfully request that the Commissioner approve Sun Life's Plan.