STATE OF MICHIGAN
DEPARTMENT OF CONSUMER & INDUSTRY SERVICES
INSURANCE BUREAU

Before the Commissioner of Insurance

| | |
|---|---|
| In the matter of the proposed conversion :<br>of Sun Life Assurance Company of Canada :<br>from a mutual to a stock insurer : | No. 99-169-M |

**STATEMENT OF DONALD A. STEWART,**
**CHAIRMAN AND CHIEF EXECUTIVE OFFICER**

Introduction and Background

My name is Donald A. Stewart. I am Chairman and Chief Executive Officer of Sun Life Assurance Company of Canada ("Sun Life" or the "Company"). I was appointed President and Chief Operating Officer in August 1996, and I became the Chairman and Chief Executive Officer in April 1998.

I am submitting this statement in support of Sun Life's request that the Commissioner of Insurance of the State of Michigan (the "Commissioner") approve the Conversion Plan[1] (the "Plan") which was unanimously adopted by Sun Life's Board of Directors (the "Sun Life Board") on September 28, 1999. Under the Plan, Sun Life will change its organizational structure from a mutual company to a company owned by shareholders by means of demutualization. Speaking on behalf of the Sun Life Board, we believe that demutualization

---

1/ Except as otherwise defined herein, capitalized terms used in this statement have the meanings set forth in the Plan or in the Policyholder Information Circular, which have been pre-filed and made a part of the record in this proceeding.

PENGAD-Bayonne, N.J. JOINT EXHIBIT 4

PENGAD-Bayonne, N.J. DEFENDANT'S EXHIBIT 4

SL-0073

as set forth in the Plan is in the best interests of Sun Life and its policyholders as a whole and will help ensure Sun Life's continuing growth as a leader in the global financial services market place, and its continuing financial strength in this industry. We believe that the Plan is fair and equitable to Sun Life's policyholders.

Overview of the Transaction

The demutualization of Sun Life will result in, among other things, the following events:

1. Sun Life shall cease to be a mutual life insurance company and become a life insurance company with common shares.

2. Sun Life Financial Services of Canada Inc. ("Financial Services") will become the holding company of Sun Life and Sun Life will become a wholly-owned subsidiary of Financial Services.[2] Financial Services, a company incorporated under Canada's Insurance Companies Act (the "ICA"), is currently a wholly-owned subsidiary of Sun Life. Upon the effectiveness of the demutualization, Sun Life shall issue its common shares to Financial Services. Sun Life shall then surrender to Financial Services, and Financial Services shall purchase for cancellation, all of the currently outstanding common and preferred shares of Financial Services held by Sun Life, for consideration equal to the initial issue price of the shares plus any accrued dividends. In addition, Sun Life will transfer its United Kingdom and related life insurance business and its life insurance businesses in the Philippines and Hong Kong to subsidiaries of Sun Life.

---

[2] Financial Services is currently known as Sun Life of Canada Holdings Corp. On November 10, 1999, Financial Services applied to the Minister of Finance of Canada to change its name to Sun Life Financial Services of Canada Inc.



SL-0074

3. All policyholders' rights with respect to, or any interest in, Sun Life as a mutual company, including Ownership Rights, shall cease.

4. Financial Services shall issue Financial Services Shares to Eligible Policyholders who are entitled to receive Financial Services Shares under the Plan, and the other Eligible Policyholders will become entitled to receive cash or Policy Credits. The entire value of Sun Life will thereby be distributed to Eligible Policyholders.

5. Financial Services plans to complete an Initial Public Offering of Financial Services Shares shortly after demutualization. As part of the Initial Public Offering, Financial Services intends to apply to list the Financial Services Shares on stock exchanges in Canada, the United States, the United Kingdom and the Philippines, the four countries in which the largest number of Eligible Policyholders reside. Most Eligible Policyholders receiving Financial Services Shares may choose to keep their shares or to sell them for cash in connection with the Initial Public Offering.

6. Policyholders' interests under their policies will continue to be protected. Policyholders' policy benefits will not be reduced and policy premiums will not be affected by the demutualization. Participating Policyholders will continue to be entitled to receive Policy Dividends as and when declared by the Sun Life Board or the directors of a Sun Life subsidiary. As an additional protection, Sun Life and its subsidiaries will put in place special arrangements designed to protect the reasonable expectations of future Policy Dividends and other non-guaranteed benefits, and to meet contractual obligations, under Participating Policies issued before demutualization.

Overview of Sun Life

Sun Life commenced business in 1871 and began operating in the United States in 1895, with the State of Michigan as the state of entry for its United States branch. Sun Life is a leading international financial services company, providing a wide range of savings, retirement, pension and life and health insurance products and services to individual and corporate customers. The Company operates primarily in Canada, the United States and the United Kingdom and also has operations in Asia and South America. The Company has approximately 11,200 employees worldwide, and an extensive global distribution network of more than 65,000 distributors, including career sales forces in certain countries, independent insurance agents, investment dealers and financial planners.

Sun Life operates in two principal businesses: the Protection Business and the Wealth Management Business. The Protection Business comprises Sun Life's insurance, or protection, operations around the world, including its group life and health insurance businesses in the United States, Canada and the United Kingdom, its individual insurance business in the United States, Canada, the United Kingdom, the Philippines, Hong Kong, Bermuda and Indonesia and the Company's reinsurance operations. The Company's protection products and services include whole life, term life, universal life, variable universal life, unit-linked life and corporate owned life insurance for individuals and life, health and disability insurance for groups. The Wealth Management Business comprises all of Sun Life's asset management, mutual fund, pension, annuity and trust and banking operations. These operations are conducted principally in Canada, the United States and the United Kingdom. Sun Life operates its Wealth Management Business in the United States primarily through its subsidiaries, Massachusetts Financial Services Company and Sun Life Assurance Company of Canada (U.S.).

Sun Life's strategic objective is to be a leading financial services provider with a significant presence in each of its chosen markets, with increasing emphasis on its Wealth Management Business. To achieve this objective, Sun Life intends to pursue the following strategies: (i) aggressively expand the Wealth Management Business; (ii) strategically grow higher return Protection Business lines; (iii) capitalize on distribution strengths; (iv) leverage strong brands across multiple product offerings; (v) pursue expansion in key strategic markets; and (vi) achieve superior shareholder returns while maintaining financial discipline.

Sun Life's Financial Standing

Sun Life is a financially sound company that will be well positioned to compete in the financial services marketplace as a stock company. At September 30, 1999, Sun Life was the largest life insurance company in Canada, based on total assets under management of approximately $264 billion (Canadian), with a surplus of approximately $6 billion (Canadian). At September 30, 1999, its total general fund assets exceeded $54 billion (Canadian). For the year ended December 31, 1998, Sun Life's total premiums were approximately $7.6 billion (Canadian), and its net income was $54 million (Canadian).

Sun Life is among the highest rated Canadian life insurers by various rating agencies. For financial strength, Sun Life is rated A++ by A.M. Best, AA+ by Standard & Poor's, and Aa2 by Moody's. For claims paying ability, Sun Life is rated AAA by Duff & Phelps.

Reasons for Demutualization

The Sun Life Board has concluded that the Plan is in the best interests of the Company and its policyholders as a whole because:

- the entire value of Sun Life will be provided to Eligible Policyholders;
- it continues to protect the interests of policyholders;



SL-0077

- it has advantages that significantly outweigh any disadvantages; and
- it is superior to the other strategic alternatives for the future of the Company.

Benefits of Demutualization for the Company

Sun Life identified a number of benefits for the Company to demutualizing. We noted that the financial services industry in which Sun Life operates is changing rapidly. These changes include:

- globalization of the financial services industry;
- increased competition from other participants in the financial services industry, such as banks, trust companies, mutual funds and money managers;
- changes in demographic trends, including aging populations and increased life expectancy;
- significant growth in wealth management products, including emphasis on retirement planning and savings, and away from traditional participating life insurance products;
- changes in distribution channels, including the use of independent third party brokers and financial planners to sell products and services; and
- advances in technology, which also affect the delivery of products and services to customers.

We believe that it is important to Sun Life's competitive position to be able to address these changes by, among other things, expansion through strategic acquisitions and alliances that can enhance performance and deliver an attractive return on capital. However, as a mutual company, Sun Life's ability to raise capital is limited. Although Sun Life can raise capital by issuing various types of securities, such as debt securities, preferred shares and participating shares, it is not permitted to issue common shares. This prevents Sun Life from creating a capital structure based on an optimal combination of common shares and other securities. Sun Life's capital raising capability is also constrained because it cannot easily control the timing of

increases in capital and so it cannot easily raise capital at the time it is most needed. To enhance value, the Sun Life Board believes that Financial Services should be able to grow, including through acquisitions in the financial services industry. Although Sun Life has considerable financial strength, it could require significant extra capital to finance this growth. It is highly desirable to have the flexibility to offer common shares rather than cash as payment in merger or acquisition transactions, which are often structured on this basis. The use of shares for acquisitions or to fund other business growth in areas such as product development, technology, distribution and marketing will also allow Financial Services to preserve cash for its operating businesses.

Benefits of Demutualization for Policyholders

Demutualization will also benefit policyholders in a number of ways. First, demutualization will provide the entire value of Sun Life to Eligible Policyholders rather than just a portion of it. At the same time, demutualization will preserve Sun Life's capital because Financial Services will issue shares to almost all Eligible Policyholders as their Demutualization Benefits. Although shares provide value to Eligible Policyholders, issuing them does not involve a distribution of Financial Services' assets.

Second, policyholders' interests under their policies will continue to be protected after demutualization. Policyholders' policy benefits will not be reduced and policy premiums will not be affected by the demutualization. Participating Policyholders will continue to be entitled to receive policy dividends as and when declared by the Sun Life Board or the directors of one of its subsidiaries. As an additional protection, Sun Life and its subsidiaries will put in place special arrangements designed to protect the reasonable expectations of future policy

dividends and other non-guaranteed benefits, and to meet contractual obligations, under Participating Policies issued before demutualization.

Third, demutualization will provide Eligible Policyholders who receive Financial Services Shares with a form of ownership that has several advantages over their current form of ownership of Sun Life. The most important of Participating Policyholders' current ownership rights are: (a) the right to vote on matters submitted to Participating Policyholders, such as the election of the Sun Life Board, (b) the right to participate in distributions of profits of Sun Life from all its businesses, (c) the right to participate in the distribution of demutualization benefits, and (d) in the unlikely event of a liquidation if Sun Life were ever to become insolvent, the right to participate in the distribution of any remaining surplus after satisfaction of all obligations. However, as long as Sun Life is a mutual company, these ownership rights cannot be sold separately from the policy, and they terminate when the policyholder's last Participating Policy ends.

Owning Financial Services Shares has many advantages. For example, Eligible Policyholders who keep their Financial Services Shares will have the right to receive shareholder dividends on Financial Services Shares declared from time to time at the discretion of the Financial Services Board and the right to vote on matters submitted to shareholders, such as electing the Financial Services Board. In addition, share ownership has three important advantages over Participating Policyholders' current ownership rights: (1) Financial Services Shares can be sold; (2) the market price of the Financial Services Shares on the Stock Exchanges will establish a clear value for the shares, which can be realized for cash when sold; and (3) shareholder rights continue as long as the Eligible Policyholder holds Financial Services Shares, regardless of whether the Eligible Policyholder's policy ends. Thus, Financial Services Shares

will also provide liquidity that is not currently available. Moreover, even though Eligible Policyholders exchange their Ownership Rights upon demutualization, they retain their policies and their interests under their policies will continue to be protected as described above.

Fourth, demutualization will separate Eligible Policyholders' rights under their insurance contracts ("Contract Rights") from their Ownership Rights. Participating Policyholders currently lose their Ownership Rights when their last Participating Policy terminates for any reason. By providing Eligible Policyholders with Financial Services Shares in exchange for their Ownership Rights, these shares, and thus, Ownership Rights, can be retained even when Contract Rights terminate. This separation will enable Sun Life to better align the interests of its owners with the worldwide business to be conducted by Financial Services. Where most of a mutual insurance company's business relates to participating policies, there is a common interest between the company's owners, who benefit from the profits made on participating policy business, and the company's interest in writing participating policies. Sun Life has experienced considerable growth in its non-participating Protection Business and its Wealth Management Business, but its Participating Policyholders are not benefitting from those businesses. Many of those businesses require the reinvestment of earnings to provide capital for future growth. Those earnings are not then available for distribution to Participating Policyholders. Accordingly, the respective interests of Sun Life and its owners are diverging. After demutualization, the value of Financial Services Shares will reflect the value of Financial Services and its worldwide businesses, including Sun Life and its future prospects. As a result, the interests of shareholders, as owners, will be aligned with the interests of Financial Services.

Fifth, after demutualization, Financial Services will be required to make regular, comprehensive public disclosure of its operations and financial results, which will be scrutinized

by shareholders, the media and financial analysts. Shareholders will have a direct financial interest in Financial Services' performance, dividend payments and share price. While Sun Life currently operates very efficiently, this increased level of scrutiny and interest from new stakeholders should increase management accountability for financial performance, to the benefit of both the policyholders of Sun Life and the shareholders of Financial Services.

In sum, demutualization will provide Sun Life with improved access to capital through Financial Services and will afford increased flexibility for Sun Life and Financial Services to develop and grow and to compete effectively in a changing environment.

Disadvantages and Possible Alternatives to Demutualization

The Sun Life Board recognized that, in the current financial services environment, the principal option for structural change is demutualization. However, in considering demutualization in principle and adopting the Plan, the Sun Life Board considered the advantages and disadvantages of demutualization for Sun Life and its policyholders and compared demutualization with remaining as a mutual company and other alternatives. The advantages of demutualization are summarized immediately above, and are further described on pages 9-12 of the Policyholder Information Circular, Part 1. As set forth on pages 12-15 of the Policyholder Information Circular, Part 1, the possible disadvantages the Sun Life Board considered are (i) loss of mutual structure, (ii) loss of Participating Policyholders' voting control, (iii) challenges in managing the separate interests of policyholders and shareholders, (iv) increased exposure to take-over, (v) additional costs to be incurred as a result of demutualization, and (vi) the potential tax and social benefits consequences to certain Eligible Policyholders. The possible alternatives the Sun Life Board looked at before deciding to recommend demutualization were: (a) retaining the mutual structure without significant change;

(b) retaining the mutual structure and increasing policy dividends; (c) selling Sun Life as a whole; (d) selling Sun Life's entire interest or a minority interest in one or more of its subsidiaries; (e) closing to new business; or (f) creating a mutual holding company. Thesc possible alternatives are analyzed in detail at pages 15-17 of the Policyholder Information Circular, Part 1.

The Sun Life Board approved the Plan upon concluding that the Plan is in the best interests of Sun Life and its policyholders as a whole because, among other things, the advantages of demutualization significantly outweigh any disadvantages, demutualization is superior to other strategic alternatives for the future of Sun Life, and demutualization will deliver the entire value of the Company to Eligible Policyholders.

Process of Demutualization

On January 27, 1998, the Sun Life Board instructed management to prepare a plan for demutualization. In response to this charge, Sun Life's management, together with a multinational team of outside advisors, spent many months working to prepare the Plan. Sun Life's outside advisors in the United States included the law firms of Dykema Gossett PLLC and LeBoeuf, Lamb, Greene & MacRae, L.L.P., the investment banking firm of Morgan Stanley & Co. Incorporated ("Morgan Stanley") and the actuarial firm of Tillinghast-Towers Perrin. On September 28, 1999, the Sun Life Board unanimously adopted the Plan which provides for the conversion of the Company from a mutual life insurance company into a life insurance company with common shares.

The demutualization and corporate reorganization is being implemented in accordance with the ICA and the Mutual Company (Life Insurance) Conversion Regulations made under the ICA (the "Canadian Regulations"). To become effective, the demutualization

must be approved by Sun Life's Eligible Policyholders and certain regulatory approvals must be obtained. Specifically, with respect to policyholder approval, the Plan must be approved by at least two-thirds of the votes cast by Eligible Policyholders voting in person or by proxy at the Special Meeting, which will be held at Roy Thomson Hall, 60 Simcoe Street, Toronto, Ontario, Canada, on December 15, 1999. A Voting Form, which allows Eligible Policyholders to vote for or against the Plan, was enclosed with the Policyholder Information Circular and mailed to such policyholders (after it had been reviewed and approved by the appropriate regulators).

As described at length in the written statement submitted by Thomas A. Bogart, Senior Vice-President and Chief Legal Officer of Sun Life, the demutualization and parts of the corporate reorganization also require the approval of the Minister of Finance of Canada (the "Minister of Finance"). In addition, the Commissioner must approve the Plan and review the aspects of the corporate restructuring of Sun Life that affect policyholders in the United States, after a public hearing scheduled for November 22, 1999. The Office of the Superintendent of Financial Institutions ("OSFI"), the principal insurance regulator in Canada, will recommend to the Minister of Finance whether or not to approve the Plan. Both OSFI and the Michigan Insurance Bureau and their advisors have reviewed the Plan, the Policyholder Information Circular and various related materials, including the written materials sent to Eligible Policyholders.

Eligibility and Demutualization Benefits

Eligible Policyholders have the right to receive Demutualization Benefits under the Plan and to vote on the Plan at the Special Meeting. In general, Eligible Policies are Participating Policies of Sun Life that were in force on January 27, 1998, the Eligibility Day.

When Sun Life demutualizes, Eligible Policyholders will receive Demutualization Benefits in exchange for their Ownership Rights. Demutualization Benefits will take the form of Financial Services Shares, cash, or Policy Credits. Demutualization will provide the entire value of Sun Life to Eligible Policyholders while preserving capital. Under the Plan, the Owners of Eligible Policies issued in the United States will receive approximately 31% of the Demutualization Benefits.

Form of Demutualization Benefits

The form of Demutualization Benefits received will depend primarily on the jurisdiction in which the Eligible Policyholder resides, as well as the type of Eligible Policy the Eligible Policyholder holds. Eligible Policyholders resident in Canada, the United States, the United Kingdom, the Philippines and Bermuda (the "Principal Jurisdictions") will be issued Demutualization Benefits in the form of Financial Services Shares. This means that, in addition to being policyholders of Sun Life, these Eligible Policyholders will also become shareholders of Financial Services. Most of these Eligible Policyholders in Principal Jurisdictions may, however, elect to sell the Financial Services Shares issued to them in connection with the Initial Public Offering.

Eligible Policyholders resident in Hong Kong, Ireland, the Channel Islands and the Isle of Man (the "Secondary Jurisdictions") will be issued Financial Services Shares in the same manner as Eligible Policyholders in the Principal Jurisdictions. However, Eligible Policyholders in the Secondary Jurisdictions will keep their shares only if they make an election to do so. If they do not make the Share Election, their shares will be sold for them in the Initial Public Offering and they will receive the cash proceeds from the sale. In addition, each Eligible

Policyholder resident in a Secondary Jurisdiction must confirm his or her address with Sun Life in order to receive Financial Services Shares or the cash proceeds from the sale thereof.

Eligible Policyholders who are either minors (and do not have a legally appointed guardian) or resident in countries other than Principal and Secondary Jurisdictions (the "Other Jurisdictions") will have the Financial Services Shares issued to them sold on their behalf in connection with the Initial Public Offering, and will receive the cash proceeds from this sale. In deciding whether Eligible Policyholders in any particular jurisdiction would be required to sell the shares issued to them on demutualization, Sun Life took into account the following factors: (a) the costs of compliance with applicable securities laws in the jurisdiction compared with the number of Eligible Policyholders resident there; (b) the ability of Eligible Policyholders in the jurisdiction to trade the shares easily after demutualization; and (c) whether Sun Life is still carrying on an active Protection Business in the jurisdiction. Eligible Policyholders who are minors (and do not have a legally appointed guardian) will receive cash because of the legal difficulty in transferring their shares.

Finally, Eligible Policyholders will receive Policy Credits instead of Financial Services Shares if they hold Eligible Policies that are in force at the time of demutualization and are one of the following types of tax-qualified retirement policies issued in the United States: (1) an individual retirement annuity contract within the meaning of Section 408(b) of the United States Tax Code; or (2) a tax sheltered annuity contract within the meaning of Section 403(b) of the United States Tax Code.

Value of Demutualization Benefits

On demutualization, benefits representing the Company's entire value will be distributed among all of its Eligible Policyholders.

We retained Morgan Stanley and RBC Dominion Securities Inc. to prepare the Valuation Report which is required under the Canadian Regulations. The Valuation Report contains a range of estimated public equity market values for Financial Services (on the basis that this range would be the same for Sun Life) based solely upon the estimated prices at which the Financial Services Shares could have been expected to be offered as of September 24, 1999, the date of valuation, (the "Valuation Date") in an initial public offering of Financial Services Shares conducted in a manner consistent with the Plan, as if the date of demutualization were September 24, 1999. Subject to the assumptions, qualifications and limitations outlined in the Valuation Report, the range estimated was approximately $5.6 billion (Canadian) to $8.4 billion (Canadian), or approximately $3.8 billion to $5.7 billion in United States dollars (calculated at an exchange rate of $1 Canadian = $0.68 U.S.). In the Valuation Report, the financial advisors also estimated that the Initial Share Price for the Financial Services Shares, as at the Valuation Date, would have been between approximately $14 (Canadian) to $21 (Canadian) per share, or approximately $9.52 to $14.28 per share in United States dollars (calculated at an exchange rate of $1 Canadian = $0.68 U.S.), based on Sun Life's advice that approximately 400 million Financial Services Shares would have been outstanding on that date.

The Valuation Report and related opinion do not constitute a recommendation as to (i) how any Eligible Policyholder should vote on the Demutualization Resolution, (ii) whether the Eligible Policyholder should elect to receive cash in lieu of some or all of the Financial Services Shares allocated to that Eligible Policyholder, or (iii) whether the Eligible Policyholder

should buy or sell Financial Services Shares. In addition, in the Policyholder Information Circular, we advised all Eligible Policyholders that this estimate of the range of the Initial Share Price is not a prediction of what the actual Initial Share Price will be on any other date, including the date of demutualization. The Initial Public Offering is not expected to be completed before March 2000, several months after this estimate was made. In the Policyholder Information Circular, Sun Life also advised Eligible Policyholders that this estimate is also not a prediction of the price at which the Financial Services Shares will trade on the Stock Exchanges after completion of the Initial Public Offering.

As noted, in certain circumstances, Eligible Policyholders will be required to receive cash or Policy Credits. Cash payments and Policy Credits are expected to be funded indirectly through the issuance of Financial Services Shares in the Initial Public Offering. Proceeds from the sale of those shares will be invested by Financial Services in Sun Life to enable Sun Life to make the cash payments and fund the Policy Credits.

Allocation of Demutualization Benefits Among Eligible Policyholders

Each Eligible Policyholder's Demutualization Benefits, in whatever form, will be based on an allocation of Financial Services Shares. The amount of cash paid or the value of Policy Credits received will be determined by the number of Financial Services Shares allocated to the Eligible Policyholder multiplied by the Initial Share Price.

On demutualization, each Eligible Policyholder will be allocated a minimum of 75 Financial Services Shares. This is the fixed component of the allocation and is intended to recognize the loss of voting control in Sun Life by Eligible Policyholders upon demutualization. In addition, each Eligible Policyholder will be allocated additional Financial Services Shares based upon a formula applied to each Eligible Policy. These variable allocations determined for

Eligible Policies reflect the varying financial interests of Eligible Policies, including their size, length of time in force with Sun Life, contribution to the value of Sun Life and their differing rights to receive surplus. The written statement submitted by Robert W. Wilson, Sun Life's Appointed Actuary, and the opinion of Nicholas Bauer, Sun Life's Independent Actuary, further describe the reasoning for the fixed and variable components as well as the method of allocation of shares among Eligible Policyholders.

Initial Public Offering

Under the Plan, it is expected that Financial Services Shares will be sold to the public in an Initial Public Offering. Financial Services intends to apply to list the Financial Services Shares on stock exchanges in Canada (Toronto), the United States (New York), the United Kingdom (London) and the Philippines (Manila), the four countries in which the largest number of Eligible Policyholders reside. Financial Services may also apply to list the Financial Services Shares on the Montreal Exchange, depending on the outcome of a proposal to reorganize the exchange. As part of the Initial Public Offering, the Underwriters will conduct a sales and marketing campaign to solicit interest from potential investors in buying Financial Services Shares. Once completed, the Underwriters will agree to purchase the Financial Services Shares at a fixed price, which will be the Initial Share Price, and then offer the Financial Services Shares to the public at the same price.

The Initial Public Offering will help create a market for the Financial Services Shares that will be distributed to Eligible Policyholders. The marketing efforts by Underwriters will increase awareness of Financial Services Shares with investors, especially among large institutional investors such as pension plans and mutual funds, and with stock analysts. These marketing efforts are also designed to create an active trading market after the Initial Public

Offering, which will benefit policyholders who keep their Financial Services Shares and who may want to sell them in the future. After the Initial Public Offering, the general public, including policyholders, will be able to buy and sell Financial Services Shares on the Stock Exchanges.

Financial Services and the Underwriters will decide how many Financial Services Shares will be sold in the Initial Public Offering and the price at which they will be sold. In making this decision, Financial Services and the Underwriters will consider many factors, such as the likely strength of demand for the Financial Services Shares, the number of shares that Eligible Policyholders elect to sell, the market conditions at the time the shares are priced, and the future business prospects of Financial Services, as well as its capital needs. Ultimately, it is up to the Financial Services Board of Directors to determine the size of the Initial Public Offering. As noted, cash payments and Policy Credits provided to Eligible Policyholders under the Plan are expected to be funded indirectly through the issuance and sale by Financial Services of Financial Services Shares in the Initial Public Offering. The Financial Services Board of Directors may decide to raise funds for use by Financial Services for general corporate purposes and payment of expenses of the Initial Public Offering even though this could mean that not all Eligible Policyholders who made the Cash Election or are subject to the Default Cash Election would have their shares sold in connection with the Initial Public Offering. The Financial Services Board may take that course if it decided it was in the best interests of Financial Services to do so.

Policyholder Dividend Protection

After demutualization, policyholders' interests under their policies will continue to be protected. As noted above, policyholders' policy benefits will not be reduced and policy

premiums will not be affected by the demutualization. Participating Policyholders will continue to be entitled to receive Policy Dividends as and when declared by the Sun Life Board or the directors of a Sun Life subsidiary. As an additional protection, Sun Life and its subsidiaries will put in place special arrangements designed to protect the reasonable expectations of future Policy Dividends and other non-guaranteed benefits, and to meet contractual obligations, under Participating Policies issued before demutualization.

Sun Life is required by the ICA to maintain accounts for its Participating Policies which are separate from those for its non-participating policies and other businesses. After demutualization, Sun Life will continue to maintain the worldwide participating account and the Canadian and U.S. territorial participating accounts. Within each of Sun Life's Canadian and United States territorial participating accounts, Sun Life will establish and maintain two separate sub-funds in respect of Participating Policies issued before demutualization. The Pre-Conversion Individual Participating Closed Sub-Fund is specially designed to manage and protect reasonable expectations in respect of future Policy Dividend levels on pre-demutualization individual Participating Policies. The Pre-Conversion Ancillary Participating Sub-Fund is designed to support the remaining obligations associated with Participating Policies written prior to demutualization. Sun Life's Appointed Actuary has opined that the initial amount of assets to be allocated to the Pre-Conversion Individual Participating Closed Sub-Funds will be determined to be sufficient to provide for all contractual obligations (other than deposit liabilities which are provided for in the Pre-Conversion Ancillary Participating Sub-Fund) and reasonable expectations in respect of future dividends and other non-guaranteed policy benefits on the policies in the sub-funds. Sun Life has established restrictions to ensure that all funds in the Pre-Conversion Individual Participating Closed Sub-Funds will accrue exclusively to the benefit of

the policies in those sub-funds. As an additional protection, the Plan will stipulate that the Pre-Conversion Individual Participating Closed Sub-Funds not be allowed to fall into deficit positions. The Plan also sets out rules developed to ensure that these sub-funds receive a fair and equitable proportion of total Company investment income, expenses and taxes.

Compensation of Officers and Employees

Sun Life is prohibited by the Canadian Regulations from providing its directors, officers or employees with a fee, compensation or any other consideration in relation to the demutualization, other than regular compensation in relation to their position and benefits to which they may be entitled as an Eligible Policyholder.

Financial Services intends to establish a stock option plan for key officers and employees of Financial Services and its subsidiaries. The option plan will not become effective until the one year restriction period imposed by the Canadian Regulations has ended. The option plan will be designed to align the interests of shareholders and option plan participants, and will reward participants for creating shareholder value. This in an important consideration for investors, and will facilitate Financial Services' ability to recruit and retain senior management. Shareholder approval of the option plan will be required.

Additionally, Financial Services intends to establish a voluntary employee share purchase plan on demutualization to facilitate employee ownership of Financial Services Shares. Initially, purchases of Financial Services Shares by employees under the purchase plan will not be made with a financial contribution from Financial Services. However, at a date following the one year restriction period imposed by Canadian law, Financial Services may amend the purchase plan to provide for contributions by Financial Services toward the purchase price of Financial Services Shares.

Conclusion

For the reasons described, we believe that demutualization under the Plan will position Sun Life to better compete in today's changing financial services market. Moreover, we believe that the Plan is fair and equitable and will protect the interests of our policyholders. Finally, we believe that the Demutualization Benefits will compensate Eligible Policyholders for the loss of their Ownership Rights. We therefore respectfully request that the Commissioner approve Sun Life's Plan.

CERTIFICATE OF SERVICE

I certify that service of the foregoing Appendix to Memorandum in Support of the Defendant's Cross-motion of the United States for Summary Judgment and in Opposition to the Plaintiffs' Motion for Partial Summary Judgment has, this 20th, day of December, 2005, been made on plaintiffs' counsel by mailing a copy thereof, USPS First Class Mail, to the following address:

Burgess J.W. Raby, Esquire
2164 East Broadway
Suite 280
Tempe, Arizona 85282

U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Station
Washington, D.C. 20044
(202) 307-6440