IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 04-1726 T

(Judge Francis M. Allegra)

EUGENE A. FISHER, Trustee,
SEYMOR P. NAGAN IRREVOCABLE TRUST,
for itself and as Representative of
all similarly situated taxpayers,

Plaintiffs

v.

UNITED STATES,

Defendant

DEFENDANT'S PRE-TRIAL MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

Pursuant to RCFC App. A, ¶¶ 14-16, and this Court's November 2, 2006, Order, defendant, the United States, submits the following pre-trial memorandum of contentions of fact and law.

## I. SUMMARY OF THE ARGUMENT

The Court in its November 15, 2006, Order noted two considerations that might indicate the voting and liquidation rights had some value. First, the Court referred to Sun Life's surplus as of June 30, 1999. Nov. 15, 1999, Order at 3. Defendant will establish at trial, however, that policyholders had no right to that surplus. Policyholders only had a right to receive distributions,

as policy dividends, of the company's divisible surplus. That right remained unchanged by the demutualization.

Second, the Court noted that the Financial Services stock the Trust received in 2000 had value. Nov. 15, 2006, Order at 3. While that is certainly true, plaintiffs are contending that basis should be allocated to the voting and liquidation rights. That question is dependent on the fair market value of the voting and liquidation rights on the date the policy was acquired in 1990. Treas. Reg. § 1.61-6(a). When the policy was purchased, the Trust had no realistic anticipation of receiving anything of value in exchange for those rights, and none of the policy premium was paid for those rights. Under these circumstances, no basis can be allocated to those rights, even though at a later date the Trust received something of value for them. *Gladden v. Commissioner*, 262 F.3d 851, 854 (9th Cir. 2001). The evidence at trial will establish that the Financial Services stock represented a windfall to the Trust and bore no relationship to the premiums the Trust paid. Therefore, the value of the Financial Services' stock received in 2000 cannot be used to determine the value of the voting and liquidation rights in 1990 when the policy was acquired.

On June 28, 1990, plaintiff, Eugene A. Fisher, trustee of the Seymour P. Nagan Trust (hereinafter, "the Trust") purchased a life insurance policy from Sun Life. (P. Brief at 1.) The Trust, as a holder of a participating policy, also had certain rights as a nominal owner of Sun Life, including the right to vote for the Board of Trustees of Sun Life and the right to share in the proceeds of a solvent liquidation. The Trust's rights could not be sold or transferred. The rights also terminated if the policy lapsed, was surrendered, or the policyholder died.

On March 22, 2000, Sun Life demutualized, converting from a mutual company to a stock company. (P. Brief at 2.) Policyholders who had policies in effect on January 27, 1998,

received Financial Services stock in exchange for their voting and liquidation rights related to those policies.[1] (Jx. 1 at 170.) The dividend and other rights under the policy remained unchanged. The premium charged for the policy remained unchanged. (Jx. 1 at 207.)

The IRS determined that the Trust had no basis in the voting and liquidation rights, because those rights had no fair market value when the policy was acquired on June 28, 1990. As a result, the Trust also had no basis in the Financial Services stock received in exchange for those rights. Therefore, the proceeds from the sale of stock was taxable gain. The Trust has the burden of proving that the IRS determination was erroneous. *Medlin v. Commissioner*, T.C. Memo. 2003-224, 2003 WL 21743513 at 32 (2003), *aff'd*, 138 Fed. Appx. 298 (11th Cir. 2003), *cert. denied*, 126 S.Ct. 146, 163 L. Ed. 2d. 72 (2005); *Sleiman v. Commissioner*, 187 F.3d 1352, fn. 21 (11th Cir. 1999); *Fasken v. Commissioner*, 71 T.C. 650, 655 (1979); *Iske v. Commissioner*, T.C. Memo. 1980-61, 1980 WL 3916 at 9 (1980).

The Trust concedes that the voting and liquidation rights had "no determinable value" when the policy was acquired in 1990, and makes no attempt to establish that those rights had any market value at that time. (P. Brief at 5.) Rather, the Trust argues that the rights acquired value in March, 2000 when Sun Life demutualized. (P. Brief at 6-8.) There is no dispute about that, but the pertinent consideration is that the rights had no market value in June, 1990. Therefore, no basis can be allocated to those rights.

When an asset consisting of several parts is purchased for a single price, Treas. Reg.

---

[1]If the policy lapsed, was surrendered, or the policy holder died on or before January 27, 1998, that policy holder would not be entitled to any stock distribution, regardless of how long the policy had been in effect, or the amount of premiums paid.

§ 1.61-6(a) requires that the single price must be allocated to each of the parts based on "the relative *fair market values* of the portions of the larger property at the time of their purchase" (emphasis added). *Medlin*, 2003 WL 21743513 at 31. The taxpayer has the burden of proving the relative fair market values on the date of acquisition. *Medlin*, 2003 WL 21743513 at 32; *Sleiman*; *Fasken; Iske*. Since the Trust does not even allege that the rights at issue had any market value when the policy was acquired in 1990, the Trust clearly cannot satisfy its burden of proving that any basis can be allocated to those rights.

Section 1012 of the Internal Revenue Code provides that a taxpayer's basis is the amount of cash or other property the taxpayer paid for the asset.[2] Whether an interest acquired value after it is purchased has no bearing on its basis. *Gladden*; *Plow Realty Co. v. Commissioner*, 4 T.C. 600, 609 (1945). A taxpayer "must demonstrate the economic outlay necessary . . . to claim basis." *Karara v. Commissioner*, T.C. Memo. 1999-253, 1999 WL 549462 at 4 (1999), *aff'd*, 214 F.3d 1358 (11th Cir. 2000), *cert. denied*, 531 U.S. 980 (2000). The Trust has not alleged any facts to show that a portion of the premium the Trust paid for the policy was attributed to the voting and liquidation rights.

Indeed, the evidence at trial will establish that no portion of the premium was attributable, directly or indirectly, to the voting and liquidation rights. The amount of stock distributed to the Trust represented a windfall to the Trust and not a return of any amount it previously paid. Sun Life distributed stock equal to the current value of the company, even though current policyholders, including the Trust, had contributed less than 10% of that value.

[2] Citations to the Internal Revenue Code are to the provisions of the Code in effect in the year at issue, 2000. Section 1012 has remained unchanged since it was adopted in 1954.

Since no cash or other property was paid for the voting and liquidation rights, and the stock received in exchange for those rights was a windfall, pursuant to § 1012, those rights could not be allocated any basis.

## II. CONTENTIONS OF FACT

### A. *The operation of a mutual company*.

A mutual life insurance company is technically owned by the holders of participating policies. Participating policies are whole life insurance policies as opposed to other forms of life insurance, such as term policies or universal life policies. A mutual company seeks to maximize divisible surplus, which is the amount of surplus the company does not need to retain for the future viability of the company. The divisible surplus is returned to policy holders in the form of policy dividends. The goal of a mutual life insurance company is to provide insurance "at cost."

In pricing its various lines of business, the company seeks to ensure that each block of business is priced to have a high probability of being self-supporting. Normally, the company sets gross premiums at a level that will ensure at least a 90% chance that the premiums will be sufficient to cover any future adverse conditions that might arise. To the extent the company's actual operating experience (e.g. mortality, investment, or expenses) is more favorable than predicted when premiums were set, the excess premiums would be refunded to the policyholders as dividends (if not needed to ensure the future viability of the company).

Each year, the company determines the portion of earnings it needs to retain as surplus to ensure that the company can meet its future contractual obligations, to enable it to grow more rapidly, and to pursue new lines of business or other strategies. This annual increase in surplus is like any other operating expense of the mutual company. The amount retained as surplus to

cover future obligations is based on risks. State regulators establish a minimum amount of surplus needed to cover risks. This amount is known as risk based capital, or RBC. If the company's surplus falls below that level, the State will place the company in receivership. To avoid this happening, companies typically hold two to three times the minimum RBC in surplus.

As a result of the annual increases in surplus, a mutual company's current surplus mostly reflects the experience from policies sold over the years, beginning with the date the company began business. Therefore, most of a company's current surplus is related to policies no longer in force, as the policies have either lapsed or the policyholders have died. The remaining surplus is from earnings on investments and from profits from nonparticipating lines of business. Only a small amount of a company's surplus is related to the current participating policy holders.

In Sun Life's case, less than 10% of its surplus at the time of the demutualization was related to premiums paid by current policyholders. Since the Trust's policy had been in effect for less than eight years prior to the effective date of the demutualization, its contribution to the surplus at that time would be negligible. Policyholders have no right against any of the surplus retained by the company. They only have a right to a distribution of the divisible surplus, which amount is paid out each year as policy dividends.

B. *Voting and liquidation rights associated with a mutual policy*.

The voting rights of participating policyholders are very limited. Policyholders have the right to vote on the Board of Trustees of the company and to approve a proposed demutualization. Unlike shareholders in a stock company, policyholders do not have any right to vote on other major corporate decisions. Further, each policyholder had only one vote, regardless of the size of his or her policy, or the amount of premiums paid. At the time of the

demutualization, Sun Life had 1,058,243 participating policyholders, so the significance of the Trust's voting right was nominal. (Jx. 1 at 158.)

Policyholders have the right to share in a solvent liquidation of the company. Policyholders, unlike shareholders, cannot force the company to liquidate all or part of its business, and State regulators will not allow a solvent mutual company to liquidate. If the company does not have sufficient capital to continue operations, it is placed in receivership, and ultimately liquidated for the benefit of its creditors. In recent history, there has never been a solvent liquidation of a mutual life insurance company.

Unlike shareholder equity rights, which are separate from the contractual rights of the insurance policy, a mutual policyholder's voting and liquidation rights are inextricably tied to the underlying insurance contract. (Jx. 1 at 153, 160-161.) The voting and liquidation rights cannot be separately purchased or transferred. They begin and end with the purchase and termination of the policy. There is no separate, continuing value to those rights. (Jx. 1 at 160-161.) There is no identifiable price for these rights at the time a participating policy is purchased.

The Sun Life actuary will testify that Sun Life did not attribute, directly or indirectly, any portion of the premium charged to the Trust's policy to these rights. The premiums, benefits, and dividends related to the Trust's policy before and after the demutualization are identical. (Jr. 1 at 207.) In addition, the premium charged for new policies sold after the demutualization are the same as the premiums charged for the pre-demutualization policies. If a portion of the premium was paid for the voting and liquidation rights, when those rights were surrendered the

premium should have been reduced. Since the premium remained unchanged, it is clear that no portion of the premium was paid for the voting and liquidation rights.

When the Trust acquired the Sun Life policy in 1990, the possibility that Sun Life might demutualize in the future was extremely remote and uncertain. At that time, the company had not even explored the possibility of demutualization, much less started the lengthy and costly process of putting a plan of demutualization into effect. In fact, Canadian law did not even allow demutualization until March, 1999. (Jx. 1 at 160.) Therefore, when the Trust purchased the policy it had no realistic expectation that Sun Life would demutualize at any time in the future. The Trust has not alleged that it had any such expectation when it purchased the policy.

In 1990, there was no prospect of a demutualization of Sun Life. Any surrender or lapse of the policy, or the death of the named insured, prior to January 27, 1998, would result in the Trust receiving nothing in the demutualization. Also, the amount of stock or other property the policyholders would receive in any demutualization was unknown. There was the possibility that no stock or other property would be distributed in the Sun Life demutualization.[3] Finally, even if Sun Life decided to demutualize, it was uncertain the company's regulators would approve of the plan. In light of these very large uncertainties, at the time the Trust acquired the policy, no value could be ascribed to the chance of the voting and liquidation rights acquiring some value as a result of a future demutualization.

C. *The distinction between stock dividends and mutual dividends*.

---

[3]The laws of Michigan, the state in which Sun Life was licensed, only required that a life insurance company that demutualized issue its participating policyholders rights to purchase stock. M.C.L.A. § 500.5905(1)(c)(I). Therefore, Sun Life could have demutualized its U.S. operations without issuing Financial Services stock to participating policyholders.

Policyholder dividends are contractually required and are distributed annually. Normally, policy dividends increase each year the policy is in effect. Policy dividends are a refund of premium reflecting the differences between the original pricing assumptions used to establish the premiums that are paid by the policyholder and the actual experience of the company. There are normally three components of policyholder dividends. First, if the mortality experience based on the number of actual deaths is better than assumed in the original premium pricing, the difference in the resulting mortality rates times the amount at risk is refunded as one portion of the dividend. Second, if investment earnings are greater than assumed in the original premium pricing, the excess earnings on the policy funds are refunded as part of the policyholder dividend. The third component of the policy holder dividend is the difference between assumed and actual expenses. Dividends are determined for each class of policies and are usually paid annually.

By contrast, stock dividends are paid to the equity owners of an insurance company, not to its policyholders. Stock dividends depend on the company's philosophy and strategy and are not contractually required. Typically, stockholder dividends vary modestly, if at all, from year to year. Stockholder dividends are reportable as taxable income. Mutual policyholder dividends are taxed differently. They are taxable only to the extent the total dividends, or policy refunds, exceed the total premiums paid.

Stockholders have direct rights against the assets of the corporation. Stockholders can compel a corporation to liquidate part of all of its assets. By contrast, policyholders only have rights against the divisible surplus (i.e. policyholder dividends) and cannot compel the mutual company to liquidate any part of its assets. Stockholders have voting rights consistent with the

size of their investment. The more shares owned, the more votes a stockholder has. By contrast, each policyholder had only one vote, regardless of the size of the policy or level of premiums paid.

Stock equity rights have defined purchase prices, determinable ongoing market value, and are sold independently of the stock company's insurance policies. When common stock is sold, the transaction is reported as a taxable gain or loss. For mutual companies, no taxable gain or loss is reported on the termination of voting and liquidation rights when a policy lapses, is surrendered, or terminates as a result of death of the named insured.

D. *The Sun Life demutualization*.

On January 27, 1998, Sun Life announced its intention to explore demutualization. (Jx. 2.) At that time, Canadian law did not allow demutualization of a mutual company. (Jx.1 at 160.) The Canadian Demutualization Regulations, allowing Sun Life to demutualize, were adopted in March, 1999. (Jx. 1 at 160.) Sun Life's Board of Trustees approved the plan on September 28, 1999. (Jx. 4 at 73.) On October 20, 1999, Sun Life's participating policyholders approved the demutualization plan. (P. Brief at 2.) The plan was approved by Sun Life's regulators and the IRS in early 2000, and the demutualization occurred on March 22, 2000. (P. Brief at 2.)

In the demutualization, Sun Life became a subsidiary of Financial Services. Prior to the demutualization, Financial Services was a subsidiary of Sun Life. (Jx. 4 at 74.) Sun life issued common shares to Financial Services and surrendered to Financial Services for cancellation all the current outstanding common and preferred stock of Financial Services held by Sun Life. (Jx. 4 at 75.) All voting and liquidation rights of Sun Life policyholders ceased and Financial

Services issued stock, equal to the then ongoing business value of Sun Life, to the eligible Sun Life policyholders. (Jx. 4 at 75.) The IRS treated the demutualization as a non-taxable reorganization under § 368 by viewing the policyholders as exchanging their voting and liquidation rights in Sun Life, which reflect all the limited equity that exists in the mutual company, in exchange for Financial Services stock under § 354. LTR 200020048, 2000 WL 19305347 at 14. Prior to the distribution of Financial Services stock in the demutualization, Sun Life policyholders owned no stock in either Sun Life or Financial Services.

Financial Services also completed an Initial Public Offering of its stock shortly after the demutualization. (Jx. 4 at 75.) Policyholders had the option of having the Financial Services stock that was distributed to them in the demutualization sold as part of the IPO. In that event the policyholder would receive the proceeds of the sale, less commission, rather than the shares. (Jx. 4 at 75.) The Trust was entitled to receive 3,892 shares of Financial Services stock, but elected to have those shares sold as part of the IPO. The Trust received $31,759.00 as the net proceeds of the sale of its Financial Services stock. (Px. 1.) Policyholders' interests under their policies remained unchanged as a result of the demutualization. (Jx. 4 at 75.)

Sun Life put in place special arrangements "designed to protect the reasonable expectations of future Policy Dividends and other non-guaranteed benefits, and to meet contractual obligations, under Participating Policies issued before demutualization." (Jx. 4 at 75.) Therefore, the Trust's rights to policyholder dividends was unaffected by the demutualization. The Trust is incorrect when it states that dividends after the demutualization were limited to the amount of historic dividends and would expire after five years. (P. Brief at 2.) At trial, the Sun Life actuary will testify that Sun Life, after the demutualization, continued

to pay dividends at the rates expected by pre-demutualization participating policyholders, for the duration of their policies.

The Financial Services stock distributed to the policyholders was not related to any premiums those policyholders had paid. The stock was a windfall for the policyholders because they paid nothing for the right to receive that stock. The actuary of Sun Life will testify that all current policyholders on January 27, 1998, the effective date of the demutualization, had contributed less than 10% of the value of the company distributed in the demutualization. Since the Trust's policy had been in effect for less than eight years at that time, the Trust's contribution to surplus would be negligible.

E. *The voting and liquidation rights had no value in 1990.*

The Trust acknowledges that the voting and liquidation rights attendant to its Sun Life policy had no determinable value prior to the demutualization of Sun Life in March, 2000. (P. Brief at 5.) The Trust does not contend that those rights had any market value prior to that date. On June 28, 1990, when the policy was purchased, the voting and liquidation rights only had the potential of acquiring value at a later date. Those rights had no actual value, and definitely no market value, when the policy was purchased.

Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller." Rev.Rul. 59-60, 1959-1 C.B. 237. There are three basic approaches to determining value, the asset approach, market approach, and income approach. Under the asset, or "cost" approach, value is measured based on the cost to replace the future service capability or utility of the subject property. Under the market approach, comparative valuation benchmarks are developed via comparisons to transactions involving similar property

or actual transactions in the subject property. Under the income approach the value of property is based upon the anticipated future economic benefits.

Defendant's expert will testify that the fair market of the voting and liquidation rights on June 28, 1990, using each of those three valuation approaches, is zero. Under the asset approach, the value is zero because the seller of the voting and liquidation rights, Sun Life, allocated zero cost (premium) to those rights.

Under the market approach, the value is zero for several reasons. First, no portion of the price charged by Sun Life for the policy was attributable to the voting and liquidation rights, indicating that the selling price of those rights is zero. Second, if the policy lapses, is surrendered, or the insured dies, the rights terminate and nothing is paid for the surrendered ownership rights. This further indicates a selling price of zero. Finally the fact that a policy with voting and liquidation rights, and a policy without them, are priced the same indicates that the selling price for those rights is zero. If the premium for the policy with voting and liquidation rights is $1,000 and, after demutualization, the premium for that same policy, without those rights, is still $1,000, then no part of the premium was paid for those rights.

Under the income approach the value is still zero, because a policyholder purchasing a Sun Life policy in 1990 had no realistic expectation of receiving anything of value, either through a solvent liquidation or a demutualization, in exchange for those rights at the time the policy was purchased. The Trust has not alleged it had any such expectation. As noted above, there was not a realistic possibility of the Trust ever receiving proceeds from a solvent liquidation of Sun Life. Likewise, it was very uncertain in 1990 that the Trust would receive proceeds from a demutualization. In light of the very large uncertainties associated with the

likelihood, timing, size and distribution of demutualization proceeds in exchange for the voting and liquidation rights, under the income approach, those rights had zero value.

## III. CONTENTIONS OF LAW

### A. *The Trust's burden of proof.*

The IRS determined that no portion of the premium paid by the Trust for the Sun Life policy could be allocated to the voting and liquidation rights surrendered in exchange for the Financial Services stock, because those rights had no fair market value on June 28, 1990, when the policy was purchased. Therefore, the Trust's basis in the stock was zero, and the full proceeds of the sale was taxable capital gain. The Trust has the burden of proving that the IRS determination is erroneous. *Sleiman*; *Medlin.* Whether an allocation of basis can be made to the voting and liquidation rights is an issue of fact on which the Trust has the burden of proof. *Iske; Medlin*.

To sustain its burden of proof, the Trust must, first, prove that the voting and liquidation rights had a fair market value on June 28, 1990, and, second, prove the amount of premium that is to be allocated to those rights, based on their market value in relation to the fair market values of the other parts of the policy. *Medlin*. In addition, to establish basis, the Trust has the burden of proving that a portion of the premium it paid for the policy was for the voting and liquidation rights. If the Trust cannot prove that it paid a portion of the premium for those rights it has no basis in those rights. *Karrara*.

The Trust will not be able to prove that the voting and liquidation rights had any market value on June 28, 1990, and, apparently, will not even attempt to do so at the trial. In its brief, the Trust only alleges that when the policy was purchased, the rights had a potential of acquiring

value at a later date. (P. Brief at 5-6.) The fact that the voting and liquidation rights acquired value on March 22, 2000, as a result of the demutualization, does not establish that those rights had market value on June 28, 1990. Therefore, the Trust cannot satisfy its burden of proving the relative fair market value of those rights, and, as a result, no basis can be allocated to those rights.

Second, the Trust will not be able to prove that any portion of the premium was paid for the voting and liquidation rights. The Trust argues that the premium was for all parts of the policy and could not be allocated to the various parts. However, the testimony of the actuary of Sun Life and defendant's expert on the insurance industry, will establish that in fact insurance companies do allocate the premium between the various parts of the policy when determining the amount of premium to be charged. The Sun Life actuary will testify that no portion of the premium was attributable, directly or indirectly, to the voting and liquidation rights. Sun Life considered those rights to have no value and did not account for them on its financial statements. Since the Trust cannot satisfy its burden of proving that any portion of the premium was paid for the voting and liquidation rights, no basis can be allocated to those rights. Therefore, the Trust had no basis in the Financial Services stock it received in exchange for those rights as part of a tax free reorganization.

B. *Treas. Reg. § 1.61-6(a).*

Allocation of basis when a part of a larger property is sold or exchange is governed by Treas. Reg. § 1.61-6(a):

> When a part of a larger property is sold, the cost or other basis of the entire property shall be equitably apportioned among the several parts, and gain realized or loss sustained on the part of the entire property sold is the difference between the selling price and the cost or other basis allocated to such part. The sale of each part is treated as a separate

> transaction and gain or loss shall be computed separately on each part. Thus, gain or loss shall be determined at the time of sale on each part and not deferred until the entire property has been disposed of.

Example 2 of the regulation provides that the allocation of basis called for in the regulation is to be based on the fair market value of each of the pieces of the property at the time the property is purchased. In *Medlin*, the court made it clear that the equitable allocation of basis under Treas. Reg. § 1.61-6(a) should be based on the "relative fair market values of the portions of the larger property at the time of their purchase." 2003 WL 21743513 at 30; *see also*, *Iske*.

The voting and liquidation rights had no market value on the date the Trust purchased the policy. No portion of the purchase price paid for the policy was paid for the voting and liquidation rights. Therefore, under Treas. Reg. § 1.61-6(a), no portion of the purchase price can be allocated to those rights, and the Trust had no basis in those rights.

In *Gladden v. Commissioner*, 262 F.3d 851, 854 (9th Cir. 2001), the court in applying the provisions of Treas. Reg. § 1.61-6(a), held that when real property was purchased with no realistic expectation of receiving future water rights, and no premium was paid for any future water rights, no basis could be allocated to the water rights subsequently granted in relation to the property. This case falls within the "easy case" described in *Gladden*. The only way the voting and liquidation rights could have value was in the case of a future solvent liquidation or demutualization. The Trust had no expectation of either event occurring when it purchased the policy. Further, no portion of the premium was paid for the voting and liquidation rights. Under *Gladden* and Treas. Reg. § 1.61-6(a), no basis can be allocated to those voting and liquidation rights.

C. *Pierce* *and* *Inaja Land* *do not apply to this case.*

The Trust cites the Court of Claims decision in *Estate of Henry Hill Pierce v. United States*, 99 Ct. Cl. 355 (1943), to defer the recognition of any gain on the sale of its Financial Services stock. That case does not apply here for two reasons. First, it was decided prior to the adoption of Treas. Reg. § 1.61-6(a), which specifically provides that gain or loss is to be determined at the time the part of the property is sold and is not deferred until the entire property is sold. Second, unlike the stock at issue in *Pierce*, a life insurance policy is not usually sold by the policyholder. Normally, policies lapse, are surrendered, or terminate because of the death of the insured. None of those events are realization events for the recognition of gain or loss. Therefore, there is nothing remaining to be sold on a later date. The concept of deferring gain or loss until the entire property is sold does not apply to the life insurance policy at issue in this case.

The Trust also relies on the decision in *Inaja Land Co., Ltd. v. Commr.*, 9 T.C. 727 (1947) that when an allocation of basis to the several parts of a property is "impossible or impracticable," then the amount received may be applied against the taxpayer's basis in the entire property. *(*P. Brief at 8.) Whether apportionment of a definite basis to the part of the property in question cannot be made is an issue of fact on which the Trust has the burden of proof. *Medlin*; *Fasken*, 71 T.C. at 656-57; *Iske*. The basis allocation rule relied on in *Inaja Land* is limited only to rare and extraordinary situations which are not present here.[4]

---

[4]*Inaja Land* cites *Burnet v. Logan*, 283 U.S. 404 (1931), in support of its position that basis should be recovered first. *Burnet* involved the receipt of an uncertain purchase price, not the purchase of uncertain rights. The legislative history to § 453 governing installment sales, provides that the new rules were intended, "to reduce substantially the justification for treating transactions as 'open' and permitting the use of the cost-recovery method sanctioned by *Burnet v. Logan*." . . . It is the Committee's intention that . . . its use be limited to those rare and extraordinary cases." S. Rep. No. 96-1000, 1980-1 C.B. 494, 506-7.

*Inaja Land* involved amounts paid for an easement to allow flooding of the taxpayer's land. The Tax Court acknowledged that the general rule was that in computing gain the taxpayer must allocate his basis to the portion of the land affected by the easement. 9 T.C. at 735. The taxpayer proved that it could not determine what portion of its property would be affected by the flooding. 9 T.C. at 736-37. Because the payment could not be allocated to any identifiable part of the entire property, the taxpayer was allowed to treat the payment as a recovery of basis.

That is clearly not the circumstance present here. The demutualization affected only the Trust's voting and liquidation rights. All other rights under the policy and the premium remained unchanged. (Jx. 4 at 3.) Therefore, there is no reason why the Financial Services stock the Trust received should reduce the basis of the entire policy, when only an insignificant, valueless portion of that policy was affected by the demutualization. Further, the recovery of basis approach enunciated in *Inaja Land*, like the decision in *Pierce*, is predicated on the fact that any gain or loss resulting from the easement would be realized when the entire property is sold. Since usually an insurance policy is never sold, the decisions in *Inaja Land* and *Pierce* are not applicable to this case.

D. *Sections 301, 305, 307 and 355 do not apply to this case*.

The Trust refers to §§ 301, 305, 307, and 355 to support its argument that its voting and liquidation rights had a basis equal to the fair market value of the Financial Services stock it received in the demutualization. Section 301 applies to "distributions of property made by a corporation to a shareholder with respect to its stock." § 301(a). Section 305 applies to "any distribution of the stock of a corporation made by such corporation to its shareholders with respect to its stock." § 305(a). Section 307 applies to distributions to which

§ 305 apply. § 307(a). Section 355 applies to a distribution by a corporation to a shareholder with respect to its stock, of the stock of a controlled corporation. § 355(a)(1).

The Trust was not a stockholder of either of Sun Life or Financial Services prior to the demutualization. Therefore, the distribution the Trust was not a distribution to a shareholder with respect to its stock. Sections 301, 305, 307 and 355 do not apply to this case.

E. *The voting and liquidation rights are not property and can have no* basis.

In *Tancredi v. Metropolitan Life Insurance Company*, 149 F.Supp. 2d 80, 86-87 (S.D.N.Y. 2001), *aff'd* 316 F.3d 308 (2d Cir. 2003), *cert. denied*, 539 U.S. 942 (2003), the court addressed whether voting and liquidation rights in a mutual insurance company have value. *Tancredi* involved the demutualization of Metropolitan Life. Metropolitan Life had over $10 billion in surplus at the time of the demutualization. The court in *Tancredi* determined that the voting and liquidation rights exchanged for Metropolitan Life stock in the demutualization were not property for purposes of 28 U.S.C. § 1983 (149 F.Supp. 2d at 87):

> "A member of a mutual corporation has no definite property interest which can be ascertained and recovered. The assets belong to the corporation, and no member has any interest in any aliquot part thereof, and the unascertained interest of a mere policy holder is quite insufficient to sustain an action brought to prevent the corporation from doing what the statute authorized it to do.

The court in *Trancredi* noted that the voting and liquidation rights of policyholders of mutual policies are directly analogous to the voting and liquidation rights of depositiors in mutual savings banks. Numerous courts have held that voting and liquidation rights of depositors in mutual savings banks have no value. *Paulsen v. Commissioner*, 469 U.S. 131, 141-142 (1985); *Society for Savings v. Bower*, 349 U.S. 143, 150 (1955); *Ordower v. OTS*, 999 F.2d 1184, 1187 (7th Cir. 1993); *York v. Federal Home Loan Bank Board*, 624 F.2d 495, 499-500 (4th

cir. 1980), *cert. denied*, 449 U.S. 1043 (1980). The court found those decisions applicable to the determination of whether voting and liquidation rights associated with a mutual policy have any value (149 F.Supp 2d at fn. 22):

> Moreover, the true analogue of the creditor/debtor relationship is the insured/insurer relationship, which, like the former relationship in a savings and loan demutualization, remains unaltered by MetLife's demutualization.

The *Trancedi* decision supports the conclusion that the Trust's voting and liquidation rights had no value, and, therefore, no basis can be allocated to those rights.

CONCLUSION

Defendant will prove at the trial that the voting and liquidation rights associated with the Trust's Sun Life policy had no market value when the policy was purchased on June 28, 1990. Defendant will also prove that no portion of the premiums the Trust paid for the Sun Life policy was allocable to those rights. The Trust had no rights to the retained surplus of Sun Life. The Financial Services stock the Trust received in exchange for the voting and liquidation rights was a windfall that bore no relation to the premiums the Trust had paid for the policy. All the rights the Trust had under the policy, including its right to receive dividends, remained unchanged after the demutualization, as did the premium. Therefore, no basis can be allocated to the voting and liquidation rights. Since those rights were exchanged for Financial Services stock, in a tax free reorganization, the Trust had no basis in the Financial Services stock. The trust is not entitled to

any refund in this case.

Respectfully submitted,

s/Benjamin C. King, Jr.
BENJAMIN C. KING, JR.
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6506

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
STEVEN I. FRAHM
Assistant Chief

s/Steven I. Frahm
Of Counsel

May 22, 2007