***Summary of Opinion of Independent Actuary***

In the opinion of Nicholas Bauer, in his capacity as the Independent Actuary, the Conversion Plan:

- provides for demutualization benefits and a method to apportion the value of Sun Life of Canada among eligible policyholders which are fair and equitable to eligible policyholders,
- allocates assets to each Pre-Conversion Individual Participating Closed Sub-Fund and to each Pre-Conversion Ancillary Participating Sub-Fund which are expected to be adequate to meet both the contractual obligations under the policies in respect of which it is maintained and the reasonable expectations of their policyholders for dividends and other non-guaranteed benefits,
- allocates assets to each Post-Conversion Individual Participating Sub-Account which are adequate to support the participating policies expected to be allocated to that Post-Conversion Individual Participating Sub-Account after the effective date of demutualization,
- does not materially adversely affect Sun Life of Canada's future financial strength and vitality or the security of its policyholders, and
- provides Policy Credits which, as of the date that the Initial Share Price is determined, will be appropriate substitutes for Financial Services Shares.

The opinion of the Independent Actuary, which is attached as Schedule D to Part 1 of this Policyholder Information Circular, is subject to the reliances and limitations stated in the opinion. The references to the various sub-funds and sub-accounts have particular meanings which are explained in the opinion.

10

*This discussion is not a complete summary of all relevant taxation laws. You should consult your own tax advisor.*

## 11. TAX CONSEQUENCES FOR POLICYHOLDERS

**The following discussion of taxation considerations to eligible policyholders of the demutualization is a general guide and is not a complete summary of all relevant taxation laws and does not address every type of eligible policyholder. The tax you must pay as a result of receiving demutualization benefits will vary depending on your particular tax situation and the form of demutualization benefits you receive. If you receive Financial Services Shares, your tax position will also depend on whether or not you sell your shares in connection with the initial public offering or afterwards. This general discussion is not tax advice to any particular policyholder and all policyholders should consult their own tax advisors to determine how the demutualization will affect them in their particular circumstances. This general discussion does not address estate or gift or territorial, state or other local tax legislation or considerations, and you should consult your own tax advisor with respect to these matters in your particular circumstances.**

The description of the tax consequences for each jurisdiction has been reviewed by a law or accounting firm retained by Sun Life of Canada in that jurisdiction.

*Tax Consequences – Canada*

### 11.1 Canada

In the opinion of Tory Tory DesLauriers & Binnington, as of the date of this Policyholder Information Circular, the following is a fair summary of the principal Canadian federal income tax considerations under the Canadian Tax Act generally applicable to eligible policyholders who receive Financial Services Shares, cash or Policy Credits in exchange for their ownership rights in Sun Life of Canada on the demutualization of Sun Life of Canada in accordance with the Conversion Plan.

This summary is based on the current provisions of the Canadian Tax Act as proposed to be amended by draft income tax legislation on the demutualization of life insurance companies released by the Department of Finance on December 15, 1998, with modifications proposed by the Department of Finance in a letter dated February 8, 1999, and all other specific proposals to amend the Canadian Tax Act which have been publicly announced before the date of this Policyholder Information Circular. If these proposals do not become law, your tax consequences may differ significantly from those described below. This summary is based on the assumption that Financial Services Shares will be listed on one or more of the Stock Exchanges within six months after the time of the demutualization. This summary is also based on counsel's understanding of Revenue Canada's published administrative practices as well as letters of Revenue Canada regarding the Canadian tax treatment of Policy Credits.

Each of the provinces, other than Quebec and, in the case of corporate income tax, Ontario and Alberta, levies its income tax on the basis of income as computed under the Canadian Tax Act and, accordingly, the following summary will apply, subject to these exceptions, for purposes of provincial income tax. In its budget of March 9, 1999 the Quebec government announced that it would amend its tax system to incorporate, with adaptations based on its general principles, most of the proposed amendments to the Canadian Tax Act relating to demutualization when these amendments are finalized. The government of Ontario, in its May 4, 1999 budget, also announced its intention to parallel, with necessary modifications, these proposed amendments to the Canadian Tax Act. Alberta has not to date made an announcement in this regard.

#### *11.1.1 Residents of Canada*

This part of the Canadian tax summary applies to policyholders who are resident in Canada for purposes of the Canadian Tax Act.

11

### *Tax Treatment for Canadian Resident Individuals and Trusts*

***If you are an individual resident in Canada...***

#### Tax Treatment of Your Policy

The demutualization will not affect the tax treatment of your insurance policy or policy benefits.

#### Receiving Financial Services Shares in Exchange for Your Ownership Rights

If you receive Financial Services Shares on the demutualization in exchange for your ownership rights, you will not have to pay any income tax when you receive these shares. Your cost of these shares will be deemed to be zero.

#### Receiving Dividends on Your Financial Services Shares

Any dividends you receive on Financial Services Shares while you hold them will be included in your income. Policyholders who are individuals or certain types of trusts will be subject to the gross-up and dividend tax credit rules applicable to taxable dividends received from taxable Canadian corporations.

#### Selling Your Financial Services Shares Under the Cash Election

If you sell your Financial Services Shares under the Cash Election, those shares will be purchased by Financial Services and you will be taxed as if you received a dividend equal to the amount paid by Financial Services to you for your shares. The tax treatment of this dividend will be as set out above under "Receiving Dividends on Your Financial Services Shares".

#### Selling Your Financial Services Shares After the Initial Public Offering

If you sell your Financial Services Shares after the initial public offering, through the Share Selling Service or otherwise, and you hold your shares as capital property, in general, you will realize a capital gain (or capital loss) equal to the amount by which the proceeds of sale, less the amount you paid in brokerage commissions and any other reasonable costs on the sale, exceed (or are less than) your adjusted cost base of the shares. Your cost of Financial Services Shares acquired in exchange for your ownership rights in Sun Life of Canada will be deemed to be zero. If you acquire Financial Services Shares after demutualization, the adjusted cost base to you of each of your Financial Services Shares will be the average of the adjusted cost base to you of all your Financial Services Shares. In general, three-quarters of any capital gain must be included in income as a taxable capital gain and three-quarters of any capital loss may be deducted against taxable capital gains, subject to the detailed tax rules in the Canadian Tax Act. The amount of any capital loss realized on the disposition of Financial Services Shares may be reduced by the amount of dividends received on the Financial Services Shares to the extent and under the circumstances set out in the Canadian Tax Act. If you do not hold your shares as capital property for tax purposes you should consult your own tax advisor regarding the tax consequences to you of holding or disposing of your shares in your circumstances.

#### Receiving Cash in Exchange for Your Ownership Rights

If you receive cash directly from Sun Life of Canada on the demutualization in exchange for your ownership rights, you will be taxed as if you received a dividend in an amount equal to the amount of the cash. The tax treatment of this dividend will be as set out above under "Receiving Dividends on your Financial Services Shares".

### *Tax Treatment for Canadian Resident Corporations*

For corporations resident in Canada for purposes of the Canadian Tax Act, in general the tax treatment will be similar to that outlined above for Canadian individuals and trusts except as indicated below.

*If you are a Canadian corporation...*

Receiving Dividends on Your Financial Services Shares

Dividends received by a corporation on Financial Services Shares held by the corporation will be included in computing the corporation's income and generally will be deductible in computing its taxable income. However, a "private corporation" (as defined in the Canadian Tax Act) or another type of "subject corporation" (as defined in the Canadian Tax Act), may be liable to pay a refundable tax at the rate of 33⅓% of the amount of these dividends to the extent that the dividends are deductible in computing taxable income.

Receiving Cash in Exchange for Your Ownership Rights Under the Cash Election

A corporation which receives cash in exchange for its ownership rights under the Cash Election will be deemed to have received a dividend in an amount equal to the amount of such cash. The tax treatment to the corporation of this dividend will be the same as that outlined above under "Tax Treatment for Canadian Resident Corporations - Receiving Dividends on Your Financial Services Shares".

*If RRSPs or other registered plans are involved...*

### *Tax Treatment Where RRSPs or Other Registered Plans are Involved*

Your tax treatment will not change from that outlined above if your policy is an RRSP, RRIF or superannuation or pension fund or plan under the Canadian Tax Act.

However, if the policy is held by a trust governed by an RRSP, RRIF, DPSP or superannuation or pension fund or plan registered under the Canadian Tax Act, demutualization benefits will be paid to the trustee of the registered plan and generally will be tax free until they are withdrawn from that registered plan. Financial Services Shares will be qualified investments for these types of RRSPs, RRIFs or DPSPs and for registered education savings plans. The receipt of demutualization benefits by a trust governed by a RRSP or DPSP will be disregarded for the purposes of the special rules in the Canadian Tax Act relating to the eligibility for investment for such a trust of life insurance policies.

### *Tax Treatment Where Employee-Paid Group Insurance Plans are Involved*

Where a policyholder is an employer or other sponsor of a group insurance policy under which individuals have been insured in the course of or because of their employment, and the full cost of a particular insurance coverage under such policy has been borne by the individuals who have been insured under the particular insurance coverage, and (i) the policyholder receives Financial Services Shares or cash in exchange for its ownership rights relating to the particular insurance coverage, (ii) pays a premium under the policy in respect of the particular coverage, and (iii) the purpose of the premium is to apply all or part of the fair market value of such Financial Services Shares or the amount of such cash for the benefit of employees insured under the particular insurance coverage, then, for the purposes of the Canadian Tax Act, the premium will be deemed to be an amount paid by the employees and no amount may be deducted by the policyholder in computing its income in respect of such premium.

11

*Tax consequences – Non-Residents of Canada*

## *11.1.2 Non-Residents of Canada*

**The following summary applies to eligible policyholders who, for purposes of the Canadian Tax Act, are neither residents nor deemed to be residents of Canada and who do not use or hold and are not deemed to use or hold ownership rights, and who will not use or hold and will not be deemed to use or hold their Financial Services Shares, in carrying on a business in Canada.**

**Policyholders who are not residents of Canada will find information about the tax treaties that apply to them in the tax section for the country in which they are resident.**

### Receiving Financial Services Shares in Exchange for Your Ownership Rights

If you receive Financial Services Shares on the demutualization in exchange for your ownership rights, you will not have to pay any tax under the Canadian Tax Act when you receive them. Your cost of these shares will be deemed to be zero.

### Receiving Dividends on Your Financial Services Shares

Dividends paid or credited on Financial Services Shares will be subject to withholding tax under the Canadian Tax Act at a rate of 25%, subject to reduction under the provisions of any applicable international tax treaty.

### Selling Your Financial Services Shares Under the Cash Election or Default Cash Election or Selling Mandatory Sale Shares

If you sell your Financial Services Shares under the Cash Election or the Default Cash Election or you sell your Mandatory Sale Shares, those shares will be sold in the initial public offering. You will not be subject to tax under the Canadian Tax Act as a result of selling your Financial Services Shares in the initial public offering. However, because Financial Services will be paying the underwriting fee on the sale of your shares, you will be considered to have received a dividend from Financial Services equal to the amount of that fee. This dividend will be subject to withholding tax under the Canadian Tax Act at a rate of 25%, subject to reduction under the provisions of any applicable international tax treaty. The amount of tax to be withheld will be deducted from your proceeds of sale. For example, if you sell Can.$5,000 of Financial Services Shares, the underwriting fee would be approximately Can.$150 (assuming that the rate of this fee is 3% of the initial public offering price). In this case, Can.$37.50 would be required to be withheld from your proceeds of sale (computed by applying the 25% Canadian withholding tax rate to the Can.$150 underwriting fee). Accordingly, in this example you would receive net sale proceeds of Can.$4,962.50 (Can.$5,000 - Can.$37.50). Your net sale proceeds would be higher in this example if the rate of Canadian withholding tax is reduced under any applicable international tax treaty.

### Selling Your Financial Services Shares After the Initial Public Offering

If you sell your Financial Services Shares after the initial public offering, capital gains that you may realize on the sale will not be subject to tax under the Canadian Tax Act unless the shares are taxable Canadian property to you within the meaning of the Canadian Tax Act. Financial Services Shares generally will not be taxable Canadian property to you unless, at any time during the five-year period immediately preceding the disposition, you, persons with whom you did not deal at arm's length, or you and persons with whom you did not deal at arm's length, owned 25% or more of the issued shares of any class or series of shares of Financial Services. Even if Financial Services Shares constitute taxable Canadian property to you, an exemption from tax under the Canadian Tax Act may be available under the provisions of an applicable international tax treaty.

### Receiving Policy Credits in Exchange for Your Ownership Rights

If you receive Policy Credits on the demutualization in exchange for your ownership rights, you will be taxed as if you received a dividend from Sun Life of Canada in an amount equal to the fair market value of your Policy Credits and will be subject to withholding tax on this amount under the Canadian Tax Act at the rate of 25%, subject to reduction under any applicable international tax treaty.

Under the Canada-United States tax treaty, dividends paid to a trust, company, organization or other arrangement that is a resident of, and generally exempt from income taxation in, the United States and operated exclusively to administer or provide pension, retirement or employee benefits, are exempt from Canadian non-resident withholding tax. Revenue Canada has provided written confirmation to Sun Life of Canada that this exemption will apply in respect of Policy Credits provided under each eligible policy, issued to a resident of the United States, that is an

11

individual retirement annuity satisfying the requirements of section 408(b) of the United States Tax Code or a tax-sheltered annuity satisfying the requirements of section 403(b) of the United States Tax Code. Accordingly, Sun Life of Canada will not withhold non-resident withholding tax from these Policy Credits.

Receiving Cash in Exchange for Your Ownership Rights

Some policyholders will receive cash directly from Sun Life of Canada on the demutualization in exchange for their ownership rights and will not have Financial Services Shares issued to them. See section 4.8, "Financial Services Shares - Principal and Secondary Jurisdictions", and section 4.9, "Cash from Sun Life of Canada". If you are one of these policyholders, you will be taxed as if you received a dividend from Sun Life of Canada in an amount equal to the amount of the cash payment and will be subject to withholding tax under the Canadian Tax Act on the cash payment at the rate of 25%, subject to reduction under any applicable international tax treaty.

## 11.2 United States

*Tax consequences – United States*

In the opinion of LeBoeuf, Lamb, Greene & MacRae, L.L.P., as of the date of this Policyholder Information Circular, the following is a fair summary of the principal United States federal income tax considerations generally applicable to eligible policyholders who are subject to United States income tax and who receive Financial Services Shares or Policy Credits in exchange for their ownership rights in Sun Life of Canada on the demutualization of Sun Life of Canada in accordance with the Conversion Plan. This summary is based on the current United States Federal income tax law and certain representations from Sun Life of Canada and Financial Services and certain other information, data, documentation and materials. Neither the opinion of Leboeuf, Lamb, Greene & MacRae, L.L.P. nor this summary is binding on the IRS or the courts.

Sun Life of Canada has requested a private letter ruling from the IRS regarding certain of the tax consequences described below. While Sun Life of Canada expects the IRS to rule in its favour, in the unlikely event it does not and if any adverse IRS position ultimately is sustained, the United States Federal income tax consequences of the demutualization may differ from those described below. The effectiveness of the Conversion Plan is not conditioned on Sun Life of Canada's receipt of favourable IRS rulings.

Some United States policyholders may be subject to special rules that are not described here, so policyholders should consult their own tax advisors to find out how the demutualization will affect their particular circumstances. You should also read section 11.1.2, "Non-Residents of Canada", for a summary of Canadian tax consequences generally applicable to eligible policyholders who are not resident in Canada.

***Residents of the United States***

***Tax Treatment for United States Individuals***

Treatment of Your Policy

11

*If you are an individual resident in the United States...*

The demutualization will not change the tax treatment of your insurance policy or policy benefits. For example, the tax rules that currently determine whether your policy is treated as life insurance or an annuity or as a modified endowment contract, or whether policy loan interest is deductible, will continue to apply after the demutualization. Sun Life of Canada has requested the IRS to rule on these matters.

Receiving Financial Services Shares in Exchange for Your Ownership Rights

If you receive Financial Services Shares in the demutualization in exchange for your ownership rights, you should not have to pay any tax as a result of receiving these shares. Your cost basis of these shares for tax purposes will be zero and your holding period for these shares generally will include the period of time you held your policy with Sun Life of Canada. Sun Life of Canada has requested the IRS to rule on these matters. However, if you own a policy through a tax-qualified retirement account in "payout" status or which is terminated, you will have to pay tax upon your receipt of

Financial Services Shares in the same manner as you are taxed on the distributions you currently receive from your tax-qualified retirement account. For special rules regarding the taxation of Financial Services Shares received by holders of certain tax-qualified retirement contracts that are currently in "payout" status or that terminate before demutualization, see "Tax Treatment for Tax Qualified Retirement Contracts Held by Individuals - Receipt of Stock by Holders of Certain Tax-Qualified Retirement Contracts will be Taxed".

#### Receiving Dividends on Your Financial Services Shares

Any dividends you receive on Financial Services Shares while you hold them will be included in your income and will be taxed at the rates applicable to ordinary income. Dividends Financial Services pays to United States individuals also will be subject to Canadian non-resident withholding tax generally at a rate of 15% under the Canada-United States tax treaty. United States individuals may be able to claim a foreign tax credit against their United States federal income tax for Canadian tax withheld from dividends received on Financial Services Shares, subject to limitations on foreign tax credits under the United States Tax Code. United States individuals with no more than United States $300 (or more than United States $600 in the case of married persons filing jointly) of creditable foreign taxes, and no foreign source income other than passive income (such as dividends and interest), may be eligible to credit such foreign taxes against their United States federal income tax liability without regard to the general foreign tax credit limitation rules. United States individuals who do not claim a foreign tax credit may instead be able to claim a deduction for Canadian tax withheld on dividends received from Financial Services.

#### Selling Your Financial Services Shares Under the Cash Election

If you sell your Financial Services Shares under the Cash Election, those shares will be purchased by the Underwriters and you will have a gain equal to the amount of the proceeds from the sale. The gain will generally be taxed as long-term capital gain, because most policyholders will have held their policies as a capital asset for at least one year before demutualization. Because Financial Services will be paying the Underwriters' fee on the sale of your shares pursuant to the Cash Election, Financial Services will treat that fee as a deemed distribution to you. While the amount of that deemed distribution should be reported as income for United States federal income tax purposes, you should be able to reduce the amount of the gain otherwise realized on the proceeds from the sale of your shares by a commission expense equal to the amount of that deemed distribution. The deemed distribution will be subject to Canadian non-resident withholding tax, generally at the reduced rate of 15% under the Canada-United States tax treaty. The amount remitted to you from the sale of your Financial Services Shares will be reduced by that withholding tax amount. You may be able to take the amount of the Canadian withholding tax into account as a credit or deduction in the determination of your United States federal income tax as discussed above.

#### Selling Your Financial Services Shares After the Initial Public Offering

If you sell your Financial Services Shares after the initial public offering, through the Share Selling Service or otherwise, in general you will have a capital gain equal to the amount by which the proceeds of sale, less the amount you pay in brokerage commissions and any other reasonable costs of the sale, exceed your adjusted cost basis of the shares. Your cost basis of Financial Services Shares acquired in exchange for your ownership rights in Sun Life of Canada will be zero. The gain with respect to the sale of shares you receive in the demutualization generally will be capital gain and taxed as long term or short term, depending on whether the length of time you owned your policy through the date the Conversion Plan becomes effective plus the length of time you held your Financial Services Shares is more than one year.

### Tax Treatment for Tax Qualified Retirement Contracts Held by Individuals

Certain tax-qualified retirement contracts (such as individual retirement annuities (IRAs) and tax sheltered annuities) will receive Policy Credits (rather than Financial Services Shares) as demutualization benefits. The receipt of Policy Credits will not be currently taxable to you. The payment of Policy Credits should not cause disqualification of the tax-qualified status accorded to the policies to which Policy Credits are posted and should not result in other adverse tax consequences with respect to those policies. The amounts ultimately paid under your tax-qualified retirement policy will be taxed at the time of payment in accordance with the rules governing the taxation of the distribution of benefits under your policy. Sun Life of Canada has requested the IRS to rule on some of the above matters.

### Receipt of Shares by Holders of Certain Tax-Qualified Retirement Contracts Will be Taxed

In the case of holders of certain tax-qualified retirement contracts that currently are in "payout" status or that terminate before the Conversion Plan becomes effective, Financial Services Shares (rather than Policy Credits) will be issued as demutualization benefits provided that the issuance of shares would not be subject to excise tax and would not result in a disqualification of the tax qualified retirement contract or a prohibited transaction under the United States Tax Code. These shares will be issued through the policy to the policyholder and treated as a distribution from the tax-qualified retirement account. If you own a tax-qualified retirement contract and receive such a distribution from your account, you will be taxed on the receipt of such shares in the same manner as you are taxed on the distributions you currently receive from your tax-qualified retirement account and your basis in those shares for tax purposes will equal the value at the time of receipt. If you are the holder of a tax-qualified retirement contract that terminates before demutualization, you will also receive Financial Services Shares as demutualization benefits, and you will be taxed on the receipt of those shares in the same manner as you are taxed on distributions you receive from your contract at termination.

### *Tax Treatment for United States Corporations*

***If you are a United States corporation...***

For a United States corporation, in general, the tax treatment will be similar to that outlined above for United States individuals except as indicated below. While the corporation may be able to deduct or credit Canadian withholding taxes imposed on dividends received on Financial Services Shares, the corporation will not be eligible for the provision that permits certain individuals to credit those foreign taxes against United States income tax liability without regard to the general foreign tax credit limitation rules. If the corporation elects to sell Financial Services Shares, like individuals the corporation will have a gain equal to the amount of the proceeds from the sale, but unlike individuals the corporation will be taxed at ordinary corporate income tax rates (rather than capital gains tax rates) on the amount realized.

11

### *Tax Treatment for United States Trusts*

***If you are a United States trust...***

In general, a trust treated as a "grantor trust" for United States federal income tax purposes is not a tax paying entity. Instead, the grantor of the trust generally is the United States taxpayer in respect of the trust. If the grantor is an individual or corporation, the tax treatment of the grantor with respect to the trust's receipt of Financial Services Shares, receipt of dividends on those shares, and the sale of those shares generally will be the same as that outlined above for United States individuals and corporations.



SL-0220

For simple or complex trusts, the receipt of demutualization benefits generally should be subject to the same United States federal income tax treatment as in the case of United States individuals and corporations. For a simple trust, ordinary dividends paid on Financial Services Shares generally are includible in gross income for federal income tax purposes, but the trust will have a corresponding distribution deduction. Any gain recognized on the sale of shares generally is includible in gross income without any corresponding distribution deduction. For a complex trust, both dividends and gains on the sale of Financial Services Shares will be included in gross income for federal income tax purposes and the trust will receive a corresponding deduction for such amounts to the extent that they are currently distributed to beneficiaries. Trusts should consult their own tax advisor concerning the specific tax rules applicable to the type of trust.

*Some Special Rules*

***If employee benefit plans or IRAs are involved...***

The receipt of demutualization benefits by policyholders that are employee benefit plans or IRAs may be considered "prohibited transactions" under section 406 of ERISA and/or section 4975 of the United States Tax Code. Sun Life of Canada has applied for an administrative exemption from both sections from the Department of Labor to cover the receipt of demutualization benefits by employee benefit plans, which is expected to be received prior to the effective date of demutualization.

The IRS has adopted a policy of not issuing rulings with respect to the application of the section 4975 "prohibited transaction" rules to the crediting of demutualization benefits to IRAs. However, those IRAs which are employee benefit plans under ERISA will be directly covered by the Department of Labor exemption. With respect to IRAs which are not part of employee benefit plans, based on the IRS's inaction in prior demutualizations, and in light of the administrative exemptions the Department of Labor issues with respect to the distribution of such benefits to employee benefit plans, Sun Life of Canada believes that the IRS will not seek to treat Sun Life of Canada's crediting of demutualization benefits to IRAs as a prohibited transaction.

For fiduciaries owning a policy that funds a benefit plan (pension or profit sharing, for example) and where the policy is not held through a trust, direct receipt of Financial Services Shares with respect to that policy could result in disqualification of the plan or certain other adverse legal consequences. Fiduciaries should consider setting up a trust prior to the demutualization to hold the Financial Services Shares or make some other appropriate provision for the benefit of participants to avoid these risks. Fiduciaries should consult their tax or benefits advisor about whether a trust is required and for other options available for their plan. In addition, fiduciaries of policies where the participants have paid some or all of the premiums under a policy, may be required to share some or all of the demutualization benefits received with the participants. Fiduciaries should consult their tax or benefits advisor for more details.

In general, receipt of demutualization benefits by a pension or profit-sharing trust or voluntary employee beneficiary association (VEBA) will be tax free to the trust. The Financial Services Shares, like any other asset of the plan, must be held by the trustee for the exclusive benefit of the plan participants and beneficiaries.



An employer or fiduciary that owns a policy that funds a welfare benefit plan may be required to take action to avoid being subject to a 100% excise tax on employer reversions caused by the receipt of demutualization benefits. Consult your tax advisor for more details.

***Receipt of demutualization benefits by other tax-exempt entities***

Other tax-exempt entities, such as charitable organizations and governmental bodies, generally will not be taxed in the United States on the receipt of any form of demutualization benefits. Special rules may apply to certain types of tax-exempt entities, and tax-exempt policyholders, should consult with a tax advisor regarding the consequences of receiving demutualization benefits.

*United States Tax Return Reporting*

Following the demutualization, Sun Life of Canada may fall within the technical definition of a controlled foreign corporation with respect to a portion of its United States insurance income under a special rule in the United States Tax Code for Captive Insurance Companies ("Captive CFCs"). If Sun Life of Canada were a Captive CFC within the meaning of the United States Tax Code, subject to certain exceptions, United States shareholders of Financial Services would have an obligation to report on IRS Form 5471 certain information regarding their indirect ownership of Sun Life of Canada. Should this information reporting obligation apply, it would be administratively impracticable for Financial Services to identify all of its United States shareholders who would be subject to that reporting obligation. Moreover, Sun Life of Canada's accounting records will not be prepared on a basis that would allow Financial Services to generate the requisite financial information for those shareholders. Because Sun Life of Canada will pay United States income tax on all of its income attributed to its United States insurance operations, the information called for by the IRS Form 5471 should have no relevance to the amount of United States taxable income reportable by Financial Services' United States shareholders. It is possible, although in Financial Services' view extremely unlikely, that the IRS would seek to impose a penalty for a United States shareholder's failure to file a Form 5471 in this circumstance.

Backup Withholding

***If Sun Life of Canada does not have your United States Taxpayer Identification Number complete, sign and return the request form...***

If Sun Life of Canada does not have a certified Taxpayer Identification Number (TIN) for you, this is indicated in the Special Information section of your Share Allocation Statement included in this package. If this applies to you, it is important that you complete, sign, and return that TIN request form. The TIN request form can be found at the back of the booklet entitled "Sun Life's Plan to Demutualize – A guide for eligible policyholders living in the United States." For individuals, your TIN is your social security number. If you fail to complete, sign and return the form, you may be subject to a U.S.$50 IRS penalty, and Financial Services, or another responsible party, may be required to withhold and remit to the IRS 31% of the gross amount otherwise payable to you, including the gross proceeds from the sale of your Financial Services Shares at the time of demutualization if you elect to sell those shares and any future dividends payable to you on your Financial Services Shares if you retain those shares. The 31% backup withholding amount may be claimed on your United States federal income tax return as a credit against your tax liability for the year. Instructions for completing the TIN request form are included with the TIN form.

## 11.3 United Kingdom

***Tax consequences – United Kingdom***

In the opinion of Freshfields, as of the date of this Policyholder Information Circular, the following is a fair summary of the principal United Kingdom tax considerations generally applicable to eligible policyholders resident or ordinarily resident in the United Kingdom who receive demutualization benefits in exchange for their ownership rights in Sun Life of Canada on the demutualization of Sun Life of Canada in accordance with the Conversion Plan.

This summary is based on the current provisions of United Kingdom tax legislation, and on current understanding of the Inland Revenue's interpretation and application of that legislation. It assumes that you do not hold your policy as an asset of a trade. You should also read section 11.1.2, "Non-Residents of Canada", for a summary of Canadian tax consequences generally applicable to eligible policyholders who are not resident in Canada.





SL-0222

### *Residents of the United Kingdom*

*If you are resident in the United Kingdom...*

Tax Treatment of Your Policy

The demutualization will not change the tax treatment of benefits under your policy.

Receiving Financial Services Shares

If you receive Financial Services Shares on the demutualization you will not have to pay any tax when you receive your Financial Services Shares. Your cost of these shares will be deemed to be zero.

Receiving Dividends on Your Financial Services Shares

Any dividends you receive on Financial Services Shares will be subject to United Kingdom income tax or corporation tax on the total of the dividend received plus any withholding tax deducted in Canada. Dividends Financial Services pays to United Kingdom residents will be subject to Canadian non-resident withholding tax generally at a rate of 15% under the Canada-United Kingdom tax treaty. You will be allowed a credit against United Kingdom income tax or corporation tax for any Canadian withholding tax deducted from dividends. The credit for Canadian withholding tax cannot exceed the United Kingdom tax payable on the total of the dividend plus the withholding tax.

Selling Your Financial Services Shares Under the Cash Election or After the Initial Public Offering

If you sell your Financial Services Shares under the Cash Election or after the initial public offering, through the Share Selling Service or otherwise, you will have a capital gain equal to the amount of the proceeds of sale less the costs of the sale which you have paid. For most United Kingdom eligible policyholders who are individuals or trustees this will mean that, provided that the value of the shares sold, together with any capital gains realized in the same tax year, is within the annual capital gains tax exemption, no capital gains tax will be payable. The annual capital gains tax exemption for the tax year commencing April 6, 1999 is £7,100 for individuals and £3,550 for trustees.

If you are an individual or other non-corporate shareholder and have held the shares for a number of years, taper relief may be available to reduce the chargeable gain. This relief reduces your chargeable gain by a fixed percentage for each year of ownership after a certain period. If you are a corporate shareholder indexation allowance should be available to reduce any chargeable gain. Your Financial Services Shares will be treated as acquired not when the ownership rights were acquired but when the shares were issued to you.

If you sell your Financial Services Shares under the Cash Election, Financial Services will pay the Underwriter's fee on the sale of your shares. For Canadian taxation purposes, you will be considered to have received a dividend from Financial Services equal to the amount of that fee even though no dividend will actually be paid. Accordingly, this dividend will be subject to withholding tax under the Canadian Tax Act and the amount of tax withheld will be deducted from your proceeds of sale. Under the current provisions of the Canada-United Kingdom tax treaty, the Canadian withholding tax will generally be at the reduced rate of 15% of the amount of the underwriting fee. For United Kingdom taxation purposes, you should not be treated as having been paid a dividend but the Inland Revenue will not treat the amount of tax withheld as deductible as an incidental cost of disposal in computing your gain for capital gains tax or corporation tax purposes. Accordingly, the amount of tax withheld will be included in calculating the proceeds of sale subject to capital gains tax or corporation tax.

*Trustees of pension schemes*

Trustees of Pension Schemes

Trustees of pension schemes will receive Financial Services Shares. Unless the trusts allow you to hold Financial Services Shares, you will need to sell the Financial Services Shares within five days after the Financial Services Shares are listed. Even if the trusts allow you to hold Financial Services Shares, the trusts of group insured pension schemes will lose their special treatment unless you sell the Financial Services Shares and invest the proceeds in additional policy benefits.

Trustees of group insured pension schemes will be assumed to have elected to sell the Financial Services Shares issued to them unless they elect to keep the Financial Services Shares. You may also elect for the proceeds to be invested on your behalf in additional policy benefits.

Tax Treatment if You Hold Financial Services Shares Through the Sun Life of Canada Share Account

If you hold Financial Services Shares through the Sun Life of Canada Share Account in the United Kingdom, on accounting to you for dividends received on the shares, the Sun Life of Canada Share Account will be obliged to withhold United Kingdom income tax at the Schedule F ordinary rate which for 1999/2000 is 10%. However, in applying this withholding the Sun Life of Canada Share Account must give credit for Canadian tax withheld if it does not exceed the applicable rate under the Canada-United Kingdom tax treaty. Therefore, at the current rates of Canadian withholding tax, there would be no liability to United Kingdom withholding tax by reason of holding the Financial Services Shares through the Sun Life of Canada Share Account in the United Kingdom because those rates exceed the Schedule F ordinary rate.

## 11.4 Philippines

*Tax consequences – Philippines*

In the opinion of Sycip Gorres Velayo & Co., as of the date of this Policyholder Information Circular, the following is a fair summary of the principal Philippine income tax considerations generally applicable to eligible policyholders who are individuals resident in, or who are individuals that are non-resident citizens or aliens of, the Philippines who receive demutualization benefits in exchange for their ownership rights in Sun Life of Canada on the demutualization of Sun Life of Canada in accordance with the Conversion Plan.

This is a summary based on the current provisions of the National Internal Revenue Code of the Philippines. It is for general information of individuals only. It does not attempt to address all tax consequences that may apply to any given taxpayer. You should consult your own tax advisor as to the tax treatment applicable to your specific circumstances. You should also read section 11.1.2, "Non-Residents of Canada", for a summary of Canadian tax consequences generally applicable to eligible policyholders who are not resident in Canada.

11

### *Individual Residents and Non-Resident Citizens or Aliens of the Philippines*

*If you are an individual resident or non-resident citizen or alien of the Philippines...*

Tax Treatment of Your Policy

The demutualization will not affect the tax treatment of benefits under your policy.

Receiving Financial Services Shares in Exchange for Your Ownership Rights

Sun Life of Canada has received a tax ruling from the Bureau of Internal Revenue to the effect that if you receive and retain Financial Services Shares on the demutualization in exchange for your ownership rights, you will not have to pay any tax as a result of receiving these shares. Your cost of these shares for tax purposes will be deemed to be zero.

### Receiving Dividends on Your Financial Services Shares

#### Resident Citizens of the Philippines

If you are a resident citizen of the Philippines, any dividends received on Financial Services Shares while you hold them will be subject to income tax in the Philippines at the regular graduated rates ranging from 5% to 32%. These dividends will also be subject to a withholding tax in Canada generally at the rate of 15% under the Canada-Philippines tax treaty. However, you may be able to claim a foreign tax credit against your Philippine income tax for tax withheld from dividends received pursuant to the Canada-Philippines tax treaty as well as the provisions of the National Internal Revenue Code of the Philippines, subject to the limitations on foreign tax credits under the National Internal Revenue Code.

#### Non-Resident Citizens and Aliens of the Philippines

If you are a non-resident citizen of the Philippines or an alien (whether resident or non-resident) of the Philippines, any dividends you receive on the Financial Services Shares while you hold them will not be subject to the Philippine income tax. The dividends will, however, be subject to withholding tax in Canada at the rate of 25% unless you are a resident of a country with which Canada has an income tax treaty and you are entitled to preferential rates under such treaty.

### Selling Your Financial Services Shares Under the Cash Election

If you sell your Financial Services Shares under the Cash Election, those shares will be purchased from you by the Underwriters. The sale of those shares through the facilities of the Philippine Stock Exchange (PSE) will be subject to a Stock Transaction Tax (STT) of 50% of 1% of the gross selling price. If you are a non-resident alien of the Philippines, you may be entitled to exemption from the STT if you are a resident of a country with which the Philippines has a tax treaty. The sale will also be subject to a Documentary Stamp Tax (DST) of 25% of 1% of the original issue price of the Financial Services Shares.

Moreover, since Financial Services will be paying the underwriting fee on the sale of your shares you will be considered to have received a dividend from Financial Services equal to the amount of the underwriting fee. As discussed above, if you are a resident citizen of the Philippines, any dividends received on Financial Services Shares will be subject to the regular graduated rates ranging from 5% to 32%. These deemed dividends will also be subject to a withholding tax in Canada generally at the rate of 15% under the Canada-Philippines tax treaty. However, you may be able to claim a foreign tax credit against your Philippine income tax for tax withheld from dividends received, pursuant to the Canada-Philippines tax treaty as well as the provisions of the National Internal Revenue Code, subject to the limitations on foreign tax credits under the National Internal Revenue Code. If you are a non-resident citizen of the Philippines or an alien (whether resident or non-resident), you will not be subject to Philippine income tax on the dividends deemed to arise from payment by Financial Services of the underwriting fees on your behalf. These deemed dividends will, however, be subject to withholding tax in Canada at the rate of 25% unless you are a resident of a country with which Canada has an income tax treaty and you are entitled to preferential rates under that treaty.

11

Selling Your Financial Services Shares After the Initial Public Offering

Citizens (whether resident or non-resident) and Resident Aliens of the Philippines

If you are a citizen whether resident or non-resident or resident alien of the Philippines and you sell your Financial Services Shares after the initial public offering through the facilities of the PSE (including sales through the Share Selling Service), there will be an STT of 50% of 1% of the gross selling price. If after the initial public offering you sell your shares in the Philippines but outside the facilities of the PSE, you will be subject to income tax on the gain at the regular graduated rates ranging from 5% to 32%. If the Financial Services Shares that you hold are capital assets and you hold these for more than 12 months before selling, only 50% of the gain from the sale will be recognized and subject to income tax. Otherwise 100% of the gain will be recognized and subject to income tax. In both cases, there will be a DST of 25% of 1% of the original issue price of the Financial Services Shares.

Non-Resident Aliens of the Philippines

If you are a non-resident alien and you sell your Financial Services Shares after the demutualization through the facilities of the PSE (including sales through the Share Selling Service), there will be an STT of 50% of 1% of the gross selling price. If you are a non-resident alien engaged in trade or business in the Philippines and you sell your Financial Services Shares in the Philippines but outside the facilities of the PSE, you will be subject to Philippine income tax on the gain on such sale in the same manner as a resident citizen and a resident alien of the Philippines. A non-resident alien is considered to be engaged in trade or business in the Philippines if he comes to the Philippines and stays therein for an aggregate period of 180 days or more in a calendar year. On the other hand, if you are a non-resident alien who is not engaged in trade or business in the Philippines, and you sell your Financial Services Shares in the Philippines outside the facilities of the PSE, the gain you derive from such sale will be subject to tax at the rate of 25%. In both cases, you may be entitled to an exemption from the STT as well as Philippine income tax on the gain if you are a resident of a country with which the Philippines has a tax treaty. For as long as you sell your Financial Services Shares in the Philippines, there will be a DST of 25% of 1% of the original issue price thereof.

Sale of Financial Services Shares Outside the Philippines

If you are a non-resident citizen of the Philippines or an alien (whether resident or non-resident) and you sell your Financial Services Shares after the initial public offering outside the Philippines, you will not be subject to Philippine income tax and DST.

## 11.5 Hong Kong

*Tax consequences – Hong Kong*

11

In the opinion of Freshfields, as of the date of this Policyholder Information Circular, the following is a fair summary of the principal Hong Kong income tax considerations generally applicable to eligible policyholders resident in Hong Kong who receive demutualization benefits in exchange for their ownership rights in Sun Life of Canada on the demutualization of Sun Life of Canada in accordance with the Conversion Plan. The tax position in Hong Kong is the same whether you receive Financial Services Shares and dividends on those shares directly for your own account or as a trustee.

The following summary applies to all eligible policyholders (both individuals and companies), who are resident in Hong Kong for Hong Kong tax purposes. However, in the unlikely event that you are carrying on a business of dealing in insurance policies, there may be additional tax consequences. In these circumstances, you should seek the advice of your tax advisor. You should also read section 11.1.2, "Non-Residents of Canada", for a summary of Canadian tax consequences generally applicable to eligible policyholders who are not resident in Canada.



SL-0226

***Residents of Hong Kong***

Tax Treatment of Your Policy

The demutualization will not change the tax treatment of benefits under your policy.

*If you are resident in Hong Kong...*

Receiving Financial Services Shares

If you receive Financial Services Shares on the demutualization, you will not have to pay any Hong Kong tax when you receive your Financial Services Shares.

Receiving Dividends on Your Financial Services Shares

You will not have to pay any Hong Kong tax on any dividends you receive on Financial Services Shares. Withholding tax will be deducted in Canada from dividends paid to you by Financial Services. You will not be entitled to receive any refund of the tax withheld in Canada, nor will you be entitled to receive any credit against Hong Kong tax for the tax withheld in Canada. Currently, the rate of Canadian withholding tax on dividends is 25% of the gross amount of the dividend.

Selling Your Financial Services Shares

If you do not make the Share Election or you sell your Financial Services Shares after the initial public offering, you will not be liable for any Hong Kong tax or any Hong Kong stamp duty as a result of the sale of your Financial Services Shares.

Estate Duty

The Financial Services Shares are Hong Kong property under Hong Kong law and therefore may be subject to estate duty on the death of the beneficial owner of the shares. Hong Kong estate duty is currently imposed on a progressive scale from 5% to 15%. No estate duty is payable where the aggregate value of the dutiable estate does not exceed HK$7.5 million. The maximum rate of duty of 15% applies where the aggregate value of the dutiable estate exceeds HK$10.5 million.

## 11.6 Bermuda

*Tax consequences – Bermuda*

In the opinion of Appleby, Spurling & Kempe, as of the date of this Policyholder Information Circular, the following is a fair summary of the principal Bermuda income tax considerations generally applicable to eligible policyholders resident in Bermuda who receive demutualization benefits in exchange for their ownership rights in Sun Life of Canada on the demutualization of Sun Life of Canada in accordance with the Conversion Plan.

This summary is based on the Exempted Undertakings Tax Protection Act, 1966 (as amended) and The Land Tax Act 1967 of Bermuda. You should also read section 11.1.2, "Non-Residents of Canada", for a summary of Canadian tax consequences generally applicable to eligible policyholders who are not resident in Canada.

***Residents of Bermuda***

Tax Treatment of Your Policy

The demutualization will not change the tax treatment of benefits under your policy.

*If you are resident in Bermuda...*

Receiving Financial Services Shares

If you receive Financial Services Shares on the demutualization, you will not have to pay any tax when you receive your Financial Services Shares.

Receiving Dividends on Your Financial Services Shares

You will not have to pay any tax in Bermuda on any dividends you receive on Financial Services Shares. Withholding tax will be deducted in Canada from dividends paid to you by Financial Services. You will not be entitled to receive any refund of the tax withheld in Canada. Currently, the rate of Canadian withholding on dividends is 25% of the gross amount of the dividend.

Selling Your Financial Services Shares

If you sell your Financial Services Shares under the Cash Election or after the initial public offering, through the Share Selling Service or otherwise, you will not be liable for any tax as a result of the sale of your Financial Services Shares.

Tax consequences – Ireland

## 11.7 Ireland

In the opinion of A&L Goodbody, as of the date of this Policyholder Information Circular, the following is a fair summary of the principal Irish income tax and capital gains tax considerations generally applicable to eligible policyholders resident in Ireland who receive demutualization benefits in exchange for their ownership rights in Sun Life of Canada on the demutualization of Sun Life of Canada in accordance with the Conversion Plan.

This summary is based on the current provisions of Irish tax legislation and on current understanding of the Irish Revenue Commissioner's interpretation and application of that legislation. It assumes that you do not hold your policy as an asset of a trade. You should also read section 11.1.2, "Non-Residents of Canada", for a summary of Canadian tax consequences generally applicable to eligible policyholders who are not resident in Canada.

### *Residents of Ireland*

If you are resident in Ireland...

#### Tax Treatment of Your Policy

The demutualization will not change the tax treatment of benefits under your policy.

#### Receiving Financial Services Shares

As an Irish eligible policyholder you will receive Financial Services Shares, which you may elect to keep. If you elect to keep your Financial Services Shares, then no tax will arise on your receipt of the Financial Services Shares, but on any subsequent disposal of those Financial Services Shares by you, you will be subject to capital gains tax in the same manner as outlined below.

#### Receiving Dividends on Your Financial Services Shares

Any dividends which you receive on your Financial Services Shares will be subject to Irish taxation on the amount received by you. Dividends Financial Services pays to Irish residents will also be subject to Canadian non-resident withholding tax generally at the rate of 15% under the Canada-Ireland tax treaty. You will be entitled to a credit against your Irish tax liability on the dividends in respect of any Canadian withholding and in respect of Canadian underlying corporate income tax paid by Financial Services but such that the total credit can not exceed the Irish tax liability in respect of the dividend.

#### Selling Your Financial Services Shares

If you do not make the Share Election, your Financial Services Shares will be sold in the initial public offering. This will constitute a sale by you for capital gains tax purposes of Financial Services Shares which were acquired by you for a deemed zero consideration. The measure of the gain, subject to tax, will be the net amount of cash you receive. The amount of Canadian withholding on the deemed income payment for Canadian tax purposes, and permitted by the Canada-Ireland tax treaty, may represent an incidental cost of the disposal, and accordingly may be deductible for Irish tax purposes. The maximum permitted withholding rate under the Canada-Ireland tax treaty is 15%, and accordingly for every $100 worth of shares sold, the Canadian withholding will be $0.45 (assuming the underwriting fee is 3%), yielding taxable proceeds to you of $99.55. The rate of capital gains tax which will be applicable to your net proceeds of sale will be 20%, which is the current standard rate of capital gains tax in Ireland. An individual is entitled to an annual tax free allowance of IR£1,000 which may be set off against capital gains for the year.

If you make the Share Election and, therefore, keep your Financial Services Shares, any subsequent disposal will be subject to capital gains tax in the same manner. If the disposal is by way of a gift, the gain will be calculated by reference to the market value of the Financial Services Shares.

## 11.8 Other Countries

If you are a resident of another country, you should read section 11.1.2, "Non-Residents of Canada", for a summary of Canadian tax consequences generally applicable to eligible policyholders who are not residents of Canada. You may also wish to consult a tax advisor to determine the tax consequences to you of receiving demutualization benefits in your country of residence.

# 12. SOCIAL BENEFITS CONSEQUENCES FOR POLICYHOLDERS

Depending on the country in which you live and your personal circumstances, there may be some social benefits consequences from the receipt of demutualization benefits. In addition, if Financial Services pays shareholder dividends in the future, receipt of those dividends would increase your income and may have some social benefits consequences. In exceptional cases where the receipt of demutualization benefits may be disadvantageous, some eligible policyholders may wish to renounce their right to receive them. For information about this, see section 12.8, "Right to Renounce Demutualization Benefits".

## 12.1 Canada

*Will receiving demutualization benefits impact entitlement to social benefits?*

If you elect to sell Financial Services Shares issued to you on demutualization, either under the Cash Election or after the initial public offering, you will increase your income. This may reduce your entitlement (or those of your dependents) to income-based social benefits. Examples of benefits that may be affected include the Guaranteed Income Supplement, Old Age Security, provincial public drug plans, provincial long term care and home care programs, and other similar programs. In many cases, the demutualization benefits will more than compensate you for the reduction in your social benefits entitlement. However, there may be instances where the reduction in your social benefits entitlement is very significant compared to your demutualization benefits. If receiving demutualization benefits will reduce your social benefits entitlement, you will see a change in your social benefits entitlement in the year after the year in which you receive demutualization benefits.

Since many of the social benefits are determined based on your income, if you keep the Financial Services Shares issued to you, there will not be any immediate impact on these income-based social benefits entitlements.

Your eligibility for some social benefits programs is determined based on your financial resources or wealth. Accordingly, your entitlement to these programs may be affected even if you keep your Financial Services Shares.

If you are concerned that your eligibility or entitlement under a social benefits program may be affected by the receipt of demutualization benefits, you should contact the federal or provincial government agencies which administer the social benefits programs in which you participate for more details. You should also read the fact sheet prepared by the federal government for use by Canadian policyholders called "Information", which is included with the materials in this package.

## 12.2 United States

If you keep Financial Services Shares issued to you on demutualization or elect to sell them, either under the Cash Election or after the initial public offering, it should not disqualify you from most federal, state or municipal social benefits programs. Eligibility for Social Security income and other programs (for example, Medicare and unemployment insurance) will not be affected if you keep Financial Services Shares issued to you on demutualization or you elect to sell them, either under the Cash Election or after demutualization, since eligibility for these programs is not determined based on your income or total assets. However, the receipt of additional income above specified levels, including the receipt of cash on the sale of Financial Services Shares or dividends paid on Financial Services Shares, can have the effect of making your Social Security benefits taxable for the period in which you receive the additional income.

Your total assets will increase by the value of the Financial Services Shares issued to you or by the amount of the cash proceeds from the sale of Financial Services Shares.

Your eligibility for a program in which eligibility is dependent on not having more than a specific level of total assets (for example, Medicaid) may be affected until you sell the Financial Services Shares and have disposed of the cash you receive for those Financial Services Shares. If you participate in a federal, state or municipal social benefits program in which the right to receive benefits is dependent on your not having more than a specified level of income (for example, Medicaid, food stamps or various welfare programs), selling the Financial Services Shares issued to you on demutualization or the receipt of dividends paid on Financial Services Shares you keep could raise your income above the specified level for some period of time.

If you or your dependents receive any publicly administered benefits at the federal, state or municipal level, and you have questions about the effect the receipt of demutualization benefits may have on your entitlement, you should contact the government agency that provides the benefits to you.

## 12.3 United Kingdom

If you keep Financial Services Shares issued to you on demutualization or elect to sell them, either under the Cash Election or after the initial public offering, it may affect your entitlement to receive some social security benefits, such as Income Support, Family Credit or Housing Benefit. Your entitlement to social security benefits may also be affected by the receipt of dividends paid on your Financial Services Shares.

If you have any questions about the effect the receipt of demutualization benefits may have on your entitlement to social security benefits, you should contact your investment advisor or your local Department of Social Security or Benefits Agency office.

## 12.4 Philippines

As a general rule, there are no social benefits consequences in the Philippines from the receipt of demutualization benefits. The only exception is if you are a "senior citizen" as defined in the Republic Act No. 7432. In that case, your receipt of additional income from demutualization above the specified poverty level could disqualify you from obtaining the special privileges and benefits available to a senior citizen. If you have any questions about the effect the receipt of demutualization benefits may have in that case, you should contact the relevant government agency.

## 12.5 Hong Kong

If you are receiving an old age allowance or benefits from the Comprehensive Social Security Assistance Scheme, you will need to disclose your receipt of Financial Services Shares or cash proceeds from the sale of those shares to the Social Welfare Department. You should consult with your case worker at the Social Welfare Department to find out more about the effect that the receipt of demutualization benefits has on your social benefit entitlement. If you do not have a case worker, you may call the Social Welfare Department hot-line at 2343-2255 to inquire in general how your social benefit entitlements may be affected by the receipt of demutualization benefits.



## 12.6 Bermuda

In general, there are no social benefits consequences in Bermuda from the receipt of demutualization benefits.

## 12.7 Ireland

Some social welfare benefits, such as unemployment assistance and the old age (non-contributory) pension, are means tested. Therefore, if you keep Financial Services Shares issued to you on demutualization or sell them, your entitlement to these benefits may be affected.

If you have any questions about the effect the receipt of demutualization benefits may have on your entitlement to social welfare benefits, you should contact your local Social Welfare Office.

## 12.8 Right to Renounce Demutualization Benefits

Sun Life of Canada recommends that eligible policyholders receiving social benefits carefully consider the potential effect of demutualization on these programs and compare this with the significant benefits that they can expect from demutualization, in each case taking into account all tax consequences. In the exceptional case where receiving demutualization benefits is ultimately disadvantageous, an eligible policyholder may elect in writing to renounce the right to receive demutualization benefits. Before you do, you should check to make sure the renunciation will be effective for tax purposes. Eligible policyholders who wish to renounce their demutualization benefits must do so in writing to Sun Life of Canada at Secretary's Department, 150 King Street West, 14th Floor, Toronto, Canada M5H 1J9 at any time before the date to be set out on the Choices Form. After that date, you may not change your decision.

12

## 13. CONDITIONS TO DEMUTUALIZATION

Demutualization will not occur until all conditions in the Conversion Plan have been satisfied. The following is a summary of the most important conditions.

### 13.1 Approval of Eligible Policyholders

*Eligible policyholders must approve demutualization by a two-thirds vote*

The Demutualization Resolution must be approved by at least two-thirds of the votes cast by eligible policyholders at the Special Meeting.

### 13.2 Regulatory Approvals

***Minister of Finance of Canada***

*The Minister of Finance of Canada must approve the demutualization*

If eligible policyholders approve the Demutualization Resolution, Sun Life of Canada will apply to the Minister of Finance of Canada for approval of the Conversion Plan. On receipt of the application, the Minister of Finance of Canada must refer it to the Superintendent for a recommendation. Before deciding whether to approve the Conversion Plan, the Minister of Finance of Canada may consider such factors as:

- whether the Conversion Plan is fair and equitable to Sun Life of Canada's eligible policyholders,
- whether the Conversion Plan is in the best interest of the Canadian financial system, and
- whether sufficient steps had been taken to inform you of the Conversion Plan.

If the Minister of Finance of Canada approves the Conversion Plan, it will be effective when all other conditions are satisfied and Letters Patent of Conversion are issued. These are the documents required from the Canadian government for Sun Life of Canada to demutualize.

*OSFI will continue to oversee the demutualization*

Before being finalized, the Conversion Plan was sent to OSFI for review. OSFI has also reviewed this Policyholder Information Circular and the accompanying documents, and the Superintendent has authorized Sun Life of Canada to send them to you.

OSFI will continue to oversee each step in the demutualization process. The Superintendent will also provide a final recommendation to the Minister of Finance of Canada on the Conversion Plan.

***Michigan Insurance Commissioner***

*United States regulatory approval*

The Michigan Bureau of Insurance is the primary regulator of Sun Life of Canada in the United States. Because of that, in order to become effective, the Conversion Plan must also be approved by the Michigan Insurance Commissioner following a public hearing. That hearing is scheduled to be held at the Law Auditorium, G. Mennen Williams Building, 525 West Ottawa Street, Lansing, Michigan on November 22, 1999 at 10:00 a.m. (Eastern Standard Time). The purpose of the hearing is to consider the Conversion Plan and to provide eligible policyholders and other interested persons with the opportunity to present data, views, comments and arguments with respect to the Conversion Plan. Eligible policyholders, among others, have the right to appear and to make an oral statement at the public hearing or to file a written statement with the Michigan Insurance Commissioner.

In order to approve the Conversion Plan, the Michigan Insurance Commissioner must be satisfied that the Conversion Plan conforms to the requirements of Michigan law and is fair and equitable to United States interested persons.

Under the Michigan Insurance Code, an action challenging the validity of, or arising out of acts taken or proposed to be taken under, the Conversion Plan, other than an appeal of the Michigan Insurance Commissioner's decision approving or disapproving the Conversion Plan, must be commenced within 30 days after eligible policyholders have approved the Conversion Plan. An action challenging the validity of the Michigan Insurance Commissioner's decision approving or disapproving the Conversion Plan must be commenced within 30 days after the Michigan Insurance Commissioner's decision.

### *United Kingdom Reorganization*

*United Kingdom court approval*

As part of the demutualization, Sun Life of Canada will transfer its United Kingdom insurance business to Sun Life of Canada (U.K.). This transfer, which is described under section 8.2, "Corporate Reorganization", requires approval of the High Court of Justice of England. The Court approved the transfer at a hearing held on September 21, 1999. The transfer also requires the approval of the Minister of Finance of Canada.

## 13.3 Underwriting Agreements

*The underwriting agreements must be signed*

Sun Life of Canada, Financial Services and the Underwriters must enter into underwriting agreements for the sale of Financial Services Shares in the initial public offering. The underwriting agreements and the initial public offering are discussed under section 4.13, "Initial Public Offering".

The underwriting agreements will be signed after the completion of the marketing of the initial public offering. The timing of the signing will determine the timing of demutualization, which will occur on the same day as the signing. When Sun Life of Canada, Financial Services and the Underwriters have signed the underwriting agreements, Sun Life of Canada will notify OSFI. If the Minister of Finance then approves the Conversion Plan, Letters Patent of Conversion will be issued and demutualization will occur.

I



SL-0233

## 14. ALTERNATIVE ARRANGEMENTS TO INITIAL PUBLIC OFFERING

Completion of the initial public offering is not a condition to demutualization and it will not occur until after Sun Life of Canada demutualizes. Sun Life of Canada expects that the initial public offering will be completed within five business days after the date it demutualizes.

### 14.1 Right Not to Proceed with Initial Public Offering

Once the underwriting agreements are signed, the Underwriters will have committed to purchase the Financial Services Shares to be sold in the initial public offering. However, the Underwriters will have the right not to proceed with the initial public offering in circumstances to be specified in the underwriting agreements, which are expected to include:

- a financial crisis in world markets,
- the commencement of a proceeding or a change in law which operates to prevent or restrict the demutualization or the initial public offering, or
- a material adverse change in the affairs of Financial Services.

The underwriting agreements will also include other standard conditions that would entitle the Underwriters to terminate the agreements if those conditions are not satisfied.

### 14.2 Alternative Arrangements

*Sun Life of Canada has a plan if the initial public offering does not happen as planned*

It is highly unusual for an offering not to be completed after the underwriting agreements are signed. However, even if that were to occur, the demutualization of Sun Life of Canada would still be legally effective and demutualization benefits will be provided to eligible policyholders but the following alternative arrangements will apply:

- Financial Services will continue to use reasonable commercial efforts to keep the Financial Services Shares listed on the Stock Exchanges,
- Cash Elections and Default Cash Elections will be cancelled and eligible policyholders who made them will keep the Financial Services Shares issued to them, with Designated Canadian Policyholders having Financial Services Shares issued to them,
- the Initial Share Price will still be used to determine the value of Policy Credits and the amount of any cash payment required to be made to eligible policyholders described in section 5.2, "Effect of Title Restrictions on Distribution of Demutualization Benefits - Secondary Jurisdictions and Other Jurisdictions", and in section 5.5, "Policyholders Who Cannot be Located - Secondary Jurisdictions" and "Policyholders Who Cannot be Located - Other Jurisdictions and Minors", and those Policy Credits and cash payments will be credited or made shortly after the scheduled completion date of the initial public offering.

In addition, Financial Services will arrange to sell the Mandatory Sale Shares on the Stock Exchanges within 60 days after the scheduled completion date of the initial public offering. Eligible policyholders entitled to the proceeds will receive the average price from all those sales and payments will be made shortly after the sales are completed. Payments will be made after deduction of any applicable withholding tax and reasonable expenses of sale, including commissions.

The Financial Services Board would implement these alternative arrangements on a basis that is consistent, so far as reasonably possible, with the other aspects of the Conversion Plan.



SL-0234

## 15. GENERAL MATTERS

### 15.1 Amendments to and Withdrawal of the Conversion Plan

Sun Life of Canada may amend the Conversion Plan at any time before eligible policyholders vote at the Special Meeting, if measures approved by the Superintendent and the Michigan Insurance Commissioner are taken by Sun Life of Canada in respect of that amendment.

The Sun Life of Canada Board may withdraw the Conversion Plan at any time before Letters Patent of Conversion are issued to effect the Conversion Plan.

### 15.2 Amendment to Sun Life of Canada's By-laws

As part of the Conversion Plan, Sun Life of Canada intends to amend its by-laws. Eligible Policyholders will vote on those amendments as part of the Demutualization Resolution at the Special Meeting. Those amendments include an amendment to create a new class of shares to be designated as "common shares". A copy of the amended and restated by-laws of Sun Life of Canada is set out in Exhibit A to the Conversion Plan attached as Schedule A to Part 1 of this Policyholder Information Circular.

The common shares will be unlimited in number and have the following rights, privileges, restrictions and conditions:

- the right to vote at all meetings of shareholders and policyholders except where only holders of a specific class of shares, or policyholders, are entitled to vote,
- the right to receive any dividends declared on those shares, and
- in the event of dissolution, the right to receive the remaining property of Sun Life of Canada to which common shareholders are entitled.

The by-laws will also be amended to provide that at least one-third of the Sun Life of Canada Board must be elected by participating policyholders. The remainder of the Sun Life of Canada Board will be elected by Financial Services, the sole shareholder of Sun Life of Canada.

### 15.3 Stock Option and Employee Share Purchase Plans

The Canadian Demutualization Regulations provide that, before the listing of the Financial Services Shares on a stock exchange in Canada and for a period of one year afterwards, Financial Services may not issue or provide shares, share options or rights to acquire shares to any of its directors, officers or employees or any person who was a director, officer or employee during the year before the effective date of demutualization and who ceased to be a director, officer or employee, other than shares issued to that person as an eligible policyholder.

The Financial Services Board intends to establish a stock option plan for key officers and employees of Financial Services and its subsidiaries. The option plan will not become effective until the one year restriction period imposed by the Canadian Demutualization Regulations has ended. The option plan will be designed to align the interests of shareholders and plan participants, and will reward participants for the creation of shareholder value. Shareholder approval of the option plan will be required. The Financial Services Board will administer the option plan in compliance with applicable law and the rules of the Stock Exchanges on which the shares are listed. The Financial Services Board will determine the exercise price and option term at the time of grant. The exercise price of an option will not be less than the market price of Financial Services Shares at the time of grant and the options will be for a term not exceeding 10 years. The options will be exercisable by a holder subject to a vesting schedule to be established by the Financial Services Board at the time of grant.

Financial Services also intends to establish a voluntary employee share purchase plan on demutualization to facilitate employee ownership of Financial Services Shares. Shareholder approval is not required for the purchase plan. Eligible employees of Financial Services and its subsidiaries will be permitted to purchase Financial Services Shares through payroll deductions up to a maximum percentage of their base salary. All purchases of Financial Services Shares under the purchase plan will be made in the open market.

Initially, purchases of Financial Services Shares by employees under the purchase plan will not be made with a financial contribution from Financial Services. However, at a date following the one year restriction period imposed by the Canadian Demutualization Regulations, Financial Services may amend the purchase plan to provide for contributions by Financial Services towards the purchase price of Financial Services Shares.

Sun Life of Canada is prohibited by the Canadian Demutualization Regulations from providing its directors, officers or employees with a fee, compensation or any other consideration in relation to the demutualization, other than regular compensation relating to their position and any benefits to which they may be entitled as an eligible policyholder.

## 15.4 Payment of Interest

Unless otherwise stated, all amounts to be paid to eligible policyholders under the Conversion Plan will be paid without interest.

## 15.5 Experts' Consents

Each expert whose report appears as a schedule to Part 1 or Part 2 of this Policyholder Information Circular or whose opinion is referred to in section 11 of Part 1 of this Policyholder Information Circular has given and has not withdrawn its written consent to the issue of this Policyholder Information Circular with the inclusion of its report or opinion or reference to its name in this Policyholder Information Circular in the form and the context in which it is included.

## 16. PART 1 GLOSSARY

The following words or expressions that are used frequently in Part 1 of this Policyholder Information Circular have the following meanings.

**Actuarial Opinions** ......... The opinion of the Appointed Actuary and the opinion of the Independent Actuary. The Actuarial Opinions are attached as Schedule C and Schedule D to Part 1 of this Policyholder Information Circular.

**Appointed Actuary** ......... Robert Wilson, Sun Life of Canada's actuary appointed under the Canadian Insurance Act.

**Canadian Demutualization Regulations** .............. Mutual Company (Life Insurance) Conversion Regulations made under the Canadian Insurance Act, which establish the regime that allows Canadian federal mutual life insurance companies to convert to companies with common shares.

**Canadian Insurance Act** ..... *Insurance Companies Act* (Canada).

**Canadian Tax Act** .......... *Income Tax Act* (Canada).

**Cash Election** ............. The process by which eligible policyholders in the Principal Jurisdictions who are issued Financial Services Shares as demutualization benefits (other than minors and trustees of United Kingdom group pension schemes) may elect to sell their Financial Services Shares for cash and Designated Canadian Policyholders may elect to receive as their demutualization benefits cash directly from Sun Life of Canada.

**Choices Circular** .......... The Circular containing detailed information about the Cash Election and Share Election which Sun Life of Canada will send to eligible policyholders in Principal Jurisdictions and Secondary Jurisdictions in late January or early February 2000.

**Choices Form** ............ The form by which eligible policyholders in Principal Jurisdictions and Secondary Jurisdictions may make the Cash Election or the Share Election.

**Conversion Plan** .......... The plan to convert Sun Life of Canada from a mutual company to a company with common shares, which, for purposes of the Canadian Insurance Act, constitutes a conversion proposal. The Conversion Plan is attached as Schedule A to Part 1 this Policyholder Information Circular.

**Default Cash Election** ....... Eligible policyholders in a Secondary Jurisdiction or the trustees of a United Kingdom group pension scheme who do not make the Share Election to keep Financial Services Shares will be deemed to have elected to sell their shares for cash in the initial public offering.

**demutualization benefits** .... Financial Services Shares, cash or Policy Credits to be received by eligible policyholders on demutualization in exchange for their rights with respect to, or any interest in, Sun Life of Canada as a mutual company.

**Demutualization Resolution** .. The special resolution approving the Conversion Plan to allow Sun Life of Canada to demutualize. The Demutualization Resolution is attached as Schedule B to Part 1 of this Policyholder Information Circular.

16

| | |
|---|---|
| **Designated Canadian Policyholder** | Holder of a Canadian group insurance policy or group pension policy or a holder of any other eligible policy with an address in Canada who is not shown on Sun Life of Canada's records as an individual. |
| **DPSP** | A deferred profit sharing plan under the Canadian Tax Act. |
| **eligible policy** | In general, a participating policy that was in force on January 27, 1998. See section 4.2, "Eligible Policyholders". |
| **eligible policyholder** | The person (or persons) whose name appears on Sun Life of Canada's records as the owner of an eligible policy. See section 4.2, "Eligible Policyholders". |
| **ERISA** | United States Employee Retirement Income Security Act of 1974. |
| **Financial Services** | Sun Life of Canada Holdings Corp., a corporation formed for the purpose of becoming the holding company of Sun Life of Canada on demutualization and which expects to change its name to Sun Life Financial Services of Canada Inc. before the Special Meeting. |
| **Financial Services Board** | Board of Directors of Financial Services. |
| **Financial Services Shares** | Common shares of Financial Services. |
| **group insurance policy** | A policy, other than a pension policy,<br>■ under which the lives and/or the health of a number of persons (other than the members of a single family only) are insured severally under a single contract between Sun Life of Canada and an employer or other person, or periodic annuity payments are made to a number of persons (other than members of a single family only) under a single contract between Sun Life of Canada and an employer or other person, and<br>■ which is classified as a group insurance policy in Sun Life of Canada's records. |
| **Independent Actuary** | Nicholas Bauer, FCIA, FSA, MAAA, partner of Eckler Partners Ltd., the independent actuary retained to provide an opinion on the Conversion Plan as required under the Canadian Demutualization Regulations. |
| **Initial Share Price** | The price at which the Financial Services Shares are to be sold in the initial public offering. An estimate of the Initial Share Price is provided under section 4.15, "Estimated Value of Benefits". |
| **IRS** | Internal Revenue Service of the United States. |
| **lost policyholder** | An eligible policyholder whose current address is not known to Sun Life of Canada. |
| **Mandatory Sale Proceeds** | Cash proceeds from the sale of Mandatory Sale Shares. |
| **Mandatory Sale Shares** | Financial Services Shares issued to eligible policyholders whose address for mailing purposes as shown on Sun Life of Canada's records is in an Other Jurisdiction and to minors, all of which are required to be sold in connection with the initial public offering of Financial Services. |

| | |
|---|---|
| **Michigan Insurance Commissioner** | Commissioner of Insurance of the State of Michigan. |
| **Minister of Finance of Canada** | Includes any Minister of State to which the Minister of Finance has delegated any of his powers, duties and responsibilities under the Canadian Insurance Act. |
| **minor** | An eligible policyholder who has not attained the age of majority in the jurisdiction in which the policyholder is resident by the deadline for receipt by Sun Life of Canada of the Choices Form and for whom Sun Life of Canada does not have notice of the appointment of a guardian. |
| **Other Jurisdictions** | All jurisdictions other than the Principal Jurisdictions and the Secondary Jurisdictions. |
| **OSFI** | The Office of the Superintendent of Financial Institutions which administers the Canadian Insurance Act and is the primary regulator of financial institutions in Canada, including Sun Life of Canada. |
| **participating policy** | A policy that entitles the participating policyholder to participate in the profits of Sun Life of Canada. |
| **participating policyholder** | An owner of a participating policy. |
| **pension policy** | A policy under which retirement benefits are provided to an individual or individuals after the termination of employment and which is subject to applicable legislation relating to pensions. |
| **Policy Credits** | Enhancements to the benefits under a participating policy. See section 4.10, "Policy Credits". |
| **policy dividend** | Dividend paid on participating policies, which, in some jurisdictions, including the United Kingdom, is called a bonus. |
| **Principal Jurisdictions** | Canada, the United States (including the States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, the insular possessions of the United States and United States military addresses), the United Kingdom (England, Scotland, Wales and Northern Ireland), the Philippines and Bermuda. |
| **RRIF** | Registered retirement income fund under the Canadian Tax Act. |
| **RRSP** | Registered retirement savings plan under the Canadian Tax Act. |
| **Secondary Jurisdictions** | Hong Kong, the Republic of Ireland, the Channel Islands (including Guernsey and Jersey) and the Isle of Man. |
| **Share Election** | The process by which eligible policyholders in the Secondary Jurisdictions (other than minors) or trustees of United Kingdom group pension schemes may elect to keep Financial Services Shares issued to them as their demutualization benefits rather than to receive the cash proceeds from the sale of those shares in the initial public offering. |
| **Share Selling Service** | The service for eligible policyholders to sell their Financial Services Shares after the initial public offering. See section 4.17, "Share Selling Service". |

16

| | |
|---|---|
| **Stock Exchanges** .......... | Collectively, The Toronto Stock Exchange, the Montreal Exchange, the New York Stock Exchange, the London Stock Exchange and the Philippine Stock Exchange, which are all the public exchanges on which Sun Life of Canada intends to apply to list the Financial Services Shares. |
| **Sun Life of Canada** ......... | Sun Life Assurance Company of Canada, a mutual life company incorporated under the Canadian Insurance Act. |
| **Sun Life of Canada (International), Sun Life of Canada (Philippines) and Sun Life of Canada (U.K.)** .... | Sun Life of Canada (International) Limited, Sun Life of Canada (Philippines), Inc. and Sun Life Assurance Company of Canada (U.K.) Limited, respectively, all wholly-owned subsidiaries of Sun Life of Canada. |
| **Sun Life of Canada Share Account** ................. | An arrangement under which CIBC Mellon Trust Company, the registrar and transfer agent for the Financial Services Shares in Canada, or its co-agents or their affiliates will hold Financial Services Shares as nominee for eligible policyholders who choose or are required to have their shares held by the nominee, which will be held in an account called the Sun Life of Canada Share Account. |
| **Sun Life of Canada Board** .... | Board of Directors of Sun Life of Canada. |
| **Superintendent** ........... | Superintendent of Financial Institutions appointed under the *Office of the Superintendent of Financial Institutions Act (Canada)*. |
| **Underwriters** ............. | Investment dealers and investment banks who enter into underwriting agreements with Financial Services and Sun Life of Canada for the initial public offering. |
| **United States Tax Code** ...... | United States Internal Revenue Code of 1986. |
| **Valuation Report** .......... | The report of Morgan Stanley & Co. Incorporated and RBC Dominion Securities Inc., as required under the Canadian Demutualization Regulations, estimating a range of public equity market values of Sun Life of Canada as of September 24, 1999. The Valuation Report is attached as Schedule E to Part 1 of this Policyholder Information Circular. |
| **Your Share Allocation Statement** ............... | The statement included with this Policyholder Information Circular which informs you about the demutualization benefits you will receive and related matters. |
| **Your Voting Form** ......... | The form included with this Policyholder Information Circular on which eligible policyholders may appoint someone else – called a proxyholder – to vote on their behalf at the Special Meeting on the Demutualization Resolution. See section 6, "How to Vote". |

## ADVISORS

### Consulting actuary

Tillinghast-Towers Perrin
175 Bloor Street East
Toronto, Ontario
Canada M4W 3T6

### Independent actuary

Nicholas Bauer
Eckler Partners Ltd.
Suite 2260, 1501 McGill College Avenue
Montreal, Quebec
Canada H3A 3M8

### Financial advisors

*Canada:*
RBC Dominion Securities Inc.
Royal Bank Plaza
South Tower, 4th Floor
Toronto, Ontario
Canada M5J 2W7

*United States:*
Morgan Stanley & Co. Incorporated
1585 Broadway
New York, New York 10036
U.S.A.

### Legal and tax advisors

*Canada:*
Tory Tory DesLauriers & Binnington
Suite 3000, Aetna Tower
Toronto-Dominion Centre
Toronto, Ontario
Canada M5K 1N2

### Legal and tax advisors (cont.)

*United States:*
LeBoeuf, Lamb, Greene & MacRae, L.L.P.
125 West 55th Street
New York, New York 10019-5389
U.S.A.

Dykema Gossett PLLC
800 Michigan National Tower
Lansing, Michigan 48933-1707
U.S.A.

*United Kingdom:*
Freshfields
65 Fleet Street
London EC4Y 1HS
United Kingdom

*Philippines:*
Quasha Ancheta Pena & Nolasco
Don Pablo Building
114 Amarsolo Street
Makati City, Philippines

Romulo Mabanta Buenaventura Sayoc & De Los Angeles
30th Floor, Citibank Tower
8741 Paseo de Roxas
Makati City, Philippines

SyCip Gorres Velayo & Co.
6760 Ayala Avenue
1226 Makati City, Philippines

*Hong Kong:*
Freshfields
12th Floor
Two Exchange Square
Hong Kong

### Auditors

Deloitte & Touche LLP
Suite 1400, BCE Place
181 Bay Street
Toronto, Ontario
Canada M5J 2V1

### Call Centre advisor

Call Centre Support Associates Inc.
Suite 910, 505 Consumers Road
Toronto, Ontario
Canada M2S 4V8

### Logistics advisor

Solid Solutions Associates
5 St. John's Lane
London EC1M 4BH
United Kingdom

### Plain language advisor

Simplified Communications Group Inc.
Suite 210, 250 The Esplanade
Toronto, Ontario
Canada M5A 1J2

## TRANSFER AGENTS AND REGISTRARS

*Canada:*
CIBC Mellon Trust Company
320 Bay Street,
3rd Floor
Toronto, Ontario
Canada M5H 4A6

*United States:*
ChaseMellon Shareholder Services, L.L.C.
Overpeck Centre
85 Challenger Road
Ridgefield Park
New Jersey 07660
U.S.A.

*United Kingdom:*
IRG plc
Bourne House
34 Beckenham Road
Beckenham, Kent BR3 4TU
United Kingdom

*Philippines:*
The Hongkong and Shanghai Banking Corporation
33/F Philippine Stock Exchange Centre
West Tower, Exchange Road
Ortigas Centre, Pasig City
Philippines

*Hong Kong:*
Central Registration Hong Kong Limited
Room 1901-5, 19th Floor
Hopewell Centre
183 Queen's Road East
Wanchai, Hong Kong

*Bermuda:*
The Bank of N.T. Butterfield & Son Ltd.
65 Front Street
Hamilton HM 12
Bermuda

(This page has been left blank intentionally.)

# CONVERSION PLAN

# OF

# SUN LIFE ASSURANCE COMPANY OF CANADA

Under section 237 of
the *Insurance Companies Act* (Canada)

Dated as of September 28, 1999

## TABLE OF CONTENTS

### ARTICLE 1.
### INTERPRETATION


| | | Page |
|---|---|---|
| 1.1 | Definitions | 94 |
| 1.2 | Headings and Table of Contents | 99 |
| 1.3 | Gender and Number | 99 |
| 1.4 | Currency | 99 |


### ARTICLE 2.
### THE CONVERSION


| | | |
|---|---|---|
| 2.1 | Effective Date | 100 |
| 2.2 | Conversion and Consequences of Conversion | 100 |
| 2.3 | Designation of Policyholders' Directors and Shareholders' Directors | 101 |


### ARTICLE 3.
### ELIGIBILITY


| | | |
|---|---|---|
| 3.1 | General | 101 |
| 3.2 | Policies | 101 |
| 3.3 | In Force | 102 |
| 3.4 | Eligible Policies | 102 |
| 3.5 | Eligible Policyholders | 103 |
| 3.6 | Renunciation of Demutualization Benefits | 104 |


### ARTICLE 4.
### ALLOCATION AND DISTRIBUTION OF DEMUTUALIZATION BENEFITS


| | | |
|---|---|---|
| 4.1 | Method of Allocation of Demutualization Benefits | 104 |
| 4.2 | Allocation of Variable Component | 104 |
| 4.3 | Calculation of Certain Amounts | 105 |
| 4.4 | Rationale for Allocation of Benefits | 108 |
| 4.5 | Distribution of Financial Services Shares as Demutualization Benefits | 108 |
| 4.6 | Distribution of Policy Credits as Demutualization Benefits | 109 |
| 4.7 | Distribution of Cash as Demutualization Benefits | 110 |
| 4.8 | Restrictions on Distribution of Benefits – Title Restricted Policies | 110 |
| 4.9 | Restrictions on Distribution of Benefits – Lost Policyholders | 111 |
| 4.10 | Disputes and Additional Restrictions on Distribution of Benefits | 112 |
| 4.11 | Mandatory Sale for Policyholders in Other Jurisdictions and Minors | 113 |
| 4.12 | Cash Election for Policyholders in Principal Jurisdictions | 113 |
| 4.13 | Share Election for Policyholders in Secondary Jurisdictions and U.K. Pension Schemes | 114 |
| 4.14 | Initial Public Offering and Purchase of Buy-back Shares | 114 |
| 4.15 | Alternative Arrangements | 117 |
| 4.16 | Effect of Additional Share Issuances on Access to Financial Markets | 118 |
| 4.17 | Valuation of the Company | 118 |


### ARTICLE 5.
### RESTRUCTURING AND OPERATION OF PARTICIPATING ACCOUNT


| | | |
|---|---|---|
| 5.1 | Interpretation | 119 |
| 5.2 | Establishment of Sub-Accounts | 120 |
| 5.3 | Recording of Policies and Allocation of Liabilities as of the Effective Date | 121 |
| 5.4 | Allocation of Assets to the Pre-Conversion Participating Sub-Accounts as of the Effective Date | 121 |
| 5.5 | Transfer of Assets from the Shareholders' Account to Certain Post-Conversion Sub-Accounts as of the Effective Date | 122 |
| 5.6 | Operating Rules for Pre-Conversion Participating Sub-Accounts | 122 |




SL-0244

Page

5.7 Transfers and Pre-Conversion Participating Sub-Accounts . . . . . . . . . . . . . . . . . . . 123
5.8 Transfers from Post-Conversion Individual Participating Sub-Accounts . . . . . . . . . . 123
5.9 Mandatory Transfers from the Shareholders' Account . . . . . . . . . . . . . . . . . . . . . . 124
5.10 Provisions in Respect of Subsidiaries of the Post-Conversion Company . . . . . . . . . . 124
5.11 Amalgamation of Pre-Conversion and Post-Conversion Individual Participating Sub-Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125
5.12 Dividend Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125
5.13 Reports by the Appointed Actuary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126
5.14 Amendments to Article 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

ARTICLE 6.
FINANCIAL SERVICES AND CORPORATE REORGANIZATION

6.1 Creation of Financial Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126
6.2 Proposed Activities of Financial Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126
6.3 Corporate Reorganization Related to the Conversion . . . . . . . . . . . . . . . . . . . . . 126

ARTICLE 7.
CONDITIONS

7.1 Effectiveness of Conversion Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

ARTICLE 8.
ADDITIONAL PROVISIONS

8.1 Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127
8.2 Authority to Remedy Errors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127
8.3 Amendments to or Withdrawal of Conversion Plan . . . . . . . . . . . . . . . . . . . . . . 128
8.4 Payment of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
8.5 Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

EXHIBIT A - Form of Amended and Restated By-laws of the Company . . . . . . . . . . . . . . . . . . 129
EXHIBIT B - Allocation of Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139
EXHIBIT C - Valuation Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141
EXHIBIT D - Restructuring and Operation of Participating Account . . . . . . . . . . . . . . . . . . 142
EXHIBIT E - Excerpts from By-law of Financial Services Relating to Issuance of Shares . . . . . . . . 149

**CONVERSION PLAN**
**OF**
**SUN LIFE ASSURANCE COMPANY OF CANADA**

**RECITALS:**

1. On January 27, 1998, the Board instructed management to prepare a conversion proposal to effect the demutualization of the Company.
2. On September 28, 1999, the Board unanimously adopted this Conversion Plan which provides for the conversion of the Company from a Life Company that is a Mutual Company into a Life Company with common shares.
3. The Board believes the Conversion is in the best interests of Sun Life of Canada and its policyholders as a whole.
4. On issuance of Letters Patent of Conversion, Eligible Policyholders' Ownership Rights will cease and Eligible Policyholders will receive in exchange therefor Financial Services Shares, Policy Credits or cash.
5. In connection with the Conversion, but subject to obtaining satisfactory regulatory approvals in all relevant jurisdictions, Sun Life of Canada will effect a corporate reorganization.

This Conversion Plan provides as follows.

## ARTICLE 1.

## INTERPRETATION

### 1.1 Definitions

As used in this Conversion Plan, the following terms have the following meanings:

**"Additional Primary Shares"** means newly issued Financial Services Shares sold in the Initial Public Offering, other than the Primary Shares and any shares issued pursuant to the exercise of an over-allotment option granted to the Underwriters in the Underwriting Agreements.

**"Appointed Actuary"** means the actuary of Sun Life of Canada appointed pursuant to the ICA.

**"Benefits Date"** means the date chosen by the Company as the deadline for receipt of the Choices Form.

**"Board"** means the board of directors of Sun Life of Canada.

**"Buy-back Shares"** has the meaning specified in section 4.14(b).

**"Cancellation Date"** has the meaning specified in section 4.9(d).

**"Cash Election"** has the meaning specified in section 4.12(a).

**"Choices Circular"** means a circular of the Company to be mailed to Eligible Policyholders in the Principal Jurisdictions and the Secondary Jurisdictions after the date of the Special Meeting and before the Effective Date describing, among other things, the Cash Election or the Share Election, as applicable.

**"Choices Form"** means the form by which Eligible Policyholders in the Principal Jurisdictions and the Secondary Jurisdictions may make the Cash Election or the Share Election, as applicable.

**"Common Shares"** means the common shares of the Post-Conversion Company.

**"Company"** means Sun Life Assurance Company of Canada, a Life Company, to which the ICA applies pursuant to section 13(1)(b) of the ICA, that is a Mutual Company.

**"Conversion"** means the conversion of the Company from a Life Company that is a Mutual Company into a Life Company with common shares pursuant to section 237.1 of the ICA and this Conversion Plan, as provided for in section 2.2(a).

**"Conversion Plan"** means this Conversion Plan (including all exhibits), as amended from time to time in accordance with section 5.14 or Article 8, being a conversion proposal as defined in section 236.1 of the ICA.

**"Demutualization Benefits"** means the Financial Services Shares to be issued to, Policy Credits to be credited for or cash to be received by, Eligible Policyholders upon Conversion in exchange for their Ownership Rights.

**"Designated Canadian Policyholder"** means a Person whose Residence is in Canada on the Benefits Date and who is the holder of an Eligible Policy which is a Group Insurance Policy, a Pension Policy or any other Policy which is classified on the Records of the Company as not issued to an individual.

**"Effective Date"** has the meaning specified in section 2.1.

**"Effective Time"** has the meaning specified in section 2.1.

**"Electing Shares"** means the Financial Services Shares subject to the Cash Election, which are comprised of the Buy-back Shares, the Resale Shares, allocated shares in respect of which Designated Canadian Policyholders have made the Cash Election and the Financial Services Shares deemed to be Electing Shares pursuant to section 4.13(c).

**"Eligibility Day"** means January 27, 1998.

**"Eligible Policy"** has the meaning specified in section 3.4.

**"Eligible Policyholder"** means the Owner of one or more Eligible Policies as determined pursuant to section 3.5.

**"Extra Premiums"** means, in respect of any Eligible Policy, that portion of the premium payable on the Policy, according to the Records of the Company, calculated by reference to a sub-standard risk insured under the Policy and payable either for the same period as the other portion of the premium under the Policy, or, if for a lesser period, at least twenty years.

**"Financial Services"** means Sun Life of Canada Holdings Corp., a corporation incorporated under the ICA which will own all of the Common Shares pursuant to this Conversion Plan.

**"Financial Services Board"** means the board of directors of Financial Services.

**"Financial Services Shares"** means the common shares of Financial Services.

**"Group Insurance Policy"** means a Policy, other than a Pension Policy,

(a) pursuant to which (i) the lives and/or the health of a number of Persons (other than the members of a single family only) are insured severally under a single contract between Sun Life of Canada and an employer or other Person; or (ii) periodic annuity payments are made to a number of Persons (other than members of a single family only) under a single contract between Sun Life of Canada and an employer or other Person; and

(b) which is classified as a group insurance policy on the Records of the Company.

**"ICA"** means the *Insurance Companies Act* (Canada), as amended.

**"In Force"** has the meaning specified in section 3.3.

**"Initial Public Offering"** means the initial public offering of Financial Services Shares, as provided for in section 4.14.

**"Initial Share Price"** means the price per share at which Financial Services Shares will be sold to the Underwriters pursuant to the Underwriting Agreements and offered to the public in the Initial Public Offering and includes such price in each currency in which it is expressed.

**"IPO Residency Date"** means the date on which the closing of the Initial Public Offering occurs.

**"IPO Shares"** means the Financial Services Shares to be sold to the Underwriters pursuant to the Underwriting Agreements and offered to the public in the Initial Public Offering, other than Financial Services Shares issued pursuant to an over-allotment option granted to the Underwriters in the Underwriting Agreements.

**"Letters Patent of Conversion"** means the letters patent of the Post-Conversion Company to be issued by the Minister to effect this Conversion Plan.

**"Life Company"** means a company incorporated or continued under the ICA or to which the ICA applies pursuant to section 13(1)(b) of the ICA that is permitted to insure risks falling within the class of life insurance, other than a company that is also permitted to insure risks falling within any other class of insurance other than accident and sickness insurance, accident insurance, personal accident insurance, sickness insurance and loss of employment insurance.

**"Lost Policyholder"** means an Eligible Policyholder who is classified on the Records of the Company on the Effective Date as having a current address which is unknown to Sun Life of Canada or who is deemed to be a Lost Policyholder under section 4.10(c).

**"Lost Policyholder Claim Date"** has the meaning specified in section 4.9(a).

**"Mandatory Sale"** has the meaning specified in section 4.11(a).

**"Mandatory Sale Shares"** has the meaning specified in section 4.11(a).

**"Market Conduct Settlements"** means claims of policyholders which remain outstanding under settlement agreements entered into by the Company in respect of class actions and related legal actions brought prior to the Effective Date in Canada and the United States related to market conduct in the sale of whole life insurance policies.

**"Michigan Commissioner"** means the Michigan Commissioner of Insurance, or such governmental officer, body or authority as may succeed the Commissioner as the primary insurance regulator in the State of Michigan.

**"Michigan Insurance Code"** means the *Michigan Insurance Code of 1956*, as amended.

**"Minister"** means the Minister of Finance (Canada) or a Minister of State who is delegated the powers, duties and functions of the Minister of Finance (Canada) under the ICA in respect of the Conversion.

**"Minor"** means an Eligible Policyholder who, on the Benefits Date, is classified on the Records of the Company as not having attained the age of majority according to the laws of the jurisdiction in which the policyholder resides and for whom on the Benefits Date the Company has not received notice of the proper appointment of a guardian of property.

**"Misrepresentation"** means:

(a) an untrue statement of material fact; or

(b) an omission to state a material fact that is required to be stated or that is necessary to make a statement not misleading in the light of the circumstances in which it was made,

where "material fact" means a fact that significantly affects, or would reasonably be expected to have a significant effect on, the market price or value of the Financial Services Shares.

**"Mutual Company"** means:

(a) a company that is incorporated or continued as a mutual company under the ICA;

(b) a company to which the ICA applies, pursuant to section 13(1)(b) of the ICA, that had no issued and outstanding shares on June 1, 1992; or

(c) a company that is converted into a mutual company under sections 226 to 236 of the ICA,

and that is not converted into a company with common shares under the ICA.

**"Other Jurisdictions"** means all jurisdictions other than:

(a) the Principal Jurisdictions;

(b) the Secondary Jurisdictions; and

(c) political subdivisions of the Principal Jurisdictions and Secondary Jurisdictions.

**"Owner"** means, in respect of any Policy, the Person or Persons specified or determined pursuant to section 3.5.

**"Ownership Rights"** means all Eligible Policyholders' rights with respect to, or any interest in, the Company as a Mutual Company that will cease on the Effective Date pursuant to section 237.1 of the ICA.

**"Participating Policy"** means a Policy that entitles the policyholder to participate in the profits of the Company or, after the Effective Time, the Post-Conversion Company.

**"Pension Policy"** means a Policy under which retirement benefits are provided to an individual or individuals after the termination of employment and which is subject to applicable legislation relating to pensions.

**"Permitted Group Premiums"** means, in respect of an Eligible Policy which is a Group Insurance Policy, for any period during which premiums are paid or payable to Sun Life of Canada, the amount of premiums in respect of regular group life insurance coverage, survivor income benefit and creditor life coverage (other than premiums for accidental death and dismemberment coverage and other than premiums paid for paid-up coverage and non-regular or cost plus premiums) and, in the case of a Policy issued through the Company's United Kingdom branch, premiums in respect of group health coverage, less, in either case, the aggregate amount of premiums reinsured during that period on a first dollar proportional basis with any insurance company or reinsurance company owned or controlled, directly or indirectly, by the holder of the Policy.

**"Person"** means an individual, corporation, joint venture, partnership, association, trust, trustee, unincorporated entity, organization or government or any department or agency thereof.

**"Policy"** has the meaning specified in section 3.2.

**"Policy Credit"** means:

(a) for an individual or joint ordinary life insurance Policy, an increase in the dividend accumulation value, if that is the dividend option elected for the Policy, and an increase in the paid-up addition cash value, if any other dividend option has been elected for the Policy;

(b) for a Policy which is In Force as extended term life insurance pursuant to a nonforfeiture provision of a life insurance policy, an extension of the coverage expiry date;

(c) for a Policy which is a deferred annuity certificate, an increase in the deferred annuity payment (and if the annuity payment is on a life basis, the increase will be on a life annuity with cash refund basis); and

(d) for a Policy which is an individual accumulation annuity, an increase in the account value, to which no sales or surrender or similar charges will be applied.

**"Policy Loan"** means an advance made by Sun Life of Canada to a policyholder on the security of or against the cash surrender value of a Policy.

**"Post-Conversion Company"** means the Life Company with common shares resulting from the Conversion of the Company.

**"Primary Shares"** has the meaning specified in section 4.14(c).

**"Principal Jurisdiction Lost Policyholders"** has the meaning specified in section 4.9(b).

**"Principal Jurisdictions"** means Canada, the United States (including the States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, the insular possessions of the United States and United States military addresses), the United Kingdom (England, Scotland, Wales and Northern Ireland), the Philippines and Bermuda.

**"Records of the Company"** means the books and records of Sun Life of Canada kept in the ordinary course of business, as corrected in those cases where there is a demonstrable error in the books and records.

**"Resale Shares"** has the meaning specified in section 4.14(d).

**"Resale Shares Transfer Fees"** means all taxes, stamp duties, commissions (other than any applicable underwriting fees or commissions as provided in the Underwriting Agreements) and transfer or administrative charges payable to stock exchanges, depositaries, governmental taxation authorities, local dealers and other third parties which are incurred in connection with a sale of Resale Shares in a manner varied pursuant to section 4.14(d), but excluding capital gains or income taxes which may be payable in respect of such sale.

**"Residence"** means, in respect of an Eligible Policyholder, the mailing address of the policyholder as shown on the Records of the Company.

**"Secondary Jurisdictions"** means Hong Kong, the Republic of Ireland, the Channel Islands (including Guernsey and Jersey) and the Isle of Man.

**"Settlement Option"** means an option exercised upon the death of an insured under a Policy other than a Group Insurance Policy or the maturity of a Policy other than a Group Insurance Policy under which the proceeds are paid as a series of payments instead of as a single payment.

**"Share Election"** has the meaning specified in section 4.13(a).

**"Share Selling Service"** has the meaning specified in section 4.14(j).

**"Shareholding Nominee"** has the meaning specified in section 4.5(b).

**"Special Meeting"** means the meeting of Eligible Policyholders of the Company duly called for the purposes of the Conversion in accordance with section 237(1.1) of the ICA.

**"Stock Exchanges"** has the meaning specified in section 4.14(i).

**"Subsidiary"** means, in respect of Sun Life of Canada or Financial Services, a body corporate controlled by Sun Life of Canada or Financial Services, respectively. For the purposes of determining control:

(a) a Person controls a body corporate if securities of the body corporate to which are attached more than 50 per cent of the votes that may be cast to elect directors of the body corporate are beneficially owned by the Person and the votes attached to those securities are sufficient, if exercised, to elect a majority of the directors of the body corporate;

(b) a Person controls an unincorporated entity, other than a limited partnership, if more than 50 per cent of the ownership interests, however designated, into which the entity is divided are beneficially owned by the Person and the Person is able to direct the business and affairs of the entity; and

(c) the general partner of a limited partnership controls the limited partnership.

For this purpose, where a Person controls an entity, the Person is deemed to control any entity that is controlled, or deemed to be controlled, by the entity and a Person is deemed to control an entity where the aggregate of:

(d) any securities of the entity that are beneficially owned by the Person; and

(e) any securities of the entity that are beneficially owned by any entity controlled by the Person,

is such that, if the Person and all of the entities specified in paragraph (e) that beneficially own securities of the entity were one Person, that Person would control the entity.

**"Sun Life of Canada"** includes the Company and the Post-Conversion Company, as the context may require.

**"Superintendent"** means the Superintendent of Financial Institutions appointed to such office pursuant to the *Office of the Superintendent of Financial Institutions Act* (Canada) or such governmental officer, body or authority as may succeed such Superintendent in such appointment.

**"Title Restricted Policy"** means an Eligible Policy which is recorded on the Records of the Company as being subject to a Title Restriction, which Title Restriction has not been removed and the removal of which has not been confirmed with Sun Life of Canada, in a manner satisfactory to Sun Life of Canada, on or prior to the Benefits Date.

**"Title Restriction"** means an assignment for the purposes of security (other than an assignment to secure a Policy Loan), a lien, any other security interest, a court-ordered garnishment, a bankruptcy or insolvency proceeding, or other title restriction.

**"Transfer Agent"** means CIBC Mellon Trust Company, the registrar and transfer agent for the Financial Services Shares, or its successors or assigns, and **"Co-Transfer Agent"** means any of the delegated subagents of the Transfer Agent.

**"U.K. Company"** has the meaning specified in section 2.2(a)(I).

**"U.K. Pension Scheme"** means an Eligible Policyholder who is a trustee or trustees of a Pension Policy that is a company pension scheme insured by the Company's United Kingdom business.

**"U.K. 2C Scheme"** has the meaning specified in section 2.2(a)(I).

**"Underwriters"** means the investment dealers or investment banks who enter into the Underwriting Agreements in respect of the Initial Public Offering.

**"Underwriting Agreements"** means one or more underwriting agreements to be entered into between Sun Life of Canada, Financial Services and the Underwriters in respect of the Initial Public Offering, as amended from time to time.

**"U.S. Tax Code"** means the *United States Internal Revenue Code of 1986*, as amended.

**"U.S. Tax Limit"** means the maximum number of Resale Shares and Mandatory Sale Shares that the Financial Services Board, in its sole discretion, on advice from Financial Services' United States tax counsel, considers may be sold in the Initial Public Offering by Eligible Policyholders without resulting in adverse tax consequences under the U.S. Tax Code to Eligible Policyholders who retain Financial Services Shares and who are U.S. residents.

**"Value of Policy Credits"** has the meaning specified in section 4.6(d).

### 1.2 Headings and Table of Contents

The inclusion of headings and a table of contents in this Conversion Plan is for convenience of reference only and shall not affect the construction or interpretation hereof.

### 1.3 Gender and Number

In this Conversion Plan, unless the context otherwise requires, words importing the singular include the plural and vice versa and words importing gender include all genders.

### 1.4 Currency

Except where otherwise expressly provided, all amounts in this Conversion Plan are stated in Canadian currency. References to "Can. $" are references to Canadian dollars. All amounts payable to an Eligible Policyholder in consideration of the proceeds of sale of Resale Shares, Buy-back Shares or Mandatory Sale Shares or as direct cash pursuant to section 4.7 shall be distributed to the policyholder in the currency determined as follows:

| Country of Residence on the Benefits Date | Country of Currency |
|---|---|
| Canada | Canada |
| United States | United States |
| United Kingdom | United Kingdom |
| Philippines | Philippines |
| Hong Kong | Hong Kong |
| Bermuda | United States |
| Republic of Ireland | Republic of Ireland |
| Malta | Malta |
| Channel Islands | United Kingdom |
| Isle of Man | United Kingdom |
| Other | Country from which Sun Life of Canada administers the Eligible Policy |

An Eligible Policyholder in Malta or in a country in the "Other" category may request at any time on or prior to the Benefits Date that the currency determined above be changed to any one of the currency of Canada, the United States, the United Kingdom, the Philippines or Hong Kong.

The amounts to be distributed to Eligible Policyholders in each of these currencies will be calculated (i) in the case of amounts calculated on the basis of the Initial Share Price and payable in a currency in which the Initial Share Price is expressed, based on the Initial Share Price expressed in such currency; and (ii) in the case of amounts calculated on the basis of the Initial Share Price and payable in any other currency, by applying the applicable Exchange Rate to the Initial Share Price expressed in Canadian currency. For this purpose, "Exchange Rate" means, in respect of any currency, the rate of exchange paid by Financial Services to its bankers to obtain the currency.

All amounts credited to Eligible Policyholders as Policy Credits will be credited in the currency in which their Policy is denominated.

## ARTICLE 2.

## THE CONVERSION

### 2.1 Effective Date

The effective date of this Conversion Plan (the "Effective Date") shall be the effective date stated in the Letters Patent of Conversion, which date shall be on or after the date upon which all of the conditions set forth in Article 7 have been satisfied. This Conversion Plan shall be deemed to have become effective at 12:01 a.m. (Toronto time) on the Effective Date (the "Effective Time").

### 2.2 Conversion and Consequences of Conversion

(a) At the Effective Time, the Conversion shall occur in the following order:

(i) the business of Sun Life of Canada conducted through the Company's United Kingdom branch shall be transferred pursuant to section 49 of and Part I of Schedule 2C to the *Insurance Companies Act 1982* (as amended) (the "U.K. 2C Scheme") to Sun Life Assurance Company of Canada (U.K.) Limited (the "U.K. Company"), a wholly-owned Subsidiary of the Company;

(ii) all policyholders' rights with respect to, or any interest in, Sun Life of Canada as a Mutual Company, including Ownership Rights, shall cease;

(iii) the amended and restated by-laws of Sun Life of Canada, as set forth in Exhibit A, shall come into force;

(iv) Sun Life of Canada shall issue to Financial Services a number of common shares not greater than the number of Financial Services Shares allocated to Eligible Policyholders pursuant to section 4.1;

(v) Financial Services shall issue Financial Services Shares to Eligible Policyholders entitled to shares in accordance with Article 4 and the other Eligible Policyholders will become entitled to receive Policy Credits or cash in accordance with Article 4;

(vi) Sun Life of Canada shall surrender to Financial Services, and Financial Services shall purchase for cancellation, all of the outstanding Financial Services Shares and preferred shares of Financial Services held by Sun Life of Canada, for consideration equal to the initial issue price of the shares plus any accrued dividends;

(vii) amounts shall be transferred from the accounts specified in section 456 of the ICA, and the accounts shall be restructured, in accordance with Article 5;

(viii) the policyholder dividend policy specified in section 5.12 shall take effect; and

(ix) the designation of policyholders' directors and shareholders' directors specified in section 2.3 shall take effect.

(b) As a result of the Conversion:

(i) Sun Life of Canada shall cease to be a Life Company that is a Mutual Company and become a Life Company with common shares by operation of section 237.1 of the ICA; Sun Life of Canada's corporate existence as a Life Company with common shares shall be a continuation of its existence as a Life Company that is a Mutual Company; and

(ii) this Conversion Plan will be legally binding on Financial Services, Sun Life of Canada and its policyholders.

(c) Subject to sections 2.2(a)(i) and 6.3, all Policies in force on the Effective Date shall continue to remain in force under the terms of the policies.

(d) All holders of Participating Policies in force on the Effective Date shall continue to have the right to receive dividends in accordance with the dividend policy applicable to their Participating Policies as contemplated by this Conversion Plan, if any.

**2.3 Designation of Policyholders' Directors and Shareholders' Directors**

(a) Upon the Effective Date, the Post-Conversion Company will have both a common shareholder (being Financial Services) and policyholders who are entitled to vote at meetings of shareholders and policyholders, including annual meetings. In accordance with section 173(5) of the ICA and the by-laws of the Post-Conversion Company:

(i) each of the following members of the Board is designated as a policyholders' director for the remaining term of his or her office:

| | |
|---|---|
| Dian N. Cohen | Sir Bob Reid |
| Bertin F. Nadeau | William W. Stinson |
| Ronald W. Osborne | W. Vickery Stoughton |

(ii) each of the following members of the Board is designated as a shareholders' director for the remaining term of his or her office:

| | |
|---|---|
| Prof. M. Colyer Crum | John D. McNeil |
| Stanley H. Hartt | Alfred Powis |
| The Hon. Donald S. Macdonald | Donald A. Stewart |
| John M. MacLeod | David G. Vice |
| Angus A. MacNaughton | Jeannine Guillevin Wood |

(b) If one of the members of the Board specified in section 2.3(a) ceases to be a director (in this section, a "retiring director") before the end of the remaining term of his or her office, any director elected or appointed to replace the retiring director shall be designated as the same category of director as the retiring director was designated.

## ARTICLE 3.

## ELIGIBILITY

**3.1 General**

Demutualization Benefits will be provided only to Eligible Policyholders and Demutualization Benefits will be provided only in respect of Policies which entitle their owners to vote at meetings of the Company. All of the Demutualization Benefits to be provided pursuant to this Conversion Plan will be provided to holders of Participating Policies. Only Eligible Policyholders will be entitled to vote at the Special Meeting. The following rules in this Article 3 shall be applied for the purposes of determining which Policies are Eligible Policies and which Persons are Eligible Policyholders.

**3.2 Policies**

(a) The following contracts and policies are Policies for the purposes of this Conversion Plan:

(i) each life insurance policy (including, without limitation, a pure endowment contract), annuity contract, accident and health insurance policy, disability income policy or retirement and pension contract that has been issued by the Company, transferred to the Company pursuant to a scheme of transfer in the United Kingdom or assumed by the Company pursuant to a transfer or assumption reinsurance agreement; and

(ii) each certificate issued to an insured or annuitant pursuant to a Group Insurance Policy or Pension Policy issued by, transferred to or assumed by the Company that expressly states that it is a separate contract between the Company and the holder of the certificate.

(b) The following contracts and policies are not Policies for the purposes of this Conversion Plan:

(i) any certificate issued to an insured or annuitant pursuant to a Group Insurance Policy or Pension Policy, with the exception of a certificate specified in section 3.2(a)(ii);

(ii) insurance policies or annuity contracts issued by other insurers which are reinsured by the Company on an indemnity reinsurance basis;

(iii) survivor income benefits payable under a Group Insurance Policy or a Pension Policy;

(iv) insurance policies or annuity contracts issued by a Subsidiary of the Company or transferred to or assumed by a Subsidiary of the Company, otherwise than pursuant to the U.K. 2C Scheme or the corporate reorganization contemplated by section 6.3; and

(v) insurance policies or annuity contracts transferred to another insurer by way of assumption reinsurance (including a scheme of transfer in the United Kingdom) prior to the Eligibility Day.

### 3.3 In Force

(a) A Policy is In Force as of any date if, as shown on the Records of the Company, unless otherwise stated in this section 3.3, (i) it has been issued; and (ii) it has not lapsed, matured by death or otherwise or been surrendered or otherwise terminated on or before that date. A Policy matures by death on the date of the death of the life insured and not on the date that notice of the death is received by the Company. A Policy which is not a Group Insurance Policy or a Pension Policy shall be deemed to be In Force on the day that it lapses or matures by death or otherwise. A Group Insurance Policy and a Pension Policy shall be deemed to be In Force for so long as insurance is provided under it.

(b) A Policy shall be deemed to be In Force during the grace period for non-payment of premiums provided for in the Policy.

(c) A Policy that has been reinstated after not being In Force shall be deemed to be In Force commencing on the date of reinstatement, as shown on the Records of the Company, without regard to any prior period during which the Policy was not In Force.

(d) A Policy is not In Force solely because, prior to the date on which the Policy was issued, insurance coverage may have been provided by a conditional receipt.

(e) A Policy shall be deemed not to be In Force as of any date if the Policy is returned to the Company and all premiums are refunded before the Effective Date.

### 3.4 Eligible Policies

A Participating Policy that is In Force in the following circumstances is an Eligible Policy:

(a) a Participating Policy that was In Force on the Eligibility Day;

(b) a Participating Policy that was applied for on or before the Eligibility Day and was issued to the applicant after that date, if:

(i) the signed application was dated on or before the Eligibility Day; and

(ii) the application was received in an office of the Company by January 27, 1998, in the case of an application made by an agent or employee of Sun Life of Canada or a member of his or her immediate family, and, in all other cases, by the applicable date set out below:

(A) January 30, 1998, in Canada, the United States, the United Kingdom, the Philippines and Bermuda; or

(B) February 4, 1998, in Hong Kong; or

(c) a Participating Policy that lapsed before the Eligibility Day but was reinstated during the period beginning on the Eligibility Day and ending 90 days before the day on which the Special Meeting is held, by the Person who was the Owner at the time the Policy became lapsed.

### 3.5 Eligible Policyholders

An Eligible Policyholder is the Owner of one or more Eligible Policies. For the purposes of this Conversion Plan, the Owner of an Eligible Policy shall be determined on the basis of the Records of the Company as of any date, unless otherwise provided for in this section 3.5, in accordance with the following provisions.

(a) Where a Person or a specific group of Persons owns more than one Eligible Policy in the same legal capacity, the Person or group of Persons will be treated as a single Owner.

(b) There may not be more than one Owner of an Eligible Policy, although more than one Person may collectively constitute a single Owner.

(c) Where an Eligible Policy is held by a trust or trustee, the trustee will be treated as the Owner of the Policy.

(d) Where a Person or a specific group of Persons owns Eligible Policies in more than one legal capacity, the Person or group of Persons will be treated as a separate Owner of an Eligible Policy in each capacity. If a Person or a specific group of Persons owns multiple Eligible Policies as a trustee for different beneficiaries or specific groups of beneficiaries, the Person or group of Persons will be treated as a separate Owner in respect of each Eligible Policy held for a different beneficiary or specific group of beneficiaries.

(e) In dealing with a Person who owns an Eligible Policy as a fiduciary, Sun Life of Canada is not bound to inquire into the existence, extent or correct description of the fiduciary relationship and Sun Life of Canada may assume without inquiry that the fiduciary shown on the Records of Sun Life of Canada continues to be the fiduciary until Sun Life of Canada receives written notice that the fiduciary is no longer acting as such in respect of the Policy or the Demutualization Benefits that may be distributed in respect of the Policy.

(f) Where a single Person owns an Eligible Policy and the Person dies on or after the Eligibility Day, the estate of the deceased will become the Owner of the Policy. Where a single Person (who was not the life insured under the Policy) was the Owner of an Eligible Policy, and that Person died before the Eligibility Day, the contingent Owner (if any) who is the Owner of the Policy on the Eligibility Day will be the Owner of the Policy.

(g) Where, either before, on or after the Eligibility Day, a Person assigned or pledged an Eligible Policy to secure a debt or other obligation, the Person will be treated as the Owner of the Policy. The determination of whether an Eligible Policy has been assigned or pledged to secure a debt or other obligation will be based on the Records of the Company. If there is any uncertainty regarding the determination in a particular case, Sun Life of Canada shall make a determination, in good faith and acting reasonably, regarding the nature of the assignment and any determination by Sun Life of Canada shall be binding on all Persons for the purposes of this Conversion Plan.

(h) Where a Person irrevocably assigns all of his or her rights and interests in an Eligible Policy (not by way of security only) on or before the Eligibility Day in accordance with the provisions of the Policy and the Company's procedures in respect of assignments in effect at the time of the assignment, the assignee will be treated as the Owner of the Policy. Where a Person irrevocably assigns all of his or her rights and interests in the Policy (not by way of security only) after the Eligibility Day, the Person will be treated as the Owner of the Policy.

(i) Subject to sections 3.5(j) and 4.10, the Owner of an Eligible Policy that is a Group Insurance Policy or a Pension Policy shall be the Person specified in the master Policy or contract as the Policy or contract holder. If no Policy or contract holder is specified, the Owner shall be the Person or Persons to whom or in whose name the master Policy or contract has been issued. Individual insureds or annuitants who are participants under a Group Insurance Policy or a Pension Policy, including holders of certificates (except as specified in section 3.5(j)) or individual insureds under the Policy, will not be treated as Owners of the Policy.

(j) Where a certificate issued to an insured or annuitant under a Group Insurance Policy or a Pension Policy is a separate contract or Policy between the insured or annuitant and the Company, the

insured or annuitant will be treated as the Owner of the separate contract or Policy and, for greater certainty, the Person specified in the master Policy or contract as the Policy or contract holder will not be treated as the Owner of the separate contract or Policy.

(k) The Owner of an Eligible Policy specified in section 3.4(b) shall be the Person or Persons to whom or in whose name the Policy has been issued.

(l) Except as otherwise provided in this Article 3, the identity of the Owner of an Eligible Policy shall be determined without giving effect to any interest of any other Person in the Policy.

(m) In any situation not expressly covered in this section 3.5, the owner of an Eligible Policy, as reflected in the Records of the Company or as determined in good faith by Sun Life of Canada, shall conclusively be presumed to be the Owner of the Policy, and Sun Life of Canada shall not be required to examine or consider any other facts or circumstances which bear on a Person's entitlement to receive all or any portion of the Demutualization Benefits payable in respect of the Policy. Any determination under this section 3.5(m) shall be binding on all Persons.

In the event that more than one Person constitutes a single Owner of an Eligible Policy, Demutualization Benefits allocated pursuant to Article 4 shall be distributed jointly to such Persons.

### 3.6 Renunciation of Demutualization Benefits

An Eligible Policyholder may elect in writing, in a form satisfactory to Sun Life of Canada, to renounce any and all of the policyholder's right to receive Demutualization Benefits. A renunciation of the right may be made by mailing or delivering the written renunciation to the head office of Sun Life of Canada in Toronto for receipt on or prior to the Benefits Date. The renunciation will be irrevocable after the Benefits Date.

## ARTICLE 4.

## ALLOCATION AND DISTRIBUTION OF DEMUTUALIZATION BENEFITS

### 4.1 Method of Allocation of Demutualization Benefits

Eligible Policyholders shall be entitled to receive Demutualization Benefits on the basis provided for in this Article 4. Each Eligible Policyholder shall be allocated for the purposes of determination of the amount of Demutualization Benefits to which the policyholder is entitled and, except where otherwise provided in this Conversion Plan, shall be entitled to the issuance of:

(a) a fixed allocation equal to 75 Financial Services Shares; and

(b) a variable allocation of Financial Services Shares determined pursuant to section 4.2.

### 4.2 Allocation of Variable Component

The number of Financial Services Shares to be allocated pursuant to section 4.1(b) to each Eligible Policyholder in respect of the interest in the Company represented by each Eligible Policy of which the policyholder is the Owner shall be calculated in the manner provided for below. All such calculations shall be based on the information contained in the Records of the Company in respect of the Eligible Policy on the Eligibility Day (or, in the case of an Eligible Policy which is a Policy contemplated by section 3.4(b) or which is a Policy which lapsed before the Eligibility Day and has been reinstated as contemplated by section 3.4(c), on the basis of the information that would have been contained in the Records of the Company if the Policy had been In Force on the Eligibility Day) and, as applicable, by reference to the rates of exchange set out in section 1 of Exhibit B. The allocation shall be calculated for the interest in the Company represented by each Eligible Policy other than a Group Insurance Policy as the sum of:

(a) 1.32 Financial Services Shares for each Can.$1,000 of Time-Weighted Cash Value; and

(b) 64 Financial Services Shares for each Can.$1,000 of Annual Premium Measure,

rounded up to the next whole Financial Services Share, and, for each Eligible Policy which is a Group Insurance Policy, as 4.7 Financial Services Shares for each Can.$1,000 of Time-Weighted Annual Premium Measure, rounded up to the next whole Financial Services Share.

"Time-Weighted Cash Value" means the product obtained when the Cash Value of an Eligible Policy is multiplied by the Duration of the Policy. "Time-Weighted Annual Premium Measure" means the product obtained when the Annual Premium Measure of an Eligible Policy is multiplied by the Duration of the Policy. The terms "Cash Value", "Duration" and "Annual Premium Measure" have the respective meanings specified in section 4.3.

**4.3 Calculation of Certain Amounts**

(a) "Cash Value" means:

(i) in respect of an Eligible Policy which contains a provision permitting the payment of a cash surrender value, the amount, if any, that the policyholder would have been entitled to receive under the terms of the Policy as cash surrender value if the policyholder had voluntarily terminated the Policy on the Eligibility Day, calculated in a manner consistent with administrative practice, without reduction for any outstanding Policy Loans and accrued interest or any outstanding premiums, and including:

(A) amounts calculated in respect of Policy riders and options of the type specified in section 3 of Exhibit B; and

(B) amounts calculated in respect of paid-up additions and any dividends left on deposit;

but excluding,

(C) any amounts in respect of premiums paid in advance;

(D) except as provided in section 4.3(a)(i)(A), amounts calculated in respect of Policy riders and options;

(E) any amounts in respect of special maturity dividends, including terminal bonuses or terminal dividends;

(F) except as provided in section 4.3(a)(i)(A), any amounts in respect of term insurance purchased by the policyholder with dividends paid on the Policy; and

(G) any accretion resulting from the review of the Policy in an individual claim-review process established under a Market Conduct Settlement,

subject to adjustment in accordance with section 2 of Exhibit B; and

(ii) in respect of an Eligible Policy which does not contain a provision permitting the payment of a cash surrender value, a nil amount, except as otherwise provided in section 4 of Exhibit B or as the Appointed Actuary may otherwise determine in accordance with section 4.3(d).

(b) "Duration" means, in respect of an Eligible Policy, other than a Group Insurance Policy, the number of whole years and any fraction of a year that the Policy has been In Force up to and including the Eligibility Day, where a year means any period of twelve consecutive months and a fraction of a year shall be measured by the quotient obtained when the numbers of days elapsed in the year is divided by 365; provided, however, that:

(i) where an Eligible Policy lapsed and was subsequently reinstated at any time before the Eligibility Day or was reinstated at any other time as contemplated by section 3.4(c), the Policy shall be deemed to have been In Force from the issue date shown on the Records of the Company for the purposes of this Article 4, notwithstanding that the Policy may have been issued at an earlier date and any lapse period following the issue date of the Policy shown on the Records of the Company shall be included in the calculation of the period that the Policy has been In Force;

(ii) in the case of an Eligible Policy originally issued by another insurance company and either transferred to the Company pursuant to a scheme of transfer in the United Kingdom on or before the Eligibility Day or assumed by the Company on or before the Eligibility Day pursuant to a transfer or assumption reinsurance agreement, the first date on which the Policy

shall be deemed to be In Force for the purposes of this Article 4 shall be, as applicable, the effective date of the scheme of transfer or the effective date of the transfer or assumption reinsurance agreement;

(iii) in the case of an Eligible Policy that is a Settlement Option, the date upon which the Policy shall be deemed to be first In Force for the purposes of this Article 4 shall be the effective date of implementation of the Settlement Option;

(iv) in the case of an Eligible Policy that is a Policy of the type specified in section 4(d) of Exhibit B, the date upon which the Policy shall be deemed to be first In Force for the purposes of this Article 4 shall be the date of death of the original insured in respect of the Policy; and

(v) in the case of an Eligible Policy which is a Pension Policy under which retirement benefits may be provided to more than one individual (other than an individual money purchase policy issued by the Company in the United Kingdom) and in respect of which the Owner is a body corporate, the number of years calculated in accordance with the foregoing shall be subject to a maximum of fifteen;

and, in respect of an Eligible Policy which is a Group Insurance Policy, means the number of whole years (measured as aforesaid) and any fraction of a year (so measured) from the earliest date of issue shown on the Records of the Company in respect of all such Eligible Policies owned by the holder of the Eligible Policy, or a group of Persons including such policyholder, up to and including January 27, 1998; provided, however, that:

(vi) if the Eligible Policy is a Policy originally issued by another insurance company and either transferred to the Company pursuant to a scheme of transfer in the United Kingdom on or before the Eligibility Day or assumed by the Company on or before the Eligibility Day pursuant to a transfer or assumption reinsurance agreement, the date of issue of such Policy for the purposes of this Article 4 shall be deemed to be, as applicable, the effective date of the scheme of transfer or the effective date of the transfer or assumption reinsurance agreement;

(vii) if, on the date of issue of a Policy shown on the Records of the Company, the Policy was not a Participating Policy, the date of issue of the Policy, for the purposes of this section 4.3(b), shall be deemed to be the first date on which the Policy was amended with the effect that the Policy became a Participating Policy;

(viii) if all or part of the insurance under a Policy had been transferred to the Policy, without interruption, from one or more Group Insurance Policies or their predecessor Policies owned or formerly owned by the holder of the Policy, or a group of Persons including such policyholder, where one or more of such Group Insurance Policies would have been an Eligible Policy at the time of transfer of insurance if it had been In Force on January 27, 1998, the date of issue of the Policy shall be deemed to be the date of issue of the Group Insurance Policy that would have so been an Eligible Policy determined in accordance with this Article 4 under which coverage under the Policy was first previously in force (or, where there is more than one such predecessor to such Policy with different dates of issue, the earliest of such dates); and

(ix) the number of years calculated in accordance with the foregoing shall be then increased by five, and that sum shall be subject to a maximum of 20.

(c) "Annual Premium Measure" means, in respect of any Eligible Policy:

(i) other than a Group Insurance Policy, the annual premium stipulated as of the Eligibility Day on the Records of the Company to be payable to Sun Life of Canada under the terms of the Policy, regardless of the frequency, or actual amount, of premium payments in any year, or any option elected by the policyholder to satisfy premium payments through the application of

policy dividends, and includes amounts in respect of any Policy riders or options specified in section 3 of Exhibit B as well as Extra Premiums paid in respect of the Policy and the Policy riders or options specified in section 3 of Exhibit B; provided, however, that:

(A) the amount of any annual premium in respect of any single premium Policy, single premium rider, single premium payment, dividend from another Policy that is applied as a premium under a "Sun Fund" Policy or dividend applied to purchase paid-up additions, shall be deemed to be nil;

(B) where no premiums are payable in respect of an Eligible Policy as a result of a waiver of premiums or as a result of a disability claim in the course of payment, the annual premium will be determined by the premiums stipulated in the Eligible Policy as if such waiver or claim were not in effect;

(C) the amount of the annual premium shall be deemed to be nil where the Eligible Policy was paid-up on the Eligibility Day;

(D) in respect of an Eligible Policy which is a universal life Policy issued through the Company's United States branch or a deposit administration Policy issued through the Company's United Kingdom branch, the amount of annual premium shall be calculated as the aggregate amount of premium paid in the policy year that includes the Eligibility Day; and

(E) in respect of an Eligible Policy which did not, as of the Eligibility Day, provide for the payment of an annual premium (or which, if it is a Policy specified in section 3.4(b) or in section 3.4(c), would not, if it had been In Force on the Eligibility Day, have provided for the payment of any annual premium), the amount shall be nil, except as the Appointed Actuary may otherwise determine in accordance with section 4.3(d);

(ii) in respect of any insurance coverage under a Group Insurance Policy that was In Force prior to January 1, 1997 and which coverage was not shown as paid-up coverage or terminated coverage on the Records of the Company on the Eligibility Day, an amount equal to the sum of Permitted Group Premiums paid or payable in 1997;

(iii) in respect of any insurance coverage under a Group Insurance Policy that became In Force on or after January 1, 1997 and on or before December 31, 1997 and which coverage was not shown as paid-up coverage or terminated coverage on the Records of the Company on the Eligibility Day, an amount equal to the product which results when the sum of all Permitted Group Premiums paid or payable during the period from January 1, 1997 to December 31, 1997 is multiplied by the quotient which results when 12 is divided by the number of months of insurance coverage in 1997 that was provided by those premiums;

(iv) in respect of any insurance coverage under a Group Insurance Policy that became In Force on or after January 1, 1998 and which coverage was not shown as paid-up coverage or terminated coverage on the Records of the Company on the Eligibility Day, an amount equal to the product which results when the portion of the Permitted Group Premiums relating to the first month's coverage under the Policy is multiplied by 12; and

(v) in respect of any coverage under a Group Insurance Policy that is shown as paid-up coverage on the Records of the Company on the Eligibility Day:

(A) in respect of paid-up life insurance coverage and disabled life insurance coverage, the amount obtained when the amount of insurance at December 31, 1997 is multiplied by the premium rate for the appropriate age and sex shown in section 5 of Exhibit B; and

(B) in respect of survivor income benefits or life insurance benefits being paid in instalments as a result of a disability, means the annual payment to the beneficiaries as at December 31, 1997.

(d) In any circumstance in which the the Appointed Actuary is of the view that the amount of the Cash Value, Duration or Annual Premium Measure cannot be fairly and equitably determined in the case of any Eligible Policy in accordance with the provisions of this section 4.3, the Appointed



[redacted]

Actuary will determine such amount on a basis which the Appointed Actuary believes to be consistent with the methodology used for the purposes in this section 4.3 for other Eligible Policies and to be fair and equitable in all circumstances.

### 4.4 Rationale for Allocation of Benefits

The method contained in this Conversion Plan of determining and allocating Demutualization Benefits:

(i) is fair and equitable, having regard to the different classes of Eligible Policies;

(ii) as far as is practical and consistent with other principles of allocation, is the same in all countries for all types of eligible policies;

(iii) recognizes the Company's history and philosophies of doing business; and

(iv) is simple, practical and intended to be understandable by Eligible Policyholders.

The fixed allocation specified in section 4.1(a) recognizes the loss of voting control of the Company by Eligible Policyholders at the Effective Time, and the variable allocation specified in section 4.1(b) recognizes the loss of the other Ownership Rights of Eligible Policyholders and reflects the varying financial interests of Eligible Policies, including their size, length of time In Force with the Company, contribution to the value of the Company, and their differing rights to receive surplus.

### 4.5 Distribution of Financial Services Shares as Demutualization Benefits

(a) Except for Eligible Policies for which Policy Credits will be credited under section 4.6 or cash will be paid under section 4.7, at the Effective Time, Financial Services shall issue to each Eligible Policyholder the number of Financial Services Shares allocated to the policyholder pursuant to sections 4.1 and 4.2.

(b) The manner in which Financial Services Shares will be issued to an Eligible Policyholder pursuant to section 4.5(a) and initially registered on the share register of Financial Services will depend on the jurisdiction of Residence of the policyholder on the Benefits Date. The Financial Services Shares will be issued and registered: (i) in the name of a nominee who will hold the shares on behalf of the policyholder (a "Shareholding Nominee"); (ii) in the policyholder's name; or (iii) at the option of Financial Services, in some other manner. Eligible Policyholders in some jurisdictions shall have the right to elect the manner in which they will hold their shares.

(c) The Shareholding Nominee for Eligible Policyholders in Canada will be the Transfer Agent and the Shareholding Nominee for Eligible Policyholders in the other relevant jurisdictions will be the Transfer Agent or the Co-Transfer Agent, or one of the Co-Transfer Agent's affiliates, in the jurisdiction. Each Eligible Policyholder holding Financial Services Shares through a Shareholding Nominee will have the right at any time after the Effective Date to request that his or her shares be removed from the Shareholding Nominee and registered in the policyholder's name or in the name of a broker or other nominee.

(d) The Shareholding Nominee arrangements in any jurisdiction may only be terminated upon 90 days written notice to all persons holding Financial Services Shares through the Shareholding Nominee in that jurisdiction. If the Shareholding Nominee arrangements are terminated, Financial Services will either cause the shares held by the Shareholding Nominees to be registered in the shareholders' names or give each shareholder holding shares through a Shareholding Nominee the option to have his or her shares registered in the shareholder's name or held through a broker or other nominee.

(e) Prior to or as soon as reasonably practicable after the Effective Date, Financial Services will send, or cause to be sent, confirmations of ownership to Eligible Policyholders who hold their shares through a Shareholding Nominee and share certificates to Eligible Policyholders who hold their shares as a registered holder.

4.6 **Distribution of Policy Credits as Demutualization Benefits**

(a) An Eligible Policyholder shall not be issued Financial Services Shares, and shall instead be credited with Policy Credits as of the Effective Date in accordance with section 4.6(d), in the following circumstances.

(i) Subject to section 4.6(b), Policy Credits shall be credited to the Eligible Policyholder in respect of an Eligible Policy if the Policy is an individual retirement annuity contract within the meaning of section 408(b) of the U.S. Tax Code or tax sheltered annuity contract within the meaning of section 403(b) of the U.S. Tax Code, including, for this purpose, custodial accounts under section 403(b)(7) of the U.S. Tax Code and retirement income accounts under section 403(b)(9) of the U.S. Tax Code.

(ii) Policy Credits shall be credited to each Eligible Policy in respect of which the Board has determined that the payment to the Eligible Policyholder of Demutualization Benefits in the form of Financial Services Shares or cash in respect of the Policy would be disadvantageous to the policyholder in respect of applicable income or other taxation, provided that Sun Life of Canada has sent notice of the determination to the policyholder.

(b) Financial Services Shares will be issued in accordance with section 4.5(a) instead of the crediting of Policy Credits pursuant to section 4.6(a)(i) in respect of:

(i) a supplementary contract or a settlement option issued pursuant to an Eligible Policy by the Company on or before the Effective Date to effect the annuitization of an individual deferred annuity, an immediate annuity contract or a deferred annuity contract in the period following deferment of annuity payments, if the Company determines that such share issuance will not be subject to excise tax and will not constitute a prohibited transaction under the U.S. Tax Code or cause a disqualification of the Eligible Policy, or a related plan, in respect of which the shares are issued; and

(ii) an Eligible Policy which is not In Force on the Effective Date.

(c) If a supplemental contract or settlement option specified in section 4.6(b)(i) is issued after the last date on which the Choices Circular is mailed to Eligible Policyholders or if the Eligible Policy specified in section 4.6(b)(ii) is still In Force on that date, as applicable, the holder of the Policy shall not be entitled to make the Cash Election.

(d) If Demutualization Benefits are to be credited in Policy Credits in respect of Eligible Policies pursuant to section 4.6(a), the value of these Demutualization Benefits shall be equal to the number of Financial Services Shares allocated to the policyholder pursuant to this Article 4 in respect of the Policies, multiplied by the Initial Share Price (the "Value of Policy Credits"). Policy Credits shall be credited, net of any applicable withholding tax, by the Post-Conversion Company as soon as reasonably practicable after the Effective Date. The Value of Policy Credits for each of the four types of credits specified in the four subsections of the definition of Policy Credit shall be applied as follows:

(i) in the case of subsection (a) of the definition, the Value of Policy Credits will be applied to increase the dividend accumulation value or increase the paid-up addition cash value, as the case may be, by that amount;

(ii) in the case of subsection (b) of the definition, the sum of the Value of Policy Credits and the cash value of the remaining term insurance, based on the insured's age at the Effective Date, will be applied to determine the extended period of the coverage;

(iii) in the case of subsection (c) of the definition, the sum of the Value of Policy Credits and the cash value of the existing future annuity payments as of the Effective Date, based on the annuitant's age at the Effective Date, will be applied to determine the increased deferred annuity payments; and

(iv) in the case of subsection (d) of the definition, the Value of Policy Credits will be applied to increase the account value by that amount.

(e) If an Eligible Policyholder holds one or more Eligible Policies in respect of which Policy Credits will be credited under section 4.6(a) and one or more other Eligible Policies, the policyholder shall be entitled to the fixed allocation made pursuant to section 4.1(a) in respect of the other Policy or Policies.

**4.7 Distribution of Cash as Demutualization Benefits**

(a) Financial Services shall not issue to a Designated Canadian Policyholder the Financial Services Shares in respect of which a Cash Election has been made under section 4.12(a). The policyholder will be paid his or her Demutualization Benefits in respect of these shares in the form of a direct cash payment from Sun Life of Canada. The amount of the cash payment shall be equal to the number of Financial Services Shares in respect of which the Cash Election was made, multiplied by the Initial Share Price. Payments of cash to an Eligible Policyholder under this section 4.7(a) shall be made by cheque as soon as reasonably practicable after the Effective Date.

(b) Subject to section 4.8(b), Financial Services shall not issue Financial Services Shares allocated pursuant to this Article 4 to an Eligible Policyholder whose Residence is in a Secondary Jurisdiction or an Other Jurisdiction or who is a Minor in respect of an Eligible Policy which is a Title Restricted Policy. Subject to section 4.8(b), the policyholder will be paid his or her Demutualization Benefits in the form of a direct cash payment from Sun Life of Canada. The amount of the cash payment shall be equal to the number of Financial Services Shares allocated but not issued to the policyholder pursuant to this Article 4, multiplied by the Initial Share Price. Payments of cash to an Eligible Policyholder under this section 4.7(b) shall be made by cheque, net of any applicable withholding tax, as soon as reasonably practicable after the Title Restriction has been removed or the question of entitlement has been resolved in accordance with section 4.8(a).

**4.8 Restrictions on Distribution of Benefits – Title Restricted Policies**

Notwithstanding anything in Article 3 or this Article 4, and with the exception of Eligible Policies specified in section 4.6(a), if an Eligible Policy is a Title Restricted Policy, the following additional provisions shall govern the manner of the form and distribution of Demutualization Benefits in respect of the Policy.

(a) Demutualization Benefits relating to a Title Restricted Policy (as well as dividends paid on any Financial Services Shares forming part of the benefits) will be retained by Sun Life of Canada (or its designee) until the Eligible Policyholder or another Person confirms with Sun Life of Canada, in a manner satisfactory to Sun Life of Canada, that the Title Restriction has been removed or the question of entitlement to receive the Demutualization Benefits has been resolved in a manner that is satisfactory to Sun Life of Canada.

(b) Where an Eligible Policyholder owns more than one Eligible Policy, some but not all of which are Title Restricted Policies:

(i) the Financial Services Shares allocated pursuant to section 4.2 relating to the Title Restricted Policies that are issued or the cash in respect of the shares, as applicable, will be retained by Sun Life of Canada in accordance with section 4.8(a); and

(ii) the Financial Services Shares allocated pursuant to section 4.1(a) and the Financial Services Shares allocated pursuant to section 4.2 relating to the policies which are not Title Restricted Policies will be issued, or the cash in respect of the shares, as applicable, will be provided, to the policyholder according to the other provisions of this Article 4.

(c) If an Eligible Policyholder, in respect of a Title Restricted Policy:

(i) was otherwise entitled to make the Cash Election or the Share Election;

(ii) has made the election; and

(iii) the Title Restriction in respect of the Policy has not been removed in a manner satisfactory to the Company on or prior to the Benefits Date,

then the election in respect of the Policy shall not be valid.

(d) Where Sun Life of Canada or its designee retains Demutualization Benefits in respect of a Title Restricted Policy in the form of Financial Services Shares, the shares shall be held by a Shareholding Nominee on behalf of the Eligible Policyholder to whom the shares were issued. The Shareholding Nominee will maintain records for those shares separate from the records for other Financial Services Shares held by the Shareholding Nominee and will not issue a confirmation of

ownership to the Eligible Policyholder or allow the shares to be transferred until the Title Restriction has been removed, or the question of entitlement to receive the Demutualization Benefits has been resolved, in accordance with section 4.8.

(e) The determination of whether an Eligible Policy is a Title Restricted Policy or whether a Title Restriction has been removed will be based on the Records of the Company. The determination of whether the question of entitlement to receive Demutualization Benefits has been satisfactorily resolved in any particular case shall be made by Sun Life of Canada. If there is any uncertainty regarding these determinations in a particular case, Sun Life of Canada shall make a determination, in good faith and acting reasonably, taking into account the nature of the Title Restriction, and the determination shall be binding on all Persons for the purposes of this Conversion Plan.

**4.9 Restrictions on Distribution of Benefits – Lost Policyholders**

(a) Eligible Policyholders who are Lost Policyholders shall be noted as such on the Records of the Company. Except as otherwise provided in this section, the Demutualization Benefits payable to a Lost Policyholder shall be held until the policyholder ceases to be a Lost Policyholder in accordance with section 4.9(j). When a policyholder so ceases to be a Lost Policyholder (the "Lost Policyholder Claim Date"), the policyholder will be entitled, to the extent permitted by applicable law and provided for in this section 4.9, to claim his or her Demutualization Benefits, including any dividends or other amounts payable pursuant to this section, as soon as reasonably practicable after the Lost Policyholder Claim Date. Payments under this section 4.9 shall be net of any applicable withholding tax.

(b) Subject to section 4.7(b), Financial Services Shares issuable to Lost Policyholders shall be issued pursuant to Section 4.5(a). Lost Policyholders whose Residence is in a Principal Jurisdiction on the Benefits Date (other than Minors and U.K. Pension Schemes) or who do not have an address in the Records of the Company on the Benefits Date ("Principal Jurisdiction Lost Policyholders") will have the Financial Services Shares issued to them registered in their names on the share register of Financial Services, but will not be issued a share certificate while they are a Lost Policyholder. Lost Policyholders whose Residence is in a Secondary Jurisdiction on the Benefits Date or who are U.K. Pension Schemes shall have the Financial Services Shares issued to them sold to the Underwriters pursuant to section 4.13(c). Lost Policyholders whose Residence is in an Other Jurisdiction on the Benefits Date or who are Minors shall have the Financial Services Shares issued to them sold pursuant to section 4.11(a). The proceeds of such sales shall be held in accordance with section 4.9(a).

(c) If the Residence of a Principal Jurisdiction Lost Policyholder is in an Other Jurisdiction at the time the policyholder ceases to be a Lost Policyholder, Financial Services may require the policyholder to sell his or her Financial Services Shares, in a manner to be determined by Financial Services.

(d) If a Lost Policyholder does not take one or more of the steps specified in section 4.9(j) prior to 11:59 p.m. (Toronto time) on the 35th month anniversary of the Effective Date (the "Cancellation Date"), any Financial Services Shares issued to the policyholder will be automatically cancelled and any cash payable to the policyholder, including proceeds from the sale of shares, shall revert to Financial Services. Upon a cancellation of Financial Services Shares pursuant to this section 4.9(d), no amount will be deducted from the stated capital account maintained by Financial Services in respect of the Financial Services Shares. Subject to sections 4.9(f) and (g), if Financial Services Shares are cancelled pursuant to this section, the dividends declared on the shares shall revert to Financial Services.

(e) An Eligible Policyholder who ceases to be a Principal Jurisdiction Lost Policyholder on or prior to the Cancellation Date shall be paid any dividends declared on the Financial Services Shares issued to the policyholder.

(f) Notwithstanding section 4.9(d) but subject to section 4.9(g), if after the Cancellation Date any Principal Jurisdiction Lost Policyholder (other than a policyholder specified in section 4.9(i)) shall cease to be a Lost Policyholder, Financial Services shall issue to the policyholder the number of Financial Services Shares the policyholder would have held if the policyholder's Financial Services Shares had not been cancelled and pay to the policyholder an amount equal to the sum of the

dividends that were declared in respect of the shares prior to cancellation of the shares and that would have been declared in respect of the shares if the shares had not been cancelled. Upon an issuance of Financial Services Shares pursuant to this section 4.9(f), no amount will be added to the stated capital account maintained by Financial Services in respect of the Financial Services Shares.

(g) In the event that any Financial Services Shares or cash to which a Lost Policyholder is entitled were delivered or transferred to a government or governmental agency, authority or official pursuant to escheat or abandoned or unclaimed property legislation, Financial Services shall not be obligated to issue shares or make a payment of cash under section 4.9(a) or section 4.9(f) to the policyholder. However, Financial Services shall transfer or pay, or cause to be transferred or paid, to the policyholder such Financial Services Shares or cash as Financial Services may recover, at the request of the Lost Policyholder and using commercially reasonable efforts, from the government or governmental agency, authority or official, including proceeds from the sale of Financial Services Shares and dividends.

(h) The number of Financial Services Shares issued to a Principal Jurisdiction Lost Policyholder pursuant to section 4.9(f) shall be adjusted to reflect any subdivision, consolidation, reclassification or other similar change to the Financial Services Shares which occurs prior to the Lost Policyholder Claim Date. If, prior to the Lost Policyholder Claim Date, any reorganization, amalgamation, arrangement, merger, statutory right to acquire or similar transaction has occurred involving Financial Services or to which Financial Services is a party and which results in the holders of Financial Services Shares receiving securities, cash or other property in exchange for, in conversion of, or in respect of their Financial Services Shares, then, upon an Eligible Policyholder ceasing to be a Principal Jurisdiction Lost Policyholder, he or she shall be issued the securities, property or cash substituted for the Financial Services Shares he or she was entitled to, or, in the discretion of Financial Services (or any successor company), the monetary equivalent thereof as at the day preceding the Lost Policyholder Claim Date.

(i) Policy Credits to be credited to a Lost Policyholder pursuant to Article 4 shall be credited as of the Effective Date in accordance with section 4.6(d).

(j) In order for an Eligible Policyholder who is a Lost Policyholder to cease to be a Lost Policyholder, the policyholder must take one or more of the following steps to confirm the current address at which he or she may be reached by mail:

(i) respond to a letter from Sun Life of Canada or Financial Services requesting confirmation of the current address;

(ii) contact Sun Life of Canada or Financial Services and confirm the current address;

(iii) inform Sun Life of Canada or Financial Services of a change of address; or

(iv) otherwise confirm the current address with Sun Life of Canada or Financial Services in a manner satisfactory to Sun Life of Canada or Financial Services, as applicable.

**4.10 Disputes and Additional Restrictions on Distribution of Benefits**

(a) Any dispute as to the identity of the Owner of an Eligible Policy or status of a Person as an Eligible Policyholder or the right to receive Demutualization Benefits or to vote at the Special Meeting shall be resolved in accordance with section 3.5 and such other reasonable procedures or criteria as may be established in good faith by Sun Life of Canada.

(b) Sun Life of Canada may, in its sole discretion, acting reasonably, withhold payment of Demutualization Benefits to any Eligible Policyholder if Sun Life of Canada becomes aware of or has knowledge of the fact that:

(i) another Person may have an interest in or rights to the benefits or claims the benefits, in addition to or in lieu of the policyholder;

(ii) an Eligible Policyholder may be subject to trust, fiduciary or other similar duties or obligations or is a nominee with respect to such benefits; or

(iii) a regulatory authority may impose terms and conditions on the distribution of the benefits and Sun Life of Canada has reasonable grounds to believe that the policyholder will not, may not, or does not intend to, comply with such duties, obligations, terms or conditions.

The benefits shall be paid to the policyholder or other Person or Persons entitled to the benefits when the question of entitlement to receive benefits has been resolved in a manner satisfactory to Sun Life of Canada, acting reasonably, or when the policyholder confirms with Sun Life of Canada in a manner that is satisfactory to Sun Life of Canada, acting reasonably, that the policyholder will comply with such duties, obligations, terms or conditions, as the case may be.

(c) Eligible Policyholders whose Residence on the Benefits Date is in a Secondary Jurisdiction (other than Minors and policyholders who make the Share Election in respect of all or part of the Financial Services Shares allocated to the policyholder) or in an Other Jurisdiction, must confirm their current address to Sun Life of Canada or inform Sun Life of Canada of a change of address, in a manner satisfactory to Sun Life of Canada, before receiving their Demutualization Benefits. Any such Eligible Policyholder who does not make such confirmation or inform Sun Life of Canada of the change prior to the Benefits Date will be deemed to be a Lost Policyholder.

### 4.11 Mandatory Sale for Policyholders in Other Jurisdictions and Minors

(a) Subject to section 4.7(b), Eligible Policyholders whose Residence is in an Other Jurisdiction on the Benefits Date or on the IPO Residency Date or who are Minors will be required to sell (the "Mandatory Sale") the Financial Services Shares issued to them ("Mandatory Sale Shares") in accordance with section 4.14.

(b) Notwithstanding section 4.11(a),

(i) if an Eligible Policyholder whose Financial Services Shares would be subject to the Mandatory Sale changes to a Residence in one of the Principal Jurisdictions or Secondary Jurisdictions or is not a Minor, as applicable, and notifies the Company, in a manner satisfactory to the Company on or prior to the Benefits Date, of the change of Residence or that the policyholder is not a Minor and that he or she wishes to keep his or her Financial Services Shares, the shares shall not be subject to the Mandatory Sale; and

(ii) subject to section 4.11(b)(i), if the Residence of any Eligible Policyholder whose Financial Services Shares are subject to the Mandatory Sale is in Canada on the IPO Residency Date, the shares will not be sold in the Initial Public Offering but will be purchased by Financial Services at the same time and on the same basis as the Buy-back Shares as provided for in section 4.14 (except that, in respect of section 4.14(e), they will be treated as Mandatory Sale Shares).

### 4.12 Cash Election for Policyholders in Principal Jurisdictions

(a) Subject to sections 4.6(c), 4.8(c), 4.12(b) and 4.14, each Eligible Policyholder whose Residence is in a Principal Jurisdiction on the Benefits Date, other than U.K. Pension Schemes and Minors, may elect (the "Cash Election"):

(i) in the case of Eligible Policyholders other than Designated Canadian Policyholders, to sell pursuant to section 4.14 the Financial Services Shares issuable to the policyholder; or

(ii) in the case of Designated Canadian Policyholders, to receive Demutualization Benefits in the form of a cash payment pursuant to Section 4.7(a).

(b) Such an Eligible Policyholder who was allocated fewer than 1,000 such Financial Services Shares may only make the Cash Election in respect of all of the shares. An Eligible Policyholder who was allocated 1,000 or more such Financial Services Shares may make the Cash Election in respect of all or part of the shares. An election pursuant to this section 4.12 shall be made by the Eligible Policyholder completing the relevant portions of the Choices Form, signing the form and returning the form as provided for in the Choices Circular. An election made by an Eligible Policyholder pursuant to this section shall be revocable at any time on or prior to the Benefits Date

by the policyholder mailing a new Choices Form to the same address to which the previous Choices Form was sent, for receipt by that date, or in any other manner that is satisfactory to the Company.

**4.13 Share Election for Policyholders in Secondary Jurisdictions and U.K. Pension Schemes**

(a) Each Eligible Policyholder whose Residence is in a Secondary Jurisdiction on the Benefits Date (other than Minors) or who is a U.K. Pension Scheme may elect (the "Share Election") to keep the Financial Services Shares allocated to the policyholder as provided for in section 4.13(b).

(b) Such an Eligible Policyholder who was allocated fewer than 1,000 Financial Services Shares may only elect to keep all of the shares. An Eligible Policyholder who was allocated 1,000 or more Financial Services Shares may elect to keep all or part of the shares. An election to keep Financial Services Shares pursuant to this section 4.13 shall be made by the Eligible Policyholder completing the relevant portions of the Choices Form, signing the form and returning the form as provided for in the Choices Circular. An election made by an Eligible Policyholder pursuant to this section shall be revocable at any time on or prior to the Benefits Date by the policyholder mailing a new Choices Form to the same address to which the previous Choices Form was sent, for receipt by that date, or in any other manner that is satisfactory to the Company.

(c) Subject to sections 4.7(b) and 4.14, if an Eligible Policyholder entitled to make the Share Election does not make the election in respect of some or all of the Financial Services Shares allocated to the policyholder, these shares will be deemed to be Electing Shares and will be sold to the Underwriters under the Underwriting Agreements.

**4.14 Initial Public Offering and Purchase of Buy-back Shares**

(a) Financial Services shall use its reasonable commercial efforts to complete the closing of the Initial Public Offering on the basis, and within the period, provided for in the Underwriting Agreements. Notwithstanding the foregoing and any other provision of this Conversion Plan, Financial Services shall have no obligation to complete the closing of the Initial Public Offering in the event that the Underwriting Agreements are terminated before the closing of the Initial Public Offering. The Initial Share Price shall be determined by Financial Services, Sun Life of Canada and the Underwriters according to their assessment of the market price for the Financial Services Shares. Financial Services may proceed with the Initial Public Offering whether or not the Initial Share Price is within the range of market values specified in the valuation report referred to in section 4.17.

(b) Subject to section 4.12(a)(ii), each Eligible Policyholder whose Residence on the IPO Residency Date is in Canada and (i) who makes the Cash Election in respect of Financial Services Shares or (ii) is a Minor shall sell the shares to Financial Services ("Buy-back Shares") at the price per share equal to the Initial Share Price. Subject to section 4.14(e), Buy-back Shares shall be purchased for cancellation by Financial Services after the Underwriters have waived any right to terminate the Underwriting Agreements and prior to the issue or sale of the IPO Shares. Notwithstanding any other provision of this Conversion Plan, Financial Services shall have no obligation to purchase the Buy-back Shares in the event that the Underwriting Agreements are terminated before the closing of the Initial Public Offering.

(c) Subject to section 4.14(e), following the purchase and cancellation of the Buy-back Shares, Financial Services shall issue and sell in the Initial Public Offering Financial Services Shares equal in number to the aggregate number of:

(i) the Buy-back Shares;

(ii) the Financial Services Shares allocated to Eligible Policyholders in respect of Eligible Policies to which Policy Credits will be credited pursuant to section 4.6; and

(iii) the Financial Services Shares allocated to Eligible Policyholders in respect of Eligible Policies for which payments of cash will be made under section 4.7

(collectively, "Primary Shares").

(d) Subject to sections 4.14(a) and 4.14(e), following the purchase and cancellation of the Buy-back Shares, the Electing Shares which are issued to Eligible Policyholders (other than Buy-back Shares) ("Resale Shares"), Primary Shares, Mandatory Sale Shares (other than Buy-back Shares) and any Additional Primary Shares shall be purchased by the Underwriters, conditional upon the closing of the Initial Public Offering, in the Initial Public Offering, at the Initial Share Price. Financial Services shall have the discretion to vary the manner in which the Resale Shares and Mandatory Sale Shares will be sold, provided that Financial Services determines that, in its reasonable judgment, the manner of sale is in the best interests of the affected Eligible Policyholders. The Buy-back Shares, the Resale Shares and the Mandatory Sale Shares shall be held by the Transfer Agent as nominee for the selling Eligible Policyholders from the Effective Date to the purchase of the shares by Financial Services or the sale of the shares in the Initial Public Offering, as the case may be. An Eligible Policyholder selling Resale Shares or Mandatory Sale Shares to the Underwriters shall be deemed:

(i) to appoint Financial Services as the policyholder's agent to effect the sale to the Underwriters on behalf of the policyholder in accordance with the Underwriting Agreements and to sign any documents and take any steps as are appropriate to transfer the shares to the Underwriters;

(ii) to agree that the shares will be sold at the Initial Share Price;

(iii) to represent and warrant to Financial Services, Sun Life of Canada and the Underwriters that the policyholder owns the shares and is able to sell them free of any Title Restriction; and

(iv) to represent and warrant to Financial Services, Sun Life of Canada and the Underwriters that the policyholder has full power, capacity and authority to sell the shares,

assuming, in the case of sections 4.14(d) (iii) and (iv), that the shares have been validly issued to the policyholder.

An Eligible Policyholder selling Buy-back Shares to Financial Services shall be deemed:

(v) to appoint Financial Services as the policyholder's agent to effect the sale to Financial Services on behalf of the policyholder and to sign any documents and take any steps as are appropriate to transfer the shares to Financial Services;

(vi) to agree that the shares will be sold at the Initial Share Price;

(vii) to represent and warrant to Financial Services that the policyholder owns the shares and is able to sell them free of any Title Restriction; and

(viii) to represent and warrant to Financial Services that the policyholder has full power, capacity and authorization to sell the shares,

assuming, in the case of sections 4.14(d) (vii) and (viii), that the shares have been validly issued to the policyholder.

(e) The number of IPO Shares shall be determined by negotiation between Financial Services and the Underwriters. Among other things, Financial Services will consider the U.S. Tax Limit, whether it wishes to issue and sell Additional Primary Shares in the Initial Public Offering and whether it wishes to grant the Underwriters an over-allotment option.

(i) In the event that the number of IPO Shares exceeds the aggregate number of Resale Shares, Primary Shares and Mandatory Sale Shares (other than Buy-back Shares), Financial Services will also issue and sell to the Underwriters in the Initial Public Offering Additional Primary Shares in the amount of the excess.

(ii) In the event that the Financial Services Board determines that the aggregate number of Resale Shares and Mandatory Sale Shares (other than Buy-back Shares) exceeds the U.S. Tax Limit or in the event that the aggregate number of Resale Shares, Primary Shares, Mandatory Sale Shares (other than Buy-back Shares) and any Additional Primary Shares which Financial Services wishes to issue and sell exceeds the number of IPO Shares, the Financial Services Shares to be sold in the Initial Public Offering shall be determined on the following basis:

(A) all of the Mandatory Sale Shares shall be sold;

(B) Financial Services may, at its option, if the Financial Services Board determines that to do so would be in the best interests of Financial Services, require that all Primary Shares relating to Financial Services Shares allocated to Eligible Policyholders in respect of Eligible Policies to which Policy Credits will be credited pursuant to section 4.6 and in respect of Eligible Policies for which a cash payment will be made pursuant to section 4.7(b), shall be sold;

(C) Financial Services may, at its option, if the Financial Services Board determines that to do so would be in the best interests of Financial Services, require that any Additional Primary Shares and any shares issuable pursuant to the exercise of an over-allotment option granted to the Underwriters in the Underwriting Agreements shall be sold;

(D) in the event that the aggregate number of Resale Shares and Mandatory Sale Shares (other than Buy-back Shares) exceeds the U.S. Tax Limit, the number of Resale Shares to be sold shall be reduced by requiring certain Eligible Policyholders to retain Resale Shares until the aggregate number of Resale Shares and Mandatory Sale Shares (other than Buy-back Shares) is reduced to the U.S. Tax Limit, with the Resale Shares to be retained based on the descending order of the size of allocation of Financial Services Shares, commencing with the largest allocation of Financial Services Shares;

(E) in the event that, notwithstanding any reduction pursuant to section 4.14(e)(ii)(D) of Resale Shares to be sold in the Initial Public Offering, the aggregate number of Resale Shares, Primary Shares, Mandatory Sale Shares (other than Buy-back Shares) and any Additional Primary Shares which Financial Services wishes to issue and sell still exceeds the number of IPO Shares, the remaining number of Resale Shares and Primary Shares to be sold shall be reduced by requiring certain Eligible Policyholders to retain Electing Shares until the aggregate number of Resale Shares, Primary Shares, Mandatory Sale Shares (other than Buy-back Shares) and any Additional Primary Shares which Financial Services wishes to issue and sell is reduced to the number of IPO Shares, with the Electing Shares to be retained based on the descending order of the size of the allocation of Financial Services Shares, commencing with the largest allocation of Financial Services Shares; and

(F) if there is more than one Eligible Policyholder with the smallest size of allocation to be retained pursuant to section 4.14(e)(ii)(D) or (E) and not all of the allocations of that size must be retained, the allocations to be retained will be chosen by lot.

Any Primary Shares in respect of which Financial Services did not exercise its option under section 4.14(e)(ii)(B) shall not be issued. Any Resale Shares not sold in the Initial Public Offering, and any Buy-back Shares the related Primary Shares of which were not sold in the Initial Public Offering, shall be retained by the relevant Eligible Policyholders and not sold pursuant to this section 4.14. Any Financial Services Shares allocated to Designated Canadian Policyholders, the related Primary Shares of which were not sold in the Initial Public Offering, shall be issued to the relevant Eligible Policyholder and no cash payment shall be made under section 4.7(a) in respect of the shares.

(f) Financial Services and Sun Life of Canada shall jointly and severally indemnify, defend and hold harmless each Eligible Policyholder who sells Resale Shares or Mandatory Sale Shares in the Initial Public Offering from and against any liability, cost or expense, whether under any applicable securities legislation or at common law, arising out of any Misrepresentation or alleged Misrepresentation or similar concept of misstatement, omission or alleged omission under applicable laws made in connection with the Initial Public Offering, provided that:

(i) if a claim is made against an Eligible Policyholder, the policyholder must provide reasonably prompt written notice of the claim to Financial Services and Sun Life of Canada;

(ii) Financial Services and Sun Life of Canada shall be entitled to assume control of the investigation, negotiation, settlement and defence of any claim for which the policyholder seeks indemnification; and

(iii) if Financial Services and Sun Life of Canada do not assume control as provided for in section 4.14(f)(ii), then they shall pay the expenses incurred by the policyholder to investigate, negotiate, settle and defend the claim.

In addition, Financial Services and Sun Life of Canada shall not seek, and shall use their reasonable commercial efforts to negotiate that the Underwriting Agreements provide that the Underwriters shall not seek, contribution from Eligible Policyholders whose Financial Services Shares are sold in the Initial Public Offering.

(g) Any proceeds to Financial Services from the sale of Additional Primary Shares in the Initial Public Offering may be retained by Financial Services to pay the expenses of the Initial Public Offering and for general corporate purposes. As soon as reasonably practicable after the closing of the Initial Public Offering, the proceeds to Financial Services from the sale of the Primary Shares, other than the Primary Shares relating to the Buy-back Shares, shall be used by Financial Services to invest in Sun Life of Canada.

(h) Subject to sections 4.9 and 4.10, Financial Services shall arrange for the proceeds from the purchase of the Buy-back Shares and from the sale of the Resale Shares and Mandatory Sale Shares (without deduction for underwriting fees but net of applicable Resale Shares Transfer Fees and withholding taxes, including withholding taxes attributable to payment of underwriting fees) to be paid to the relevant Eligible Policyholders as soon as reasonably practicable after the closing of the Initial Public Offering.

(i) Financial Services shall use its reasonable commercial efforts to arrange for the listing of the Financial Services Shares on The Toronto Stock Exchange, the Montreal Exchange (except as provided below), the New York Stock Exchange, the London Stock Exchange and the Philippine Stock Exchange (collectively, the "Stock Exchanges") on the first trading day after the Effective Date. Financial Services shall use its reasonable commercial efforts to keep the Financial Services Shares listed on the Stock Exchanges for at least the remainder of the two years after the Effective Date. Such listings and efforts shall satisfy any duty Sun Life of Canada or Financial Services may have to ensure that Eligible Policyholders who receive Financial Services Shares will be able to sell the shares on a public market. If a proposed reorganization of Canadian stock exchanges occurs before the Effective Date, with the result that equity shares of large issuers will no longer be listed on the Montreal Exchange, the Financial Services Shares will not be listed on that exchange and that exchange will not be a "Stock Exchange".

(j) Subject to receipt of satisfactory regulatory approvals and the feasibility of offering the service on a commercially reasonable basis in each jurisdiction, as determined by Financial Services, acting reasonably, Financial Services shall arrange for the Shareholding Nominees to provide a service (the "Share Selling Service") to assist Eligible Policyholders to whom Financial Services Shares are issued to sell their Financial Services Shares. Financial Services may decide that the Share Selling Service in certain jurisdictions will only be available to policyholders who hold their shares through the Shareholding Nominee. The Share Selling Service shall be available from the thirtieth day after the date scheduled for the closing of the Initial Public Offering or from such other date as may be selected by Financial Services. The Share Selling Service may only be terminated in any jurisdiction upon 90 days' written notice to the address in the Records of the Company of all persons who are eligible to use the Share Selling Service in that jurisdiction. Under the Share Selling Service, an Eligible Policyholder may sell Financial Services Shares by instructing the Shareholding Nominee to do so. The Shareholding Nominee will arrange for the sale of shares through a dealer on one of the Stock Exchanges.

### 4.15 Alternative Arrangements

Notwithstanding any other provision of this Conversion Plan, in the event that the closing of the Initial Public Offering does not occur within the period provided for in the Underwriting Agreements (or by such



SL-0269

later date as the Financial Services Board may in its discretion agree to in accordance with the Underwriting Agreements), then the following rules shall govern the manner of the distribution of the Demutualization Benefits.

(a) Financial Services shall continue to use its reasonable commercial efforts to keep the Financial Services Shares listed and posted for trading on the Stock Exchanges in accordance with section 4.14(i).

(b) Cash Elections shall be cancelled and Financial Services shall issue to Designated Canadian Policyholders the Financial Services Shares allocated to such policyholders in respect of which the Cash Election was made. Eligible Policyholders entitled to make the Share Election who did not make the election in respect of some or all of the Financial Services Shares allocated to them shall not be entitled to a cash payment in respect of those shares but rather shall retain those shares. Financial Services shall instruct the Transfer Agent to transfer the Buy-back Shares and the Resale Shares to the applicable Shareholding Nominee in the relevant jurisdiction on behalf of the Eligible Policyholders or, in jurisdictions where there is not a Shareholding Nominee, instruct the Transfer Agent or the applicable Co-Transfer Agent to register the shares in the names of the policyholders and issue a share certificate to the policyholders.

(c) Policy Credits will be credited and cash will be paid in accordance with sections 4.6 and 4.7(b).

(d) Promptly following the time scheduled for the closing of the Initial Public Offering, Financial Services shall arrange for the Mandatory Sale Shares to be sold on the Stock Exchanges through a broker. Such sale of Financial Services Shares shall be on the following basis:

(i) the Mandatory Sale Shares shall be sold as soon as reasonably practicable and, in any event, within 60 days from the day on which the closing of the Initial Public Offering was scheduled to occur;

(ii) reasonable commercial efforts shall be made to sell the shares at the best available prices; and

(iii) the broker making the sales shall exercise its discretion in respect of the timing of each sale, the amount of shares to be sold under each sale and the Stock Exchange over which each sale will be made.

After all of the Mandatory Sale Shares have been sold, Financial Services shall determine the price payable to Eligible Policyholders for each share sold by dividing the total proceeds from the sale of the shares by the number of the shares. The payments to Eligible Policyholders shall be made by cheque as soon as reasonably practicable after calculation of the price payable for each share. The payments shall be net of applicable withholding tax and all reasonable expenses of the sale, including brokerage commissions.

### 4.16 Effect of Additional Share Issuances on Access to Financial Markets

The obligation of Financial Services to list the Financial Services Shares on the Stock Exchanges will not be affected by the issuance of additional Financial Services Shares or any other shares in the capital of Financial Services during the two years following the Effective Date.

### 4.17 Valuation of the Company

(a) The Company retained Morgan Stanley & Co. Incorporated and RBC Dominion Securities Inc. to prepare a valuation of the Company. Their report, which is attached as Exhibit C, sets out the estimated range of market values of the Company on the basis that it is the same as the range of estimated public equity market values for Financial Services based solely on estimated prices at which the Financial Services Shares could have been expected to be offered as of September 24, 1999 in an initial public offering conducted in a manner consistent with the Initial Public Offering, as if the Effective Date were September 24, 1999.

(b) The actual public equity market value of Financial Services as of the Effective Date will be determined through the Initial Public Offering and this will represent the aggregate value of Financial Services at that date. All of that value will be distributed to Eligible Policyholders pursuant to this Conversion Plan as Demutualization Benefits.

## ARTICLE 5.

## RESTRUCTURING AND OPERATION OF PARTICIPATING ACCOUNT

### 5.1 Interpretation

(a) As used in this Article 5, the following terms and expressions shall have the following meanings:

**"Continuing Branch"** means, as the context requires:

(a) the business units of the Post-Conversion Company that transact insurance in Canada and Bermuda (collectively, the **"Canadian Branch"**);

(b) the business unit of the Post-Conversion Company that transacts insurance in the United States of America (the **"U.S. Branch"**); and

(c) the business unit of the Post-Conversion Company that, prior to the Conversion, transacted insurance within the Philippines (the **"Philippines Branch"**).

**"Deposit Liabilities"** means, in respect of a Territorial Participating Account, the liabilities for amounts on deposit with the Company in respect of Pre-Conversion Individual Participating Policies.

**"Individual Participating Asset Segment"** means, in respect of each Territorial Participating Account, prior to the Effective Time, the assets within the account which were allocated by the Company in respect of Pre-Conversion Individual Participating Liabilities and, from and after the Effective Time, (I) in respect of the Territorial Participating Account maintained in respect of each of the Canadian Branch, the U.S. Branch and the Philippines Branch, the assets within the account which are allocated by the Post-Conversion Company in the manner contemplated by this Article 5 in respect of Pre-Conversion Individual Participating Policies and Post-Conversion Individual Participating Policies; and (II) in respect of the Territorial Participating Account maintained in respect of the Philippines Branch, that portion of the assets held by Sun Life of Canada (Philippines), Inc., a Subsidiary of the Post-Conversion Company, which are notionally allocated in the manner contemplated by this Article 5 in respect of Pre-Conversion Individual Participating Policies, Post-Conversion Individual Participating Policies, if any, and individual participating policies issued by Sun Life of Canada (Philippines), Inc.

**"Operating Rules"** means the rules contained in Part 1 and Part 2 of Exhibit D relating to the operation of Pre-Conversion Participating Sub-Accounts.

**"Post-Conversion Individual Participating Policy"** means, at any time, a Participating Policy other than a Group Insurance Policy or a Pension Policy, for which a signed application was dated on or after the Effective Date and which was issued by the Post-Conversion Company and which remains In Force at such time.

**"Post-Conversion Individual Participating Sub-Account"** has the meaning specified in section 5.2(c).

**"Pre-Conversion Ancillary Participating Sub-Fund"** has the meaning specified in section 5.2(d)(II).

**"Pre-Conversion Individual Participating Adjusted Liabilities"** means, in respect of a Territorial Participating Account, the Pre-Conversion Individual Participating Liabilities in such account, other than: (I) provisions for adverse deviation in respect of the Policies in the Pre-Conversion Individual Participating Closed Sub-Fund; (II) Deposit Liabilities; and (III) liabilities in respect of Market Conduct Settlements.

**"Pre-Conversion Individual Participating Closed Sub-Fund"** has the meaning specified in section 5.2(d)(I).

**"Pre-Conversion Individual Participating Liabilities"** means, in respect of a Territorial Participating Account, that portion of Pre-Conversion Participating Liabilities in the account referable to Pre-Conversion Individual Participating Policies.

**"Pre-Conversion Individual Participating Policy"** means, at any time, a Pre-Conversion Participating Policy other than a Group Insurance Policy, a Pension Policy, a Policy constituted by a certificate issued to an insured pursuant to a Group Insurance Policy or a Pension Policy, or a Policy not issued by a Continuing Branch, notwithstanding that a Continuing Branch may administer it.

**"Pre-Conversion Participating Liabilities"** means, in respect of a Territorial Participating Account, all liabilities in respect of Pre-Conversion Participating Policies in the account.

**"Pre-Conversion Participating Policy"** means, at any time, a Participating Policy In Force and recorded in the Worldwide Participating Account at the Effective Time, or in respect of which a signed application was dated prior to the Effective Time and the Policy was issued by the Post-Conversion Company, and which remains In Force at such time.

**"Pre-Conversion Participating Sub-Account"** has the meaning specified in section 5.2(b).

**"Reporting Period"** means, in respect of the Post-Conversion Company, a three-month period ending on any of March 31, June 30, September 30 or December 31 in any year, or such other period as may be determined by the Post-Conversion Company.

**"Seed Capital"** has the meaning specified in section 5.5(a).

**"Shareholders' Account"** has the meaning specified in section 5.2(e).

**"Territorial Participating Account"** means, in respect of a Continuing Branch, a sub-account of the Worldwide Participating Account maintained by Sun Life of Canada in respect of Participating Policies issued or administered by the Continuing Branch and, in the case of the Canadian Branch, also includes Participating Policies issued in Malta.

**"Worldwide Participating Account"** means, prior to the Effective Time, the participating account of the Company and, from and after the Effective Time, the participating account of the Post-Conversion Company, in each case as maintained pursuant to section 456 of the ICA.

(b) Unless otherwise specified, for the purposes of any provision of this Article 5 which requires assets and liabilities to be valued, such assets and liabilities shall be valued in accordance with generally accepted accounting principles in Canada, and for the purposes of any provision which contemplates or requires actuarial liabilities to be valued, such amounts shall be valued using methods and assumptions which are consistent with generally accepted actuarial practice in Canada, with such changes as may be determined by the Superintendent, and any additional directions that may be made by the Superintendent.

**5.2 Establishment of Sub-Accounts**

As of the Effective Time, in accordance with section 2.2, and, in particular, after giving effect to completed transfers contemplated by sections 2.2(a)(i) and 6.3(b) and (c), the Post-Conversion Company shall:

(a) continue to maintain the Worldwide Participating Account and each Territorial Participating Account;

(b) establish and maintain, within the Territorial Participating Account of each Continuing Branch, a separate sub-account (a "Pre-Conversion Participating Sub-Account") in respect of all Pre-Conversion Participating Policies in the Territorial Participating Account;

(c) establish and maintain, within the Territorial Participating Account of each Continuing Branch, a separate sub-account (a "Post-Conversion Individual Participating Sub-Account") in respect of all Post-Conversion Individual Participating Policies in the Territorial Participating Account;

(d) establish and maintain, within the Pre-Conversion Participating Sub-Account in each Territorial Participating Account, the following sub-funds:

(i) a sub-fund in respect of all Pre-Conversion Individual Participating Policies in the Territorial Participating Account (the "Pre-Conversion Individual Participating Closed Sub-Fund"); and

(ii) a sub-fund (the "Pre-Conversion Ancillary Participating Sub-Fund") in respect of the following in each Territorial Participating Account:

(A) the provisions for adverse deviation in respect of the policies in the Pre-Conversion Individual Participating Closed Sub-Fund;

(B) Deposit Liabilities; and

(C) Pre-Conversion Participating Policies that are not Pre-Conversion Individual Participating Policies;

(e) establish and maintain an account from which, subject to the ICA, payments can be made to the Post-Conversion Company's shareholders (the "Shareholders' Account"), which shall include accounts maintained prior to the Effective Time by the Company in respect of its Policies which are not Participating Policies;

(f) maintain separate accounting records in respect of the Worldwide Participating Account, each Territorial Participating Account and each of the foregoing sub-accounts and sub-funds thereof;

(g) make the allocations of policies, assets and liabilities from the Worldwide Participating Account specified in sections 5.3 and 5.4; and

(h) subject to section 5.10(d), transfer from the Worldwide Participating Account to the Shareholders' Account all assets in the Worldwide Participating Account immediately prior to the Effective Time that have not been allocated in accordance with section 5.4.

Nothing herein shall prevent the Post-Conversion Company from establishing additional participating accounts or from establishing further separate sub-accounts or sub-funds within each Pre-Conversion Individual Participating Closed Sub-Fund or Pre-Conversion Ancillary Participating Sub-Fund or within each Post-Conversion Individual Participating Sub-Account.

**5.3 Recording of Policies and Allocation of Liabilities as of the Effective Date**

As of the Effective Date:

(a) (i) all Pre-Conversion Individual Participating Policies recorded in a Territorial Participating Fund shall be recorded in the Pre-Conversion Individual Participating Closed Sub-Fund of the Territorial Participating Account; and

(ii) all Pre-Conversion Participating Policies recorded in a Territorial Participating Account, other than Pre-Conversion Individual Participating Policies, shall be recorded in the Pre-Conversion Ancillary Participating Sub-Fund of the Territorial Participating Account;

(b) the following allocations shall be made from the Worldwide Participating Account to the Pre-Conversion Participating Sub-Account of each Territorial Participating Account:

(i) Pre-Conversion Individual Participating Adjusted Liabilities in the Territorial Participating Account shall be allocated to the Pre-Conversion Individual Participating Closed Sub-Fund of the Territorial Participating Account; and

(ii) Pre-Conversion Participating Liabilities in a Territorial Participating Account, other than Pre-Conversion Individual Participating Adjusted Liabilities and liabilities in respect of Market Conduct Settlements, shall be allocated to the Pre-Conversion Ancillary Participating Sub-Fund of the Territorial Participating Account; and

(c) liabilities in respect of Market Conduct Settlements shall be allocated to the Shareholders' Account.

**5.4 Allocation of Assets to the Pre-Conversion Participating Sub-Accounts as of the Effective Date**

(a) As of the Effective Date, the following allocations shall be made from the Worldwide Participating Account in respect of the Pre-Conversion Participating Sub-Account of each Territorial Participating Account:

(i) assets in the Individual Participating Asset Segment of the Territorial Participating Account which are loans on the security of Policies shall be allocated to the Pre-Conversion Individual Participating Closed Sub-Fund of the Territorial Participating Account;

(ii) assets in the Individual Participating Asset Segment of the Territorial Participating Account equal to the excess of the Pre-Conversion Individual Participating Adjusted Liabilities in the Territorial Participating Account over the value of the assets allocated pursuant to section 5.4(a)(i) shall be allocated to the Pre-Conversion Individual Participating Closed Sub-Fund of the Territorial Participating Account;

(iii) assets in the Individual Participating Asset Segment equal to the Pre-Conversion Individual Participating Liabilities in the Territorial Participating Account, other than Pre-Conversion Individual Participating Adjusted Liabilities and liabilities in respect of Market Conduct Settlements, shall be allocated to the Pre-Conversion Ancillary Participating Sub-Fund of the Territorial Participating Account; and

(iv) assets within the Territorial Participating Account which were allocated by the Company prior to the Effective Time in respect of the Pre-Conversion Participating Liabilities other than Pre-Conversion Individual Participating Liabilities of the Territorial Participating Account, shall be allocated to the Pre-Conversion Ancillary Participating Sub-Fund of the Territorial Participating Account.

(b) Pre-Conversion Participating Liabilities shall be calculated in accordance with methods and assumptions which are consistent with those used in the calculation of the Company's actuarial liabilities as at the last day of the Reporting Period immediately prior to the Effective Date. The allocations of assets specified in this section 5.4 are expected to be adequate to meet contractual obligations under the policies in respect of which the Pre-Conversion Participating Sub-Accounts of each Territorial Participating Account is maintained, and to meet the reasonable expectations of the holders of those policies in respect of future dividends and other non-guaranteed policy benefits. Part 4 of Exhibit D sets out an explanation of the basis for this expectation.

(c) Based upon the foregoing, it is estimated that, if the Effective Date had occurred on December 31, 1998, after giving effect to the allocations specified in this section 5.4, assets with an approximate value of Can.$3.5 billion would have been transferred to the Shareholders' Account pursuant to section 5.2(h).

**5.5 Transfer of Assets from the Shareholders' Account to Certain Post-Conversion Sub-Accounts as of the Effective Date**

(a) On completion of the allocations specified in section 5.3 and section 5.4, as of the Effective Date, the Post-Conversion Company shall transfer from the Shareholders' Account, assets with an approximate value of Can.$40 million to the Post-Conversion Individual Participating Sub-Account of the Territorial Participating Account maintained in connection with the Canadian Branch, and assets with an approximate value of U.S.$30 million to the Post-Conversion Individual Participating Sub-Account of the Territorial Participating Account maintained in connection with the U.S. Branch ("collectively, the Seed Capital").

(b) The Seed Capital is expected to be adequate to support the Post-Conversion Individual Participating Policies which the Post-Conversion Company expects to issue for at least five years following the Conversion. The aggregate surplus in the Post-Conversion Individual Participating Sub-Accounts at the end of the five-year period following the Effective Date is expected by the Company to be approximately Can.$57 million. In this regard, transfers of assets specified in section 5.9(d) may be made.

**5.6 Operating Rules for Pre-Conversion Participating Sub-Accounts**

With effect from and after the Effective Date, the Post-Conversion Company shall operate the Pre-Conversion Participating Sub-Accounts in accordance with the Operating Rules and the applicable provisions of the ICA. The Operating Rules may be revised by the Post-Conversion Company with the prior approval of the Superintendent and any other regulatory authorities whose approval may be required by applicable law. To the extent that any proposed revision to the Operating Rules would affect the Pre-Conversion Individual Participating Closed Sub-Fund in the Territorial Participating Account maintained in connection with the U.S. Branch, such revision shall require the prior approval of the Michigan Commissioner.

**5.7 Transfers and Pre-Conversion Participating Sub-Accounts**

Except as permitted by section 462(b) of the ICA or the Operating Rules, transfers of assets from any Pre-Conversion Participating Sub-Account shall be limited on the basis provided for in this section 5.7.

(a) No transfers shall be made from any Pre-Conversion Individual Participating Closed Sub-Fund, except as provided in section 5.11.

(b) If, on review by the Appointed Actuary of financial information in respect of any Reporting Period, the Appointed Actuary determines that the value of the Pre-Conversion Individual Participating Adjusted Liabilities in a Pre-Conversion Individual Participating Closed Sub-Fund of a Territorial Participating Account exceeds the value of the assets allocated to such sub-fund then, to the extent that there are assets in the Pre-Conversion Ancillary Participating Sub-Fund of the Territorial Participating Account which exceed the liabilities in such sub-fund, such assets shall be transferred to the Pre-Conversion Individual Participating Closed Sub-Fund to the extent necessary to eliminate the deficit in the Pre-Conversion Individual Participating Closed Sub-Fund as of the end of that Reporting Period.

(c) Subject to section 5.7(b), if as of the end of any Reporting Period, there is an excess of assets over liabilities in a Pre-Conversion Ancillary Participating Sub-Fund of a Territorial Participating Account, then, subject to the approval of the Appointed Actuary, assets with a value equal to such surplus may be transferred therefrom to the Shareholders' Account. The actual amount of assets which the Company will transfer from the Pre-Conversion Ancillary Participating Sub-Funds to the Shareholders' Account at the end of any Reporting Period will not be known precisely until financial statements are available for such Reporting Period and will be dependent on a number of factors. However, based upon the financial statements of the Company for the year ended December 31, 1998 and upon the expected future experience of the Post-Conversion Company, the amount which the Company will transfer during the first twelve months after the Effective Date is Can.$52 million, after tax. In subsequent years, the amount will vary with experience. By the twenty-fifth year, the annual amount so transferred is expected to be about Can.$60 million, and thereafter declines.

(d) Notwithstanding section 462(b) of the ICA in the case of the Pre-Conversion Individual Closed Sub-Fund maintained in connection with the U.S. Branch, Sun Life of Canada may not reinsure a material part of the fund without the prior approval of the Michigan Commissioner.

For greater certainty, nothing in this section 5.7 shall be deemed to limit the payment of amounts from any Pre-Conversion Participating Sub-Account in accordance with the Operating Rules.

**5.8 Transfers from Post-Conversion Individual Participating Sub-Accounts**

(a) Assets may be transferred from any Post-Conversion Individual Participating Sub-Account, or any other account that may be established by the Post-Conversion Company in respect of Participating Policies issued by it, as permitted by the ICA. For purposes of such transfers, the "portion of the profits of the participating account" specified in section 461 of the ICA shall not include the profits attributable to Pre-Conversion Individual Participating Policies.

(b) Subject to the limitation specified in section 5.8(c), as of the end of any Reporting Period that is at least five years after the Effective Date, the Post-Conversion Company may, from time to time, subject in each instance to the prior approval of the Superintendent and any other regulatory authorities whose approval may be required by applicable law, transfer assets from the Post-Conversion Individual Participating Sub-Account of a Territorial Participating Account to the Shareholders' Account if the Appointed Actuary determines that such assets are no longer required to support the Post-Conversion Individual Participating Policies in the Territorial Participating Account.

(c) The amount of Seed Capital allocated to a Territorial Participating Account shall be deemed to be adjusted daily to reflect any additional amount transferred to the Post-Conversion Individual Participating Sub-Account of the Territorial Participating Account from the Shareholders' Account or any amount transferred out of the Post-Conversion Individual Participating Sub-Account as permitted by this Conversion Plan, and the adjusted daily amount shall be deemed to accrue interest at a rate

equal to the daily after-tax investment return earned on the Individual Participating Asset Segment of that Territorial Participating Account (such amount to be known, at any time, as the "Notional Amount"); the amount of assets proposed to be transferred from a Post-Conversion Individual Participating Sub-Account at any time in accordance with section 5.8(b) may not exceed the Notional Amount calculated in respect of that sub-account at the time of the proposed transfer.

**5.9 Mandatory Transfers from the Shareholders' Account**

(a) If, on review by the Appointed Actuary of financial information in respect of any Reporting Period, the Appointed Actuary determines that a Pre-Conversion Ancillary Participating Sub-Fund of a Territorial Participating Account does not have available assets with sufficient value to transfer to the corresponding Pre-Conversion Individual Participating Closed Sub-Fund of that Territorial Participating Account in order to cover a deficit as required by section 5.7(b), then additional assets with a value equal to the remaining balance of such deficit shall be transferred from the Shareholders' Account to the Pre-Conversion Individual Participating Closed Sub-Fund as of the end of that Reporting Period.

(b) If, on review by the Appointed Actuary of financial information in respect of any Reporting Period, the Appointed Actuary determines that the value of the liabilities in the Pre-Conversion Ancillary Participating Sub-Fund of a Territorial Participating Account exceeds the value of the assets allocated to such Pre-Conversion Ancillary Participating Sub-Fund, then assets with a value equal to such deficit shall be transferred to the Pre-Conversion Ancillary Participating Sub-Fund from the Shareholders' Account as of the end of that Reporting Period.

(c) If, on review by the Appointed Actuary of financial information in respect of any Reporting Period, the Appointed Actuary determines that the satisfaction of claims under Market Conduct Settlements results in an increase in Pre-Conversion Individual Participating Adjusted Liabilities in any Territorial Participating Account, assets with a value equal to such increase shall be transferred to the Pre-Conversion Individual Participating Closed Sub-Fund from the Shareholders' Account as of the end of that Reporting Period.

(d) If, on review by the Appointed Actuary of financial information in respect of any Reporting Period that is at, or within five years after, the Effective Date, the Appointed Actuary determines that the value of the liabilities in a Post-Conversion Individual Participating Sub-Account exceeds the value of the assets in that sub-account, then assets with a value equal to such deficit shall be transferred to that sub-account from the Shareholders' Account as of the end of that Reporting Period.

**5.10 Provisions in Respect of Subsidiaries of the Post-Conversion Company**

(a) Pursuant to the indemnity reinsurance arrangement specified in section 6.3(a), Sun Life of Canada (Philippines), Inc. shall agree to manage the Pre-Conversion Participating Policies of the Philippines Branch in all respects in accordance with the provisions of this Article 5 of this Conversion Plan.

(b) Notwithstanding the foregoing, the Post-Conversion Company is bound by the provisions of this Conversion Plan in all respects with regard to the Pre-Conversion Participating Policies of the Philippines Branch, except that the Post-Conversion Company shall be deemed to have complied with the requirements hereof to the extent that Sun Life of Canada (Philippines), Inc. complies therewith. In the event of the termination of the agreement specified in section 6.3(a), the Post-Conversion Company shall ensure that the Territorial Participating Account maintained in respect of the Philippines Branch and the Shareholders' Account properly reflect all Policies, liabilities and assets of the Philippines Branch in accordance with the provisions of this Conversion Plan.

(c) For greater certainty, the foregoing shall apply to any such Pre-Conversion Participating Policies that may be novated to Sun Life of Canada (Philippines), Inc. in accordance with Philippines law.

(d) Participating Policies which are transferred to subsidiaries of the Company on or before the Effective Date in accordance with sections 6.3(b) and 6.3(c) shall not be included in the Worldwide Participating Account. In the event that the transfer of a business of the Company specified in section 6.3(b) or 6.3(c) shall not be completed on or before the Effective Date, the

Post-Conversion Company shall continue to record the Participating Policies forming part of such business in the Worldwide Participating Account and, in connection therewith, shall establish such accounts and make such allocations of assets and liabilities as the Appointed Actuary, with the approval of the Superintendent, shall deem necessary and appropriate pending the completion of the transfer of business, and which, in any event, shall be expected to be adequate to meet contractual obligations under such policies and to meet reasonable expectations of the holders of those policies in respect of future dividends and other non-guaranteed policy benefits.

**5.11 Amalgamation of Pre-Conversion and Post-Conversion Individual Participating Sub-Accounts**

(a) Subject to section 5.11(b), the Post-Conversion Company, with the prior approval of the Superintendent, of any other regulatory authority whose approval may be required by applicable law and, in the case of the Territorial Participating Account maintained in connection with the U.S. Branch, of the Michigan Commissioner, may cease to maintain such Pre-Conversion Individual Participating Closed Sub-Fund as a separate sub-fund of the applicable Pre-Conversion Participating Sub-Account in the Territorial Participating Account and may amalgamate that Pre-Conversion Individual Participating Closed Sub-Fund with the Post-Conversion Individual Participating Sub-Account in the Territorial Participating Account if in the opinion of the Appointed Actuary:

(i) the cost to the Post-Conversion Company of maintaining a Pre-Conversion Individual Participating Closed Sub-Fund in a Territorial Participating Account outweighs the benefit to the holders of the Policies included in such sub-fund; or

(ii) it is otherwise appropriate to do so.

(b) Notwithstanding section 5.11(a), the Post-Conversion Company may cease to maintain a Pre-Conversion Individual Participating Closed Sub-Fund in a Territorial Participating Account as a separate sub-fund of the Pre-Conversion Participating Sub-Account in the Territorial Participating Account and may amalgamate the Pre-Conversion Individual Participating Closed Sub-Fund with the Post-Conversion Individual Participating Sub-Account in the Territorial Participating Account, on terms to be approved by the Superintendent, any other regulatory authority whose approval may be required by applicable law and, in the case of the Territorial Participating Account maintained in connection with the U.S. Branch, the Michigan Commissioner, when the number of Pre-Conversion Individual Participating Policies in the sub-fund falls below:

(i) in the case of the Pre-Conversion Individual Participating Closed Sub-Fund maintained in the Territorial Participating Account in respect of the Canadian Branch, 25,000 policies;

(ii) in the case of the Pre-Conversion Individual Participating Closed Sub-Fund maintained in the Territorial Participating Account in respect of the U.S. Branch, 10,000 policies; or

(iii) in the case of the Pre-Conversion Individual Participating Closed Sub-Fund maintained in the Territorial Participating Account in respect of the Philippines Branch, 15,000 policies.

(c) Upon any amalgamation permitted by this section 5.11, the Pre-Conversion Individual Participating Liabilities in the Territorial Participating Account and an amount of assets equal to the value of such liabilities shall be transferred to the Post-Conversion Individual Participating Sub-Account of the Territorial Participating Account. In any such case, section 5.8(a) of this Article 5 shall continue to apply following the amalgamation.

**5.12 Dividend Policy**

Dividends on Pre-Conversion Individual Participating Policies and Post-Conversion Individual Participating Policies shall be paid when declared by the Board from time to time, at its discretion, in accordance with the dividend policy established with effect on and from the Effective Date, as amended from time to time. During the first five years following the Effective Date, the dividend policy that will apply to Pre-Conversion Individual Participating Policies and Post-Conversion Individual Participating Policies is set forth in Part 3 of Exhibit D.

**5.13 Reports by the Appointed Actuary**

The Appointed Actuary shall provide the Superintendent from time to time with such reports and opinions as the Superintendent may require relating to the compliance by the Post-Conversion Company with this Conversion Plan. The Appointed Actuary shall also provide the Michigan Commissioner from time to time with such reports and opinions as are provided to the Superintendent, as well as any additional reports and opinions as the Michigan Commissioner may require relating to the compliance by the Post-Conversion Company with this Conversion Plan, in each case relating to the Territorial Participating Account maintained in respect of the U.S. Branch.

**5.14 Amendments to Article 5**

Financial Services and the Company may amend this Article 5 at any time with the prior approval of the Superintendent, the Michigan Commissioner (to the extent that the proposed amendment may have any effect on the policyholders resident in the United States), and any regulatory authorities whose approval may be required by applicable law.

## ARTICLE 6.

## FINANCIAL SERVICES AND CORPORATE REORGANIZATION

**6.1 Creation of Financial Services**

Sun Life of Canada has incorporated Financial Services under the ICA as a Life Company and Financial Services has issued to Sun Life of Canada one Financial Services Share and preferred shares of Financial Services for an aggregate consideration of Can.$10,000,001. The sections of the by-law of Financial Services providing for the issuance of Financial Services Shares are attached as Exhibit E. Pursuant to section 2.2(a), at the Effective Time, Sun Life of Canada shall become a wholly-owned Subsidiary of Financial Services.

**6.2 Proposed Activities of Financial Services**

Financial Services currently proposes to hold assets which include all of the Common Shares and, directly or indirectly, the shares of Sun Life of Canada's Subsidiaries and the voting shares or other ownership interests of such other entities as may be permitted for Financial Services to hold under the ICA or other applicable legislation. Financial Services may also raise capital, borrow money and provide services to its Subsidiaries. Financial Services may carry on other activities as the Financial Services Board may approve from time to time and as may be permitted pursuant to the ICA or other applicable law. Financial Services has no present intention to issue insurance policies or otherwise to directly insure risks.

**6.3 Corporate Reorganization Related to the Conversion**

(a) Prior to, or as soon as reasonably practicable after, the Conversion, but subject to receipt of satisfactory regulatory approval, the assets of the Philippines Branch (other than its policies) shall be transferred to Sun Life of Canada (Philippines), Inc., a wholly-owned Subsidiary of Sun Life of Canada, and the policies which have been issued by that branch shall be reinsured by Sun Life of Canada (Philippines), Inc., pursuant to indemnity reinsurance.

(b) Simultaneously with, or as soon as reasonably practicable after, the Conversion, but subject to receipt of satisfactory regulatory and court approvals in all relevant jurisdictions, either:

(i) the businesses of the Company conducted in the Republic of Ireland and the Channel Islands shall be transferred to the U.K. Company pursuant to schemes under the applicable insurance regulatory regimes; or

(ii) the assets of those businesses shall be transferred to the U.K. Company and the policies issued by those businesses shall be reinsured by the U.K. Company pursuant to indemnity reinsurance.

(c) Simultaneously with, or as soon as practicable after, the Conversion, but subject to receipt of satisfactory regulatory and court approval, the business of the Company conducted through the

Company's Hong Kong branch shall be transferred pursuant to a scheme under section 24 of the Insurance Companies Ordinance (Chapter 41 of the Laws of Hong Kong) to Sun Life of Canada (International) Limited, a wholly-owned Subsidiary of Sun Life of Canada.

## ARTICLE 7.

## CONDITIONS

### 7.1 Effectiveness of Conversion Plan

The effectiveness of this Conversion Plan is subject to the following conditions:

(a) this Conversion Plan, the amended and restated by-laws of Sun Life of Canada, as set out in Exhibit A, and the making of an application to the Minister for approval of this Conversion Plan and the issuance of the Letters Patent of Conversion shall have been approved by a special resolution of not less than two-thirds of the votes cast by the Eligible Policyholders voting on the resolution in person or by proxy at the Special Meeting;

(b) the following regulatory approvals shall have been obtained:

(i) the Minister and the Superintendent shall have provided all necessary approvals for or in respect of the U.K. 2C Scheme;

(ii) the High Court of Justice in England shall have made an Order under section 49 of and Schedule 2C to the *Insurance Companies Act 1982* sanctioning the U.K. 2C Scheme;

(iii) following a public hearing, this Conversion Plan shall have been approved by the Michigan Commissioner under section 500.5915 of the Michigan Insurance Code; and

(iv) this Conversion Plan shall have been approved by the Minister under section 237(1) of the ICA and the Minister shall have issued the Letters Patent of Conversion to the Company under section 237(1) of the ICA; and

(c) the Underwriting Agreements shall have been entered into in respect of the Initial Public Offering.

## ARTICLE 8.

## ADDITIONAL PROVISIONS

### 8.1 Notices

If Sun Life of Canada and/or Financial Services complies substantially and in good faith with the terms of this Conversion Plan in respect of the giving of any required notice to policyholders, its failure in any case to give the notice to any Person entitled thereto shall not impair the validity of the actions and proceedings taken pursuant to this Conversion Plan or entitle the Person to any injunctive or other equitable relief with respect thereto.

### 8.2 Authority to Remedy Errors

(a) Subject to the terms of this Conversion Plan, Financial Services may issue additional Financial Services Shares and Sun Life of Canada or Financial Services may take any other action it deems appropriate to remedy errors or miscalculations made in connection with this Conversion Plan, including errors or miscalculations in respect of the allocation or distribution of Demutualization Benefits and the restructuring of the accounts provided for in Article 5.

(b) Following prior written notice to the Superintendent and the Michigan Commissioner, Sun Life of Canada or Financial Services may make modifications to this Conversion Plan of a formal, minor or technical nature or to correct or rectify any ambiguities, defective provisions or omissions provided that, in the opinion of the Board, the rights of Eligible Policyholders are not prejudiced thereby.

### 8.3 Amendments to or Withdrawal of Conversion Plan

The Board may amend this Conversion Plan at any time before the vote of the Eligible Policyholders at the Special Meeting, if measures approved by the Superintendent and the Michigan Commissioner are taken by the Company in respect of the amendment. The Board may withdraw this Conversion Plan at any time prior to the issuance of the Letters Patent of Conversion.

### 8.4 Payment of Interest

All amounts paid to Eligible Policyholders pursuant to this Plan of Conversion shall be paid without interest, unless otherwise specified.

### 8.5 Governing Law

The terms of this Conversion Plan shall be governed by and construed in accordance with the laws of Ontario and the laws of Canada applicable therein.

**IN WITNESS WHEREOF**, Sun Life Assurance Company of Canada and Sun Life of Canada Holdings Corp. have executed this Conversion Plan this 28th day of September, 1999.

**SUN LIFE ASSURANCE COMPANY OF CANADA**

By: ______________________________
Name:
Title:

By: ______________________________
Name:
Title:

**SUN LIFE OF CANADA HOLDINGS CORP.**

By: ______________________________
Name:
Title:

By: ______________________________
Name:
Title:

EXHIBIT A – FORM OF AMENDED AND RESTATED BY-LAWS OF THE COMPANY

SUN LIFE ASSURANCE COMPANY OF CANADA

BY-LAW NO. 1

An Amended and Restated By-Law relating generally to the conduct of the business and affairs of Sun Life Assurance Company of Canada

BE IT ENACTED AND IT IS HEREBY ENACTED as a by-law of Sun Life Assurance Company of Canada as follows:

SECTION 1.

DEFINITIONS

1.1 Definitions

In this By-law No. 1:

(a) "Act" means the *Insurance Companies Act* (Canada), S.C. 1991, c. 47, as amended from time to time, and every statute that may be substituted therefor;

(b) "Company" means Sun Life Assurance Company of Canada;

(c) "Policyholders' Directors" means the directors of the Company elected by the policyholders of the Company entitled to vote at an annual meeting of shareholders and policyholders of the Company;

(d) "Shareholders' Directors" means the directors of the Company elected by the shareholders of the Company; and

(e) words and expressions that are defined in the Act have the same meanings when used in this by-law and any other by-laws of the Company.

SECTION 2.

BOARD OF DIRECTORS

2.1 Manage the Business and Affairs of the Company

The Board of Directors shall manage or supervise the management of the business and affairs of the Company in accordance with and subject to the Act.

The Board of Directors may, in accordance with and subject to the Act, declare a dividend, bonus or other benefit on participating policies in accordance with the dividend or bonus policy established by the Board of Directors.

2.2 Number of Directors

The Company shall have a minimum of 12 directors and a maximum of 24 directors, of which a minimum of 4 and a maximum of 16 shall be Shareholders' Directors and a minimum of 4 and a maximum of 8 shall be Policyholders' Directors, provided that at all times at least one-third of the directors must be Policyholders' Directors and at least one-third must be Shareholders' Directors. The number of directors to be elected at each annual meeting of policyholders and shareholders shall be such number as is fixed by the directors prior to the annual meeting. The Shareholders' Directors may appoint one or more additional directors, and the Policyholders' Directors may appoint one or more additional directors, to hold office for a term expiring not later than the close of the next annual meeting of shareholders and policyholders, provided that: (a) the total number of directors so appointed shall not exceed one third of the number of directors elected at the previous annual meeting of shareholders and policyholders; and (b) the maximum number of directors is not exceeded.

2.3 Term of Office

Each director shall be elected for a term of 3 years, but if the result of electing each director for a term of 3 years would be that one-third, as nearly as may be, of the directors would not retire each year, then a number of directors may be elected for a term of two years and a number of directors may be elected for a

term of 1 year in order that one-third, as nearly as may be, of the directors shall retire each year. A person is not eligible to be elected a director if that person has reached the age of 72 years or such lesser age as may be established from time to time by the Board of Directors.

2.4 Meetings of the Board of Directors

The Board of Directors shall meet regularly without notice on such dates, at such times and at such places as shall be determined from time to time by the directors. Special meetings of the Board of Directors may be called at any time upon 24 hours' notice by either the Chairman of the Board of Directors or any 3 directors.

The number of directors constituting a quorum at any meeting of the Board of Directors shall be 7, but a majority of the number of directors then in office shall constitute a quorum at any meeting of the directors at which by-laws are made, amended or repealed or at which policy dividends are declared.

2.5 Meetings of Committees of the Board of Directors

Committees of the Board of Directors shall determine their own procedures, including notice requirements, if any, for the calling and conduct of meetings, subject to any regulations imposed by the Board of Directors.

SECTION 3.

REMUNERATION OF DIRECTORS

3.1 Remuneration of Directors

The aggregate of all amounts that are to be paid to all directors of the Company in respect of directors' remuneration during a financial year of the Company is hereby fixed at a maximum of $950,000. The directors are also entitled to such additional amounts as may be necessary to reimburse them for their reasonable expenses properly incurred in respect of their services as directors.

SECTION 4.

INDEMNIFICATION OF DIRECTORS AND OFFICERS

4.1 Indemnification of Directors and Officers

Subject to any limitations contained in the Act, the Company shall indemnify a director or an officer, a former director or officer or any person who acts or acted at the Company's request as a director or officer of an entity of which the Company is or was a shareholder or creditor, and each such person's heirs and personal representatives, against all costs, charges and expenses, including an amount paid to settle an action or satisfy a judgment reasonably incurred by such person in respect of any civil, criminal or administrative action or proceeding to which such person is made a party by reason of being or having been a director or officer of the Company or such entity, if

(a) such person acted honestly and in good faith with a view to the best interests of the Company, and

(b) in the case of a criminal or administrative action or proceeding enforced by a monetary penalty, such person had reasonable grounds for believing that the impugned conduct was lawful.

The Company may enter into agreements evidencing its indemnity in favour of the foregoing persons to the full extent permitted by law.

SECTION 5.

MEETINGS OF SHAREHOLDERS AND/OR POLICYHOLDERS

5.1 Chairman

The chairman at all meetings of shareholders and/or policyholders of the Company shall be:

(a) the Chairman of the Board of Directors, or

(b) in the absence of the Chairman of the Board of Directors or at the latter's request, the President, or

(c) in the absence of the Chairman of the Board of Directors and the President, a director chosen as the chairman of the meeting by the directors who are present.

SECTION 6.

CORPORATE MATTERS

6.1 Financial Year

The financial year of the Company shall end on the expiration of the 31st day of December in each year.

6.2 Corporate Seal

The seal of the Company shall be such as the Board of Directors may adopt.

6.3 Execution of Documents

Documents to be executed by the Company shall be executed by such persons and in such manner as may be determined by the Board of Directors.

SECTION 7.

TRANSITIONAL MATTERS

7.1 Effective Date

This by-law shall come into force on the effective date specified in the Company's letters patent of conversion.

SUN LIFE ASSURANCE COMPANY OF CANADA

BY-LAW NO. 2

An Amended and Restated By-law creating classes of shares of
Sun Life Assurance Company of Canada

BE IT ENACTED AND IT IS HEREBY ENACTED as a by-law of Sun Life Assurance Company of Canada as follows:

SECTION 1.

DEFINITIONS

1.1 Definitions

In this By-law No. 2:

(a) "Act" means the *Insurance Companies Act* (Canada), S.C. 1991, c.47, as amended from time to time, and every other statute that may be substituted therefor;

(b) "Board" means the Board of Directors of the Company;

(c) "Company" means Sun Life Assurance Company of Canada; and

(d) words and expressions that are defined in the Act have the same meanings when used in this by-law and any other by-laws of the Company.

SECTION 2.

AUTHORIZED CAPITAL

The authorized capital of the Company consists of:

(a) an unlimited number of Class A Shares without nominal or par value, issuable in series, (the "Class A Shares");

(b) an unlimited number of Class B Shares without nominal or par value, issuable in series, (the "Class B Shares");

(c) an unlimited number of Class C Shares without nominal or par value, issuable in series, (the "Class C Shares");

(d) an unlimited number of Class D Shares without nominal or par value, issuable in series, (the "Class D Shares"); and

(e) an unlimited number of common shares without nominal or par value (the "Common Shares").

SECTION 3.

CLASS A SHARES

The Class A Shares, as a class, have attached thereto the following rights, privileges, restrictions and conditions:

3.1 Board's Authority to Issue in One or More Series

The Board may issue the Class A Shares at any time or from time to time in one or more series. Before any shares of a series are issued, the Board shall fix the number of shares that will form the series and shall, subject to any limitations set out in the by-laws of the Company or in the Act, determine the designation, rights, privileges, restrictions and conditions to be attached to the Class A Shares of the series. Before the issue of any shares of a series, the particulars of the series, including the rights, privileges, restrictions and conditions determined by the Board, shall be sent to the Superintendent of Financial Institutions (Canada).

3.2 Ranking of the Class A Shares

No rights, privileges, restrictions or conditions attached to a series of Class A Shares confer on the series a priority in respect of dividends or return of capital over any other series of Class A Shares.

The Class A Shares:

(a) rank equally with the Class B Shares and the Class C Shares; and

(b) are entitled to a preference over the Class D Shares, the Common Shares and any other shares ranking junior to the Class A Shares

with respect to priority in the payment of dividends and in the distribution of assets in the event of the liquidation, dissolution or winding-up of the Company, whether voluntary or involuntary, or any other distribution of the assets of the Company among its policyholders and shareholders for the specific purpose of winding up its affairs.

If any cumulative dividends, whether or not declared, or declared non-cumulative dividends or amounts payable on return of capital are not paid in full in respect of any series of Class A Shares, then the Class A Shares of all series participate rateably in respect of such dividends in accordance with the sums that would be payable on such shares if all such dividends were declared and paid in full, and in respect of such return of capital in accordance with the sums that would be payable on such return of capital if all sums so payable were paid in full; provided, however, that if there are insufficient assets to satisfy in full all such claims as aforesaid, then the claims of the holders of the Class A Shares with respect to return of capital shall be paid and satisfied first and any assets remaining thereafter shall be applied towards the payment and satisfaction of claims in respect of dividends. The Class A Shares of any series may also be given such other preferences not inconsistent with the rights, privileges, restrictions and conditions attached to the Class A Shares as a class over the Class D Shares, the Common Shares and any other shares ranking junior to the Class A Shares as may be determined in the case of such series of Class A Shares.

3.3 Voting Rights

Except as hereinafter referred to or as required by law or as specified in the rights, privileges, restrictions and conditions attached from time to time to any series of Class A Shares, the holders of the Class A Shares as a class are not entitled as such to receive notice of, to attend or to vote at any meeting of the shareholders or policyholders of the Company.

3.4 Amendment with Approval of the Holders of Class A Shares

The rights, privileges, restrictions and conditions attached to the Class A Shares as a class may be added to, changed or removed but only with the approval of the holders of the Class A Shares given as hereinafter specified.

3.5 Approval of the Holders of the Class A Shares

The approval of the holders of the Class A Shares to add to, change or remove any right, privilege, restriction or condition attaching to the Class A Shares as a class or in respect of any other matter requiring the consent of the holders of the Class A Shares may be given in such manner as may then be required by law, subject to a minimum requirement that such approval be given by resolution passed by the affirmative vote of at least two-thirds (⅔) of the votes cast at a meeting of the holders of the Class A Shares duly called for that purpose at which the holders of a majority of the outstanding Class A Shares are present in person or represented by proxy. If at any such meeting, the holders of at least a majority of the outstanding Class A Shares are not present in person or represented by proxy within 30 minutes after the time appointed for the meeting, then the meeting shall be adjourned to such date not less than 15 days thereafter and to such time and place as may be appointed by the chairman of the meeting and not less than 7 days notice shall be given of the adjourned meeting. At such adjourned meeting the holders of the Class A Shares present or represented by proxy may transact the business for which the meeting was originally called and a resolution passed thereat by not less than two-thirds (⅔) of the votes cast constitutes the approval of the holders of the Class A Shares referred to above.

The formalities to be observed with respect to the giving of notice of any such meeting or any adjourned meeting and the conduct thereof are those from time to time prescribed by the by-laws or the administrative resolutions of the Company passed by the Board with respect to meetings of shareholders or as required by the Act. On every poll taken at every meeting of the holders of the Class A Shares as a class, or at any joint meeting of the holders of two or more series of Class A Shares, each holder of Class A Shares entitled to vote thereat has one vote in respect of each Class A Share held.

SECTION 4.

CLASS B SHARES

The Class B Shares, as a class, have attached thereto the following rights, privileges, restrictions and conditions:

4.1 Board's Authority to Issue in One or More Series

The Board may issue the Class B Shares at any time or from time to time in one or more series. Before any shares of a series are issued, the Board shall fix the number of shares that will form the series and shall, subject to any limitations set out in the by-laws of the Company or in the Act, determine the designation, rights, privileges, restrictions and conditions to be attached to the Class B Shares of the series. Before the issue of any shares of a series, the particular of the series, including the rights, privileges, restrictions and conditions determined by the Board, shall be sent to the Superintendent of Financial Institutions (Canada).

4.2 Ranking of the Class B Shares

No rights, privileges, restrictions or conditions attached to a series of Class B Shares confer on the series a priority in respect of dividends or return of capital over any other series of Class B Shares.

The Class B Shares:

(a) rank equally with the Class A Shares and the Class C Shares; and

(b) are entitled to a preference over the Class D Shares, the Common Shares and any other shares ranking junior to the Class B Shares

with respect to priority in the payment of dividends and in the distribution of assets in the event of the liquidation, dissolution or winding-up of the Company, whether voluntary or involuntary, or any other distribution of the assets of the Company among its policyholders and shareholders for the specific purpose of winding up its affairs.

If any cumulative dividends, whether or not declared, or declared non-cumulative dividends or amounts payable on return of capital are not paid in full in respect of any series of the Class B Shares, then the Class B Shares of all series participate rateably in respect of such dividends in accordance with the sums that would be payable on such shares if all such dividends were declared and paid in full, and in respect of such return of capital in accordance with the sums that would be payable on such return of capital if all sums so payable were paid in full; provided, however, that if there are insufficient assets to satisfy in full all such claims as aforesaid, then the claims of the holders of the Class B Shares with respect to return of capital shall be paid and satisfied first and any assets remaining thereafter shall be applied towards the payment and satisfaction of claims in respect of dividends. The Class B Shares of any series may also be given such other preferences not inconsistent with the rights, privileges, restrictions and conditions attached to the Class B Shares as a class over the Class D Shares, the Common Shares and any other shares ranking junior to the Class B Shares as may be determined in the case of such series of Class B Shares.

4.3 Voting Rights

Except as hereinafter referred to or as required by law or as specified in the rights, privileges, restrictions and conditions attached from time to time to any series of Class B Shares, the holders of the Class B Shares as a class are not entitled as such to receive notice of, to attend or to vote at any meeting of the shareholders or policyholders of the Company.

4.4 Amendment with Approval of the Holders of Class B Shares

The rights, privileges, restrictions and conditions attached to the Class B Shares as a class may be added to, changed or removed but only with the approval of the holders of the Class B Shares given as hereinafter specified.

4.5 Approval of the Holders of the Class B Shares

The approval of the holders of the Class B Shares to add to, change or remove any right, privilege, restriction or condition attaching to the Class B Shares as a class or in respect of any other matter requiring the consent of the holders of the Class B Shares may be given in such a manner as may then be required by law, subject to a minimum requirement that such approval be given by resolution passed by the affirmative vote of