(b) are entitled to a preference over the Class D Shares, the Common Shares and any other shares ranking junior to the Class A Shares

with respect to priority in the payment of dividends and in the distribution of assets in the event of the liquidation, dissolution or winding-up of the Company, whether voluntary or involuntary, or any other distribution of the assets of the Company among its policyholders and shareholders for the specific purpose of winding up its affairs.

If any cumulative dividends, whether or not declared, or declared non-cumulative dividends or amounts payable on return of capital are not paid in full in respect of any series of Class A Shares, then the Class A Shares of all series participate rateably in respect of such dividends in accordance with the sums that would be payable on such shares if all such dividends were declared and paid in full, and in respect of such return of capital in accordance with the sums that would be payable on such return of capital if all sums so payable were paid in full; provided, however, that if there are insufficient assets to satisfy in full all such claims as aforesaid, then the claims of the holders of the Class A Shares with respect to return of capital shall be paid and satisfied first and any assets remaining thereafter shall be applied towards the payment and satisfaction of claims in respect of dividends. The Class A Shares of any series may also be given such other preferences not inconsistent with the rights, privileges, restrictions and conditions attached to the Class A Shares as a class over the Class D Shares, the Common Shares and any other shares ranking junior to the Class A Shares as may be determined in the case of such series of Class A Shares.

3.3 Voting Rights

Except as hereinafter referred to or as required by law or as specified in the rights, privileges, restrictions and conditions attached from time to time to any series of Class A Shares, the holders of the Class A Shares as a class are not entitled as such to receive notice of, to attend or to vote at any meeting of the shareholders or policyholders of the Company.

3.4 Amendment with Approval of the Holders of Class A Shares

The rights, privileges, restrictions and conditions attached to the Class A Shares as a class may be added to, changed or removed but only with the approval of the holders of the Class A Shares given as hereinafter specified.

3.5 Approval of the Holders of the Class A Shares

The approval of the holders of the Class A Shares to add to, change or remove any right, privilege, restriction or condition attaching to the Class A Shares as a class or in respect of any other matter requiring the consent of the holders of the Class A Shares may be given in such manner as may then be required by law, subject to a minimum requirement that such approval be given by resolution passed by the affirmative vote of at least two-thirds (⅔) of the votes cast at a meeting of the holders of the Class A Shares duly called for that purpose at which the holders of a majority of the outstanding Class A Shares are present in person or represented by proxy. If at any such meeting, the holders of at least a majority of the outstanding Class A Shares are not present in person or represented by proxy within 30 minutes after the time appointed for the meeting, then the meeting shall be adjourned to such date not less than 15 days thereafter and to such time and place as may be appointed by the chairman of the meeting and not less than 7 days notice shall be given of the adjourned meeting. At such adjourned meeting the holders of the Class A Shares present or represented by proxy may transact the business for which the meeting was originally called and a resolution passed thereat by not less than two-thirds (⅔) of the votes cast constitutes the approval of the holders of the Class A Shares referred to above.

The formalities to be observed with respect to the giving of notice of any such meeting or any adjourned meeting and the conduct thereof are those from time to time prescribed by the by-laws or the administrative resolutions of the Company passed by the Board with respect to meetings of shareholders or as required by the Act. On every poll taken at every meeting of the holders of the Class A Shares as a class, or at any joint meeting of the holders of two or more series of Class A Shares, each holder of Class A Shares entitled to vote thereat has one vote in respect of each Class A Share held.

## SECTION 4.

## CLASS B SHARES

The Class B Shares, as a class, have attached thereto the following rights, privileges, restrictions and conditions:

4.1 Board's Authority to Issue in One or More Series

The Board may issue the Class B Shares at any time or from time to time in one or more series. Before any shares of a series are issued, the Board shall fix the number of shares that will form the series and shall, subject to any limitations set out in the by-laws of the Company or in the Act, determine the designation, rights, privileges, restrictions and conditions to be attached to the Class B Shares of the series. Before the issue of any shares of a series, the particular of the series, including the rights, privileges, restrictions and conditions determined by the Board, shall be sent to the Superintendent of Financial Institutions (Canada).

4.2 Ranking of the Class B Shares

No rights, privileges, restrictions or conditions attached to a series of Class B Shares confer on the series a priority in respect of dividends or return of capital over any other series of Class B Shares.

The Class B Shares:

(a) rank equally with the Class A Shares and the Class C Shares; and

(b) are entitled to a preference over the Class D Shares, the Common Shares and any other shares ranking junior to the Class B Shares

with respect to priority in the payment of dividends and in the distribution of assets in the event of the liquidation, dissolution or winding-up of the Company, whether voluntary or involuntary, or any other distribution of the assets of the Company among its policyholders and shareholders for the specific purpose of winding up its affairs.

If any cumulative dividends, whether or not declared, or declared non-cumulative dividends or amounts payable on return of capital are not paid in full in respect of any series of the Class B Shares, then the Class B Shares of all series participate rateably in respect of such dividends in accordance with the sums that would be payable on such shares if all such dividends were declared and paid in full, and in respect of such return of capital in accordance with the sums that would be payable on such return of capital if all sums so payable were paid in full; provided, however, that if there are insufficient assets to satisfy in full all such claims as aforesaid, then the claims of the holders of the Class B Shares with respect to return of capital shall be paid and satisfied first and any assets remaining thereafter shall be applied towards the payment and satisfaction of claims in respect of dividends. The Class B Shares of any series may also be given such other preferences not inconsistent with the rights, privileges, restrictions and conditions attached to the Class B Shares as a class over the Class D Shares, the Common Shares and any other shares ranking junior to the Class B Shares as may be determined in the case of such series of Class B Shares.

4.3 Voting Rights

Except as hereinafter referred to or as required by law or as specified in the rights, privileges, restrictions and conditions attached from time to time to any series of Class B Shares, the holders of the Class B Shares as a class are not entitled as such to receive notice of, to attend or to vote at any meeting of the shareholders or policyholders of the Company.

4.4 Amendment with Approval of the Holders of Class B Shares

The rights, privileges, restrictions and conditions attached to the Class B Shares as a class may be added to, changed or removed but only with the approval of the holders of the Class B Shares given as hereinafter specified.

4.5 Approval of the Holders of the Class B Shares

The approval of the holders of the Class B Shares to add to, change or remove any right, privilege, restriction or condition attaching to the Class B Shares as a class or in respect of any other matter requiring the consent of the holders of the Class B Shares may be given in such a manner as may then be required by law, subject to a minimum requirement that such approval be given by resolution passed by the affirmative vote of

at least two-thirds (⅔) of the votes cast at a meeting of the holders of the Class B Shares duly called for that purpose at which the holders of a majority of the outstanding Class B Shares are present in person or represented by proxy. If at any such meeting the holders of at least a majority of the outstanding Class B Shares are not present in person or represented by proxy within 30 minutes after the time appointed for the meeting, then the meeting shall be adjourned to such date not less than 15 days thereafter and to such time and place as may be appointed by the chairman of the meeting and not less than 7 days notice shall be given of the adjourned meeting. At such adjourned meeting the holders of the Class B Shares present or represented by proxy may transact the business for which the meeting was originally called and a resolution passed thereat by not less than two-thirds (⅔) of the votes cast constitutes the approval of the holders of the Class B Shares referred to above.

The formalities to be observed with respect to the giving of notice of any such meeting or any adjourned meeting and the conduct thereof are those from time to time prescribed by the by-laws or the administrative resolutions of the Company passed by the Board with respect to meetings of shareholders or as required by the Act. On every poll taken at every meeting of the holders of the Class B Shares as a class, or at any joint meeting of the holders of two or more series of Class B Shares, each holder of Class B Shares entitled to vote thereat has one vote in respect of each Class B Share held.

## SECTION 5.

## CLASS C SHARES

The Class C Shares, as a class, have attached thereto the following rights, privileges, restrictions and conditions:

### 5.1 Board's Authority to Issue in One or More Series

The Board may issue the Class C Shares at any time or from time to time in one or more series. Before any shares of a series are issued, the Board shall fix the number of shares that will form the series and shall, subject to any limitations set out in the by-laws of the Company or in the Act, determine the designation, rights, privileges, restrictions and conditions to be attached to the Class C Shares of the series. Before the issue of any shares of a series, the particulars of the series, including the rights, privileges, restrictions and conditions determined by the Board, shall be sent to the Superintendent of Financial Institutions (Canada).

### 5.2 Ranking of the Class C Shares

No rights, privileges, restrictions or conditions attached to a series of Class C Shares confer on the series a priority in respect of dividends or return of capital over any other series of Class C Shares.

The Class C Shares:

(a) rank equally with the Class A Shares and the Class B Shares; and

(b) are entitled to a preference over the Class D Shares, the Common Shares and any other shares ranking junior to the Class C Shares

with respect to priority in the payment of dividends and in the distribution of assets in the event of the liquidation, dissolution or winding-up of the Company, whether voluntary or involuntary, or any other distribution of the assets of the Company among its policyholders and shareholders for the specific purpose of winding up it affairs.

If any cumulative dividends, whether or not declared, or declared non-cumulative dividends or amounts payable on return of capital are not paid in full in respect of any series of the Class C Shares, then the Class C Shares of all series participate rateably in respect of such dividends in accordance with the sums that would be payable on such shares if all such dividends were declared and paid in full, and in respect of such return of capital in accordance with the sums that would be payable on such return of capital if all sums so payable were paid in full; provided, however, that if there are insufficient assets to satisfy in full all such claims as aforesaid, then the claims of the holders of the Class C Shares with respect to return of capital shall be paid and satisfied first and any assets remaining thereafter shall be applied towards the payment and satisfaction of claims in respect of dividends. The Class C Shares of any series may also be given such other preferences not inconsistent with the rights, privileges, restrictions and conditions attached to the Class C Shares as a class over the Class D Shares, the Common Shares and any other shares ranking junior to the Class C Shares as may be determined in the case of such series of Class C Shares.

5.3 Voting Rights

Except as hereinafter referred to or as required by law or as specified in the rights, privileges, restrictions and conditions attached from time to time to any series of Class C Shares, the holders of the Class C Shares as a class are not entitled as such to receive notice of, to attend or to vote at any meeting of the shareholders or policyholders of the Company.

5.4 Amendment with Approval of the Holders of Class C Shares

The rights, privileges, restrictions and conditions attached to the Class C Shares as a class may be added to, changed or removed but only with the approval of the holders of the Class C Shares given as hereinafter specified.

5.5 Approval of the Holders of the Class C Shares

The approval of the holders of the Class C Shares to add to, change or remove any right, privilege, restriction or condition attaching to the Class C Shares as a class or in respect of any other matter requiring the consent of the holders of the Class C Shares may be given by resolution passed by the affirmative vote of at least two-thirds (⅔) of the votes cast at a meeting of the holders of the Class C Shares duly called for that purpose at which the holders of a majority of the outstanding Class C Shares are present in person or represented by proxy. If at any such meeting the holders of at least a majority of the outstanding Class C Shares are not present in person or represented by proxy within 30 minutes after the time appointed for the meeting, then the meeting shall be adjourned to such date not less than 15 days thereafter and to such time and place as may be appointed by the chairman of the meeting and not less than 7 days notice shall be given of the adjourned meeting. At such adjourned meeting the holders of the Class C Shares present or represented by proxy may transact the business for which the meeting was originally called and a resolution passed thereat by not less than two-thirds (⅔) of the votes cast constitutes the approval of the holders of the Class C Shares referred to above.

The formalities to be observed with respect to the giving of notice of any such meeting or any adjourned meeting and the conduct thereof are those from time to time prescribed by the by-laws or the administrative resolutions of the Company passed by the Board with respect to meetings of shareholders or as required by the Act. On every poll taken at every meeting of the holders of the Class C Shares as a class, or at any joint meeting of the holders of two or more series of Class C Shares, each holder of Class C Shares entitled to vote thereat has one vote in respect of each Class C Share held.

SECTION 6.

CLASS D SHARES

The Class D Shares, as a class, have attached thereto the following rights, privileges, restrictions and conditions:

6.1 Board's Authority to Issue in One or More Series

The Board may issue the Class D Shares at any time or from time to time in one or more series. Before any shares of a series are issued, the Board shall fix the number of shares that will form the series and shall, subject to any limitations set out in the by-laws of the Company or in the Act, determine the designation, rights, privileges, restrictions and conditions to be attached to the Class D Shares of the series. Before the issue of any shares of a series, the particulars of the series, including the rights, privileges, restrictions and conditions determined by the Board, shall be sent to the Superintendent of Financial Institutions (Canada).

6.2 Ranking of Class D Shares

No rights, privileges, restrictions or conditions attached to a series of Class D Shares confer on the series a priority in respect of dividends or return of capital over any other series of Class D Shares.

The Class D Shares:

(a) rank junior with the Class A Shares, the Class B Shares and the Class C Shares; and

(b) are entitled to a preference over the Common Shares and any other shares ranking junior to the Class D Shares

with respect to priority in the payment of dividends and in the distribution of assets in the event of the liquidation, dissolution or winding-up of the Company, whether voluntary or involuntary, or any other distribution of the assets of the Company among its policyholders and shareholders for the specific purpose of winding up it affairs.

If any cumulative dividends, whether or not declared, or declared non-cumulative dividends or amounts payable on return of capital are not paid in full in respect of any series of the Class D Shares, then the Class D Shares of all series participate rateably in respect of such dividends in accordance with the sums that would be payable on such shares if all such dividends were declared and paid in full, and in respect of such return of capital in accordance with the sums that would be payable on such return of capital if all sums so payable were paid in full; provided, however, that if there are insufficient assets to satisfy in full all such claims as aforesaid, then the claims of the holders of the Class D Shares with respect to return of capital shall be paid and satisfied first and any assets remaining thereafter shall be applied towards the payment and satisfaction of claims in respect of dividends. The Class D Shares of any series may also be given such other preferences not inconsistent with the rights, privileges, restrictions and conditions attached to the Class D Shares as a class over the Common Shares and any other shares ranking junior to the Class D Shares as may be determined in the case of such series of Class D Shares.

6.3 Voting Rights

Except as hereinafter referred to or as required by law or as specified in the rights, privileges, restrictions and conditions attached from time to time to any series of Class D Shares, the holders of the Class D Shares as a class are not entitled as such to receive notice of, to attend or to vote at any meeting of the shareholders or policyholders of the Company.

6.4 Amendment with Approval of the Holders of Class D Shares

The rights, privileges, restrictions and conditions attached to the Class D Shares as a class may be added to, changed or removed but only with the approval of the holders of the Class D Shares given as hereinafter specified.

6.5 Approval of the Holders of the Class D Shares

The approval of the holders of the Class D Shares to add to, change or remove any right, privilege, restriction or condition attaching to the Class D Shares as a class or in respect of any other matter requiring the consent of the holders of the Class D Shares may be given by resolution passed by the affirmative vote of at least two-thirds (⅔) of the votes cast at a meeting of the holders of the Class D Shares duly called for that purpose at which the holders of a majority of the outstanding Class D Shares are present in person or represented by proxy. If at any such meeting the holders of at least a majority of the outstanding Class D Shares are not present in person or represented by proxy within 30 minutes after the time appointed for the meeting, then the meeting shall be adjourned to such date not less than 15 days thereafter and to such time and place as may be appointed by the chairman of the meeting and not less than 7 days notice shall be given of the adjourned meeting. At such adjourned meeting the holders of the Class D Shares present or represented by proxy may transact the business for which the meeting was originally called and a resolution passed thereat by not less than two-thirds (⅔) of the votes cast constitutes the approval of the holders of the Class D Shares referred to above.

The formalities to be observed with respect to the giving of notice of any such meeting or any adjourned meeting and the conduct thereof are those from time to time prescribed by the by-laws or the administrative resolutions of the Company passed by the Board with respect to meetings of shareholders or as required by the Act. On every poll taken at every meeting of the holders of the Class D Shares as a class, or at any joint meeting of the holders of two or more series of Class D Shares, each holder of Class D Shares entitled to vote thereat has one vote in respect of each Class D Share held.

SECTION 7.

COMMON SHARES

The Common Shares shall have attached thereto the following rights, privileges, restrictions and conditions:

7.1 Dividends

(a) Subject to the prior rights of the holders of the Class A Shares, the Class B Shares, the Class C Shares, the Class D Shares and any other shares ranking senior to the Common Shares with respect to priority in payment of dividends, the holders of Common Shares shall be entitled to receive dividends as and when declared by the Board out of moneys properly applicable to the payment of

dividends, in such amount and in such forms as the Board may from time to time determine and all dividends which the Board may declare on the Common Shares shall be declared and paid in equal amounts per share on all Common Shares outstanding at the time.

(b) Any dividend (other than a stock dividend) unclaimed after a period of six years from the date on which the same has been declared to be payable shall be forfeited and shall revert to the Company.

7.2 Dissolution

In the event of the liquidation, dissolution or specific winding up of the Company, whether voluntary or involuntary, or any other distribution of the assets of the Company among its policyholders and shareholders for the specific purpose of winding up its affairs, subject to the prior rights of the holders of the Class A Shares, the Class B Shares, the Class C Shares, the Class D Shares and any other shares ranking senior to the Common Shares with respect to priority in the distribution of assets in the event of the liquidation, dissolution or winding up of the Company, the holders of the Common Shares shall be entitled to receive the remaining property of the Company that pertains to shareholders in equal amounts per share, without preference or priority of one share or another.

7.3 Voting Rights

The holders of Common Shares shall be entitled to receive notice of and to attend all meetings of the shareholders or policyholders of the Company and shall have one vote for each Common Share held at all meetings of the shareholders or policyholders of the Company, except for meetings at which only holders of another specified class or series of shares of the Company are entitled to vote separately as a class or series and meetings at which only policyholders of the Company are entitled to vote separately as policyholders.

7.4 Notice of Meeting

The formalities to be observed with respect to the giving of notice of any such meeting or any adjourned meeting, the quorum required therefor and the conduct thereof shall be those from time to time required by the Act as in force at the time of the meeting and those, if any, prescribed by the by-laws or the administrative resolutions of the Company with respect to meetings of shareholders.

SECTION 8.

EFFECTIVE DATE

8.1 Effective Date

This by-law shall come into force on the effective date specified in the Company's letters patent of conversion.

## EXHIBIT B – ALLOCATION OF VALUE

1. For the purposes of section 4.2, the applicable rates of exchange to the Canadian dollar, as of the Eligibility Day, are:

| | | | |
|---|---|---|---|
| Bermudian dollar | 1.4561 | Netherlands guilder | 0.7228 |
| Cuban peso | 1.4561 | Pakistan rupee | 0.0331 |
| East Caribbean (WI) dollar | 0.5393 | Philippine peso | 0.0344 |
| Hong Kong dollar | 0.1882 | South African rand | 0.2972 |
| Indian rupee | 0.0383 | Trinidad and Tobago dollar | 0.2341 |
| Irish punt (Eire) | 2.0369 | United Kingdom pound sterling | 2.3912 |
| Jamaican dollar | 0.0414 | United States dollar | 1.4561 |
| Maltese lira | 3.6678 | Zimbabwe dollar | 0.0770 |

2. (a) For the purposes of this section 2 of Exhibit B:

(i) the term "Special Policy" means any Eligible Policy:

(A) which was issued by the Company in Canada, Bermuda or Hong Kong and recorded on the Records of the Company, in the case of a policy issued in Canada or Bermuda, under Sun 100 policy (plan codes 013 or 014) or Sun 250 policy (plan codes 033 or 034), or, in the case of a policy issued in Hong Kong, under an Excel Life Special policy (plan codes 0B0 or 0B1 (ALIS) or XLS (Abacus)) or Excel Life Combo policy (plan codes 0C0 or 0C1 (ALIS) or XLC (Abacus)); and

(B) which has a Duration which is not greater than 20 years;

(ii) the term "Base Cash Value" means the Cash Value of a Special Policy calculated in the manner prescribed in section 4.3(a) of the Conversion Plan, but excluding the amounts specified in section 4.3(a)(i)(A) and 4.3(a)(i)(B); and

(iii) the term "Base Annual Premium Measure" means the Annual Premium Measure of a Special Policy calculated in the manner prescribed in section 4.3(c) of the Conversion Plan but excluding any amounts in respect of any policy riders or options specified in section 3 of this Exhibit B as well as Extra Premiums paid in respect of the policy and the policy riders or options specified in section 3 of this Exhibit B.

(b) If the Base Cash Value of any Special Policy is less than the amount obtained when the product of 0.9 and the Base Annual Premium Measure of the policy is multiplied by the difference which results when six is subtracted from the Duration of the policy (such product being known as the "Adjusted Base Cash Value") then the Cash Value of the Special Policy calculated in accordance with section 4.3(a)(i) of the Conversion Plan shall be increased by adding to it the difference between the Adjusted Base Cash Value and the Base Cash Value.

3. For the purposes of section 4.3(a)(i)(A) and section 4.3(c)(i) of the Conversion Plan and section 2(a)(iii) of this Exhibit B, the following are the Policy riders and options:

(a) Enhancement Feature (offered in Canada);

(b) Enhanced Life rider (offered in the United States);

(c) Low Cost Endowment, Low Start Endowment, Build up Endowment and Life Plus (offered in the United Kingdom);

(d) Enhanced Whole Life Plan (offered in the Philippines);

(e) Plus rider (United States), other than single premium payments made by a policyholder under the terms of any such rider in connection with any reinstatement of the policy initiated by the policyholder after the Eligibility Day;

(f) Plus Premium rider (Canada), other than single premium payments made by a policyholder under the terms of any such rider in connection with any reinstatement of the policy initiated by the policyholder after the Eligibility Day;

(g) Inflation Shield Options that have been exercised; and

(h) Readjustment income rider (pertaining to United States individual health Eligible Policies).

4. For the following Policies, using actuarial principles consistent with those generally employed in the calculation of a cash surrender value:

(a) Settlement options (Canada and United States only), Pensions (Canada and United States only): the Cash Value will be calculated using the following assumptions:

Mortality: 1983 Individual Annuity Basic Table without projection
Interest: 4%

(b) Annuities in course of payment (United Kingdom only): the Cash Value will be equal to the actuarial reserve held in the Company's annual statement as at December 31, 1997;

(c) Individual Transfer Plan (United Kingdom only): the Cash Value will be equal to the account balance of the deposit administration portion of the Policy;

(d) Family Insurance Benefit, Children's Insurance Benefit and Spousal Insurance Benefit (Canada only): the Cash Value will be calculated using the following assumptions:

Mortality: 1958 CSO
Interest: 4%

(e) Individual disability claims in the course of payment (all countries): the Cash Value will be equal to that amount that would have been calculated as the Cash Value of the Policy if the claim were not in effect.

5. For the purposes of section 4.3(c)(v)(A) of the Conversion Plan:

YRT Rates for Group Paid-Up Insurance
Rates per $1,000

| Age Nearest Birthday as at January 27, 1998 | Males | Females | Age Nearest Birthday as at January 27, 1998 | Males | Females |
|---|---|---|---|---|---|
| 15 | 1.27673 | 0.42575 | 58 | 12.53827 | 6.68143 |
| 16 | 1.27673 | 0.42575 | 59 | 13.35015 | 7.07667 |
| 17 | 1.27673 | 0.42575 | 60 | 14.94240 | 7.98812 |
| 18 | 1.27673 | 0.42575 | 61 | 15.51355 | 8.30961 |
| 19 | 1.27673 | 0.42575 | 62 | 16.16975 | 8.80121 |
| 20 | 1.27722 | 0.42575 | 63 | 17.44552 | 9.65173 |
| 21 | 1.27722 | 0.42575 | 64 | 18.97644 | 10.67234 |
| 22 | 1.27770 | 0.42575 | 65 | 20.59133 | 11.81763 |
| 23 | 1.27773 | 0.42576 | 66 | 22.73999 | 13.33960 |
| 24 | 1.27776 | 0.42628 | 67 | 25.06770 | 14.95109 |
| 25 | 1.02314 | 0.51134 | 68 | 27.66400 | 16.83117 |
| 26 | 1.02317 | 0.51136 | 69 | 30.52888 | 18.89030 |
| 27 | 1.02373 | 0.51190 | 70 | 33.66234 | 21.12849 |
| 28 | 1.02379 | 0.51193 | 71 | 37.06439 | 23.54573 |
| 29 | 1.02439 | 0.51252 | 72 | 40.64549 | 26.23156 |
| 30 | 1.02501 | 0.51257 | 73 | 44.40564 | 29.27549 |
| 31 | 1.02510 | 0.51261 | 74 | 48.16580 | 32.58801 |
| 32 | 1.02575 | 0.51324 | 75 | 51.92595 | 36.07958 |
| 33 | 1.02588 | 0.51333 | 76 | 56.04422 | 40.01879 |
| 34 | 1.02602 | 0.51341 | 77 | 60.61012 | 44.40564 |
| 35 | 1.11182 | 0.68423 | 78 | 65.89224 | 49.59824 |
| 36 | 1.19764 | 0.68497 | 79 | 71.89058 | 55.32800 |
| 37 | 1.28350 | 0.77014 | 80 | 78.24704 | 61.59492 |
| 38 | 1.36965 | 0.85613 | 81 | 85.23018 | 68.48854 |
| 39 | 1.54091 | 0.94220 | 82 | 93.01907 | 76.18790 |
| 40 | 1.71299 | 1.02833 | 83 | 101.70324 | 84.78254 |
| 41 | 1.88521 | 1.11453 | 84 | 110.92457 | 93.82482 |
| 42 | 2.05756 | 1.28585 | 85 | 121.04118 | 103.85190 |
| 43 | 2.40172 | 1.45855 | 86 | 132.14259 | 114.86378 |
| 44 | 2.66121 | 1.63152 | 87 | 144.22880 | 127.12905 |
| 45 | 3.00615 | 1.80371 | 88 | 157.38935 | 140.64770 |
| 46 | 3.43760 | 1.97714 | 89 | 171.53469 | 154.79305 |
| 47 | 3.86958 | 2.23705 | 90 | 186.93342 | 170.19178 |
| 48 | 4.30522 | 2.49799 | 91 | 203.76459 | 187.29153 |
| 49 | 4.91352 | 2.75951 | 92 | 222.11773 | 206.00278 |
| 50 | 5.44133 | 3.10985 | 93 | 242.17189 | 226.59410 |
| 51 | 6.14123 | 3.37455 | 94 | 263.92707 | 249.24456 |
| 52 | 6.84497 | 3.72705 | 95 | 287.65186 | 274.13321 |
| 53 | 7.62014 | 4.20547 | 96 | 357.90973 | 349.08507 |
| 54 | 8.59083 | 4.60785 | 97 | 421.67347 | 413.35767 |
| 55 | 9.59882 | 5.11540 | 98 | 582.58886 | 575.88127 |
| 56 | 10.76471 | 5.65955 | 99 and above | 1,150.00000 | 1,150.00000 |
| 57 | 11.92303 | 6.29127 | | | |

**EXHIBIT C – VALUATION REPORT**

**[For convenience, the Valuation Report is reproduced as Schedule E to Part 1 of this Policyholder Information Circular.]**

## EXHIBIT D – RESTRUCTURING AND OPERATION OF PARTICIPATING ACCOUNT

PART 1 - OPERATING RULES

1.1 Allocations to Pre-Conversion Individual Participating Closed Sub-Funds

In order to ensure that the actual experience in respect of mortality, lapse, premium, policy dividends, expenses and taxes is reflected by each Pre-Conversion Individual Participating Closed Sub-Fund, the Post-Conversion Company shall allocate to the Pre-Conversion Individual Participating Closed Sub-Fund in a Territorial Participating Account all amounts in respect of Pre-Conversion Individual Participating Policies in that Territorial Participating Account only, including premiums, payment of policy benefits, payment of cash surrender values, policy dividends, related reinsurance cash flows, expenses and taxes. For greater certainty, the foregoing excludes amounts in respect of Deposit Liabilities. Policies issued by the Post-Conversion Company shall not be recorded in, and the cash flows and liabilities in respect thereof shall not be allocated to, any Pre-Conversion Participating Sub-Account. Sun Life of Canada will provide to the Michigan Commissioner a report prepared by the Independent Actuary confirming that Sun Life of Canada has allocated assets to the Pre-Conversion Individual Participating Closed Sub-Fund maintained in connection with the U.S. Branch in accordance with the requirements of the Plan and in a manner consistent with Actuarial Standard of Practise No. 33. Sun Life of Canada will seek the approval of the Michigan Commissioner to that allocation prior to making it, which approval may only be withheld if the allocation has not been made in a manner consistent with Actuarial Standard of Practise No. 33, as determined by the Michigan Commissioner, and in accordance with the requirements of the Conversion Plan.

1.2 Allocation of Investment Income to Pre-Conversion Individual Participating Closed Sub-Funds

(a) The Post-Conversion Company shall allocate to each Pre-Conversion Individual Participating Closed Sub-Fund in each Territorial Participating Account, at the end of each Reporting Period, that proportion of the investment income generated by assets (other than loans on the security of policies) in the Individual Participating Asset Segment of the Territorial Participating Account represented by the ratio of A to B where:

(i) A is equal to the sum of (x) the value of assets (other than loans on the security of policies) allocated to such Pre-Conversion Individual Participating Closed Sub-Fund at the beginning of the Reporting Period, (y) one-half of the aggregate net amount of cash flows and allocations in respect of Pre-Conversion Individual Participating Policies in the sub-fund for the Reporting Period in question, and (z) one-half of the difference, if any, which results when the amount of advances on loans allocated to the Pre-Conversion Individual Participating Closed Sub-Fund during the Reporting Period are subtracted from repayments of such loans during the Reporting Period; and

(ii) B is equal to the sum of (x) the value of all such assets (other than loans on the security of policies) in the Individual Participating Asset Segment of that Territorial Participating Account at the beginning of such Reporting Period, (y) one-half of the aggregate net amount of cash flows and allocations in respect of the Individual Participating Asset Segment for the Reporting Period in question, and (z) one-half of the difference, if any, which results when the amount of advances on loans on the security of Pre-Conversion Individual Participating Policies and Post-Conversion Individual Participating Policies in the Territorial Participating Account during the Reporting Period are subtracted from repayments of such loans during the Reporting Period.

(b) Subject to paragraph (c) below, the Post-Conversion Company shall, at the end of each Reporting Period, allocate to each Pre-Conversion Individual Participating Closed Sub-Fund in each Territorial Participating Account all the investment income generated by loans allocated to the Pre-Conversion Individual Participating Closed Sub-Fund during such Reporting Period.

(c) The Post-Conversion Company shall, at the end of each Reporting Period, with the approval of the Appointed Actuary, adjust the allocation of investment income between the Pre-Conversion Individual Participating Closed Sub-Fund and the Pre-Conversion Ancillary Participating Sub-Fund of each Territorial Participating Account. Such adjustment shall be made in order to offset any

disproportionate investment returns accruing to the sub-funds by reason of the allocation to the Pre-Conversion Individual Participating Closed Sub-Fund, in accordance with section 5.4(a)(i) of the Conversion Plan, for practical reasons, of all assets which are loans on the security of policies.

(d) Should the Post-Conversion Company in future be capable of allocating, and determine to so allocate, assets which are loans on the security of policies between the Pre-Conversion Ancillary Participating Sub-Fund and the Pre-Conversion Individual Participating Closed Sub-Fund of that Territorial Participating Account, then investment income on such assets shall be allocated accordingly, and section 1.2(c) shall not apply.

1.3 Allocation of Expenses

As used in this Part, the following terms and expressions shall have the following meanings:

"acquisition expenses" means the expenses incurred in respect of the sale and servicing of policies consisting of commissions that are paid as a percentage of first year and renewal premiums to agents, brokers and other intermediaries, other agency and brokerage expenses and other expenses directly or indirectly associated with the sale of policies including head office expenses related to the selection and issue of policies and head office marketing and product development expenses; and

"maintenance expenses" means expenses directly or indirectly associated with the servicing and maintenance of policies, such as billing, collection, accounting, actuarial, death claims, and customer service.

The Post-Conversion Company shall allocate to the Pre-Conversion Individual Participating Closed Sub-Fund of each Territorial Participating Account only those acquisition expenses related to the Pre-Conversion Individual Participating Policies in that sub-fund, and no other acquisition expenses will be allocated to the Pre-Conversion Individual Participating Closed Sub-Fund.

The Post-Conversion Company shall initially allocate maintenance expenses to the Pre-Conversion Individual Participating Closed Sub-Fund of each Territorial Participating Account based on the best estimate maintenance expense assumptions used in the calculation of the Company's actuarial liabilities as at the last day of the Reporting Period immediately prior to the Effective Date, except that allocations for per policy maintenance expenses will be increased or decreased periodically to reflect inflation in accordance with a recognized index of inflation that the Appointed Actuary deems to be appropriate for such Territorial Participating Account, which index shall initially be the United States Consumer Price Index in the case of the Pre-Conversion Individual Participating Closed Sub-Fund maintained in respect of the U.S. Branch; provided, however, that, in the case of the Pre-Conversion Individual Participating Closed Sub-Fund of the Territorial Participating Account maintained in connection with the Philippines Branch, the allocations for per policy maintenance expenses, determined in accordance with the foregoing, shall not, at any time, be permitted to exceed the lesser of:

(a) the per policy maintenance expenses initially allocated to the sub-fund, as adjusted at that time by the then applicable inflation index; and

(b) the greater of:

(i) the per policy maintenance expenses allocated to the sub-fund immediately prior to that time; and

(ii) an amount calculated at that time as the amount which would result if the per policy maintenance expenses initially allocated to the sub-fund were increased or decreased by a percentage equal to the cumulative pre-tax portfolio investment return of the sub-fund measured from the Effective Date and calculated based on investment allocations to the sub-fund made in accordance with the Operating Rules.

1.4 Allocation of Taxes

(a) The Post-Conversion Company shall allocate current income taxes to each Pre-Conversion Individual Participating Closed Sub-Fund based on the taxable income of such sub-fund and the tax rates in effect at the time.

(b) The Post-Conversion Company shall allocate premium taxes and investment income taxes to each Pre-Conversion Individual Participating Closed Sub-Fund only to the extent such taxes are related to the Pre-Conversion Individual Participating Policies in that sub-fund.

(c) Part I.3 (Tax on Large Corporations) of the Income Tax Act (Canada) shall not be allocated to any Pre-Conversion Individual Participating Closed Sub-Fund.

1.5 Interest Rates on Deposit Liabilities

The Post-Conversion Company shall ensure that Deposit Liabilities accrue interest that is credited in a manner consistent with the practices of the Company prior to the Effective Date.

PART 2 – INVESTMENT POLICIES

The investment policies of the Post-Conversion Company in respect of each Individual Participating Asset Segment of any Territorial Participating Account shall initially be those of the Company for that Individual Participating Asset Segment immediately prior to the Effective Time, as set forth in this Part 2 of Exhibit D. The Post-Conversion Company may revise these policies, from time to time, as it deems appropriate.

2.1 Investment Policy for the Canadian Participating Individual Asset Segment

| | | |
|---|---|---|
| Investment Objectives: | To maximize long-term after-tax investment earnings subject to constraints on asset quality and liquidity, while supporting a market competitive dividend payment and surplus level, with a focus on portfolio total return. | |
| Asset Mix Target: | Cash | 1% |
| | Canada Bonds | 20% |
| | Public Bonds | 19% |
| | Private Bonds | 11% |
| | Mortgages NHA | 3% |
| | Mortgages Conventional | 12% |
| | Real Estate | 18% |
| | Stock | 15% |
| | Non-Canadian Bonds/Equities | 1% |
| | Total | 100% |
| Target Equity Content: | 25–35% | |
| Fixed Income Duration: | | |
| Target: | 7.0 years | |
| Allowable Range: | 5.0–9.0 years | |
| Liquidity: | Moderate liquidity requirements to meet potential withdrawals of amounts on deposit and/or policy surrenders/lapses. | |
| | Minimum of 10% in cash and liquid bonds. | |
| Credit Risk: | Minimum fixed income quality standard is 1.00 (equivalent to provincial bond rated BBB+ or public/private bond rated A –, A, or A+). | |
| Other: | Foreign investments should match the internal reserves for Bermuda and U.S. dollar liabilities. | |

2.2 Investment Policy for the U.S. Participating Individual Asset Segment

| | |
|---|---|
| Investment Objective: | To maximize the total return on a diversified portfolio over the long term, while providing and maintaining the return necessary to achieve competitive and relatively stable net cost insurance and profitability in the short term. |

Asset Mix Target:

| | |
|---|---|
| Short Term Funds | 1% |
| Public Bonds | 24% |
| Private Bonds | 28% |
| Mortgages | 30% |
| Synthetic Convertibles | 2% |
| Real Estate/REIT | 15% |
| Total | 100% |

Target Equity Content: 17%

Fixed Income Duration:
Target: 6.5 years
Allowable Range: 5.5 to 7.5 years

Liquidity: Moderate liquidity requirements to meet potential withdrawal of amounts on deposit and potential for policy loans.

Credit Risk: Minimum fixed income quality standard is 1.65 (for example, a value of 2 is applied for bonds rated BBB and 1 for bonds rated A).

Other: Forward commitments will be made to manage liquidity, subject to expectations of prospective interest rate levels.

2.3 Investment Policy for Philippines Participating Individual Asset Segment

Investment Objectives: To maximize long-term after-tax investment earnings subject to constraints on asset quality and liquidity, while supporting a market competitive dividend payment and surplus level, with a focus on portfolio total return.

Asset Mix Target:

| | | |
|---|---|---|
| Bonds | Govt. Peso | 42% |
| | Govt. U.S.$ | 7% |
| | Corporate Peso | 12% |
| | Corporate U.S. | 4% |
| Real Estate | | 5% |
| Common Stock | | 19% |
| Cash | Peso | 12% |
| Total | | 100% |

Target Equity Content: 20%

Fixed Income Duration
Target: 10 years

Liquidity: Minimum of 10% in cash and liquid bonds to meet potential withdrawals and to offset interest rate and political risk.

Credit Risk: Minimum fixed income quality is A or better.

Other: Investments must be eligible under the rules of the Philippine Insurance Commission.

Up to 15% can be held in eligible long-term U.S.$ bonds.

PART 3 - DIVIDEND POLICY FOR PARTICIPATING POLICYHOLDERS

Sun Life Assurance Company of Canada (the "Company") is a company governed by the *Insurance Companies Act* of Canada that was converted from a mutual company into a company with common shares (the "Conversion"). This Dividend Policy applies to individual participating policies issued by the Company before the Conversion in Canada (including Bermuda), the United States of America, and the Philippines, and to individual participating policies issued by the Company after the Conversion.

Participating policyholders of the Company are eligible to receive distributions in respect of their policies, commonly referred to as policy dividends, as declared from time to time by the Board of Directors of the Company in accordance with applicable law.

Individual participating policies issued by the Company before the Conversion in Canada (including Bermuda), the United States of America, and the Philippines are accounted for separately, by territory, from policies issued by the Company after the Conversion. The assets and earnings of this pre-Conversion individual participating business in each territory, as specified by the terms of the Conversion, enure exclusively to the aforesaid individual participating policies in that territory. Distributions of such earnings to shareholders of the Company are not permitted. Dividends on these policies generally reflect changes in the experience of this pre-Conversion individual participating business, by territory, over time, as adjusted to maintain consistency in distribution from one period to another, with the objective of minimizing tontine effects and exhausting the assets of this business over the lifetime of the business.

Dividends on policies issued by the Company after the Conversion are distributed from the earnings of the post-Conversion participating business consisting of those policies. The amount of dividends distributed at any time depends on a number of factors including the experience of the post-Conversion participating business, as adjusted to maintain consistency in distribution from one period to another, the growth of that business, the need to retain a portion of earnings to support that business, and the overall capital adequacy position of the Company. The distribution of any earnings of the post-Conversion participating business to shareholders of the Company is limited by applicable law.

The dividend allocation process followed by the Company in respect of participating policies recognizes the contributions made by the policies to the pre-Conversion or post-Conversion participating business to which they belong. Not all policies contribute to the same extent or at the same time, and there are certain practical limits, legal constraints and prevailing local practices that apply to the allocation in some circumstances. This process seeks to achieve reasonable equity between classes of policies and between generations of policies. In order to determine the contribution of policies, policies are grouped into classes with common experience factors such as mortality, investment return, taxes and administrative expenses.

The dividend scales of the Company are established by the Board of Directors of the Company from time to time, and reviewed at least once each year. Generally, dividends are credited to policies on the anniversary date of a policy. Other dividends called terminal or special maturity dividends may be credited to a policy upon surrender or maturity of the policy, or upon death of the insured. The type of policy, the amount of time it has been in force and the manner of its termination will affect eligibility for, and the amount of, the terminal or special maturity dividend.

The Company may, from time to time, acquire individual participating business from other insurers. This Dividend Policy is intended to apply to such acquired business, subject to the terms and conditions applying to the acquisition.

This Dividend Policy may not be changed for five years following the date of the Conversion. Thereafter, it is subject to change from time to time by the Board of Directors of the Company, subject to applicable law.

PART 4 - ADEQUACY OF PLAN TO MEET CONTRACTUAL OBLIGATIONS AND REASONABLE EXPECTATIONS IN RESPECT OF FUTURE DIVIDENDS AND OTHER NON-GUARANTEED BENEFITS

The provisions of the Conversion Plan are expected to be adequate to meet contractual obligations under the Pre-Conversion Participating Policies and the expectations of the holders of such Policies in respect of future dividends and other non-guaranteed policy benefits for the reasons set forth below.

The Pre-Conversion Individual Participating Closed Sub-Funds are specifically designed to protect future dividend levels. All policies that require protection of future dividend levels will be included in these sub-funds. This includes all individual participating life insurance Policies with discretionary dividends that are In Force up to the day before the Effective Date.

The initial amount of assets to be allocated to the Pre-Conversion Individual Participating Closed Sub-Funds will be determined on a basis expected to be sufficient to provide for all contractual obligations (other than deposit liabilities which are provided for in the Pre-Conversion Ancillary Participating Sub-Fund) and reasonable expectations in respect of future dividends and other non-guaranteed policy benefits on the Policies in the sub-funds (the Pre-Conversion Individual Participating Policies). The starting point for this amount is the present value of future benefits (including annual dividends and terminal dividends) and expenses minus the present value of future gross premiums, assuming that current dividend scales and the experience underlying those scales persists without change. To this a margin has been added, which provides increased confidence that reasonable expectations in respect of future dividends and other non-guaranteed policy benefits on Pre-Conversion Individual Participating Policies will continue to be met.

The Company's dividend policy for the Pre-Conversion Individual Participating Policies will specify that dividends will reflect the emergence of earnings in the Pre-Conversion Individual Participating Closed Sub-Funds, so as to exhaust the assets over the lifetime of the business while avoiding a material surplus or deficiency in those sub-funds. This is consistent with past dividend-setting practices, where dividends change with changes in experience.

All profits earned by the Pre-Conversion Individual Participating Closed Sub-Funds will accrue exclusively to the benefit of the Pre-Conversion Individual Participating Policies. The Company will not be permitted to transfer assets out of the Pre-Conversion Individual Participating Closed Sub-Funds over the lifetime of those sub-funds for reasons other than to pay policy benefits (including policy dividends), expenses, and taxes of the sub-fund.

Furthermore, the Pre-Conversion Individual Participating Closed Sub-Funds will not be allowed to fall into a deficit position. That is, if the Appointed Actuary determines that the best estimate liabilities of a Pre-Conversion Individual Participating Closed Sub-Fund are greater than the assets in the sub-fund, then sufficient assets will be transferred into the sub-fund to make up the difference.

The Conversion Plan also sets out rules for the future allocations of investment income, expenses and taxes to the Pre-Conversion Individual Participating Closed Sub-Funds. These rules have been developed to ensure that these sub-funds receive a fair and equitable proportion of total Post-Conversion Company investment income, expenses and taxes. The allocation methods are essentially the same as those used prior to Conversion for investment income and taxes. Expenses will generally be set based on best estimate assumptions used in the calculation of Sun Life of Canada's actuarial liabilities as at the last day of the Reporting Period immediately prior to the Effective Date and indexed to inflation as measured by a recognized index of inflation which the Appointed Actuary deems to be appropriate. Moreover, the Conversion Plan requires that the Appointed Actuary shall provide from time to time opinions and reports to the regulators as may be required to demonstrate compliance with the Conversion Plan.

Sun Life of Canada has made the commitment that policy dividends will not be adjusted to absorb future costs associated with claims under the Market Conduct Settlements. Therefore, after demutualization, provisions for these costs will be held in the Shareholders' Account. This ensures that the risk that actual costs are different from estimated costs will be borne by the shareholders, and not the Pre-Conversion Individual Participating Policies. When the settlement of a claim under the Market Conduct Settlements involves enhancing future policy benefits or dividends on a Pre-Conversion Individual Participating Policy, sufficient assets will be transferred from the Shareholders' Account into the applicable Pre-Conversion Individual Participating Closed Sub-Fund to cover the resulting increase in the liabilities.

The separation of Pre-Conversion Individual Participating Policies in the Pre-Conversion Individual Participating Closed Sub-Funds protects these policies by ensuring that future dividend levels will not be affected by the pricing or dividend management on Post-Conversion Individual Participating Policies. Furthermore, dividends on Pre-Conversion Individual Participating Policies will not be affected by mortality or lapse experience on Post-Conversion Individual Par Policies, nor by profits or losses on any other business outside the sub-funds.

Pooling of investment experience between Pre-Conversion Individual Participating Policies and Post-Conversion Individual Participating Policies will continue. This is consistent with past dividend setting practices, and helps achieve the objective that future dividends on Pre-Conversion Individual Participating Policies be similar to what they would have been had the Conversion not occurred.

Assets equal to the actuarial provision for adverse deviations on Pre-Conversion Individual Participating Policies are allocated to the Pre-Conversion Ancillary Participating Sub-funds. These assets provide an additional layer of protection in the participating account to support the Pre-Conversion Individual Participating Policies.

The Conversion Plan specifies that Deposit Liabilities associated with Pre-Conversion Individual Participating Policies will accrue interest in a manner consistent with the past practices of Sun Life of Canada for setting credited rates of interest on amounts on deposits. The assets allocated to the Pre-Conversion Ancillary Participating Sub-funds in respect of such Deposit Liabilities will be expected to be sufficient to provide for a continuation of current practices, plus a margin equal to the excess of earned rates over credited rates.

Pre-Conversion Participating Policies which do not require the dividend protections of the Pre-Conversion Individual Participating Closed Sub-funds (primarily Pre-Conversion Participating Policies which are Group Insurance Policies) will be allocated to the Pre-Conversion Ancillary Participating Sub-Funds. These sub-funds will be allocated assets equal to the associated actuarial liabilities on the Policies in the sub-funds. This is sufficient to provide for contractual obligations on such Policies, plus a provision for adverse deviations.

**EXHIBIT E – EXCERPTS FROM BY-LAW OF FINANCIAL SERVICES RELATING TO ISSUANCE OF SHARES**

SECTION 1.

DEFINITIONS

1.1 Definitions

In this By-law No. 2:

(a) "Act" means the *Insurance Companies Act* enacted by the Parliament of Canada, as amended or replaced from time to time;

(b) "Board" means the Board of Directors of the Corporation;

(c) "Cancellation Time" means 11:59 p.m., Toronto time, on the thirty-fifth month anniversary of the Effective Date;

(d) "Class A Shares" means the Class A Shares of any series in the capital of the Corporation, without nominal or par value, now existing or hereafter created;

(e) "Class B Shares" means the Class B Shares of any series in the capital of the Corporation, without nominal or par value, now existing or hereafter created;

(f) "Common Shares" means the common shares in the capital of the Corporation, without nominal or par value, now existing or hereafter created;

(g) "Conversion Plan" means the conversion proposal of Sun Life as approved by the Minister which constitutes a Conversion Proposal as contemplated by the Act;

(h) "Corporation" means Sun Life of Canada Holdings Corp.;

(i) "Effective Date" means the effective date specified in the Letters Patent of Conversion issued to Sun Life;

(j) "Letters Patent of Conversion" has the meaning ascribed thereto in the Conversion Plan;

(k) "Lost Policyholder" has the meaning ascribed thereto in the Conversion Plan;

(l) "Regulations" means the regulations made under the Act, as amended or replaced from time to time;

(m) "Share Constraint Regime" means the provisions of the Act and the Regulations, if any, which establish rules restricting the purchase or other acquisition, issue, transfer and voting of shares of the Corporation, as those provisions may be amended from time to time; and

(n) "Sun Life" means Sun Life Assurance Company of Canada.

1.2 Interpretation

In this By-law No. 2, the terms "control", "entity", "person" and "significant interest" and all other terms which are not defined herein shall have the meanings ascribed to those terms in the Act.

SECTION 2.

AUTHORIZED CAPITAL

2.1 Authorized Capital

The authorized capital of the Corporation consists of:

(a) an unlimited number of Class A Shares issuable in series;

(b) an unlimited number of Class B Shares issuable in series; and

(c) an unlimited number of Common Shares.

SECTION 5.

COMMON SHARES

The Common Shares shall have attached thereto the following rights, privileges, restrictions and conditions:

5.1 Dividends

(a) Subject to the prior rights of the holders of the Class A Shares, the Class B Shares and any other shares ranking senior to the Common Shares with respect to priority in payment of dividends, the holders of Common Shares shall be entitled to receive dividends as and when declared by the Board out of monies properly applicable to the payment of dividends, in such amount and in such forms as the Board may from time to time determine and all dividends which the Board may declare on the Common Shares shall be declared and paid in equal amounts per share on all Common Shares outstanding at the time.

(b) Any dividend (other than a stock dividend) unclaimed after a period of six years from the date on which the same has been declared to be payable shall be forfeited and shall revert to the Corporation.

5.2 Dissolution

In the event of the liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, or any other distribution of the assets of the Corporation among its shareholders for the specific purpose of winding up its affairs, subject to the prior rights of the holders of the Class A Shares, the Class B Shares and any other shares ranking senior to the Common Shares with respect to priority in the distribution of assets in the event of the liquidation, dissolution or winding up of the Corporation, the holders of the Common Shares shall be entitled to receive the remaining property of the Corporation that pertains to shareholders, in equal amounts per share, without preference or priority of one share over another.

5.3 Voting Rights

The holders of Common Shares shall be entitled to receive notice of and to attend all meetings of the shareholders of the Corporation and shall have one vote for each Common Share held at all meetings of the shareholders of the Corporation, except for meetings at which only holders of another specified class or series of shares of the Corporation are entitled to vote separately as a class or series.

5.4 Constrained Shares

(a) On and after the date upon which the Corporation becomes the holding body corporate of a company that has converted from a mutual company into a company with common shares, the Corporation shall not issue or allot any Common Shares to any person, or any entity controlled by a person, the Corporation shall refuse to allow the entry in the securities register of the Corporation of an issue or transfer of any Common Shares to any person, or any entity controlled by a person, and no person, or any entity controlled by a person, shall purchase or otherwise acquire any Common Shares, if such issue, transfer or purchase or other acquisition would cause the person to have a significant interest in the Common Shares. No person who has a significant interest in any class of shares of the Corporation, or entity controlled by a person who has a significant interest in any class of shares of the Corporation, shall, in person or by proxy, exercise any voting rights attached to Common Shares beneficially owned by, or that are subject to agreement pertaining to the exercise of voting rights entered into by, that person, or entity. In accordance with the authority granted to the Board under the Act and the Regulations, the Board is hereby authorized to make such arrangements as the Board deems necessary to carry out the intent of the acquisition, issue, transfer and voting restrictions contained in the Act, the Regulations and the by-laws.

(b) If the purchase or other acquisition, issue, transfer or voting of any Common Shares would be permitted under the Act and the Regulations, notwithstanding the provisions of subsection 5.4(a),

the Board is hereby authorized, in its discretion, to permit by resolution of the Board, any such purchase or other acquisition, issue, transfer or exercise of voting rights with respect to such Common Shares.

(c) Subject to subsection 5.4(d), if, after the date of incorporation of the Corporation, the Share Constraint Regime is amended, replaced or deleted, such that the provisions of subsection 5.4(a) are inconsistent with the Share Constraint Regime resulting from such amendment, replacement or deletion, then the Board is hereby authorized to amend, replace or delete subsection 5.4(a) such that it will be consistent with the Share Constraint Regime then in effect. The action of the Board to amend, replace or delete subsection 5.4(a) shall be by resolution of the Board and such amendment, replacement or deletion of subsection 5.4(a) shall be effective without the approval of the holders of any of the Class A Shares, the Class B Shares or the Common Shares. Promptly following any amendment, replacement or deletion of subsection 5.4(a) by the Board, the Corporation shall give notice to the holders of the Common Shares of the amendment, replacement or deletion thereto.

(d) If, after the date of incorporation of the Corporation, the Share Constraint Regime is amended or replaced and the Share Constraint Regime then in effect allows the Corporation to determine the application to it and its shareholders of all or any part of such Share Constraint Regime then the provisions of subsection 5.4(a) may only be amended or replaced with approval of the holders of the Class A Shares, the Class B Shares and the Common Shares as provided in the Act.

5.5 Amendment With Approval of Holders of Common Shares

The rights, privileges, restrictions and conditions attached to the Common Shares as a class may be added to, changed or removed but only with the approval of the holders of the Common Shares given as hereinafter specified.

5.6 Approval of Holders of Common Shares

The approval of the holders of the Common Shares to add to, change or remove any right, privilege, restriction or condition attaching to the Common Shares as a class may be given in such manner as may then be required by law, subject to a minimum requirement that such approval be given by resolution signed by all the holders of the Common Shares or passed by the affirmative vote of at least two-thirds (⅔) of the votes cast at a meeting of the holders of the Common Shares duly called for that purpose. Notwithstanding anything else in this Section 5, the approval of the holders of the Common Shares, voting separately as a class, is not required on a proposal to amend the by-laws of the Corporation to:

(a) increase or decrease the maximum number of authorized Common Shares, or increase the maximum number of authorized shares of a class of shares having rights or privileges equal or superior to the Common Shares;

(b) effect the exchange, reclassification or cancellation of all or any part of the Common Shares; or

(c) create a new class of shares equal to or superior to the Common Shares.

The formalities to be observed with respect to the giving of notice of any such meeting or any adjourned meeting, the quorum required therefor and the conduct thereof shall be those from time to time required by the Act as in force at the time of the meeting and those, if any, prescribed by the by-laws or the administrative resolutions of the Corporation with respect to meetings of shareholders. On every poll taken at every meeting of the holders of the Common Shares as a class, each holder of Common Shares entitled to vote thereat shall have one vote in respect of each Common Share held.

5.7 Notice to the Holders of the Common Shares

Any notice, cheque or other communication from the Corporation herein provided for shall be sent to the holders of the Common Shares by mail, postage prepaid at their respective addresses appearing on the securities register of the Corporation or, in the event of the address of any such holder not so appearing, then at the last address of such holder known to the Corporation. Accidental failure to give any such notice or other communication to one or more holders of Common Shares shall not affect the validity thereof, but, upon such failure being discovered, a copy of the notice or other communication, as the case may be, shall be sent or

delivered forthwith to such holder or holders. Unless otherwise provided herein, any notice, request, certificate or other communication from a holder of Common Shares herein provided for shall be either sent to the Corporation by mail, postage prepaid, or delivered by hand to the Corporation at its head office.

SECTION 6.

LOST POLICYHOLDERS

6.1 Restriction on Voting Rights

(a) Subject to subsection 6.1(b), no Lost Policyholder shall, in person or by proxy, exercise any voting rights that are attached to the Common Shares issued to such Lost Policyholder.

(b) Subsection 6.1(a) shall cease to apply in respect of a Lost Policyholder once such Lost Policyholder ceases to be a Lost Policyholder in accordance with Section 6.2.

6.2 Confirmation Criteria

A Lost Policyholder shall cease to be a Lost Policyholder at any time from the Effective Date up to and including the Cancellation Time if such Lost Policyholder confirms the current address at which he or she may be reached by mail by: (i) responding to a letter from Sun Life or the Corporation requesting confirmation of the current address; (ii) contacting Sun Life or the Corporation and confirming the current address; (iii) informing Sun Life or the Corporation of a change of address; or (iv) otherwise confirming the current address with Sun Life or the Corporation, in a manner satisfactory to Sun Life or the Corporation.

6.3 Securities Register

From the Effective Date up to and including the Cancellation Time, the Corporation shall record in its securities register the status of a person as a Lost Policyholder. If a Lost Policyholder ceases to be a Lost Policyholder in accordance with Section 6.2, the Corporation shall amend its securities register accordingly.

6.4 Dividends and Distributions

No payments in respect of dividends or distributions declared by the Corporation in respect of the Common Shares issued pursuant to the Conversion Plan shall be made in respect of a Lost Policyholder. However, the Corporation shall pay to a person who ceases to be a Lost Policyholder, in accordance with Section 6.2, all dividends and distributions, without interest and net of any applicable withholding taxes, to which such person was otherwise entitled as a shareholder of record of the Corporation, while such person was a Lost Policyholder. The payment of such dividends or distributions shall be in accordance with the other provisions of this By-law No. 2.

6.5 Cancellation of Shares and Dividends and Subsequent Reissuance

Upon the Cancellation Time, the Corporation shall, for no consideration, cancel all Common Shares issued to Lost Policyholders who remain as such at the Cancellation Time, and all such Common Shares shall be deemed to have been surrendered to the Corporation, together with all entitlements to dividends and distributions thereon, including any proceeds of dissolution pursuant to the Act. Notwithstanding the foregoing, the Corporation shall, from time to time in accordance with the Conversion Plan, subsequent to the Cancellation Time reissue Common Shares and pay an amount in respect of dividends or issue securities or pay cash or other property to a person, as the case may be, whose Common Shares were cancelled in accordance with this Section 6.5.

No amount shall be deducted from, or added to, the stated capital account maintained for Common Shares in respect of the Common Shares cancelled or reissued, respectively, pursuant to this Section 6.5.

## SCHEDULE B

## DEMUTUALIZATION RESOLUTION

### SUN LIFE ASSURANCE COMPANY OF CANADA

### SPECIAL RESOLUTION OF ELIGIBLE POLICYHOLDERS

**Eligible policyholders will be asked to pass the following resolution at the Special Meeting of Sun Life of Canada to be held on December 15, 1999 or any later date to which the meeting may be continued after an adjournment.**

**RECITALS:**

1. Sun Life Assurance Company of Canada proposes to convert from a mutual company to a company with common shares pursuant to the provisions of the *Insurance Companies Act* (Canada) and the regulations under that Act.

2. In order to implement the conversion, Sun Life of Canada has prepared the Conversion Plan, which is described in the Policyholder Information Circular and which is set out in Schedule A to Part 1 of the Policyholder Information Circular.

3. In order to implement the Conversion Plan, Sun Life of Canada is proposing to amend and restate its by-laws to provide, among other things, for the issuance of common shares.

4. For the Conversion Plan to become effective, eligible policyholders of Sun Life of Canada must approve the Conversion Plan and the Minister of Finance of Canada must approve the Conversion Plan and issue Letters Patent of Conversion to effect the Conversion Plan under subsection 237(1) of the *Insurance Companies Act* (Canada).

5. The Conversion Plan, the amended and restated by-laws and the application to the Minister of Finance of Canada for his approval and the issuance of Letters Patent of Conversion must be approved by a special resolution, being at least two-thirds of the votes cast in person or by proxy by eligible policyholders, at a special meeting of Sun Life of Canada called for that purpose.

**RESOLVED** as a special resolution of eligible policyholders of Sun Life Assurance Company of Canada that:

1. The conversion of Sun Life of Canada from a mutual company to a company with common shares, substantially in the manner set forth in the Conversion Plan, is approved.

2. The amended and restated by-laws of Sun Life of Canada, substantially in the form set out in Exhibit A to the Conversion Plan, are confirmed and will take effect on the written approval of the amended and restated by-laws by the Superintendent of Financial Institutions (Canada) and the issuance of Letters Patent of Conversion to effect the Conversion Plan.

3. The board of directors of Sun Life of Canada is authorized to make an application on behalf of Sun Life of Canada to the Minister of Finance of Canada for the approval of the Conversion Plan and the issuance of Letters Patent of Conversion to effect the Conversion Plan.

4. The proper officers of Sun Life of Canada are authorized to execute and deliver any documents and instruments and to do any other acts and things that they may determine to be necessary or desirable to give effect to the Conversion Plan.

5. Notwithstanding that this resolution has been passed, the board of directors of Sun Life of Canada is authorized to withdraw or not to proceed with the Conversion Plan at any time before Letters Patent of Conversion are issued to effect the Conversion Plan.

SCHEDULE C

OPINION OF SUN LIFE OF CANADA'S APPOINTED ACTUARY

Sun Life Assurance Company of Canada

**Robert W. Wilson**, FCIA, FSA, MAAA
Vice-President & Appointed Actuary

I, Robert Wilson, am the Appointed Actuary of Sun Life Assurance Company of Canada ("Sun Life of Canada" or the "Company"). I am also the owner of six participating life insurance policies issued by the Company and expect to receive a number of shares in connection with my ownership of these policies upon demutualization.

This is a summary of my report on the Conversion Plan of Sun Life of Canada from a mutual to a stock company required pursuant to Section (5)(1)(a) of the *Mutual Company (Life Insurance) Conversion Regulations* (the "Regulations"). The full version of my report has been filed with the Office of Superintendent of Financial Institutions ("OSFI").

In this report, the terms "conversion" and "demutualization" are used interchangeably.

As required by the Regulations my report addresses three areas: (i) the equity and fairness of the approach to the allocation of demutualization benefits, (ii) the adequacy of the funds in the participating policyholder account to meet contractual obligations and reasonable expectations in respect of future dividends, and (iii) the impact of the conversion on the financial strength of the company and the security of policyholders.

In my opinion:

- the benefits to be provided to eligible policyholders and the method used to apportion the value of the Company among eligible policyholders are fair and equitable to those policyholders;
- the assets which will be allocated to the participating accounts of the Company upon the conversion of the Company are expected to be adequate to:
  - i) meet contractual obligations under the policies in respect of which the participating accounts are maintained,
  - ii) meet the reasonable expectations of the holders of those policies in respect of future dividends and other non-guaranteed policy benefits, and
  - iii) support future participating policies expected to be allocated to those accounts; and
- the future financial strength and vitality of the Company and the security of policyholders will not be materially adversely affected by the conversion.

The following pages comprise my summary report as required by the *Insurance Companies Act* (Canada).

Robert Wilson

Robert W. Wilson
Vice-President & Appointed Actuary

Date: September 28, 1999

TABLE OF CONTENTS


| | Page |
|---|---|
| 1. Scope | 156 |
| 2. Allocation of Benefits to Policyholders | 156 |
| 2.1 Introduction | 156 |
| 2.2 Allocation Principles | 157 |
| 2.3 Fixed Component | 157 |
| 2.4 Individual Life Insurance | 157 |
| 2.4.1 Variable Component | 157 |
| 2.4.2 Tests of Reasonableness | 158 |
| 2.4.3 Consideration of Other Formulas | 159 |
| 2.5 Other Lines of Business | 159 |
| 2.5.1 Application of Formula to Other Lines of Business | 159 |
| 2.5.2 Variable Component (Group Insurance Policies) | 159 |
| 2.5.3 Tests of Reasonableness (Group Insurance) | 160 |
| 2.5.4 Annuities, Pensions, Individual Health and Supplementary Contracts | 160 |
| 2.6 Form of Benefits | 160 |
| 3. Restructuring and Future Operations of the Participating Account | 160 |
| 3.1 Current Structure | 160 |
| 3.2 Corporate Reorganization of the Insurance Businesses | 161 |
| 3.3 Restructuring of the Participating and Non-Participating Accounts | 161 |
| 3.3.1 Sun Life of Canada (Canada, U.S.) | 161 |
| 3.3.1.1 Protecting Future Dividends | 162 |
| 3.3.1.2 Protecting Other Policy Benefits | 163 |
| 3.3.1.3 Support for Post-Demutualization Participating Policies | 163 |
| 3.3.2 Philippines | 163 |
| 3.3.3 United Kingdom | 164 |
| 3.3.4 Hong Kong | 164 |
| 3.4 Alternative Arrangements | 164 |
| 4. Financial Strength and Vitality of the Company and Policyholder Security | 164 |
| 4.1 Introduction | 164 |
| 4.2 DCAT and Company Strength | 164 |
| 4.3 Conversion Plan Features | 165 |
| 4.3.1 Allocation and Distribution of Demutualization Benefits | 165 |
| 4.4 Reorganization of the Insurance Businesses | 165 |
| 4.4.1 Policyholders Remaining in Sun Life of Canada | 165 |
| 4.4.2 Policyholders Transferring to Sun Life U.K. | 166 |
| 4.4.3 Policyholders Transferring to Sun Life International (Hong Kong) | 166 |
| 4.4.4 Policyholders Indemnity Reinsured to Sun Life Philippines | 166 |

## 1. SCOPE

As a Fellow of the Canadian Institute of Actuaries, my report is limited to actuarial matters. Accordingly, my report does not address any legal, accounting, financial, share valuation, commercial or other aspect of the Conversion Plan which is outside the scope of actuarial practice.

Upon the conversion of the Company into a company owned by shareholders, the value of the Company will be allocated among eligible policyholders in the form of common shares of Sun Life of Canada Holdings Corp. ("Financial Services") or cash or policy credits. This report reviews the allocation of these benefits to eligible policyholders, and examines the equity and fairness of the approach used. This report does not consider which policies are eligible, or who is the owner of eligible policies.

This report also reviews the restructuring and future operation of the participating account that will take effect on demutualization. Demutualization separates a participating policyholder's ownership rights in the Company from his or her rights to receive policy benefits and dividends when declared. The primary objective of the restructuring of the participating account is to ensure that contractual obligations and reasonable expectations in respect of future dividends and other non-guaranteed policy benefits are protected for Sun Life of Canada's participating policyholders, and to make adequate support for any future participating policies expected to be allocated to those accounts.

My review of the restructuring of the participating account is limited to consideration of the impact of the demutualization itself on policy benefits and dividends. Policy benefits and dividends could also be affected by other factors unrelated to demutualization, such as changes to the taxes paid by the Company, and these are outside the scope of this report.

Finally, this report reviews the impact of the Conversion Plan on the future financial strength and vitality of the Company and on the security of all policyholders. This review takes place in the context of the corporate reorganization and restructuring that is taking place in conjunction with the demutualization.

## 2. ALLOCATION OF BENEFITS TO POLICYHOLDERS

### 2.1 Introduction

The Regulations require that eligible policyholders receive demutualization benefits in return for giving up their mutual company ownership rights and interests. This section of the report describes the recommended formula for allocating benefits to eligible policies and the reasons why I support that formula.

The description of the allocation formula in this report is simplified. For precise details, see Article 4 of the Conversion Plan.

Sun Life of Canada is a large company, with business in a number of different countries. Although about 98% of the eligible policies are individual life, there are also eligible individual health and annuity policies, and eligible pension and group insurance policies. The nature of the eligible business differs in each country. Given the diversity of eligible policies, the following approach was followed.

1. A set of principles was developed to provide the foundation for the allocation basis.
2. A formula was developed for individual life that both met those principles and also produced results that met a series of reasonableness tests.
3. The formula was then reviewed to see if it could be applied to lines of business other than individual life. This proved to be possible except in the case of group insurance. A second formula was developed for group insurance that also met the principles and passed a set of reasonableness tests.

The formula allocates a certain number of shares of Financial Services to each eligible policyholder. The fairness and equity of the allocation of shares is discussed in sections 2.2 to 2.5. In some cases, shares will not be issued to the policyholder but instead the policyholder will receive demutualization benefits in the form of cash or policy credits. A discussion of the fairnesss of these different forms of demutualization benefits is in section 2.6.

### 2.2 Allocation Principles

The following major principles form the foundation of the formula for the allocation of shares. I consider these principles to be sound. I have satisfied myself that the proposed allocation basis meets these principles.

1. The allocation of value amongst eligible policyholders should be fair and equitable (recognising that there is more than one equitable way of allocating value), and should be perceived to be fair and equitable by as many of those policyholders as practical.
2. As far as is practical and consistent with the other principles, the same allocation formula should apply in all countries, for all types of eligible policies.
3. The allocation of value should comprise:
   - a fixed component (i.e. the same amount for all eligible policyholders) – to compensate for loss of voting control in Sun Life of Canada as a mutual company, and
   - a variable component – to recognize the loss of any other ownership rights in Sun Life of Canada as a mutual company, reflecting the varying financial interests of eligible policies, including their size, length of time in force, contribution to the value of the Company, and their differing rights to receive surplus.
4. The allocation of value should recognize the Company's history and philosophies of conducting business.
5. The allocation formula should be simple, practical to implement, and easy to understand.

### 2.3 Fixed Component

The fixed component of the allocation is 75 shares per eligible policyholder, regardless of the number, size or type of the policies owned. This is to compensate for the loss of voting control in Sun Life of Canada as a mutual company.

In aggregate, this component represents about 20% of the total distribution. I consider this to be satisfactory compensation for the loss of voting control. The fixed component is consistent with the current distribution of voting rights – one vote per voting policyholder, no matter how many or what size or what type eligible policies are owned. Moreover, it is consistent with demutualizations in other countries where this part of the allocation has generally been between 10% and 30% of total shares. The existence of a fixed component also results in each eligible policyholder receiving a reasonable minimum value.

### 2.4 Individual Life Insurance

#### 2.4.1 Variable Component

The formula for allocating shares for all eligible policies other than group insurance policies is:

- 1.32 shares per Can.$1,000 of cash value times duration ("time-weighted cash value"), plus
- 64 shares per Can.$1,000 of annual premium.

I endorse this formula. It meets the principles listed above. Together with the fixed component, it also meets a series of reasonableness tests that are described later. I also describe later (see section 2.5) why a different formula for the variable component for group insurance is appropriate.

*The use of cash value* provides a good measure of the size of a policy. A policy's cash value is also readily accessible to policyholders. The weighting of cash value by duration provides greater credit to policyholders of long standing, and reflects the past contribution to value made by policies. About 50% of the total shares will be allocated in proportion to time-weighted cash value.

*The use of annual premium* provides another measure of the size of the policy. Whereas cash value is a retrospective measure, annual premium reflects the ongoing commitment of the policyholder to pay premiums in future years and the future contribution to value. Like cash value, annual premium is also readily available to policyholders. About 30% of all shares will be allocated in proportion to annual premiums (including those of group insurance).

*The 50/30 distribution* of shares between time weighted cash value and annual premium provides a reasonable balance between recently issued policies and those in force for many years, and also results in a good fit with the overall reasonableness tests described later.

*The definition of cash value* is generally the amount the policyholder would have received if the policy had been terminated. It includes dividends on deposit and the cash value of paid up additions, but excludes the cash value of special maturity dividends (SMDs or terminal bonuses). The exclusion is appropriate because these dividends and bonuses would not be considered if a special distribution of surplus was being contemplated. In addition, the amounts are not vested or guaranteed, and their exclusion results in a fairer allocation among countries and among individuals.

*The definition of annual premium* is generally the annual premium for the base policy and those riders that attract dividends. Premiums for other riders are excluded for consistency with the Company's dividend practices – the regular annual dividend does not recognise whether a policy includes these riders or not. Single premiums are also excluded. By their nature, these are contractually non-recurrent, and recognition for past single premiums is given in the time-weighted cash value component. I consider these exclusions to be appropriate.

*The definition of duration* is generally the period of time that the policy has been in force. If business has been acquired from another company, recognition is given only to the period since acquisition by Sun Life of Canada. I consider this to be appropriate because the Company did not earn profits during the period that the policy was in force with the previous company. There are two cases where this has occurred. The largest is a group of about 24,000 U.K. eligible policies acquired from Confederation Life Insurance Company in 1994. There is also a much smaller group of about 180 Canadian eligible policies acquired from Teachers Insurance and Annuity Association of America at the beginning of 1996.

*The effective date for policy values* (cash value, annual premium and duration) is generally January 27, 1998 – the same as the eligibility date. Similarly, any conversion of policy values into Canadian dollars is done using currency exchange rates at the close of business on January 27, 1998. The effect is as if the entire process of allocating shares was done on the night of January 27, 1998, immediately after the announcement that the Board of Directors had instructed management to develop a demutualization plan.

### 2.4.2 Tests of Reasonableness

In addition to confirming that the formula met the principles described earlier, a number of tests were made to check that the results of applying the formula are reasonable.

Firstly, tests were made to *see how the value of shares allocated compared with the contribution to past and future surplus made by groupings of individual life policies.* The groupings were generally by country and year of issue. If each share is assumed to have a value of Can.$14, then the value of shares allocated exceeds the contribution to past and future surplus for over 98% of eligible policies. I consider this a satisfactory result.

Secondly, no significant inequities resulted when performing a series of reasonableness tests for *sample eligible policies*, in particular a comparison of the relative benefits received by:

- policies with different issue ages,
- policies with different issue years,
- different policy types,
- policies with different dividend options,
- different size policies, and
- similar policies issued in different countries.

Thirdly *a comparison was made of the results by country with the distribution of actual surplus* as at December 31, 1997. The allocation of shares by territory is broadly consistent with the distribution of actual surplus in the Company's accounts.

2.4.3 Consideration of Other Formulas

A number of different formulas were considered and tested before selecting the recommended formula. This formula was chosen because it met the allocation principles and it provided the best results when performing the reasonableness tests.

In particular, the Contribution to Surplus ("CTS") approach, which has been used as the basis for allocating the variable component of shares in most U.S. demutualizations, has not been used by Sun Life of Canada. The fairness of the method across different territories is questionable because of the significant differences in the type of products written in various countries. Moreover, it is an extremely complicated method and would have been very difficult to explain to eligible policyholders. Further, analysis performed by the Company shows that the contribution made by current eligible policyholders to the value of the Company at the end of 1997 is a very small proportion of the total value. In particular, about a third of eligible policyholders would have received no variable component if a CTS approach had been used. This would have been unacceptable.

## 2.5 Other Lines Of Business

2.5.1 Application of Formula to Other Lines of Business

As noted in the introduction, after developing a formula for Individual Life, the formula was reviewed to see if it could be applied to other lines of business. In the case of group insurance, a separate formula was considered appropriate.

Although it would have been preferable to use the same formula for all lines of business in all countries, there are fundamental differenees in the nature of the Company's different lines of business, particularly group insurance. Group insurance policies generally have no cash values. The use of the formula for individual life insurance would therefore have given no recognition to how long a group policy had been in force. I considered this unsatisfactory. In addition, group insurance policies do not participate in the same manner as individual participating policies, because the basis and methods used to share profits (e.g. experience rating refunds) are quite different than for participating individual life policies, in particular they are generally based on contractual formulas and are not at the discretion of the board of directors.

2.5.2 Variable Component (Group Insurance Policies)

The *formula for allocating shares to eligible group insurance policies* is 4.7 shares for each Can.$1,000 of premium times duration ("time-weighted premium").

I endorse this formula. It meets the major principles described earlier and also results in an appropriate allocation of shares to group insurance policies, both in aggregate and individually.

*The use of premium* recognises the size of the policy and, in most cases, is readily available to policyholders. It is a good measure of a policy's contribution to the value of the Company, both retrospectively and prospectively. The weighting of premium by duration ("time weighted premium") provides greater credit to policyholders of long standing.

*The definition of premium* is generally the 1997 billed premium, excluding any premiums paid for health insurance and Accidental Death and Dismemberment ("A.D.& D."). I consider the exclusion of these premiums to be appropriate since, in all countries except the U.K., if either health insurance or A.D.&D. were sold on a stand-alone basis, the policy would be non-participating and therefore ineligible to receive demutualization benefits. In the U.K. there are a very small number of participating health insurance policies. Credit is given for health insurance premiums only if paid under a participating health insurance policy. To recognise contributions made for paid-up coverages, a deemed annual premium is calculated, roughly equal to the annual premium that would be payable if the coverage was being paid for with annual premiums. Premiums that are reinsured with an insurance company owned or controlled by the policyholder are excluded. In these situations, the net premium is a better reflection of the financial interest of the policyholder in the Company.

*The definition of duration* is the period of continuous participating coverage that a group insurance policyholder has had with Sun Life of Canada (subject to a maximum of 15 years) plus five years. The addition of five years gives recognition to the expected future contribution to value. The maximum of 15 years results in a reasonable balance between policies in force for many years and recent issues – consistent with the formula for individual life. As is the case for individual policies, if business was acquired from another company, the period the policy has been in force is measured from the date of acquisition by Sun Life of

Canada. The only policies affected by this are a small number of policies acquired from The Prudential Group Assurance Company of England (Canada) on January 1, 1995. I consider the definition of duration to be appropriate.

#### 2.5.3 Tests of Reasonableness (Group Insurance)

In addition to confirming that the formula for group insurance policies met the principles described earlier, two tests were performed to see if it produced reasonable results.

Firstly, the number of shares allocated to group insurance policies in aggregate was reviewed. Eligible group policyholders will receive about 26 million shares or about 6.5% of the total value of the Company. This is similar to the ratio of group life par surplus to total surplus at December 31, 1997. Secondly, the number of shares allocated to group policyholders is about the same in aggregate as the number that would have been allocated if the formula for individual life had been applied.

The use of a different formula for group insurance therefore does not result in a significant change to the total number of shares allocated to eligible group policyholders, but does result in a distribution among eligible policyholders that is more equitable.

#### 2.5.4 Annuities, Pensions, Individual Health and Supplementary Contracts

Except for one modification, it was not considered necessary to change the individual life formula for these product lines, as the individual life formula provides a reasonable allocation to these policies. The one modification is for corporate owned pension policies (other than the U.K. individual money purchase plan), where duration will be limited to 15 years. I consider this limitation to be appropriate. It is consistent with the definition of duration for group insurance, and in addition, the irregular and generally increasing pattern of premium[1] payments under such plans justifies a differentiation with individually owned policies where premiums are normally level.

### 2.6 Form of Benefits

In general, benefits will be distributed in the form of shares of Financial Services (with an option to receive cash). In some cases benefits must be distributed in the form of cash or policy credits.

In those cases where eligible policyholders receive cash, either voluntarily or involuntarily, the amount of cash received will be the value (at the IPO price) of the shares allocated. These policyholders will therefore receive a consideration equal in value at the date of conversion to that given to those policyholders who are allocated shares and elect not to sell them. I am explicitly relying on the opinion of the valuation expert that the cash amount to be distributed in lieu of shares is an appropriate substitute for those shares.

When policyholders receive policy credits, the first step will be to calculate the value of the shares allocated, using the IPO price. Policy benefits will then be increased, with the value of the increase in benefits being equal to the IPO value of the shares allocated. The form of policy credits depends upon the nature of the contract.

## 3. RESTRUCTURING AND FUTURE OPERATIONS OF THE PARTICIPATING ACCOUNT

### 3.1 Current Structure

Sun Life of Canada is required under section 456 of the *Insurance Companies Act* (ICA) to maintain and report accounts for its participating business that are separate from those for its non-participating policies and other businesses. Within the worldwide participating account, Sun Life of Canada also maintains separate participating accounts for each major territory. Similarly, non-participating accounts are maintained separately for each major territory.

These participating and non-participating accounts contain the policies, assets and liabilities of the insurance business of Sun Life of Canada. The major territories for which separate accounts are maintained are Canada (including Bermuda), the U.S., the U.K., Hong Kong, and the Philippines.

---

(1) Premiums in the case of such corporate pension policies are also called "deposits".

### 3.2 Corporate Reorganization of the Insurance Businesses

At the time of demutualization, Sun Life of Canada will transfer its U.K. insurance business to Sun Life Assurance Company of Canada (U.K.) Limited ("Sun Life U.K."), a wholly owned subsidiary of Sun Life of Canada. At the same time, Sun Life of Canada will transfer its insurance businesses in Ireland and the Channel Islands to Sun Life U.K. These transfers require local regulatory and court approval and Canadian regulatory approval, including the report and opinion of both a local and Canadian independent actuary on the impact on the interests of policyholders. Copies of those reports are available to policyholders. Court approval for the U.K. transfer was obtained on September 21, 1999. After the transfers, Sun Life U.K. will replace Sun Life of Canada as the insurer for the transferred policies. These transfers will only occur if demutualization is completed.

Subject to regulatory approval and approval at a Hong Kong court hearing (expected to take place in November or December 1999), at the time of or as soon as reasonably practicable after demutualization, Sun Life of Canada will transfer its Hong Kong insurance business to Sun Life of Canada (International) Limited ("Sun Life International"), a newly created wholly owned subsidiary of Sun Life of Canada. This transfer requires both local and Canadian regulatory approval and local court approval, including a report and opinion of both a local and Canadian independent actuary on the impact on the interests of policyholders. Copies of those reports will be made available to policyholders. After that transfer, Sun Life International will replace Sun Life of Canada as the insurer for the transferred policies. That transfer will only occur if demutualization is completed.

Shortly before or as soon as reasonably practicable after demutualization, Sun Life of Canada will transfer its Philippine insurance business (other than its policies) to Sun Life of Canada (Philippines), Inc. ("Sun Life Philippines"), a wholly owned subsidiary of Sun Life of Canada. At the time of the transfer, Sun Life of Canada will arrange for its policy obligations in the Philippines to be reinsured by Sun Life Philippines through indemnity reinsurance. The transfer and reinsurance require regulatory approval, including a report and opinion of a Canadian independent actuary on the impact on the interests of policyholders. Copies of those reports will be made available to policyholders. Sun Life of Canada will continue to be ultimately responsible for all policies issued in the Philippines and outstanding before the transfer. Any policies issued in the Philippines after the transfer will be issued by Sun Life Philippines and it and not Sun Life of Canada will be the insurer under those policies.

The corporate reorganization of the insurance business will leave Sun Life of Canada's Canadian and U.S. insurance businesses largely unchanged.

See section 3.4 for alternative arrangements if such transfers do not occur.

### 3.3 Restructuring of the Participating and Non-Participating Accounts

As noted earlier, the primary objective of the restructuring of the participating account is to protect contractual obligations and reasonable expectations in respect of future dividends and other non-guaranteed policy benefits for Sun Life of Canada's participating policyholders, and to make adequate support for any future participating policies expected to be allocated to those accounts.

The remainder of this section is a description of the main elements of that restructuring and of how those protections are provided in respect of the business in each major territory.

#### 3.3.1 Sun Life of Canada (Canada, U.S.)

After demutualization, Sun Life of Canada will continue to maintain the worldwide participating account and the Canadian and U.S. territorial participating accounts. Sun Life of Canada will also establish and maintain the "Shareholders' Account", which will include the accounts in respect of the Canadian and U.S. non-participating businesses.

Within each of the Canadian and U.S. territorial participating accounts, Sun Life of Canada will establish and maintain two separate sub-accounts as follows:

i) A sub-account in respect of pre-demutualization participating policies in the Canadian and U.S. territorial participating accounts, called the "Pre-Conversion Participating Sub-Account", and

ii) A sub-account in respect of all post-demutualization participating policies in the Canadian and U.S. territorial participating accounts, called the "Post-Conversion Individual Participating Sub-Account".

Furthermore, within each of the Canadian and U.S. Pre-Conversion Participating Sub-Accounts, Sun Life of Canada will establish and maintain two separate sub-funds as follows:

i) A sub-fund to manage and protect reasonable expectations in respect of future dividends on pre-demutualization individual participating policies, called the "Pre-Conversion Individual Participating Closed Sub-Fund".

ii) A sub-fund, called the "Pre-Conversion Ancillary Participating Sub-Fund", in respect of the remaining obligations associated with participating policies written prior to demutualization. These include:

- provisions for adverse deviations on policies in the Pre-Conversion Individual Participating Closed Sub-Fund,
- amounts on deposit for policies in the Pre-Conversion Individual Participating Closed Sub-Fund, and
- group participating policies written prior to demutualization.

At demutualization, assets from the Canadian and U.S. territorial participating accounts will be allocated to the Canadian and U.S. Pre-Conversion Participating Sub-Accounts to provide for the contractual obligations and reasonable expectations with respect to future dividends and other non-guaranteed policy benefits for the policies in the sub-accounts. The remaining assets of the Canadian and U.S. territorial participating accounts will be transferred to the Shareholders' Account. Then assets from the Shareholders' Account will be transferred to the Canadian and U.S. Post-Conversion Individual Participating Sub-Accounts to support future participating business expected to be written in those sub-accounts.

The Conversion Plan outlines procedures and controls on the future operation of the restructured accounts which are designed to protect contractual obligations and reasonable expectations in respect of future dividends and other non-guaranteed policy benefits, for participating policies in force at demutualization. The objective of these provisions is that, for those policies, the policy benefits and future dividends will be similar to what they would have been had the demutualization not occurred. The following is an explanation of how this objective is accomplished.

#### 3.3.1.1 Protecting Future Dividends

The Pre-Conversion Individual Participating Closed Sub-Funds are specially designed to protect future dividend levels. The sub-funds will include all policies that require protection of future dividend levels, which are the individual participating life insurance policies with discretionary dividends that are in force at demutualization. A small number of other participating policies will also be included in the sub-funds for practical reasons.

The initial amount of assets to be allocated to the Pre-Conversion Individual Participating Closed Sub-Funds will be determined to be sufficient to provide for all contractual obligations (other than deposit liabilities which are provided for in the Pre-Conversion Ancillary Participating Sub-Fund) and reasonable expectations in respect of future dividends and other non-guaranteed policy benefits on the policies in the sub-funds.

The Company's dividend policy for the Pre-Conversion Individual Participating Closed Sub-Funds will specify that dividends will reflect the emergence of earnings in the Pre-Conversion Individual Participating Closed Sub-Funds, so as to exhaust the assets over the lifetime of the business while avoiding a material surplus or deficiency in those sub-funds. This is consistent with past dividend setting practices, where dividends change with changes in experience.

All profits earned by the Pre-Conversion Individual Participating Closed Sub-Funds will accrue exclusively to the benefit of the policies in those sub-funds. The Company will not be permitted to transfer assets out of the Pre-Conversion Individual Participating Closed Sub-Funds for reasons other than to pay policy benefits, expenses, and taxes of the sub-fund.

As an additional protection, the Conversion Plan will stipulate that the Pre-Conversion Individual Participating Closed Sub-Funds not be allowed to fall into a deficit position. That is, if the Appointed Actuary determines that the best estimate liabilities of a Pre-Conversion Individual Participating Closed Sub-Fund are greater than the assets in the sub-fund, then sufficient assets will be transferred into the sub-fund to make up the difference.

The Conversion Plan also sets out rules for the future allocations of investment income, expenses and taxes to the Pre-Conversion Individual Participating Closed Sub-Funds. The allocation methods are essentially the same as those used prior to Conversion for investment income, and taxes. Expenses will be set at their pre-demutualization levels and indexed with inflation as measured by an appropriate index. These rules have been developed to ensure that these sub-funds receive a fair and equitable proportion of total Company investment income, expenses and taxes.

After demutualization, provisions for future costs associated with claims under the Market Conduct Settlements will be held in the Shareholders' Account. This ensures that the risk that actual costs are different from estimated costs will be borne by the shareholders, and not the participating policyholders.

The separation of pre-demutualization individual participating policies in the Pre-Conversion Individual Participating Closed Sub-Funds protects those policies by ensuring that future dividend levels will not be affected by profits or losses on any other business outside the sub-funds.

Assets equal to the actuarial provision for adverse deviations on pre-demutualization individual participating policies will be allocated to the Pre-Conversion Ancillary Participating Sub-Funds. These assets provide an additional layer of protection in the participating account to support the policies in the Pre-Conversion Individual Participating Closed Sub-Funds.

#### 3.3.1.2 Protecting Other Policy Benefits

The Conversion Plan specifies that amounts on deposit for pre-demutualization individual participating policies will accrue interest in a manner consistent with the past practices of Sun Life of Canada for setting credited rates of interest on amounts on deposit.

Pre-demutualization participating policies which do not require the dividend protections of the Pre-Conversion Individual Participating Closed Sub-funds (primarily participating group policies) will be allocated to the Pre-Conversion Ancillary Participating Sub-Funds. These sub-funds will be allocated assets equal to the associated actuarial liabilities on the policies in the sub-funds.

#### 3.3.1.3 Support for Post-Demutualization Participating Policies

The Conversion Plan also contains provisions to support participating policies sold by Sun Life of Canada after demutualization.

The initial amount of assets to be allocated to the Canadian and U.S. Post-Conversion Individual Participating Sub-Accounts is based on assumptions of future experience (such as mortality, lapses, expenses, dividends, taxes, and investment income) and the estimated level of sales of participating business according to the Company's most recent business plan. Testing shows that the initial amount will be sufficient to support at least five years' of new participating business under various realistic scenarios of future experience and future levels of sales.

### 3.3.2 Philippines

The pre-demutualization policies in Sun Life of Canada's Philippines branch will be reinsured, on an indemnity reinsurance basis, with Sun Life Philippines. However, the nature of indemnity reinsurance is such that the ceding company (Sun Life of Canada) continues to be the primary obligor to the policyholders. Accordingly, the indemnity reinsurance agreement requires Sun Life Philippines to set up the same participating account structure as for Sun Life of Canada in respect of pre-demutualization policies in Sun Life of Canada's Philippines branch, namely accounts to mirror the Pre-Conversion Individual Participating Closed Sub-Fund and Pre-Conversion Ancillary Participating Sub-Fund.

The establishment and future operations of the Pre-Conversion Individual Participating Closed Sub-Fund and the Pre-Conversion Ancillary Participating Sub-Fund are subject to the same rules and requirements as the analogous sub-funds in Canada and the U.S.. Expense charges to the closed fund will be limited when

cumulative inflation increases exceed the cumulative pre-tax investment return on the portfolio of assets backing those liabilities. Therefore, future dividends and other policy benefits are protected as described under Sun Life of Canada (Canada, U.S.) above.

#### 3.3.3 United Kingdom

The transfer of the U.K. and related insurance business of Sun Life of Canada to Sun Life U.K. is subject to regulatory and court approval in the United Kingdom and elsewhere and the approval of the Canadian Minister of Finance. Court approval has been obtained for the U.K. transfer. The transfer incorporates provisions to protect reasonable expectations in respect of future bonuses and other non-guaranteed policy benefits for those policies written prior to demutualization.

A separate "with-profit" sub-fund will be established for participating business, and a set of "Principles of Financial Management" have been agreed which stipulates how future bonuses will be determined for transferred policies.

Sun Life's U.K. branch business currently includes a separate sub-fund comprising the participating business transferred from Confederation Life under a separate transfer on December 31, 1994. This business will be maintained as a separate sub-fund in Sun Life U.K., on the same terms and with the same assets as currently held in Sun Life of Canada's U.K. branch.

#### 3.3.4 Hong Kong

The transfer of the Hong Kong business of Sun Life of Canada to Sun Life International requires Hong Kong and Canadian regulatory approval and the approval of the Hong Kong High Court. The transfer will incorporate provisions to protect reasonable expectations in respect of future bonuses and other non-guaranteed policy benefits, and to meet contractual obligations, for those policies written prior to demutualization.

Sun Life International will contain a long-term business fund for its insurance business, and a shareholder account. A separate part of the long-term business fund will be established to protect the transferred participating policies.

### 3.4 Alternative Arrangements

If at the time of demutualization, the planned transfer to a subsidiary of Sun Life of Canada of insurance business in Hong Kong, Ireland or the Channel Islands has not taken place, Sun Life of Canada, rather than the subsidiary, will establish and maintain the special arrangements designed to protect reasonable expectations of future policy dividends and other non-guaranteed policy benefits, and to meet contractual obligations, under participating policies issued before demutualization in the jurisdiction. Those arrangements will be structured on a basis determined by the Appointed Actuary with the approval of OSFI and will remain in place pending completion of the transfer of insurance business.

## 4. FINANCIAL STRENGTH AND VITALITY OF THE COMPANY AND POLICYHOLDER SECURITY

### 4.1 Introduction

In reviewing the effect of the conversion on the future financial strength and vitality of the company, I examined the capital of the company and the ratio of the company's available capital to the required capital (the "MCCSR" ratio), as projected over a suitable period under a variety of adverse scenarios. The security of policyholders can be gauged by examining the financial strength and vitality of the company that is the primary obligor to the policyholders.

Such a review is similar to the annual Dynamic Capital Adequacy Testing ("DCAT") performed by Sun Life of Canada, and therefore a good starting point is the most recent DCAT testing performed by Sun Life of Canada.

### 4.2 DCAT and Company Strength

In performing the required annual DCAT testing, the Company has developed actuarial and financial models of each business unit in each territory. These models are used to project the Company's future financial condition under a number of different scenarios. The "base case" scenario projections are consistent with the most

recent Company business plans presented to the Board. In addition, a variety of adverse scenarios are tested, in order to gain insight into the sensitivity of the Company's capital position to various plausible adverse events.

The most recent DCAT testing was presented to the Board in December 1998. That testing confirmed that in its current form as a mutual company, Sun Life of Canada is a strong, well-capitalised financial institution capable of withstanding significant adversity. The Company's MCCSR ratio stood at 285% at December 31, 1998, and was shown under a wide variety of plausible adverse scenarios to remain well above the internal minimum of 175% which is documented in the Company's Capital Management Policy.

### 4.3 Conversion Plan Features

Following demutualization, Financial Services will in effect inherit directly or indirectly all the assets and liabilities of Sun Life of Canada, and therefore Financial Services will inherit Sun Life of Canada's financial strengths and attributes. Therefore, there is no need to repeat the adverse scenario testing for Financial Services.

However, "base case" scenario projections of Financial Services were carried out, to take into account the effects of the reorganization and conversion, including:

- the development of a holding company structure and associated capitalisation and ongoing expenses,
- projected shareholder dividends,
- changes in taxes when changing from a mutual company to a stock company,
- the corporate reorganization of the insurance business (see sections 3.2 and 4.4),
- the restructuring of the participating and non-participating accounts, and
- estimated costs of the demutualization itself.

The base case projections show that for the Sun Life of Canada group as a whole, financial strength and security will not be materially changed by the conversion. In particular, the MCCSR ratio of Financial Services is projected to be 257% at Dec 2001, which compares well against the 280% as projected in the prior DCAT testing for Sun Life of Canada, when one allows for the difference in starting point of the two projections and the subsequent events between the two. I consider the change in the MCCSR ratio to be immaterial for the Sun Life of Canada group as a whole. Moreover, financial strength and security is enhanced by the increased ability of the converted company to raise new capital as a stock company.

#### 4.3.1 Allocation and Distribution of Demutualization Benefits

Demutualization benefits distributed to eligible policyholders will be primarily in the form of common shares of Financial Services. This has the advantage of not reducing the Company's surplus, and therefore the issuance of such common shares is neutral to the financial strength of the company and the security of policyholders.

For policyholders who receive demutualization benefits in cash or policy credits, common shares in the amount of their allocation will either be sold directly in the IPO or re-purchased by Financial Services with a corresponding amount to be sold in the IPO. If there is insufficient demand for those shares in the IPO, there are "scale back" rules in the plan that ensure that the funds required to provide necessary cash payments and policy credits do not exceed the cash raised in the IPO. The net result is that those cash payments and policy credits will not have a material impact on financial strength and security.

### 4.4 Reorganization of the Insurance Businesses

In this section we examine the effect of the reorganization of the insurance businesses (see section 3.2) on policyholder security.

#### 4.4.1 Policyholders Remaining in Sun Life of Canada

Sun Life of Canada is currently the obligor to policyholders in respect of all policies it has issued in all jurisdictions.

After the transfers of business and related assets to Sun Life U.K. and Sun Life International, Sun Life of Canada will cease to be the obligor to the transferred policyholders, and the assets of Sun Life of Canada will no longer be available to meet the obligations under those policies. The remaining assets of Sun Life of Canada, including the shares of its subsidiaries, will continue to be available to meet the obligations of Sun Life of Canada under the policies that have not been transferred (primarily the Canadian, the United States and "other"(2) business). In fact, the position of policyholders remaining in Sun Life of Canada will be slightly improved, in that their interest in the transferred business will be more liquid than before conversion.

4.4.2 Policyholders Transferring to Sun Life U.K.

Sun Life U.K., a wholly-owned subsidiary of Sun Life of Canada, is a domestic United Kingdom company and has as its principal solvency regulator the United Kingdom insurance regulator.

The transfers of businesses to Sun Life U.K. has been reviewed by Sun Life of Canada's local U.K. appointed actuary and the U.K. and Canadian independent actuaries. The reports of those actuarial reviews are available to policyholders. The reports include discussion of the impact of the transfer on the interests of those policyholders transferring to Sun Life U.K. I have reviewed the actuarial reports and concur with the opinions therein regarding the security of policyholders transferring to Sun Life U.K.

In support of the opinion of Sun Life of Canada's local U.K. appointed actuary, I observe that from a Canadian perspective, the policyholders being transferred from Sun Life of Canada to Sun Life U.K. will become policyholders of a company with a similar MCCSR ratio to that of Sun Life of Canada.

4.4.3 Policyholders Transferring to Sun Life International

Sun Life International, a newly created wholly-owned subsidiary of Sun Life of Canada, has as its principal solvency regulator the Hong Kong insurance regulator.

The proposed transfer of business to Sun Life International has been reviewed by a local independent actuary and a Canadian independent actuary, and in each case copies of those reports will be made available to policyholders. The reports include discussion of the impact of the transfer on the interests of those policyholders transferring to Sun Life International.

I am also the local appointed actuary under the Hong Kong Insurance Ordinance for Sun Life of Canada for the purposes of reporting to the Hong Kong Insurance Authority on solvency matters in accordance with the local Hong Kong accounting and actuarial practice and regulatory guidelines. In that capacity, I concur with the conclusions the two independent actuaries have drawn in relation to the security of the transferring Hong Kong policyholders.

Pro-forma modelling of what Sun Life International's position would have been had the demutualization and transfers taken place December 31, 1998 indicates that Sun Life International would have had a higher MCCSR ratio than that for Sun Life of Canada ignoring the demutualization and transfers. Projections show that under the current business plan for the Hong Kong business and under a variety of plausible adverse scenarios, Sun Life International is expected to be able to meet the Hong Kong solvency requirements without any recourse to capital from Sun Life of Canada for many years into the future.

4.4.4 Policyholders Indemnity Reinsured to Sun Life Philippines

Shortly before or as soon as reasonably practicable after demutualization, Sun Life of Canada will transfer the assets of its insurance business in the Philippines (other than its policies) to Sun Life Philippines. At the time of the transfer, Sun Life of Canada will arrange for its policy obligations in the Philippines to be reinsured by Sun Life Philippines through indemnity reinsurance. After that transfer, all new insurance business in the Philippines will be issued by Sun Life Philippines.

Such arrangement does not alter the fact that Sun Life of Canada is a direct obligor to such policyholders. Therefore, the impact of conversion on the security of the Philippine policyholders is identical to that for policyholders who remain in Sun Life of Canada (see section 4.4.1).

(2) The "other" territories consist of over 30 jurisdictions, including primarily Bermuda and Malta.

SCHEDULE D

OPINION OF INDEPENDENT ACTUARY

ECKLER PARTNERS LTD.
Actuaries and Consultants

28 September, 1999

Board of Directors
Sun Life Assurance Company of Canada
Sun Life Centre
150 King Street West
Toronto, Ontario
Canada M5H 1J9

Ladies and Gentlemen:

This is the opinion which the *Insurance Companies Act* requires pursuant to subsections 5(1)(a) and (c) of the *Mutual Company (Life Insurance) Conversion Regulations* (the "Regulations") from an independent actuary. This opinion is addressed to the Board of Directors and is also provided for the benefit of Eligible Policyholders.

Unless otherwise indicated, capitalized expressions in this opinion have their meaning in the Conversion Plan of Sun Life Assurance Company of Canada dated 28 September, 1999.

In my opinion, the Conversion Plan

1. provides for Demutualization Benefits and a method to apportion the value of Sun Life of Canada among the Eligible Policyholders which are fair and equitable to Eligible Policyholders,
2. allocates assets to each Pre-Conversion Individual Participating Closed Sub-Fund and to each Pre-Conversion Ancillary Participating Sub-Fund which are expected to be adequate to meet both the contractual obligations under the policies in respect of which it is maintained and the reasonable expectations of their policyholders for dividends and other non-guaranteed benefits,
3. allocates assets to each Post-Conversion Individual Participating Sub-Account which are adequate to support the Participating Policies expected to be allocated to that Post-Conversion Individual Participating Sub-Account after the Effective Date,
4. does not materially adversely affect Sun Life of Canada's future financial strength and vitality or the security of its policyholders, and
5. provides Policy Credits which, as of the date that the Initial Share Price is determined, will be appropriate substitutes for Financial Services Shares.

The following pages are my summary report in respect of the Conversion Plan required by the *Insurance Companies Act*.

Respectfully submitted,

NICHOLAS BAUER
Fellow, Canadian Institute of Actuaries



SL-0319

### 1.1 The Author

I am an independent consulting actuary in the firm of Eckler Partners Ltd. Neither I nor any of my colleagues has any direct or indirect interest in Sun Life of Canada, nor in any of its subsidiaries.

I am a Fellow of the Canadian Institute of Actuaries. I have been qualified as an actuary for 32 years and have been a consulting actuary for 12 years. My principal consulting activity has always been with respect to insurance and insurance companies. I have been engaged on several occasions to write opinions as independent actuary on corporate transactions, including demutualizations, or to assist in the implementation of such transactions. My firm is being paid a fee for the work supporting this opinion and is entitled to certain rights of indemnification in the event of any litigation that may arise in relation to this opinion.

D

### 1.2 Intended Users

The intended users of this opinion are the Board, the Eligible Policyholders, the Michigan Commissioner, and the Superintendent.

### 1.3 Intended Use

This opinion is written for inclusion in a document called the "Policyholder Information Circular." It is intended to assist users in assessing the Conversion Plan. It should be read in its entirety and with the rest of the Policyholder Information Circular.

### 1.4 Use of the Work of Colleagues

I have been assisted in my work by colleagues in my own firm and, in respect of Sun Life of Canada's U.S. operations, our affiliate firm, Milliman & Robertson, Inc. Neither I nor any of these colleagues own any Eligible Policies.

### 1.5 Use of Sun Life of Canada's Data

In doing my work, I had unrestricted access to management of Sun Life of Canada and to their files and records. The data which I used for my work consist of information, oral and written, which management communicated to me and my colleagues during the course of my work and of the calculations and records supplied to me. I satisfied myself that I could use and rely upon those data.

Formulation and implementation of the Conversion Plan requires massive special research and calculations. Two notable examples are the territorial contribution to surplus analysis – i.e., the analysis of Sun Life of Canada's surplus by territory – and the funding calculations of each Pre-Conversion Individual Participating Closed Sub-Fund (collectively the "Pre-Conversion Individual Participating Closed Sub-Funds") – i.e., the identification of the assets needed to assure that contractual obligations to policyholders and their reasonable expectations for dividends and other non-guaranteed benefits after demutualization will be met. Much of that is fortunately based on data which are regularly used in financial reporting, policy and investment administration, and dividend scale formulation, which are subject to audit committee review, external audit, and regulatory review, and which have stood the test of time.

I can report that the data upon which I relied are sufficient. As to their reliability, I can report that my colleagues and I broadly reviewed the special research and calculations with respect to each territory. I satisfied myself that I could use those data but I did not verify them. I can, however, report that my colleagues and I noticed no defect in them and have no reason to suspect any defect. I can also report that in my opinion the resources, skill, and care which management dedicated to the research and calculations were appropriate.

### 1.6 Currency

Unless otherwise stipulated, all amounts are in Canadian dollars (Can.$). Conversion to or from another currency to Canadian dollars is done at

- exchange rates prevailing on the Eligibility Day, for purposes of allocation of Demutualization Benefits (explained in section 3 of this report), and
- exchange rates prevailing on the relevant date, for all other purposes.

## 2. RELATED TRANSACTIONS

The corporate structure of Sun Life of Canada will be reorganized as part of the demutualization. The Conversion Plan sets out, in section 2.2 of Article 2 and in Article 6, the steps involved in the planned reorganization. It is further explained in Section 8 of the Policyholder Information Circular. Briefly:

- Financial Services has been incorporated under the ***Insurance Companies Act*** as a wholly owned subsidiary of Sun Life of Canada. At the Effective Time, Financial Services will become the owner of 100% of Sun Life of Canada and in turn will issue common shares which the Conversion Plan allocates to Eligible Policyholders.
- All business of Sun Life of Canada conducted in the U.K., including the business carried on in the Isle of Man, whether through a branch or a subsidiary (other than Sun Life Assurance Company of Canada (U.K.) Limited ("Sun Life of Canada (U.K.)")), will be transferred to Sun Life of Canada (U.K.). Regulatory requirements to effect those transfers include reports from the appointed actuary of Sun Life of Canada (U.K.), and from independent actuaries in each of Canada and the U.K., all recommending that the transfers be approved, and the approval of the High Court of Justice in the U.K. The High Court has now granted its approval. In the case of transfers of business from Ireland, Jersey and Guernsey, the approval of the appropriate court in those jurisdictions is also required.
- The business of Sun Life of Canada, conducted in the Hong Kong branch, will be transferred to a newly created subsidiary of Sun Life of Canada called Sun Life of Canada (International) Limited. That transfer will also require reports of independent actuaries in each of Canada and Hong Kong recommending that the transfer be approved, as well as regulatory approval and the approval of the High Court of Hong Kong. While not a statutory requirement, the Hong Kong appointed actuary has prepared and submitted a commentary on the transfer to the Hong Kong regulator.
- New business in the Philippines will be issued through a newly incorporated subsidiary, Sun Life of Canada (Philippines), Inc. That subsidiary will also take responsibility for the management and administration of the in force business of Sun Life of Canada's Philippines branch as well as service to its policyholders, but in force policies in that branch will continue to be policies of Sun Life of Canada.

The transfers of Sun Life of Canada's policies and business to subsidiaries in the U.K. and Hong Kong will only take place if the demutualization takes place. The ownership rights and interests of the transferring policyholders are thus fully protected. If the proposed demutualization is implemented, then all transferring policyholders who were Eligible Policyholders remain so and fully participate in the distribution of Demutualization Benefits. If not, then there will be no transfers and their current ownership and policyholder rights in Sun Life of Canada as a mutual company continue without change.

The Philippines subsidiary has been incorporated. The reorganization of the Philippines business will occur, subject to regulatory approval, whether or not demutualization takes place, but existing policyholders of Sun Life of Canada in the Philippines are unaffected: they continue as policyholders of Sun Life of Canada.

Consequently, my opinion below that the apportionment of Demutualization Benefits is fair and equitable to Eligible Policyholders applies to all such policyholders, whether or not their policies are transferred to a subsidiary as part of the reorganization.

As to the protection of the contractual obligations to, and reasonable expectations for dividends and other non-guaranteed benefits of, holders of policies that are transferred to subsidiaries, I rely on the favourable opinions of the appointed and independent actuaries and the approval of the transfers by the relevant courts and regulators. The same is true with respect to the overall security of all those policyholders, both eligible and non-eligible, and ongoing service to them.

## 3. ALLOCATION OF DEMUTUALIZATION BENEFITS

Allocation of Demutualization Benefits - which determines how many Financial Services Shares each Eligible Policyholder is allocated - is the most difficult actuarial aspect of demutualization. Everyone agrees on the allocation's goal - fairness and equity - but there is no unique "right" answer. Allocation is moreover a zero-sum game. One cannot say, "this policyholder should get more" without also identifying another policyholder to get less.



D

I have established the criteria listed in subsection 3.1 of this report to test the fairness and equity of the allocation of a demutualizing life insurance company's value among its policyholders. In subsection 3.2 of this report, I explain the criteria and give my opinion on how the Conversion Plan conforms to them.

My opinion does not consider which policyholders should be entitled to an allocation, because the *Insurance Companies Act* determines which policyholders are eligible to participate in the allocation of Demutualization Benefits based upon the Eligibility Date. My opinion considers only the allocation among them.

### 3.1 Criteria

Here are the criteria by which I test the fairness and equity of the allocation of Demutualization Benefits in the Conversion Plan:

A. An insurance company's board of directors, advised by its management, should determine the allocation according to an articulated policy, and with due skill, care, and objectivity.

B. The allocation should be of the insurance company's entire value.

C. The allocation should fairly compensate for what policyholders lose in the demutualization; namely, voting control of the insurance company and the right to share in the insurance company's residual value if it is wound-up. As a corollary, the allocation need provide no compensation for what policyholders do *not* lose in the demutualization; namely, their policyholder reasonable expectations (as set out in section 4 of this report).

D. The allocation should be consistent with the insurance company's established practices for

- territorial or business unit management of its operations,
- attribution of its income and capital among those territorial or business units, and
- determination of policyholder dividends.

E. The allocation should take appropriate account of similarities and differences among policies and their policyholders. As a corollary, the allocation should not unfairly discriminate among policies or policyholders.

F. The allocation should take account of international precedents for life insurance company demutualization to the extent that their satisfactory outcome has created regulatory or policyholder expectation.

G. The allocation formula should be as simple and as uniform among territories and business units as is practical.

H. If the insurance company's value is much greater than what those receiving an allocation have contributed to it, then it is desirable that the allocation in respect of a particular group of similar policies should at least equal what that group has contributed.

### 3.2 Application of the Criteria

Criterion A: ***An insurance company's board of directors, advised by its management, should determine the allocation according to an articulated policy, and with due skill, care, and objectivity.***

Sun Life of Canada's articulated policy, embodied in a set of major principles is set forth in section 2.2 of the Appointed Actuary's report (please see Schedule C of the Policyholder Information Circular) and is, in my opinion, reasonable.

Sun Life of Canada engaged me on 23 March, 1998 to serve as Independent Actuary, as required by the Regulations. My colleagues and I have communicated continually with its management since then, so I was able to observe the preparation of the Conversion Plan for consideration by the Board. The research and calculations needed in each territory and in the corporate office were in my opinion adequately resourced and carried out appropriately. Senior management in my opinion considered the policy issues thoughtfully and objectively. I conclude that the Conversion Plan was prepared in accordance with the criterion.

Criterion B: *The allocation should be of the insurance company's entire value.*

"Policyholder reasonable expectations", and what funds need to be retained to meet them, are set out in section 4 of this report.

The Conversion Plan provides that all Eligible Policyholders and only Eligible Policyholders are entitled to an allocation of Financial Services Shares on demutualization. Financial Services Shares are the common shares of Financial Services and collectively represent the ownership of Financial Services.

In the case of a relatively small proportion of Eligible Policyholders, the actual issue of Financial Services Shares would cause tax problems or violate insurance or securities laws. They will receive the equivalent in cash or Policy Credits instead. While Financial Services Shares will be issued to some of them, those shares must be sold on their behalf; they may not retain them. It is expected that those Financial Services Shares will be sold in the Initial Public Offering (also referred to as "IPO") at the Initial Share Price, failing which they will be sold at their market value.

The other Eligible Policyholders may decide among Financial Services Shares, the equivalent in cash or, in the case of Eligible Policyholders whose allocation equals or exceeds 1,000 Financial Services Shares, partly shares and partly cash equivalent. It is expected that the needed cash will be available from the Initial Public Offering, but that is not assured. If the needed cash is not available, then Financial Services Shares will be issued to those policyholders.

The Conversion Plan provides that the equivalent in cash of a Financial Services Share will be equal to the Initial Share Price. Investment bankers retained by Sun Life of Canada have given their opinion on the appropriateness of that equivalent. I have relied on that opinion in giving my opinion in section 7 of this report on the appropriateness of the Policy Credits as a substitute for Financial Services Shares.

The Conversion Plan therefore distributes value to Eligible Policyholders in the form of either Financial Services Shares or an appropriate substitute for Financial Services Shares. When value is distributed as an appropriate substitute, the Financial Services Shares which would otherwise have been issued to Eligible Policyholders may be sold to investors at the Initial Share Price.

In the IPO, Financial Services may issue shares in addition to those allocated to Eligible Policyholders. So long as those additional shares do not exceed ten percent of the Financial Services Shares allocated to Eligible Policyholders, in my opinion no material dilution of the value to be distributed to Eligible Policyholders is likely to occur. Such is expected to be the case.

The Conversion Plan thus allocates the entire value of Sun Life of Canada to the Eligible Policyholders.

Criterion C: *The allocation should fairly compensate for what the policyholders lose in the demutualization; namely voting control of the insurance company and the right to share in the insurance company's residual value if it is wound-up. As a corollary, the allocation need provide no compensation for what the policyholders do not lose in the demutualization; namely, their policyholder reasonable expectations.*

Eligible Policyholders may vote in the election of the Board. Each Eligible Policyholder has one vote, regardless of how many policies he or she owns. In the demutualization, the non-transferred Eligible Policyholders do not lose their votes, but they may vote in the election of only one-third of the Board. The compensation is therefore for loss of voting control, not for loss of vote. That is also true for the transferred policyholders, although they do lose all voting rights on transfer of their policies to a subsidiary of Sun Life of Canada. As noted in section 2 of this report, however, in the opinion of Canadian and local independent actuaries who reviewed and approved the transfers, the interests of transferring policyholders have been appropriately protected despite the loss of voting rights, so that the loss of those minority voting rights is not a material loss to them.

If Sun Life of Canada were wound-up, the Eligible Policyholders would share in its residual value. In the demutualization, they lose that right.

The section of the Policyholder Information Circular entitled "Your Demutualization Benefits" and Article 4 of the Conversion Plan address the allocation of Financial Services Shares.

The Conversion Plan provides for a fixed allocation of 75 Financial Services Shares to each Eligible Policyholder, regardless of the number of policies held, and for a variable allocation to each Eligible Policy of a number of Financial Services Shares which depends on its Cash Value, the number of years it has been in force and its annual premium.

I regard the fixed allocation as compensation for loss of voting control and the variable allocation as compensation for loss of the right to share in residual value. It is appropriate that the fixed allocation be the same to each Eligible Policyholder, since each has one vote and all the votes should be treated as equal. It is appropriate that the variable allocation differ among Eligible Policyholders because they have different customer attachments to, different financial interests in, and different rights to receive surplus distributions from, Sun Life of Canada.

The Conversion Plan allocates about 20% of the shares - hence 20% of value - as fixed, with the remaining 80% being allocated as variable. Is that 20%/80% split appropriate? There is no theoretically correct answer to the question.

There appears, however, to be a consensus among those who have considered the question that the variable allocation, which reflects financial ownership interest, should comprise the larger part and the fixed allocation should comprise the smaller part of the total allocation. I agree with that consensus and the Conversion Plan conforms to it. Among previous international demutualizations the percentage for the fixed allocation has generally ranged from 10% to 30%, so that Sun Life of Canada's 20% is comfortably within that range. There have been two recently completed demutualizations in Canada so far, and altogether three companies (Mutual Life (since renamed Clarica), Manulife and Canada Life) have published their allocation formulae. All three also fall within the indicated range. I conclude that the 20% fixed allocation in the Conversion Plan is appropriate.

For the variable allocation, the Conversion Plan allocates Financial Services Shares to each Eligible Policy as follows:

1. All policies other than Group Insurance Policies

    1.32 shares for each Can.$1,000 of Time-Weighted Cash Value, and

    64 shares for each Can.$1,000 of Annual Premium Measure.

    Time-Weighted Cash Value is the Cash Value multiplied by the number of years, including fractional years, that the policy has been in force in Sun Life of Canada from its issue until the Eligibility Day. For corporate owned Pension Policies only (other than the U.K. individual money purchase pension plan), the number of years that the policy has been in force, taken into account for this purpose, is limited to fifteen. For policies issued by and transferred from another insurer to Sun Life of Canada, the number of years in force is limited to the number of years the policy has been in force in Sun Life of Canada (for a discussion of the reason for this, please see subsection 3.3 of this report).

    Cash Value generally includes everything that the policyholder is entitled to receive on termination of the policy, including dividends on deposit and without deducting any policy loan, but excluding any special maturity dividends or terminal bonuses. For certain plans that do not allow the receipt of a cash value or possess unusually low cash values, an actuarially calculated or increased value will be used as the Cash Value (as set out in Exhibit B of the Conversion Plan).

    Annual Premium Measure is the annual premium stipulated in the policy for the base coverage and those riders that attract dividends (regardless of whether the premium is actually paid annually or more frequently), and is nil if the policy is paid up.

2. Group Insurance Policies

    4.70 shares for each Can.$1,000 of Time-Weighted Annual Premium Measure.

    Time-Weighted Annual Premium Measure is the annual premium paid for life insurance coverages in 1997 (or, if the policy was issued in 1997, what that annual premium would have been had the average monthly premium paid during the period that the policy has been in force in 1997 been paid for all of 1997) multiplied by: five plus the number of years the policy (or a predecessor policy that was participating) has been continuously in force in Sun Life of Canada, including fractional years, but not more than twenty in total.

If the Appointed Actuary of Sun Life of Canada is of the view in any particular case that the Duration, Cash Value or Annual Premium Measure cannot be equitably determined under the rules set out in the Conversion Plan, then the Appointed Actuary will determine a fair and equitable substitute.

The variable allocation description above is simplified. For detail, see Article 4 of the Conversion Plan.

The remainder of this subsection 3.2 sets out my reasons for the view that the allocation formula is fair and equitable to all Eligible Policyholders.

Individual life insurance policies account for 98% of Eligible Policies.

The Conversion Plan allocates 50% of the total distribution based on Time-Weighted Cash Value and 30% based on annual premiums (the balance of 20% being the fixed allocation). Time-Weighted Cash Value takes into account both the current financial interest of the policyholder in Sun Life of Canada and how long that relationship has endured. It is logical to attach greater weight to it than to the annual premium, which relates to the future financial interest that the policyholder is expected to build in Sun Life of Canada.

Since individual insurance policies represent the overwhelming majority of Eligible Policies, it was logical to try to apply the same allocation formula to other policies so long as the resulting allocations conformed to the principles governing the allocation and met the tests of reasonableness applied to the allocation. A variation of the formula was found desirable only in the case of group insurance and group pensions. Here is why:

> Since group insurance has no cash values, direct application of the individual insurance formula would have resulted in failure to recognise the durability of the relationship of the policyholder with the company. Basing the allocation on time-weighted premium overcomes that drawback.
>
> The relationship of group insurance and group pension policyholders to a company is, in general, weaker than that of individual holders of participating policies, because it is more in the nature of customer to supplier than of a sharing of fortunes. Also, premiums tend to grow year by year under in force group policies, contrary to policies purchased by individuals. It is therefore logical to limit the number of years taken into account in the allocation to group policies. It is also logical to reflect future financial interests that the policyholder is expected to build. In my opinion, the limitation of 15 years on past duration and the addition of five years to recognise future financial interests of group insurance policies, are reasonable, fair and equitable in light of the nature of this business.

I conclude that the Conversion Plan strikes a fair balance in compensating Eligible Policyholders for their loss of voting control and their loss of right to participate in Sun Life of Canada's residual value on wind-up.

Criterion D: *The allocation should be consistent with the insurance company's established practices for*

- *territorial or business unit management of its operations,*
- *the attribution of its income and capital among those territorial or business units, and*
- *determination of policyholder dividends.**

That criterion is the most important criterion because the insurance company's established practices have met the test of time and define expectations of the insurance company's future treatment of its policyholders.

Sun Life of Canada's policies are concentrated in the territories of Canada, the U.S.A., the U.K., Hong Kong, and the Philippines. The businesses within each territory include individual life insurance, which consists of participating life insurance (and which includes the vast bulk of Eligible Policies) and non-participating life insurance. Sun Life of Canada's other businesses in the territories consist of individual health insurance, group life and health insurance, individual and group annuities, and non-insurance businesses. They are generally managed by local managements in each of those jurisdictions. Most of the other businesses are non-participating, but there are a few participating (that is, eligible) annuity, group insurance, individual health and group pension policies among them.

**References to dividends include references to bonuses, where applicable*

Surplus generated by each territory and, at a more refined level, each business within each territory, is tracked. In addition, a pool of surplus called "core" or corporate surplus is also maintained. Its purpose is to fund new or non-insurance ventures, and to provide additional security and stability to Sun Life of Canada as a whole. The businesses in each territory are expected to make regular contributions to core surplus. In turn, core surplus is available and has been used to support operations in territories when needed due to adverse business conditions or to fund rapid growth.

Sun Life of Canada's primary historical sources of surplus have been its individual participating policies, both those in force and those no longer in force. More recently, successful investment of part of that surplus in other businesses, including non-insurance (mostly asset management) businesses, has produced considerable additional surplus growth.

The allocation formula produces aggregate allocations by territory that are consistent primarily with the proportions of surplus accumulated by the individual participating businesses in those territories, but which also take modest account the proportions of total surplus generated by each territory. The table below compares those proportions with the proportions of total allocations by territory. The last column in the table is weighted territorial surplus, applying weights of 80% and 20% respectively to the individual participating and total territorial surplus proportions.

| | Allocation Formula | Individual Par Territorial Surplus as at Dec 31, 1997 | Total Territorial Surplus as at Dec 31, 1997 | Weighted Territorial Surplus as at Dec 31, 1997 |
|---|---|---|---|---|
| Canada | 35% | 34% | 44% | 36% |
| USA | 31% | 33% | 22% | 31% |
| U.K. | 23% | 19% | 28% | 21% |
| Others | 11% | 13% | 5% | 11% |
| Total | 100% | 100% | 100% | 100% |

Note: columns may not add due to rounding

Sun Life of Canada's dividend policy distributes surplus generated by in force Participating Policies partly in the form of annual dividends and partly in the form of special maturity dividends or terminal bonuses (the practice differs by territory).

The formulae for special maturity dividends and terminal bonuses, which reflect the surplus accumulated during the lifetime of the policy and not distributed in the form of annual dividends, are similar to the Time-Weighted Cash Value component of the variable allocation. They depend on the cash value of the policy at time of termination and on the number of years the policy has been in force. The Time-Weighted Cash Value component of the variable allocation is therefore consistent with Sun Life of Canada's historical dividend practices.

Because the special maturity dividends and terminal bonuses themselves reflect a distribution of accumulated surplus it is logical to exclude them from the Cash Value used in the allocation formula.

In my opinion, the allocation formula proposed by Sun Life of Canada is consistent with its established practices for the management of its businesses in the territories, with the way it has allocated and managed its surplus, and with the way it has determined policy dividends, including special maturity dividends or terminal bonuses.

Criterion E: *The allocation should take appropriate account of similarities and differences among policies and their policyholders. As a corollary, the allocation should not unfairly discriminate among policies or policyholders.*

One would expect, for example, a similar allocation to two policies in a territory or business unit having similar policy characteristics, such as plan of insurance, size, and duration in force. One would likewise expect a larger allocation to a larger, or older, or more expensive policy than to an otherwise similar smaller, newer, or less expensive policy.

In the Conversion Plan, the variable allocation to an individual Eligible Policy is determined with reference to its Time-Weighted Cash Value, and its Annual Premium Measure. The variable allocation to a

group Eligible Policy is consistent with that to an individual policy, with the formula having been modified to the extent necessary to preserve fairness. The Conversion Plan therefore plainly distinguishes among policies in a way which is fair and logical.

Criterion F: *The allocation should take account of international precedents for life insurance company demutualization to the extent that their satisfactory outcome has created regulatory or policyholder expectation.*

Precedents are relevant if they define policyholder or regulatory expectation. There were no Canadian precedents when Sun Life of Canada was developing its allocation formula. Four Canadian based demutualizations were going forward concurrently with Sun Life of Canada's, so none was a precedent for the others. Three of them have now published their allocation formula (shortly before Sun Life of Canada) and two have actually completed their demutualizations. All three have adopted the "policy metrics" method for allocation of value.

In the last ten years, there have been several demutualizations in the U.S.A., the U.K., Australia, and, most recently, South Africa. They are precedents.

The fixed allocation in those precedents similar to the fixed allocation under the Conversion Plan has ranged from 10% to 30% of total value. At 20%, the Conversion Plan conforms to precedent.

The variable allocation in those precedents is by the so-called "contribution method" for U.S. based insurance companies and according to policy metrics for U.K., Australian, or South African based insurance companies. The explanation for the difference in method may be that a mutual life insurance company based in the U.S.A. tends to operate differently from a mutual life insurance company in the other countries.

A U.S. based mutual life insurance company tends not to do business outside the U.S.A. and not to sell non-participating policies. Its sale of non-participating policies is forbidden or limited in many states.

A U.K., Australian or South African based mutual life insurance company is the opposite. It tends to do business internationally. It sells non-participating policies. In recent years especially, sales of non-participating policies exceed sales of participating policies in many mutual life insurance companies.

In those respects, Sun Life of Canada and other Canadian mutual life insurance companies are unlike U.S. mutual life insurance companies and like mutual life insurance companies in the other countries, so that the latter precedents are relevant, and the former precedents are much less relevant, for a Canadian demutualization.

In the U.S. contribution method, the variable allocation to a policy is proportional to that policy's contribution to the insurance company's capital, or alternatively, to the sum of that policy's contribution to the insurance company's capital plus the present value of its expected future contribution to the insurance company's capital if the insurance company does not demutualize.

In the non-U.S. method, the variable allocation is proportional to policy metrics. Policy metrics are simple, accessible policy attributes like cash value, premium, death benefit, and number of years in force. Policy metrics measure the policyholder's financial interest in the insurance company - for example, the policyholder relies on the insurance company for eventual payment of death benefit or cash value. They also measure the policyholder's attachment to the insurance company as a customer. Allocation by policy metrics is a logical choice when the insurance company's capital and value are materially larger than the contribution thereto by its Eligible Policies. This is the case for Sun Life of Canada.

The variable allocation in the Conversion Plan is according to policy metrics and takes appropriate account of relevant (non-U.S.) international precedents. One feature of Sun Life of Canada's variable allocation that is relatively new is the use of Time-Weighted Cash Value, a combination policy metric. As noted previously, however, it is consistent with Sun Life of Canada's dividend and surplus management practices.

Sun Life of Canada has also calculated the historical and expected future contributions to surplus of groups of Eligible Policies, in a manner similar to the U.S. contribution method, and found that the proposed allocation is expected to exceed the contribution for all but a small number of policies. This is explained below, under criterion H.

In my opinion, the Conversion Plan takes proper account of international precedents for life company demutualization.

Criterion G: *The allocation formula should be as simple and as uniform among territories and business units as is practical.*

Fairness and equity do not inherently require a simple or a uniform allocation formula, but simplicity and uniformity help policyholders to understand the allocation and to form a perception of its fairness and equity.

The Conversion Plan's fixed allocation is truly simple. It is uniform among Eligible Policyholders and will be seen to conform to the one-person-one-vote precept.

The Conversion Plan's variable allocation is essentially according to policy metrics, and therefore inherently simple - much simpler than the inherently complicated U.S. contribution method for a variable allocation. The allocation formula is uniform among territories and as uniform as possible by type of policy.

In my opinion, therefore, the Conversion Plan's allocation is as simple and as uniform as considerations of fairness and equity permit.

Criterion H: *If the insurance company's value is much greater than what those receiving an allocation have contributed to it, then it is desirable that the allocation in respect of a particular group of like policies should at least equal what that group has contributed.*

I list this criterion last because I consider it desirable but not essential.

I begin by noting an important practical constraint in the application of the criterion. To calculate what a policy "has contributed to the insurance company's value" can be done only for groups of policies and then only approximately. The calculation is moreover complicated, time-consuming, and demanding of resources. The practical constraints must therefore be accepted.

Sun Life of Canada has carried out the contribution calculations as accurately as possible. It was found that the individual Eligible Policies have contributed less than 10% of Sun Life of Canada's total book value. No calculation was done to ascertain the corresponding contribution of eligible group insurance, group pension and individual health policies, but it can easily be inferred by inspection of the volume of such Eligible Policies that their aggregate contribution is small compared to that of individual Eligible Policies. Consequently, the condition for the criterion applies.

A detailed comparison of those contributions to the expected value of the corresponding Financial Services Shares allocated shows that the value of the allocations is expected to exceed the contributions for over 98% of Eligible Policies. That comparison is based on an Initial Share Price of Can.$14, which is at the lower end of the valuation range described in the Policyholder Information Circular. Therefore, based on this price, I conclude that even though Sun Life of Canada did not include this criterion among the principles governing its allocation, nonetheless the criterion has been met.

### 3.3 Acquisitions

Sun Life of Canada's Eligible Policies comprise mainly those issued on its own paper but also include policies resulting from the acquisitions of blocks of business from other insurers. We have to consider the question: should the allocation formula for Eligible Policies be modified for those originally issued by another insurer? The Conversion Plan makes one, and only one, such modification by recognising only the number of years the policy has been in force in Sun Life of Canada (as opposed to from its original date of issue) for purposes of the time-weighted factors in the variable component of the allocation formula.

There were three transactions concluded before the Eligibility Day, that resulted in the transfer of policies that are Eligible Policies (as well as other policies) from other companies to Sun Life of Canada. The transactions related to the acquisition of:

- the U.K. branch of Confederation Life Insurance Company ("Confederation Life"), acquired in 1994,
- the Canadian group life and health business of The Prudential Group Assurance Company of England (Canada) ("Prudential"), and
- the Canadian business of Teachers Insurance and Annuity Association ("TIAA").

*Policies acquired from Confederation Life*

The acquired policies contributed no surplus to Sun Life of Canada. In the words of the U.K. independent actuary, commenting in 1994 on the transaction: "The transferred assets will be held by the U.K. branch of Sun Life of Canada within a separately identified account (the "Fund"). All the surplus within the Fund will accrue to the benefit of the transferred policyholders." The Fund, which holds the assets of the Confederation Life policyholders, will continue unaffected when those policies are transferred to Sun Life of Canada (U.K.).

Because all assets transferred to Sun Life of Canada must be used exclusively for the benefit of the acquired policies, any contribution of those policies to the value of Sun Life of Canada (or Sun Life of Canada (U.K.) after demutualization) has arisen and will arise only from realised expense efficiencies. There have been no commitments of any kind made to the transferred Confederation Life policyholders beyond the safeguarding of their guaranteed obligations and policyholder reasonable expectations.

Since these policies contributed no surplus to Sun Life of Canada at time of their acquisition, it is entirely reasonable that the time that they have been in force be calculated from the date of their transfer to Sun Life of Canada. I therefore conclude that the treatment of the transferred Confederation Life policyholders who are Eligible Policyholders is fair and equitable.

*Other transferred policies*

Policies acquired from TIAA and from Prudential were acquired in commercial arm's-length transactions. No surplus was transferred to Sun Life of Canada in connection with them.

Since these policies contributed no surplus to Sun Life of Canada at the time of their acquisition, it is entirely reasonable that the time that they have been in force be calculated from the date of their transfer to Sun Life of Canada. I therefore conclude that the treatment of the transferred Prudential and TIAA policyholders who are Eligible Policyholders is fair and equitable.

### 3.4 Conclusion

In my opinion, the Conversion Plan conforms to the criteria and therefore provides for Demutualization Benefits and a method to apportion the value of Sun Life of Canada which are fair and equitable to Eligible Policyholders.

## 4. PARTICIPATING ACCOUNTS

Participating policyholders are both owners and customers of their mutual life insurance company. Both the ownership and customer interest terminate at termination of the policy. The intent of demutualization is to separate those interests, by converting the ownership interest to shareholding, but leaving the customer interest - that is, the policy - unchanged.

The customer interest is defined by "policyholder reasonable expectations", which are that the demutualized insurance company will meet its guaranteed obligations under all of its policies and, in the case of participating policies, also pay policy dividends and other non-guaranteed benefits which are expected to be as favourable as what it would have paid if it had not demutualized. In section 6 of this report, I opine on Sun Life of Canada's ability to meet those guaranteed obligations. In this section, I deal with policy dividends.

Payment of policy dividends in a mutual life insurance company is governed by regulation and accepted actuarial practice, but is largely at the discretion of its board of directors. The policyholders, however, elect the board. After demutualization, the shareholders elect the majority of the board. In the case of subsidiary companies, the shareholders elect all of the directors. Formal structure, which helps assure policyholder reasonable expectations, therefore seems desirable in the demutualized insurance company, and in any subsidiaries to which Eligible Policies and non-eligible participating policies (those issued or reinstated after the Eligibility Day but before Conversion) have been transferred.

The Conversion Plan separately earmarks funds within each territory where Sun Life of Canada continues to operate called the Pre-Conversion Individual Participating Closed Sub-Fund and the Pre-Conversion Ancillary Participating Sub-Fund, and establishes formal rules for their operation and relationship to the rest of the organization.

At the time of Conversion, and only if Conversion takes place, Sun Life of Canada's business in the U.K. will be transferred to a wholly owned subsidiary, namely to Sun Life of Canada (U.K.) At the time of Conversion, or as soon thereafter as possible, Sun Life of Canada's businesses in the Republic of Ireland,

Guernsey and Jersey will also be transferred to Sun Life of Canada (U.K.), and Sun Life of Canada's Hong Kong business will be transferred to Sun Life of Canada (International) Limited. Those transfers are subject to approval by the relevant court in each of those jurisdictions, as well as Canadian regulatory approval. Requests for regulatory approval must be supported by formal opinions of the appointed actuary and of independent actuaries. If any of these approvals has not been received by the Effective Date, the Conversion Plan stipulates that Sun Life of Canada will put alternative arrangements in place to ensure equivalent protection of policyholder reasonable expectations, until such time as the transfers can be effected. The approval of the U.K. court has been obtained. Each of the local and Canadian regulators require independent actuarial reports prepared in accordance with their requirements.

The regulators require, and all reports must confirm, that the security of transferred policyholders and their policyholder reasonable expectations are fully protected. I rely on those regulatory approvals and opinions of independent and appointed actuaries. Therefore, the remainder of this summary report deals only with the interests of policyholders who remain with Sun Life of Canada.

Those policyholders include the Philippines policyholders, whose policies will be administered by a new subsidiary of Sun Life of Canada, Sun Life of Canada (Philippines), Inc. This new subsidiary will undertake to comply fully with the requirements of the Conversion Plan. Moreover, policies issued by Sun Life of Canada in the Philippines continue to be policies of Sun Life of Canada, so the remainder of this summary report fully applies to them.

**4.1 Pre-Conversion Individual Participating Closed Sub-Funds**

The Pre-Conversion Individual Participating Closed Sub-Fund for each territory will be allocated the individual dividend-paying Eligible Policies which will be in force in the territory at the Effective Date and their supporting assets. It will also be allocated individual participating policies issued or reinstated by Sun Life of Canada in the territory after the Eligibility Day but before Conversion and their supporting assets. The territories are Canada (including Bermuda), the U.S.A. and the Philippines.

The amount of supporting assets at the Effective Date is determined so as to meet the contractual obligations to the holders of the policies allocated to the particular Pre-Conversion Individual Participating Closed Sub-Fund, as well as their reasonable expectations with respect to dividends and other non-guaranteed benefits.

After the Effective Date, each of the Pre-Conversion Individual Participating Closed Sub-Funds will be separately accounted for. It will be charged with its benefits, taxes, and dividends, and credited with its premiums and investment income. It will also be charged with expenses fixed at Conversion equal to the best estimate assumptions set by the Appointed Actuary to determine the actuarial liabilities at the end of the immediately prior Reporting Period, except that per policy administration charges will be increased periodically to reflect inflation in accordance with the inflation index generally accepted in each territory. In the Philippines, inflation indexation will be limited so that the cumulative inflation adjustment will not exceed the cumulative investment return on the Philippines Pre-Conversion Individual Participating Closed Sub-Fund.

In the past, depending on territory, policy administration expenses tended to increase in line with or somewhat faster than the applicable rate of inflation, so that fixing the policy administration expense charges, as described, does not cause a reduction in policyholder reasonable expectations.

If (which is unlikely) the actual experience is the same as the assumed experience underlying the current dividend scale, then future dividends can be expected to be at least as high as would have been paid under the current scale of dividends. If the actual experience differs from that assumed experience, then the scale of dividends will be adjusted from time to time, upward or downward, to compensate. Ultimately, all of the funds in each closed sub-fund must be used to pay policy benefits (including dividends) or expenses and taxes properly allocated to them.

Finally, in the unlikely event that at any future time the then closed sub-fund should prove insufficient to fully protect the reasonable expectations of holders of policies allocated to that closed sub-fund, the Conversion Plan mandates that sufficient funds be transferred to it to eliminate the deficiency. As set out in the Conversion Plan, such funds will be transferred first from the corresponding Pre-Conversion Participating Ancillary Sub-Fund, to the extent available, and then from the Shareholders' Account.

In my opinion, therefore, the Pre-Conversion Individual Participating Closed Sub-Funds provide appropriate assurance for policyholder reasonable expectations for dividends and other non-guaranteed benefits.

### 4.2 Pre-Conversion Ancillary Participating Sub-Funds

The Conversion Plan requires that Sun Life of Canada create, in each territory, a sub-account of its participating account which is referred to as the "Pre-Conversion Ancillary Participating Sub-Fund".

The assets of each Pre-Conversion Ancillary Participating Sub-Fund consist of those which

- support participating group policies, dividends and other policy amounts on deposit, which do not require protection by a Pre-Conversion Individual Participating Closed Sub-Fund,
- support, in the case of the Canadian Pre-Conversion Ancillary Participating Sub-Fund, small blocks of participating individual policies of residents in Other Jurisdictions, and
- provide additional security to the Pre-Conversion Individual Participating Closed Sub-Fund policies

but which, to the extent not needed to preserve policyholder reasonable expectations, would not have enhanced dividends in the past and so are not needed in the Pre-Conversion Individual Participating Closed Sub-Fund and may appropriately revert to the shareholders.

Participating Policyholders resident in Other Jurisdictions, whose policies are consequently not included in closed sub-funds, will have their reasonable expectations protected in one of two ways:

- where the nature and circumstances of those policies in a particular territory are sufficiently similar to one of the Principal Jurisdictions, future dividend distributions to them will be directly linked to the dividend scales in the particular jurisdiction, and
- in the few remaining cases the current scale of dividends will be fixed and guaranteed.

The determinations of dividends for group participating policies are contractually stipulated and thus do not require the protection afforded by a closed sub-fund.

Section 1.5 of Exhibit D to the Conversion Plan asserts that past practices in the setting of interest rates paid on amounts on deposit will be continued after demutualization. This affords additional protection to policyholders with dividends or other amounts on deposit.

The Pre-Conversion Ancillary Participating Sub-Funds provide additional assurance that policyholder reasonable expectations will be met, because their assets will revert to shareholders only as they are not needed to meet those expectations.

### 4.3 Operating Rules

The Conversion Plan establishes formal rules for the operations of the Pre-Conversion Individual Participating Closed Sub-Funds (including in particular rules that determine what expenses and taxes may be allocated to each Pre-Conversion Individual Participating Closed Sub-Fund and how the investment income credited to it must be determined) and Pre-Conversion Ancillary Participating Sub-Funds in the years following the Effective Date. The intent of those rules is to safeguard participating policyholder reasonable expectations. The rules are in my opinion appropriate.

The Appointed Actuary will have to report annually to the Superintendent on the operation of the Pre-Conversion Individual Participating Closed Sub-Funds and confirm that they have fully complied with the operating rules.

### 4.4 Conclusion

In my opinion, the Conversion Plan allocates assets to each Pre-Conversion Individual Participating Closed Sub-Fund and to each Pre-Conversion Ancillary Participating Sub-Fund which are expected to be adequate to meet both the contractual obligations under the policies in respect of which it is maintained and the reasonable expectations of their policyholders for contractual obligations, dividends and other non-guaranteed benefits.

## 5. NEW PARTICIPATING POLICIES

Participating Policies sold by Sun Life of Canada after the Effective Date will be allocated to Post-Conversion Individual Participating Sub-Accounts. The *Insurance Companies Act* requires that "seed capital" assets be allocated to each Post-Conversion Individual Participating Sub-Account at the Effective Date in an amount adequate to support policies expected to be allocated to that sub-account. The requirement

applies only to Sun Life of Canada and not to the subsidiaries. The "seed capital", together with interest earned thereon, is expected to revert gradually to the shareholders as the policies in the Post-Conversion Individual Participating Sub-Account become self-supporting.

In my opinion, the Conversion Plan allocates assets to the Post-Conversion Individual Participating Sub-Account which are adequate to support the Participating Policies expected to be allocated to the Post-Conversion Individual Participating Sub-Account after the Effective Date.

## 6. STRENGTH AND VITALITY

Sun Life of Canada is among the highest rated Canadian life insurers by various rating agencies as follows: A. M. Best Company rating of A++, a Moody's rating of Aa2, a Standard & Poor's rating of AA+ and a Duff & Phelps rating of AAA. Its available surplus was about 270% of the minimum regulatory required surplus at the end of June, 1999 and is not expected to be materially different at the end of 1999.

Each year, the Appointed Actuary produces a financial projection over the next five year period and tests Sun Life of Canada's ability to withstand plausible adverse scenarios. These projections have shown that Sun Life of Canada's financial position is expected to continue to be strong over the entire projection period.

As noted above in the commentary on criterion B in subsection 3.2 of this report, there are Eligible Policyholders to whom the issue of Financial Services Shares would cause tax problems or violate securities laws, and who will receive cash or Policy Credits instead. The reduction in Sun Life of Canada's capital through payment of cash or granting of Policy Credits to those policyholders will be offset by sale, at the Initial Share Price, of the Financial Services Shares allocated to them. If the sale is impractical (which is thought to be unlikely), then Sun Life of Canada's capital is reduced, but the reduction is less than 0.5% of capital.

As also noted above, other Eligible Policyholders may, as a result of their own decisions, receive cash instead of Financial Services Shares. The shares thus forgone will be offered for sale in the same way. If the sale is impractical (which again is thought to be unlikely), then a decision in favour of cash is inoperative. Either way, Sun Life of Canada pays no cash of its own to those policyholders and so suffers no loss of capital from a decision in favour of cash.

The expense in connection with Sun Life of Canada's demutualization will decrease its capital, but that expense is not material when compared with the capital.

The shareholder dividends which Sun Life of Canada declares to Financial Services after demutualization will be subject to the usual standards for prudent management of a life insurance company, and to the limitations imposed by the *Insurance Companies Act*, and therefore should not impair Sun Life of Canada's capitalization.

There is no other decrease in Sun Life of Canada's capital as a result of demutualization. In arriving at that conclusion, I note that no cash or assets, and in particular no non-insurance or insurance subsidiaries of Sun Life of Canada, will be transferred by way of dividend or otherwise to Financial Services in connection with or as part of the demutualization. I further rely on there being no current plans for such "dividending" to take place.

Demutualization will enable Sun Life of Canada to raise additional capital, if it is needed, in the stock markets.

In my opinion, therefore, the Conversion Plan does not materially adversely affect Sun Life of Canada's future financial strength and vitality or the security of its policyholders.

## 7. POLICY CREDITS

I noted above that Eligible Policyholders who may not be issued Financial Services Shares will receive their equivalent either in cash or as Policy Credits. There are about 150 such policyholders who will receive Policy Credits. Their aggregate allocation is about 62,500 shares.

The Conversion Plan provides that the cash equivalent of a Financial Services Share is the Initial Share Price, and that the Policy Credit equivalent is policy benefits having a value equal to the cash equivalent. I assume that the cash equivalent is an appropriate substitute for Financial Services Shares at the date the Initial Share Price is determined, and I note that in the Policyholder Information Circular are opinions from investment bankers to that effect. Based on that assumption, my opinion is that the Policy Credit equivalent is also an appropriate substitute for Financial Services Shares at that date.

**SCHEDULE E**

**VALUATION REPORT**

*MORGAN STANLEY DEAN WITTER* RBC DOMINION SECURITIES

The Boards of Directors of Sun Life Assurance Company of Canada
and Sun Life of Canada Holdings Corp.
150 King Street West
Toronto, Ontario
Canada M5H 1J9

September 28, 1999

Members of the Boards:

## I. Valuation Overview

We understand that Sun Life Assurance Company of Canada ("Sun Life") intends to submit to the Superintendent of Financial Institutions of Canada ("OSFI"), the Commissioner of Insurance of the State of Michigan and certain other regulators a Conversion Plan under the *Insurance Companies Act* (Canada), dated September 28, 1999 (the "Plan"). Under the Plan, Sun Life will convert from a mutual life insurance company into a life insurance company with common shares (the "Conversion") and will become a wholly-owned subsidiary of Sun Life of Canada Holdings Corp. ("Financial Services"). The Plan also provides, among other things, that: (i) all Eligible Policyholders will have issued to them common shares ("Common Shares") of Financial Services or will receive cash proceeds or be credited with Policy Credits in exchange for their rights with respect to, or any interest in, Sun Life as a mutual company, including their Ownership Rights; and (ii) Financial Services and those Eligible Policyholders who have so elected or are deemed to have so elected (to the extent such elections are given effect under the Plan), together with those who are so required by the terms of the Plan, will offer Common Shares pursuant to or in connection with an initial public offering of the Common Shares, as provided for in the Plan (the "Initial Public Offering"). Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan.

As required by sections 4(1)(a) and 7(1)(f) of the *Mutual Company (Life Insurance) Conversion Regulations* (the "Regulations") under the *Insurance Companies Act* (Canada), this report will form a part of the Plan that will be included in the Policyholder Information Circular of Sun Life to be dated October 20, 1999 (the "Policyholder Information Circular"). As required by the Regulations, this report sets out the estimated range of market values of Sun Life on the basis that it is the same as the Range of Values as defined below. This report contains a range of estimated public equity market values for Financial Services based solely on estimated prices at which the Common Shares could have been expected to be offered as of September 24, 1999 (the "Valuation Date") in an initial public offering conducted in a manner consistent with the Initial Public Offering (the "Range of Values"), as if the effective date of the Conversion (the "Effective Date") were the Valuation Date, and a description of how the Range of Values was estimated, the methods used and assumptions made in estimating the Range of Values.

Our estimate of the Range of Values in this report is an opinion. An opinion is an expression of professional judgment on the issues explicitly addressed. By rendering a professional opinion, we do not become an insurer or guarantor of the expression of professional judgment, of any transaction or of any future performance. In particular, an opinion is not a prediction of future events and the rendering of this opinion does not guarantee the outcome of the matters opined upon.

## II. Valuation Assumptions and Limitations on the Methods

The estimation of the Range of Values is a complex process involving various judgments as to the most appropriate and relevant methods of financial analyses and the application of those methods to Financial Services' particular circumstances. This report does not purport to be a complete description of the processes, judgments and determinations underlying the Range of Values.

In estimating the Range of Values, qualitative judgments were made as to the significance and relevance of each analysis and factor considered. Accordingly, the report must be considered as a whole and considering portions of the report in isolation could create a misleading or incomplete view of the basis upon which we

have estimated the Range of Values. Numerous judgments and estimations were made with respect to Financial Services, industry performance, regulatory, general business, economic, market and financial considerations and other matters, many of which are beyond the control of Financial Services. No company, business segment or historical demutualization used in such analyses as a comparison is identical to Financial Services, its businesses or the Conversion and the evaluation of the results of such analyses is not entirely mathematical; rather, it involves complex considerations and judgments, both quantitative and qualitative, concerning financial and operating characteristics and other factors that could affect the public equity market values of the companies, business segments or historical demutualizations being analyzed. The estimates contained in such analyses and the range of estimated public equity market values resulting from any particular analysis are not necessarily indicative of actual values or predictive of future results or values, which may be significantly more or less favourable than those suggested by such analyses. In addition, analyses relating to the value of businesses or securities do not purport to be appraisals or to reflect the prices at which businesses or securities actually may be sold. Accordingly, such analyses and estimates are inherently subject to substantial uncertainty.

You have asked us to prepare the Range of Values on the basis that:

(i) there will be no new equity capital raised by Financial Services in excess of the cash proceeds to be distributed to Eligible Policyholders who are to receive cash proceeds or to fund Policy Credits as part of the Conversion, although Financial Services may in fact decide to raise such additional equity capital;

(ii) the dividend yield on the Common Shares will be comparable to the dividend yield of other North American public financial services companies;

(iii) the Initial Public Offering will be a minimum of 10% of the total market capitalization of Financial Services;

(iv) the Initial Public Offering will not be so large as to negatively impact the Initial Share Price;

(v) the distribution and redistribution of the Common Shares following the Initial Public Offering would be expected to result in a reasonable level of market liquidity in the Common Shares; and

(vi) the closing of the Initial Public Offering will occur approximately five business days after the Effective Date and in accordance with the Plan.

The Initial Public Offering, if it occurs, will occur at least five months after the date of this report. Changes in economic and market conditions and other events and developments, including but not limited to legal, tax and regulatory changes, changes in Sun Life's operating performance and changes in the factors described in the preceding paragraphs after the Valuation Date, may have a material effect on the business, operations, financial condition or prospects of Sun Life or Financial Services or on the prices at which the Common Shares may initially be offered and sold to the public and otherwise trade. We assume no obligation to update, revise, reaffirm or withdraw this report as a result of any subsequent events or developments or otherwise.

The limitations on the assumptions and methodologies used to determine the Range of Values include the following:

a) **The unknown supply-demand dynamics**: (i) it cannot be determined how many of Sun Life's approximately 1,058,243 Eligible Policyholders will elect to receive cash proceeds rather than retain their Common Shares at the time of the Initial Public Offering; (ii) institutional investors usually have greater demand for common shares available in large blocks if there is some assurance of liquidity, (iii) Eligible Policyholders choosing to sell their Common Shares in the early aftermarket may create an excess supply of Common Shares; and (iv) anticipation of excess supply, excess demand or lack of availability may impact the Initial Share Price.

b) **The lack of companies directly comparable to Financial Services**: (i) although a number of companies which share various characteristics with Financial Services were included in our analysis ("Comparable Companies"), no company, including the few other large publicly traded Canadian life insurance companies, is directly comparable to Financial Services; (ii) other Canadian financial institutions that may be considered to be comparable to Financial Services have substantially different businesses and business compositions than those of Financial Services; and

(iii) computations and analysis of operating earnings of Comparable Companies that are U.S. life insurers are based on U.S. GAAP (as defined below), while such computations and analysis for Financial Services are based on Canadian GAAP (as defined below).

c) **Unicover Controversy:** Sun Life is involved in a controversy concerning certain health reinsurance contracts arranged on behalf of Sun Life with Unicover Managers, Inc. There is uncertainty as to the ultimate financial impact on Sun Life that will result from this matter, but there is a risk that Sun Life may suffer material losses. In conducting our analyses relating to the Range of Values set out below, we have relied upon the information and analysis included in the Policyholder Information Circular and otherwise provided to us by Sun Life and its advisors with respect to this matter.

d) **Canadian vs. U.S. GAAP:** (i) Sun Life reports its financial results under generally accepted accounting principles in Canada ("Canadian GAAP"); (ii) Canadian GAAP differs from generally accepted accounting principles in the United States ("U.S. GAAP") and the two methodologies can generate very different earnings results in any specific year; and (iii) although Sun Life generally manages its business under Canadian GAAP, certain U.S. investors may value Financial Services on a U.S. GAAP basis, which may result in a different valuation for Financial Services.

e) **Historical volatility:** (i) shares of North American publicly traded Comparable Companies have shown considerable price volatility over time; and (ii) this volatility underscores the fact that the Range of Values is estimated at a point in time and the public equity market value of Financial Services can be expected to vary significantly over time.

f) **Other Considerations:** (i) Sun Life operates with a level of capital (that is, a Minimum Continuing Capital and Surplus Requirements ratio of 269% as of June 30, 1999) that is considerably in excess of regulatory requirements and that of many Comparable Companies; (ii) the Government of Canada has announced a policy that no merger or acquisition of a demutualized life insurance company may take place during the two-year period following its demutualization, and that certain large demutualized life insurance companies including Sun Life will be required to remain widely held indefinitely; (iii) Sun Life has informed us of its current business strategy as at the Valuation Date. We understand that Sun Life is currently undergoing a strategic review, which it undertakes periodically, and that revisions to Sun Life's strategy or operations could occur as a result. Such changes or developments occurring after the Valuation Date and prior to the Initial Public Offering may impact the Range of Values; and (iv) circumstances in the future may dictate that it would be appropriate to apply different valuation methodologies for all or a portion of Financial Services' operations.

For purposes of this report, we have relied on the accuracy and completeness of all information supplied or otherwise made available, discussed with or reviewed by or for us, and we have not assumed any responsibility for independently verifying such information or undertaken an independent evaluation or appraisal of any of the assets or liabilities of Sun Life or Financial Services or been furnished with any such evaluation or appraisal. In addition, we have not conducted any physical inspection of the properties or facilities of Sun Life. With respect to information relating to the prospects of Financial Services, this report has been prepared on the basis that such information reflects the best currently available estimates and judgments of management of Sun Life as to the likely future financial performance of Financial Services and that the pro forma condensed consolidated financial statements of Financial Services forming part of such information present fairly the effects of the Conversion and the reorganization provided for in the Plan had the Conversion and the reorganization occurred on the dates indicated. We understand that Nicholas Bauer, the independent actuary you have retained in connection with the Plan, and Sun Life's appointed actuary have each provided an opinion to the Board as of the date of this report that the benefits and method used to apportion the value of Sun Life among Eligible Policyholders are fair and equitable to those policyholders and on other matters as set forth in the Policyholder Information Circular. We are not actuaries and our services did not include any actuarial determination or evaluations or any attempt to evaluate actuarial assumptions. We have relied upon Sun Life and the independent actuary and the appointed actuary with respect to all actuarial-related information. In addition, we have been advised as to certain tax and legal matters by counsel to Sun Life and, with respect to such tax and legal matters, we have relied upon such counsel. We are not legal advisors, accountants or tax experts and our services did not include any legal, accounting or tax determination or evaluation or any attempt to evaluate legal, accounting or tax assumptions.

## III. Scope of Review

The following information was reviewed in connection with this report:

(i) audited Canadian GAAP financial statements for Sun Life for each of the five years ended December 31, 1998 and certain U.S. GAAP information included therein for each of the two years ended December 31, 1998, including the reports of the auditors thereon;

(ii) certain financial projections of Sun Life and Financial Services prepared and supplemented by management of Sun Life;

(iii) certain interim financial reports of Sun Life;

(iv) certain internal financial analyses of Sun Life and Financial Services prepared and supplemented by management of Sun Life;

(v) the market prices and other financial information for Comparable Companies based on publicly available information;

(vi) the results of operations of Comparable Companies for the most recent fiscal period based on publicly available information;

(vii) selected historical demutualizations and their public offerings;

(viii) the Policyholder Information Circular in the form approved by the Board for mailing to all Eligible Policyholders in connection with the Special Meeting;

(ix) a copy of the Plan and related documents;

(x) the opinions of each of the independent actuary and the appointed actuary referred to above;

(xi) the financial terms of the transactions contemplated by the Plan and the Exhibits thereto, which we compared with the financial terms of other transactions we deemed to be relevant;

(xii) such other financial studies and analyses and such other matters as we deemed necessary, including our assessment of general economic, market and monetary conditions; and

(xiii) information obtained from discussions with members of the senior management of Sun Life and Financial Services regarding the operations, financial condition and future prospects of Sun Life and Financial Services including the effect of the Plan, as well as with internal and external legal, accounting and actuarial advisors of Sun Life and Financial Services;

No historical information in respect of periods or dates after September 24, 1999 was taken into account in preparing this report.

In estimating the Range of Values, we used primarily the comparable company valuation methodology to estimate the range of fully distributed trading values for Financial Services. This methodology involves comparing Sun Life to publicly traded companies. The principal trading multiples used in our analysis included price-to-earnings multiples and price-to-book multiples.

We used two approaches in estimating the range of fully distributed trading values for Financial Services: the consolidated company approach and the sum-of-the-parts approach. To arrive at the Range of Values, we then applied an initial public offering discount to the estimated range of fully distributed trading values.

## IV. Range of Values versus Initial Share Price

The Range of Values is not necessarily the same as the valuation of Financial Services which will result from the actual Initial Public Offering process. In the actual Initial Public Offering process, important market information, including information relating to demand and pricing levels, will be solicited and received by the Underwriters from prospective investors. This information may be material to the determination of the Initial Share Price. Such information also may lead to revision of the Initial Share Price during the marketing period. For the purposes of this report it has not been possible to undertake a typical marketing process with respect to the Common Shares (which will only take place in the period immediately prior to Conversion) and such information is therefore not available. While the Initial Share Price will be determined through negotiations involving the Board of Directors of Financial Services and the Underwriters, and no such negotiations have

been undertaken as of yet, we note that the Board of Directors of Financial Services will approve the Initial Share Price for the purposes of the issuance and sale of the Common Shares in the Initial Public Offering at the time of the Initial Public Offering.

Furthermore, our experience with large distributions of equity securities, such as the proposed offering and sale of the Common Shares, leads us to believe that the proposed offering would require a discount from the expected range of fully distributed trading values for Financial Services. In pricing the Initial Public Offering, the following factors, among others, could cause the Initial Share Price to differ from the expected fully distributed trading value: (i) the lack of a public market trading record; (ii) the lack of equity investors' familiarity with Financial Services; (iii) the absolute size of the offering; (iv) the size of the offering relative to the overall capitalization of Financial Services; (v) the performance of Sun Life and expectations as to Financial Services' performance; (vi) marketing considerations; (vii) timing considerations; and (viii) prevailing market conditions in the overall market, as well as the new issue market, at the time of the Initial Public Offering.

The actual price at which the Common Shares will trade may be higher or lower than the Range of Values per Common Share set forth in Section VI of this report. In the course of actual trading of the Common Shares following the Initial Public Offering, other factors may influence the actual public equity market value of Financial Services including, among others: (i) certain financial information and data of Financial Services; (ii) the history of, and the prospects for, Financial Services and the industry in which it competes; (iii) an assessment of Financial Services' management, management compensation and other incentives; (iv) Sun Life's and Financial Services' past and present operations; (v) Sun Life's investment policies and the quality of its assets; (vi) the prospects for, and timing of, future revenues and earnings of Financial Services; (vii) the state of Financial Services' development; (viii) the impact of any acquisitions or divestitures by Sun Life or Financial Services; (ix) the geographic focus of its operations; (x) its product and services mix; (xi) its channels of distribution for such products and services; (xii) its dividend rate and yield; (xiii) its return on equity and earnings growth rates; (xiv) prevailing industry, economic and equity and debt market conditions and expectations with respect thereto, including the number and size of the equity financings and initial public offerings that may be completed around the time of the Initial Public Offering; and (xv) the length of time which Eligible Policyholders receiving Common Shares on Conversion retain such Common Shares, and the other matters referred to in Sections II and III above relating to factors relevant to the valuation of Financial Services. The valuation of non-publicly traded securities, and the estimation of the Range of Values for Financial Services, is inherently imprecise and subject to numerous uncertainties and contingencies, all of which are difficult to predict. Accordingly, the actual public equity market values for Financial Services from time to time after the Initial Public Offering could differ substantially from the Range of Values.

## V. Other Relationships

As you are aware, Sun Life has retained us to provide investment banking and other financial advice in respect of the Conversion, including this report and certain opinions included in the Policyholder Information Circular, for which we will receive a fee. In addition, we have in the past performed and continue to perform other investment banking and financial advisory services for Sun Life and certain of its affiliates. In the ordinary course of our business as a broker/dealer, we may from time to time purchase securities and interests in loans from, and sell securities and interests in loans to, Sun Life, Financial Services and their subsidiaries, as a market-maker or otherwise. We may from time to time have a long or a short position in, and buy or sell, securities of Financial Services, Sun Life or their subsidiaries for our own account and for the account of our customers. In this regard, as you are aware, we, as Underwriters, expect to enter into the Underwriting Agreements providing for, upon the terms and subject to the conditions set forth therein, the issuance and sale by Financial Services, the sale by certain Eligible Policyholders and, in exchange for a fee, the purchase by the Underwriters, of Common Shares at the Initial Share Price.

## VI. Range of Values

You have not asked for and we express no opinion or recommendation as to and this report should not be relied upon as to:

(i) the Initial Share Price;

(ii) the price at which the Common Shares to be issued in connection with the Plan or pursuant to the Initial Public Offering will trade;

(iii) the fairness of the Initial Share Price;

(iv) the fair market value of any of the Common Shares to be issued in connection with the Plan or pursuant to the Initial Public Offering;

(v) the adequacy or sufficiency of the Policyholder Information Circular or any other document to be sent or disclosure to be made to Eligible Policyholders in connection with the Conversion;

(vi) which of Sun Life's policyholders are appropriately included among the Eligible Policyholders;

(vii) the fairness of the Plan including its fairness to any individual Eligible Policyholder or to any class of Eligible Policyholders or the fairness of any provisions of the Plan relating to which Eligible Policyholders receive any particular form of the Demutualization Benefits or other provisions of the Plan which distinguish among Eligible Policyholders;

(viii) any matters relating to the reorganization of Sun Life described in the Policyholder Information Circular or the restructuring or operation of the Worldwide Participating Account;

(ix) the likelihood of consummation of the Plan or any other aspect of the Plan;

(x) the appropriateness of the Conversion relative to any other transaction Sun Life could undertake; or

(xi) how Eligible Policyholders should vote in connection with the Plan or whether or not they should elect to receive cash in lieu of some or all of their allocated Common Shares or buy or sell Common Shares.

We note the following:

(i) we do not know the circumstances of any Eligible Policyholders and therefore are not in a position to advise any Eligible Policyholders; and

(ii) the opinions expressed herein are subject to the assumptions, qualifications, limitations and uncertainties described herein.

Based upon and subject to the methods, assumptions, qualifications and limitations discussed herein, in our opinion as investment bankers, the estimated Range of Values as of the Valuation Date is approximately Can.$5.6 billion to Can.$8.4 billion and, based on your advice that approximately 400 million Common Shares will be outstanding as of such date, approximately Can.$14 to Can.$21 per Common Share.

This report is provided to the boards of directors of Sun Life and Financial Services in connection with the Plan and, without our prior written consent, this report is not to be quoted, summarized, paraphrased, excerpted or referred to, in whole or in part, in any prospectus, registration statement, policyholder information circular or proxy statement, or in any other report, document, filing, release or other written or oral communication prepared, issued or transmitted by Financial Services or Sun Life, except the Plan and the Policyholder Information Circular to be mailed to Eligible Policyholders.

Morgan Stanley & Co. Incorporated RBC Dominion Securities Inc.

SCHEDULE F

OPINION OF FINANCIAL ADVISORS ON VALUATION REPORT

*MORGAN STANLEY DEAN WITTER* RBC DOMINION SECURITIES

The Boards of Directors of Sun Life Assurance Company of Canada
and Sun Life of Canada Holdings Corp.
150 King Street West
Toronto, Ontario
Canada M5H 1J9

September 28, 1999

Members of the Boards:

We understand that Sun Life Assurance Company of Canada ("Sun Life") intends to submit to the Superintendent of Financial Institutions of Canada ("OSFI"), the Commissioner of Insurance of the State of Michigan and certain other regulators a Conversion Plan under the *Insurance Companies Act* (Canada), dated September 28, 1999 (the "Plan"). Under the Plan, Sun Life will convert from a mutual life insurance company into a life insurance company with common shares (the "Conversion") and will become a wholly-owned subsidiary of Sun Life of Canada Holdings Corp. ("Financial Services"). The Plan also provides, among other things, that: (i) all Eligible Policyholders will have issued to them common shares ("Common Shares") of Financial Services or will receive cash proceeds or be credited with Policy Credits in exchange for their rights with respect to, or any interest in, Sun Life as a mutual company, including their Ownership Rights; and (ii) Financial Services and those Eligible Policyholders who have elected or are deemed to have elected (to the extent such elections are given effect under the Plan) together with those who are so required by the terms of the Plan will offer Common Shares pursuant to or in connection with an initial public offering of the Common Shares, as provided for in the Plan (the "Initial Public Offering"). Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan.

We refer you to the valuation report attached at Exhibit C to the Plan (the "Valuation Report") which sets out the range of values of Sun Life on the basis that it is the same as the Range of Values as defined in the Valuation Report. Section 5(1)(b) of the *Mutual Company (Life Insurance) Conversion Regulations* (the "Regulations") under the *Insurance Companies Act* (Canada) requires Sun Life to submit to OSFI an opinion from a valuation expert that the methods used and assumptions made to estimate the Range of Values are appropriate and that the Range of Values reasonably reflects prevailing market conditions as at the date it was estimated. In connection with this requirement, you have asked us, as investment bankers, to provide our opinion to you as of the Valuation Date (as defined in the Valuation Report) as to: (i) whether the Range of Values reasonably reflects prevailing market conditions as at the Valuation Date; and (ii) the appropriateness of the methods and assumptions employed to estimate the Range of Values. The Valuation Report, including, without limitation, the limitations and qualifications in it, is incorporated in its entirety by reference into, and forms part of, this letter. In addition, we have relied on the documentation and other information discussed in the Valuation Report as set forth therein in preparing this letter.

An opinion is an expression of professional judgment on the issues explicitly addressed. By rendering a professional opinion, we do not become an insurer or guarantor of the expression of professional judgment, of any transaction or of any future performance. In particular, an opinion is not a prediction of future events and the rendering of this opinion does not guarantee the outcome of the matters opined upon.

As you are aware, Sun Life has retained us to provide investment banking and other financial advice in respect of the Conversion, including the Valuation Report and this and certain other opinions, each of which is included in the Policyholder Information Circular, for which we will receive a fee. In addition, we have in the past performed and continue to perform other investment banking and financial advisory services for Sun Life and certain of its affiliates. In the ordinary course of our business as a broker/dealer, we may from time to time purchase securities and interests in loans from, and sell securities and interests in loans to, Sun Life, Financial Services and their subsidiaries, as a market-maker or otherwise. We may from time to time have a long or a short position in, and buy or sell, securities of Financial Services, Sun Life or their subsidiaries for our own account and for the account of our customers. In this regard, as you are aware, we, as Underwriters,

expect to enter into the Underwriting Agreements providing for, upon the terms and subject to the conditions set forth therein, the issuance and sale by Financial Services, the sale by certain Eligible Policyholders and, in exchange for a fee, the purchase by the Underwriters, of Common Shares.

You have not asked for and we express no opinion or recommendation as to and this opinion should not be relied upon as to:

(i) the Initial Share Price;

(ii) the price at which the Common Shares to be issued in connection with the Plan or pursuant to the Initial Public Offering will trade;

(iii) the fairness of the Initial Share Price;

(iv) the fair market value of any of the Common Shares to be issued in connection with the Plan or pursuant to the Initial Public Offering;

(v) the adequacy or sufficiency of the Policyholder Information Circular of Sun Life to be dated October 20, 1999 (the "Policyholder Information Circular") or any other document to be sent or disclosure to be made to Eligible Policyholders in connection with the Conversion;

(vi) which of Sun Life's policyholders are appropriately included among the Eligible Policyholders;

(vii) the fairness of the Plan, including its fairness to any individual Eligible Policyholder or to any class of Eligible Policyholders or the fairness of the Plan relating to which Eligible Policyholders receive any particular form of the Demutualization Benefits or other provisions of the Plan which distinguish among Eligible Policyholders;

(viii) any matters relating to the reorganization of Sun Life described in the Policyholder Information Circular or the restructuring or operation of the Worldwide Participating Account;

(ix) the likelihood of consummation of the Plan or any other aspect of the Plan;

(x) the appropriateness of the Conversion relative to any other transaction Sun Life could undertake; or

(xi) how Eligible Policyholders should vote in connection with the Plan or whether or not they should elect to receive cash in lieu of some or all of their allocated Common Shares or buy or sell Common Shares.

The Initial Public Offering, if it occurs, will occur at least five months after the date of this letter. Changes in economic and market conditions and other events and developments, including but not limited to legal, tax and regulatory changes, changes in Sun Life's operating performance and changes in the factors described in the preceding paragraphs after the Valuation Date, may have a material effect on the business, operations, financial condition or prospects of Sun Life or Financial Services or on the prices at which the Common Shares may initially be offered and sold to the public and otherwise trade. We assume no obligation to update, revise, reaffirm or withdraw this letter as a result of any subsequent events or developments or otherwise.

The opinions expressed herein are provided to the boards of directors of Sun Life and Financial Services in connection with the Plan and, without our prior written consent, such opinions are not to be quoted, summarized, paraphrased, excerpted or referred to, in whole or in part, in any prospectus, registration statement, policyholder information circular or proxy statement, or in any other report, document, filing, release or other written or oral communication prepared, issued or transmitted by Financial Services or Sun Life, except the Plan and the Policyholder Information Circular to be mailed to Eligible Policyholders.

The opinions expressed herein are being provided to the boards of directors of Sun Life and Financial Services for their benefit and for the benefit of Eligible Policyholders as a group, as required by the Regulations. The opinions expressed herein should be read in light of all of the information provided in the Policyholder Information Circular.

We note the following:

(i) we do not know the circumstances of any Eligible Policyholders and therefore are not in a position to advise any Eligible Policyholders; and

(ii) the opinions expressed herein are subject to the assumptions, qualifications, limitations and uncertainties described herein.

Based upon and subject to the limitations, qualifications and assumptions discussed herein, in our opinion as investment bankers from a financial point of view, as of the Valuation Date: (i) the Range of Values reasonably reflects prevailing market conditions as at the Valuation Date; and (ii) the methods used and assumptions made to estimate the Range of Values are appropriate.

Very truly yours,

Morgan Stanley & Co. Incorporated

RBC Dominion Securities Inc.

SCHEDULE G

OPINION OF FINANCIAL ADVISORS AS TO CASH IN LIEU OF COMMON SHARES

*MORGAN STANLEY DEAN WITTER* **RBC DOMINION SECURITIES**

The Boards of Directors of Sun Life Assurance Company of Canada
and Sun Life of Canada Holdings Corp.
150 King Street West
Toronto, Ontario
Canada M5H 1J9

September 28, 1999

Members of the Boards:

We understand that Sun Life Assurance Company of Canada ("Sun Life") intends to submit to the Superintendent of Financial Institutions of Canada ("OSFI"), the Commissioner of Insurance of the State of Michigan and certain other regulators a Conversion Plan under the *Insurance Companies Act* (Canada), dated September 28, 1999 (the "Plan"). Under the Plan, Sun Life will convert from a mutual life insurance company into a life insurance company with common shares (the "Conversion") and will become a wholly-owned subsidiary of Sun Life of Canada Holdings Corp. ("Financial Services"). The Plan also provides, among other things, that: (i) all Eligible Policyholders will have issued to them common shares ("Common Shares") of Financial Services or will receive cash proceeds or be credited with Policy Credits in exchange for their rights with respect to, or any interest in, Sun Life as a mutual company, including their Ownership Rights; and (ii) Financial Services and those Eligible Policyholders who have so elected or are deemed to have so elected (to the extent such elections are given effect under the Plan) together with those who are so required by the terms of the Plan will offer Common Shares pursuant to or in connection with an initial public offering of the Common Shares, as provided for in the Plan (the "Initial Public Offering"), at a price per share for the Common Shares (the "Initial Share Price") to be specified in the underwriting agreement (the "Underwriting Agreement") with the Underwriters for the Initial Public Offering (for greater certainty, without regard to any commission or other fee payable to the Underwriters by Financial Services or any other person in respect of such Initial Public Offering). Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan.

The amount of cash per Common Share to which an Eligible Policyholder may be entitled under the Plan, prior to the deduction of any applicable withholding taxes, will be equal to the Initial Share Price.

Sun Life is required by Section 5(1)(c) of the *Mutual Company (Life Insurance) Conversion Regulations* (the "Regulations") under the *Insurance Companies Act* (Canada) to submit to OSFI an opinion from an independent actuary, or from a valuation expert, that where, in respect of a conversion, other benefits are to be provided in lieu of shares, those benefits are appropriate substitutes for the shares as at the date the value of Sun Life was estimated. In connection with this requirement, you have asked us, as investment bankers, to provide our opinion as at the date hereof to you as to whether the cash that is to be paid to certain Eligible Policyholders under the Plan in lieu of Common Shares will be, at the time of the determination of the Initial Share Price, an appropriate substitute for those Common Shares.

An opinion is an expression of professional judgment on the issues explicitly addressed. By rendering a professional opinion, we do not become an insurer or guarantor of the expression of professional judgment of any transaction or of any future performance. In particular, an opinion is not a prediction of future events and the rendering of this opinion does not guarantee the outcome of the matters opined upon.

We understand that Nicholas Bauer, as independent actuary (the "Independent Actuary"), will provide an opinion to the Board that, among other things, the Plan provides Policy Credits which, as of the date the Initial Share Price is determined, will be appropriate substitutes for the Common Shares.

We note that the term "appropriate substitute" is not defined in the *Insurance Companies Act* (Canada) or in the Regulations. After consultation with you and your advisors and OSFI and its advisors, for the purposes of this opinion, we have applied, with your consent, the following definition of the term "appropriate substitute". The term "appropriate substitute" means, as applied to the relationship between (i) the cash payments to be made to Eligible Policyholders who request or are required to receive cash under the Plan in lieu of Common Shares, and (ii) such Common Shares, that such cash payments are equal, at the

time of the determination of the Initial Share Price of the Common Shares, to the cash value of such Common Shares determined solely by reference to the Initial Share Price of the Common Shares multiplied by the number of Common Shares allocated to such Eligible Policyholders.

In connection with rendering our opinion herein, we have:

(i) reviewed the Policyholder Information Circular of Sun Life to be dated October 20, 1999 (the "Policyholder Information Circular") in the form approved by the Board for mailing to all Eligible Policyholders in connection with the Special Meeting;

(ii) reviewed a copy of the Plan and related documents;

(iii) reviewed the opinion of the Independent Actuary referred to above; and

(iv) taken into account such other matters as we deemed necessary;

We have assumed that:

(i) the closing of the Initial Public Offering will occur approximately five business days after the Effective Date and in accordance with the Plan;

(ii) Financial Services will apply for listing on the Stock Exchanges;

(iii) Financial Services will meet the initial and continuing listing requirements of the Stock Exchanges;

(iv) the Common Shares will be listed and permitted to be traded on the Stock Exchanges not later than the first trading day after the Effective Date and will remain listed on the Stock Exchanges indefinitely after such date; and

(v) not later than the first trading day following the Effective Date, Financial Services will become and will remain indefinitely following such date a reporting issuer in good standing (or equivalent status) such that the Common Shares may be traded without restriction in the jurisdictions in which the Stock Exchanges are situated.

As you are aware, Sun Life has retained us to provide investment banking and other financial advice in respect of the Conversion, including a report and this and certain other opinions, each of which is included in the Policyholder Information Circular, for which we will receive a fee. In addition, we have in the past performed and continue to perform other investment banking and financial advisory services for Sun Life and certain of its affiliates. In the ordinary course of our business as a broker/dealer, we may from time to time purchase securities and interests in loans from, and sell securities and interests in loans to, Sun Life, Financial Services and their subsidiaries, as a market-maker or otherwise. We may from time to time have a long or a short position in, and buy or sell, securities of Financial Services, Sun Life or their subsidiaries for our own account and for the account of our customers. In this regard, as you are aware, we, as Underwriters, expect to enter into the Underwriting Agreements providing for, upon the terms and subject to the conditions set forth therein, the issuance and sale by Financial Services, the sale by certain Eligible Policyholders and, in exchange for a fee, the purchase by the Underwriters, of Common Shares.

For purposes of this opinion, we have relied on the accuracy and completeness of all the information supplied or otherwise made available, discussed with or reviewed by or for us, and we have not assumed any responsibility for independently verifying such information. We are not actuaries and our services did not include any actuarial determination or evaluations or any attempt to evaluate actuarial assumptions. We have relied upon Sun Life and the Independent Actuary with respect to all actuarial-related information. In addition, we have been advised as to certain legal matters by counsel to Sun Life and, with respect to such legal matters, we have relied upon such counsel. We are not legal advisors, accountants or tax experts and our services did not include any legal, accounting or tax determination or evaluation or any attempt to evaluate legal, accounting or tax assumptions.

You have not asked for and we express no opinion or recommendation as to and this opinion should not be relied upon as to:

(i) the Initial Share Price;

(ii) the price at which the Common Shares to be issued in connection with the Plan or pursuant to the Initial Public Offering will trade;

(iii) the fairness of the Initial Share Price;

(iv) the fair market value of any of the Common Shares to be issued in connection with the Plan or pursuant to the Initial Public Offering;

(v) the adequacy or sufficiency of the Policyholder Information Circular or any other document to be sent or disclosure to be made to Eligible Policyholders in connection with the Conversion;

(vi) which of Sun Life's policyholders are appropriately included among the Eligible Policyholders;

(vii) the fairness of the Plan, including its fairness to any Eligible Policyholder or to any class of Eligible Policyholders or the fairness of the Plan relating to which Eligible Policyholders receive any particular form of the Conversion Benefits or other provisions of the Plan which distinguish among Eligible Policyholders;

(viii) any matters relating to the reorganization of Sun Life described in the Policyholder Information Circular or the restructuring or operation of the Worldwide Participating Account;

(ix) the likelihood of consummation of the Plan or any other aspect of the Plan;

(x) the appropriateness of the Conversion relative to any other transaction Sun Life could undertake;

(xi) how Eligible Policyholders should vote in connection with the Plan or whether or not they should elect to receive cash in lieu of some or all of their allocated Common Shares or buy or sell Common Shares;

(xii) whether a cash amount and the Common Shares are equal in value at any time other than at the time of determination of the Initial Share Price; or

(xiii) whether the cash amount to be paid under the Plan in respect of Common Shares would be sufficient to enable a person to purchase the Common Shares in the market at any time, including on the Effective Date, the date of closing of the Initial Public Offering or in the market following the completion of the Initial Public Offering.

G

Without limiting the foregoing, we note that the Initial Share Price and the subsequent market prices of the Common Shares will be a function of, among other things, market conditions and the recent performance of and outlook for Financial Services and its subsidiaries, including Sun Life, from time to time. The Initial Share Price and the subsequent market prices for the Common Shares for a period following the Initial Public Offering will reflect the expected redistribution of the Common Shares distributed to Eligible Policyholders in accordance with the Plan. Accordingly, the market prices of Common Shares may be greater or less than the Initial Share Price.

The opinion expressed herein is provided to the boards of directors of Sun Life and Financial Services in connection with the Plan and, without our prior written consent, such opinion is not to be quoted, summarized, paraphrased, excerpted or referred to, in whole or in part, in any prospectus, registration statement, information circular or proxy statement, or in any other report, document, filing, release or other written or oral communication prepared, issued or transmitted by Financial Services or Sun Life, except the Plan and the Policyholder Information Circular to be mailed to all Eligible Policyholders.

The opinion expressed herein is being provided to the boards of directors of Sun Life and Financial Services for their benefit and for the benefit of Eligible Policyholders as a group, as required by the Regulations. This opinion should be read in light of all of the information provided in the Policyholder Information Circular. We assume no obligation to update, revise, reaffirm or withdraw this letter as a result of any subsequent events or developments or otherwise.

We note the following:

(i) we do not know the circumstances of any Eligible Policyholders and therefore are not in a position to advise any Eligible Policyholders;

(ii) it would be inappropriate for any Eligible Policyholder to conclude, on the basis of the views set forth in this letter or without consulting his or her own advisors, whether or not the Eligible Policyholder should make a request to receive cash in lieu of, or to sell, some or all of their allocated Common Shares under the Plan;

(iii) the opinion expressed herein is subject to the numerous assumptions, qualifications, limitations and uncertainties described herein.

In addition, we have not taken into consideration the tax or other consequences to Eligible Policyholders of selling their Common Shares under the Plan or receiving cash rather than other Demutualization Benefits, including (i) the deduction of withholding taxes from the cash being paid to Eligible Policyholders resident outside of Canada; (ii) the time value of money; (iii) currency exchange rates, including those available to Sun Life in respect of amounts payable under the Plan, or fluctuations therein; (iv) the impact on Eligible Policyholders' entitlement to social benefits arising from the receipt of Demutualization Benefits; or (v) any dividends payable on the Common Shares that Eligible Policyholders receiving cash would have otherwise received.

Based upon and subject to the limitations, qualifications and assumptions discussed herein, in our opinion as investment bankers, cash paid to Eligible Policyholders in lieu of Common Shares in an amount equal to the Initial Share Price multiplied by the number of Common Shares allocated to such Eligible Policyholders will be, at the time of the determination of the Initial Share Price, an appropriate substitute for those Common Shares.

Very truly yours,

Morgan Stanley & Co. Incorporated

RBC Dominion Securities Inc.

G

## SCHEDULE H

## OPINION OF FINANCIAL ADVISORS ON ACCESS TO FINANCIAL MARKETS

*MORGAN STANLEY DEAN WITTER* **RBC DOMINION SECURITIES**

The Boards of Directors of Sun Life Assurance Company of Canada
and Sun Life of Canada Holdings Corp.
150 King Street West
Toronto, Ontario
Canada M5H IJ9

September 28, 1999

Members of the Boards:

We understand that Sun Life Assurance Company of Canada ("Sun Life") intends to submit to the Superintendent of Financial Institutions of Canada ("OSFI"), the Commissioner of Insurance of the State of Michigan and certain other regulators a Conversion Plan under the *Insurance Companies Act* (Canada), dated September 28, 1999 (the "Plan"). Under the Plan, Sun Life will convert from a mutual life insurance company into a life insurance company with common shares (the "Conversion") and will become a wholly-owned subsidiary of Sun Life of Canada Holdings Corp. ("Financial Services"). The Plan also provides, among other things, that: (i) all Eligible Policyholders will have issued to them common shares ("Common Shares") of Financial Services or will receive cash proceeds or be credited with Policy Credits in exchange for their rights with respect to, or any interest in, Sun Life as a mutual company, including their Ownership Rights; and (ii) Financial Services and those Eligible Policyholders who have so elected or are deemed to have so (to the extent such elections are given effect under the Plan) together with those who are so required by the terms of the Plan will offer Common Shares pursuant to or in connection with an initial public offering of the Common Shares, as provided for in the Plan (the "Initial Public Offering"). Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan.

As required by section 4(1)(1) of the *Mutual Company (Life Insurance) Conversion Regulations* (the "Regulations") under the *Insurance Companies Act* (Canada), the Plan describes the measures to be taken by Financial Services, in the two years following the Effective Date, to ensure that the Eligible Policyholders who receive Common Shares will be able to sell those shares on a public market. These measures (the "Measures") are the requirement that Financial Services use its reasonable commercial efforts to arrange for the listing of the Common Shares on the Stock Exchanges on the first trading day after the Effective Date and use reasonable commercial efforts to keep the Common Shares listed on the Stock Exchanges for at least the remainder of the two years following the Effective Date. Section 5(1)(d) of the Regulations requires Sun Life to submit to OSFI an opinion from a financial market expert that the Measures are likely to ensure that the Eligible Policyholders who receive shares will be able to sell those shares, within the two years following the Effective Date, on a public market. In connection with this requirement, you have asked us, as investment bankers, to provide our opinion to you as to whether the Measures are likely to ensure that the Eligible Policyholders who receive Common Shares will be able to sell these shares, within the two years following the Effective Date, on a public market.

An opinion is an expression of professional judgment on the issues explicitly addressed. By rendering a professional opinion, we do not become an insurer or guarantor of the expression of professional judgment, of any transaction or of any future performance. In particular, an opinion is not a prediction of future events and the rendering of this opinion does not guarantee the outcome of the matters opined upon.

In connection with rendering our opinion herein, we have:

(i) reviewed the Policyholder Information Circular of Sun Life to be dated October 20, 1999 (the "Policyholder Information Circular") in the form approved by the Board for mailing to all Eligible Policyholders in connection with the Special Meeting;

(ii) reviewed a copy of the Plan and related documents; and

(iii) taken into account such other matters as we deemed necessary.

As you are aware, Sun Life has retained us to provide investment banking and other financial advice in respect of the Conversion, including a report and this and certain other opinions, each of which is included in

the Policyholder Information Circular, for which we will receive a fee. In addition, we have in the past performed and continue to perform other investment banking and financial advisory services for Sun Life and certain of its affiliates. In the ordinary course of our business as a broker/dealer, we may from time to time purchase securities and interests in loans from, and sell securities and interests in loans to, Sun Life, Financial Services and their subsidiaries, as a market-maker or otherwise. We may from time to time have a long or a short position in, and buy or sell, securities of Financial Services, Sun Life or their subsidiaries for our own account and for the account of our customers. In this regard, as you are aware, we, as Underwriters, expect to enter into the Underwriting Agreements providing for, upon the terms and subject to the conditions set forth therein, the issuance and sale by Financial Services, the sale by certain Eligible Policyholders and, in exchange for a fee, the purchase by the Underwriters, of Common Shares.

For purposes of this opinion, we have relied on the accuracy and completeness of all the information supplied or otherwise made available, discussed with or reviewed by or for us, and we have not assumed any responsibility for independently verifying such information. In addition, we have been advised as to certain legal matters by counsel to Sun Life and, with respect to such legal matters, we have relied upon such counsel. We are not legal advisors, accountants or tax experts and our services did not include any legal, accounting or tax determination or evaluation or any attempt to evaluate legal, accounting or tax matters.

We have assumed that:

(i) Financial Services will apply for listing on the Stock Exchanges;

(ii) Financial Services will meet the initial and continuing listing requirements of the Stock Exchanges;

(iii) the Common Shares will be listed and permitted to be traded on the Stock Exchanges not later than the first trading day after the Effective Date and will remain listed on the Stock Exchanges indefinitely after such date; and

(iv) not later than the first trading day following the Effective Date, Financial Services will become, and will remain indefinitely following such date, a reporting issuer in good standing (or have equivalent status) in the jurisdictions in which the Stock Exchanges are situated such that the Common Shares may be traded without restriction in such jurisdictions.

You have not asked for and we express no opinion or recommendation as to and this opinion should not be relied upon as to:

(i) whether the Common Shares will be listed on the Stock Exchanges;

(ii) whether Financial Services will become, and will remain indefinitely, a reporting issuer (or have equivalent status) in the jurisdictions in which the Stock Exchanges are situated so as to permit the Common Shares to trade without restriction in such jurisdictions;

(iii) whether the market for the Common Shares on such Stock Exchanges will be a liquid market;

(iv) the Initial Share Price;

(v) the price at which the Common Shares to be issued in connection with the Plan or pursuant to the Initial Public Offering will trade;

(vi) the fairness of the Initial Share Price;

(vii) the fair market value of any of the Common Shares to be issued in connection with the Plan or pursuant to the Initial Public Offering;

(viii) the adequacy or sufficiency of the Policyholder Information Circular or any other document to be sent or disclosure to be made to Eligible Policyholders in connection with the Conversion;

(ix) which of Sun Life's policyholders are appropriately included among the Eligible Policyholders;

(x) the fairness of the Plan, including its fairness to any individual Eligible Policyholder or to any class of Eligible Policyholders or the fairness of the Plan relating to which Eligible Policyholders receive any particular form of the Conversion Benefits or other provisions of the Plan which distinguish among Eligible Policyholders;

(xi) any matters relating to the reorganization of Sun Life described in the Policyholder Information Circular or the restructuring or operation of the Worldwide Participating Account;

(xii) the likelihood of consummation of the Plan or any other aspect of the Plan;

(xiii) the appropriateness of the Conversion relative to any other transaction Sun Life could undertake;

(xiv) how Eligible Policyholders should vote in connection with the Plan or whether or not they should elect to receive cash in lieu of some or all of their allocated Common Shares or buy or sell Common Shares; or

(xv) whether any Eligible Policyholder or group of Eligible Policyholders will be legally permitted or otherwise capable of selling Common Shares on any public market.

The opinion expressed herein is provided to the boards of directors of Sun Life and Financial Services in connection with the Plan and, without our prior written consent, such opinion is not to be quoted, summarized, paraphrased, excerpted or referred to, in whole or in part, in any prospectus, registration statement, information circular or proxy statement, or in any other report, document, filing, release or other written or oral communication prepared, issued or transmitted by Financial Services or Sun Life, except the Plan and the Policyholder Information Circular to be mailed to all Eligible Policyholders.

The opinion expressed herein is being provided to the boards of directors of Sun Life and Financial Services for their benefit and for the benefit of Eligible Policyholders as a group, as required by the Regulations. This opinion should be read in light of all of the information provided in the Policyholder Information Circular. We assume no obligation to update, revise, reaffirm or withdraw this letter as a result of any subsequent events or developments or otherwise.

We note the following:

(i) we do not know the circumstances of any Eligible Policyholders and therefore are not in a position to advise any Eligible Policyholders; and

(ii) the opinion expressed herein is subject to the assumptions, qualifications, limitations and uncertainties described herein.

Based upon and subject to the limitations, qualifications and assumptions discussed herein, in our opinion as investment bankers, the Measures are likely to ensure that the Eligible Policyholders who receive Common Shares will be able to sell those shares within the two years following the Effective Date on a public market.

Very truly yours,

Morgan Stanley & Co. Incorporated

RBC Dominion Securities Inc.

# Policyholder Information Circular

# Part 2

This part contains information about Sun Life of Canada and its business, including financial statements, and certain considerations relevant to the ownership of common shares of Sun Life of Canada Holdings Corp. This part also contains additional information about Sun Life of Canada's plan to convert from a mutual company to a company with common shares.

No securities commission, financial institutions regulator or similar authority in Canada has in any way passed upon the merits of the securities offered in Part 1 and Part 2 of this Policyholder Information Circular, which constitutes a prospectus under the *Securities Act* (Québec), and any representation to the contrary is an offence. The *Securities Act* (Québec) provides remedies for damages where this document contains a misrepresentation. Damages may be claimed from the issuer, its senior executives or from the expert whose opinion, containing a misrepresentation, appears with his consent in this document. Policyholders should refer to the applicable provisions of the *Securities Act* (Québec) for the particulars of this right to claim damages or consult with a legal adviser. The Office of the Superintendent of Financial Institutions of Canada has reviewed Sun Life of Canada's plan to convert from a mutual life insurance company to a company with common shares but does not make any recommendation to eligible policyholders as to how to vote on the plan. A copy of this Policyholder Information Circular has been registered by the Registrar of Companies in Hong Kong as required by Section 342C of the *Companies Ordinance* of Hong Kong. Neither the Securities and Futures Commission of Hong Kong nor the Registrar of Companies in Hong Kong takes any responsibility for the contents of the Policyholder Information Circular.

Sun Life Assurance Company of Canada

EXPANDING OUR HORIZONS

IN MAKING A DECISION REGARDING THE PLAN OF DEMUTUALIZATION, ELIGIBLE POLICYHOLDERS MUST RELY ON THEIR OWN EXAMINATION OF SUN LIFE ASSURANCE COMPANY OF CANADA, SUN LIFE OF CANADA HOLDINGS CORP. AND THE TERMS OF THE PLAN OF DEMUTUALIZATION, INCLUDING THE MERITS AND RISKS INVOLVED. IF YOU ARE IN ANY DOUBT ABOUT THIS DOCUMENT, YOU SHOULD CONSULT YOUR STOCKBROKER, BANK MANAGER, SOLICITOR, PROFESSIONAL ACCOUNTANT OR OTHER PROFESSIONAL ADVISOR. THE SHARES OF SUN LIFE OF CANADA HOLDINGS CORP. HAVE NOT BEEN RECOMMENDED BY ANY CANADIAN PROVINCIAL SECURITIES COMMISSION OR OTHER SECURITIES REGULATORY AUTHORITY, ANY UNITED STATES FEDERAL OR STATE SECURITIES COMMISSION OR SECURITIES REGULATORY AUTHORITY OR THE SECURITIES COMMISSION OR SECURITIES REGULATORY AUTHORITY OF ANY OTHER JURISDICTION. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS PART 2 OF THE POLICYHOLDER INFORMATION CIRCULAR. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENCE.

## FORWARD-LOOKING STATEMENTS

THIS PART 2 OF THE POLICYHOLDER INFORMATION CIRCULAR INCLUDES FORWARD-LOOKING STATEMENTS WITH RESPECT TO THE COMPANY, INCLUDING ITS BUSINESS OPERATIONS AND STRATEGY AND FINANCIAL PERFORMANCE AND CONDITION. THESE STATEMENTS, WHICH APPEAR UNDER THE HEADINGS "SUMMARY", "BUSINESS OF THE COMPANY", "RESTRUCTURING OF PARTICIPATING AND OTHER ACCOUNTS ON DEMUTUALIZATION", "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS", "RISK MANAGEMENT" AND "RISK FACTORS", AS WELL AS ELSEWHERE IN THIS PART 2 OF THE POLICYHOLDER INFORMATION CIRCULAR, GENERALLY CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING WORDS SUCH AS "MAY", "WILL", "EXPECT", "INTEND", "ESTIMATE", "ANTICIPATE", "BELIEVE", OR "CONTINUE" OR THE NEGATIVE THEREOF OR SIMILAR VARIATIONS. ALTHOUGH MANAGEMENT BELIEVES THAT THE EXPECTATIONS REFLECTED IN SUCH FORWARD-LOOKING STATEMENTS ARE REASONABLE, SUCH STATEMENTS INVOLVE RISKS AND UNCERTAINTIES AND ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED BY SUCH FORWARD-LOOKING STATEMENTS. IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THE COMPANY'S EXPECTATIONS INCLUDE, AMONG OTHER THINGS, GENERAL ECONOMIC AND MARKET FACTORS, INCLUDING INTEREST RATES, BUSINESS COMPETITION, CHANGES IN GOVERNMENT REGULATIONS OR IN TAX LAWS AND OTHER FACTORS DISCUSSED UNDER "RISK FACTORS".

## TABLE OF CONTENTS – PART 2


| | Page |
|---|---|
| INTRODUCTION | 4 |
| EXCHANGE RATE INFORMATION | 4 |
| SUMMARY | 6 |
| SUMMARY CONSOLIDATED FINANCIAL INFORMATION | 10 |
| BUSINESS OF THE COMPANY | 14 |
| Overview | 14 |
| The Wealth Management and Insurance Industries | 20 |
| Strategy | 21 |
| Wealth Management Business | 23 |
| Protection Business | 41 |
| SELECTED CONSOLIDATED FINANCIAL INFORMATION | 50 |
| RESTRUCTURING OF PARTICIPATING AND OTHER ACCOUNTS ON DEMUTUALIZATION | 52 |
| Overview | 52 |
| SLC Pre-Demutualization Participating Policies (Canada, the United States and the Philippines) | 53 |
| SLC Post-Demutualization Participating Policies (Canada and the United States) | 54 |
| Operation of the Participating Policyholders' Account of Sun Life Assurance | 55 |
| Participating Policyholders' Funds in Sun Life of Canada (Philippines) | 55 |
| Participating Policyholders' Funds in Sun Life of Canada (U.K.) | 55 |
| Participating Policyholders' Funds in Sun Life of Canada (International) (Hong Kong) | 56 |
| PRO FORMA CONDENSED CONSOLIDATED FINANCIAL STATEMENTS | 58 |
| CAPITALIZATION | 69 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 70 |
| Overview | 70 |
| Certain Items Affecting Net Income | 71 |
| Challenges in United Kingdom Operations | 75 |
| Six Months Ended June 30, 1999 Compared to Six Months Ended June 30, 1998 | 75 |
| Year Ended December 31, 1998 Compared to Year Ended December 31, 1997 | 79 |
| Year Ended December 31, 1997 Compared to Year Ended December 31, 1996 | 90 |
| Liquidity and Capital Resources | 101 |
| Year 2000 Issues | 103 |
| INVESTMENTS OF THE COMPANY | 104 |
| RISK MANAGEMENT | 115 |
| RATINGS | 119 |
| LEGAL MATTERS | 119 |
| Proceedings Relating to Unicover | 119 |
| Matters Relating to Premium Offset | 121 |
| Other Matters | 121 |
| RISK FACTORS | 122 |
| REGULATORY MATTERS | 131 |
| Canada | 131 |
| United States | 134 |
| United Kingdom | 138 |
| Asia | 140 |
| DIRECTORS AND EXECUTIVE OFFICERS OF FINANCIAL SERVICES | 142 |
| Directors | 142 |
| Committees of the Board | 143 |
| Executive Officers | 144 |
| DIRECTORS' AND OFFICERS' REMUNERATION | 144 |
| Directors' Compensation | 144 |
| Executive Compensation | 145 |
| Pension Plan Table | 146 |
| Indebtedness of Directors, Executive Officers and Senior Officers | 147 |
| OWNERSHIP OF SHARES | 148 |
| STOCK OPTION AND EMPLOYEE SHARE PURCHASE PLANS | 148 |
| DESCRIPTION OF SHARE CAPITAL OF FINANCIAL SERVICES | 148 |
| DIVIDEND POLICY OF FINANCIAL SERVICES | 149 |
| CONSTRAINTS ON OWNERSHIP OF FINANCIAL SERVICES SHARES | 150 |
| CORPORATE GOVERNANCE OF SUN LIFE ASSURANCE | 151 |
| AUDITORS | 151 |
| TRANSFER AGENTS AND REGISTRARS | 151 |
| AVAILABILITY OF CERTAIN DOCUMENTS | 152 |
| ENFORCEABILITY OF CIVIL LIABILITIES | 152 |
| APPOINTED ACTUARY'S REPORT (1996) | 153 |
| APPOINTED ACTUARY'S REPORT (1997) | 153 |
| APPOINTED ACTUARY'S REPORT (1998) | 153 |
| AUDITORS' REPORT | 154 |
| CONSOLIDATED FINANCIAL STATEMENTS | 155 |
| UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS AT AND FOR THE SIX MONTHS ENDED JUNE 30, 1999 | 198 |
| AUDITORS' REPORT | 205 |
| BALANCE SHEET OF SUN LIFE OF CANADA HOLDINGS CORP. | 206 |
| PART 2 GLOSSARY | 207 |
| CERTIFICATE OF SUN LIFE OF CANADA HOLDINGS CORP. | 211 |

## INTRODUCTION

This part of the Policyholder Information Circular provides you with all material information about Sun Life of Canada, as well as Sun Life of Canada Holdings Corp. (to be renamed Sun Life Financial Services of Canada Inc ("Financial Services") prior to the Special Meeting), which will become Sun Life of Canada's new holding company through the demutualization, and the common shares of the holding company. This information provides you with the same type of information about Sun Life of Canada and Sun Life of Canada Holdings Corp. as will be provided to new investors who purchase common shares of Sun Life of Canada Holdings Corp. in the initial public offering to be completed following demutualization. These new investors will receive a prospectus and not a copy of this Policyholder Information Circular. Eligible policyholders are urged to read both Part 1 and Part 2 of the Policyholder Information Circular.

In this part of the Policyholder Information Circular, the term "Sun Life of Canada" refers to Sun Life Assurance Company of Canada together with its consolidated subsidiaries and "Sun Life Assurance" refers only to Sun Life Assurance Company of Canada. For the purposes of this part of the Policyholder Information Circular, the term "Company" refers, at all times prior to the demutualization, to Sun Life Assurance and its consolidated subsidiaries, including Financial Services, and, at all times on or after the demutualization, to Financial Services and its consolidated subsidiaries, including Sun Life Assurance. The term "Financial Services" refers only to Sun Life of Canada Holdings Corp.

Certain capitalized terms used in this part of the Policyholder Information Circular are defined in the Part 1 Glossary. An explanation of certain insurance and investment terms as well as certain capitalized terms used in this Part 2 of the Policyholder Information Circular is contained in the Part 2 Glossary.

## EXCHANGE RATE INFORMATION

**Unless otherwise indicated, references in this part of the Policyholder Information Circular to "$", "Can.$" or "dollars" are to Canadian dollars.** In accordance with Canadian GAAP, the Company uses period end exchange rates to convert balance sheet amounts and average exchange rates in effect during reporting periods to convert statement of operations amounts. Rates shown below are the Canadian dollar price per unit of foreign currency and are based upon closing bid rates published by Reuters.

| | Six Months Ended June 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| | 1999 | 1998 | 1998 | 1997 | 1996 |
| **U.S. Dollar:** | | | | | |
| Period-end rates | 1.460 | 1.460 | 1.550 | 1.430 | 1.370 |
| Average for the period | 1.492 | 1.438 | 1.483 | 1.384 | 1.363 |
| High for the period | 1.534 | 1.474 | 1.582 | 1.439 | 1.398 |
| Low for the period | 1.447 | 1.407 | 1.407 | 1.337 | 1.329 |
| **U.K. Pound:** | | | | | |
| Period-end rates | 2.310 | 2.430 | 2.570 | 2.370 | 2.320 |
| Average for the period | 2.416 | 2.373 | 2.457 | 2.269 | 2.128 |
| High for the period | 2.539 | 2.464 | 2.638 | 2.409 | 2.320 |
| Low for the period | 2.306 | 2.306 | 2.306 | 2.158 | 2.031 |
| **Philippine Peso:** | | | | | |
| Period-end rates | 0.039 | 0.036 | 0.040 | 0.036 | 0.052 |
| Average for the period | 0.039 | 0.037 | 0.037 | 0.048 | 0.052 |
| High for the period | 0.040 | 0.039 | 0.040 | 0.053 | 0.053 |
| Low for the period | 0.038 | 0.032 | 0.032 | 0.035 | 0.051 |
| **Hong Kong Dollar:** | | | | | |
| Period-end rates | 0.189 | 0.189 | 0.200 | 0.185 | 0.177 |
| Average for the period | 0.193 | 0.186 | 0.192 | 0.179 | 0.176 |
| High for the period | 0.198 | 0.191 | 0.204 | 0.186 | 0.179 |
| Low for the period | 0.187 | 0.182 | 0.182 | 0.173 | 0.172 |

As at September 17, 1999, the closing bid rates published by Reuters for currency conversion to Canadian dollars were: U.S. $1.00 = Can. $1.471; U.K. £1.00 = Can. $2.387; Philippine Peso 1.00 = Can. $0.037; and Hong Kong $1.00 = Can. $0.189.

The exchange rates to convert a Canadian dollar to each of a U.S. Dollar, a U.K. Pound, a Philippine Peso and a Hong Kong Dollar for the relevant periods are summarized in the following table:

| | Six Months Ended June 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| | 1999 | 1998 | 1998 | 1997 | 1996 |
| **U.S. Dollar:** | | | | | |
| Period-end rates | 0.685 | 0.685 | 0.645 | 0.699 | 0.730 |
| Average for the period | 0.670 | 0.695 | 0.674 | 0.723 | 0.734 |
| **U.K. Pound:** | | | | | |
| Period-end rates | 0.433 | 0.412 | 0.389 | 0.422 | 0.431 |
| Average for the period | 0.414 | 0.421 | 0.407 | 0.441 | 0.470 |
| **Philippine Peso:** | | | | | |
| Period-end rates | 25.641 | 27.778 | 25.000 | 27.778 | 19.231 |
| Average for the period | 25.641 | 27.027 | 27.027 | 20.833 | 19.231 |
| **Hong Kong Dollar:** | | | | | |
| Period-end rates | 5.291 | 5.291 | 5.000 | 5.405 | 5.650 |
| Average for the period | 5.181 | 5.376 | 5.208 | 5.587 | 5.682 |

As at September 17, 1999, the closing bid rates published by Reuters for currency conversion from a Canadian dollar to each of a U.S. Dollar, a U.K. Pound, a Philippine Peso and a Hong Kong Dollar were: Can. $1 = U.S. $0.680; Can. $1 = U.K. £0.419; Can. $1 = Philippine Peso 27.248; and Can. $1 = Hong Kong $5.280.

**SUMMARY**

*The following summary does not purport to be complete and is qualified in its entirety by the more detailed information appearing elsewhere in this Part 2 of the Policyholder Information Circular and policyholders should read the Policyholder Information Circular in its entirety. Unless otherwise indicated, information in the Policyholder Information Circular is as at September 28, 1999.*

## The Company

### Business of the Company

The Company is a leading international financial services company, providing a wide range of savings, retirement, pension and life and health insurance products and services to individual and corporate customers. The Company operates primarily in Canada, the United States and the United Kingdom and also has operations in Asia and South America. At June 30, 1999, Sun Life of Canada was the largest life insurance company in Canada, based on total assets under management of approximately $265.6 billion. For the year ended December 31, 1998, Sun Life of Canada had consolidated revenues of $13.7 billion ($7.7 billion for the six-month period ended June 30, 1999). Sun Life Assurance is one of the highest rated Canadian-based insurance companies, with an AA+ rating from Standard & Poor's (for financial strength) and an AAA rating from Duff & Phelps (for claims paying ability). At June 30, 1999, the Company had approximately 11,200 employees worldwide and an extensive global distribution network of more than 65,000 distributors, including career sales forces in certain countries, independent insurance agents, investment dealers and financial planners.

The Company operates in two principal businesses. The Wealth Management Business comprises all of the Company's asset management, mutual fund, pension, annuity and trust and banking operations. These operations are conducted principally in Canada, the United States and the United Kingdom. The Protection Business comprises the Company's insurance, or protection, operations around the world, including its group life and health insurance businesses in the United States, Canada and the United Kingdom, its individual insurance businesses in the United States, Canada, the United Kingdom, the Philippines, Hong Kong, Bermuda and Indonesia and the Company's reinsurance operations. The Company has a third reporting area, Corporate and Other Business, which comprises revenues and expenses not directly attributable to the Wealth Management and Protection Businesses, including income on corporate capital and unallocated corporate office costs.

#### *Wealth Management Business*

Through its Wealth Management Business, the Company provides mutual funds and unit trusts, pensions and pooled institutional funds, fixed and variable annuity products, asset management services and trust, banking and brokerage services. The Wealth Management Business comprised $6.1 billion, or 44%, of the Company's consolidated revenues in 1998 ($3.8 billion, or 49%, of consolidated revenues for the six-month period ended June 30, 1999) and accounted for $235.7 billion, or 89%, of the Company's total assets under management at June 30, 1999. The Wealth Management Business' clients included approximately 2.8 million individual investors and 7,000 institutional investors worldwide at that date. In 1998, approximately 96% of the Company's wealth management products, measured by dollars of sales, were sold by independent third parties, with the balance being sold by career agents.

The Company operates its Wealth Management Business in the United States primarily through its subsidiaries, Massachusetts Financial Services Company ("MFS") and Sun Life Assurance Company of Canada (U.S.) ("Sun Life of Canada (U.S.)"). At June 30, 1999, MFS managed over $168.0 billion in assets for individual and institutional mutual fund and annuity investors worldwide, including $20.9 billion of assets managed on behalf of other business units of the Company. At August 31, 1999, Morningstar Inc. awarded four or five stars to 19 of 55 MFS funds ranked by Morningstar, representing 62% of total U.S. mutual fund assets under management by MFS which were ranked by Morningstar at that date. MFS has also been ranked among the top four large mutual fund organizations in terms of overall service provided for each of the past five years in the DALBAR, Inc. industry survey of broker/dealers in the U.S. In 1998, MFS funds accounted for 6.7% of new sales in the United States of non-proprietary retail mutual funds distributed by third parties and, according to Strategic Insight, ranked third among mutual fund companies in the U.S. in mutual fund net new flows, being the net flow of funds into or out of a fund. The Company also conducts substantial wealth management operations in the United States through the sale by MFS and Sun Life of Canada (U.S.) of variable and fixed annuity products. At June 30, 1999, the Company had $23.8 billion of assets under management relating to its U.S. annuity products with more than 282,000 individual annuity contracts.

In Canada, the Company administers and manages group retirement products, including pension plans. According to Benefits Canada, the Company was ranked first in Canada among providers of defined contribution pensions and first among life insurance companies which provide group retirement products (including defined contribution pension plans, group registered retirement savings plans and deferred profit sharing plans) based on assets under

management at December 31, 1998. In addition, the Company offers mutual funds, institutional investment funds and investment management services to individual and institutional clients through its subsidiaries, Spectrum United Mutual Funds Inc. ("Spectrum United") and McLean Budden Limited ("McLean Budden"). At June 30, 1999, assets under management in the Canadian Wealth Management Business were $36.1 billion, including $1.9 billion sub-managed by MFS.

The Company offers unit trusts, unit-linked pension products, annuities, pension fund management services and banking operations in the United Kingdom. At June 30, 1999, the Company's U.K. Wealth Management Business had approximately $20.8 billion of assets under management.

The Company believes that the strength of its Wealth Management Business results from the variety and quality of its products and services, its investment management performance, the effectiveness of its multiple channels of distribution and the quality of its customer service.

### *Protection Business*

Through its Protection Business, the Company offers protection products and services primarily in Canada, the United States, the United Kingdom and Asia and engages in reinsurance operations. The Company's protection products and services include whole life, term life, universal life, variable universal life, unit-linked life and corporate-owned life insurance for individuals and life, health and disability insurance for groups. Measured by premium income, in 1998 the Company was ranked second in Canada among insurance providers of group life and health insurance in Canada by Benefits Canada and was ranked third in group life and health insurance in the United Kingdom in terms of premium revenue by ERC Frankona. The Protection Business comprised $7.3 billion, or 54%, of the Company's consolidated revenues for the year ended December 31, 1998 ($3.8 billion, or 50%, of consolidated revenues for the six-month period ended June 30, 1999) and accounted for $28.0 billion, or 10%, of the Company's total assets under management at June 30, 1999. In 1998, approximately 59% of the sales of the Company's protection products, measured by dollars of sales, were made by career agents and approximately 41% were made by independent third parties.

The Company believes that its success in the Protection Business results from the variety and quality of the Company's protection products, the Company's financial strength, as measured by its claims paying ability, the effectiveness of the Company's underwriting and the quality of its customer service.

## Strategy

The Company's strategic objective is to be a leading financial services provider with a significant presence in each of its chosen markets, with increasing emphasis on its Wealth Management Business. To achieve this objective, the Company intends to pursue the following strategies: (i) aggressively expand the Wealth Management Business; (ii) strategically grow higher return Protection Business lines; (iii) capitalize on distribution strengths; (iv) leverage strong brands across multiple product offerings; (v) pursue expansion in key strategic markets; and (vi) achieve superior shareholder returns while maintaining financial discipline.

### *Aggressively Expand the Wealth Management Business*

The Company seeks to continue the growth of its Wealth Management Business, which generates fee income and requires relatively low levels of capital. The Company has been successful in increasing assets under management in its Wealth Management Business, having generated a compound annual growth rate for the five-year period ended December 31, 1998 of approximately 25%. The Company is committed to increasing its share in the expanding global market for savings and retirement products by offering its customers a wide range of innovative wealth management products designed to address customers' changing needs in various stages of life and in different financial market cycles. The Company also seeks to grow its Wealth Management Business by increasing marketing initiatives which target individual participants in group plans, as well as by expanding third party distribution channels.

### *Strategically Grow Higher Return Protection Business Lines*

The Company believes that its ability to design and distribute innovative protection products will allow for profitable growth in the individual Protection Business. Over the past few years, the Company has repositioned its individual life product offerings in Canada and the United States from traditional products to higher value-added products designed to respond to customers' needs for estate planning and intergenerational wealth transfer. As a result, the Company has gained an attractive niche position in the high net worth segment of the U.S. life insurance market. Through its demonstrated expertise in servicing large group customers, the Company has developed a diverse portfolio of products with customized services. The Company has also been able to enhance and expand its array of services

through partnerships and other initiatives. By providing a broad range of value-added services to its group clients, the Company expects to provide a foundation for continued growth of the Protection Business.

### *Capitalize on Distribution Strengths*

The Company has a leading market position in group distribution of life and health products in Canada, the U.S. and the U.K. With the trend for group plan sponsors to outsource many elements of benefits administration to financial service providers, the Company increasingly has the opportunity to establish direct contact with individual plan members through the Internet and telephone, thereby providing significant new marketing opportunities. The Company intends to capitalize on this and other emerging distribution channels to expand its customer base and increase the profitability of products and services offered to those customers. The Company believes that, as financial services and products are increasingly distributed through the channel of the customer's choice, its expertise in managing multi-channel distribution networks provides a competitive advantage.

### *Leverage Strong Brands Across Multiple Product Offerings*

The Company has been selling its products under the *Sun Life* name since 1871. Additionally, the MFS organization, which started the first mutual fund in the United States, has been operating since 1924, McLean Budden since 1947 and Spectrum United since 1987. Due to their long operating histories and broad distribution of high quality products, these entities have established strong brand recognition in the markets in which they operate. The Company seeks to capitalize on cross-selling opportunities by leveraging its position in established distribution channels and by exploiting the strength of its respected brand names.

### *Pursue Expansion in Key Strategic Markets*

The Company intends to pursue strategic acquisitions and alliances that will enhance its performance and deliver attractive returns on invested capital. In its existing markets, the Company seeks acquisitions and alliances that would help achieve economies of scale, reduce costs, increase the range of products offered and expand or add distribution channels. When expanding into new markets, the Company primarily intends to pursue joint ventures with local partners. The Company believes that this approach allows it to leverage its competitive strengths in product development, distribution, investment management and technology with its partners' knowledge of local markets. The Company believes that, following demutualization, it will be better positioned to pursue strategic alliances and acquisitions by having greater access to capital markets and the ability to issue shares as consideration for acquisitions.

### *Achieve Superior Shareholder Returns While Maintaining Financial Discipline*

The Company will be focused on effectively deploying its capital to maximize its return to shareholders. The Company maintains financial discipline in each of its strategic business units, targeting a minimum return on capital allocated to each unit. The Company intends to divest businesses that do not achieve an adequate level of shareholder return within a prescribed timeframe, that do not fit with the Company's overall strategic objective, or that are unlikely to achieve a significant market presence. In addition, the Company intends to aggressively implement cost reduction measures designed to improve profitability and to contribute to shareholder returns. The Company intends to maintain appropriate financial strength to protect the interests of its stakeholders while maximizing shareholder returns.

## Stock Exchange Listings

There is currently no market for Financial Services Shares. However, Financial Services intends to apply to list the Financial Services Shares on The Toronto Stock Exchange, the New York Stock Exchange, the London Stock Exchange and the Philippine Stock Exchange. Financial Services may also apply to list the Financial Services Shares on the Montreal Exchange depending on the outcome of a proposal to reorganize that exchange.

## Risk Factors

In addition to the other information contained in this Policyholder Information Circular, eligible policyholders should carefully consider the following important factors relating to owning Financial Services Shares:

(a) obligations of the Company in respect of compensation for prior pension sales practices in the United Kingdom;

(b) obligations of the Company in respect of liabilities relating to certain guaranteed annuity products in the United Kingdom;

(c) potential reinsurance liabilities of the Company relating to Unicover;

(d) the fact that Financial Services is a holding company and that there are certain restrictions on the payment of dividends to Financial Services by its subsidiaries;

(e) the continuing obligations of the Company to its participating policyholders;

(f) certain restrictions on the ownership of Financial Services Shares which have the effect of preventing an acquisition of, or certain other transactions by, the Company;

(g) certain factors affecting the wealth management industry, such as the effect of changes in market conditions on fee income, investment performance and the retention of qualified personnel;

(h) fluctuations in interest rates;

(i) obligations of the Company in respect of "premium offset" class action litigation;

(j) potential U.S. tax liabilities;

(k) dependence on certain third-party relationships;

(l) the fact that the insurance and wealth management industries are significantly regulated in each of the jurisdictions in which the Company carries on business;

(m) the effect of market changes on the Company's investment portfolio and on fee income earned by the Company, primarily in the Wealth Management Business;

(n) fluctuations in currency exchange rates;

(o) variations in the claims experience of the Company's Protection Business;

(p) increases in surrenders of annuity products offered by the Company;

(q) the effect of the Year 2000 issue on the Company's information systems;

(r) changes in ratings assigned to Sun Life Assurance or its subsidiaries which carry on the Protection Business;

(s) potential changes in tax laws which could reduce the attractiveness of certain of the Company's products;

(t) intense competition in both the insurance and wealth management industries;

(u) the immediate eligibility of Financial Services Shares issued on the demutualization for resale in the public market without restriction;

(v) the absence of a prior public market for Financial Services Shares; and

(w) potential environmental liabilities in connection with investments of the Company.

See "Risk Factors".



SL-0357

## SUMMARY CONSOLIDATED FINANCIAL INFORMATION

The following summary consolidated financial data at and for the years ended December 31, 1998, 1997 and 1996, except for "Other Data" and "Certain Pro Forma Information", have been extracted without adjustment from the audited consolidated financial statements of Sun Life of Canada. The following summary consolidated financial data at and for the six-month periods ended June 30, 1999 and 1998, except for "Other Data" and "Certain Pro Forma Information", have been extracted without adjustment from the unaudited consolidated financial statements of Sun Life of Canada. Except as indicated, the following data show the historical results of Sun Life of Canada and do not give effect to the demutualization. For a description of the effect of, among other things, the demutualization and the initial public offering of Financial Services Shares following the demutualization on the consolidated financial results of Sun Life of Canada, see "Pro Forma Condensed Consolidated Financial Statements". Following the demutualization, Sun Life Assurance and its subsidiaries will be subsidiaries of Financial Services. The consolidated financial statements of Sun Life of Canada have been prepared in accordance with generally accepted accounting principles in Canada ("Canadian GAAP"). Canadian GAAP differs in certain significant respects from accounting principles generally accepted in the United States ("U.S. GAAP"), the United Kingdom, Hong Kong and the Philippines. For a discussion of the differences between Canadian GAAP and U.S. GAAP and a reconciliation of Sun Life of Canada's Consolidated Financial Statements at and for the years ended December 31, 1998 and December 31, 1997 to U.S. GAAP, see Note 32 to the Consolidated Financial Statements.

| | Six Months Ended June 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| | 1999 | 1998 | 1998 | 1997 | 1996 |
| | | | (in millions) | | |
| **Statement of Operations Data:** | | | | | |
| **Canadian GAAP** | | | | | |
| **Revenue** | | | | | |
| Premiums: | | | | | |
| Life insurance | $ 1,806 | $1,771 | $ 3,541 | $ 3,126 | $ 2,968 |
| Health insurance | 916 | 764 | 1,633 | 1,325 | 1,208 |
| Annuities | 1,718 | 1,022 | 2,408 | 2,488 | 1,917 |
| | 4,440 | 3,557 | 7,582 | 6,939 | 6,093 |
| Net investment income | 2,046 | 2,074 | 4,097 | 3,836 | 3,526 |
| Fee income | 1,239 | 967 | 2,017 | 1,430 | 1,113 |
| Total revenue | 7,725 | 6,598 | 13,696 | 12,205 | 10,732 |
| **Policy benefits and expenses** | | | | | |
| Payments to policyholders, beneficiaries and depositors | 3,700 | 3,418 | 6,898 | 6,240 | 5,769 |
| Net transfers to segregated funds | 965 | 781 | 1,493 | 994 | 315 |
| Increase in actuarial liabilities | 568 | 234 | 473 | 710 | 931 |
| Commissions and operating expenses | 1,777 | 1,559 | 3,262 | 2,625 | 2,193 |
| Interest on borrowed funds | 43 | 54 | 106 | 99 | 95 |
| Taxes | 179 | 119 | 310 | 269 | 304 |
| | 7,232 | 6,165 | 12,542 | 10,937 | 9,607 |
| **Operating income** | 493 | 433 | 1,154 | 1,268 | 1,125 |
| Policyholder dividends | 405 | 374 | 764 | 711 | 635 |
| Cumulative capital securities dividends | 38 | 37 | 76 | 46 | – |
| Confederation Life goodwill write-off | – | 260 | 260 | – | – |
| **Net income** | $ 50 | $ (238) | $ 54 | $ 511 | $ 490 |



SL-0358

| | Year Ended December 31, | |
|---|---|---|
| | 1998 | 1997 |
| | (In millions) | |
| **U.S. GAAP** | | |
| Premiums | $ 5,298 | $ 4,641 |
| Total revenue | 12,543 | 10,896 |
| Net income | $ 448 | $ 790 |

| | At June 30, | | At December 31, | |
|---|---|---|---|---|
| | 1999 | 1998 | 1998 | 1997 |
| | (in millions) | | | |
| **Balance Sheet Data:** | | | | |
| **Canadian GAAP** | | | | |
| **Assets** | | | | |
| Total general fund assets | $53,363 | $50,979 | $54,150 | $49,564 |
| Segregated funds net assets | $39,880 | $35,825 | $39,213 | $30,519 |
| **Liabilities and surplus** | | | | |
| Total general fund liabilities | $45,978 | $43,825 | $46,375 | $42,263 |
| Subordinated debt | 737 | 737 | 764 | 728 |
| Cumulative capital securities of a subsidiary | 876 | 876 | 930 | 858 |
| Surplus | 5,772 | 5,541 | 6,081 | 5,715 |
| Total general fund liabilities and surplus | $53,363 | $50,979 | $54,150 | $49,564 |
| Segregated funds contract liabilities | $39,880 | $35,825 | $39,213 | $30,519 |

| | At December 31, | |
|---|---|---|
| | 1998 | 1997 |
| | (in millions) | |
| **U.S. GAAP** | | |
| Total consolidated assets | $101,932 | $87,315 |
| Total consolidated liabilities and segregated funds liabilities | 91,551 | 78,115 |
| Equity | $ 8,687 | $ 7,614 |

## Data for the Wealth Management and Protection Businesses

The following table summarizes certain historical financial data for the Wealth Management Business and the Protection Business at and for the years ended December 31, 1998, 1997 and 1996 and the six-month periods ended June 30, 1999 and 1998.

| | At and for the Six Months Ended June 30, | | | | At and for the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1999 | | 1998 | | 1998 | | 1997 | | 1996 | |
| | ($ in millions) | % of Total | ($ in millions) | % of Total | ($ in millions) | % of Total | ($ in millions) | % of Total | ($ in millions) | % of Total |
| **Revenues:** | | | | | | | | | | |
| Wealth Management | $ 3,769 | 49% | $ 2,791 | 42% | $ 6,086 | 44% | $ 5,565 | 46% | $ 4,649 | 43% |
| Protection | 3,846 | 50 | 3,604 | 55 | 7,331 | 54 | 6,439 | 53 | 5,843 | 55 |
| Corporate and Other | 110 | 1 | 203 | 3 | 279 | 2 | 201 | 1 | 240 | 2 |
| Total | $ 7,725 | 100% | $ 6,598 | 100% | $ 13,696 | 100% | $ 12,205 | 100% | $ 10,732 | 100% |
| **Net Income (Loss):** | | | | | | | | | | |
| Wealth Management | $ (156) | N/A | $ (324) | N/A | $ (279) | N/A | $ 113 | 22% | $ 296 | 60% |
| Protection | 159 | N/A | 182 | N/A | 438 | N/A | 317 | 62 | 128 | 26 |
| Corporate and Other | 47 | N/A | (96) | N/A | (105) | N/A | 81 | 16 | 66 | 14 |
| Total | $ 50 | N/A | $ (238) | N/A | $ 54 | N/A | $ 511 | 100% | $ 490 | 100% |
| **Total Assets Under Management:** | | | | | | | | | | |
| Wealth Management | $235,693 | 89% | $192,818 | 87% | $220,646 | 88% | $158,839 | 85% | $117,155 | 83% |
| Protection | 28,025 | 10 | 26,120 | 12 | 28,427 | 11 | 24,241 | 13 | 21,867 | 15 |
| Corporate and Other | 1,840 | 1 | 2,855 | 1 | 1,364 | 1 | 3,038 | 2 | 2,646 | 2 |
| Total | $265,558 | 100% | $221,793 | 100% | $250,437 | 100% | $186,118 | 100% | $141,668 | 100% |

## Other Data

The following table summarizes the growth experienced by the Company in net mutual fund sales and gross additional segregated fund deposits, as well as the growth in assets under management by the Company, other than its general funds and segregated funds.

| | At and for the Six Months Ended June 30, | | At and for the Year Ended December 31, | | |
|---|---|---|---|---|---|
| | 1999 | 1998 | 1998 | 1997 | 1996 |
| | | | (in millions) | | |
| Mutual fund sales (net) | $ 10,689 | $ 9,897 | $ 19,815 | $ 9,400 | $ 6,095 |
| Segregated fund deposits | 2,153 | 2,387 | 4,345 | 3,430 | 3,719 |
| Other assets under management | $172,315 | $134,989 | $157,074 | $106,035 | $69,820 |

## Certain Items Affecting Net Income

Sun Life of Canada recorded significant charges in 1998 and during the first half of 1999 with respect to its business in the United Kingdom. In 1998, these charges related principally to compensation for prior pension sales practices, minimum rate guarantees on annuities which may be purchased in connection with certain pension policies and, in connection with both of these matters, the write-off of goodwill recorded on the acquisition in 1994 of a U.K. subsidiary of Confederation Life Insurance Company. In the six-month period ended June 30, 1999, the Company recorded additional charges with respect to prior pension sales practices. The following table sets forth these and certain other significant items which are reflected in the Company's results of operations in the six-month period ended June 30, 1999 and the year ended December 31, 1998 and, for comparative purposes, the amount of the same items in 1997 and 1996. For an explanation of these items, see "Management's Discussion and Analysis of Financial Condition and Results of Operations – Certain Items Affecting Net Income".

| | Six Months Ended June 30, 1999 | Year Ended December 31, | | |
|---|---|---|---|---|
| | | 1998 | 1997 | 1996 |
| | | (in millions) | | |
| Net income as reported | $ 50 | $ 54 | $511 | $490 |



SL-0360

| | Six Months Ended June 30, 1999 | Year Ended December 31, 1998 | 1997 | 1996 |
|---|---|---|---|---|
| | | (in millions) | | |
| **Adjustments** | | | | |
| **United Kingdom Adjustments** | | | | |
| Pension Sales Provisions | $354 | $ 347 | $196 | $ 24 |
| Annuity Rate Provisions | (28) | 313 | 31 | 35 |
| Write-off of goodwill recorded on the 1994 acquisition of Confederation U.K. Holdings | - | 260 | - | - |
| Change in actuarial liabilities on participating business in the United Kingdom | 28 | (178) | - | 41 |
| Tax impact of U.K. Adjustments | - | (56) | (64) | (18) |
| Total United Kingdom Adjustments | 354 | 686 | 163 | 82 |
| **MFS Adjustments** | | | | |
| Gain on issue of MFS shares to certain MFS employees | (27) | (66) | (11) | (30) |
| Tax impact of MFS Adjustments | 9 | 22 | 4 | 10 |
| Total MFS Adjustments | (18) | (44) | (7) | (20) |
| Total Adjustments | $336 | $ 642 | $156 | $ 62 |

## Certain Pro Forma Information

The following table sets forth certain pro forma financial data extracted without adjustment from the pro forma condensed consolidated financial information of the Company for the year ended December 31, 1998 and at and for the six-month period ended June 30, 1999 contained in this Policyholder Information Circular. This pro forma financial data gives effect at each date to (i) the demutualization, including the restructuring of the Participating Policyholders' Account of Sun Life Assurance described under "Restructuring of Participating and Other Accounts on Demutualization", (ii) the initial public offering of Financial Services Shares following the demutualization described under "Your Demutualization Benefits – Initial Public Offering" in Part 1 of this Policyholder Information Circular and (iii) the application of any net proceeds of the initial public offering to Financial Services to pay the expenses of the initial public offering and for general corporate purposes. See "Pro Forma Condensed Consolidated Financial Statements".

| | Six Months Ended June 30, 1999 | Year Ended December 31, 1998 |
|---|---|---|
| | (in millions, except earnings per share data) | |
| **Canadian GAAP** | | |
| Pro forma revenue | $7,725 | $13,696 |
| Pro forma operating income | 470 | 911 |
| Pro forma net income (loss) attributable to shareholders[1] | 25 | (156) |
| Pro forma basic earnings (loss) per common share | $ 0.06 | $ (0.39) |
| Shares used in calculation of pro forma basic earnings (loss) per common share | 400 | 400 |

| | Year Ended December 31, 1998 |
|---|---|
| | (in millions, except earnings per share data) |
| **U.S. GAAP** | |
| Pro forma revenue | $12,543 |
| Pro forma net income before extraordinary item attributable to shareholders[1] | 353 |
| Pro forma basic earnings before extraordinary item per common share | $ 0.88 |

1. During the six-month period ended June 30, 1999 and for the year ended December 31, 1998, the Company recorded the significant charges described above under "Certain Items Affecting Net Income". Certain of these charges (aggregating $788 million for the year ended December 31, 1998, $308 million for the six-month period ended June 30, 1999 and, on a U.S. GAAP basis, $574 million for the year ended December 31, 1998) are reflected in the Company's pro forma net income (loss) attributable to shareholders for those periods. See "Management's Discussion and Analysis of Results of Operations – Certain Items Affecting Net Income – Pro Forma Consolidated Statement of Operations."

## Overview

The Company is a leading international financial services company, providing a wide range of savings, retirement, pension and life and health insurance products and services to individual and corporate customers. The Company operates primarily in Canada, the United States and the United Kingdom and also has operations in Asia and South America. At June 30, 1999, Sun Life of Canada was the largest life insurance company in Canada, based on total assets under management of approximately $265.6 billion. For the year ended December 31, 1998, Sun Life of Canada had consolidated revenues of $13.7 billion ($7.7 billion for the six-month period ended June 30, 1999). Sun Life Assurance is one of the highest rated Canadian-based insurance companies, with an AA+ rating from Standard & Poor's (for financial strength) and an AAA rating from Duff & Phelps (for claims paying ability). At June 30, 1999, the Company had approximately 11,200 employees worldwide and an extensive global distribution network of more than 65,000 distributors, including career sales forces in certain countries, independent insurance agents, investment dealers and financial planners.

While the Company's management structure and internal financial reporting are segmented primarily along geographic lines, the Company operates two principal businesses in these geographic areas. For purposes of presentation in this Policyholder Information Circular, the business and operations of the Company are described along these principal business lines. The Wealth Management Business comprises all of the Company's asset management, mutual fund, pension, annuity and trust and banking operations. These operations are conducted principally in Canada, the United States and the United Kingdom. The Protection Business comprises the Company's insurance, or protection, operations around the world, including its group life and health insurance businesses in the United States, Canada and the United Kingdom, its individual insurance businesses in the United States, Canada, the United Kingdom, the Philippines, Hong Kong, Bermuda and Indonesia and the Company's reinsurance operations.

### *Corporate Structure*

The Company's Wealth Management Business is conducted primarily through direct and indirect subsidiaries of Sun Life Assurance in Canada, the United States and the United Kingdom. The Company currently conducts the majority of its protection operations through Sun Life Assurance and branch operations in Hong Kong and the Philippines and subsidiaries and branch operations in the United States and the United Kingdom (including operations in the Republic of Ireland and the Channel Islands).

In Canada, the Company's wealth management operations are principally conducted through its wholly-owned subsidiary, Spectrum United Mutual Funds Inc. ("Spectrum United") and its 58%-owned subsidiary, McLean Budden Limited ("McLean Budden"). Wealth management operations in the United States are conducted primarily through the Company's 85%-owned (as at June 30, 1999) subsidiary, Massachusetts Financial Services Company ("MFS"), and through the Company's wholly-owned subsidiary, Sun Life Assurance Company of Canada (U.S.) ("Sun Life of Canada (U.S.)"). The main operating subsidiaries in the Company's U.K. wealth management business are SLC Asset Management Limited ("SLC Asset Management"), Sun Life of Canada Unit Managers Limited ("SLOCUM"), Langbourn Property Investment Services Limited ("Langbourn") and Sun Bank plc ("Sun Bank"), all of which are wholly-owned, indirect subsidiaries of Sun Life Assurance.

In Canada, the Company's protection operations are carried on directly by Sun Life Assurance. The Company's protection operations in the United States are carried on through branch operations and through its subsidiary, Sun Life of Canada (U.S.). In the United Kingdom, the Company's protection operations are presently conducted through branch operations and through its indirect subsidiary, Confederation Life Insurance Company (U.K.) Limited ("Confederation Life (U.K.)"). The Company's protection operations in Hong Kong and the Philippines are currently conducted through branch operations.

The material subsidiaries of Sun Life Assurance currently include the principal direct and indirect subsidiaries shown below. Unless otherwise indicated, all subsidiaries are 100% owned.




[1] As at June 30, 1999

Subject to the receipt of satisfactory regulatory approvals, Sun Life Assurance will transfer its business conducted in the Philippines, on an indemnity reinsurance basis, to Sun Life of Canada (Philippines), Inc. ("Sun Life of Canada (Philippines)") prior to or, as soon as reasonably practicable, after demutualization. Under the terms of the indemnity reinsurance arrangement, Sun Life of Canada (Philippines) will assume all the risk of Sun Life of Canada with respect to policies sold by the Philippines branch. Holders of the affected policies will continue to have direct contractual relationships with Sun Life of Canada.

Subject to the receipt of satisfactory regulatory and court approvals, the business of Sun Life Assurance currently conducted through its United Kingdom branch and related businesses (including its operations in the Republic of Ireland and the Channel Islands) and its Hong Kong branch will be transferred to subsidiaries. The business conducted through the United Kingdom branch and related businesses (including the business of Confederation Life (U.K.)) will be transferred to Sun Life Assurance Company of Canada (U.K.) Limited ("Sun Life of Canada (U.K.)") on demutualization. In addition, the assets of Confederation U.K. Holdings plc will be transferred to Sun Life of Canada UK Holdings plc. It is expected that the business conducted through the Hong Kong branch will be transferred to Sun Life of Canada (International) Limited ("Sun Life of Canada (International)") simultaneously with or, as soon as reasonably practicable, after demutualization. In each case, the transfers are proposed to be made through statutory schemes under applicable insurance legislation.

Following demutualization and the completion of the corporate reorganization described in "Financial Services and Corporate Reorganization" in Part 1 of this Policyholder Information Circular, the corporate structure of the Company will include the principal direct and indirect subsidiaries shown below. Unless otherwise indicated, all subsidiaries are 100% owned.




[1] As at June 30, 1999

In contemplation of the demutualization, Financial Services was incorprated under the Canadian Insurance Act on August 5, 1999, and is currently a wholly-owned subsidiary of Sun Life Assurance. Financial Services' head office is located at Sun Life Centre, 150 King Street West, Toronto, Ontario Canada, M5H 1J9.

### *Wealth Management Business*

Through its Wealth Management Business, the Company provides mutual funds and unit trusts, pensions and pooled institutional funds, fixed and variable annuity products, asset management services and trust, banking and brokerage services. The Wealth Management Business comprised $6.1 billion, or 44%, of the Company's consolidated revenues in 1998 ($3.8 billion, or 49%, of consolidated revenues for the six-month period ended June 30, 1999) and

accounted for $235.7 billion, or 89%, of the Company's total assets under management at June 30, 1999. The Wealth Management Business' clients included approximately 2.8 million individual investors and 7,000 institutional investors worldwide at that date. In 1998, approximately 96% of the Company's wealth management products, measured by dollars of sales, were sold by independent third parties, with the balance being sold by career agents.

The Company operates its Wealth Management Business in the United States primarily through its subsidiaries, MFS and Sun Life of Canada (U.S.). At June 30, 1999, MFS managed over $168.0 billion in assets for individual and institutional mutual fund and annuity investors worldwide, including $20.9 billion of assets managed on behalf of other business units of the Company. Morningstar, Inc. ("Morningstar") and Lipper Analytical Services Inc. ("Lipper"), independent providers of information concerning mutual fund performance, rank many of the MFS funds among the industry leaders. At August 31, 1999, Morningstar awarded four or five stars to 19 of 55 MFS funds ranked by Morningstar, representing 62% of total U.S. mutual fund assets under management by MFS which were ranked by Morningstar at that date. In addition, for the ten-year period ended August 31, 1999, Lipper ranked the two largest MFS funds, Massachusetts Investors Trust (A) and Massachusetts Emerging Growth Fund (B), in the top 14% and 5%, respectively, of their fund categories for ten year performance. MFS has also been ranked among the top four large mutual fund organizations in terms of overall service provided for each of the past five years in the DALBAR, Inc. industry survey of broker/dealers in the U.S. In 1998, MFS funds accounted for 6.7% of new sales in the United States of non-proprietary retail mutual funds distributed by third parties and, according to Strategic Insight, a mutual fund industry monitoring organization, ranked third among mutual fund companies in the U.S. in mutual fund net new flows, being the net flow of funds into or out of a fund. The Company also conducts substantial wealth management operations in the United States through the sale by MFS and Sun Life of Canada (U.S.) of variable and fixed annuity products. At June 30, 1999, the Company had $23.8 billion of assets under management relating to its U.S. annuity products, with more than 282,000 individual annuity contracts. According to the Kehrer Report, a quarterly report produced by Kenneth Kehrer Associates Inc., a financial services consulting company, on the sale of financial products through bank channels, for the year ended December 31, 1998, Sun Life of Canada ranked fourth among insurers in sales (by dollar amount) of variable annuity products through U.S. financial institutions.

In Canada, the Company administers and manages group retirement products, including pension plans, and, according to Benefits Canada, was ranked first in Canada among providers of defined contribution pensions and first among life insurance companies which provide group retirement products (including defined contribution pension plans, group registered retirement savings plans and deferred profit sharing plans) based on assets under management at June 30, 1998. In addition, the Company, through its subsidiaries, Spectrum United and McLean Budden, offers mutual funds and investment management services to individual and institutional clients. At June 30, 1999, assets under management in the Canadian Wealth Management Business were $36.1 billion, including $1.9 billion sub-managed by MFS.

The Company offers unit trusts, unit-linked pension products, annuities, pension fund management services and banking services in the United Kingdom. At June 30, 1999, the Company's U.K. Wealth Management Business had approximately $20.8 billion of assets under management.

The Company believes that the strength of its Wealth Management Business results from the variety and quality of its products and services, its investment management performance, the effectiveness of the Company's multiple channels of distribution and the quality of its customer service.

***Protection Business***

The Company offers protection products and services primarily in Canada, the United States, the United Kingdom and Asia. The Company's protection products and services include whole life, term life, universal life, unit-linked life and corporate-owned life insurance for individuals and life, health and disability insurance for groups. The Company also offers life, health and financial reinsurance, primarily in the United States. The Protection Business comprised $7.3 billion, or 54%, of the Company's consolidated revenues for the year ended December 31, 1998 ($3.8 billion, or 50%, of consolidated revenues for the six-month period ended June 30, 1999) and accounted for $28.0 billion, or 10%, of the Company's total assets under management at June 30, 1999. According to Benefits Canada, measured by premium income in 1998, the Company was ranked second in Canada among insurance providers of group life and health insurance. In 1998, the Company was ranked third in group life and health insurance in the United Kingdom in terms of premium revenue based on surveys by ERC Frankona, a subsidiary of Employers Re International, an international reinsurer. In 1998, approximately 59% of sales of the Company's protection products, measured by dollars of sales, were made by career agents and approximately 41% were made by independent third parties.

The Company believes that its success in the Protection Business results from the variety and quality of the Company's protection products, the Company's financial strength, as measured by its claims paying ability, the effectiveness of the Company's underwriting and the quality of its customer service.

***orldwide Operations***

The Company operates in four principal geographic areas: Canada, the United States, the United Kingdom and ther International, which includes operations in Asia and South America. The Company's revenues, net income and nsolidated assets under management at and for the year ended December 31, 1998 and the six-month period ended ne 30, 1999, by business in each of the four principal geographic areas in which the Company operates, are set forth in e following tables.

**Business Operation Data by Geographic Area**
**At and for the Year Ended December 31, 1998**

| | Canada | U.S. | U.K. | Other International | Consolidation Adjustments[1] | Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| **Vealth Management Business** | | | | | | |
| Revenues | $ 1,463 | $ 3,595 | $ 1,055 | $ 1 | $ (28) | $ 6,086 |
| Net income | 100 | 172 | (531) | 1 | (21) | (279) |
| Assets under management | 34,887 | 183,436 | 21,964 | 182 | (19,823) | 220,646 |
| **Protection Business** | | | | | | |
| Revenues | 2,147 | 2,483 | 1,523 | 1,178 | – | 7,331 |
| Net income | 111 | 201 | 170 | (44) | – | 438 |
| Assets under management | 8,308 | 8,622 | 8,733 | 2,764 | – | 28,427 |

**Business Operation Data by Geographic Area**
**At and for the Six Months Ended June 30, 1999**

| | Canada | U.S. | U.K. | Other International | Consolidation Adjustments[1] | Total |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| **Wealth Management Business** | | | | | | |
| Revenues | $ 746 | $ 2,490 | $ 544 | $ 4 | $ (15) | $ 3,769 |
| Net income | 38 | 117 | (302) | 3 | (12) | (156) |
| Assets under management | 36,073 | 199,482 | 20,802 | 199 | (20,863) | 235,693 |
| **Protection Business** | | | | | | |
| Revenues | 1,122 | 1,211 | 804 | 709 | – | 3,846 |
| Net income | 51 | 83 | 26 | (1) | – | 159 |
| Assets under management | 8,532 | 7,989 | 8,618 | 2,886 | – | 28,025 |

1. Adjustments reflect assets managed on behalf of other business areas of the Company and related revenues and net income.

The principal products and services, distribution channels and customers of the Wealth Management Business and the Protection Business at June 30, 1999 are summarized in the following chart.

## WEALTH MANAGEMENT[1]

| Business Line | Products and Services | Distribution Channels[2] | Customers[3] |
|---|---|---|---|
| **U.S.** | | | |
| Mutual Funds (MFS) | – 77 U.S. mutual funds including domestic equity, bond, money market and international equity funds<br>– 27 off-shore international funds | – approximately 800 broker/dealers<br>– approximately 1,800 financial advisors<br>– approximately 300 banks/financial institutions | 4,082,000 accounts |
| Individual Retirement Products and Services (Sun Life of Canada (U.S.) and MFS) | – individual variable annuity<br>– individual fixed annuity | – approximately 2,000 independent broker dealers representing 65,000 sales representatives<br>– U.S. banks<br>– wholesale distribution by Sun Life of Canada (U.S.) and MFS | 282,000 variable and fixed annuity contracts |
| Institutional Asset Management (MFS) | – advice to public and private institutions<br>– separate and commingled vehicles | – in-house sales force | over 100 institutional clients |
| **Canada** | | | |
| Group Pension and Retirement Products | – defined contribution plans<br>– defined benefit plans<br>– deferred profit sharing plans<br>– RRSP, RRIF, LIF<br>– accumulation, deferred and pay-out annuities<br>– self-directed savings | – Sun Life of Canada agents<br>– independent pension brokers and consultants<br>– Sun Life Securities brokerage | over 336,000 plan members |
| Individual Savings Products | – fixed annuities<br>– variable annuities<br>– RRIF<br>– LIF | – independent life insurance brokers<br>– investment dealer sales representatives<br>– Sun Life of Canada agents | 120,000 individual annuity contracts |
| Mutual Funds (Spectrum United, McLean Budden) | – 33 mutual funds (Spectrum) and 6 mutual funds (McLean Budden) including North American equity, global equity, income and diversified funds | – independent brokers<br>– mutual fund dealers<br>– Sun Life of Canada agents | over 382,000 investors |
| Asset Management Services (McLean Budden) | – advice to institutions and high net worth individuals<br>– separate or pooled funds | – agents<br>– discount brokers<br>– in-house sales force<br>– pension fund consultants | over 200 institutions<br>over 600 individuals<br>6 mutual fund clients |
| Trust and Brokerage (Sun Life Trust, Sun Life Securities) | – deposits, mortgage lending, trust services, Interac<br>– RRSP, discount brokerage | – independent agents<br>– Sun Life of Canada agents<br>– discount brokers | over 72,000 customers |
| **U.K.** | | | |
| Individual Annuities and Pension | – unit trusts<br>– unit-linked pension<br>– immediate/deferred annuities<br>– compulsory purchase annuities | – Sun Life of Canada agents<br>– independent brokers | 400,000 investors<br>97,000 unit trust accounts |
| Pension Fund Management Services (SLC Asset Management) | – institutional pooled pension fund trusts<br>– segregated pension funds | – specialist intermediaries | over 500 clients |
| Banking (Sun Bank) | – residential mortgages<br>– commercial mortgages<br>– asset financing<br>– deposits and credit | – Sun Life of Canada agents<br>– financial advisors | over 52,000 customers |

1. For an explanation of certain wealth management and protection industry terms, see "Business of the Company", the Part 1 Glossary and the Part 2 Glossary.

2. Distribution channels may be included in more than one business line.

3. Individuals and entities may be customers of more than one business line.



SL-0366

## PROTECTION[1]

| Business Line | Products and Services | Distribution Channels[2] | Customers[3] |
|---|---|---|---|
| **U.S.** | | | |
| Individual Life | – term insurance<br>– fixed and variable universal life<br>– participating whole life<br>– corporate-owned life insurance | – general agents<br>– investment advisors<br>– banks<br>– independent producer groups<br>– independent brokers<br>– financial planners | 210,000 individual policyholders |
| Group Life and Health | – life insurance<br>– short and long term disability<br>– medical stop-loss plans | – in-house sales representatives<br>– benefits consultants | 3,100,000 lives covered |
| **Canada** | | | |
| Group Life and Health | – life insurance<br>– short and long term disability<br>– dental plans<br>– extended health care plans<br>– administration services only | – independent brokers<br>– benefits consultants<br>– in-house sales representatives<br>– Sun Life of Canada agents<br>– associations (professional and alumni) | 3,100,000 lives covered |
| Individual Life | – term insurance<br>– non-participating and participating whole life<br>– fixed and variable universal life | – independent brokers<br>– Sun Life of Canada agents<br>– financial planners<br>– investment dealers | 420,000 individual policyholders |
| **U.K.** | | | |
| Individual Life | – participating whole life<br>– participating endowment<br>– term insurance<br>– unit-linked life insurance products | – Sun Life of Canada agents | 432,000 policies in force |
| Group Life and Health | – life insurance<br>– permanent health | – independent brokers | 1,215,000 lives covered |
| **Other International** | | | |
| Individual Life<br>Philippines, Hong Kong, Indonesia | – participating whole life<br>– participating endowments | Sun Life of Canada agents:<br>– Philippines: 1,500<br>– Hong Kong: 250 agents and 400 independent brokers<br>– Indonesia: 1,000 | Policies in force:<br>Philippines: 304,000<br>Hong Kong: 70,000<br>Indonesia: 22,000 |
| Group Life<br>Philippines | – life insurance | – 1,500 Sun Life of Canada agents<br>– 15 brokers | 82,000 lives covered |
| Life, Health and Financial Reinsurance | – retrocessionaire<br>– reinsurer | – direct by Company<br>– reinsurance brokers<br>– managing general underwriters | 553 treaties |

1. For an explanation of certain wealth management and protection industry terms, see "Business of the Company", the Part 1 Glossary and the Part 2 Glossary.

2. Distribution channels may be included in more than one business line.

3. Individuals and entities may be customers of more than one business line.

## The Wealth Management and Insurance Industries

The global financial services industry is undergoing a period of significant evolution, particularly in North America. The insurance and wealth management industries are transforming rapidly in response to demographic shifts, changing government regulation, advances in technology and increased competition and consolidation in the financial services market.

Global demographic shifts, particularly in North America, have resulted in significant changes in the consumer base of the insurance and wealth management industries. In the United States, the number of Americans between the ages of 45 and 64 is projected to grow from 53.7 million in 1996 to over 70 million in 2005, while in Canada, approximately 4.3 million people are expected to reach retirement age by 2005. In addition, increasing life expectancies are expected to result in longer retirement periods for this growing segment of the population. As a result, consumers of financial products have demonstrated an increased emphasis on retirement planning and saving, with a focus on generational wealth transfer vehicles. Concerns about the ability of governments to finance traditional sources of retirement income have led consumers to focus on self-directed investments intended to supplement these sources of retirement income. Customers in the insurance and wealth management industries have also grown increasingly sophisticated which, together with a growing desire for self-directed investments, has resulted in a more knowledgeable customer base that requires more customer-focused products.

Changes in the regulation of the financial services industry in North America have reduced the traditional barriers between the banking, insurance and investment industries, heightening competition in these markets. For example, several of the major Canadian banks have significant operations in securities, insurance and wealth management operations. A recent government report on the future of the Canadian financial services industry advocated further dismantling of the barriers between the banking, insurance and investment industries. In the United States, recent consolidation has created larger financial institutions involved in the banking, insurance and investment management businesses.

Financial services companies, particularly in North America, are developing multiple distribution channels, including independent third party brokers and financial planners, and making increasing use of electronic communication channels, such as the Internet, to reach customers.

### *The Wealth Management Industry*

The trend towards increasing emphasis on retirement planning and savings, coupled with strong capital markets over the past decade, has resulted in significant growth in the wealth management industry, particularly in North America. Investments in mutual funds and variable annuities have shown strong growth in recent years. Total assets under management in the Canadian mutual fund industry grew from $25 billion at December 31, 1990 to $360 billion at June 30, 1999, while in the United States total assets under management in mutual funds grew from $1.6 trillion to $8.9 trillion at June 30, 1999. Sales of variable annuity products in the United States grew from $36 billion in 1992 to approximately $153 billion in 1998 (while variable annuity assets grew from $269 billion at December 31, 1991 to $1.3 trillion at June 30, 1999). Employers in Canada and the United States have increasingly shifted from offering defined benefit plans (where the employer makes the investment decisions) to employee directed, defined contribution retirement and savings plans (where employees generally make investment decisions within a range of investment options established by the employer).

Generally, investment and wealth management services provided to retail mutual funds, segregated or separate funds underlying individual variable annuities, and institutional clients are performed under advisory contracts which provide for a fee payable to the managers. The amount of the fee varies depending on the type of mutual fund, segregated or separate fund, or client and is usually based upon a sliding scale in relation to the amount of assets under management and, in certain circumstances, investment performance.

North American mutual fund markets are highly competitive and new participants continue to enter the market. In Canada, the market has recently experienced more intense competition from new insurance company-sponsored individual variable annuity products, sometimes referred to as segregated fund contracts, which offer professional portfolio investment management as well as enhancements such as guarantees and protection of the investor's assets from creditors in the event of the investor's insolvency. Competitive trends in the North American mutual fund industries have resulted in increasing pressures on mutual fund pricing and greater investor sensitivity to the management expense ratios of, and sales charges associated with, mutual fund products and variable annuity products in North America.

The North American markets for institutional money management services are also highly competitive, with the key determinant being strong, long-term investment performance. The principal participants in this market are well diversified institutional money management firms, companies which offer indexed mutual fund and institutional pooled fund products and foreign investment management organizations. Competition in this market is often product specific, with competitors vying for new mandates for specific products.

Competition for group retirement business, including for the management and administration of defined contribution and defined benefit pension plans, is also intense in Canada and the United States. Competitors in those countries include insurance companies, banks, trust companies and investment companies.

The market in the United Kingdom for unit-linked products and annuity products is competitive, particularly as a result of new market entrants. Banks now sell unit-linked products, and direct marketers, including telemarketers, have become increasingly active sellers of these products. The insurance industry has suffered significant financial loss and loss of market share to banks and direct marketers in the pensions area as a result of the pressure exerted by the U.K. government since 1994 with respect to pension sales practices compensation.

### *The Insurance Industry*

In North America and the United Kingdom, the traditional individual life and group health and life insurance businesses are mature and, generally, highly competitive. In North America, industry consolidation and the entrance of non-traditional competitors, such as banks, have exerted downward pressure on product pricing margins. The U.K. market for individual insurance products has become increasingly competitive in recent years, also as a result of new market entrants. Banks have increasingly begun to sell traditional insurance products. In addition, direct marketers, including telemarketers, have become increasingly active sellers of insurance products. The group life and health insurance business in the United Kingdom is a stable and mature business in which products are generally differentiated by cost.

In response to increased focus on retirement planning and saving by consumers, many insurance companies have decreased their emphasis on traditional participating life insurance products in favour of products such as universal life insurance in Canada, variable universal life insurance in the United States and unit-linked life insurance products in the United Kingdom. In less mature insurance markets, however, such as Asia, participating life insurance products continue to enjoy strong customer demand.

## Strategy

The Company's strategic objective is to be a leading financial services provider with a significant presence in each of its chosen markets, with increasing emphasis on its Wealth Management Business. In order to achieve this objective, the Company intends to pursue the following strategies: (i) aggressively expand the Wealth Management Business, (ii) strategically grow higher return Protection Business lines, (iii) capitalize on distribution strengths, (iv) leverage strong brands across multiple product offerings, (v) pursue expansion in key strategic markets and (vi) achieve superior shareholder returns while maintaining financial discipline.

### *Aggressively Expand the Wealth Management Business*

The Company seeks to continue the growth of its Wealth Management Business, which generates fee income and requires relatively low levels of capital. The Company has been successful in increasing assets under management in its Wealth Management Business, having generated a compound annual growth rate for the five-year period ended December 31, 1998 of approximately 25%. The Company is committed to increasing its share in the expanding global market for savings and retirement products by offering its customers a wide range of wealth management products designed to address customers' changing needs in various stages of life and in different financial market cycles. The Company plans to develop innovative products designed to fill the growing demands of its customer base. For example, the Company has introduced variable annuity products in the United States that appeal to high net worth customers in that market. The Company also seeks to grow its Wealth Management Business by increasing marketing initiatives which target individual participants in group plans, as well as by expanding third party distribution channels. The Company believes that the growth of its Wealth Management Business will continue due to its ability to provide and distribute a wide variety of wealth management products, its strong investment management performance and capabilities, and an increasing savings and investment rate within its target markets.

### *Strategically Grow Higher Return Protection Business Lines*

The Company believes that its ability to design and distribute innovative protection products will allow for profitable growth in the individual Protection Business. Over the past few years, the Company has repositioned its individual life product offerings in Canada and the U.S. from traditional products to higher value-added products designed to respond to customers' needs for estate planning and intergenerational wealth transfer. As a result, the Company has gained an attractive niche position in the high net worth segment of the U.S. life insurance market. Through its demonstrated expertise in servicing large group customers, the Company has developed a diverse portfolio of products with customized services and a reputation for delivering superior customer service. For example, the Company has recently launched SunAdvisor in Canada, an early claims management and intervention service for employers who want to supplement their own self-insured, self-administered programs. The Company has also been able to enhance and expand its array of services through partnerships and other initiatives. By providing a broad range

of value-added services to its group clients, the Company expects to provide a foundation for continued growth of the Protection Business.

### *Capitalize on Distribution Strengths*

The Company has a leading market position in group distribution of life and health products in Canada, the U.S. and the U.K. With the trend for group plan sponsors to outsource many elements of benefits administration to financial service providers, the Company increasingly has the opportunity to establish direct contact with individual plan members through the Internet and telephone, thereby providing significant new marketing opportunities. For example, the Company has entered into an alliance through which Sun Life of Canada licenses technology from an Internet health care management company which facilitates the management of member information, claims administration and payments to group policy members over the Internet. The Company intends to use this low cost administration technology as an innovative distribution platform from which it can market wealth management products to individual participants in group plans. The Company intends to capitalize on this and other emerging distribution channels to expand its customer base and increase the profitability of products and services offered to those customers. The Company believes that, as financial services and products are increasingly distributed through the channel of the customer's choice, its expertise in managing multi-channel distribution networks provides a competitive advantage.

### *Leverage Strong Brands Across Multiple Product Offerings*

The Company has been selling its products under the *Sun Life* name since 1871. Additionally, the MFS organization, which started the first mutual fund in the United States, has been operating since 1924, McLean Budden since 1947 and Spectrum United since 1987. Due to their long operating histories and broad distribution of high quality products, these entities have established strong brand recognition in the markets in which they operate. The Company seeks to capitalize on cross-selling opportunities by leveraging its position in established distribution channels and by exploiting the strength of its respected brand names. For example, the Company intends to use its strong market presence and significant brand recognition in the high net worth segment of the U.S. individual life insurance market as a platform for cross-selling increasingly sophisticated wealth management and retirement planning products to those customers. The Company believes that it is in a strong position to exploit such opportunities by leveraging its brand strength.

### *Pursue Expansion in Key Strategic Markets*

The Company intends to pursue strategic acquisitions and alliances that will enhance its performance and deliver attractive returns on invested capital. In its existing markets, the Company seeks acquisitions and alliances that would help achieve economies of scale, reduce costs, increase the range of products offered and expand or add distribution channels. In 1997, the Company complemented its Canadian Wealth Management Business by acquiring a 60% equity interest in McLean Budden, an investment management company. When expanding into new markets, the Company primarily intends to pursue joint ventures with local partners. The Company believes that this approach allows it to leverage its competitive strengths in product development, distribution, investment management and technology with its partners' knowledge of local markets. The Company recently acquired a 32% equity interest in Administradora de Fondos de Pensiones Cuprum, S.A., one of the leading pension fund administrators in Chile, to gain access to wealth management markets in Chile and other South American countries. In addition, the Company has entered into a joint venture agreement with Aditya Birla Group, a major Indian industrial group, to market and distribute a broad range of financial products and services in India. As well, the Company recently received approval from applicable regulatory authorities to prepare for market entry to participate in China's financial services industry. The Company believes that following demutualization, it will be better positioned to pursue strategic alliances and acquisitions by having greater access to capital markets and the ability to issue shares as consideration for acquisitions.

### *Achieve Superior Shareholder Returns While Maintaining Financial Discipline*

The Company will be focused on effectively deploying its capital to maximize its return to shareholders. The Company maintains financial discipline in each of its strategic business units, targeting a minimum return on capital allocated to each unit. The Company intends to divest businesses that do not achieve an adequate level of shareholder return within a prescribed timeframe, that do not fit with the Company's overall strategic objective, or that are unlikely to achieve a significant market presence. For example, the Company is seeking to sell substantially all of its reinsurance business, other than contracts related to Unicover Managers, Inc., and has agreed to sell its Canadian GIC and residential mortgage lending businesses. In addition, the Company intends to aggressively implement cost reduction measures designed to improve profitability and to contribute to shareholder returns including, for example, as part of the strategic plan being developed for its United Kingdom operations. The Company intends to maintain appropriate financial strength to protect the interests of its stakeholders while maximizing shareholder returns.

## Wealth Management Business

The Company operates the Wealth Management Business primarily in Canada, the United States, and the United Kingdom and intends to expand this business in the Philippines, South America and India. The wealth management products and related investment management services of the Company focus primarily on meeting the savings and retirement needs of its customers, and helping them plan, and achieve, lifetime financial security.

The Wealth Management Business is the largest of the Company's businesses, measured by total assets under management, and, in recent years, has been the primary focus of the Company's growth. Annual gross sales of wealth and asset management products and aggregate assets under management in the Wealth Management Business, by product, at and for each year in the three-year period ended December 31, 1998 and at and for the six-month period ended June 30, 1999, are set forth below.

**Wealth Management Business**
**Sales and Assets Under Management**

| | At and for the Six Months Ended June 30, | At and for the Year Ended December 31, | | |
|---|---|---|---|---|
| | 1999 | 1998 | 1997 | 1996 |
| | | (in millions) | | |
| **Sales[1]** | | | | |
| Group pensions | | | | |
| General funds | $ 189 | $ 328 | $ 356 | $ 706 |
| Segregated funds[2] | 824 | 1,711 | 1,249 | 1,378 |
| Fixed annuities | 1,498 | 2,028 | 2,098 | 1,158 |
| Variable annuities | 1,033 | 2,111 | 1,716 | 1,897 |
| Unit-linked pensions | 221 | 388 | 342 | 316 |
| Mutual funds and unit trust | 21,920 | 33,850 | 18,790 | 13,150 |
| Asset management | 8,261 | 12,255 | 11,522 | 4,631 |
| Consolidation Adjustments | (409) | (1,855) | (1,625) | (1,865) |
| Total | $ 33,537 | $ 50,816 | $ 34,448 | $ 21,371 |
| **Total Assets Under Management** | | | | |
| Group pensions | | | | |
| General funds | $ 6,231 | $ 6,875 | $ 7,409 | $ 7,751 |
| Segregated funds[2] | 14,179 | 13,581 | 12,155 | 12,061 |
| Fixed annuities | 13,423 | 14,172 | 11,781 | 11,102 |
| Variable annuities | 19,327 | 18,508 | 12,868 | 9,028 |
| Unit-linked pensions | 4,287 | 4,914 | 3,455 | 2,777 |
| Mutual funds and unit trusts | 132,835 | 120,943 | 80,466 | 58,639 |
| Asset management | 62,115 | 55,612 | 39,983 | 24,068 |
| Trust/banking | 6,133 | 6,391 | 5,746 | 5,290 |
| Other | 3,993 | 4,187 | 2,704 | 1,239 |
| Consolidation adjustments | (26,830) | (24,537) | (17,728) | (14,800) |
| Total | $235,693 | $220,646 | $158,839 | $117,155 |

1. Sales amounts shown for "Group pensions – General funds" and "Fixed annuities" represent all premium revenues for these products and are included in the Consolidated Statement of Operations of the Company. Sales amounts for "Group pensions – Segregated funds", "Variable annuities" and "Unit-linked pensions" represent deposits for these products and are included as deposits in the Consolidated Statement of Changes in Segregated Fund Net Assets of the Company. Sales amounts for "Mutual funds and unit trust" and "Asset management" represent all deposits received by the Company for these items. Sales of these items are not included in either the general funds or the segregated funds of the Company. Fee income and investment income earned by the Company on the products described above are included in revenues of the Company but are not included in the sales amounts shown above as they represent additional revenue earned by the Company on existing business rather than amounts received by the Company for new business.

2. Segregated funds are held in accounts separate from the general funds of the Company. The assets are carried at fair value. Deposits, investment income and net realized capital gains and losses from these assets are not included in the Company's Consolidated Statement of Operations.



SL-0371

The Company's assets under management by geographic region for the periods indicated are set forth in the following table.

**Wealth Management Business**
**Total Assets Under Management**

| | At June 30, 1999 | At December 31, 1998 | 1997 | 1996 |
|---|---|---|---|---|
| | | (in millions) | | |
| MFS | $169,416 | $153,200 | $101,095 | $ 72,194 |
| Other U.S. | 30,066 | 30,236 | 24,620 | 19,812 |
| Canada | 36,073 | 34,887 | 30,235 | 20,567 |
| U.K. | 20,802 | 21,964 | 16,742 | 14,852 |
| Other International | 199 | 182 | – | – |
| Consolidation Adjustments | (20,863) | (19,823) | (13,853) | (10,270) |
| Total | $235,693 | $220,646 | $158,839 | $117,155 |

The Company's net income (loss) by geographic region for the periods indicated are set forth in the following table.

**Wealth Management Business**
**Net Income (Loss)**

| | Six Months Ended June 30, 1999 | Year Ended December 31, 1998 | 1997 | 1996 |
|---|---|---|---|---|
| | | (in millions) | | |
| MFS | $ 82 | $ 113 | $ 86 | $ 68 |
| Other U.S. | 35 | 59 | 62 | 51 |
| Canada | 38 | 100 | 85 | 104 |
| U.K. | (302) | (531) | (105) | 79 |
| Other International | 3 | 1 | – | – |
| Consolidation Adjustments | (12) | (21) | (15) | (6) |
| Total | $(156) | $(279) | $ 113 | $296 |

***United States***

The Company is a leading provider of mutual funds and annuity products in the United States through its 85%-owned (as at June 30, 1999) subsidiary, MFS, and its U.S. life insurance subsidiaries.

***MFS***

MFS was the first mutual fund organization in the United States, with operations dating back to its founding of the first mutual fund in the U.S. in 1924. MFS manages mutual funds, pension funds and other client funds in addition to managing U.S. variable annuity products on behalf of the Company and other financial services companies. MFS also provides investment advice to a substantial number of private clients, including public and private institutional investors. It also provides mutual fund and variable annuity distribution services, mutual fund transfer agency services, retirement plan administration, record-keeping and other related services. MFS is headquartered in Boston, Massachusetts, and has offices in London, Bahrain, Buenos Aires, São Paulo, Hong Kong, Singapore, Sydney and Tokyo. MFS' strength lies in its strong research capabilities, superior investment performance and its distribution network. In addition, MFS believes that it has experienced low turnover rates among its portfolio managers, which has helped it achieve superior fund performance. At June 30, 1999, MFS managed over $168.0 billion in assets for individual and institutional mutual fund and annuity investors worldwide, including $20.9 billion of assets managed on behalf of other business units of the Company.

MFS has recently experienced significant growth in its assets under management, from $72.2 billion at December 31, 1996 to $101.1 billion at December 31, 1997 and $153.2 billion at December 31, 1998, representing an annual growth rate of 40% from 1996 to 1997 and 51% from 1997 to 1998. At June 30, 1999, MFS had total assets under management of $169.4 billion, representing an annualized growth rate of 21% from December 31, 1998. This market strength is reflected in MFS' market share of new sales of load mutual funds sold through non-proprietary or third-party distribution channels, which increased from 3.5% in 1996 to 6.7% for 1998, according to the Investment Company Institute, a trade association for U.S. mutual funds and similar investment vehicles. According to Strategic Insight, a mutual fund industry monitoring organization, MFS ranked third among all mutual fund companies in the United States in mutual fund net new flows in 1998. Net new flows are the net flow of funds into or out of a fund, calculated as the change in assets under management over a period, adjusted for gains or losses resulting from investment returns, timing of fund flows, and distributions out of the funds to investors.