The Company's real estate is located primarily in Canada, the United States and the United Kingdom, as indicated by the following table:

## Real Estate Portfolio – Regional Distribution

| | At June 30, 1999 | | At December 31, 1998 | | 1997 | | 1996 | |
|---|---|---|---|---|---|---|---|---|
| | Statement Value | % of Total | Statement Value | % of Total | Statement Value | % of Total | Statement Value | % of Total |
| | | | ($ in millions) | | | | | |
| Ontario | $ 482 | 19.8% | $ 476 | 19.5% | $ 429 | 19.4% | $ 427 | 19.2% |
| British Columbia | 145 | 5.9 | 143 | 5.9 | 143 | 6.5 | 143 | 6.4 |
| Other Western Provinces | 234 | 9.5 | 231 | 9.5 | 211 | 9.6 | 210 | 9.4 |
| Quebec | 213 | 8.7 | 210 | 8.6 | 205 | 9.3 | 211 | 9.5 |
| Other | 8 | 0.3 | 8 | 0.3 | 7 | 0.3 | 6 | 0.2 |
| Total Canada | $1,082 | 44.2% | $1,068 | 43.8% | $ 995 | 45.1% | $ 997 | 44.7% |
| U.S. Pacific | 62 | 2.5% | 65 | 2.7% | 77 | 3.5% | 93 | 4.2% |
| U.S. Mid-Atlantic | 45 | 1.8 | 48 | 2.0 | 56 | 2.5 | 50 | 2.3 |
| U.S. North Central | 193 | 7.9 | 205 | 8.4 | 208 | 9.4 | 132 | 5.9 |
| U.S. New England | 82 | 3.3 | 86 | 3.5 | 82 | 3.7 | 103 | 4.6 |
| Other | 377 | 15.4 | 342 | 14.0 | 259 | 11.8 | 248 | 11.1 |
| Total United States | $ 759 | 30.9% | $ 746 | 30.6% | $ 682 | 30.9% | $ 626 | 28.1% |
| United Kingdom | 607 | 24.8% | 623 | 25.5% | 528 | 23.9% | 605 | 27.2% |
| Other Countries | 3 | 0.1 | 3 | 0.1 | 2 | 0.1 | – | – |
| Total | $2,451 | 100.0% | $2,440 | 100.0% | $2,207 | 100.0% | $2,228 | 100.0% |

The following table sets out the Company's real estate portfolio by property type:

## Real Estate Portfolio – Property Type Distribution

| | At June 30, 1999 | | At December 31, 1998 | | 1997 | | 1996 | |
|---|---|---|---|---|---|---|---|---|
| | Statement Value | % Leased | Statement Value | % Leased | Statement Value | % Leased | Statement Value | % Leased |
| | | | | ($ in millions) | | | | |
| Office | $1,280 | 92.1% | $1,299 | 90.6% | $1,172 | 90.4% | $1,244 | 87.8% |
| Retail commercial | 583 | 96.8 | 526 | 97.7 | 444 | 95.8 | 407 | 95.6 |
| Residential | 5 | – | 5 | – | 11 | – | 11 | – |
| Industrial | 500 | 94.0 | 527 | 94.0 | 524 | 93.6 | 490 | 92.6 |
| Other | 83 | – | 83 | – | 56 | – | 76 | – |
| Total | $2,451 | | $2,440 | | $2,207 | | $2,228 | |

Real estate held for investment is originally recorded at cost. The carrying value is adjusted annually by 10% of the difference between market value and previously adjusted carrying value. Realized gains and losses on sales are deferred and recorded in net investment income at an annual rate of 10% of the unamortized balance. The balance of realized gains and losses on sales of real estate held for investment are reported on the balance sheet as deferred net realized gains and losses.

Unrealized gains or losses on real estate are based on a market value determined by a combination of independent appraisals and values established by professional accredited appraisers who are employees of the Company. All real estate properties are appraised at least every three years with larger holdings being appraised annually. The Company monitors the current values of properties appraised in previous years and seeks to ensure that the market values used, in the aggregate, are not in excess of current values. Approximately 60% of the real estate portfolio, by market value, is appraised each year.

### *Policy Loans*

Policy loans represented 2.4% of invested assets at December 31, 1998 (2.5% at June 30, 1999). Most individual life insurance policies, excluding term insurance, provide the individual policyholder with the right to obtain a policy loan

from Sun Life of Canada. Such loans are made in accordance with the terms of the respective policies and are carried at the unpaid balance.

Policy loans are fully secured by the cash surrender value of the policies on which the respective loans are made. If a policyholder surrenders the policy, the cash value paid by the Company will be the cash surrender value less the amount of the outstanding policy loan. Similarly, upon the death of the policyholder, the death benefit paid by the Company will be the benefit less the amount of the outstanding policy loan. Consequently, the Company has no exposure to default risk on policy loans. The majority of policy loans are made at prime loan interest rates currently prevailing in the market.

### *Non-Performing Invested Assets*

Total net non-performing invested assets were $222 million, or 0.4% of the Company's invested assets and 0.4% of the Company's general fund assets at December 31, 1998 and $174 million, or 0.4% of invested assets and 0.3% of general fund assets, at June 30, 1999. The Company provides both specific and general allowances against non-performing invested assets. The following table provides a breakdown of the non-performing invested assets net of specific allowances by location at December 31, 1998 and at June 30, 1999:

**Net Non-Performing Assets**

| | At June 30, 1999 | | | | At December 31, 1998 | | | | At December 31, | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Canada | United States | United Kingdom | Total | Canada | United States | United Kingdom | Total | 1997 Total | 1996 Total |
| | | | | | ($ in millions) | | | | | |
| Non-accrual assets: | | | | | | | | | | |
| Commercial mortgages | $ 62 | $ – | $ 12 | $ 74 | $ 87 | $ – | $ 15 | $102 | $124 | $132 |
| Residential mortgages | 31 | – | 20 | 51 | 27 | 3 | 33 | 63 | 91 | 126 |
| Bonds and other loans | 4 | – | – | 4 | 11 | 7 | – | 18 | 25 | 21 |
| Foreclosed properties held for resale | 25 | 20 | – | 45 | 24 | 15 | – | 39 | 46 | 63 |
| Total non-performing assets, net | $122 | $ 20 | $ 32 | $174 | $149 | $ 25 | $ 48 | $222 | $286 | $342 |
| Total non-performing assets as a % of total invested assets | 0.7% | 0.1% | 0.3% | 0.4% | 0.8% | 0.1% | 0.4% | 0.4% | 0.6% | 0.8% |

### *Mortgage Portfolio Surveillance*

The Company actively manages the asset quality of its commercial mortgage portfolio. In Canada, a specialty group manages problem mortgages. Mortgages are rated using a formal rating system during an appraisal, upon renewal or when identified by mortgage personnel as requiring re-rating. The Company has mortgage offices across Canada, allowing for early identification and review of problem mortgages.

In the U.S., the mortgage portfolio is originated through a correspondent network. A formal rating system is in place. It is the Company's policy that mortgage correspondents review and rate each mortgage annually and provide a written report to the Company's mortgage officers.

Generally, it has been the Company's policy to take power of sale or other available foreclosure action on mortgages in default. However, restructurings ($121 million in 1998 and $112 million for the six-month period ended June 30, 1999) have taken place where there is a financial benefit for the Company to do so. Provisions for losses on restructured mortgages are based upon the lower of the value of the underlying asset or the present value of the expected restructured cash flow, discounted at the original mortgage rate.

The Company deals with its non-performing assets through ongoing collateral reviews and active management, and by ensuring that appropriate provisions and reserves have been established. The following table sets out 90-day arrears at the dates indicated. The percentages indicated represent the outstanding principal amount of delinquent loans in each category as a percentage of total loans in such category. In completing these percentages, the amounts of arrears and the respective total portfolio amounts have not been reduced by related asset loss allowances.



SL-0460

## Non-Performing Mortgages – Commercial and Residential

| | At June 30, 1999 | At December 31, 1998 | 1997 | 1996 |
|---|---|---|---|---|
| Canada | 2.0% | 2.5% | 3.4% | 4.4% |
| United States | 0.1 | 0.1 | 0.3 | 0.3 |
| United Kingdom | 1.8 | 2.8 | 2.4 | 4.2 |
| Total Non-Performing Mortgages | 1.3 | 1.7 | 2.3 | 2.9 |

***Asset Loss Allowances and Default Provisions***

In addition to loss provisions and allowances established for non-performing bonds and mortgages, provisions are taken if:

i) recovery of the principal balance on a loan and any accrued interest is, in the opinion of management, in doubt and the value of the underlying security has declined below the carrying value of the loan;

ii) a decline in value of a security is considered to be other than temporary;

iii) the value of a foreclosed property held for resale declines below its carrying value; or

iv) the market value of the investment real estate portfolio falls below its carrying value and any such deficiency is other than temporary in nature.

The Company had established aggregate asset loss allowances of $144 million at June 30, 1999 ($169 million at December 31, 1998 and $239 million at December 31, 1997). The following table sets forth asset loss allowances for the periods indicated:

## Asset Loss Allowances

| | Six Months Ended June 30, 1999 | Year Ended December 31, 1998 | 1997 | 1996 |
|---|---|---|---|---|
| | (in millions) | | | |
| Balance at beginning of the period | $169 | $239 | $283 | $299 |
| Provision for (recovery of) losses | 7 | (16) | 12 | 44 |
| Write-downs, net of recoveries | (28) | (57) | (57) | (61) |
| Other | (4) | 3 | 1 | 1 |
| Balance at end of the period | $144 | $169 | $239 | $283 |
| Asset loss allowances by region: | | | | |
| Canada | $ 99 | $124 | $189 | $230 |
| U.S. | 35 | 30 | 34 | 44 |
| U.K. | 10 | 15 | 16 | 9 |
| Total | $144 | $169 | $239 | $283 |

The allowance balance at the beginning of a year is increased by provisions for losses that are charged to income, and reduced by permanent write-downs or write-offs.

In addition, the Company has allowances for possible future asset defaults and the related loss of income in its actuarial liabilities which amounted to $439 million at June 30, 1999 ($461 million as at December 31, 1998 and $435 million as at December 31, 1997). These allowances provide for possible future asset defaults on assets currently owned by the Company. Provisions for asset defaults on assets to be acquired in the future are reflected in expected investment returns on such assets.

***Provisions for Losses on Invested Assets***

The Company recovered $16 million on invested assets in 1998, primarily reflecting improvements in the Company's Canadian commercial mortgage loan portfolio. In the six-month period ended June 30, 1999, the Company took provisions of $6 million on invested assets. The following table provides a breakdown of provisions for losses or recoveries on invested assets by location for the years ended December 31, 1998, 1997 and 1996 and the six-month period ended June 30, 1999.



SL-0461

## Provision for (recovery of) Losses

| | Six Months Ended June 30, 1999 | Year Ended December 31, 1998 | 1997 | 1996 |
|---|---|---|---|---|
| | (in millions) | | | |
| Commercial mortgages: | | | | |
| Canada | $ – | $(15) | $ 6 | $30 |
| United States | 4 | – | (7) | (2) |
| United Kingdom | (1) | 1 | 1 | 2 |
| Total commercial mortgages | 3 | (14) | – | 30 |
| Residential mortgages: | | | | |
| Canada | – | (2) | – | 6 |
| United States | – | – | – | 2 |
| United Kingdom | – | – | – | – |
| Total residential mortgages | – | (2) | – | 8 |
| Securities and other invested assets | 4 | 4 | 16 | 6 |
| Foreclosures | (1) | (4) | (4) | – |
| Total | $ 6 | $(16) | $12 | $44 |

Bond and mortgage portfolios are reviewed quarterly to identify whether allowances for losses are adequate.

### *Deferred Realized Net Gains*

Deferred realized net gains represent gains and losses that are realized when invested assets are sold. Deferred realized net gains and losses on bonds and mortgages are amortized, on a constant yield basis, over the remaining term to maturity. This accounting method helps to maintain the yield recorded on invested assets on a basis that is consistent with the return assumed in discounting the actuarial liabilities which the assets support. For stocks, deferred realized net gains and losses are amortized at 15% per year, and on real estate at 10% per year, both on a declining balance basis.

Sun Life of Canada recorded the following deferred realized net gains and losses at the dates indicated below:

| | At June 30, 1999 | At December 31, 1998 | 1997 | 1996 |
|---|---|---|---|---|
| | (in millions) | | | |
| Bonds | $1,517 | $1,392 | $ 908 | $ 686 |
| Mortgages | 52 | 50 | 35 | 8 |
| Stocks | 1,557 | 1,344 | 928 | 695 |
| Real estate | 126 | 124 | 100 | 87 |
| Financial derivatives | 33 | 147 | 35 | (5) |
| Total | $3,285 | $3,057 | $2,006 | $1,471 |

### *Market Value Versus Carrying Value of Investments*

The difference between market value and carrying value of investments represents potential unrealized gains and losses which are not recorded on the Company's balance sheet except with respect to stocks and real estate as described below. The Company also does not record the difference between the market value and carrying value of liabilities, such as actuarial liabilities, which these investments support. The market value of the Company's investments differed from their carrying value by the amounts shown in the table below:

## Excess of Market Value Over Carrying Value of Investments

| | At June 30, 1999 | At December 31, 1998 | 1997 | 1996 |
|---|---|---|---|---|
| | (in millions) | | | |
| Bonds | $1,616 | $3,028 | $2,020 | $1,159 |
| Mortgages | 371 | 582 | 524 | 518 |
| Stocks | 702 | 994 | 1,234 | 882 |
| Real estate | 221 | 322 | 133 | (106) |
| Cash and Short-Term Investments | – | 1 | 2 | 6 |
| Other Invested Assets | 16 | 16 | 17 | 17 |
| Total | $2,926 | $4,943 | $3,930 | $2,476 |

A significant portion of any excess or deficiency of market values to carrying values relates to assets that are matched to liabilities as to net yield and duration. Where assets are so matched, if they are disposed of before maturity, the proceeds will be reinvested to maintain sufficient assets to meet the liabilities. Consequently, excesses or deficiencies do not necessarily represent amounts that will be credited to or charged against income.

Market values are established on the basis of quoted market values for bonds and stocks, and on the present value of future payments discounted at current market interest rates for mortgages. The Company monitors the current values of property appraised in previous years annually and ensures that, in the aggregate, the market values used are not in excess of current values. Carrying values for stocks and real estate are determined on a moving average market method of accounting whereby a portion of unrealized gains or losses are included in the carrying value of investments.

## RISK MANAGEMENT

The board of directors of Sun Life Assurance has established a Risk Review Committee which is generally responsible for requiring management to identify and review the major areas of risk in respect of the business activities of the Company and for approving, and reviewing compliance with, the policies implemented for the management and control of risk. Among other things, the Risk Review Committee requires management of each major area within Sun Life of Canada to prepare an annual report identifying its principal business and other risks and risk management techniques.

### *Asset and Liability Management*

The objective of the Company's asset and liability management policy is to minimize exposure to losses from substantial market fluctuations. The Company's insurance liabilities are segmented according to major product type with investment guidelines established for each segment. Asset mix, asset quality, liquidity and interest rate exposure are frequently measured and compared to policy objectives and liability requirements for each product type.

Interest rate risk is the risk of economic loss arising from changes in interest rates and the impact of these changes on the reinvestment or disinvestment of cash flows. The Company, for example, is exposed to this risk when cash flows from assets and the policy obligations they support are mismatched, which could result in maturing asset cash flows being reinvested at unfavourable interest rates relative to the related liability obligation or the need to sell assets to meet policy payment obligations. To control this risk, the Company has set a matching policy for each portfolio of assets and associated liabilities in order to keep disinvestment and reinvestment losses within acceptable limits. The primary approach for managing interest rate risk for interest sensitive business lines (primarily individual and group annuities) is management of the "duration gap" of assets and liabilities. Duration gap analysis measures the sensitivity of assets, liabilities and off-balance sheet instruments to changes in interest rates. Specifically, the Company employs a "key rate duration" technique which examines the duration gap of assets and liabilities at discrete intervals on the yield curve. These gaps are managed within specified tolerance limits, including through the use of derivative instruments. Market risk is the risk that the value of an investment will decrease as a result of adverse changes in market prices caused by factors specific to the individual investment or its issuer, or factors affecting all securities traded in the market. Market risk is most prevalent for the Company's investment in stocks. Investments in stocks and, to a lesser extent, real estate, entails greater volatility in returns over time than other investments. Because of this volatility, the Company's exposure to these investments is contained through established limits relative to the amount of supporting liabilities and surplus. Stock and real estate holdings are also diversified by industry type and by corporate group. In addition, the effect of potential adverse market movements is regularly monitored through Dynamic Capital Adequacy Testing and other portfolio stress testing techniques.

The mix of invested assets supporting actuarial liabilities, surplus and other at June 30, 1999 and at December 31, 1998 is shown in the following tables:

| At June 30, 1999 | Bonds % | Mortgages % | Stocks % | Real Estate % | Other % |
|---|---|---|---|---|---|
| Individual Par Life | 37 | 14 | 24 | 12 | 13 |
| Individual Non-par Life | 53 | 22 | 2 | 1 | 22 |
| Group Life | 68 | 22 | 1 | 3 | 6 |
| Individual Annuities | 59 | 27 | – | 1 | 13 |
| Group Annuities | 75 | 22 | – | 3 | – |
| Health | 68 | 25 | 1 | – | 6 |
| Surplus and Other | 32 | 40 | 8 | 4 | 16 |
| Total | 51 | 24 | 9 | 5 | 11 |

| At December 31, 1998 | Bonds % | Mortgages % | Stocks % | Real Estate % | Other % |
|---|---|---|---|---|---|
| Individual Par Life | 38 | 13 | 24 | 13 | 12 |
| Individual Non-par Life | 62 | 24 | 2 | 1 | 11 |
| Group Life | 68 | 24 | – | 3 | 5 |
| Individual Annuities | 62 | 29 | – | 2 | 7 |
| Group Annuities | 73 | 24 | – | 3 | – |
| Health | 72 | 24 | 1 | 1 | 2 |
| Surplus and Other | 38 | 34 | 8 | 1 | 19 |
| Total | 52 | 24 | 9 | 5 | 10 |

Among the different lines of the Company's businesses, annuities are the most sensitive to changes in interest rates. At December 31, 1998, the annuity business represented 46% of the Company's total actuarial liabilities. The sensitivity of the Company's annuity business to interest rate changes was such that, at December 31, 1998, an immediate 1% increase in interest rates across the entire yield curve would have resulted in a $20 million increase in actuarial liabilities and a corresponding decrease in net income. An immediate 1% decrease in interest rates at December 31, 1998 would have resulted in an estimated $7 million increase in net income.

### *Claims Risk Management*

Claims risk is the risk that the Company will incur higher than anticipated mortality and morbidity claim losses on any one policy or group of policies. The Company manages this risk through establishing underwriting policies to determine the insurability of applicants and managing its exposure to large claims. The Company follows detailed, uniform underwriting practices and procedures designed to properly assess and qualify risks before issuing coverage to qualified applicants. For example, a prospective life insurance policyholder must submit to a variety of underwriting tests, that, depending upon the amount of the policy, may include medical examinations, electrocardiograms, blood tests, urine tests, saliva tests, treadmill tests, chest X-rays and inspection reports if the policy amount exceeds prescribed limits. Underwriting requirement limits are regularly scrutinized against industry standards to stay abreast of industry trends. At the present time, comprehensive blood and saliva test screening is generally performed on individual life insurance business written with a face amount equal to or greater than $50,000. In certain circumstances, relating particularly to corporate owned life insurance, tailored underwriting arrangements may be made.

The Company evaluates each policy application from every distributor separately. The Company is not obligated to accept any policy or group of policies from any distributor. Every policy is underwritten on its own merits, and no individual policy (other than those issued under special arrangements described above) is issued without having been examined and underwritten individually.

The process for underwriting reinsurance risks includes the review of the financial position and the product pricing, underwriting and claims administration practices of the ceding company.

Group insurance underwriting differs from individual policy underwriting in the sense that groups are underwritten prior to the issue of the policy and again at each annual renewal. The Company's group insurance underwriting methods include risk selection, plan design and rating techniques.

Risk selection includes such considerations as financial stability, job-related hazards, the percentage of employee participation in the plan and varying degrees of individual underwriting. For large groups of participants, individual underwriting is generally used only where the amounts of insurance on particular individuals are very large in relation to amounts on other group members. For very small groups, each individual is underwritten using techniques similar to those used for underwriting individual policies.



SL-0464

Plans are designed to accommodate the needs of most employers and employees without incurring excessive loss ratios or administrative expenses.

Ratings techniques vary according to the size of the group. For the largest groups, the primary consideration is the historical claims experience of the group. For the smallest groups, the industry classification is the primary consideration. Intermediate size groups are rated using a blend of the historical experience and the industry classification.

### *Pricing Risk*

The process of pricing products requires estimates of many factors, including future investment yields, mortality and morbidity experience, expenses, rates of policy termination and taxes. Pricing risk is the risk that the actual experience with a product will not develop as estimated in pricing that product. While many products are designed to allow adjustments to premiums or benefits for experience variations, other products do not allow such adjustments.

The Company manages pricing risk by setting standards and guidelines for pricing that address pricing methods and assumptions, setting profit margin objectives, required scenario analysis, documentation and pricing approval processes. These standards and guidelines are intended to ensure that the level of risk borne by the Company is within acceptable limits. The pricing risk management process includes completion of an annual compliance self-assessment by all business units and the internal audit of business unit pricing on a rotating basis.

### *Credit Risk Management*

Credit risk is the risk of economic loss resulting from the failure of an obligor of the Company to make any payment of principal or interest when due, in the case of fixed income investments or, in the case of an equity investment, the loss in value of an equity investment resulting from a corporate failure. The Company mitigates credit risk by utilizing detailed credit and underwriting policies, by undertaking comprehensive due diligence on potential investments, and by imposing aggregate counterparty exposure limits within fixed income and equity portfolios. The Company's investment guidelines also require that the risk levels of the various investment sectors be continuously monitored with allocations adjusted accordingly. Provisions for losses on assets that are currently impaired are made through a reduction in the carrying value of the asset. Adjustments in the actuarial liabilities provide allowances for possible future asset defaults on assets currently owned.

### *Liquidity Risk Management*

Liquidity risk refers to the ability of the Company to meet its obligations to policyholders or other creditors as they arise. Liquidity management is an important aspect of the Company's operations and recognizes consumers' need for confidence in the ability of financial services providers to meet payment obligations on a timely basis.

The Company maintains, on a consolidated basis and as a matter of policy, liquifiable assets equal to at least 100% of all liabilities payable on demand. In addition, minimum levels of cash and money market investments as a percentage of total investment assets are maintained both on a consolidated level and within each national operation. Standby credit facilities are also maintained with a variety of banks throughout the world.

Within each product line separate investment guidelines are maintained, with liquidity management taking into account the particular liquidity needs of each product line.

### *Concentration Risk Management*

Concentration risk is the risk of major losses resulting from an overexposure of investments to a single entity, group of related entities or industry segment. The Company's investment guidelines establish limits on the level of investment which can be made in any single entity or group of related entities and these limits are reviewed and amended, as necessary, at least annually. These limits are consolidated across all investment types to capture total exposure to any single borrower or investment. On a broader industry segment approach, the Company's guidelines establish limits on concentrations in types of investments, such as common shares and real estate.

### *Foreign Currency Risk Management*

Foreign currency risk is the risk of loss resulting from changes in currency exchange rates. Fluctuations in exchange rates between the Canadian dollar and other currencies in which the Company does business may affect the Company's results of operations.

Virtually all of the assets and liabilities held in each of the jurisdictions in which the Company does business are denominated in local currencies, providing an effective operational hedge against adverse currency fluctuations. The

Company's non-Canadian operations are accounted for on a self-sustaining basis. This method requires all assets and liabilities to be translated into Canadian dollars at period end rates of exchange. Revenue and expenditure items are translated at average rates of exchange during the period.

The effects of fluctuations in exchange rates between the Canadian dollar and other currencies on the Company's results of operations and surplus cannot be predicted. See "Risk Factors". For example, changes in the market rates of exchange during 1998 caused an increase in net income of $16 million, an increase in total assets of $5.4 billion, and an increase in surplus, through the CTA, of $312 million, compared to an increase in net income of $2 million, an increase in assets of $1.6 billion and in surplus of $52 million in 1997. Foreign exchange controls imposed by jurisdictions in which the Company carries on business do not have a material impact on the Company's business or operations.

### *Derivative Risk Management*

As part of its asset and liability management program, the Company uses derivative instruments, including interest rate swaps, currency swaps, financial futures, options and forward contracts to manage risks associated with currency and interest rate fluctuations, duration mismatch and stock market fluctuations. Guidelines for the use of derivatives specifically prohibit the use of derivative strategies which increase risks beyond the limits established for direct investments.

All hedging instruments put in place by the Company are marked to market on a daily basis with all derivative positions reported monthly to the board of directors of Sun Life Assurance and, following demutualization, to be reported to the Financial Services Board. Each report includes an explanation of the original purpose for entering into the derivative contract and a determination as to whether the position taken is still required for hedging purposes.

The Company generally enters into derivative contracts only with counterparties rated AA or better. In limited circumstances, the Company will enter into transactions with lower rated counterparties if the counterparty obligation can be fully collateralized or if other credit enhancement features are included.

At June 30, 1999, the Company had $6.9 billion notional amount of derivatives outstanding constituting a credit equivalent amount of $269 million. At December 31, 1998, these amounts were $6.3 billion and $211 million, respectively, and at December 31, 1997 these amounts were $3.1 billion and $142 million, respectively. See Note 29 to the Consolidated Financial Statements.

### *Operational Risk Management*

Operational risk is the risk of loss resulting from errors, inefficiencies, or a lack of effectiveness of people, processes or systems. The management of these risks is critical to the success of an organization such as the Company, which is engaged in a number of different business environments.

The Company maintains a human resources department to ensure that effective people are continually placed in key positions. Ongoing training through internal and external programs is designed to prepare staff at all levels for the demands of their positions. Operating and reporting processes are reviewed and updated regularly, with monitoring completed on a yearly basis by the internal audit group. Information systems and technology are reviewed regularly and upgraded where necessary.

The Company maintains a comprehensive insurance program which reviews and provides protection against potential losses. This program may include moderate levels of self-insurance. The Company maintains appropriate insurance on both properties that it owns and those securing its mortgage investments.

The Company's environmental risk management program is designed to ensure compliance with applicable laws and to protect investment assets from losses due to environmental problems. The senior investment officer in each national office is responsible for developing the local environmental policy under the auspices of the corporate office.

### *Insurance and Annuity Actuarial Liabilities*

Most life insurance and annuity policies are for terms of more than one year and extend a company's obligations into the future. Accordingly, the accounting and actuarial principles followed by the life insurance industry are based on this long-term view. The Company's actuarial liabilities are calculated using the policy premium method and accepted actuarial practice, and represent the net present value of estimated future policyholder benefits, dividends and policy maintenance expenses, less future premiums, on insurance and annuity contracts currently in force. The Company's Appointed Actuary is responsible for determining the amount of these liabilities. Reinsurance ceded and reinsurance risk are a small component of the actuarial liabilities of the Company, representing approximately 0.8% of the actuarial liabilities of the Company at December 31, 1998 (1.0% at June 30, 1999).

Due to the long-term nature of life insurance and annuity policies, the Appointed Actuary must make many assumptions with respect to future events and economic conditions. These assumptions include expected future mortality trends, investment yields, asset loss levels, policy lapse and surrender expectations, policy maintenance expenses and renewal premium payments. Because actual experience will not be exactly as expected, a provision, commonly referred to as the "provision for adverse deviations", is included in the calculation of actuarial liabilities. These provisions are based on professional actuarial standards. The assumptions are tested extensively each year to ensure that they are appropriate for expected future conditions.

The valuation methods employed by the Company's Appointed Actuary in the determination of actuarial liabilities are based on standards established by the Canadian Institute of Actuaries. The Appointed Actuary must follow these professional standards and apply knowledge of the Company's assets, future obligations and operations in the determination of these liabilities.

The Company has a policy of minimizing mortality risks above predetermined limits on any one life or pair of lives when a policy is issued. These limits vary by geographic region. The maximum amount of risk retained by the Company on any one life, at policy issuance, is U.S.$7 million and U.S.$10 million for any pair of lives insured under a joint life and last-to-die policy, although policies of up to U.S.$15 million may be issued if the amounts exceeding these limits are reinsured with other participating insurers. Any policies which exceed U.S.$15 million require approval of the Company's President and are reported to the board of directors annually.

## RATINGS

The ratings provided for Sun Life of Canada by four major independent rating agencies as at September 28, 1999, are set forth below:

| Rating Agency | Measurement | Rating |
|---|---|---|
| Duff & Phelps | Claims Paying Ability | AAA |
| A.M. Best Company | Financial Strength | A++ |
| Standard & Poor's | Financial Strength | AA+ |
| Moody's Investors Services | Financial Strength | Aa2 |

Financial strength and claims paying ability ratings reflect a rating agency's opinion of the Company's financial strength, claims paying ability, operating performance and ability to meet its obligations to policyholders and are not directed toward the protection of investors in Financial Services Shares. Such factors are of concern to policyholders, agents and intermediaries. Such ratings are not ratings of securities and should not be relied upon when making a decision to buy, hold or sell Financial Services Shares or any other security.

In addition, the subordinated debt and Cumulative Capital Securities issued by Sun Life of Canada have been rated by the major rating agencies, as at September 28, 1999, as follows:

| Rating Agency | Measurement | Rating |
|---|---|---|
| Duff & Phelps | Subordinated Notes and Cumulative Capital Securities | AA |
| Standard & Poor's | Capital Debentures and Subordinated Notes | AA- |
| | Cumulative Capital Securities | A+ |
| Moody's Investor Services | Subordinated Notes and Cumulative Capital Securities | A1 |

## LEGAL MATTERS

### Proceedings Relating to Unicover

*Overview*

In January 1999, Sun Life Assurance advised Unicover that it had terminated an arrangement to participate in the reinsurance of a reinsurance pool and facilities created and managed by Unicover (the "Unicover Treaties"). The members of that pool and those facilities (the "Unicover Reinsurers") provided reinsurance for the health insurance components of workers' compensation insurance policies written by U.S. insurers. In July 1999, Sun Life Assurance commenced an arbitration against Unicover and the Unicover Reinsurers. In the arbitration, Sun Life Assurance is seeking rescission of the Unicover Treaties and damages on the basis that Unicover made material misrepresentations and non-disclosures prior to, during and after the underwriting of those treaties, and on the basis of breaches of contract and bad faith conduct by Unicover in the performance of the treaties. In September 1999, Phoenix Home Life Mutual Insurance Company ("Phoenix Home"), which had participated with Sun Life Assurance in providing the reinsurance under the Unicover Treaties, joined in the arbitration with Sun Life Assurance against Unicover and the

Unicover Reinsurers. If the remedy of rescission were to be granted, it would have the effect of annulling or voiding the Unicover Treaties.

On the basis of its investigation of the facts currently available, and on the advice of counsel, Sun Life Assurance believes that it has strong grounds on which to rescind the Unicover Treaties.

### *Reinsurance of Unicover Reinsurers*

The Unicover Treaties commenced on December 1, 1997 for a term of three years. The Company understands that, at various times, the Unicover Reinsurers included Phoenix Home, Life Reassurance Corporation of America, Lincoln National Life Insurance Company, Connecticut General Life Insurance Company, Cologne Life Reinsurance Company ("Cologne"), ReliaStar Life Insurance Company and Reliance Insurance Company.

Under the Unicover Treaties, Sun Life Assurance, Phoenix Home and Cologne were to provide whole account excess-of-loss reinsurance to the Unicover Reinsurers. Pursuant to the Unicover Treaties and certain related arrangements, the Unicover Reinsurers acquired, for what was, in effect, a fixed premium, protection against all losses above U.S. $10,000 and up to U.S. $500,000 per claim. The contracts under the Unicover Treaties contained estimates that the Unicover program would involve premium volume on the underlying workers' compensation policies (known as "subject premium") over the period from December 1, 1997 to November 30, 2000 of U.S. $150 million in the first twelve month period, U.S. $200 million in the second twelve month period and U.S. $250 million in the remaining period.

During 1998, the Company became increasingly concerned that Unicover may have been exceeding its subject premium estimate. On January 25, 1999, Sun Life Assurance advised Unicover that, effective on that date, it regarded the Unicover Treaties as terminated. Sun Life also advised Unicover that it would not accept any further premium in respect of those contracts, and that it reserved all its rights, including, without limitation, to void the contracts entirely and return any associated premium or to claim damages for breaches of contractual or other legal duties owed to Sun Life Assurance by Unicover or its brokers or the Unicover Reinsurers. Unicover has advised the Company that it disputes the right of Sun Life Assurance to terminate the Unicover Treaties.

The Company learned in April 1999 from Unicover documentation that the estimated subject premium under the insurance policies expected to be written over the period from December 1, 1997 to November 30, 2000 by direct insurers which had reinsurance contracts with the Unicover Reinsurers would be approximately U.S. $7.8 billion. The Company understands that this estimate was based in part on information provided by insurance brokers and direct insurers. This amount, however, is an estimate only, and the actual amount of subject premium will depend on the amount of insurance written by the underlying insurers which is covered by reinsurance with the Unicover Reinsurers. The impact on the amount of these policies, if any, of the actions taken by Sun Life Assurance and others in connection with the Unicover Treaties and the Unicover Reinsurers cannot be predicted with certainty. The Company also has learned that the reinsurance policies written by the Unicover Reinsurers were written for terms of up to twenty-seven months, and that some have a "run-off" option, which, if exercised by the underlying insurer, has the effect of extending the reinsurance coverage for up to eighteen months. The Company believes that the latest maturity date of any underlying reinsurance policy, together with its associated "run-off" period, is July 1, 2002.

If the subject premium ultimately amounts to approximately U.S. $7.8 billion and the Unicover Treaties are not rescinded and no other remedy is granted, Sun Life Assurance estimates that the claims to Sun Life Assurance, Phoenix Home and Cologne under the Unicover Treaties, net of reinsurance premiums paid to them, would be approximately U.S. $1.6 billion, before taking into account the exercise of "run-off" options. This estimate is based upon, among other things, the Company's current understanding of the contracts between the direct insurers and the Unicover Reinsurers and the historical underwriting loss ratios for those direct insurers. On this basis, Sun Life Assurance believes that the amount of claims made to it, net of reinsurance premiums paid to it, under the Unicover Treaties could be approximately U.S. $700 million before the exercise of "run-off" options, and that, if these options were to be exercised, that amount could increase by up to approximately 30%.

### *Retrocession Arrangements*

Sun Life Assurance has retrocession coverage for the reinsurance provided to the Unicover Reinsurers under retrocession treaties with U.S. and international insurers. These retrocession treaties cover claims to Sun Life Assurance made by the Unicover Reinsurers in all amounts in excess of U.S. $5,000 per claim. Sun Life Assurance believes that application of this coverage would eliminate substantially all of its exposure to loss under the Unicover Treaties. In the event that Sun Life Assurance is not substantially successful in the arbitration against Unicover and the Unicover Reinsurers, the extent to which the Company will be subject to losses will depend upon its ability to enforce this coverage under its retrocession treaties. There is also a risk that Sun Life Assurance may be exposed to additional potential liability in respect of Unicover as a result of the Company's possible direct or indirect participation in arrangements which provide retrocession coverage to the Company's retrocessionaires.

Sun Life Assurance is a defendant in a complaint filed by one of the Company's retrocessionaires, Allianz Life Insurance Company of North America ("Allianz") in the United States District Court, Minnesota in April 1999. The complaint, which also named Phoenix Home and Aon Re, Inc. as defendants, seeks rescission of, or damages with respect to, certain retrocession treaties between Sun Life Assurance and Allianz, including a treaty which would provide Sun Life Assurance with some reinsurance in connection with Unicover-related claims. In the complaint, Allianz alleges, among other things, that, at the time of entering into the treaties, and in the course of ceding Unicover risks to them, misrepresentations were made to Allianz, including in respect of the amount and quality of the reinsurance to be written or written and the ceding of claims related to workers' compensation policies. Allianz also alleges that retrocession treaties were written with it, and the Unicover Treaties agreed to, with the objective of passing on underwriting losses. Allianz, Sun Life Assurance and Phoenix Home have agreed not to proceed further in the legal action until November 1, 1999.

## Matters Relating to Premium Offset

Legal actions, including class action lawsuits, have been filed against a number of insurance companies related to the sale of whole life insurance policies on a "premium offset" basis. Sun Life of Canada was named as a defendant in lawsuits filed in courts in the United States alleging mis-selling issues, and certification as a class action was requested in certain of these cases. In 1996, the class action lawsuits brought against Sun Life of Canada were consolidated into a single amended complaint filed in New Jersey Federal Court. On August 7, 1998, Sun Life of Canada and the plaintiffs filed an agreement to resolve the consolidated lawsuits, and the Court approved the settlement agreement (the "U.S. Settlement Agreement") on December 3, 1998. Prior to the Court's approval of the settlement, the owners of 255 policies opted out of the settlement entirely, thereby preserving their right to pursue independent remedies. Of this group, 15 individual suits have been filed. Under the U.S. Settlement Agreement, policyholders of the approximately 335,000 policies affected may either elect "general policy relief" or pursue an alternative claims process. A policyholder who elects to receive general policy relief may receive a range of benefits, including the right to purchase a new universal life policy or annuity at a discounted premium rate or price or receive enhanced dividends for a period of time on the outstanding policy depending on the nature and status of his or her policy. Alternatively, policyholders may elect to proceed under an alternative claims process pursuant to which their claims will be reviewed by the Company and class counsel and a determination made of the amount to be paid to resolve such claims.

In Canada, a lawsuit proposing a class action based on "premium offset" issues was brought against the Company in the courts of each of British Columbia, Ontario and Quebec. On July 3, 1997, the Company announced that it had reached an agreement to resolve these lawsuits. Following lengthy proceedings (including dismissal by the Supreme Court of Canada on October 22, 1998 of an application by a single objector in the Ontario action for leave to appeal), the necessary court orders were obtained certifying the actions as class proceedings and approving of the settlement agreement (the "Canadian Settlement Agreement") in each of these three provinces. The Canadian Settlement Agreement also permits policyholders in provinces other than British Columbia, Ontario and Quebec to elect to opt in to receive benefits under the Agreement.

The Company is proceeding with implementation of the Canadian Settlement Agreement which affects more than 300,000 Sun Life of Canada policies across Canada. Under its terms, policyholders may elect to receive fixed increases to the dividend rate on their policies for a set period of time and/or to the maturity of the policy. Alternatively, policyholders may elect to proceed under an alternative claims process pursuant to which their claims will be reviewed by the Company and, in some cases, by class counsel and by an independent designate. Approximately 900 policyholders have elected to opt out of the Canadian Settlement Agreement which preserves their right to pursue independent remedies. In addition, approximately 39,328 in-force policyholders and 36,362 owners of lapsed policies resident in other provinces did not opt in to the settlement agreement and therefore retain their right to pursue independent remedies.

Based on the information presently known to it, management believes that adequate financial provisions have been made for all of these matters, and that any outcome of the class action litigation in Canada or the United States (including the commitments made in the settlement agreements in Canada and the United States) will not have a material adverse effect on the consolidated financial position of the Company. See "Risk Factors — Class Action Litigation Against the Company".

## Other Matters

In addition, the Company and its subsidiaries are engaged in litigation arising in the ordinary course of business. None of this litigation, however, is expected to have a material adverse effect on the consolidated financial position of the Company.

## RISK FACTORS

In addition to the other information contained in this Policyholder Information Circular, eligible policyholders should consider carefully the following important factors relating to owning Financial Services Shares.

### *United Kingdom Operations*

In recent years, the Company's United Kingdom Wealth Management Business has experienced significant losses arising out of certain pension sales practices and guaranteed annuity products which are described in more detail below. During 1996, 1997 and 1998, the potential liabilities arising from these practices and products required the Company to make total pre-tax provisions of $946 million and to write off $260 million in goodwill remaining from the acquisition of Confederation Life's U.K. operations. In the six-month period ended June 30, 1999, the Company made additional provisions of $354 million with respect to potential liabilities relating to pension sales practices.

These losses and the United Kingdom regulatory requirements related to these losses have necessitated significant infusions of capital into the Company's U.K. operations. In 1998, Sun Life Assurance invested approximately $1.3 billion in its U.K. operations. At December 31, 1998 and June 30, 1999, 33% and 28%, respectively, of the Company's consolidated surplus was invested in the United Kingdom operations.

In addition to the liabilities arising from pension sales practices and guaranteed annuity products, the Company faces significant ongoing operating issues in the United Kingdom. As a consequence of increasing competition in the United Kingdom, decreased market share and high expense levels in certain product lines, the introduction of stakeholder pensions and increasing regulation of product pricing, design and sales practices, certain products being sold by the Company's U.K. operations are generating losses and the long-term profitability of these products is uncertain.

The Company has taken steps to address the problems in the United Kingdom, including by the introduction of a new senior management team, a major review of its U.K. operations and the development of a new strategic plan for the United Kingdom. See "Management's Discussion and Analysis of Financial Condition and Results of Operations – Challenges in United Kingdom Operations." No assurances can be given that prior or current financial or operational issues or difficulties will not give rise to further material liabilities.

### *United Kingdom Pension Sales Practices Liabilities*

In recent years, the Company has been required to record substantial Pension Sales Provisions in the United Kingdom as a result of liabilities to customers arising out of sales of individual pension plans from 1988 to 1994. The Company made Pension Sales Provisions of $196 million and $347 million in 1997 and 1998, respectively. The Company increased its Pension Sales Provisions in the first two quarters of 1999, resulting in an aggregate increase to these provisions of $354 million in the six-month period ended June 30, 1999. This increase in Pension Sales Provisions was based on revised regulatory guidance and the Company's experience to date. As at June 30, 1999, total Pension Sales Provisions were $755 million. In October 1998, the FSA also announced a review of sales practices in connection with FSAVC and similar products. As at December 31, 1998, the Company had established aggregate provisions of $45 million for these and similar products. Proposals for conducting the review are yet to be finalized and at present the Company is unable to quantify the cost of any review and any compensation payable by it as a result. See "Management's Discussion and Analysis of Financial Condition and Results of Operations – Certain Items Affecting Net Income – United Kingdom Adjustments – Provisions for Prior U.K. Pension Sales".

There can be no assurance that the Company's existing Pension Sales Provisions will ultimately prove sufficient to cover all liabilities to its personal pension customers in the United Kingdom. A number of different factors could cause the Company's liabilities to these customers to increase materially, including: (i) an expansion by the FSA and PIA of the class of customers entitled to compensation, (ii) an unfavourable change in the required method of determining compensation, (iii) the Company's estimates may turn out to be incorrect, including with respect to the number of customers ultimately requesting compensation and the average amount of compensation due to each customer and (iv) adverse changes in interest rate levels and the performance of equity markets. Accordingly, there can be no assurance that the Company will not experience further material losses in its U.K. Wealth Management Business in connection with personal pension selling practices compensation.

### *Guaranteed Annuity Option Liabilities*

The Company has established significant Annuity Rate Provisions against future losses in its U.K. Wealth Management Business in connection with certain guaranteed annuities issued prior to 1994 by Confederation Life (U.K.). The cumulative amount of such Annuity Rate Provisions was $502 million at December 31, 1998. See "Management's Discussion and Analysis of Financial Condition and Results of Operations – Certain Items Affecting Net Income – United Kingdom Adjustments – Provisions for Annuity Rate Guarantees in the U.K.".

The Company has instituted a hedging program with the objective of limiting losses that would otherwise arise upon further declines in interest rates in the United Kingdom. This program provides a substantial, although not complete, hedge against declines in interest rates which, however, becomes less effective as rates decline further. There can be no assurance that material additional reserves will not be required in the future as a result of a number of different factors, including: (i) more conservative reserving requirements arising from changes in regulations, (ii) significant interest rate reductions or shifts in the yield curve, against which the Company's current hedges would have reduced effectiveness, (iii) increases in the pool of pension assets entitled to the guaranteed annuity option and (iv) further unanticipated adverse changes in mortality experience.

*Other Sales Practice Issues in the United Kingdom*

The Company offers a variety of endowment products in the United Kingdom. Endowment policies are generally sold to provide customers with a method of repaying mortgage debt after the term of a mortgage. The sale of endowment policies by life insurance companies has recently attracted criticism from the press and politicians in the United Kingdom.

The FSA has announced that it is monitoring the situation and in August 1999 issued a press release noting that, with the sharp decline in inflation in recent years, the expected future returns on insurance companies' endowment funds may decline. The Association of British Insurers has announced plans to require its member companies to make regular premium reviews for their mortgage endowment products. There can be no guarantee that the FSA will not in future require providers of endowment products to bear some or all of the additional costs required to ensure that such policies meet their targets.

***Reinsurance Liabilities Related to Unicover***

In July 1999 Sun Life Assurance commenced an arbitration against Unicover and the Unicover Reinsurers seeking rescission of the Unicover Treaties. See "Legal Matters – Proceedings Related to Unicover". The Unicover Treaties commenced December 1, 1997 and Sun Life Assurance advised Unicover that it was terminating its participation in them in January 1999. Under the Unicover Treaties, Sun Life Assurance, Phoenix Home and Cologne provided whole account excess-of-loss reinsurance to the Unicover Reinsurers for losses under health reinsurance contracts written by the Unicover Reinsurers. In September 1999, Phoenix Home joined with Sun Life Assurance in the arbitration against Unicover and the Unicover Reinsurers.

While Sun Life Assurance believes that it has strong grounds on which to rescind the Unicover Treaties, the outcome of the arbitration is uncertain. The arbitration is at an early stage, it will likely involve an extensive discovery process through which the Company should gain access to additional information and the timing of the resolution of the arbitration is uncertain. Accordingly, there is a risk that the arbitration will not result in any material reduction in the potential liability of the Company to the Unicover Reinsurers.

In the event that Sun Life Assurance is not substantially successful in the arbitration against Unicover and the Unicover Reinsurers, the extent to which the Company will be subject to losses will depend upon its ability to enforce its coverage under its retrocession treaties. Given the unanticipated magnitude of the subject premium relating to Unicover, the Company's retrocessionaires may seek to avoid payment of amounts under these retrocession treaties. One of the Company's retrocessionaires, Allianz, has commenced litigation against Sun Life Assurance seeking rescission of certain retrocession treaties with Sun Life Assurance, including a retrocession treaty which would cover some of the Unicover-related claims. Retrocessionaires other than Allianz may seek to assert similar or other defences to the enforcement of their retrocession treaties. This may result in additional litigation or arbitration involving Sun Life Assurance, the outcome of which is uncertain. Accordingly, there is a risk that the retrocession treaties will not be enforced so as to cover any material liability of the Company to the Unicover Reinsurers.

If the subject premium under the Unicover Treaties ultimately amounts to U.S. $7.8 billion, and if the Unicover Treaties are not rescinded, no other remedy is granted and Sun Life Assurance cannot enforce its retrocession treaties, Sun Life Assurance believes that the amount of its liability under claims made to it, net of reinsurance premiums paid to it, under the Unicover Treaties could be approximately U.S. $700 million, before the exercise of "run-off" options in the underlying contracts. If all such "run-off" options are exercised, Sun Life Assurance believes that amount could increase to as much as approximately U.S. $910 million.

There is a risk that Sun Life Assurance may be exposed to additional potential liability in respect of Unicover as a result of the Company's possible direct or indirect participation in arrangements which provide retrocession coverage to the Company's retrocessionaires. It is also possible that Sun Life Assurance may become involved in additional litigation relating to Unicover, and such litigation may be protracted and costly.

Accordingly, there can be no assurance that the Company will not incur material losses in connection with the Unicover Treaties.

***Holding Company Structure and Restrictions on Dividends***

As a holding company, Financial Services' ability to pay operating expenses and dividends depends primarily on the receipt of sufficient funds from its principal operating subsidiaries. The inability of the operating subsidiaries to pay dividends to Financial Services in an amount sufficient to pay operating expenses and dividends and meet other obligations would have a material adverse effect on Financial Services.

The payment of dividends by the operating subsidiaries is subject to restrictions set forth in the insurance, securities and corporate laws and regulations of the various jurisdictions in which those subsidiaries are domiciled. In particular, the insurance subsidiaries and branches of the Company are required to maintain solvency and capital standards in the jurisdictions in which they operate. These standards effectively restrict the amount of dividends, distributions or other payments that may be made by such subsidiaries and branches to Financial Services or other subsidiaries. See "Regulatory Matters". As discussed above under "– United Kingdom Operations", over one-third of the Company's surplus was invested in the Company's United Kingdom operations at June 30, 1999. This capital cannot be made available to Financial Services in the form of dividends, or otherwise, until the contingent liabilities and regulatory provisions that the capital supports are reduced. The laws of certain other jurisdictions where the Company's subsidiaries are domiciled may also limit the payment of dividends to a parent company such as Financial Services. As a result of such regulatory requirements, certain assets of Financial Services' subsidiaries and branches may not be available to Financial Services. Payment of dividends by foreign subsidiaries of Financial Services may also be subject to withholding tax or other similar charges.

***Obligations to Participating Policyholders***

Following demutualization, the Company's principal subsidiary, Sun Life Assurance, may be required, in certain circumstances, to transfer money from its shareholders' account to cover certain shortfalls experienced by the sub-accounts for SLC Pre-Demutualization Participating Policies and SLC Post-Demutualization Participating Policies. In particular, if, at any time, the liabilities in any sub-account for SLC Pre-Demutualization Participating Policies are, in the opinion of the Appointed Actuary, greater than the assets in that sub-account, the Company will be required to transfer sufficient assets from the shareholders' account into that sub-account to prevent it from falling into a deficit. The Company's insurance subsidiaries may also be required from time to time to transfer assets from their respective shareholders' accounts in order to protect policyholders' interests. See "Restructuring of Participating and Other Accounts on Demutualization".

***Certain Restrictions on Take-overs and Other Transactions***

Following demutualization, Sun Life Assurance's participating policyholders will have the right to vote as a separate class on certain significant corporate transactions, and as a result, may have an effective veto right on transactions which Financial Services, as the sole shareholder of Sun Life Assurance, may otherwise approve. See "Corporate Governance of Sun Life Assurance".

The Canadian Insurance Act and the regulations thereunder contain restrictions on the purchase or other acquisition, issue, transfer and voting of the shares of a demutualized insurance company or, when a holding company structure is used, of the holding company. Pursuant to these restrictions as currently enacted, no person is permitted to acquire any shares of Financial Services if the acquisition would cause the person to have a "significant interest" in any class of shares of Financial Services. In addition, Financial Services is not permitted to record any transfer or issue of its shares if the transfer or issue would cause the person to have a significant interest in Financial Services. No such person who has a significant interest in Financial Services may exercise any voting rights attached to the shares held by such person. If a person contravenes any of these restrictions, the Minister of Finance of Canada may, by order, direct such person to dispose of all or any portion of those shares. For these purposes, a person has a significant interest in a class of shares of Financial Services where the aggregate of any shares of that class beneficially owned by that person, any entity controlled by that person and by any person acting jointly or in concert with that person exceeds 10% of all the outstanding shares of that class of shares. The Canadian government has issued a policy paper proposing to modify the restrictions to increase the 10% limit to 20% for each class of voting shares and 30% for each class of non-voting shares, subject to a fit and proper test. The Canadian government has also announced that, during a two-year transitional period after demutualization, mergers with or an acquisition of another demutualized insurance company would not be permitted. See "Regulatory Matters – Canada – Canadian Government's Proposed Reforms to the Financial Services Sector" and "Constraints on Ownership of Holding Shares".

In addition, the insurance laws and regulations of the states in which the Company's U.S. insurance subsidiaries are domiciled may delay or impede a business combination involving the Company that the stockholders might consider in their best interests. Such insurance laws and regulations require the approval of the insurance commissioner of the states in which the Company's U.S. insurance subsidiaries are domiciled for any transaction which would result in a person acquiring control of such subsidiaries. For these purposes, control is generally presumed to exist where any person directly or indirectly owns, controls, holds the power to vote, or holds proxies representing 10% or more of the

outstanding voting stock of Financial Services. As a result, such laws and regulations could require approval by the relevant insurance commissioners for a business combination in which a person acquired 10% or more of the outstanding common shares of Financial Services.

## *Certain Factors Affecting the Wealth Management Industry*

### *Effect of Changes in Market Conditions on Fee Income*

The Company derives a substantial portion of its net income from fees generated by the Wealth Management Business, including, in particular, MFS. The Company intends to continue expanding its Wealth Management Business in the future. The fees earned from the Wealth Management Business are generally assessed as a percentage of assets under management and therefore vary directly with the value of such assets. Accordingly, fluctuations in the market value of such assets may result in fluctuations in the Company's Wealth Management revenue. Thus, a general rise in interest rates could reduce the value of securities held in mutual funds offered by the Company or the Company's variable annuity products, with a corresponding reduction in fee income from these products. Similarly, a general drop in share prices could reduce the value of shares held in equity mutual funds offered by the Company or the equity portfolios of the Company's variable annuity products, with a corresponding reduction in fee income from these products.

The level of assets under management in the Wealth Management Business and amount of fee income derived from those assets are also affected by other factors. The investment management business is highly competitive, with the amount of assets under management dependent in large part on types and performance of products, fees charged and the strength of distribution channels. A decline in market values of investments or an increase in asset withdrawals (which could occur as a result of volatile markets, changes in public perceptions about certain investment classes, poor investment performance, changes in the regulation of certain products, a weakening of distribution channels or other factors) could materially adversely affect the Company's level of fee income.

Significant growth in the retirement-oriented investment market and uncommonly strong stock and bond market appreciation have been material factors in the growth of the Company's assets under management and its ability to generate sales of its Wealth Management products in recent years. There can be no assurance, however, that these economic and market trends will continue. Adverse economic conditions and other factors, including a protracted or precipitous decline in the stock market and other economic factors, could affect the popularity of the Company's products and services or result in investors withdrawing from the markets or decreasing their rate of investment, any of which could adversely affect the Company's Wealth Management Business. The growth of the Company's Wealth Management Business is dependent to some degree upon the ability of the mutual funds it underwrites and distributes and the variable annuities it offers to attract and retain customer assets, and could be impaired in an adverse economic environment.

### *Impact of Performance of Funds*

Success in the investment management and mutual fund businesses is dependent on the investment performance of the Company's wealth management products. Good performance stimulates sales of these products and, in the case of mutual funds, tends to keep redemptions low. Sales of mutual funds generate higher management fees and distribution revenues (which are based on the amount of the mutual funds assets). Good performance also attracts private institutional accounts to the Company's Wealth Management Business. Conversely, relatively poor performance tends to result in decreased sales, increased redemptions of the mutual funds, and the loss of private institutional accounts, with corresponding decreases in revenues to the Company. Failure of the Company's Wealth Management Business products to perform well could, therefore, have a material adverse effect on the Company.

### *Key Employee Retention*

The future success of the Wealth Management Business depends, in part, on the Company's ability to attract and retain qualified personnel to conduct its fund management and investment advisory business. Failure to do so could have a material adverse impact on the Company's financial condition and results of operations.

### *Interest Rate Risk*

In addition to risks arising from the effects of interest rate changes on fee income described above, movements in interest rates also create several interest risks for the Company's Protection business and the fixed annuity portion of the Wealth Management Business. Many of the Company's annuity products contain express or implied guarantees and, if long-term interest rates fall below these guaranteed rates, the Company may be required to increase reserves against losses, thereby adversely affecting the Company's results of operations. Interest rate changes can also cause compression of the Company's net spread between interest earned on investments and interest credited on insurance policies or fixed annuities, thereby adversely affecting the Company's results of operations. Rapid changes in interest

rates may result in, among other things, increased asset calls, mortgage prepayments or policy withdrawals and reinvestment at significantly lower yields, which could adversely affect earnings. Interest rate changes can also produce an unanticipated increase in transfers to separate account (variable) options or surrenders by holders of the Company's fixed annuity products, which may force the Company to sell investment assets at a loss in order to fund such transfers or surrenders.

Spread Compression

The Company will experience spread compression when it is unable or chooses not to maintain its target margin between investment earnings and its crediting rates. When interest rates rise, the Company may not be able to replace the assets in its investment portfolio with higher yielding assets that will be necessary to fund the higher crediting or policy dividend rates necessary to keep its Protection and fixed annuities products competitive. As a result, the Company may experience either a decrease in sales and an increase in transfers to variable annuity products or withdrawals if its chooses to maintain its spread by not raising its crediting rates, or spread compression if it does increase its crediting rates. Conversely, when interest rates fall, the Company would have to reinvest the cash received from its investments (i.e., interest and payments of principal upon maturity or redemption) in the lower yielding instruments then available. If the Company were unable (e.g., due to guaranteed minimum or fixed crediting rates or limitations on the frequency of crediting rate resets) or chose not to reduce policy dividends or the crediting rates on its fixed annuities or acquire relatively higher risk investments yielding higher rates of return, spread compression would occur.

Increase in Withdrawals

If, as a result of interest rate increases, the Company were unable or chose not to raise its policy dividend rates or crediting rates to keep them competitive, the Company may experience an increase in transfers to variable annuity products or withdrawals. If the Company lacked sufficient liquidity, the Company might have to sell investment securities to fund associated payments. As the value of such securities would likely have decreased in response to the increase in interest rates, the Company could realize a loss on the sales. Although certain of the Company's protection and fixed annuity products contain market value adjustment features which transfer an approximation of such loss to the customer upon a surrender of the policy or annuity in certain circumstances, there can be no assurance that the Company would be fully insulated from realizing any losses on sales of its securities. In addition, regardless of whether the Company realizes an investment loss, the withdrawals would produce a decrease in invested assets, with a resulting adverse effect on future earnings therefrom. Finally, premature withdrawals may also cause the Company to accelerate amortization of deferred policy acquisition costs which would otherwise be amortized over a longer period, thereby adversely affecting the Company's results of operations, although the impact of such acceleration generally would be offset to some extent by surrender charge fees.

The Company attempts to mitigate the negative impact of interest rate changes through asset/liability management, including purchasing non-callable bonds where practical and investing in private placement bonds and mortgage loans which provide prepayment protection. See "Investments of the Company – Investment Policies" and "Risk Management – Liquidity Risk Management". There can be no assurance that management of the Company will be able to manage successfully the negative impact of interest rate changes.

### *Class Action Litigation Against the Company*

In recent years Sun Life Assurance has been a defendant in class action litigation in the United States and Canada concerning "premium offset" whole life insurance policies. The litigation in both countries has been settled, but the total liability in respect of this litigation has not been established and is subject to ongoing claims administration. The cost of settling this litigation following demutualization will not be funded from the Participating Policyholders' Account of Sun Life Assurance. While the Company has made provisions for these settlement costs, no assurances can be given that the Company's actual settlement costs will not materially exceed the provisions established. In addition, policyholders in Canada who were not parties to the Canadian class action litigation may choose to not participate in the settlement of this litigation and could commence litigation against the Company based on the same theories of liability advanced by the class action plaintiffs. See "Legal Matters – Matters Relating to Premium Offset".

### *Potential U.S. Tax Liabilities*

In January 1998, MFS received an examination report from the Internal Revenue Service (the "IRS") proposing adjustments for MFS's 1992 and 1993 tax years. The proposed adjustments relate primarily to the tax accounting treatment of commissions paid by MFS to dealers on behalf of individuals who invest in certain mutual funds distributed by MFS. MFS recorded these commissions as an expense for tax purposes in accordance with the IRS' national office position. The proposed adjustments seek additional federal taxes of U.S. $28 million to U.S. $35 million for 1992 and 1993 combined. Although such amounts are currently provided for in future income taxes, penalties and interest, if



SL-0474

imposed, have not been recognized. MFS has filed a response protesting the proposed adjustments. If such adjustments are sustained, MFS could face similar adjustments for years subsequent to 1993, which have not been provided for. Management estimates that the maximum amount of such adjustments would aggregate U.S. $275 million for the period from January 1992 to December 31, 1998, of which U.S. $213 million has been provided for by MFS in future income taxes.

### *Dependence on Third Party Relationships*

The Company distributes its wealth management and protection products through a variety of distribution channels, including broker-dealers, banks, wholesalers, its own internal sales force and other third party marketing organizations. In connection with the distribution or investment management of these products, certain third party service providers have materially contributed to the growth of the Company. The Company periodically negotiates renewal terms for these relationships and there can be no assurance that such renewal terms will remain acceptable to the Company or such service providers. An interruption in the Company's continuing relationship with certain of these third parties or the impairment of their reputation or creditworthiness could materially and adversely affect the Company's ability to market its products. There can be no assurance that the Company would be able to find alternate sources of distribution in a timely manner.

### *Regulatory and Related Matters*

#### *Wealth Management Industry*

The Wealth Management Business subsidiaries of the Company are subject to extensive regulatory oversight in the jurisdictions in which they do business. Canadian securities legislation imposes restrictions on the types of portfolio investments that may be made by a mutual fund, the type of sales incentives that may be offered to dealers and the forms of advertising that may be used. The Company's Wealth Management Business in the United States is subject to extensive regulation, at the federal and state level, including regulation by the Securities and Exchange Commission.

The ability of the Company's subsidiaries to carry on their respective investment management businesses may also be dependent upon their continued registration under the applicable laws or regulations in the jurisdictions in which they do business.

With respect to those jurisdictions in which the Company carries on its Wealth Management Business, changes in laws or regulations, or in governmental policies, could materially and adversely affect the business and operations of the Company. See also "– United Kingdom Operations – United Kingdom Pension Sales Practice Liabilities".

#### *Insurance Industry*

Highly Regulated Industry

The Company and its insurance subsidiaries are subject to extensive regulatory oversight in the jurisdictions in which they do business. This regulatory oversight is vested in government agencies having broad administrative power with respect to, among other things, capital adequacy and risk-based capital requirements, asset and reserve valuation requirements, permitted investments, policy rates and forms and dividend payments. These regulations are primarily intended to protect policyholders and beneficiaries rather than investors. See "Regulatory Matters". Recently, insurance regulation in Canada, the United States, the United Kingdom and other jurisdictions in which the Company does business has been subject to increased scrutiny by legislative and regulatory bodies. The Company's business could be adversely affected by changes in applicable law or regulation or the interpretation or enforcement thereof.

Increasing Levels of Taxation

The Company's results are further subject to fluctuations as a result of the level of income, premium, capital and other taxes levied by tax authorities in those jurisdictions in which the Company conducts business. From time to time, governments, particularly in Canada, the U.S. and the U.K., have pursued policies aimed at increasing the level of tax revenue derived from the life insurance industry and its policyholders. These measures have tended in Canada towards methods of taxation based on capital employed and in the U.S. towards assessment of tax based on minimum imputed levels of investment income. There can be no assurance that such policies, if pursued further, will not have an adverse effect on the Company and the returns generated from its annuity and life insurance products. In Canada, proposals intended to be effective in January 1999 will extend the capital tax and are expected to result in increased income tax payable by the Company.

Sales Practice Regulation

Insurance regulators in Canada and the United States have given greater emphasis in recent years to the investigation of allegations of improper life insurance pricing and sales practices by life and annuity insurers, including

"churning" and misleading sales presentations by insurance agents. In the United States, state insurance regulatory authorities regularly make inquiries, hold investigations and administer market conduct examinations with respect to insurers' compliance with applicable insurance laws and regulations. There can be no assurance that any non-compliance with such applicable laws and regulations would not have a material adverse effect on the Company. In the United States, the NAIC has adopted a model law and regulation which would standardize the form and content of any illustrations provided to prospective purchasers of individual life insurance products. The model law has been enacted in a number of states, and is currently under consideration in a number of other states. Management expects that similar legislation will eventually be enacted in additional states in which the Company's subsidiaries sell individual life insurance products. There can be no assurance as to whether this reform will adversely affect sales of such products by the industry as a whole or by the Company's U.S. subsidiaries.

Changes in U.K. Regulation

The Company may be adversely affected by changes in U.K. government policy or legislation applying to companies in the financial services industry. These include possible changes to the taxation treatment of financial services and products, retirement income policy, the regulation of products, pricing and selling practices and solvency standards and the introduction of so called "stakeholder pensions". They may affect the Company's existing and future business by, for example, causing customers to cancel existing policies or requiring the Company to change its existing range of products and services, redesign its technology or other systems, retrain staff, pay increased tax, pay compensation or incur other costs.

### *Investment Portfolio*

The surplus and earnings of the Company are affected by, among other things, the investment results, carrying value and levels of allowances for losses on, and write-downs of, the Company's investment portfolio. The Company's investment portfolio consists of, in order of relative magnitude, bonds, commercial and residential mortgages, equity securities, real estate, cash and short term securities and policy loans. The market value of the Company's investments varies depending upon prevailing economic and market conditions, including interest rates and the strength of the stock markets. Recent stock and bond market appreciation has left the Company with substantial realized gains on its investment portfolio, which are being amortized into income over time. A reversal of these trends could adversely affect future investment income. For a variety of reasons, the Company may, on occasion, sell an investment at a price that is less than the book value of that investment. During periods of rising interest rates, the value of bonds and stocks will generally decline. During periods of declining interest rates, bond calls and mortgage loan prepayments generally increase, necessitating the reinvestment of these funds at lower prevailing rates. Mortgage loans and real estate investments are relatively illiquid compared to investment grade bonds. If the Company were to require significant amounts of cash on short notice, the Company could have difficulty selling these loans and investments at attractive prices, in a timely manner, or both. These loans and investments also carry a greater risk of investment loss than investment grade bonds. In the past, commercial real estate markets have undergone periods of significant declining values. There can be no assurance that such conditions will not affect the Company's bond, mortgage loan or real estate portfolios in the future. While management believes its valuation allowances for mortgage loans were adequate as of June 30, 1999, no assurance can be given that further valuation allowances will not be required. See "Investments of the Company – Mortgage Portfolio Surveillance".

The Company is also subject to credit risk relating to the uncertainty associated with the continued ability of debtors to make timely payments pursuant to the contractual terms underlying such loans and investments. Although almost all of the Company's bonds are investment-grade and the Company believes that it maintains prudent issuer diversification, a major economic downturn could result in issuer default. Any such defaults could materially adversely affect the Company's business, financial condition and results of operations.

Strong stock market performance in recent years has contributed significantly to the market value of the Company's general fund equity portfolio. Under Canadian GAAP, 15% of unrealized and realized stock market gains or losses is included in investment income each year. A pronounced and sustained decline in the Canadian or U.S. stock markets would reduce the market value of the Company's general fund equity portfolio and result in any unrealized and realized losses being brought into investment income at a rate of 15% each year. As at June 30, 1999, the carrying value of the Company's general fund equity portfolio constituted approximately 8.9% of its general fund invested assets. See "Risk Management — Investment Policies".

### *Currency Exchange Rate Fluctuations*

As an international provider of financial services, the Company operates in a number of countries, with revenues and expenses denominated in several local currencies. The United States, Canada and the United Kingdom currently account for almost all of the Company's revenues, representing 50%, 27% and 19% of total revenues, respectively, in 1998. In each territory in which it operates, it is the Company's policy to invest in sufficient local-currency assets to

match its aggregate liabilities and minimum surplus requirements in that territory. This approach provides an operational hedge against disruptions in local operations caused by currency fluctuations. However, changes in exchange rates can affect the Company's net income and surplus when results in local currency are translated into Canadian dollars. For example, in 1998 the weakening of the Canadian dollar against the U.S. dollar and the pound sterling resulted in an increase in the Company's consolidated general fund assets of $2.8 billion, an increase in surplus of $312 million and an increase in net income of $16 million when all foreign currencies of jurisdictions in which the Company operates were converted into Canadian dollars. A strengthening of the Canadian dollar against the U.S. dollar and the pound sterling in the future could adversely affect the Company's reported net income.

### *Variations in Claims Experience*

An insurance company's earnings depend significantly upon the claims paid under its insurance contracts and will vary from period to period depending on the amount of claims incurred in the relevant periods. Therefore, there is a limited predictability of claims experience within any given month or year. As a result, it is anticipated that the Company's financial results (and, accordingly, the trading price of the Financial Services Shares) may vary from period to period and that such variations may be material in any given period. The Company uses certain assumptions in pricing its products, including assumptions relating to guaranteed payments or levels of expenses associated with these products. There can be no assurance that actual experience will match the assumptions made for pricing purposes and, to the extent they differ, the Company's operating results could be materially adversely affected.

### *Expiration of Surrender Penalties with Respect to Certain Annuities*

The Company typically imposes surrender charges or market value adjustments on certain annuities sold by it to enable the Company to recover unamortized policy acquisition costs in the event that the annuity is surrendered before the policy acquisition costs are fully amortized and to discourage contract surrenders, which could require the Company to dispose of assets prematurely at a loss. These surrender charges typically decline to zero over a period of time established in the individual annuity contract. As surrender charges expire, it is likely that surrenders of certain annuities will increase. An increase in surrenders could have a material adverse effect on the Company's financial position and results of operations.

### *Year 2000 Issues*

There is a high level of uncertainty associated with the Year 2000 preparedness of the Company and the Company's service providers, distributors and customers, and as such, the Company may experience material problems and costs that may have a material and adverse impact on the Company's results of operations, liquidity and financial condition. See "Management's Discussion and Analysis of Financial Condition and Results of Operations – Year 2000 Issues".

### *Ratings*

Ratings with respect to claims-paying ability and financial strength have become an increasingly important factor in establishing the competitive position of insurance companies. Insurers compete with other insurance companies, financial intermediaries and other financial institutions on the basis of a number of factors, including the ratings assigned by nationally-recognized statistical ratings organizations. Any lowering of the ratings of Sun Life Assurance or the Company's other life insurance subsidiaries could have a material adverse effect on Sun Life of Canada's ability to market its products and could increase the surrender of Sun Life of Canada's annuity products. In December, 1998, Moody's Investors Services announced that it reduced its unsolicited financial strength rating of Sun Life Assurance from Aa1 to Aa2. Moody's expressed concern over continuing pension and annuity problems in the United Kingdom, specifically the uncertainties regarding the timing of a definitive resolution and possible future provision and expenses in respect of these problems, and over the Company's loss of relative market presence in Canada due mostly to heightened acquisition activity by competitors. In August, 1999, Standard & Poor's announced that it had reduced its financial strength and counterparty credit ratings for Sun Life of Canada to AA+ from AAA. Standard & Poor's stated that the downgrade reflected the performance of, and challenges facing, Sun Life of Canada's U.K. businesses. Standard & Poor's also lowered its subordinated debt rating on Sun Life of Canada's Capital Debentures and Subordinated Notes to AA- from AA, and its rating on Sun Life of Canada's Cumulative Capital Securities to A+ from AA-.

The ratings described under "Ratings" reflect each rating agency's current opinion of Sun Life of Canada's claims-paying ability, financial strength, operating performance and ability to meet its obligations to policyholders and are not evaluations directed toward the protection of investors in the Financial Services Shares. Such factors are of concern to policyholders, agents and intermediaries. Such ratings are not ratings of securities and should not be relied upon when making a decision to buy, hold or sell Financial Services Shares or any other security.

### *Potential Tax Legislation*

The attractiveness to customers of many of the Company's U.S. products is due in part to favorable tax treatment. The U.S. Congress has, from time to time, considered possible tax legislation changes that would affect the relative attractiveness of the Company's products, including elimination of the tax deferral on the accretion of value within certain annuities and life insurance products, adoption of a simplified "flat tax" income tax structure with an exemption from taxation for investment income, reductions in U.S. capital gains tax rates, reduction or elimination of the federal estate tax and expansion of the availability of 401(k) accounts and individual retirement accounts. There can be no assurance that tax legislation will not be enacted which would contain provisions with possible adverse effects on the Company's U.S. annuity and life insurance products.

### *Competition*

The Wealth Management and Protection Businesses in which the Company engages are, for the most part, highly competitive. The Company's products compete not only with those offered by other insurance companies, but with those offered by mutual fund companies, banks, financial planners and other providers. Frequently, competition is on the basis of pricing and service provided to distribution channels. Many of the Company's competitors are better capitalized and have greater access to resources than the Company. Among other things, the competition in these industries throughout the world has resulted in a trend towards the global consolidation of the financial services industry including, in particular, the insurance, banking and investment management sectors. To the extent that consolidation continues, the Company will increasingly face more competition from large, well capitalized financial services companies in each jurisdiction in which it operates. There can be no assurance that this increasing level of competition will not adversely affect the Company's businesses in certain countries.

In the United States, national banks, with their pre-existing customer bases for financial services products, may, in the future, provide increased competition to insurers selling annuities, including the Company, as a result of a United States Supreme Court decision in 1994. This decision permitted national banks to sell annuity products of life insurance companies in certain circumstances. In addition, in the United States several proposals to repeal or modify the *Bank Holding Company Act of 1956*, as amended, have been made by members of Congress and the Clinton Administration. Currently, the *Bank Holding Company Act of 1956* restricts banks from being affiliated with insurance companies. None of these proposals has yet been enacted, and it is not possible to predict whether any of these proposals will be enacted or, if enacted, their potential effect on the Company.

### *Shares Eligible for Future Sale*

Substantially all of the Financial Services Shares distributed in the demutualization will be eligible for immediate resale in the public market without restriction. Moreover, following demutualization, the Share Selling Service will be established to facilitate the sale, at market prices, of Financial Services Shares held in book-entry form by eligible policyholders. As a result of the volume of sell orders, these sales may be made at relatively low costs. No prediction can be made as to the effect, if any, such future sales of shares, or the availability of shares for such future sales, will have on market price of the Financial Services Shares prevailing from time to time. Sales of substantial amounts of Financial Services Shares, or the perception that such sales could occur, could adversely affect prevailing market prices for all the Financial Services Shares. See "Your Demutualization Benefits – Share Selling Service" in Part 1 of this Policyholder Information Circular.

### *No Prior Market for Financial Services Shares*

Prior to the demutualization and the initial public offering of Financial Services Shares, there will have been no public market through which the Financial Services Shares could be sold and there can be no assurance that a significant public market will develop or be sustained after the demutualization and initial public offering or that the market price for the Financial Services Shares will not decline below the Initial Share Price. The Initial Share Price will be determined by negotiation between the Company and the Underwriters and may not be indicative of the market price for the Financial Services Shares following the demutualization and the initial public offering.

### *Environmental Considerations*

As the owner and operator of real property, the Company is subject to extensive federal, provincial, state and municipal environmental laws and regulations. Inherent in such ownership and operation is the risk that there may be potential environmental liabilities and costs in connection with any required remediation of such properties. In addition, the Company holds equity stakes in companies that could potentially be subject to environmental liabilities. While the Company routinely conducts environmental assessments for real estate being acquired for investment or on foreclosure, there can be no assurance that unexpected environmental liabilities will not arise.

## REGULATORY MATTERS

The Company is subject to regulation and supervision of its Wealth Management Business and Protection Business by governmental authorities in the jurisdictions in which it does business. In Canada, the Company is subject to both federal and provincial regulation. In the United States, the Company is primarily regulated by each of the states in which it conducts business and by federal securities laws. In the United Kingdom, the Company is subject to national regulation, primarily by the FSA. The Company's Asia operations are similarly subject to a variety of regulatory and supervisory regimes in each of the jurisdictions in which the Company operates, and which vary in degree of regulation and supervision.

### Canada

#### *General*

The Company is governed by the Canadian Insurance Act. The Canadian Insurance Act is administered, and the activities of the Company are supervised, by OSFI. The Canadian Insurance Act permits insurance companies to offer, directly or through subsidiaries or through networking arrangements, a broad range of financial services, including banking services, investment counselling and portfolio management, mutual funds, trust services, real property brokerage and appraisal and merchant banking services.

The Canadian Insurance Act requires the filing of annual and other reports on the financial condition of the Company, provides for periodic examinations of the Company's affairs, imposes restrictions on transactions with related parties, and sets forth requirements governing reserves for actuarial liabilities and other matters, and the safekeeping of assets.

#### *Regulation of Financial Services*

Like Sun Life of Canada, Financial Services has all the powers and restrictions applicable to life insurance companies governed by the Canadian Insurance Act. Based on the understanding, however, that holding companies like Financial Services will not write insurance, will not have dealings with the public in a client service relationship, and will envisage activities limited to raising capital and borrowing, holding shares of subsidiaries and providing services to subsidiaries, OSFI and the Canadian Department of Finance have worked with a life insurance industry task force to review the application of the Canadian Insurance Act to such holding companies rather than full service life insurance companies. Prior to 1999, no such holding companies had been permitted under the Canadian Insurance Act.

As a result of the review, OSFI has determined that, in general, the regulatory regime for such holding companies will include the principal aspects of the regulatory regime for full service life insurance companies. However, the application of the regulatory regime may vary for such holding companies, depending on their actual activities, corporate structure and further analysis. OSFI also recognized that the regulatory regime for such holding companies is an interim measure pending implementation by the Government of Canada of its Policy Paper entitled "Reforming Canada's Financial Services Sector: A Framework for the Future" which would create a new regulatory regime for holding companies of demutualized insurance companies. See "– Canadian Government's Proposed Reforms to the Canadian Financial Services Sector".

#### *Investment Powers*

Under the Canadian Insurance Act, a life insurance company must maintain a prudent portfolio of investments, subject to certain overall limitations on the amount it may invest in certain classes of investments, such as commercial loans, real estate and stocks. Additional restrictions (and, in some cases, the need for regulatory approvals) limit the type of investments which the Company can make in excess of 10% of the voting rights or 25% of the equity of any entity.

#### *Minimum Continuing Capital and Surplus Requirements*

The Canadian Insurance Act requires Financial Services and Sun Life Assurance to maintain adequate capital and adequate and appropriate forms of liquidity in relation to their operations. In furtherance of this requirement, OSFI has established its MCCSR. Under MCCSR, a life insurance company is required to maintain an amount of capital which is calculated by reference to, and which varies with, the risk characteristics of each category of on and off balance sheet assets and liabilities held by it. The MCCSR calculation involves applying quantitative factors to specific assets and liabilities, as well as to certain off-balance sheet items, based on four risk components: (i) asset default risk, (ii) mortality/morbidity and lapse risk, (iii) interest margin pricing risk and (iv) changes in interest rate environment risk. The total capital required is the sum of the capital required calculated for each of the four risk components. OSFI uses this total, in conjunction with the amount calculated as available capital and together with other considerations, in assessing the capital adequacy of a life insurance company. OSFI has advised the Company that it will require Financial Services to maintain a minimum MCCSR of 150% or greater, based on the risk profile of the Company.

The principal elements of available capital include common shares, contributed surplus, retained earnings, reported surplus, unamortized deferred realized and unrealized gains and certain losses on investments not taken into account in the valuation of liabilities, preferred shares and subordinated debt. The amount of available capital is then reduced by the Company's goodwill and controlling interests in non-life financial corporations, a portion of negative policy reserves and cash value deficiencies and reserves on reinsurance ceded to unregistered reinsurers. In addition, prior to 1996, certain unamortized gains and losses on investments taken into account in the valuation of liabilities were included in available surplus. Under transition rules, these gains and losses are being phased out of available capital over the four year period ending December 31, 1999. OSFI may require that a higher amount of capital be available for an insurance company, taking into account such factors as the company's operating experience and diversification of asset or insurance portfolios. MCCSR may be adjusted by OSFI in the future, as experience with it develops, as the risk profile of Canadian life insurers changes, and in order to reflect other risks, such as foreign exchange risk.

### *Restrictions on Dividends and Capital Transactions*

The Canadian Insurance Act prohibits the declaration or payment of any dividend on shares if there are reasonable grounds for believing a company subject to the Canadian Insurance Act is, or the payment of the dividend would cause the company to be, in contravention of MCCSR. The Canadian Insurance Act also requires an insurance company to notify the Superintendent of the declaration of a dividend at least 10 days prior to the date fixed for its payment. Similarly, the Canadian Insurance Act prohibits the purchase for cancellation of any shares issued by an insurance company or the redemption of any redeemable shares or other similar capital transactions, if there are reasonable grounds for believing that the company is, or the payment would cause the company to be, in contravention of its MCCSR. These latter transactions would also require the prior approval of the Superintendent.

### *Appointed Actuary*

In accordance with the Canadian Insurance Act, the board of directors of Sun Life Assurance has appointed a Fellow of the Canadian Institute of Actuaries as the Appointed Actuary. The Appointed Actuary is required to value the policy liabilities of Sun Life of Canada as at the end of each financial year in accordance with accepted actuarial practices, including selection of appropriate assumptions and methods, and provide an opinion as to whether the amount of policy liabilities makes appropriate provisions for all obligations to policyholders and whether the valuation of liabilities is fairly presented in the consolidated financial statements. At least once in each financial year, the Appointed Actuary is also required to report to the chief executive officer and the chief financial officer of Sun Life Assurance if the Appointed Actuary identifies any matters which, in the Appointed Actuary's opinion, have material adverse effects on the financial condition of the Company.

### *CompCorp*

CompCorp is a federally incorporated private company established in 1988. CompCorp's objective is to protect, within certain limits, and subject to certain exclusions, Canadian policyholders against loss of benefits should a member of CompCorp become insolvent and be wound up. CompCorp is funded by its member insurance companies, including Sun Life Assurance.

Member companies of CompCorp are primarily assessed on an after-the-fact basis according to a formula based on Canadian premium income from covered policies. There are two principal forms of assessment: (i) specific assessments to cover funding made in connection with an insolvent member, to a maximum of 0.85% per annum of a company's Canadian premium income from covered policies averaged over the previous five years with certain exclusions, including segregated fund premiums and (ii) loan assessments, but in no circumstances will loan assessments result in loans outstanding from a member being in excess of 3.0% of that member's five-year average premium income from covered policies.

### *Provincial Insurance and Trust Company Regulation*

Sun Life Assurance and its subsidiaries are also subject to provincial regulation and supervision in the provinces of Canada and other jurisdictions in which they conduct business. Various subsidiaries of Financial Services engage in other federally regulated types of business, such as the trust business, which are also subject to similar provincial regulation. Provincial insurance regulation is concerned primarily with insurance contracts and supervision of insurance agents.

### *Securities Laws*

Sun Life Assurance and certain of its subsidiaries, including Spectrum United, McLean Budden and Sun Life Securities Inc., certain of their employees and certain policies and contracts offered by such subsidiaries are registered with provincial securities commissions and are subject to regulation and supervision under provincial securities laws in each of the provinces of Canada. Such registrations may be terminated or suspended for failure to adhere to certain

regulatory requirements. The Company's Canadian mutual fund operations are governed by a national policy of Canadian securities regulators which is administered by the provincial securities commissions. This policy regulates, among other things, the nature and extent of investments by mutual funds, the relationship between mutual funds and their managers, advisors and distributors, and mutual funds sales practices. In addition, this policy imposes significant disclosure obligations on mutual funds and their managers, and imposes fiduciary duties, as well as recordkeeping and operational requirements, on the managers and advisors to these funds.

### *Canadian Government's Proposed Reforms to the Financial Services Sector*

In June 1999, the Canadian government released a policy paper entitled "Reforming Canada's Financial Sector: A Framework for the Future" (the "Policy Paper"). This Policy Paper was primarily a response to the Report of the Task Force on the Future of the Canadian Financial Services Sector which was delivered in September 1998 to the Canadian government and contained numerous recommendations aimed at, among other things, encouraging greater competition in the financial services industry, providing a framework for industry mergers and protecting consumers. This Task Force was established by the government in 1996 to recommend changes to the public policy framework that would govern the Canadian financial services industry into the 21st century.

One of the principal proposals contained in the Policy Paper is a modification to the current ownership limits which restrict ownership to 10% of any class of shares of a demutualized insurance company, or its holding body corporate. In the Policy Paper, the government has stated that it will allow an investor to hold up to 20% of any class of voting shares and up to 30% of any class of non-voting shares of a demutualized insurance company having shareholders' equity in excess of $5 billion, subject to a fit and proper test. This fit and proper test is stated to include an examination of the proposed investor's past business record, the soundness of its business plan and the reasons for the proposed investment and would also seek to assess whether the proposed investor has the necessary integrity and fitness of character. The test will be designed to ensure that key shareholders are not a source of weakness to regulated institutions such as Financial Services.

In addition, during a two year transition period following demutualization, the demutualized insurance companies must remain widely-held and no mergers among, or acquisitions of, demutualized insurance companies would be permitted and the ownership restrictions that are proposed to apply to demutualized insurance companies having shareholders' equity in excess of $5 billion would also apply to smaller demutualized insurance companies. After the transition period, demutualized insurance companies with less than $5 billion in shareholders' equity may request the Minister of Finance of Canada to permit them to be acquired by another institution, subject to certain restrictions. However, under the proposals, insurance companies or their holding body corporate, such as Financial Services, with more than $5 billion of shareholders' equity must remain widely held.

The Policy Paper also proposes that demutualized insurance companies be permitted to organize under a non-operating regulated holding company structure. The regulated holding company's activities could include raising capital, investing and managing its cash flow and liquidity and investing in fixed assets related to its operations. It would also be permitted to provide certain common services to other entities in the group, but would not be permitted to undertake any core financial services functions for the group.

The government also proposes to expand the permitted types of subsidiaries so that both a regulated holding company and an insurance company would be permitted to make a broader range of strategic investments than is currently the case for insurance companies and other federally regulated financial institutions ("FRFIs"). This expansion of permitted investment activities would give insurance companies and other FRFIs additional choice and flexibility regarding their organizational structures.

The ability to have additional subsidiaries would also permit the creation of new special-purpose entities and facilitate alliances and joint ventures through these entities. This could enhance flexibility for FRFIs to meet technological and competitive changes from sources such as unregulated and "monoline" firms specializing in a single line of business. These new rules will be based on defined categories of eligible investments and a number of key parameters. There will be five categories of permitted investments: (i) regulated financial institutions (such as banks, trust companies and insurance companies); (ii) firms primarily engaged in providing financial services (such as credit cards, small business loans and consumer loans); (iii) entities acting in the capacity of a financial agent, advisor or administrator (such as investment counselling, payroll administration); (iv) entities undertaking ancillary, complementary or incidental activities; and (v) certain other activities not primarily related to financial services but specifically enumerated (such as certain information services and real property brokerage corporations). Control requirements, approvals and other rules will be based on the category of investment.

Under the proposals, Financial Services would be required to own more than 50% of the voting shares of Sun Life Assurance. Any shares of Sun Life Assurance which are not owned by Financial Services would be required to meet the new widely held criteria. The government will apply the 20% limit on voting share ownership and 30% limit on non-voting share ownership to the direct and indirect cumulative ownership of Sun Life Assurance, with the effect that no single investor will be able to use the holding company structure to exceed these ownership restrictions.

OSFI will supervise Financial Services on a consolidated basis (including from a capital adequacy perspective) to ensure that it has an overview of the group's activities. This consolidated regulation will include the ability to review both insurance and non-insurance activities conducted by subsidiaries of Financial Services and have adequate supervisory power to bring about corrective action.

OSFI will use its supervisory authority over Financial Services and its subsidiaries on a discretionary basis and as events warrant. For example, if Financial Services places certain activities such as administrative services only arrangements in affiliates outside Sun Life Assurance itself, regulation of such affiliates will generally be lighter, overall, than that applied to Sun Life Assurance itself. Sun Life Assurance, however, will continue to be subject to the full supervisory regime.

The Policy Paper also includes proposals to expand certain business powers of FRFIs in order to increase competition. In particular, the Policy Paper proposes to grant access by life insurance companies, among others, to the Canadian payments system used by banks and other deposit-taking FRFIs (which includes the cheque payment systems, the credit card payment systems, automated teller machines and debit card networks and clearance systems for debt, equity and mutual fund securities). In addition, the Policy Paper rejects the recommendation of the Task Force to allow banks and other deposit-taking FRFIs to sell insurance through their branch networks.

In support of the various initiatives to promote greater competition in the financial services sector, the Superintendent will be granted additional supervisory powers to deal with the potential for increased risk in the system. These powers would increase the consequences for any institution that fails to meet certain regulatory or supervisory requirements. In particular, the measures proposed include: (i) a new authority to remove directors and senior officers from office in certain circumstances such as instances of misconduct; (ii) a system of administrative penalties on both financial institutions and individuals that fail to comply with undertakings and cease and desist orders or violate the financial institutions legislation or regulations and (iii) measures to enhance the Superintendent's power to deal with related party transactions.

It is uncertain when the necessary amendments to the Act and similar legislation governing other FRFI's that are required to implement these proposals will be made.

## United States

### *General Regulation at the State Level*

In the United States, each state and the District of Columbia have insurance laws that apply to companies licensed to carry on an insurance business in the jurisdiction. However, the state of domicile of the insurer is the primary regulator of the company. Jurisdictions in which a company is licensed will apply their solvency standards, product and sales compliance requirements as well as agent appointments and policy form approvals. The National Association of Insurance Commissioners ("NAIC") is a voluntary organization through which industry representatives and consumer advocates assist regulators in drafting proposed model legislation and regulations for enactment or adoption by state legislatures or insurance departments, respectively. The NAIC has also established accounting standards that have been enacted into law by states for the filing of insurer annual statements that are filed in all jurisdictions where the insurer is licensed. States may impose certain special reporting requirements not found in the NAIC models.

Financial Services is not regulated as an insurance company but will, as the direct or indirect owner of the capital stock of Sun Life Assurance and other U.S. insurance subsidiaries, be subject to the insurance holding company acts of the states in which Sun Life Assurance and its other U.S. insurance subsidiaries are domiciled (or deemed to be commercially domiciled). Most states have enacted legislation that requires each insurance holding company and each insurance company in a holding company system to register with the insurance regulatory authority of the insurance company's state of domicile and, annually, to furnish financial and other information concerning the operations of companies within the holding company system that may materially affect the operations, management or financial condition of the insurers within such system. Michigan is Sun Life Assurance's "state of entry", and, as such, it is treated as Sun Life Assurance's state of domicile in the United States for purposes of the insurance holding company laws. Under such laws, all transactions within a holding company system affecting insurers must be fair and equitable and each insurer's policyholder surplus following any such transaction must be both reasonable in relation to its outstanding liabilities and adequate for its needs. The Michigan holding company laws also require prior notice or regulatory approval of the change of control of an insurer or its holding company and of material intercorporate transfers of assets or other material transactions within the holding company structure. The laws of the states in which



SL-0482

the Company's U.S. insurance subsidiaries are domiciled contain similar provisions with respect to such subsidiaries and their affiliates. Generally, under such laws, a state insurance authority must approve in advance the direct or indirect acquisition of 10% or more of the voting securities of an insurance company domiciled in its state.

Sun Life Assurance is licensed to transact business in every state in the U.S. and in the District of Columbia. Sun Life Assurance's insurance subsidiaries are, collectively, licensed to transact business in all states except Vermont and the District of Columbia. The laws of the various states establish state insurance departments with broad administrative powers to approve policy forms and, for certain lines of insurance, rates, grant and revoke licenses to transact business, regulate trade practices, license agents, require statutory financial statements and prescribe the type and amount of investments permitted. The primary purpose of such regulation by the state insurance departments is for the benefit of policyholders, rather than shareholders.

Insurance companies are required to file detailed annual and quarterly financial statements with state insurance regulators in each of the states in which they do business, and their business and accounts are subject to examination by such agencies at any time. The U.S. branch of Sun Life Assurance, which has selected Michigan as its "state of entry" into the United States, prepares such statutory financial statements in accordance with accounting practices and procedures prescribed or permitted by the Michigan Insurance Bureau, and each of the Company's U.S. insurance subsidiaries prepares such statutory financial statements in accordance with accounting practices prescribed or permitted by the insurance departments of their respective states of domicile. Such practices include publications of the National Association of Insurance Commissioners ("NAIC"), as well as state laws, regulations and general administrative rules.

In addition, as part of their routine oversight process, state insurance departments conduct detailed examinations periodically (generally every three years) of the books, records, accounts and market conduct of insurance companies domiciled in their states. Such examinations are generally conducted in cooperation with the departments of two or three other states under guidelines published by the NAIC. The Michigan Insurance Bureau conducts such examinations of Sun Life Assurance's U.S. branch. Applicable state insurance laws, rather than federal bankruptcy laws, apply to the liquidation or restructuring of insurance companies.

In recent years, a number of life and annuity insurers have been the subject of regulatory proceedings and litigation relating to alleged improper life insurance pricing and sales practices. Some of these insurers have incurred or paid substantial amounts in connection with the resolution of such matters. See "Legal Matters". In addition, state insurance regulatory authorities regularly make inquiries, hold investigations and administer market conduct examinations with respect to insurers' compliance with applicable insurance laws and regulations. In addition, state regulatory authorities, industry groups and rating agencies have developed several initiatives regarding market conduct. For example, the NAIC has adopted the NAIC Model Illustration Regulation, which applies to group and individual life insurance policies and certificates, and the Market Conduct Handbook. State regulators have imposed significant fines on various insurers for improper market conduct. The American Council of Life Insurance has established the Insurance Marketplace Standards Association ("IMSA"), a self-regulatory organization, to implement its Principles and Code of Ethical Life Insurance Market Conduct, which includes a third-party assessment procedure. Sun Life Assurance's U.S. branch is a member of IMSA. Market conduct also has become one of the criteria used to establish the ratings of an insurance company. For example, A.M. Best's ratings analysis now includes a review of the insurer's compliance program. Sun Life Assurance and its insurance subsidiaries continuously monitor sales, marketing and advertising practices and related activities of their agents and personnel and provide continuing education and training in an effort to ensure compliance with applicable insurance laws and regulations.

In recent years, the insurance regulatory framework has been placed under increased scrutiny by various states, the U.S. federal government and the NAIC. A number of state legislatures have considered or enacted legislative proposals that alter, and in many cases increase, the authority of state agencies to regulate insurance companies and holding company systems. Over the past few years, the NAIC has approved and recommended to the states for adoption and implementation several regulatory initiatives designed to reduce the risk of insurance company insolvencies, including initiatives with respect to new investment reserve requirements, risk-based capital standards and restrictions on an insurance company's ability to pay dividends to its shareholders. These initiatives may be adopted by the various states in which Sun Life Assurance and the Company's U.S. insurance subsidiaries are licensed, but the ultimate content and timing of any statutes and regulations adopted by the states or their effect on the Company cannot be determined at this time.

In particular, the NAIC has adopted a model regulation called "Valuation of Life Insurance Policies Model Regulation," which would establish new minimum statutory reserve requirements for individual life insurance policies written in the future. Before the new reserve standards can become effective, individual states must enact the model regulation. If these reserve standards were adopted in their current form, companies selling certain individual life insurance products such as term life products with guaranteed premium periods and universal life products with no-lapse guarantees would be required to adjust reserves to be consistent with the new minimum standards. It is impossible to predict whether any states will promulgate the model regulation and, if promulgated, when it will become applicable.

### *Restrictions on Dividends and Capital Transactions*

The insurance holding company laws and regulations of various states regulate the amount of dividends that a domestic insurance company may pay to its parent without prior regulatory approval. Under relevant insurance laws and regulations, prior regulatory approval is required for any dividends or other distributions that are paid other than from earned surplus or that, together with any other dividends or distributions made within the preceding 12 months, exceed the greater of (a) 10% of the insurance company's surplus as of the preceding December 31 or (b) its net gain from operations for the preceding year. The Michigan Insurance Bureau has advised the Company that it currently takes the position that these restrictions on dividends apply to the U.S. branches of foreign insurance companies operating in the United States pursuant to Michigan's "state of entry" statute.

### *NAIC IRIS Ratios*

The NAIC has developed a set of financial relationships or "tests" known as the Insurance Regulatory Information System ("IRIS") that were designed for early identification of companies which may require special attention or action by insurance regulatory authorities. Insurance companies submit data annually to the NAIC, which in turn analyzes the data by utilizing, in the case of life insurance companies, 12 ratios, each with defined "usual ranges". Generally, an insurance company will become subject to regulatory scrutiny if it falls outside the usual ranges of four or more of the ratios, and regulators may then act, if the company has insufficient capital, to constrain such company's underwriting capacity. Neither Sun Life Assurance nor any of its U.S. insurance subsidiaries were outside the "usual ranges" on any of the ratios for the year ended December 31, 1998.

### *Statutory Investment Valuation Reserves*

Under NAIC rules, life insurance companies must maintain an asset valuation reserve ("AVR"), supplemented by an interest maintenance reserve ("IMR"). These reserves are recorded for purposes of statutory accounting practices; they are not recorded under the provisions of Canadian GAAP and therefore have no impact on the Company's reported results of operations or financial position. These reserves affect the determination of statutory surplus, and changes in such reserves may impact the ability of Sun Life of Canada to pay dividends or other distributions to the Company. The impact of the AVR will depend upon future composition of the investment portfolios of Sun Life Assurance and the Company's U.S. life insurance subsidiaries.

### *Risk-Based Capital Requirements*

In order to enhance the regulation of insurer solvency, the NAIC has adopted a model law to implement risk-based capital ("RBC") requirements for life insurance companies, including foreign life insurance companies operating through a U.S. branch. The requirements are designed to monitor capital adequacy, to facilitate identification by insurance regulators of inadequately capitalized insurance companies based upon type and mixture of risks inherent in the insurer's operations, and to raise the level of protection that statutory surplus provides for policyholders. The formulas for determining the amount of risk-based capital specify various weighting factors that are applied to financial balances or various levels of activity based on the perceived level of risk. Regulatory compliance is determined by a ratio of the company's regulatory total adjusted capital, as defined by the NAIC, to its authorized control level risk based capital, as defined by the NAIC. The model law measures four major areas of risk facing life insurers: (i) the risk of loss from asset defaults and asset value fluctuations; (ii) the risk of loss from adverse mortality and morbidity experience; (iii) the risk of loss from mismatching of asset and liability cash flow due to changing interest rates and (iv) business risks. Insurers having less statutory surplus than required by the RBC model formula will be subject to varying degrees of regulatory action depending on the level of capital inadequacy.

The RBC formula provides a mechanism for the calculation of an insurance company's Authorized Control Level RBC and its total adjusted capital. The model law sets forth the points at which a state insurance regulator is authorized and expected to take regulatory action. The first level is known as the Company Action Level RBC, which is set at twice the Authorized Control Level RBC. The second level is the Regulatory Action Level RBC, set at 1.5 times the Authorized Control Level RBC. The third is the Authorized Control Level RBC, and the fourth is the Mandatory Control Level, set at 70% of the Authorized Control Level RBC.

If an insurance company's adjusted capital is higher than the Regulatory Action Level but below the Company Action Level, the insurance company must submit to its insurance regulator a comprehensive financial plan. If an insurance company's adjusted capital is higher than the Authorized Control level but lower than the Regulatory Action Level, the insurance regulator is required to perform such examination or analysis as he or she deems necessary of the insurer's business and operations and issue any appropriate corrective orders to address the insurance company's financial problems. If an insurer's adjusted capital is higher than the Mandatory Control Level but lower than the Authorized Control Level, the regulator may place the insurer under regulatory control. If the insurance company's adjusted capital falls below the Mandatory Control Level, the regulator will be required to place the insurer under

regulatory control. Based on the formula adopted by the NAIC, Sun Life Assurance and each of its U.S. insurance subsidiaries exceeded the Company Action Level as of December 31, 1998.

The Company's U.S. branch is required to maintain a certain amount of assets in trust with a financial institution acceptable to the Michigan Insurance Commissioner in an amount at all times at least equal to the sum of the U.S. branch's reserves and other liabilities, the minimum required capital and surplus and any additional amounts considered necessary by the Michigan Insurance Commissioner to cover the Company's liabilities plus a portion of its surplus in the United States. These assets are generally only available to meet the policyholder obligations of the Company to its U.S. policyholders, claimants and other U.S. branch creditors. Any amendment to the trust agreement must be approved by the Michigan Insurance Commissioner. As at June 30, 1999, the Company had assets in trust in excess of Michigan's requirements that are applicable to branches of alien insurers including the RBC requirements referred to above.

### *Minimum Statutory Surplus and Capital*

Sun Life Assurance and the Company's U.S. life insurance subsidiaries are required to have minimum statutory surplus and capital of various amounts, depending on the state in which they are licensed and the types of business they transact.

### *Regulation of Investments*

Sun Life Assurance and its U.S. insurance subsidiaries are subject to state laws and regulations that require diversification of their investment portfolios and limit the amount of investments in certain investment categories such as below investment grade fixed income securities, equity real estate and equity investments. Failure to comply with these laws and regulations would cause investments exceeding regulatory limitations to be treated as non-admitted assets for purposes of measuring surplus, and, in some instances, would require divestiture of such non-qualifying investments.

### *Assessments Against Insurers*

Insurance guaranty association laws exist in all states, the District of Columbia and Puerto Rico. Insurers doing business in any of these jurisdictions can be assessed for policyholder losses incurred by insolvent insurance companies. Recent regulatory actions against certain large life insurers encountering financial difficulty have prompted the various state insurance guaranty associations to begin assessing life insurance companies for the deemed loss. Most of these laws do provide, however, that an assessment may be excused or deferred if it would threaten an insurer's solvency and further provide for annual limits on such assessments. A large part of the assessments paid by the Company pursuant to these laws may be used as credits for a portion of the Company's premium taxes. Based on the best information presently available, the Company believes the total assessments will not be material to its operating results or financial position.

### *General Regulation of Insurance at Federal Level*

Although the U.S. federal government does not directly regulate the insurance business, federal legislation and administrative policies in several areas, including pension regulation, age and sex discrimination, investment company regulation, financial services regulation and federal taxation, do affect the insurance business. For example, Congress has from time to time considered legislation related to the deferral of taxation on the accretion of value within certain annuities and life insurance products, limitations on antitrust immunity, the removal of barriers preventing banks from engaging in the insurance business, the alteration of the federal income tax structure and the availability of Section 401(k) or individual retirement accounts. In addition, legislation has been introduced from time to time in recent years which, if ever enacted, could result in the federal government assuming a more direct role in the regulation of the insurance industry.

### *Securities Laws*

The Company, certain of its subsidiaries and certain policies and contracts offered by such subsidiaries are subject to various levels of regulation under the federal securities laws administered by the Securities and Exchange Commission (the "SEC") and under certain state securities laws.

All aspects of the Company's subsidiaries' investment advisory activities are subject to various federal and state laws and regulations in jurisdictions in which they conduct business. These laws and regulations are primarily intended to benefit investment advisory clients and investment company shareholders. MFS and certain of the Company's other subsidiaries are investment advisors registered under the Investment Advisers Act of 1940, as amended (the "Investment Advisers Act") and, as such, are regulated by and subject to examination by the SEC. The Investment

Advisers Act imposes numerous obligations on registered investment advisers, including fiduciary duties, recordkeeping and reporting requirements, operational requirements, and disclosure obligations. The SEC is authorized to institute proceedings and impose sanctions for violations of the Investment Advisers Act, ranging from censure to limitations on the investment adviser's activities to termination of an investment adviser's registration. Certain investment companies managed by such subsidiaries, including the MFS mutual funds, are registered with the SEC under, and subject to, the Investment Company Act of 1940, as amended, and the shares of certain of these entities are qualified for sale in certain states in the United States and the District of Columbia.

Certain annuity contracts and insurance policies issued by the Company's U.S. subsidiaries are registered under the Securities Act of 1933, as amended. Sun Life of Canada (U.S.) files periodic reports with the SEC under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Certain other subsidiaries of the Company are registered as broker-dealers under the Exchange Act, are subject to the SEC's net capital rules, and are members of, and subject to regulation by, the National Association of Securities Dealers.

### *ERISA Considerations*

Certain assets in the Company's U.S. insurance operations attributable to participating group annuity contracts may be considered "plan assets" within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"). In that event, the Company would be a "fiduciary" of the plans that purchased those contracts and would be subject to the fiduciary provisions of ERISA with respect to those assets. In 1993, the Supreme Court held in *John Hancock Mutual Life Insurance Company v. Harris Trust & Savings Bank* that a portion of the funds held in an insurer's general account constituted "plan assets" under ERISA. In 1996, Congress passed the Small Business Job Protection Act which, among other things, provided relief from the *Harris Trust* holding. Specifically, Congress directed the United States Department of Labor ("DOL") to promulgate regulations exempting certain group annuity contracts from the "plan asset" provisions of ERISA. In December 1997, DOL issued proposed regulations which provide that when an employee benefit plan purchases an insurance policy issued on or before December 31, 1998 that is supported by the assets of the insurer's general account, the assets of the general account will not be deemed to be "plan assets" (and the insurer will not be subject to the fiduciary provisions of ERISA in dealing with those assets), provided certain conditions are met. The regulation is still pending, but is expected to be promulgated in final form some time in 1999. A review of Sun Life Assurance's and the Company's U.S. insurance subsidiaries' procedures with respect to its general account contracts will be required to ensure compliance with the regulations. If the final regulations are adopted in a form substantially similar to the proposed regulations, the Company anticipates that it would be able to comply with such regulations in a manner that will not have a material impact on its operations.

## United Kingdom

### *Insurance Regulation*

The Company's U.K. life insurance subsidiaries are subject to the Insurance Companies Act 1982 (the "U.K. Insurance Companies Act"), administered for the most part by the FSA. All U.K. insurance companies are required to conduct their affairs in accordance with the principles of sound and prudent management set out in Schedule 2A of the U.K. Insurance Companies Act which includes the conduct of their business with due regard to the interests of policyholders and potential policyholders.

The U.K. Insurance Companies Act also requires insurance companies to file audited financial statements and related reports and to file audited accounts and other prescribed documents with the FSA.

### *Long-term Assets and Liabilities*

The Company's U.K. life insurance subsidiary will be required to maintain its life and pension assets separate from the assets attributable to non-life insurance business or to shareholders. Separate accounting and other records must be maintained and one or more separate funds to hold receipts of money applicable to insurance business must be established. Sun Life of Canada (U.K.) intends to maintain separate sub-funds for assets and liabilities representing participating policies and non-participating policies. See "Restructuring of Participating and Other Accounts on Demutualization". The U.K. Insurance Companies Act also restricts the extent to which life fund assets may be used for other purposes.

### *Margin of Solvency*

The U.K. Insurance Companies Act requires that insurance companies maintain a margin of solvency, the calculation of which in any particular case depends upon the type and amount of insurance business a company writes. Failure to maintain the margin required is one of the grounds on which wide powers of intervention provided for in the U.K. Insurance Companies Act may be exercised.

For the purpose of determining the amount of the required margin of solvency, among other things, a company must determine the amount of its long term liabilities including contingent and prospective liabilities, in accordance with the U.K. Insurance Companies Regulations. Long term liabilities are liabilities arising under or in connection with contracts for long term business. Their determination must be made on actuarial principles which have due regard to the reasonable expectations of policyholders and make proper provision for all liabilities on prudent assumptions.

The regulatory solvency position of the long term fund of a life insurance company in the U.K. is generally measured in two ways. The first is the "free asset ratio", or the ratio of the free assets (the excess of the long term admissible assets over the total of actuarial liabilities and other liabilities) to total liabilities. The second is the "cover ratio", or the ratio of free assets to the minimum margin of solvency which the Company is required to maintain.

Fluctuations in the levels of financial markets have led to some volatility in the free asset ratios and cover ratios of most U.K. life companies, since assets are valued broadly at market value, while liabilities are not so directly affected. In particular, in valuing liabilities, the appointed actuary is required to exercise his judgment about future economic conditions, demographic experience and operating costs of Sun Life of Canada (U.K.). Currently, all solvency margin requirements for the Company's United Kingdom insurance operations are being met.

### *Restrictions on Dividends*

Insurance companies are subject to the provisions of the Companies Act 1985 in the payment of dividends, which prevents any distribution by a company except out of profits available for this purpose. In addition, under the U.K. Insurance Companies Act, a life insurance company and any parent company of a life insurance company cannot declare a dividend at any time when the assets of the long term business fund do not exceed the liabilities of the long term business. The U.K. Insurance Companies Act also requires that once an allocation of surplus in the long term fund in which policyholders are eligible to participate has been made to policyholders, no transfer of assets representing a subsequent part of such surplus can be made to shareholders unless the "relevant minimum" (as defined in the U.K. Insurance Companies Act) of such surplus has been allocated to policyholders or a statutory notification procedure has been carried out. Calculation of the relevant minimum is based upon the percentage of the relevant surplus previously allocated to the eligible policyholders. Under the statutory insurance scheme pursuant to which the United Kingdom branch business of Sun Life will be transferred to Sun Life of Canada (U.K.), Sun Life of Canada (U.K.) will be prohibited from transferring assets maintained in the account for participating policies to the shareholders' account. See "Restructuring of Participating and Other Accounts on Demutualization".

### *Other Regulation*

Most long term insurance products are considered to be investments for the purposes for the Financial Services Act 1986 (the "Financial Services Act"). Firms carrying on investment business are regulated under the Financial Services Act. Many firms are regulated by one of the self-regulating organizations relating to the financial services industry. For example, the PIA is the main regulator for the retail marketing of investment products and the Investment Management Regulatory Organization is the regulator for investment management business.

The rules of these self-regulatory organizations impose a duty on the staff representatives of regulated firms to offer best advice to customers in respect of the range of products offered by the firm, having regard to the circumstances and aspirations of the customer. Advertisements, disclosure requirements and complaints procedures are also regulated and it is necessary for firms to comply with prescribed requirements in respect of pre-contractual information. The PIA rules contain stringent training and competence standards for staff. In addition, PIA rules impose what is known as "polarization" pursuant to which directly employed or "tied" sales staff can usually only sell the product of one company or group, while independent advisers must offer "best advice" across the wide range of products offered by companies in the relevant sector.

Sun Bank plc is authorized to take deposits in the U.K. under the Banking Act 1987 and is subject to the rules and regulations of the FSA in relation to its deposit taking business.

### *Policyholders Protection Scheme*

The Policyholders Protection Scheme was established under the Policyholders Protection Act 1975 (the "Policyholders Protection Act"). It provides for the protection of certain individual U.K. policyholders who may be affected by the inability of established insurance companies carrying on business in the United Kingdom to meet their liabilities. The Policyholders Protection Scheme is administered by the Policyholders' Protection Board.

In addition, the Policyholders' Protection Board has the power to take measures for securing the transfer of all or any part of the insurance business carried on by a company in financial difficulties (but not in liquidation).

The Policyholders Protection Scheme is funded by statutory levies, calculated by reference to premium income on authorized insurance companies. Separate levies are imposed on long term and general insurance business.

Once it has been brought into force, the Policyholders Protection Act 1997, which received Royal Assent in March 1997, will have a significant impact on the scope of protection afforded by the scheme.

***Intervention***

The FSA (or, in some cases, the Treasury) has extensive powers to intervene in the affairs of an insurance company. Powers of intervention include the power to limit an insurance company's premium income, to restrict the range of investments in which insurance funds are placed, to impose requirements for the submission of quarterly management accounts and powers relating to investigation, information and search and the power to require the company to take appropriate actions for the fulfilment of the criteria of sound and prudent management.

***Changes in Law***

In May 1997, the Government announced a proposal to establish the FSA as a single regulator for all financial services businesses, including supervision of insurance companies. It is expected that the FSA will assume full responsibility for insurance supervision in 2000. As a transitional measure, responsibility for insurance supervision was transferred from the Department of Trade and Industry to the Treasury with effect from January 5, 1998. While day-to-day responsibility for supervision of insurance companies has now passed (by way of delegation by the Treasury's Insurance Directorate) to the FSA, certain powers and duties have been retained by the Treasury.

On February 10, 1999, the Welfare Reform and Pensions Bill was published. This Bill contains proposals for: (i) the introduction of stakeholder pension schemes and (ii) changes to the regulatory framework for occupational and personal pensions.

Stakeholder pension schemes are intended to ensure participants have access to high quality, low cost, secure second pensions which meet specified standards. Schemes will have to allow members to make contributions either on a regular or intermittent basis and will have to accept transfers of pension rights from other schemes (unless this would prejudice its tax-approved status).

The FSA has recently published consultation papers, setting out its proposals for handling consumer complaints and compensating consumers in financial services including proposals for a single scheme to replace current compensation schemes.

The European Council formally adopted directive 99/78/EC on the supplementary supervision of insurance companies within an insurance group (the "Insurance Groups Directive") in October 1998. Currently, under European law, insurance regulation (including in respect of solvency) is directed at individual insurance companies, disregarding any connection they may have with other group companies (so-called "solo supervision"). The Insurance Groups Directive introduces certain additional measures to strengthen supervision of insurance companies which are part of a group ("solo-plus supervision") including the following:

(a) an additional solvency calculation is designed to eliminate "double-gearing", or the use of the same capital to cover different risks within a group;

(b) the insurance holding company test is intended to allow supervisory authorities to assess the potential effect of the holding company's capital structure on the solvency of the insurance company;

(c) member states will be required to monitor intra-group transactions; and

(d) further provisions are included to ensure that supervisory authorities can receive, and exchange with each other, the information needed to fulfil their functions under the directive.

The Insurance Groups Directive must be implemented by member states into national law by June 2000, to apply first to accounts for financial years beginning on January 1, 2001 or during that calendar year. The Company believes that implementation of the Insurance Groups Directive will not have a material effect on the Company's U.K. operations.

## Asia

In each of the countries in which Sun Life of Canada operates in Asia, local insurance authorities supervise and monitor the Company's business and financial condition. In a number of countries, Sun Life of Canada is required to meet specific minimum working and regulatory capital requirements.

## *Philippines*

### *Insurance Regulation*

Foreign-owned domestic insurance companies carrying on business in the Philippines are subject to the Insurance Code of 1978 (the "Insurance Code"). The Insurance Code is administered by the Insurance Commission whose main functions are to regulate and supervise the insurance industry and to protect policyholders and the public. Insurance companies in the Philippines must obtain an annual certificate of authority from the Insurance Commission. In order to obtain a renewal certificate of authority, insurance companies are required to have filed an annual report, financial statement and other filings with the Insurance Commission, and must not otherwise be in default of any other requirements of the Insurance Code. In addition, insurance companies must report any changes of control or changes of management to the Insurance Commission.

### *Long-term Assets and Liabilities*

Assets relating to Sun Life of Canada (Philippines)'s long term business are not required to be maintained separately from the assets relating to its general (non-life) insurance business.

### *Restrictions on Dividends*

An insurance company is prohibited from declaring or distributing dividends from its profits unless it retains unimpaired: (i) its entire paid-up capital stock; (ii) the margin of solvency required; (iii) the legal reserves required; and (iv) a sum sufficient to pay all net losses reported, or in the course of settlement, and all liabilities for expenses and taxes. All dividends declared or distributed must be reported to the Insurance Commission within 30 days from such declaration or distribution.

### *Margin of Solvency Requirements*

Following the subsidiarization of the Company's Philippines operations, Sun Life of Canada (Philippines) must maintain a margin of solvency in excess of the value of its admitted assets in the Philippines, exclusive of its paid-up capital, over the amount of its liabilities, unearned premium, and reinsurance reserves in the Philippines, of at least two Philippine Pesos per 1,000 Philippine Pesos of the total amount of its insurance in force as of the preceding year on all insurance policies, except term insurance. Currently, all solvency requirements for the Company's Philippines operations are being met.

### *Powers of Intervention*

The Insurance Commission has wide discretionary powers to intervene, audit, inspect and direct insurance companies doing business in the Philippines. The Insurance Commission may, among other things, direct insurance companies to comply with the Insurance Code, restrict the investments or business of insurance companies and revoke, suspend or refuse to renew an insurance company's certificate of authority.

## *Hong Kong*

### *Insurance Regulation*

The regulatory framework for insurance companies carrying on business in or from Hong Kong is prescribed by the Insurance Companies Ordinance (the "ICO") and subsidiary legislation.

The Insurance Authority is responsible for the regulation and supervision of the insurance industry, including compliance with the ICO, although to a large extent the insurance regime in Hong Kong is self-regulatory. The main functions of the Insurance Authority are to promote the general stability of the insurance industry and to protect existing and potential policyholders.

Insurance companies are required to file audited accounts, financial statements and other documents with the Insurance Authority each year, within six months after the end of their financial year.

### *Long-term Assets and Liabilities*

The assets relating to an insurance company's long term business must be maintained in a separate fund from the assets relating to the company's general (non-life) insurance business. Separate accounting and other records must also be kept. The assets in the long term fund must be used exclusively to support and satisfy the liabilities of the long term business, although, except as provided under the statutory scheme of transfer pursuant to which the Hong Kong branch business is proposed to be transferred to Sun Life of Canada (International), there are no restrictions on withdrawing

surplus, that is, assets over the prescribed margin of solvency. See "Restructuring of Participating and Other Accounts on Demutualization". Under the Hong Kong statutory scheme, Sun Life of Canada (International) will be prohibited from withdrawing assets maintained for the benefit of Hong Kong Transferred Participating Policies.

The ICO requires that insurance companies maintain a prescribed margin of solvency. If an insurance company fails to maintain the required margin of solvency, the Insurance Authority may require it to submit a plan for the restoration of a sound financial position or may exercise any of its other powers of intervention under the ICO. Compliance with the solvency margin requirements is reported annually to the Insurance Authority. Currently, all solvency requirements for the Company's Hong Kong operations are being met.

*Restrictions on Dividends*

Provided that there is sufficient surplus in the relevant fund (that is, sufficient excess of assets over the prescribed solvency margin), there are no restrictions under the ICO on the amount of dividends distributable either to policyholders or shareholders.

*Supervision of Management and Change of Control*

Insurance companies which are authorized to carry on business in Hong Kong, but are incorporated outside Hong Kong, are required to obtain the Insurance Authority's prior approval to any proposed change of managing director or chief executive responsible for the business carried on in Hong Kong. The Insurance Authority must also be notified of changes in other directors and controllers of such companies, including changes in shareholders who (alone or with any associate) are entitled to exercise, or control the exercise of, 15% or more of the voting power at any general meeting of the company.

*Powers of Intervention*

The Insurance Authority has extensive powers to intervene in the carrying on of an insurance company's business in Hong Kong. These powers are exercisable if, among other things, it appears to the Insurance Authority that the insurance company has failed to satisfy any of its obligations under the ICO, or if the Insurance Authority considers it desirable to exercise its powers in order to protect policyholders against the risk that the insurance company may be unable to meet its liabilities or to fulfil policyholders' reasonable expectations.

The Insurance Authority's powers include restricting the insurance company from effecting new business, prohibiting it from making investments of a particular class or description and requiring it to maintain assets in Hong Kong. Its ultimate sanction is to withdraw the insurance company's authorization, or to petition for its winding-up.

## DIRECTORS AND EXECUTIVE OFFICERS OF FINANCIAL SERVICES

### Directors

The by-laws of Financial Services provide that the Financial Services Board will consist of a minimum of 8 directors and a maximum of 20 directors. The exact number of directors to be elected at any annual meeting of shareholders of Financial Services will be fixed by the Financial Services Board prior to the meeting. Each director will be elected for a term of not more than three years, with terms staggered so that one third, as nearly as may be, of the Financial Services Board is elected at the annual meeting each year. The name, municipality of residence, positions with Financial Services and principal occupation of each of the directors of Financial Services are as follows:

| Name and Municipality of Residence | Positions with Financial Services | Principal Occupation |
|---|---|---|
| Dian N. Cohen, C.M., LL.D.<br>Ayer's Cliff, Quebec | Director | President, Dian Cohen Productions Ltd. |
| Prof. M. Colyer Crum<br>Weston, Massachusetts | Director | Company Director |
| Stanley H. Hartt, O.C., Q.C.<br>Toronto, Ontario | Director | Chairman, Salomon Smith Barney Canada Inc. |
| The Hon. Donald S. Macdonald, P.C., C.C.<br>Toronto, Ontario | Director | Counsel, McCarthy Tetrault |
| John M. MacLeod<br>Calgary, Alberta | Director | Corporate Director |

| Name and Municipality of Residence | Positions with Financial Services | Principal Occupation |
|---|---|---|
| Angus A. MacNaughton, Danville, California | Director | President, Genstar Investment Corporation |
| John D. McNeil, C.F.A., Toronto, Ontario | Director | Company Director |
| Bertin F. Nadeau, Montreal, Quebec | Director | Chairman and Chief Executive Officer, GescoLynx Inc. |
| Ronald W. Osborne, F.C.A., Toronto, Ontario | Director | President and Chief Executive Officer, Ontario Power Generation Inc. |
| Alfred Powis, O.C., Toronto, Ontario | Director | Company Director |
| Sir Bob Reid, London, England | Director | Deputy Governor, Bank of Scotland |
| Donald A. Stewart, F.I.A., F.C.I.A., Mississauga, Ontario | Chairman of the Board and Chief Executive Officer | Chairman and Chief Executive Officer, Sun Life Assurance |
| William W. Stinson, Calgary, Alberta | Director | Chairman Executive Committee, United Dominion Industries |
| W. Vickery Stoughton, Los Angeles, California | Director | Chairman and Chief Executive Officer, Careside, Inc. |
| David G. Vice, Mississauga, Ontario | Director | Company Director |
| Jeannine Guillevin Wood, O.C., Montreal, Quebec | Director | Chairman of the Board, Laurentian Bank of Canada |

## Committees of the Board

It is expected that Financial Services will have the same committees of the board of directors as those of Sun Life Assurance. The board of directors of Sun Life Assurance fulfils its responsibilities directly and through the work of six committees.

The Executive Committee considers general policy issues affecting the Company on a worldwide basis. Of particular importance is the responsibility to review the investment policies and the invested assets of the Company each year, and to review and recommend approval of dividends to policyholders.

The Audit Committee oversees the system of internal controls and financial reporting of the Company. It also reviews compliance with legislative and regulatory requirements, and monitors compliance with the Code of Business Conduct of the Company.

The Nominating and Corporate Governance Committee is responsible for corporate governance matters and makes recommendations on Board meeting processes, new Board nominees, Committee mandates and membership, and Directors' compensation.

The Management Resources Committee is responsible for the compensation policies of the Company, the succession planning process, review of senior management performance and remuneration, and overseing the staff and agents' pension plans.

The Conduct Review Committee reviews the "related party" procedures and practices of the Company in accordance with statutory requirements.

The Risk Review Committee is responsible for overseeing the major areas of business risk facing the Company as well as approving, and reviewing compliance with, policies implemented by the Company for the management and control of risk.

## Executive Officers

The name and positions with Financial Services of each of the executive officers of Financial Services are as follows:

| Name | Positions with Financial Services |
| --- | --- |
| Thomas A. Bogart | Senior Vice-President and Chief Legal Officer |
| Gregory W. Gee | Vice-Chairman |
| Marcel M. Gingras | Senior Vice-President and General Manager for Canada |
| Michael A. Hasley | Senior Vice-President, Finance |
| John S. Lane | Senior Vice-President, Investments |
| Yves Laneuville | Senior Vice-President, Asia |
| James A. McNulty III | Senior Vice-President and General Manager for the United States |
| A. Stephen Melcher | Senior Vice-President and General Manager for the United Kingdom |
| C. James Prieur | President and Chief Operating Officer |
| Robert J. Sharkey | Senior Vice-President |
| Donald A. Stewart | Chairman of the Board and Chief Executive Officer |
| C.L.F. Watchorn | Senior Vice-President, Strategic Development |
| John R. Wright | Senior Vice-President and Chief Information Officer |

Each of the directors and executive officers of Financial Services has been engaged for more than five years in his or her present principal occupation or in other capacities with the company or organization (or predecessor thereof) in which he or she currently holds his or her principal occupation except: Professor Crum, who prior to July 1996 was Professor of Investment Management, Harvard University Graduate School of Business Administration; Mr. Hartt, O.C., Q.C., who prior to October 1996 was Chairman, President and Chief Executive Officer of Camdev Corporation; Mr. Osborne, who prior to March 1998 was President and Chief Executive Officer of Bell Canada, prior to September 1997 was President of BCE Inc., prior to May 1996 was Executive Vice President and Chief Financial Officer of BCE Inc. and prior to January 1995 was President and Chief Executive Officer of Maclean Hunter Limited; Mr. Powis, O.C., who prior to April 1995 was Chairman of Noranda Inc.; Sir Bob Reid, who prior to March 1995 was Chairman of British Railways and from 1995 to 1997 was Chairman of London Electricity; Mr. Stinson, who prior to May 1996 was Chairman and Chief Executive Officer of Canadian Pacific Limited; Mr. Stoughton, who prior to July 1996 was President of SmithKline Beecham Diagnostic Systems and prior to October 1995 was President of SmithKline Beecham Clinical Laboratories; Ms. Wood, O.C., whose principal occupation prior to December 1997 was chairman of Guillevin International Inc., a position which she continues to hold; Mr. Bogart, who prior to August 1998, was a Partner with Tory Tory DesLauriers & Binnington, a law firm; Mr. McNulty, who prior to April 1998, was President, Reinsurance Division, of Union Mutual Life Insurance Company; Mr. Melcher, who prior to December 1998, was a Senior Executive Advisor with Marsh & McLennan Securities Corp., prior to 1997 was Chief Executive of Allied Dunbar Assurance PLC/ Eagle Star Life Assurance Co. and prior to 1996 was Chief Executive of Eagle Star Holdings; and Mr. Wright, who prior to October 1996 was Vice-President, Systems, with The New England, a life insurance company.

# DIRECTORS' AND OFFICERS' REMUNERATION

## Directors' Compensation

Directors of Financial Services receive a retainer of $11,000 per annum. Retainers are also paid to the members of certain Committees of the Board of Directors as follows: members of the Executive Committee – $2,250 per annum; members of the Audit Committee – $1,750 per annum; and members of the Nominating and Corporate Governance Committee, Risk Review Committee, and Management Resources Committee – $1,250 per annum. The Chairs of the Executive Committee and the Audit Committee each receive an additional retainer of $1,750 per annum; the Chairs of the Nominating and Corporate Governance Committee, Risk Review Committee and Management Resources Committee receive an additional retainer of $1,250 per annum. In addition, the director appointed to serve as spokesperson for the outside directors of the Company shall receive an additional annual retainer of $5,000. Directors receive an attendance fee of $1,200 for each Board meeting, Committee meeting and Directors' Education Seminar that they attend. Directors who are officers of Financial Services or Sun Life of Canada do not receive fees for serving as directors. Directors are reimbursed for travel and other out of pocket expenses incurred in connection with meetings of the Board of Directors or any committee of the Board of Directors. The by-laws of Financial Services provide that the annual appropriation for the compensation of all directors shall not exceed $600,000, plus reimbursement for reasonable expenses. Directors of Financial Services who also serve as directors of Sun Life Assurance will be

compensated by Sun Life Assurance for services performed in their capacity as directors of that company, on the same basis as which they are compensated for serving as directors of Financial Services. Where meetings of the Financial Services Board are held concurrently with meetings of the board of directors of Sun Life Assurance, attendance fees and expenses for such meetings will be shared equally between Financial Services and Sun Life Assurance.

## Executive Compensation

Financial Services was incorporated on August 5, 1999 for purposes of the demutualization and, prior to the demutualization, will be a wholly-owned subsidiary of Sun Life Assurance. Securities laws require that an issuer of securities disclose the compensation of certain of its senior officers. As, prior to the date hereof, Financial Services had no operations and its officers had not received any compensation for serving in such capacities, except where otherwise indicated, information relating to the compensation of the applicable senior officers of Sun Life Assurance has been included in this Policyholder Information Circular.

The Summary Compensation Table sets forth, for the periods indicated, the compensation of the Chief Executive Officer ("CEO"), and the four other most highly compensated executive officers of Sun Life Assurance, measured by base salary and incentive bonuses pertaining to the year ended December 31, 1998. The CEO and these four officers are referred to collectively as the "Named Executives". Donald A. Stewart succeeded John D. McNeil as CEO on April 9, 1998, following which Mr. McNeil continued to hold the office of Chairman of the Board until his retirement on April 8, 1999. Mr. Stewart was appointed Chairman on April 8, 1999.

### Summary Compensation Table

| | | Annual Compensation | | | Long-Term Compensation | | |
|---|---|---|---|---|---|---|---|
| | | | | | Awards | Payouts | |
| Name & Principal Position | Year | Salary $ | Bonus[1] $ | Other Annual Compensation[2] $ | Units granted under LTIP[3] | LTIP Payouts $ | All other Compensation $ |
| John D. McNeil<br>Chairman (Retired) | 1998<br>1997 | 875,000<br>829,327 | –<br>625,000 | –<br>– | 250,000<br>– | –<br>– | –<br>– |
| Donald A. Stewart<br>Chairman & Chief Executive Officer | 1998<br>1997 | 588,077<br>474,077 | –<br>300,000 | –<br>– | 185,500<br>– | –<br>– | –<br>– |
| Gregory W. Gee[4]<br>Vice-Chairman | 1998 | 308,308 | 215,200 | – | 72,000 | – | – |
| Michael A. Hasley<br>Senior Vice-President, Finance | 1998<br>1997 | 300,000<br>297,600 | 207,000<br>140,500 | –<br>– | 53,000<br>– | –<br>– | –<br>– |
| C. James Prieur[5]<br>President & Chief Operating Officer | 1998 | 342,789(U.S.) | 136,700(U.S.) | 50,722(U.S.) | 107,000 | – | – |

1. Named Executives participate in an incentive compensation program, which provides for annual cash payments to participants, based on the achievement of predetermined corporate, group and individual results. The Board of Directors determines actual awards at the March meeting following completion of the fiscal year. A special bonus was paid to each of Mr. Gee and Mr. Hasley in December 1998 for exceptional efforts on critical projects undertaken in 1998.

2. The amounts in this column represent taxable benefits for automobile costs, club memberships, spousal travel and other employee benefit costs.

3. Represents Value Appreciation Units which were granted effective January 1, 1998 for 1998 and 1999 under the Company's Unit Value Application Plan. See "Description of Long Term Incentive Plan" and "Long Term Incentive Plan – Awards in Most Recently Completed Financial Year".

4. Mr. Gee was appointed Executive Vice President on April 9, 1998 and Vice-Chairman on April 8, 1999.

5. Mr. Prieur was appointed General Manager, U.S. on November 13, 1997 and President and Chief Operating Officer on April 8, 1999. The other annual compensation for Mr. Prieur includes U.S. $17,907 for travel expenses and U.S. $19,550 for tuition expenses. During 1998, Mr. Prieur was resident in the United States.

### *Change of Control Contracts*

In 1998, Sun Life Assurance introduced change of control contracts for the CEO and seven Senior Vice Presidents. In the event of a change of control, which results in the termination of the employment of the executive, the contracts provide for up to 24 months of base pay and target incentive compensation from the date of actual termination. Most benefits and perquisites are continued throughout the severance period and the early retirement reduction factors in the pension plan may be improved. On a change of control, outstanding Value Appreciation Units awarded under the Unit Value Appreciation Plan will become vested.

### *Long Term Incentive Compensation*

Effective January 1, 1998, Sun Life Assurance introduced a long term incentive compensation plan for certain officers of Sun Life Assurance holding positions at the level of Vice President or higher. The Unit Value Appreciation Plan (the "UVA Plan") provides eligible officers with value appreciation units ("Value Appreciation Units") designed to reward management for growth in the value of the Company over a multi-year period. For purposes of the UVA Plan, the value of the Company is determined by applying predefined multiples to the net income earned in the Company's various businesses. When the UVA Plan was introduced, participants were awarded two allotments of Value Appreciation Units – a three-year grant and a four-year grant, representing grants for 1998 and 1999, respectively. The three-year grant will reward increases in the value of the Company from January 1, 1998 to December 31, 2000. The four-year grant will reward increases in the value of the Company from January 1, 1998 to December 31, 2001. The starting value of the Value Appreciation Units at the time of these grants was established by reference to the Company's 1997 financial results, adjusted for certain items. Awards are payable in cash and are based on the increase in the value of Value Appreciation Units over the performance period. The UVA Plan does not establish minimum thresholds, targets or maximum payouts.

### *Long-term Incentive Plan – Awards in Most Recently Completed Financial Year*

The following table sets forth information concerning the award of Value Appreciation Units under the Company's UVA Plan in the year ended December 31, 1998 in respect of the Named Executive Officers:

| Name | Units | Performance Period |
|---|---|---|
| John D. McNeil | 125,000<br>125,000 | 3 years<br>4 years |
| Donald A. Stewart | 85,500<br>100,000 | 3 years<br>4 years |
| Gregory W. Gee | 32,000<br>40,000 | 3 years<br>4 years |
| Michael A. Hasley | 26,500<br>26,500 | 3 years<br>4 years |
| C. James Prieur | 42,500<br>64,500 | 3 years<br>4 years |

## Pension Plan Table

Executive officers of the Company are eligible to participate in the pension plans available in their country of residence. The following describes the pension arrangements in effect in Canada and the United States.

### *Retirement Benefits for Executive Officers in Canada*

The following table illustrates the total pension calculated according to the Alternate Pension Formula for principal officers of Sun Life Assurance. Average pensionable earnings for this purpose are calculated as the highest average of the basic salary and target bonus over the best consecutive 36 month period of the last 120 months. The pension benefit is determined as years of service multiplied by the sum of 1.3% of pensionable earnings up to the average of the last three years' maximum pensionable earnings ("YMPE") and 1.65% of average pensionable earnings over the average YMPE, without regard to the maximum pension limit for registered pension plans imposed by Revenue Canada. In no event can the pension exceed 85% of the participant's highest average base salary. The credited years of service are limited to 35.

The pension is payable to Canadian Named Executives from a combination of the Company's Canadian Staff Pension Plan (a non-contributory defined benefit pension plan) and the Company's Canadian Staff Non-Registered

Pension Plan. Upon retirement, income is payable for the life of the executive officer with a 60% survivor option for married employees and a life only benefit for single employees.

### Annual Pension – Canada

| Average Pensionable Earnings | Years of Service | | | | |
|---|---|---|---|---|---|
| | 15 | 20 | 25 | 30 | 35 |
| $ 200,000 | $ 47,608 | $ 63,478 | $ 79,347 | $ 95,217 | $ 111,086 |
| 250,000 | 59,983 | 79,978 | 99,972 | 119,967 | 139,961 |
| 300,000 | 72,358 | 96,478 | 120,597 | 144,717 | 168,836 |
| 400,000 | 97,108 | 129,478 | 161,847 | 194,217 | 226,586 |
| 600,000 | 146,608 | 195,478 | 244,347 | 293,217 | 342,086 |
| 800,000 | 196,108 | 261,478 | 326,847 | 392,217 | 457,586 |
| 1,000,000 | 245,608 | 327,478 | 409,347 | 491,217 | 573,086 |
| 1,200,000 | 295,108 | 393,478 | 491,847 | 590,217 | 688,586 |
| 1,500,000 | 369,358 | 492,478 | 615,597 | 738,717 | 861,836 |
| 1,800,000 | 443,608 | 591,478 | 739,347 | 887,217 | 1,035,086 |

***Retirement Benefits for Executive Officers in the United States***

The following table illustrates the total annual pension for employees in the United States who are eligible to participate in the U.S. Employees' Retirement Income Plan and accompanying Trust (the "Plan"). Under the Plan, income is payable for the life of the eligible officer. The normal form of pension for single employees is a life annuity; for married individuals it is an actuarially reduced 50% joint and survivor benefit.

Pensionable earnings for this purpose are calculated using the highest average of base earnings and officer incentive payment, up to target, earned over the highest consecutive 36 month period in the last 120 months. The pension benefit is determined by years of service (maximum of 30) multiplied by 1.67% of the pensionable earnings, plus 0.5% of pensionable earnings for service in excess of 30 years (to a maximum of 40).

In no event can the annual pension benefit exceed U.S. $125,000 at the normal retirement age as defined by the United States Social Security Office. The maximum pensionable earnings that can be used to determine this benefit is U.S. $160,000. Benefits attributable to pensionable earnings over the U.S. $160,000 maximum are accounted for under the United States Excess Plan, a pension plan with terms similar to the Plan, which provides for earnings in excess of the U.S. $160,000 maximum. The following table shows combined benefits under both the Plan and the U.S. Excess Plan.

### Annual Pension – United States (U.S. $)

| Average Pensionable Earnings (U.S.$) | Years of Service | | | | |
|---|---|---|---|---|---|
| | 15 | 20 | 25 | 30 | 35 |
| $200,000 | $ 50,000 | $ 66,667 | $ 83,333 | $100,000 | $105,000 |
| 225,000 | 56,250 | 75,000 | 93,750 | 112,500 | 118,125 |
| 250,000 | 62,500 | 83,333 | 104,167 | 125,000 | 131,250 |
| 300,000 | 75,000 | 100,000 | 125,000 | 150,000 | 157,500 |
| 400,000 | 100,000 | 133,333 | 166,667 | 200,000 | 210,000 |
| 600,000 | 150,000 | 200,000 | 250,000 | 300,000 | 315,000 |

***Years of Credited Service***

Mr. J.D. McNeil retired with 35 years credited service under the Company's Canadian pension plan. The projected years of credited service under their respective pension plans, at their normal retirement date for the Named Executives, are as follows: Mr. D.A. Stewart, 35 years; Mr. G.W. Gee, 35 years; Mr. M.A. Hasley, 32 years; and Mr. C.J. Prieur, 37 years.

## Indebtedness of Directors, Executive Officers and Senior Officers

As at August 31, 1999, the aggregate indebtedness entered into in connection with the purchase of securities of the Company or any of its subsidiaries by all directors, officers, employees and former directors, officers and employees of the Company or any of its subsidiaries was $132,977,629. Of this aggregate indebtedness, $132,207,453 relates to financing provided by MFS to eligible MFS employees for purchases of common shares of MFS under the MFS Equity

Purchase and Participation Plan. The balance is related to loans provided by McLean Budden to eligible McLean Budden officers for purchases of common shares of McLean Budden. No indebtedness was incurred by directors and executives of Sun Life of Canada for the purchase of securities of the Company or its subsidiaries.

As at August 31, 1999, the aggregate indebtedness entered into for purposes other than in connection with the purchase of securities, by directors, officers employees and former directors, officers and employees of the Company or any of its subsidiaries was $113,934,071. The majority of this indebtedness relates to housing loans to employees, secured by their principal residences. No senior officers of the Company were indebted to the Company or any of its subsidiaries, other than for "routine indebtedness".

## OWNERSHIP OF SHARES

After giving effect to demutualization, the directors and senior officers of Financial Services will own beneficially, as a group, less than one-tenth of 1% of the Financial Services Shares outstanding. All of these Financial Services Shares will be issued to directors and senior officers or certain persons or entities affiliated with them as eligible policyholders under the Conversion Plan.

## STOCK OPTION AND EMPLOYEE SHARE PURCHASE PLANS

The Canadian Demutualization Regulations provide that neither a demutualized life insurance company nor its holding company may, prior to the listing of its shares on a recognized stock exchange in Canada and for a period of one year after such a listing, issue or provide shares, share options or rights to acquire shares of the company to any director, officer or employee of the company or any person who was a director, officer or employee of the company during the year preceding the effective date of demutualization of the company and who ceased to be a director, officer or employee of the company, other than shares issued to that person as an eligible policyholder.

The Financial Services Board intends to establish a stock option plan (the "Option Plan") for key officers and employees of Financial Services and certain of its subsidiaries. The Option Plan will not become effective until the one year restriction period imposed by the Canadian Demutualization Regulations has ended. The Option Plan will be designed to align the interests of shareholders and plan participants, and will reward participants for the creation of shareholder value. Shareholder approval of the option plan will be required. The Financial Services Board will administer the Option Plan in compliance with applicable law and the rules of stock exchanges on which the shares are listed. The Financial Services Board will determine the exercise price and option term at the time of grant. The exercise price of an option will not be less than the market price of Financial Services Shares at the time of grant and the options will be for a term not exceeding 10 years. The options will be exercisable by a holder subject to a vesting schedule to be established by the Financial Services Board at the time of grant.

Financial Services also intends to establish a voluntary employee share purchase plan (the "Purchase Plan") on demutualization to facilitate employee ownership of Financial Services Shares. No shareholder approval is required for the Purchase Plan. Eligible employees of Financial Services and its subsidiaries will be permitted to purchase Financial Services Shares through payroll deductions up to a maximum percentage of their base salary. All purchases of Financial Services Shares under the Purchase Plan will be made in the open market.

Initially, purchases of Financial Services Shares by employees under the Purchase Plan will not be made with a financial contribution from Financial Services. However, at a date following the one year restriction period imposed by the Canadian Demutualization Regulations, Financial Services may amend the Purchase Plan to provide for contributions by Financial Services towards the purchase price of Financial Services Shares.

## DESCRIPTION OF SHARE CAPITAL OF FINANCIAL SERVICES

The authorized capital of Financial Services consists of an unlimited number of common shares, an unlimited number of Class A Shares, issuable in series, and an unlimited number of Class B Shares, issuable in series, the share conditions of which are summarized below. As of the date hereof, one common share is issued and outstanding and 100,000 Class A Shares are issued and outstanding. No Class B Shares are issued and outstanding. All of the issued and outstanding common shares and Class A Shares are currently held by Sun Life Assurance. The common share and Class A Shares held by Sun Life Assurance will be repurchased by Financial Services and Financial Services Shares will be issued to certain eligible policyholders on the date of demutualization. See "Financial Services and Corporate Reorganization" in Part 1 of this Policyholder Information Circular.

### *Common Shares*

Each common share of Financial Services is entitled to one vote at meetings of the shareholders of Financial Services, except for meetings at which only holders of another specified class or series of shares of Financial Services are



SL-0496

entitled to vote separately as a class or series. Each common share of Financial Services is also entitled to receive dividends if, as and when declared by the Financial Services Board. All dividends that the Financial Services Board may declare and pay will be declared and paid in equal amounts per share on all common shares of Financial Services, subject to the rights of holders of the Class A Shares and the Class B Shares. Holders of common shares will participate in any distribution of the net assets of Financial Services upon its liquidation, dissolution or winding-up on an equal basis per share, subject to the rights of the holders of the Class A Shares and the Class B Shares. There are no pre-emptive, redemption, purchase or conversion rights attaching to the common shares.

***Class A Shares***

The Class A Shares may be issued at any time or from time to time in one or more series as may be determined by the Financial Services Board. The Financial Services Board is authorized to fix before issue the number, the consideration per share and the designation of and, subject to the special rights and restrictions attached to all Class A Shares, the rights and restrictions attached to the Class A Shares of each series. The Class A Shares of each series rank on a parity with the Class A Shares of each other series with respect to the payment of dividends and the return of capital on the liquidation, dissolution or winding-up of the Company. The Class A Shares are entitled to preference over the Class B Shares, the common shares and any other shares ranking junior to the Class A Shares with respect to the payment of dividends and the return of capital. The special rights and restrictions attaching to the Class A Shares as a class may not be amended without such approval as may then be required by law, subject to a minimum requirement of approval by the affirmative vote of at least two-thirds of the votes cast at a meeting of the holders of Class A Shares to be called and held for that purpose. The holders of Class A Shares are not entitled to any voting rights except as provided by law.

***Class B Shares***

The Class B Shares may be issued at any time or from time to time in one or more series as may be determined by the Financial Services Board. The Financial Services Board is authorized to fix before issue the number, the consideration per share and the designation of and, subject to the special rights and restrictions attached to all Class B Shares, the rights and restrictions attached to the Class B Shares of each series. The Class B Shares of each series rank on a parity with the Class B Shares of each other series with respect to the payment of dividends and the return of capital on the liquidation, dissolution or winding-up of Financial Services. The Class B Shares are entitled to preference over the common shares and any other shares ranking junior to the Class B Shares with respect to the payment of dividends and the return of capital, but are subordinate to the Class A Shares and any other shares ranking senior to the Class B Shares with respect to the payment of dividends and return of capital. The special rights and restrictions attaching to the Class B Shares as a class may not be amended without such approval as may then be required by law, subject to a minimum requirement of approval by the affirmative vote of at least two-thirds of the votes cast at a meeting of the holders of Class B Shares to be called and held for that purpose. The holders of Class B Shares are not entitled to any voting rights except as provided by law.

## DIVIDEND POLICY OF FINANCIAL SERVICES

Financial Services intends to consider paying dividends to shareholders in a range that is comparable to that of shareholder dividends paid by other publicly traded North American financial services companies. The dividend policy will be reviewed periodically by the Financial Services Board. The declaration and payment of dividends are at the sole discretion of the Financial Services Board and will be dependent upon the Company's earnings, financial condition and capital requirements, and dividends may be adjusted or eliminated at the discretion of the Financial Services Board on the basis of these or other considerations.

As a holding company, Financial Services' ability to meet its cash requirements and pay dividends on the Financial Services Shares will depend in large part upon the receipt of dividends and other payments from its subsidiaries. The payment of dividends to Financial Services by certain of its subsidiaries is regulated under corporate, insurance and securities laws. See "Regulatory Matters" and "Risk Factors – Holding Company Structure and Restrictions on Dividends".

Subject to regulatory approval, Financial Services intends to adopt a dividend reinvestment plan (the "Dividend Reinvestment Plan"), which is not expected to be implemented by the Board of Financial Services until at least 12 months after the date of demutualization. Pursuant to the Dividend Reinvestment Plan, holders of Financial Services Shares in certain jurisdictions will be able to elect to have all dividends paid on Financial Services Shares held by them automatically reinvested in additional Financial Services Shares at a price per Financial Services Share calculated by reference to the weighted average of the trading price for Financial Services Shares on a stock exchange on which the Financial Services Shares are listed for the five trading days immediately preceding the date the relevant dividend is paid by Financial Services. No brokerage commissions will be payable in connection with the purchase of Financial Services

Shares under the Dividend Reinvestment Plan and all administrative costs will be borne by Financial Services. Proceeds received by Financial Services upon the issuance of additional Financial Services Shares under the Dividend Reinvestment Plan will be used by Financial Services for working capital.

## CONSTRAINTS ON OWNERSHIP OF FINANCIAL SERVICES SHARES

The Canadian Insurance Act and the regulations thereunder contain restrictions on the purchase or other acquisition, issue, transfer and voting of the shares of a demutualized insurance company or, when a holding company structure is used, its holding body corporate. Pursuant to these restrictions, no person is permitted to acquire any shares of Financial Services if the acquisition would cause the person to have a "significant interest" in any class of shares of Financial Services. In addition, Financial Services is not permitted to record any transfer or issue of its shares if the transfer or issue would cause the person to have a significant interest in Financial Services. No such person who has a significant interest in Financial Services may exercise any voting rights attached to the shares held by such person. For these purposes, a person has a significant interest in a class of shares of Financial Services where the aggregate of any shares of that class beneficially owned by that person, any entity controlled by that person and by any person acting jointly or in concert with that person exceeds 10% of all the outstanding shares of that class of shares of Financial Services. If a person contravenes any of these restrictions, the Minister of Finance of Canada may, by order, direct such person to dispose of all or any portion of those shares.

In June 1999 the Canadian government announced its intention to change the ownership regime described above to allow an investor to hold up to 20% of any class of voting shares, and up to 30% of any class of non-voting shares, for a demutualized insurance company having shareholders' equity in excess of $5 billion, or its holding body corporate, subject to a "fit and proper" test. The government also indicated that the fit and proper test would include an examination of the proposed investor's past business record, the soundness of its business plan and the business reasons for the investment and would seek to assess whether the proposed investor has the necessary integrity and fitness of character. The government indicated that this test would be designed to help ensure that key shareholders are not a source of weakness to regulated institutions such as Financial Services.

In addition, the government announced that during a two-year transitional period following demutualization no mergers with or acquisition of another demutualized insurance company will be permitted. After this two-year transition period, Financial Services would be permitted, subject to obtaining necessary regulatory approval, to merge with another demutualized insurance company and, in certain circumstances, to acquire a demutualized insurance company with less than $5 billion in shareholders' equity, subject to a requirement that 35% of the acquired company's voting shares be held by the public. However any demutualized insurance company, or its holding body corporate, such as Financial Services, with more than $5 billion in shareholders' equity would not be permitted to be acquired.

No legislation has been passed or tabled by the Canadian government to implement these proposals.

## CORPORATE GOVERNANCE OF SUN LIFE ASSURANCE

The corporate governance rights of Sun Life Assurance will be shared between Financial Services, as the holder of all of the outstanding common shares of Sun Life Assurance, and participating policyholders of Sun Life Assurance. See "Ongoing Rights of Participating Policyholders – Voting Rights" in Part 1 of this Policyholder Information Circular. The participating policyholders will be entitled to elect at least one-third of the board of directors of Sun Life Assurance and Financial Services will be entitled to elect the remaining members of the board of directors of Sun Life Assurance. The board of directors of Sun Life Assurance will continue to have a fiduciary duty to act in the best interests of Sun Life Assurance and may only consider the interests of particular stakeholders if they do not conflict with those of the company. In most cases, amendments to the letters patent or the by-laws of Sun Life Assurance will be required to be approved by the participating policyholders and Financial Services, voting together. Participating policyholders will have the right to vote as a separate class on certain significant corporate transactions, including: (i) any proposal to amend its by-laws to add, change or remove the rights of policyholders, other than participating policyholders, to vote at meetings of policyholders or shareholders, (ii) any amalgamation agreement, (iii) any proposed agreement of Sun Life Assurance to transfer all or substantially all of its policies, reinsure all or substantially all of its risks or sell all or substantially all of its assets and (iv) any proposal to mutualize Sun Life Assurance. As a result, Sun Life Assurance's participating policyholders may have an effective veto right on certain transactions which Financial Services, the sole shareholder of Sun Life Assurance, may otherwise approve. Each participating policyholder is entitled to one vote on such matters, irrespective of the number or size of policies owned, both before and after demutualization. Financial Services will be entitled to one vote for each common share of Sun Life Assurance that it holds.

## AUDITORS

The auditors of the Company are Deloitte & Touche LLP, Chartered Accountants, Suite 1400, BCE Place, 181 Bay Street, Toronto, Ontario, Canada M5J 2V1.

## TRANSFER AGENTS AND REGISTRARS

The transfer agents and registrars for the Financial Services Shares are set out below:

| | |
|---|---|
| **Canada:** | CIBC Mellon Trust Company<br>320 Bay Street, 3rd Floor<br>Toronto, Ontario<br>Canada M5H 4A6 |
| **United States:** | ChaseMellon Shareholder Services, L.L.C.<br>Overpeck Centre<br>85 Challenger Road<br>Ridgefield Park, New Jersey 07660<br>U.S.A. |
| **United Kingdom:** | IRG plc<br>Bourne House<br>34 Beckenham Road<br>Beckenham<br>Kent BR3 4TU<br>United Kingdom |
| **Philippines:** | The Hongkong and Shanghai Banking Corporation<br>33/F Philippine Stock Exchange Centre<br>West Tower, Exchange Road<br>Ortigas Centre, Pasig City<br>Philippines |
| **Hong Kong:** | Central Registration Hong Kong Limited<br>Room 1901-5, 19th Floor<br>Hopewell Centre<br>183 Queen's Road East<br>Wanchai<br>Hong Kong |
| **Bermuda:** | The Bank of N.T. Butterfield & Son Ltd.<br>65 Front Street<br>Hamilton HM 12<br>Bermuda |

## AVAILABILITY OF CERTAIN DOCUMENTS

Copies of the following documents may be examined by eligible policyholders between the hours of 9:00 a.m. and 5:00 p.m. (local time), Monday through Friday, at the principal office of Sun Life of Canada in each of Canada, the United States, Hong Kong and the Philippines: (i) the Letters Patent of Financial Services; (ii) the by-laws of Financial Services; (iii) the current Letters Patent of Sun Life Assurance; (iv) the current by-laws of Sun Life Assurance; (v) the Letters Patent of Conversion for Sun Life Assurance to be issued in order to effect the Conversion Plan; (vi) the by-laws of Sun Life Assurance as they are proposed to be amended upon demutualization; and (vii) the Conversion Plan. The address of the head office of Sun Life Assurance in Canada is 150 King Street West, Toronto. The Company's principal office in the United States is One Sun Life Executive Park, Wellesley Hills, Massachusetts, its principal office in the United Kingdom is Basing View, Basingstoke, Hampshire, its principal office in Hong Kong is 11/F Paliburg Plaza, 68 Yee Wo Street, Causeway Bay and its principal office in the Philippines is 11 Paseo de Roxas, Makati, Metro Manila. Copies of any of the above-noted documents may be requested by contacting Sun Life Assurance at one of the above addresses.

## ENFORCEABILITY OF CIVIL LIABILITIES

Each of Sun Life Assurance and Financial Services is a corporation incorporated under the laws of Canada. A majority of each of its directors and officers, as well as certain experts named herein, are residents of Canada and all or a substantial portion of their assets are located in Canada. Most of the assets owned by Sun Life Assurance and Financial Services are located in Canada. The assets of Sun Life Assurance located in the United States, the United Kingdom, the Philippines and Hong Kong (each a "Jurisdiction") are owned principally by subsidiaries. As a result, it may be difficult for holders of Financial Services Shares to effect service within a Jurisdiction upon directors, officers and experts who are not residents of such Jurisdiction or to realize in a Jurisdiction upon judgements of courts of such Jurisdiction predicated upon civil liability under the securities laws of the Jurisdiction or any smaller relevant jurisdiction. Financial Services has been advised by Tory Tory DesLauriers & Binnington, its Canadian counsel, that there is some doubt as to the enforceability in Canada against Financial Services or against its directors, officers and experts who are not residents of a Jurisdiction, in original actions or in actions for enforcement of judgements of such Jurisdiction's courts, of liabilities predicated solely upon such Jurisdiction's securities laws or the securities laws of any jurisdiction within that Jurisdiction.

## APPOINTED ACTUARY'S REPORT (1996)

The Policyholders,
SUN LIFE ASSURANCE COMPANY OF CANADA

I have valued the Actuarial liabilities of Sun Life Assurance Company of Canada for its Consolidated Balance Sheet at December 31, 1996 and its other consolidated financial statements for the year then ended, in accordance with accepted actuarial practice.

In my opinion, the valuation is appropriate and the financial statements fairly present the results of the valuation.

Toronto, Canada
February 10, 1997

(Signed) Robert J. Sharkey
Fellow, Canadian Institute of Actuaries
Senior Vice-President and Chief Actuary

## APPOINTED ACTUARY'S REPORT (1997)

The Policyholders,
SUN LIFE ASSURANCE COMPANY OF CANADA

I have valued the Actuarial liabilities of Sun Life Assurance Company of Canada for its Consolidated Balance Sheet at December 31, 1997 and their change in the Consolidated Statement of Operations for the year then ended in accordance with accepted actuarial practice, including selection of appropriate assumptions and methods.

In my opinion, the amount of policy liabilities makes appropriate provision for all policyholders' obligations and the consolidated financial statements fairly present the result of the valuation.

Toronto, Canada
February 10, 1998

(Signed) Robert J. Sharkey
Fellow, Canadian Institute of Actuaries
Senior Vice-President and Chief Actuary

## APPOINTED ACTUARY'S REPORT (1998)

The Policyholders,
SUN LIFE ASSURANCE COMPANY OF CANADA

I have valued the policy liabilities of Sun Life Assurance Company of Canada for its Consolidated Balance Sheet at December 31, 1998 and their change in the Consolidated Statement of Operations for the year then ended in accordance with Canadian accepted actuarial practice, including selection of appropriate assumptions and methods.

In my opinion, the amount of policy liabilities makes appropriate provision for all policyholders' obligations and the consolidated financial statements fairly present the result of the valuation.

Toronto, Canada
February 17, 1999

(Signed) Robert W. Wilson
Fellow, Canadian Institute of Actuaries
Vice-President and Appointed Actuary

# AUDITORS' REPORT

The Board of Directors,
SUN LIFE ASSURANCE COMPANY OF CANADA

We have audited the Consolidated Balance Sheets of Sun Life Assurance Company of Canada, including the separate Consolidated Balance Sheets of its Segregated Funds, as at December 31, 1998 and 1997 and the Consolidated Statements of the Company's Surplus for each of the years in the two year period ended December 31, 1998 and the Consolidated Statements of the Company's Operations, Cash Flow and of Changes in Net Assets of its Segregated Funds for each of the years in the three year period ended December 31, 1998. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform an audit to obtain reasonable assurance whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.

In our opinion, these Consolidated Financial Statements present fairly, in all material respects, the financial position of the Company and its segregated funds as at December 31, 1998 and 1997, the results of the Company's operations and its cash flow and the changes in the net assets of its segregated funds for each of the years in the three-year period ended December 31, 1998 in accordance with Canadian generally accepted accounting principles, including the accounting requirements of the Superintendent of Financial Institutions Canada.

Toronto, Canada
February 17, 1999

(Signed) Deloitte & Touche LLP
Chartered Accountants

# CONSOLIDATED FINANCIAL STATEMENTS

## Consolidated Balance Sheet

| | December 31, 1998 | December 31, 1997 |
|---|---|---|
| | (in millions of Canadian dollars) | |
| **ASSETS** | | |
| Bonds | $26,153 | $23,514 |
| Mortgages | 11,979 | 11,225 |
| Stocks | 4,413 | 4,365 |
| Real Estate | 2,440 | 2,207 |
| Policy Loans | 1,222 | 1,066 |
| Cash and short-term securities | 2,602 | 2,811 |
| Other invested assets | 1,138 | 466 |
| **Invested Assets** | 49,947 | 45,654 |
| Investment income due and accrued | 639 | 607 |
| Outstanding premiums | 202 | 206 |
| Future income taxes | 460 | 507 |
| Deferred acquisition costs | 936 | 589 |
| Other assets | 1,966 | 2,001 |
| **Total general fund assets** | $54,150 | $49,564 |
| **Segregated funds net assets** | $39,213 | $30,519 |
| **LIABILITIES AND SURPLUS** | | |
| Actuarial liabilities | $34,498 | $32,018 |
| Amounts on deposit | 5,457 | 4,840 |
| Policy benefits in process of payment | 360 | 307 |
| Borrowed funds | 306 | 462 |
| Accrued expenses and taxes | 786 | 711 |
| Future income taxes | 328 | 287 |
| Deferred net realized gains | 3,057 | 2,006 |
| Other liabilities | 1,583 | 1,632 |
| | 46,375 | 42,263 |
| **Subordinated debt** | 764 | 728 |
| **Cumulative capital securities of a subsidiary** | 930 | 858 |
| **Surplus** | 6,081 | 5,715 |
| **Total general fund liabilities and surplus** | $54,150 | $49,564 |
| **Segregated funds contract liabilities** | $39,213 | $30,519 |

On behalf of the Board:

(Signed) Alfred Powis
Director

(Signed) William W. Stinson
Director

*The attached notes form part of these financial statements.*



SL-0503

## Consolidated Statement of Operations

| | Year Ended December 31, 1998 | 1997 | 1996* |
|---|---|---|---|
| | (in millions of Canadian dollars) | | |
| **Revenue** | | | |
| Premiums: | | | |
| Life insurance | $ 3,541 | $ 3,126 | $ 2,968 |
| Health insurance | 1,633 | 1,325 | 1,208 |
| Annuities | 2,408 | 2,488 | 1,917 |
| | 7,582 | 6,939 | 6,093 |
| Net investment income | 4,097 | 3,836 | 3,526 |
| Fee income | 2,017 | 1,430 | 1,113 |
| | 13,696 | 12,205 | 10,732 |
| **Policy benefits and expenses** | | | |
| Payments to policyholders, beneficiaries and depositors: | | | |
| Death and disability benefits | 1,182 | 977 | 1,020 |
| Maturities and surrenders | 3,040 | 3,055 | 2,715 |
| Annuity payments | 913 | 853 | 805 |
| Interest on claims and deposits | 323 | 305 | 303 |
| Experience rating refunds | 87 | 32 | 47 |
| Health benefits | 1,353 | 1,018 | 879 |
| | 6,898 | 6,240 | 5,769 |
| Net transfers to segregated funds | 1,493 | 994 | 315 |
| Increase in actuarial liabilities | 473 | 710 | 931 |
| Commissions | 1,212 | 913 | 737 |
| Operating expenses | 2,050 | 1,712 | 1,456 |
| Interest on borrowings | 106 | 99 | 95 |
| Taxes | 310 | 269 | 304 |
| | 12,542 | 10,937 | 9,607 |
| **Operating income** | 1,154 | 1,268 | 1,125 |
| Policyholder dividends | 764 | 711 | 635 |
| Cumulative capital securities dividends | 76 | 46 | – |
| Confederation Life goodwill write-off | 260 | – | – |
| **Net income** | $ 54 | $ 511 | $ 490 |

* As restated.

*The attached notes form part of these financial statements.*



SL-0504

## Consolidated Statement of Surplus

| | Surplus | Currency Translation Account | Total Surplus |
|---|---|---|---|
| | (in millions of Canadian dollars) | | |
| **1998** | | | |
| Balance, January 1 | $5,271 | $444 | $5,715 |
| Net income | 54 | – | 54 |
| Effect of changes in currency exchange rates | – | 312 | 312 |
| Balance, December 31 | $5,325 | $756 | $6,081 |
| **1997** | | | |
| Balance, January 1, as restated | $4,760 | $392 | $5,152 |
| Net income | 511 | – | 511 |
| Effect of changes in currency exchange rates | – | 52 | 52 |
| Balance, December 31 | $5,271 | $444 | $5,715 |

*The attached notes form part of these financial statements.*

# Consolidated Statement of Cash Flow

| | 1998 | 1997 | 1996* |
|---|---|---|---|
| | Year Ended December 31, (in millions of Canadian dollars) | | |
| **Operating Activities** | | | |
| Net income | $ 54 | $ 511 | $ 490 |
| Items not affecting cash: | | | |
| Increase in actuarial and other policy related liabilities | 999 | 1,080 | 1,281 |
| Amortization of net deferred realized and unrealized gains on investments | (554) | (479) | (326) |
| Provisions (recoveries) for losses on investments | (16) | 12 | 44 |
| Future income taxes | 75 | 7 | 24 |
| Amortization of goodwill and deferred acquisition costs | 199 | 132 | 83 |
| Write-off of Confederation Life goodwill | 260 | – | – |
| New business acquisition costs capitalized | (463) | (284) | (213) |
| Net increase in policy loans | (98) | (59) | (44) |
| Net change to securities transactions receivable/payable | (98) | 41 | 162 |
| Other changes in other assets and liabilities | 22 | – | 18 |
| Net cash provided by operating activities | 380 | 961 | 1,519 |
| **Financing Activities** | | | |
| Increase (decrease) in borrowed money | (184) | 25 | (106) |
| Issuance of cumulative capital securities, net of issuance costs | – | 822 | – |
| | (184) | 847 | (106) |
| **Investing Activities** | | | |
| Net increase in long-term investments | (390) | (628) | (1,890) |
| Net cash change on acquisitions | (170) | (113) | – |
| | (560) | (741) | (1,890) |
| **Increase (Decrease) in Cash and Short-Term Securities** | (364) | 1,067 | (477) |
| Cash and short-term securities, beginning of period | 2,811 | 1,703 | 2,136 |
| Changes due to fluctuations in exchange rates | 155 | 41 | 44 |
| **Cash and short-term securities, end of period** | $2,602 | $2,811 | $ 1,703 |

* As restated.

*The attached notes form part of these financial statements.*



SL-0506

## Consolidated Segregated Funds Balance Sheet

| | December 31, 1998 | December 31, 1997 |
|---|---|---|
| | (in millions of Canadian dollars) | |
| **Assets** | | |
| Bonds | $ 4,274 | $ 6,178 |
| Mortgages | 299 | 275 |
| Stocks | 32,929 | 21,229 |
| Real estate | 834 | 722 |
| Cash and short-term securities | 1,751 | 2,477 |
| Investment income due and accrued | 117 | 112 |
| Other assets | 816 | 120 |
| | 41,020 | 31,113 |
| **Liabilities** | | |
| Accrued expenses and taxes | 134 | 104 |
| Other liabilities | 1,673 | 490 |
| | 1,807 | 594 |
| **Net Assets** | | |
| Applicable to Segregated Funds policyholders | $39,213 | $30,519 |

*The attached notes form part of these financial statements.*

## Consolidated Statement of Changes In Segregated Funds Net Assets

| | Year Ended December 31, | | |
|---|---|---|---|
| | 1998 | 1997 | 1996 |
| | (in millions of Canadian dollars) | | |
| **Net Assets, January 1** | $30,519 | $26,250 | $23,709 |
| **Additions** | | | |
| Deposits: | | | |
| Life insurance | 135 | 123 | 128 |
| Annuities | 4,210 | 3,307 | 3,591 |
| | 4,345 | 3,430 | 3,719 |
| Net realized and unrealized gains | 4,048 | 3,897 | 1,880 |
| Other investment income | 1,106 | 1,012 | 1,097 |
| Effect of changes in currency exchange rates | 2,434 | 769 | 1,031 |
| | 42,452 | 35,358 | 31,436 |
| **Deductions** | | | |
| Payments to policyholders and their beneficiaries: | | | |
| Death and disability benefits | 251 | 276 | 191 |
| Maturities and surrenders | 2,395 | 4,050 | 4,597 |
| Annuity payments | 107 | 108 | 103 |
| Management fees | 371 | 296 | 245 |
| Other expenses | 38 | 22 | 21 |
| Taxes | 77 | 87 | 29 |
| **Net Assets, December 31** | $39,213 | $30,519 | $26,250 |

*The attached notes form part of these financial statements.*



SL-0508

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts in millions of Canadian dollars)

## 1. ACCOUNTING POLICIES

### *Description of Business*

Sun Life Assurance Company of Canada and its subsidiaries are collectively referred to as "the Company". The Company is an internationally diversified financial services organization providing annuity, retirement and pension products, and life and health insurance to individuals and groups through its long-standing operations in Canada, the United States, the United Kingdom and the Asia Pacific region. The Company also operates mutual fund, trust, banking and investment management businesses, primarily in Canada, the United States and the United Kingdom. Sun Life Assurance Company of Canada is a mutual life insurance company registered under the Insurance Companies Act of Canada, which is administered by the Office of the Superintendent of Financial Institutions Canada.

### *Basis of Presentation*

Sun Life Assurance Company of Canada prepares its Consolidated Financial Statements according to Canadian generally accepted accounting principles (GAAP) including the requirements of the Office of the Superintendent of Financial Institutions Canada.

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect:

- the reported amounts of assets and liabilities at the date of the financial statements,
- the disclosure of contingent assets and liabilities at the date of the financial statements, and
- the reported amounts of revenues and expenses during the reporting period.

Actual results could differ from those estimates.

The significant accounting policies used in the preparation of these Consolidated Financial Statements are summarized below.

### *Basis of Consolidation*

The Consolidated Financial Statements reflect the accounts of the Company which include life insurance and non-life insurance subsidiaries. Significant intercompany balances and transactions have been eliminated. The purchase method is used to account for the acquisition of subsidiaries. The difference between the acquisition cost of a subsidiary and the fair value of the net identifiable assets acquired represents goodwill. Other entities over which the Company is able to exercise a significant influence are reported on the equity basis. The Company's share of earnings of such entities is reported in net investment income in the Consolidated Statement of Operations.

### *Bonds and Mortgages*

Bonds and mortgages are carried at amortized cost, net of allowances for losses. Purchase premium or discount on bonds is amortized over the life of the particular security.

Asset-backed securities are carried at cost and adjusted for unamortized premiums and discounts. Unamortized premiums and discounts are amortized on a constant yield basis over the estimated remaining term of the securities adjusted for anticipated prepayments.

A bond or mortgage is classified as impaired when payment is 90 days past due, foreclosure or power of sale procedures have started, or as other circumstances warrant. When an asset is classified as impaired, allowances for losses are established, interest is no longer accrued and previous interest accruals are reversed. When this happens, the carrying value of the asset becomes the net present value of its future estimated cash flows. Allowances for losses against bonds and mortgages are charged against net investment income and are reduced by write-offs of specific investments and recoveries. Allowances are reduced once the conditions causing the impairment improve and future payments are reasonably assured. The invested asset is then reclassified as performing.

Management also establishes general allowances for classes of assets when there is concern about the ultimate collection of principal or interest. The Company's actuarial liabilities include additional provisions for possible future asset losses.

Realized gains and losses on the sales of bonds and mortgages are deferred and brought into net investment income on a constant yield basis over the remaining period to maturity.

### *Stocks*

Stocks are originally recorded at cost and the carrying value is adjusted annually by 15% of the difference between market value and previously adjusted carrying value.



SL-0509

1. **ACCOUNTING POLICIES (Continued)**

Realized gains and losses on sales of stocks are deferred and brought into income at the annual rate of 15% of the unamortized balance.

***Real Estate***

Real estate includes real estate held for investment and real estate held for sale.

*Real estate held for investment:*

Real estate held for investment is originally recorded at cost. The carrying value is adjusted annually by 10% of the difference between market value and previously adjusted carrying value. Realized gains and losses on sales are deferred and recorded in net investment income at the annual rate of 10% of the unamortized balance.

Market value is determined for each property by qualified appraisers. Appraisals are obtained annually for high value properties and at least once every three years for other properties. The Company monitors the values of these properties to ensure that, in aggregate, the carrying values used are not in excess of market values and records a write down for any non-temporary decline in value.

*Real estate held for sale:*

Properties held for sale are usually acquired through foreclosure. They are carried at the lower of the carrying value of the foreclosed loan or the estimated net sales proceeds of the particular property. The Company estimates the net sales proceeds using independent appraisals or discounted future cash flow analyses. Gains and losses on sales of these properties are recorded in net investment income immediately.

***Derivative Financial Instruments***

The Company uses interest rate contracts, foreign exchange contracts, financial futures and options to manage the risk associated with interest and foreign exchange rate changes and common stock market fluctuations. The Company's monitoring policies are described in Note 29. The Company also writes covered options to enhance the return on certain bonds and stocks.

Realized and unrealized gains and losses on derivative instruments are recognized in income on a basis consistent with the underlying assets or liabilities.

***Policy Loans***

Policy loans are carried at their unpaid balance and are fully secured by the policy values on which the loans are made.

***Cash and Short-term Securities***

Short-term securities are highly liquid investments with a term to maturity of less than one year. They are carried at amortized cost.

***Other Invested Assets***

Other invested assets include the Company's investment in segregated funds, investments accounted for by the equity method and equipment leases.

***Deferred Acquisition Costs***

Deferred acquisition costs arise on mutual fund sales and certain term deposits. They are amortized over the period of related sales charges or the term of the related deposits, as appropriate.

The policy premium method implicitly includes acquisition costs on insurance and annuity product sales in actuarial liabilities. The effect is to recognize these expenses over the premium paying period.

***Goodwill***

Goodwill represents the excess of the cost of businesses acquired over the fair value of their net identifiable assets and is amortized on a straight-line basis over varying periods, up to 20 years. The Company regularly evaluates the carrying amount of goodwill and it is written down when judged to be impaired.



SL-0510

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts in millions of Canadian dollars)

1. ACCOUNTING POLICIES (Continued)

*Fixed Assets*

Furniture, computers, other equipment and leasehold improvements are carried at cost less accumulated depreciation and amortization. Depreciation and amortization are recorded on a straight-line basis over the estimated useful lives of these assets, which generally range from two to ten years.

*Segregated Funds*

Segregated funds are lines of business in which the Company issues a contract where the benefit amount is directly linked to the market value of the investments held in the particular segregated fund. Although the underlying assets are registered in the name of the Company and the segregated fund contract holder has no direct access to the specific assets, the contractual arrangements are such that the segregated fund policyholder bears the risk and rewards of the fund's investment performance. In addition, certain individual contracts have guarantees from the Company.

Segregated fund assets are carried at fair value. Fair values are determined using quoted market values or, where quoted market values are not available, estimated fair values as determined by the Company. Segregated fund assets may not be applied against liabilities that arise from any other business of the Company.

The investment results of the segregated funds are reflected directly in segregated fund liabilities. Deposits to segregated funds are reported as increases in segregated fund liabilities and are not reported as revenues in the Consolidated Statement of Operations.

The Company derives only fee income from segregated funds. Fee income includes fund management fees, income earned by the Company on capital invested in the funds as well as mortality, policy administration and surrender charges on segregated funds. Changes in the Company's interest in the segregated funds, including undistributed net investment income, are reflected in net investment income. Separate financial statements are provided for the segregated funds balance sheet and the changes in net assets.

*Amounts on Deposit*

Amounts on deposit represent premiums paid in advance, reinvested policy dividends and customer deposits in the Company's trust and banking subsidiaries.

*Income Taxes*

Future income tax assets and liabilities are recognized based on temporary differences between the carrying value of the Company's assets and liabilities on the balance sheet and their values for tax purposes. Future income tax assets are recognized to the extent that they are more likely than not to be realized. The income tax provision is based on the financial statement income rather than taxable income.

In determining the impact of taxes, the Company is required to comply with both the standards of the Canadian Institute of Actuaries and those of the Canadian Institute of Chartered Accountants. Actuarial standards require that the projected timing of all cash flows associated with policy liabilities, including income taxes, be included in the determination of actuarial liabilities under the policy premium method.

The actuarial liabilities are first computed including all related income tax effects on a discounted basis, including the effects of temporary differences which have already occurred. Future income tax assets and/or liabilities arising from temporary differences which have already occurred are computed without discounting. These amounts are reclassified from the actuarial liabilities to future income tax balances so as to show them separately on an undiscounted basis on the balance sheet. The net result of this reclassification is to leave the discounting effect of the future income tax balances in the actuarial liabilities.

*Premium Income and Related Expenses*

Gross premiums for all types of insurance contracts, and contracts with limited mortality or morbidity risk, are generally recognized as revenue when due. When premiums are recognized, actuarial liabilities are computed, with the result that benefits and expenses are matched with such revenue.

*Foreign Currency Translation*

The Company's translation of foreign currency arises from the conversion of its self-sustaining foreign operations. Revenues and expenses in foreign currencies, including amortized gains and losses on foreign investments, are translated into Canadian dollars at an average of the market exchange rates during the year. Assets and liabilities are translated into Canadian dollars at market exchange rates at the end of the year. The net translation adjustment is reported as a separate item in the Consolidated Statement of Surplus.



SL-0511

1. ACCOUNTING POLICIES (Continued)

*Company Pension Plans and Other Retiree Benefits*

Pension costs related to current service are charged to income as services are rendered. Variations between plan experience and actuarial estimates as well as adjustments arising from plan amendments, if any, are amortized to income over the estimated average remaining service life of the members covered by the plans. The estimated present value of post-retirement health care and life insurance benefits is charged to income over the employees' years of service to their date of eligibility.

2. ACTUARIAL POLICIES

Actuarial liabilities are computed using generally accepted actuarial practice in accordance with the standards established by the Canadian Institute of Actuaries as well as the requirements of Office of the Superintendent of Financial Institutions Canada.

Actuarial liabilities represent the estimated amount which, together with estimated future premiums and net investment income, will provide for outstanding claims, future benefits, policyholders' dividends, taxes (other than income taxes) and expenses on in-force policies.

In calculating actuarial liabilities, assumptions must be made about the timing and amount of many events, including death, disability, investment, inflation, policy termination, expenses, taxes, premiums, commissions and policyholder dividends.

The Company uses best estimate assumptions for expected future experience. Uncertainty is inherent in the process, as no one can accurately predict the future. Additional provisions are included in the actuarial liabilities to provide for possible adverse deviations from the best estimates. Each assumption includes a margin that must lie within a range prescribed by actuarial standards. The actual size of each margin is determined with respect to product characteristics, distribution system, and management practices. If the assumption is more susceptible to change or if the actuary is less certain about the underlying best estimate assumption, a larger margin is used.

Many assumptions relate to events that may occur many years into the future and may require subsequent revision. With the passage of time and resulting reduction in estimation risk, the provisions may be released into income.

Reinsurance is used to limit exposure to large losses. The Board of Directors approves the Company's retention policy and limits. Arrangements are placed with well-established, highly rated reinsurers. Coverage is well diversified, with no significant concentration in any one reinsurer. Actuarial liabilities are shown net of ceded reinsurance. Although reinsurance arrangements provide for the recovery of claims arising from the liabilities ceded, the Company retains primary responsibility to the policyholders.

The significant actuarial policies and assumptions are summarized below.

*Mortality*

Mortality refers to the rate at which death occurs for a defined group of people. Insurance mortality is based on the Company's average five-year experience. For annuities, Company experience is combined with industry experience since the Company's own experience is insufficient to be statistically reliable. Allowances are made for mortality improvements of annuitants, using industry tables.

The Company has established an issue limit on any one life, to protect against potential large losses. The Company has also established retention limits for different territories. The issue and retention limits are approved by the Board of Directors.

*Morbidity*

Morbidity refers to the disability rate for a defined group of people. Most of the Company's disability insurance is marketed on a group basis. In Canada, morbidity assumptions are based on the Company's five-year average experience, modified to reflect the trend in recovery rates. In the United States and the United Kingdom, both industry and Company experience is used because the Company's own experience is not sufficient to set a reliable assumption.

*Investment Return*

The Company maintains distinct asset portfolios for each line of business. To ensure the adequacy of assets backing the liabilities, the Company does cash flow testing using a set of plausible future interest rates and economic environments. In each set, asset and liability cash flows are projected. Positive net cash flows are invested and assets sold to meet cash needs in accordance with the assumptions in the test and the Company's investment policies. Whenever needed, specific assumptions are made for cyclical credit risks that exceed the long-term expectation. The reserve is set to satisfy liability commitments under all cash flow projections examined. Deferred net realized gains are taken into account in establishing the reserve level.

2. ACTUARIAL POLICIES (Continued)

*Policy Lapse Rates*

Policyholders may allow their policies to lapse by choosing not to continue to pay premiums. Assumptions for lapse experience are based on the Company's average five-year experience. Lapse rates vary by plan, age at issue, method of premium payment and policy duration. Studies prepared by the Canadian Institute of Actuaries are used for certain products where the Company's experience is too limited to be statistically valid.

*Operating Expenses and Inflation*

Actuarial liabilities provide for future policy-related expenses. These include the costs of premium collection, adjudication, claims processing, actuarial calculations, preparation and mailing of policy statements and related indirect expenses and overhead. Expense assumptions are based upon recent Company experience using an internal expense allocation methodology. The trend of expenses over the last four years and the current level of inflation are considered in determining expected future expense levels. The increases assumed in future expenses are consistent with the inflation rate used in the cash flow testing.

*Policyholder Dividends*

Estimated future policyholder dividend payments are included in the actuarial liabilities on a basis that reflects the current scale of policyholder dividends and the expectation that future dividends will be adjusted to reflect future experience.

*Role of the Appointed Actuary*

The Appointed Actuary is appointed by the Company's Board of Directors and is responsible for ensuring that the assumptions and methods used in the valuation of policy liabilities are in accordance with accepted actuarial practice, applicable legislation and associated regulations or directives.

The Appointed Actuary is required to provide an opinion regarding the appropriateness of the policy liabilities at the balance sheet date to meet all obligations to policyholders of the Company. Examination of supporting data for accuracy and completeness and analysis of Company assets for their ability to support the amount of policy liabilities are important elements of the work required to form this opinion.

The Appointed Actuary is required each year to analyze the financial condition of the Company and prepare a report for the Board of Directors. The analysis tests the capital adequacy of the Company until December 31, 2002 under adverse economic and business conditions.

3. CHANGES IN ACCOUNTING POLICIES

*Adopted in 1998*

*Income Taxes:*

The Canadian Institute of Chartered Accountants (CICA) issued CICA Handbook section 3465 in December 1997 for the accounting for income taxes as a replacement for sections 3470 and 3471. The Company adopted the recommendations of section 3465 effective for the fiscal year beginning January 1, 1998. The impact of this change in accounting policy was not material to these Consolidated Financial Statements.

*Adopted in 1997*

*Actuarial Liabilities and Value of Real Estate:*

The Company adopted two new accounting policies in 1997: the Canadian Institute of Actuaries valuation standard for participating life insurance and the CICA guideline setting out the requirements for determining whether a non-temporary decline in the value of real estate had occurred. As a result, net income for 1996 increased by $2 as a result of the changes in recognition of real estate impairment and by $3 as a result of the changes in the valuation of actuarial liabilities. The 1996 restated numbers are denoted by "* As restated" where presented in the Consolidated Financial Statements.

*Segment Disclosures:*

The Company adopted Segmented Disclosures, CICA Handbook section 1701, in 1997. This section has amended criteria for segmented reporting and this has been reflected in Note 28 on Segmented Information. The impact of this change was not material to these Consolidated Financial Statements.



SL-0513

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts in millions of Canadian dollars)

## 3. CHANGES IN ACCOUNTING POLICIES (Continued)

*Future Impact of Recently Issued Accounting Standards*

*Cash Flow Statements:*

The Company will adopt Cash Flow Statements, CICA Handbook section 1540, in 1999, which requires cash and cash equivalents to have a term to maturity of less than 3 months. Currently the Company reports the changes in cash and short-term securities, including highly liquid investments with a term to maturity of less than one year, in its Consolidated Statement of Cash Flow. The impact of this change in accounting policy is not expected to be material to the Consolidated Financial Statements.

## 4. FAIR VALUE OF FINANCIAL INSTRUMENTS

The fair values of the Company's financial instruments are shown in the following table. For completeness, all other general funds assets and liabilities, subordinated debt and cumulative capital securities are also included.

The net of the fair values of tangible assets and liabilities, detailed below, should not be used as an estimate of the market value of the Company.

| On-Balance Sheet | 1998 Carrying Value | 1998 Fair Value | 1997 Carrying Value | 1997 Fair Value |
|---|---|---|---|---|
| | $ | $ | $ | $ |
| **Assets** | | | | |
| Bonds | 26,153 | 29,181 | 23,514 | 25,534 |
| Mortgages | 11,979 | 12,561 | 11,225 | 11,749 |
| Stocks | 4,413 | 5,407 | 4,365 | 5,599 |
| Real estate | 2,440 | 2,762 | 2,207 | 2,340 |
| Policy loans | 1,222 | 1,222 | 1,066 | 1,066 |
| Cash and short-term securities | 2,602 | 2,603 | 2,811 | 2,813 |
| Other invested assets | 1,138 | 1,154 | 466 | 483 |
| Invested assets | 49,947 | 54,890 | 45,654 | 49,584 |
| Investment income due and accrued | 639 | 639 | 607 | 607 |
| Outstanding premiums | 202 | 202 | 206 | 206 |
| Future income taxes | 460 | - | 507 | - |
| Deferred acquisition costs | 936 | 936 | 589 | 589 |
| Other assets | 1,966 | 1,966 | 2,001 | 2,001 |
| Total general funds assets | 54,150 | 58,633 | 49,564 | 52,987 |
| **Liabilities** | | | | |
| Actuarial liabilities | 34,498 | 41,052 | 32,018 | 36,331 |
| Amounts on deposit | 5,457 | 5,466 | 4,840 | 4,856 |
| Policy benefits in process of payment | 360 | 360 | 307 | 307 |
| Borrowed funds | 306 | 306 | 462 | 452 |
| Accrued expenses and taxes | 786 | 786 | 711 | 711 |
| Future income taxes | 328 | 864 | 287 | 678 |
| Deferred net realized gains | 3,057 | - | 2,006 | - |
| Other liabilities | 1,583 | 1,583 | 1,632 | 1,632 |
| Total general funds liabilities | 46,375 | 50,417 | 42,263 | 44,967 |
| Subordinated debt | 764 | 859 | 728 | 784 |
| Cumulative capital securities of a subsidiary | 930 | 1,020 | 858 | 927 |
| **Off-Balance Sheet Net Positive / (Net Negative) Fair Value** | | | | |
| Derivative financial instruments (Note 29) | - | 342 | - | (3) |

A significant portion of any difference between fair values and carrying values relates to assets that are matched to liabilities as to duration, within specified limits. If these assets are sold before maturity, the Company will reinvest the proceeds to ensure there are sufficient assets to match liabilities. Consequently, changes in the fair values of assets backing liabilities will tend to be offset by changes in the fair values of those liabilities.



SL-0514

**4. FAIR VALUE OF FINANCIAL INSTRUMENTS (Continued)**

In an exchange of financial instruments, "fair value" refers to the amount agreed upon between willing knowledgeable parties. The methods and assumptions used to estimate fair value are given below.

*Items with fair value equal to carrying value:*

Due to their nature, the fair values of the following items are assumed to be equal to their carrying values:

- Policy loans
- Cash
- Investment income due and accrued
- Outstanding premiums
- Deferred acquisition costs
- Other assets
- Policy benefits in process of payment
- Accrued expenses and taxes
- Other liabilities

*Bonds:*

For publicly traded bonds, fair value is determined using quoted market prices. For bonds without a readily ascertainable market price, the Company has determined an estimated fair value using a discounted cash flow approach, including provisions for credit risk, generally based upon the assumption such securities will be held to maturity. Such estimated fair values do not necessarily represent the values for which these securities could have been sold at the dates of the Consolidated Balance Sheet.

*Mortgages:*

Fair values of mortgages are determined by discounting the expected future cash flows using current market interest rates for mortgages with similar credit risks and terms to maturity.

*Stocks:*

Fair value of stocks is based on quoted market prices, usually the last trade values.

*Real estate:*

Fair value of real estate is determined by referring to sales of comparable properties in the marketplace and the net present value of the expected future cash flows, discounted using current interest rates.

*Short-term securities:*

Fair value of short-term securities is based on market yields.

*Other invested assets:*

Fair value is determined by reference to market prices for similar investments.

*Future income taxes:*

Fair value of future income taxes represents the amount that would be recognized on the balance sheet if the financial instruments were measured at fair value.

*Actuarial liabilities:*

Fair value of actuarial liabilities is determined by reference to the fair value of the assets supporting those liabilities.

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts in millions of Canadian dollars)

**4. FAIR VALUE OF FINANCIAL INSTRUMENTS (Continued)**

*Amounts on deposit:*

Fair value of fixed rate deposits is determined by discounting the expected future cash flows using current market interest rates for similar deposits. For amounts on deposit with no stated maturity, fair value is equal to carrying value.

*Borrowed funds:*

Fair values of variable rate bank credit facilities approximate carrying value. Fair values for other borrowed funds are based on market prices for the same or similar instruments.

*Deferred net realized gains:*

When financial assets and liabilities are measured at fair value, deferred net realized gains no longer exist.

*Subordinated debt:*

Fair value is based on market prices for the same or similar instruments in Canada and the United States, as appropriate.

*Cumulative capital securities of a subsidiary:*

Fair value of the cumulative capital securities is based on market prices for those instruments.

*Derivative financial instruments:*

Fair value of interest rate contracts and foreign exchange contracts is determined by discounting expected future cash flows using current market interest and exchange rates for similar instruments. Fair value of options, financial futures and common stock index swaps is based on the value of underlying securities or indices, or the quoted market price.

**5. UNREALIZED GAINS AND LOSSES**

Gross unrealized gains (losses) on bonds, issued or guaranteed by the following parties, are as follows:

| | 1998 | | | |
|---|---|---|---|---|
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized (Losses) | Estimated Fair Value |
| | $ | $ | $ | $ |
| Issued or guaranteed by: | | | | |
| Canadian federal government | 1,823 | 121 | (3) | 1,941 |
| Canadian provincial and municipal governments | 2,723 | 456 | (1) | 3,178 |
| U.S. Treasury and other U.S. agencies | 820 | 55 | (2) | 873 |
| Other foreign governments | 3,261 | 609 | (3) | 3,867 |
| Corporate | 15,580 | 1,799 | (59) | 17,320 |
| Asset-backed securities | 1,946 | 63 | (7) | 2,002 |
| Total Bonds | 26,153 | 3,103 | (75) | 29,181 |

| | 1997 | | | |
|---|---|---|---|---|
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized (Losses) | Estimated Fair Value |
| | $ | $ | $ | $ |
| Issued or guaranteed by: | | | | |
| Canadian federal government | 1,830 | 84 | (8) | 1,906 |
| Canadian provincial and municipal governments | 2,970 | 394 | (3) | 3,361 |
| U.S. Treasury and other U.S. agencies | 905 | 35 | 0 | 940 |
| Other foreign governments | 1,834 | 233 | (25) | 2,042 |
| Corporate | 13,855 | 1,304 | (42) | 15,117 |
| Asset-backed securities | 2,120 | 52 | (4) | 2,168 |
| Total Bonds | 23,514 | 2,102 | (82) | 25,534 |



SL-0516

## 5. UNREALIZED GAINS AND LOSSES (Continued)

Bonds are carried at amortized cost, net of allowances for losses, in the Consolidated Financial Statements. Gross unrealized gains and losses on bonds are not brought into income nor are they included in the carrying value. The fair value is determined as described in Note 4.

Gross unrealized gains (losses) on stocks are as follows:

| | Carrying Value | Original Cost | Gross Unrealized Gains | Gross Unrealized (Losses) | Estimated Fair Value |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |
| Total 1998 | 4,413 | 2,970 | 2,700 | (263) | 5,407 |
| Total 1997 | 4,365 | 3,168 | 2,617 | (186) | 5,599 |

Stocks are originally recorded at cost. The carrying value of stocks in the Consolidated Financial Statements is adjusted annually by 15% of the difference between market value and previously adjusted carrying value. The total amount of unrealized gains and losses taken into income in the year is shown in Note 22.

## 6. DEFERRED NET REALIZED GAINS

Deferred net realized gains are realized gains and losses which have not yet been recognized in income. The following deferred amounts will be amortized into future net investment income:

| | 1998 | 1997 |
|---|---|---|
| | $ | $ |
| Bonds | 1,392 | 908 |
| Mortgages | 50 | 35 |
| Stocks | 1,344 | 928 |
| Real estate | 124 | 100 |
| Derivatives | 147 | 35 |
| | 3,057 | 2,006 |

Changes in deferred net realized gains are as follows:

| | 1998 | 1997 |
|---|---|---|
| | $ | $ |
| Deferred net realized gains, January 1 | 2,006 | 1,471 |
| Net realized investments gains for the period: | | |
| Bonds | 550 | 295 |
| Mortgages | 24 | 31 |
| Stocks | 588 | 377 |
| Real estate | 34 | 12 |
| Derivatives | 109 | 41 |
| Amortization of deferred realized gains and losses (Note 22) | (367) | (262) |
| Effect of changes in currency exchange rates | 113 | 41 |
| Deferred net realized gains, December 31 | 3,057 | 2,006 |

## 7. CREDIT AND CONCENTRATION RISK MANAGEMENT

Credit risk is the risk of financial loss resulting from the failure of debtors to make payments of interest or principal when due. The Company controls credit risk through detailed credit and underwriting policies, as well as counterparty exposure limits.

It is the Company's policy to diversify all investment portfolios. Except for sovereign country issuers where the Company carries on business or where the Board of Directors grants specific approval, Company policy limits credit exposure to 4% of consolidated surplus invested in any single issuer and to 8% of consolidated surplus invested in any associated group of issuers.

Investment grade bonds are those rated BBB and above. The Company's bond portfolio has 98.2% (98.5% in 1997) invested in investment grade bonds based on carrying value.

The Company's mortgage loans, stocks and real estate investments are diversified by type and location and, for mortgage loans, by borrower. Mortgage loans are collateralized by the related property and generally do not exceed 75% of value of the property at the time the original loan is made.

The Company's investments in bonds, mortgages, stocks and real estate are shown in the tables below:

Bonds by investment grade:

| | 1998 | | 1997 | |
|---|---|---|---|---|
| | Carrying Value | Fair Value | Carrying Value | Fair Value |
| | $ | $ | $ | $ |
| AAA | 7,883 | 8,713 | 6,928 | 7,283 |
| AA | 4,278 | 5,088 | 4,160 | 4,721 |
| A | 8,119 | 9,059 | 7,493 | 8,201 |
| BBB | 5,411 | 5,822 | 4,579 | 4,964 |
| BB & lower | 462 | 499 | 354 | 365 |
| Total Bonds | 26,153 | 29,181 | 23,514 | 25,534 |

Breakdown of bonds, mortgages, stocks and real estate by geographic location, as opposed to reportable segment, is as follows:

| 1998 | Bonds by Issuer Country | Mortgages Non-residential | Mortgages Residential | Stocks by Location | Real Estate |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |
| Canada | 8,661 | 2,280 | 3,589 | 918 | 1,068 |
| United States | 10,143 | 3,683 | 493 | 793 | 746 |
| United Kingdom | 6,426 | 558 | 1,372 | 2,287 | 623 |
| Other | 923 | 4 | – | 415 | 3 |
| Total | 26,153 | 6,525 | 5,454 | 4,413 | 2,440 |

| 1997 | Bonds by Issuer Country | Mortgages Non-residential | Mortgages Residential | Stocks by Location | Real Estate |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |
| Canada | 8,659 | 2,307 | 3,614 | 970 | 995 |
| United States | 10,228 | 3,268 | 492 | 1,019 | 682 |
| United Kingdom | 4,011 | 491 | 1,050 | 2,037 | 528 |
| Other | 616 | 3 | – | 339 | 2 |
| Total | 23,514 | 6,069 | 5,156 | 4,365 | 2,207 |

Residential mortgages include mortgages for single and multiple family dwellings.



SL-0518

7. **CREDIT AND CONCENTRATION RISK MANAGEMENT (Continued)**

Real estate by type:

| | 1998 | | 1997 | |
|---|---|---|---|---|
| | Carrying Value | Fair Value | Carrying Value | Fair Value |
| | $ | $ | $ | $ |
| Held for investment | 2,374 | 2,683 | 2,136 | 2,269 |
| Held for sale | 66 | 79 | 71 | 71 |
| Total | 2,440 | 2,762 | 2,207 | 2,340 |

8. **SECURITIES LENDING**

The Company engages in securities lending to generate additional income. Certain securities from its portfolio are loaned to other institutions for short periods. Collateral, which exceeds the market value of the loaned securities, is deposited by the borrower with a lending agent, usually a securities custodian, and retained by the lending agent until the underlying security has been returned to the Company. The market value of the loaned securities is monitored on a daily basis with additional collateral obtained or refunded as the market values fluctuate. It is Company practice to obtain a guarantee from the lending agent against counterparty default, including collateral deficiency, in securities lending transactions. At December 31, 1998, the Company had loaned securities (which are included in invested assets) with a carrying value and market value of approximately $916 and $1,004, respectively.

9. **INTEREST RATE RISK MANAGEMENT**

Interest rate risk is the potential for financial loss arising from changes in interest rates. For example, the Company is exposed to this risk when the cash flows from assets and the policy obligations they support are significantly mismatched, as this may result in the need to either sell assets to meet policy payments and expenses, or re-invest excess asset cash flows under unfavourable interest environments.

To manage this risk, a matching policy is established for each portfolio of assets and related liabilities. Asset/liability management programs are in place to implement this policy. The primary approach used is duration analysis, which measures the sensitivity of assets and liabilities to interest rate changes across the entire yield curve. Partial duration analysis is used to examine the duration gap of assets and liabilities at discrete intervals on the yield curve. These gaps are managed within specified tolerance limits.

Interest rate sensitivity is provided for in the actuarial liabilities for all policies, with adequate provisions to absorb moderate changes in interest rates.

For certain product types, including participating insurance and certain forms of universal life policies and annuities, the effect of changes in the interest rate environment will be passed through to policyholders as changes to the amount of dividend declared or to the rate of interest credited in accordance with the nature of the contract and policy terms. Changes to dividends declared and the rate of interest credited occur routinely as interest rates change, and reflect the normal operation of these policies according to their contractual terms.

Among the different lines of insurance business, annuities are the most sensitive to changes in interest rates. The annuity business represents 46% of the Company's total actuarial liabilities. For the Company's annuity business, an immediate 1% increase in interest rates at December 31, 1998 across the entire yield curve would result in an estimated increase in actuarial liabilities of $20, with a corresponding decrease in net income. Conversely, an immediate 1% decrease in interest rates would result in an estimated

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts in millions of Canadian dollars)

## 9. INTEREST RATE RISK MANAGEMENT (Continued)

decrease in actuarial liabilities of $7, with a corresponding increase in net income. The following table shows the expected cash flows for annuity business:

| | 1998 | | | | |
|---|---|---|---|---|---|
| | Under 1 year | 1 to 5 years | Over 5 years to 10 years | 10 years or more | Total |
| | $ | $ | $ | $ | $ |
| **Canada** | | | | | |
| Assets | 1,526 | 3,847 | 2,332 | 3,382 | 11,087 |
| Liabilities | 1,533 | 4,025 | 1,902 | 3,651 | 11,111 |
| Cash flow gap | (7) | (178) | 430 | (269) | (24) |
| **United States** | | | | | |
| Assets | 1,406 | 3,298 | 1,713 | 1,617 | 8,034 |
| Liabilities | 1,834 | 3,411 | 1,172 | 1,512 | 7,929 |
| Cash flow gap | (428) | (113) | 541 | 105 | 105 |
| **United Kingdom** | | | | | |
| Assets | 215 | 872 | 1,138 | 4,131 | 6,356 |
| Liabilities | 227 | 899 | 1,098 | 4,214 | 6,438 |
| Cash flow gap | (12) | (27) | 40 | (83) | (82) |

## 10. CONTRACTUAL MATURITIES

The contractual maturity of bonds at December 31 is shown below. The interest rate risk, the potential for financial loss due to interest rate fluctuations, is included in Note 9.

| | 1998 | | 1997 | |
|---|---|---|---|---|
| | Carrying Value | Fair Value | Carrying Value | Fair Value |
| | $ | $ | $ | $ |
| Due in one year or less | 969 | 977 | 818 | 822 |
| Due in years two through five | 4,970 | 5,151 | 5,186 | 5,328 |
| Due in years six through ten | 4,896 | 5,224 | 4,777 | 5,063 |
| Due after ten years | 13,372 | 15,827 | 10,613 | 12,153 |
| Asset-backed securities | 1,946 | 2,002 | 2,120 | 2,168 |
| Total | 26,153 | 29,181 | 23,514 | 25,534 |

Bonds not due at a single maturity date have been included in the above table in the year of final maturity. Actual maturities may differ from contractual maturities because of the Company's right to call or the borrower's right to prepay obligations, with or without call or prepayment penalties. Asset-backed securities, which are not due at a single maturity date, are shown separately.

At December 31, 1998, scheduled mortgage loan maturities are as follows: 1999 – $1,553; 2000 – $1,098; 2001 – $1,138; 2002 – $881; 2003 – $1,104; and $6,337 thereafter. Actual maturities could differ from contractual maturities because borrowers may have the right to prepay obligations, with or without prepayment penalties.

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts in millions of Canadian dollars)

## 11. ALLOWANCES FOR LOSSES ON INVESTED ASSETS

The Company has impaired invested assets and foreclosed properties held for sale with specific allowances, and other general allowances, as follows:

| | 1998 | | 1997 | |
|---|---|---|---|---|
| | Carrying Value before Allowance for Impaired Invested Assets | Allowances for Losses | Carrying Value before Allowance for Impaired Invested Assets | Allowances for Losses |
| | $ | $ | $ | $ |
| Mortgages | | | | |
| – impaired, with allowance for losses | 176 | 52 | 243 | 82 |
| – impaired, with no allowance for losses | 41 | – | 54 | – |
| – general allowance | – | 80 | – | 100 |
| Foreclosed properties – specific allowance | 49 | 10 | 69 | 23 |
| Other – specific allowance | 27 | 9 | 40 | 15 |
| – general allowance | – | 18 | – | 19 |
| | 293 | 169 | 406 | 239 |

Changes in the allowances for losses are as follows:

| | 1998 | | 1997 | | 1996 | |
|---|---|---|---|---|---|---|
| | Mortgages | Foreclosed Properties and Other | Mortgages | Foreclosed Properties and Other | Mortgages | Foreclosed Properties and Other |
| | $ | $ | $ | $ | $ | $ |
| Balance, January 1 | 182 | 57 | 201 | 82 | 223 | 76 |
| Provision for losses | (16) | – | – | 12 | 38 | 6 |
| Write-offs, net of recoveries | (36) | (21) | (18) | (39) | (54) | (7) |
| Currency translation adjustment | 2 | 1 | 1 | – | 1 | – |
| Transfers | – | – | (2) | 2 | (7) | 7 |
| Balance, December 31 | 132 | 37 | 182 | 57 | 201 | 82 |

At December 31, 1998, the carrying value of bonds, mortgages and real estate, including any specific allowances, which were non-income producing for the preceding twelve months was $64.

### *Mortgages*

At December 31, 1998 and 1997, mortgages with scheduled payments which were 90 days or more in arrears were $200 (1.7% of total mortgages) and $260 (2.3% of total mortgages), respectively, before any allowances.

During 1998 and 1997, the Company's weighted average recorded investment in impaired mortgage loans, before any allowances, was $256 and $338, respectively. Interest on impaired mortgage loans is recorded as received and was $15 for 1998 and $11 for 1997. Impaired mortgage loans with no allowance for losses are loans for which at a minimum either the fair value of the collateral or the expected future cash flows exceed the carrying value.

## 12. ACQUISITIONS

On March 25, 1998, the Company acquired 31.7% of the outstanding shares of Administradora de Fondos de Pensiones Cuprum S.A. (Cuprum), a pension fund administrator in Chile. The investment is accounted for using the equity method of accounting and is classified under other invested assets. Consequently Cuprum's assets under management, which total $8 billion as at December 31, 1998, are not included in the Company's other assets under management.

On December 31, 1997, SLC Asset Management Limited, a wholly-owned subsidiary of the Company, acquired Langbourn Property Investment Services (Langbourn), a property management company based in the United Kingdom. At the date of the acquisition, Langbourn held $1 billion in assets under management.

On August 27, 1997, the Company acquired 60% of the voting interest in McLean Budden Limited (McLean Budden), a Canadian investment counsel and portfolio management company. As part of the transaction, McLean Budden purchased Sun Life Assurance Investment Management Limited, the Company's wholly-owned investment management subsidiary. At the date of the acquisition, McLean Budden held $6 billion in assets under management.

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts in millions of Canadian dollars)

## 12. ACQUISITIONS (Continued)

On June 6, 1997, Sun Bank plc, a wholly-owned subsidiary of the Company, acquired Exeter Bank Limited (Exeter Bank) for cash. Exeter Bank, now renamed Exeter Trust Limited, operates in the United Kingdom.

These transactions are summarized below:

| | Cuprum | Langbourn | McLean Budden | Exeter Bank |
|---|---|---|---|---|
| | $ | $ | $ | $ |
| Balance sheet assets acquired | 32 | 4 | 23 | 150 |
| Balance sheet liabilities acquired | 7 | 4 | 7 | 122 |
| Net balance sheet assets acquired | 25 | – | 16 | 28 |
| Cost of acquisition | 170 | 29 | 68 | 28 |
| Goodwill | 145 | 29 | 52 | – |
| Goodwill amortization period | 20 years | 15 years | 15 years | |

## 13. DEFERRED ACQUISITION COSTS

Deferred acquisition costs of $936 in 1998 ($589 in 1997) represent the costs of acquiring new business, principally commissions on mutual fund sales having a deferred sales charge, as well as certain term deposits. These acquisition costs are amortized over the applicable period of such mutual fund sales charges or the term of the related deposits, as appropriate. Amortization charged to income amounted to $169 in 1998 ($102 and $53 in 1997 and 1996, respectively).

## 14. GOODWILL

Goodwill of $117 ($392 in 1997) is included in other assets and $148 (nil in 1997) is included in other invested assets. Goodwill amortization charged to income during the year was $30 ($30 and $30 in 1997 and 1996, respectively).

In 1994, the Company acquired Confederation Life Insurance Company (U.K.) Limited, which has a substantial pensions business. Since acquisition, this business has reported significant losses. These losses arose from the costs associated with the minimum annuity rates on most of its pensions as well as the compensation costs for prior pension sales being significantly in excess of preliminary estimates. Consequently the Company wrote-off the remaining $260 in goodwill associated with this acquisition in 1998.

## 15. FIXED ASSETS

Fixed assets are included in other assets. They are carried at a cost of $591 ($559 in 1997), less accumulated depreciation and amortization of $407 ($392 in 1997). Depreciation and amortization charged to income totalled $56 ($54 and $45 in 1997 and 1996, respectively).



SL-0522

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts in millions of Canadian dollars)

## 16. ACTUARIAL LIABILITIES

Composition of Actuarial Liabilities

The actuarial liabilities include the following components:

| | Canada | United States | United Kingdom | Asia Pacific | Other Operations | Total |
|---|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ | $ |
| **1998** | | | | | | |
| Individual participating life | 2,580 | 4,332 | 4,859 | 512 | 6 | 11,489 |
| Individual non-participating life | 298 | 1,609 | (46) | 3 | 381 | 2,245 |
| Group life | 727 | 132 | 368 | 1 | 77 | 1,305 |
| Individual annuities | 3,409 | 600 | 2,137 | – | 11 | 6,157 |
| Group annuities | 3,309 | 6,085 | 370 | – | – | 9,764 |
| Health insurance | 2,206 | 713 | 223 | – | 697 | 3,839 |
| | 12,529 | 13,471 | 7,111 | 516 | 1,172 | 34,799 |
| Less reinsurance ceded | 71 | 47 | 2 | 1 | 180 | 301 |
| | 12,458 | 13,424 | 7,109 | 515 | 992 | 34,498 |
| **1997** | | | | | | |
| Individual participating life | 2,389 | 3,528 | 3,750 | 369 | 12 | 10,048 |
| Individual non-participating life | 209 | 1,226 | (98) | 2 | 334 | 1,673 |
| Group life | 734 | 112 | 270 | 1 | 38 | 1,155 |
| Individual annuities | 3,634 | 650 | 1,357 | – | 12 | 5,653 |
| Group annuities | 3,456 | 6,406 | 491 | – | – | 10,353 |
| Health insurance | 2,067 | 675 | 186 | – | 435 | 3,363 |
| | 12,489 | 12,597 | 5,956 | 372 | 831 | 32,245 |
| Less reinsurance ceded | 45 | 31 | 1 | 1 | 149 | 227 |
| | 12,444 | 12,566 | 5,955 | 371 | 682 | 32,018 |

In the above table, the other operations are primarily business from the reinsurance operations.

Individual participating life insurance policies in force represent approximately 16% of the face value of total life insurance in force at December 31, 1998. The premiums on individual participating life policies were 54%, 56% and 55% of total life premiums in 1998, 1997 and 1996, respectively.

Provisions for adverse deviations from expected assumptions have been included in the actuarial liabilities to recognize the measurement uncertainty inherent in the computation process. In determining these provisions, the Company ensures:

- When taken one at a time, each provision is reasonable with respect to the underlying best estimate assumption, and the extent of uncertainty present in making that assumption.
- In total, the cumulative effect of all provisions is reasonable with respect to the total actuarial liabilities.

These provisions will be reduced and included in future income to the extent that they are no longer required. For group insurance, reductions in provisions may be returned to policyholders as experience rating refunds.

### *Changes in Actuarial Liabilities*

The changes in actuarial liabilities during the year were as follows:

| | 1998 | 1997 |
|---|---|---|
| | $ | $ |
| Balance, January 1 | 32,018 | 30,558 |
| Change in liabilities on in-force business | (1,323) | (1,182) |
| Liabilities arising from new policies | 2,076 | 2,073 |
| Effect of changes in currency exchange rates | 1,727 | 569 |
| Balance, December 31 | 34,498 | 32,018 |

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts in millions of Canadian dollars)

16. ACTUARIAL LIABILITIES (Continued)

Within the change in liabilities on in-force business, significant items affecting the actuarial liabilities in 1998 were as follows:

Actuarial liabilities were increased by $325 in 1998 for minimum annuity rate guarantees on certain policies acquired through the purchase of Confederation Life Insurance Company (U.K.) Limited in 1994. This increase arose from the change in the actuarial assumptions since December 31, 1997, of which the most significant was the decline in long-term interest rates.

Actuarial liabilities were reduced by $178 in 1998 for individual life policies in the United Kingdom primarily as a result of policy dividend reductions in response to adverse experience, including the reduction in invested asset portfolio yield rates.

***Measurement Uncertainty and Assumptions Most Susceptible to Change***

The Company uses best estimate assumptions for expected future experience in calculating actuarial liabilities. An additional margin is then added to provide for possible adverse deviations from the best estimates. The best estimate assumptions and provisions for adverse deviations are reviewed annually. Revisions are made to either the best estimate assumptions and/or the margins, where deemed necessary and prudent. Due to the long-term nature of the policy liabilities, the time spans of the assumptions are usually longer than a single year. Accordingly, the assumptions are expected to change slowly over time. The actuarial policies addressing measurement uncertainty are further discussed in Note 2.

*Mortality and morbidity:*

These assumptions are set based on average experience over the last five years or industry tables as specified in Note 2. The susceptibility to yearly change is therefore low.

*Lapse rates:*

For individual life insurance products where fewer lapses would be financially adverse to the Company, actuarial liabilities would be increased by 0.7% if the lapse rate assumption was reduced by 10% from year 6 (5% for participating policies and policies with adjustable premiums). For products where more lapses would be financially adverse to the Company, actuarial liabilities would be increased by 0.8% if the lapse rate assumption was increased by 1% from year 6 (0.5% for participating policies and policies with adjustable premiums).

*Expenses:*

The sensitivity of actuarial liabilities to changes in expense assumptions is relatively low. For example, in the case of Canadian individual participating policies, a 25% increase in unit expenses per policy would result in an increase in actuarial liabilities of less than 1.5%, assuming no dividend scale changes.

*Asset default:*

In addition to the allowance for impaired assets outlined in Note 11, the actuarial liabilities include an amount of $461 ($435 in 1997) to provide for possible future asset defaults on currently owned assets. This provision results from a reduction in the expected future investment yield recognized in the computation of actuarial liabilities. The reduction varies depending on the creditworthiness of the class of asset.

*Interest rate:*

The effect of changes in interest rates on actuarial liabilities is discussed in Note 9.

***Invested Assets Supporting Actuarial Liabilities, Surplus and Other***

Bonds and mortgages are used extensively to support actuarial liabilities, particularly in the annuity and group businesses. Stocks and real estate are primarily used to support individual insurance business where the Company has some ability to adjust



SL-0524

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts in millions of Canadian dollars)

## 16. ACTUARIAL LIABILITIES (Continued)

participating policyholder dividends. Surplus and other includes both the insurance and non-insurance operations of the Company. The following tables show the percentage of invested assets supporting actuarial liabilities, surplus and other:

| 1998 | Bonds | Mortgages | Stocks | Real Estate | Other | Total |
|---|---|---|---|---|---|---|
| | % | % | % | % | % | % |
| Individual participating life | 38 | 13 | 24 | 13 | 12 | 100 |
| Individual non-participating life | 62 | 24 | 2 | 1 | 11 | 100 |
| Group life | 68 | 24 | – | 3 | 5 | 100 |
| Individual annuities | 62 | 29 | – | 2 | 7 | 100 |
| Group annuities | 73 | 24 | – | 3 | – | 100 |
| Health | 72 | 24 | 1 | 1 | 2 | 100 |
| Surplus and other | 38 | 34 | 8 | 1 | 19 | 100 |
| Total invested assets | 52 | 24 | 9 | 5 | 10 | 100 |

| 1997 | Bonds | Mortgages | Stocks | Real Estate | Other | Total |
|---|---|---|---|---|---|---|
| | % | % | % | % | % | % |
| Individual participating life | 37 | 13 | 26 | 13 | 11 | 100 |
| Individual non-participating life | 58 | 24 | 2 | 2 | 14 | 100 |
| Group life | 67 | 28 | 1 | 3 | 1 | 100 |
| Individual annuities | 60 | 32 | 1 | 1 | 6 | 100 |
| Group annuities | 67 | 28 | 1 | 2 | 2 | 100 |
| Health | 74 | 24 | 1 | – | 1 | 100 |
| Surplus and other | 30 | 34 | 11 | 3 | 22 | 100 |
| Total invested assets | 51 | 25 | 10 | 5 | 9 | 100 |

## 17. REINSURANCE AGREEMENTS

Reinsurance is used to limit exposure to large losses. The Board of Directors approves the Company's retention policy and limits. Arrangements are placed with well-established, highly rated reinsurers. Coverage is well diversified, with no significant concentration in any one reinsurer. Actuarial liabilities are shown net of ceded reinsurance. While reinsurance arrangements provide for the recovery of claims arising from the liabilities ceded, the Company retains primary responsibility to the policyholders. The Company also assumes certain levels of risk in various areas of exposure from other insurance companies or insurers.

The effect of reinsurance on premiums and payments to policyholders, beneficiaries and depositors is summarized as follows:

| | 1998 | 1997 | 1996 |
|---|---|---|---|
| | $ | $ | $ |
| Premiums: | | | |
| Direct premiums | 6,997 | 6,636 | 5,863 |
| Reinsurance assumed | 1,158 | 762 | 626 |
| Reinsurance ceded | (573) | (459) | (396) |
| | 7,582 | 6,939 | 6,093 |
| Payments to policyholders, beneficiaries and depositors: | | | |
| Direct payments | 6,321 | 5,974 | 5,561 |
| Reinsurance assumed | 1,051 | 581 | 445 |
| Reinsurance ceded | (474) | (315) | (237) |
| | 6,898 | 6,240 | 5,769 |

## 18. MINIMUM CAPITAL REQUIREMENTS

The Company is subject to the Canadian minimum continuing capital and surplus requirements (MCCSR) on its worldwide operations. At December 31, 1998, the Company had a MCCSR ratio of 284%, considerably in excess of the minimum requirement of 120%. In addition, Sun Life Assurance Company of Canada and its subsidiaries must comply with local capital requirements in



SL-0525

## 18. MINIMUM CAPITAL REQUIREMENTS (Continued)

each of the jurisdictions in which they operate. Furthermore, the Company is required to appropriate surplus of $1,947 ($1,658 in 1997). All of these requirements constrain the Company's ability to distribute its surplus.

## 19. BORROWED FUNDS

The following obligations are included in borrowed funds:

| | Maturity | 1998 $ | 1997 $ |
|---|---|---|---|
| **Amounts borrowed in pounds Sterling:** | | | |
| Deep discount bond * | 2010* | – | 69 |
| Interest at 10%, swapped into a floating rate, linked to the London Inter Bank Offered Rate (LIBOR) | | | |
| Bond * | | | |
| Interest at 8.5% | 2003* | – | 119 |
| Bank credit facilities | 2001 | 240 | 217 |
| Interest is payable at various floating rates, linked to LIBOR | | | |
| Notes payable | 2012 | 3 | 5 |
| Interest is payable at various floating rates, linked to LIBOR | | | |
| **Amounts borrowed in U.S. dollars:** | | | |
| Encumbrances on real estate | 2000-2019 | 36 | 35 |
| Bank credit facilities | 2002 | 16 | 10 |
| Interest is payable at various floating rates, linked to LIBOR | | | |
| **Amounts borrowed in Canadian dollars:** | | | |
| Encumbrances on real estate | 2000-2007 | 11 | 7 |
| | | 306 | 462 |

* In 1998, the Company redeemed these bonds prior to maturity.

Interest expense for the borrowed funds was $42, $43 and $40 for 1998, 1997 and 1996, respectively.

At December 31, 1998, aggregate maturities, including principal repayments, of borrowed funds other than bank credit facilities are $1 for 1999 and are $19 for 2000, $5 for 2001, $1 for 2002, $1 for 2003 and $1 for 2004.

At December 31, 1998 short-term borrowings are $256 ($227 in 1997) with weighted average interest rates related to those borrowings ranging from 5.9% to 7.7% (5.9% to 7.9% in 1997).

At December 31, 1998, the Company had $1,445 in lines of credit from numerous financial institutions of which $1,189 was unused. These lines of credit generally have terms ranging from 1 to 5 years.

## 20. SUBORDINATED DEBT

The following obligations are included in subordinated debt:

| | Maturity | 1998 $ | 1997 $ |
|---|---|---|---|
| **Amounts borrowed in Canadian dollars:** | | | |
| 8.49% capital debentures | 2005 | 300 | 300 |
| **Amounts borrowed in U.S. dollars:** | | | |
| 6.63% subordinated notes | 2007 | 232 | 214 |
| 7.25% subordinated notes | 2015 | 232 | 214 |
| | | 764 | 728 |

Interest on subordinated debt borrowings was $60, $56 and $55 for 1998, 1997 and 1996, respectively.

This subordinated debt qualifies as capital for Canadian regulatory purposes.

## 21. CUMULATIVE CAPITAL SECURITIES OF A SUBSIDIARY

On May 6, 1997, Sun Life of Canada (U.S.) Capital Trust I, an indirect subsidiary of the Company, issued U.S.$600 of 8.526% cumulative capital securities (Securities). These Securities were issued in U.S. dollars and have no scheduled maturity date. Distributions are payable semi-annually in arrears. The payment of distributions is indirectly guaranteed by the Company on a subordinated basis. These cumulative capital securities qualify as capital for Canadian regulatory purposes.

## 22. NET INVESTMENT INCOME

Net investment income has the following components:

| | 1998 | 1997 | 1996* |
|---|---|---|---|
| | $ | $ | $ |
| Interest from: | | | |
| Bonds | 1,942 | 1,739 | 1,693 |
| Mortgages | 1,015 | 1,049 | 1,045 |
| Policy loans | 86 | 78 | 76 |
| Cash and short-term investments | 97 | 146 | 96 |
| Interest income | 3,140 | 3,012 | 2,910 |
| Dividends from stocks | 145 | 146 | 156 |
| Real estate income (net) | 176 | 167 | 141 |
| Amortization of deferred realized gains and losses (Note 6) | 367 | 262 | 210 |
| Amortization of unrealized gains and losses | 187 | 217 | 116 |
| Other items (net) | 126 | 97 | 89 |
| | 4,141 | 3,901 | 3,622 |
| Provisions for losses on investments | 16 | (12) | (44) |
| Investment expenses and taxes | (60) | (53) | (52) |
| | 4,097 | 3,836 | 3,526 |

* As restated.

## 23. OPERATING EXPENSES

| | 1998 | 1997 | 1996* |
|---|---|---|---|
| | $ | $ | $ |
| Operating expenses consist of the following: | | | |
| Compensation costs | 1,156 | 994 | 847 |
| Premise and equipment costs | 258 | 237 | 195 |
| Fixed asset depreciation and amortization (Note 15) | 56 | 54 | 45 |
| Goodwill amortization | 24 | 30 | 30 |
| Other | 556 | 397 | 339 |
| Total | 2,050 | 1,712 | 1,456 |

* As restated.



SL-0527

## 24. TAXES

In the Consolidated Statement of Operations, the tax provision for the Company's worldwide operations has the following components:

| | 1998 | 1997 | 1996* |
|---|---|---|---|
| | $ | $ | $ |
| Canadian income tax expense (benefit): | | | |
| Current | 54 | 48 | 53 |
| Future | 45 | 14 | (19) |
| | 99 | 62 | 34 |
| Foreign income tax expense (benefit): | | | |
| Current | 110 | 150 | 165 |
| Future | 30 | (7) | 43 |
| | 140 | 143 | 208 |
| Total income taxes | 239 | 205 | 242 |
| Premium taxes | 71 | 64 | 62 |
| Total taxes | 310 | 269 | 304 |

* As restated.

The Company's effective worldwide income tax rate differs from the combined Canadian income tax rate as follows:

| | 1998 | | 1997 | | 1997 | |
|---|---|---|---|---|---|---|
| | $ | % | $ | % | $ | % |
| Net income per Consolidated Statement of Operations | 54 | | 511 | | 490 | |
| Add: Taxes | 310 | | 269 | | 304 | |
| Less: Premium taxes included in taxes | (71) | | (64) | | (62) | |
| Net income before income and capital taxes | 293 | | 716 | | 732 | |
| Taxes at the combined Canadian federal and provincial statutory income tax rate | 128 | 43.6% | 312 | 43.6% | 319 | 43.6% |
| Increase (decrease) in rate resulting from: | | | | | | |
| Higher (lower) effective rates on income subject to taxation in foreign jurisdictions | 157 | 53.6% | (54) | (7.5)% | (37) | (5.0)% |
| Tax exempt income from Canadian securities and non-taxable portion of capital gains | (40) | (13.6)% | (49) | (6.8)% | (60) | (8.2)% |
| Federal capital taxes | 28 | 9.6% | 28 | 3.9% | 27 | 3.7% |
| Federal capital tax credits utilized in the year | (42) | (14.3)% | (51) | (7.2)% | (37) | (5.1)% |
| Other | 8 | 2.7% | 19 | 2.7% | 30 | 4.1% |
| Company's effective worldwide income taxes | 239 | 81.6% | 205 | 28.7% | 242 | 33.1% |

* As restated.

The Company has accumulated net tax losses, primarily in Canada and the United Kingdom, totalling $2,923 ($783 in 1997). The future benefit of these tax losses has been recognized to the extent that they are more likely than not to be realized in the amount of $725 ($304 in 1997) in future income taxes. The Company will realize this benefit in future years through a reduction in current income taxes. These net operating loss carryforwards are included in income tax returns that are subject to examination by various tax authorities and could be reduced as a result of adjustments to tax returns for prior years.

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts in millions of Canadian dollars)

## 24. TAXES (Continued)

The Company's future tax assets and liabilities arise from temporary differences on the following items:

| | 1998 | | 1997 | |
|---|---|---|---|---|
| | Assets | Liabilities | Assets | Liabilities |
| | $ | $ | $ | $ |
| Investments | 70 | 138 | 151 | 169 |
| Actuarial liabilities | (190) | 362 | (63) | 138 |
| Deferred acquisition costs | 109 | 205 | 87 | 163 |
| Operating loss carryforwards | 347 | (378) | 264 | (40) |
| Other | 124 | 1 | 68 | (143) |
| | 460 | 328 | 507 | 287 |

Future income taxes are the result of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. The sources of these temporary differences and the tax effects for each year are as follows:

| | 1998 | 1997 | 1996 |
|---|---|---|---|
| | $ | $ | $ |
| Investments | 66 | (30) | (52) |
| Actuarial liabilities | 285 | 12 | 35 |
| Deferred acquisition costs | 84 | 64 | 48 |
| Operating loss carryforwards | (402) | (41) | 23 |
| Other | 42 | 2 | (30) |
| | 75 | 7 | 24 |

The undistributed earnings of most non-Canadian subsidiaries would be taxed only upon their repatriation to Canada. The Company recognizes a future tax liability, if any, on these undistributed earnings to the extent that management expects they will be repatriated in the foreseeable future.

## 25. COMPANY PENSION PLANS AND OTHER RETIREE BENEFITS

### *Pension Plans*

The Company sponsors non-contributory defined benefit pension plans for eligible employees and career agents, primarily in Canada, the United States, the United Kingdom and the Philippines. The defined benefit pension plans offer benefits based on length of service and final average earnings. The specific features of these plans vary in accordance with the countries in which employees and career agents are located. The Company's policy is to fund at least the amount required by the regulations of the countries in which the plans are offered. In addition, the Company maintains supplementary non-contributory pension arrangements for eligible employees and agents, primarily for benefits which do not qualify for funding under the various formal pension plans.



SL-0529

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts in millions of Canadian dollars)

## 25. COMPANY PENSION PLANS AND OTHER RETIREE BENEFITS (Continued)

The following tables set forth the status of these pension plans.

| | 1998 $ | 1997 $ |
|---|---|---|
| **Change in benefit obligation:** | | |
| Benefit obligation, January 1 | 1,046 | 989 |
| Service cost | 42 | 39 |
| Interest cost | 77 | 72 |
| Actuarial losses / (gains) | 99 | (15) |
| Benefits paid | (51) | (40) |
| Plan amendments | 9 | 1 |
| Benefit obligation, December 31 | 1,222 | 1,046 |
| **Change in plan assets:** | | |
| Fair value of plan assets, January 1 | 1,502 | 1,339 |
| Actual return on plan assets | 186 | 189 |
| Employer contributions | 13 | 14 |
| Fund recognition change | (112) | - |
| Benefits paid | (51) | (40) |
| Fair value of plan assets, December 31 | 1,538 | 1,502 |
| Net funded status, December 31 | 316 | 456 |
| Unamortized net actuarial loss / (gain) | (192) | (286) |
| Unamortized prior service cost | 43 | 41 |
| Unamortized transition obligation / (asset) | (90) | (84) |
| Prepaid benefit asset, December 31 | 77 | 127 |
| **Plans with projected benefit obligations in excess of plan assets:** | | |
| Projected benefit obligations | 174 | 10 |
| Plan assets | 101 | 7 |
| **Weighted-average assumptions as at December 31:** | | |
| Discount rate | 6.6% | 7.9% |
| Expected return on plan assets | 7.6% | 8.0% |
| Rate of compensation increase | 4.3% | 6.1% |

| | 1998 $ | 1997 $ | 1996 $ |
|---|---|---|---|
| **Components of net periodic benefit cost:** | | | |
| Service cost | 42 | 39 | 39 |
| Interest cost | 77 | 72 | 73 |
| Expected return on plan assets | (109) | (106) | (96) |
| Amortization of actuarial losses / (gains) | (22) | (16) | (12) |
| Amortization of prior service cost | 2 | 4 | 5 |
| Amortization of transition obligation | (15) | (14) | (12) |
| Net periodic benefit cost | (25) | (21) | (3) |

The assumed discount rates, the expected long-term rates of return on plan assets and the rates of increase in future compensation used in determining the actuarial present value of the projected benefit obligations vary according to the economic conditions of the countries in which the pension plans are situated.

As at December 31, 1998, the assets supporting the defined benefit plans and the other supplementary pension arrangements were trusteed or held in the segregated funds of the Company. Prior to 1998, assets supporting the supplementary pension arrangements were held within the general fund of the Company.

The Company has also established defined contribution pension plans for eligible qualifying employees, agents and salaried field representatives. Generally the contribution is a set percentage of an individual's annual income. The total contribution made by the Company to such plans was $33 in 1998 and $26 in 1997.

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts in millions of Canadian dollars)

### 25. COMPANY PENSION PLANS AND OTHER RETIREE BENEFITS (Continued)

*Other Post-Retirement Benefits*

In addition to the Company's pension plans, the Company provides certain post-retirement medical, dental and life insurance benefits to eligible employees and career agents, and to their dependants upon meeting certain requirements. A substantial portion of the Company's employees may become eligible for these benefits upon retirement. These post-retirement benefits are not funded and are paid by the Company as expenses are incurred.

The following tables set forth the status of the post-retirement benefit plans.

| | 1998 $ | 1997 $ |
|---|---|---|
| Change in benefit obligation: | | |
| Benefit obligation, January 1 | 94 | 108 |
| Service cost | 3 | 3 |
| Interest cost | 9 | 6 |
| Actuarial losses/(gains) | 37 | (19) |
| Benefits paid | (5) | (4) |
| Plan amendments | – | – |
| Benefit obligation, December 31 | 138 | 94 |
| Change in plan assets: | | |
| Fair value of plan assets, January 1 | – | – |
| Employer contributions | 5 | 4 |
| Benefits paid | (5) | (4) |
| Fair value of plan assets, December 31 | – | – |
| Net funded status, December 31 | (138) | (94) |
| Unamortized net actuarial loss/(gain) | 5 | (26) |
| Unamortized prior service cost | – | – |
| Unamortized transition obligation/(asset) | – | – |
| Accrued benefit liability, December 31 | (133) | (120) |
| Weighted-average assumptions as at December 31: | | |
| Discount rate | 6.6% | 9.2% |

| | 1998 $ | 1997 $ | 1996 $ |
|---|---|---|---|
| Components of net periodic benefit cost: | | | |
| Service cost | 3 | 3 | 5 |
| Interest cost | 9 | 6 | 7 |
| Expected return on plan assets | – | – | – |
| Amortization of actuarial losses/(gains) | 1 | (2) | (1) |
| Amortization of prior service cost | – | – | – |
| Amortization of transition obligation | – | – | – |
| Net periodic benefit cost | 13 | 7 | 11 |

The assumed medical cost trend rate used in measuring the accumulated post-retirement benefits obligation in Canada in 1998 was 10%, decreasing by 1% each year until 2002, after which it remains at 6%. In the United States in 1998, the assumed rate was 10%, decreasing evenly to 5% by 2005, and remaining at that level thereafter. The assumed dental cost trend rate was 5.5% in Canada and 5.7% in the United States.

If the health care cost trend rate assumptions were increased by 1%, the accumulated post-retirement benefit obligations would be increased by $20 as at December 31, 1998. This rate increase would increase the 1998 aggregate service and interest costs by $2. A decrease of 1% in the trend rate assumptions would result in respective decreases of about the same amounts.

## 26. COMMITMENTS AND CONTINGENCIES

### *Lease Commitments*

The Company leases offices and certain equipment. These are operating leases with rents charged to operations in the year to which they relate. Total future rental payments for the remainder of these leases are $108 for 1999, $102 for 2000, $95 for 2001, $88 for 2002, $67 for 2003 and $267 thereafter.

### *Contractual Commitments*

In the normal course of business, various contractual commitments are outstanding which are not reflected in the Consolidated Financial Statements. At December 31, 1998, there were outstanding contractual commitments of $666, of which $369 expires in 30 days, $290 expires in 31 to 365 days and $7 expires in 2000 or later. The majority of these commitments are to extend credit under commercial and residential mortgage loans.

### *Letters of Credit*

The Company issues letters of credit in the normal course of business. At December 31, 1998, letters of credit in the amount of $300 have been issued.

### *Legal Proceedings*

Legal actions, including class action lawsuits, have been filed against a number of insurance companies related to the sale of whole life insurance policies on a "vanishing premium" or "premium offset" basis.

In the United States, the Company was named as a defendant in lawsuits based on the "vanishing premium" concept and other sales practices. The plaintiffs in certain of those actions sought certification as a class action. In 1996, these actions were consolidated in New Jersey Federal Court. On August 7, 1998, the Company and the plaintiffs filed an agreement to resolve the consolidated lawsuits, and the Court approved the settlement agreement on December 3, 1998. A small number of policyholders elected to opt out of the settlement class to preserve their right to pursue independent remedies.

In Canada, a lawsuit proposing a class action based on "premium offset" issues was brought against the Company in British Columbia, Ontario and Quebec. On July 3, 1997, the Company announced that it had reached an agreement to resolve these lawsuits. Following lengthy proceedings (including dismissal by the Supreme Court of Canada on October 22, 1998 of an application in the Ontario action for leave to appeal), the necessary court orders were obtained certifying the actions as class proceedings and approving of the settlement agreement in each of these three provinces. To date, a small number of policyholders have elected to opt out of the settlement class to preserve their right to pursue independent remedies.

Based on information presently known, management believes that adequate provisions have been made, and that the commitments made in the settlement agreement in Canada and in the settlement agreement in the United States will not have a material adverse effect on the consolidated financial position of the Company.

In addition, the Company and its subsidiaries are engaged in litigation arising in the ordinary course of business. None of this litigation is expected to have a material adverse effect on the consolidated financial position of the Company.

### *Provisions for Prior Pension Sales*

In the United Kingdom, the life insurance industry is being required to compensate certain policyholders under the Financial Services Authority guidelines on sales of pension products. These guidelines have been significantly expanded in the past year for the second phase of required compensation, which has required the entire industry to significantly increase its provisions. The Financial Services Authority is continuing to provide more specific guidance for this compensation. The liability has been determined by the use of estimates derived from the regulatory guidance or the Company's prior experience. The Company's future experience may be different from these estimates and consequently there is still uncertainty in measuring its ultimate costs. The increase in provisions charged to income during the year by the Company was $347 ($196 and $24 in 1997 and 1996, respectively), for a total cost since inception of $737. During the year, the Company paid compensation of $167 ($46 and $14 in 1997 and 1996, respectively), for total compensation payments since inception of $227. At December 31, 1998, the Company had provisions and other allowances of $529 ($344 in 1997) for future compensation payments.

## 27. UNCERTAINTY DUE TO THE YEAR 2000 ISSUE

The year 2000 issue arises because some computer systems use two digits instead of four to identify a year. Date-sensitive systems may recognize the year 2000 as 1900 or some other date, resulting in errors when additional information using the year 2000 dates is processed. In addition, similar problems may arise in some systems which use certain dates in 1999 to represent something other than a date. The effects of the year 2000 issue may be experienced before, on, or after January 1, 2000, and if not addressed,

**27. UNCERTAINTY DUE TO THE YEAR 2000 ISSUE (Continued)**

the impact on operations and financial reporting may range from minor errors to significant systems failure which could affect an entity's ability to conduct normal business operations. It is not possible to be certain that all aspects of the year 2000 issue affecting the Company, including those related to efforts of customers, suppliers, or other third parties, will be fully resolved.

**28. SEGMENTED INFORMATION**

The Company's reportable segments are determined by the Company's management structure and internal financial reporting. Each of these segments has its own management. All of these segments operate in the financial services industry. They derive their revenues principally from wealth management operations (mutual funds, investment management, annuities, trust operations and banking) and protection services (life and health insurance). Corporate and other represents amounts not attributed to wealth management and protection. It primarily includes investments of a corporate nature and earnings on capital not attributed to the strategic business units.

Other operations include those operations for which management responsibility resides in head office. Included in this category under protection services are the Company's reinsurance operations. The net income in this category is shown net of certain expenses borne centrally.

The revenue by major product category includes premiums, net investment income (which is detailed in Note 22) and fee income. Inter-segment revenue consists of interest of $102 in 1998 ($75 in 1997 and $42 in 1996) and fee income of $28 in 1998 ($23 in 1997 and $26 in 1996). The major non-cash item is the change in actuarial liabilities which is separately disclosed. Interest expense includes interest on borrowings, claims and deposits.

Transactions occurring between segments consist primarily of internal financing agreements. Inter-segment transactions are measured at market values prevailing when the arrangements were negotiated.

The results of the segments' operations are described in the Management Discussion and Analysis. The unusual actuarial liability changes referred to in Note 16 are included in United Kingdom wealth management for the minimum annuity rate guarantees, and United Kingdom protection for the individual life policies change. The write-off of goodwill referred to in Note 14 is primarily

**28. SEGMENTED INFORMATION (Continued)**

included in United Kingdom corporate and other. The cost of provisions for prior pension sales referred to in Note 26 are included in United Kingdom wealth management.

| | 1998 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | United States | | | | | | |
| | Canada | Sun Life | MFS | United Kingdom | Asia Pacific | Other | Consolidation Adjustments | Total |
| | $ | $ | $ | $ | $ | $ | $ | $ |
| **Revenue** | | | | | | | | |
| Wealth management | 1,463 | 2,289 | 1,306 | 1,055 | – | 1 | (28) | 6,086 |
| Protection | 2,147 | 2,483 | – | 1,523 | 344 | 834 | – | 7,331 |
| Corporate and other | 21 | 64 | – | 23 | – | 273 | (102) | 279 |
| | 3,631 | 4,836 | 1,306 | 2,601 | 344 | 1,108 | (130) | 13,696 |
| Change in actuarial liabilities | (52) | (287) | – | 625 | 87 | 100 | – | 473 |
| Interest expense | 159 | 122 | 23 | 159 | 21 | 47 | (102) | 429 |
| Taxes | 141 | 61 | 88 | 31 | 14 | (25) | – | 310 |
| **Net income** | | | | | | | | |
| Wealth management | 100 | 59 | 113 | (531) | – | 1 | (21) | (279) |
| Protection | 111 | 201 | – | 170 | 30 | (74) | – | 438 |
| Corporate and other | 55 | (15) | – | (235) | – | 69 | 21 | (105) |
| | 266 | 245 | 113 | (596) | 30 | (4) | – | 54 |
| **Assets** | | | | | | | | |
| General fund assets | | | | | | | | |
| Wealth management | 9,827 | 8,377 | 1,285 | 6,897 | – | 182 | – | 26,568 |
| Protection | 8,308 | 8,446 | – | 6,700 | 1,220 | 1,544 | – | 26,218 |
| Corporate and other | 282 | 762 | – | (119) | – | 1,637 | (1,198) | 1,364 |
| | 18,417 | 17,585 | 1,285 | 13,478 | 1,220 | 3,363 | (1,198) | 54,150 |
| Segregated fund assets | | | | | | | | |
| Wealth management | 6,053 | 19,745 | – | 11,206 | – | – | – | 37,004 |
| Protection | – | 176 | – | 2,033 | – | – | – | 2,209 |
| Corporate and other | – | – | – | – | – | – | – | – |
| | 6,053 | 19,921 | – | 13,239 | – | – | – | 39,213 |
| Other assets under management | | | | | | | | |
| Wealth management | 19,007 | 2,114 | 151,915 | 3,861 | – | – | (19,823) | 157,074 |
| Protection | – | – | – | – | – | – | – | – |
| Corporate and other | – | – | – | – | – | – | – | – |
| | 19,007 | 2,114 | 151,915 | 3,861 | – | – | (19,823) | 157,074 |

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts in millions of Canadian dollars)

**28. SEGMENTED INFORMATION (Continued)**

| | 1997 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | United States | | | | | | |
| | Canada | Sun Life | MFS | United Kingdom | Asia Pacific | Other | Consolidation Adjustments | Total |
| | $ | $ | $ | $ | $ | $ | $ | $ |
| **Revenue** | | | | | | | | |
| Wealth management | 1,504 | 2,316 | 909 | 859 | – | – | (23) | 5,565 |
| Protection | 2,047 | 2,125 | – | 1,419 | 346 | 502 | – | 6,439 |
| Corporate and other | 11 | 59 | – | 22 | – | 184 | (75) | 201 |
| | 3,562 | 4,500 | 909 | 2,300 | 346 | 686 | (98) | 12,205 |
| Change in actuarial liabilities | (147) | 132 | – | 556 | 83 | 86 | – | 710 |
| Interest expense | 169 | 107 | 14 | 127 | 22 | 40 | (75) | 404 |
| Taxes | 98 | 73 | 69 | 12 | 16 | 1 | – | 269 |
| **Net income** | | | | | | | | |
| Wealth management | 85 | 62 | 86 | (105) | – | – | (15) | 113 |
| Protection | 104 | 120 | – | 55 | 37 | 1 | – | 317 |
| Corporate and other | 60 | (26) | – | (22) | – | 54 | 15 | 81 |
| | 249 | 156 | 86 | (72) | 37 | 55 | – | 511 |
| **Assets** | | | | | | | | |
| General fund assets | | | | | | | | |
| Wealth management | 10,190 | 8,638 | 783 | 4,715 | – | – | – | 24,326 |
| Protection | 7,686 | 6,711 | – | 5,712 | 896 | 1,195 | – | 22,200 |
| Corporate and other | 476 | 983 | – | 191 | – | 1,990 | (602) | 3,038 |
| | 18,352 | 16,332 | 783 | 10,618 | 896 | 3,185 | (602) | 49,564 |
| Segregated fund assets | | | | | | | | |
| Wealth management | 4,958 | 14,157 | – | 9,363 | – | – | – | 28,478 |
| Protection | – | 134 | – | 1,907 | – | – | – | 2,041 |
| Corporate and other | – | – | – | – | – | – | – | – |
| | 4,958 | 14,291 | – | 11,270 | – | – | – | 30,519 |
| Other assets under management | | | | | | | | |
| Wealth management | 15,087 | 1,825 | 100,312 | 2,664 | – | – | (13,853) | 106,035 |
| Protection | – | – | – | – | – | – | – | – |
| Corporate and other | – | – | – | – | – | – | – | – |
| | 15,087 | 1,825 | 100,312 | 2,664 | – | – | (13,853) | 106,035 |



SL-0535

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts in millions of Canadian dollars)

### 28. SEGMENTED INFORMATION (Continued)

| | 1996* | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | United States | | | | | | |
| | Canada | Sun Life | MFS | United Kingdom | Asia Pacific | Other | Consolidation Adjustments | Total |
| | $ | $ | $ | $ | $ | $ | $ | $ |
| **Revenue** | | | | | | | | |
| Wealth management | 1,720 | 1,528 | 686 | 741 | – | – | (26) | 4,649 |
| Protection | 1,932 | 1,961 | – | 1,216 | 317 | 417 | – | 5,843 |
| Corporate and other | 9 | 48 | – | 77 | – | 148 | (42) | 240 |
| | 3,661 | 3,537 | 686 | 2,034 | 317 | 565 | (68) | 10,732 |
| Change in actuarial liabilities | 246 | 121 | – | 420 | 72 | 72 | – | 931 |
| Interest expense | 195 | 78 | 8 | 104 | 18 | 37 | (42) | 398 |
| Taxes | 63 | 72 | 54 | 92 | 16 | 7 | – | 304 |
| **Net income** | | | | | | | | |
| Wealth management | 104 | 51 | 68 | 79 | – | – | (6) | 296 |
| Protection | 10 | 23 | – | 50 | 37 | 8 | – | 128 |
| Corporate and other | 40 | (39) | – | (24) | – | 83 | 6 | 66 |
| | 154 | 35 | 68 | 105 | 37 | 91 | – | 490 |
| **Assets** | | | | | | | | |
| General fund assets | | | | | | | | |
| Wealth management | 10,468 | 8,400 | 536 | 3,568 | – | – | – | 22,972 |
| Protection | 7,013 | 5,603 | – | 5,483 | 902 | 979 | – | 19,980 |
| Corporate and other | 653 | 581 | – | 357 | – | 1,276 | (221) | 2,646 |
| | 18,134 | 14,584 | 536 | 9,408 | 902 | 2,255 | (221) | 45,598 |
| Segregated fund assets | | | | | | | | |
| Wealth management | 4,452 | 10,403 | – | 9,508 | – | – | – | 24,363 |
| Protection | – | 118 | – | 1,769 | – | – | – | 1,887 |
| Corporate and other | – | – | – | – | – | – | – | – |
| | 4,452 | 10,521 | – | 11,277 | – | – | – | 26,250 |
| Other assets under management | | | | | | | | |
| Wealth management | 5,647 | 1,009 | 71,658 | 1,776 | – | – | (10,270) | 69,820 |
| Protection | – | – | – | – | – | – | – | – |
| Corporate and other | – | – | – | – | – | – | – | – |
| | 5,647 | 1,009 | 71,658 | 1,776 | – | – | (10,270) | 69,820 |

* As restated.

The segments reported have been updated in 1998 reflecting the growth in Massachusetts Financial Services Company (MFS) and changes in the Company's reporting structure. Prior year information has been restated.



SL-0536

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts in millions of Canadian dollars)

## 28. SEGMENTED INFORMATION (Continued)

The following table shows revenue, net income and assets by territory for the Company's other operations:

| | 1998 | 1997 | 1996 |
|---|---|---|---|
| | $ | $ | $ |
| **Revenue:** | | | |
| Canada | 104 | 57 | 47 |
| United States | 722 | 439 | 364 |
| Other countries | 9 | 6 | 6 |
| Corporate | 273 | 184 | 148 |
| | 1,108 | 686 | 565 |
| **Net Income:** | | | |
| Canada | 3 | (10) | 3 |
| United States | (84) | 7 | 1 |
| Other countries | 8 | 4 | 4 |
| Corporate | 69 | 54 | 83 |
| | (4) | 55 | 91 |
| **Assets:** | | | |
| General funds: | | | |
| Canada | 235 | 165 | 122 |
| United States | 1,246 | 978 | 827 |
| Other countries | 245 | 52 | 30 |
| Corporate | 1,637 | 1,990 | 1,276 |
| | 3,363 | 3,185 | 2,255 |

## 29. DERIVATIVE FINANCIAL INSTRUMENTS

The Company uses derivative instruments, including interest rate swaps, currency swaps, financial futures, options and forward contracts, to manage risks associated with currency and interest rate fluctuations, duration mismatch and stock market fluctuations. The outstanding notional amounts and fair values are shown in the following tables.

The main focus of the Company's derivative management is on using:

- interest rate swaps to manage its exposure to interest rate fluctuations by exchanging one set of interest flows for another in addition to managing duration mismatches in interest-sensitive portfolios;
- currency swaps to reduce exposure to foreign exchange fluctuations associated with cross-currency investments and debt;
- financial futures and options to reduce exposure to stock market fluctuations; and
- financial futures to manage the duration between assets and liabilities.

During 1998, the Company entered into a dynamic hedging strategy using interest rate contracts, interest rate futures and options, in the United Kingdom to hedge against the impact of downward interest rates associated with the minimum annuity rate guarantees.

Models are utilized by the Company to ensure the continuing effectiveness of hedging strategies. The Company monitors the gap in duration between assets and liabilities for specific insurance and annuity business segments. That gap is managed within defined tolerance limits, including through the use of derivative instruments. Hedging instruments put in place by the Company are marked to market values and derivative positions are reported to the Board of Directors of the Company monthly.

Since counterparty failure in a derivative transaction could render it ineffective for hedging purposes, the Company will only enter into derivative contracts with counterparties rated AA or better. In limited circumstances, the Company will enter into transactions with lower rated counterparties if credit enhancement features are included.

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts in millions of Canadian dollars)

## 29. DERIVATIVE FINANCIAL INSTRUMENTS (Continued)

The positive fair value, which is the maximum credit risk, as well as the netted positive and negative fair value of derivative financial instruments at December 31 are as follows:

| | 1998 | | 1997 | |
|---|---|---|---|---|
| | Fair Value | | Fair Value | |
| | Positive | Net | Positive | Net |
| | $ | $ | $ | $ |
| Interest rate contracts | 419 | 382 | 35 | 16 |
| Foreign exchange contracts | 1 | (101) | 3 | (42) |
| Equity and other contracts | 65 | 61 | 23 | 23 |
| | 485 | 342 | 61 | (3) |

Fair value of interest rate contracts and foreign exchange contracts is determined by discounting expected future cash flows using current market interest and exchange rates for similar instruments. Fair value of options and financial futures is based on the value of underlying securities or indices, or the quoted market price.

The Company has the following amounts outstanding at December 31:

| | Term to Maturity | | | Total Notional Amount | Credit Equivalent Amount | Risk-Weighted Amount |
|---|---|---|---|---|---|---|
| | Under 1 year | One to 5 years | Over 5 years | | | |
| | $ | $ | $ | $ | $ | $ |
| 1998 | | | | | | |
| Interest rate contracts | 3,378 | 1,340 | 743 | 5,461 | 104 | 2 |
| Foreign exchange contracts | 120 | 69 | 327 | 516 | 13 | – |
| Equity and other contracts | 75 | 306 | – | 381 | 94 | 1 |
| | 3,573 | 1,715 | 1,070 | 6,358 | 211 | 3 |
| 1997 | | | | | | |
| Interest rate contracts | 759 | 879 | 797 | 2,435 | 71 | 2 |
| Foreign exchange contracts | 96 | 51 | 286 | 433 | 28 | – |
| Equity and other contracts | 12 | 249 | – | 261 | 43 | 1 |
| | 867 | 1,179 | 1,083 | 3,129 | 142 | 3 |

The notional amount is the face value of the underlying asset or liability from which the value of the derivative is derived. The credit risk exposure, if the counterparties were to default, is indicated by the cost of replacing, at current market rates, all contracts with a positive fair value as shown above. The credit equivalent amount is the credit risk exposure plus an amount for potential future credit exposure. The risk-weighted amount is a measure of credit risk, which represents the credit equivalent amount weighted according to the nature of the derivative and the creditworthiness of the counterparty. This measure is used to determine the amount of capital necessary to support derivative transactions for certain Canadian regulatory purposes. The credit equivalent and risk-weighted amounts have been determined in accordance with guidelines provided by the Office of the Superintendent of Financial Institutions Canada.

## 30. MORTGAGE SECURITIZATION

The Company has sold for cash, with limited recourse, residential and non-residential mortgages. The maximum recourse on these mortgages is less than 10% of the proceeds. The Company has also sold for cash, without recourse, an undivided interest in pools of residential mortgages insured under the Canadian National Housing Act.

When the mortgages are sold, they are removed from the Company's balance sheet and the amortized gains are recognized in net investment income.



SL-0538

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts in millions of Canadian dollars)

**30. MORTGAGE SECURITIZATION (Continued)**

Outstanding balances of sold mortgages are as follows:

| | 1998 | 1997 |
|---|---|---|
| | $ | $ |
| With limited recourse | 567 | 597 |
| Without recourse | 213 | 241 |
| | 780 | 838 |

**31. COMPARATIVE FIGURES**

Certain comparative figures have been reclassified to conform with the presentation adopted in 1998.

**32. SUMMARY OF MATERIAL DIFFERENCES BETWEEN ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN CANADA AND IN THE UNITED STATES**

The Company's Consolidated Financial Statements are prepared in accordance with accounting principles generally accepted in Canada (Cdn. GAAP), including the requirements of the Office of the Superintendent of Financial Institutions Canada. These accounting principles differ in certain material respects from accounting principles generally accepted in the United States (U.S. GAAP). The differing basis of accounting changes the incidence of profit recognition over the life of an insurance contract. Regardless of the accounting basis chosen, the total profit recognized over the life of an insurance contract will not change. The financial statement impact and a description of the material differences follow.

**(a) Reconciliation of selected Cdn. GAAP financial statement information to U.S. GAAP:**

***(i) Consolidated balance sheet:***

| | 1998 | | 1997 | |
|---|---|---|---|---|
| | Cdn. GAAP | U.S. GAAP | Cdn. GAAP | U.S. GAAP |
| | $ | $ | $ | $ |
| **ASSETS** | | | | |
| Bonds | 26,153 | | 23,514 | |
| Bonds – available for sale | | 27,443 | | 24,269 |
| Bonds – trading | | 1,697 | | 1,443 |
| Mortgages | 11,979 | 11,974 | 11,225 | 11,222 |
| Stocks | 4,413 | | 4,365 | |
| Stocks – available for sale | | 1,854 | | 2,389 |
| Stocks – trading | | 3,553 | | 3,210 |
| Real estate | 2,440 | 2,054 | 2,207 | 1,854 |
| Policy loans | 1,222 | 1,222 | 1,066 | 1,066 |
| Cash and short-term securities | 2,602 | | 2,811 | |
| Cash and cash equivalents | | 1,465 | | 1,965 |
| Short-term investments | | 1,137 | | 970 |
| Other invested assets | 1,138 | 670 | 466 | 423 |
| Invested assets | 49,947 | 53,069 | 45,654 | 48,811 |
| Deferred acquisition costs | 936 | 5,350 | 589 | 4,374 |
| Future income taxes* | 460 | – | 507 | – |
| Other assets | 2,807 | 3,377 | 2,814 | 3,220 |
| Segregated funds assets** | – | 40,136 | | 30,910 |
| **Total consolidated assets** | 54,150 | 101,932 | 49,564 | 87,315 |
| **Segregated funds net assets** | 39,213 | | 30,519 | |



SL-0539

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts in millions of Canadian dollars)

**32. SUMMARY OF MATERIAL DIFFERENCES BETWEEN ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN CANADA AND IN THE UNITED STATES (Continued)**

| | 1998 | | 1997 | |
|---|---|---|---|---|
| | Cdn. GAAP | U.S. GAAP | Cdn. GAAP | U.S. GAAP |
| | $ | $ | $ | $ |
| **LIABILITIES AND EQUITY** | | | | |
| Actuarial liabilities | 34,498 | 30,608 | 32,018 | 26,335 |
| Contract holder deposits | – | 11,292 | – | 11,730 |
| Amounts on deposit | 5,457 | 5,420 | 4,840 | 4,831 |
| Future income taxes* | 328 | 1,082 | 287 | 806 |
| Deferred net realized gains | 3,057 | – | 2,006 | – |
| Other liabilities | 3,035 | 3,481 | 3,112 | 3,546 |
| **Total consolidated liabilities** | 46,375 | 51,883 | 42,263 | 47,248 |
| **Subordinated debt** | 764 | 764 | 728 | 728 |
| **Cumulative capital securities of a subsidiary** | 930 | 930 | 858 | 858 |
| **Segregated funds liabilities**** | | 39,668 | | 30,867 |
| **Equity** | 6,081 | 8,687 | 5,715 | 7,614 |
| **Total consolidated liabilities and equity** | 54,150 | 101,932 | 49,564 | 87,315 |
| **Segregated funds contract liabilities**** | 39,213 | | 30,519 | |

* U.S. GAAP terminology is deferred income tax.

** U.S. GAAP terminology is separate accounts.

***(ii) Consolidated statement of operations:***

| | 1998 | | 1997 | |
|---|---|---|---|---|
| | Cdn. GAAP | U.S. GAAP | Cdn. GAAP | U.S. GAAP |
| | $ | $ | $ | $ |
| **REVENUE** | | | | |
| Premiums | 7,582 | 5,298 | 6,939 | 4,641 |
| Net investment income | 4,097 | 4,101 | 3,836 | 4,112 |
| Net realized gains | – | 1,066 | – | 610 |
| Fee income | 2,017 | 2,078 | 1,430 | 1,533 |
| | 13,696 | 12,543 | 12,205 | 10,896 |
| **POLICY BENEFITS AND EXPENSES** | | | | |
| Payments to policyholders, beneficiaries and depositors | 8,391 | 5,269 | 7,234 | 4,560 |
| Increase in actuarial liabilities | 473 | 2,408 | 710 | 2,040 |
| Acquisition expense amortization | 169 | 377 | 102 | 286 |
| Other expenses** | 3,199 | 2,577 | 2,622 | 2,067 |
| Policyholder dividends | 764 | 749 | 711 | 677 |
| Cumulative capital securities dividends | 76 | 76 | 46 | 46 |
| Confederation Life goodwill write-off | 260 | 312 | – | – |
| | 13,332 | 11,768 | 11,425 | 9,676 |
| **Income before income taxes** | 364 | 775 | 780 | 1,220 |
| **Taxes*** | 310 | 293 | 269 | 430 |
| **Income before extraordinary item** | 54 | 482 | 511 | 790 |
| Extraordinary item – demutualization expenses | – | (34) | – | – |
| **Net income** | 54 | 448 | 511 | 790 |

* Includes premium taxes under Cdn. GAAP.

** Includes premium taxes under U.S. GAAP.

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts in millions of Canadian dollars)

**32. SUMMARY OF MATERIAL DIFFERENCES BETWEEN ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN CANADA AND IN THE UNITED STATES (Continued)**

***(iii) Comprehensive income:***

U.S. GAAP includes the concept of comprehensive income. Comprehensive income is a measure of changes in the equity of the Company during the year. It includes both net income and other comprehensive income. Other comprehensive income for the year includes such items as the movement in the foreign currency translation account and the unrealized gains and losses on available for sale securities. Other comprehensive income also includes the changes to deferred acquisition costs and other liabilities, as well as the income tax impact arising from the unrealized gains and losses on available for sale securities.

| | 1998 | 1997 |
|---|---|---|
| | $ | $ |
| **Net income based on U.S. GAAP** | 448 | 790 |
| Other comprehensive income: | | |
| Foreign currency translation account movement for the year | 411 | 75 |
| Unrealized gains and losses for the year on: | | |
| Available for sale bonds | 697 | 639 |
| Available for sale stocks | (326) | 55 |
| Changes to deferred acquisition costs and other liabilities | (210) | (412) |
| Other | 64 | (4) |
| Income taxes | (54) | (109) |
| **Total other comprehensive income** | 582 | 244 |
| **Comprehensive income** | 1,030 | 1,034 |

***(iv) Consolidated statement of equity:***

| | 1998 | | 1997 | |
|---|---|---|---|---|
| | Cdn. GAAP | U.S. GAAP | Cdn. GAAP | U.S. GAAP |
| | $ | $ | $ | $ |
| **SURPLUS (excluding currency translation account)** | | | | |
| Balance, January 1 | 5,271 | 6,246 | 4,760 | 5,449 |
| Subsidiary Equity Transaction | – | 43 | – | 7 |
| Net income | 54 | 448 | 511 | 790 |
| Balance, December 31 | 5,325 | 6,737 | 5,271 | 6,246 |
| **CURRENCY TRANSLATION ACCOUNT** | | | | |
| Balance, January 1 | 444 | 467 | 392 | 392 |
| Effect of changes in currency exchange rates | 312 | 411 | 52 | 75 |
| Balance, December 31 | 756 | 878 | 444 | 467 |
| **UNREALIZED GAINS AND LOSSES** | | | | |
| Balance, January 1 | – | 901 | – | 732 |
| Changes for the year | – | 171 | – | 169 |
| Balance, December 31 | – | 1,072 | – | 901 |
| **TOTAL EQUITY** | 6,081 | 8,687 | 5,715 | 7,614 |



SL-0541

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts in millions of Canadian dollars)

## 32. SUMMARY OF MATERIAL DIFFERENCES BETWEEN ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN CANADA AND IN THE UNITED STATES (Continued)

***(v) Effect of material differences between Cdn. GAAP and U.S. GAAP net income:***

For the material differences between Cdn. GAAP and U.S. GAAP net income listed below, please refer to the following section for a description of the differences in accounting policies.

| | 1998 | 1997 |
|---|---|---|
| | $ | $ |
| **Net income in accordance with Cdn. GAAP** | 54 | 511 |
| Adjustments related to: | | |
| Investments: | | |
| Bonds | 626 | 334 |
| Stocks | 354 | 492 |
| Derivative instruments | 154 | 12 |
| Real estate | (2) | 39 |
| | 1,132 | 877 |
| Deferred acquisition costs: | | |
| Deferred acquisition costs – deferred | 548 | 543 |
| Deferred acquisition costs – amortization and interest | (214) | (184) |
| | 334 | 359 |
| Actuarial liabilities & other policyholder revenues and expenses: | | |
| Premium and fees revenue | (2,059) | (2,100) |
| Payments to policyholders, beneficiaries and depositors | 3,122 | 2,674 |
| Actuarial liabilities | (1,920) | (1,296) |
| | (857) | (722) |
| Other | (75) | (10) |
| Confederation Life goodwill write-off | (52) | - |
| Income tax effect of above adjustments | (54) | (225) |
| Extraordinary demutualization expense | (34) | - |
| **Net income in accordance with U.S. GAAP** | 448 | 790 |

**(b) The following describes the material accounting policy differences between Cdn. GAAP and U.S. GAAP applicable to the Company:**

For a complete description of Cdn. GAAP accounting and actuarial policies, please refer to notes 1 and 2, respectively.

*(i) Bonds:* Under Cdn. GAAP, bonds are carried at amortized cost. Realized gains and losses are deferred and amortized to income using the constant yield method over the remaining period to maturity. Under U.S. GAAP, bonds are carried at market value. The bonds are classified as available for sale or trading and unrealized gains and losses are included in other comprehensive income if classified as available for sale, and included in net income if classified as trading. Realized gains and losses are included in net income when realized.

For purposes of U.S. GAAP, at December 31, 1998 and 1997, the Company has classified as available for sale bonds with an amortized cost of $24,886 and $22,479, respectively, and fair value of $27,443 and $24,269, respectively. Gross realized gains and gross realized losses on available for sale bonds of $442 and $26, respectively, in 1998 and $276 and $55, respectively, in 1997 are included in U.S. GAAP net realized gains. For bonds classified as trading, the change in net unrealized gains and losses for the years ended December 31, 1998 and 1997 of $318 and $183, respectively, are included in U.S. GAAP net investment income.

*(ii) Stocks:* Under Cdn. GAAP, stocks are originally recorded at cost. The carrying value is adjusted annually by 15% of the difference between market value and previously adjusted carrying value. Realized gains and losses are deferred and amortized into income at the rate of 15% per year. Under U.S. GAAP, stocks are carried at market value. The stocks are classified as available for sale or trading and unrealized gains and losses are included in other comprehensive income if classified as available for sale, and included in net income if classified as trading. Realized gains and losses are included in net income when realized.

For purposes of U.S. GAAP, at December 31, 1998 and 1997, the Company has classified as available for sale investments in stocks with a cost of $1,555 and $1,788, respectively, and fair value of $1,854 and $2,389, respectively. Gross realized gains and gross realized losses on available for sale stocks of $527 and $82, respectively, in 1998 and $364 and $42, respectively, in 1997 are

**32. SUMMARY OF MATERIAL DIFFERENCES BETWEEN ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN CANADA AND IN THE UNITED STATES (Continued)**

included in U.S. GAAP net realized gains. For stocks classified as trading, the change in net unrealized gains and losses for the years ended December 31, 1998 and 1997 of $308 and $554, respectively, are included in U.S. GAAP net investment income.

***(iii) Real estate:*** Under Cdn. GAAP, real estate held for investment is originally recorded at cost. The carrying value is adjusted annually by 10% of the difference between market value and previously adjusted carrying value. Realized gains and losses on sales are deferred and recognized into income at the rate of 10% per year. Under U.S. GAAP, real estate held for investment is carried at depreciated cost. Realized gains and losses on sales are reflected in income when realized.

Accumulated depreciation on real estate was $418 and $391 at December 31, 1998 and 1997, respectively. Depreciation expense was $44 in 1998 and $40 in 1997.

***(iv) Cash and cash equivalents, short-term investments:*** Under Cdn. GAAP, cash and short-term securities include highly liquid investments with an original maturity of one year or less. Under U.S. GAAP, highly liquid investments with an original maturity greater than three months, but less than one year, are classified under short-term investments on the balance sheet.

***(v) Derivatives:*** Under Cdn. GAAP, all the Company's derivatives are eligible for hedge accounting. Realized gains and losses are treated in a manner consistent with realized gains and losses of the underlying hedged asset. Under U.S. GAAP, market value adjustments are recognized in income for non-hedges, or on the same basis as the underlying asset for hedges.

***(vi) Deferred acquisition costs:*** Under Cdn. GAAP, costs of acquiring new insurance and annuity business, primarily commissions, underwriting, issue expenses and agency expenses, are implicitly recognized in actuarial liabilities by the policy premium method. The effect is to recognize these expenses over the premium paying period. U.S. GAAP requires the explicit deferral of acquisition costs. Amortization of such costs is dependent on the product to which the costs relate. For participating life insurance contracts, except for participating policies in the United Kingdom, amortization is based on a constant percentage of gross margin. For universal life and investment-type contracts, amortization is based on a constant percentage of gross profit. For participating policies in the United Kingdom as well as non-participating products, including term, group and disability insurance, amortization is based on a constant percentage of premium. In cases where amortization is based on gross profit or margin, and available for sale bonds or stocks are used to support the underlying contract liability or actuarial reserve, a portion of the unrealized gains and losses balance is removed from equity and netted against the deferred acquisition cost balance.

Deferred acquisition costs under U.S. GAAP amount to $5,350 at December 31, 1998 ($4,374 at December 31, 1997). Amortization charged to income was $377 in 1998 and $286 in 1997.

***(vii) Future income tax asset and liability*:*** Under both Cdn. and U.S. GAAP, the Company provides for future income taxes on temporary differences between book and tax assets and liabilities. Differences between Cdn. GAAP and U.S. GAAP arise

**32. SUMMARY OF MATERIAL DIFFERENCES BETWEEN ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN CANADA AND IN THE UNITED STATES (Continued)**

from differing accounting policies for assets and liabilities and the use of a valuation allowance in U.S. GAAP for future tax assets. Differences are as follows:

| | 1998 | | | |
|---|---|---|---|---|
| | Future income tax asset* | | Future income tax liability* | |
| | Cdn. GAAP | U.S. GAAP | Cdn. GAAP | U.S. GAAP |
| | $ | $ | $ | $ |
| Investments | 70 | – | 138 | 1,354 |
| Actuarial liabilities | (190) | – | 362 | (1,006) |
| Deferred acquisition costs | 109 | – | 205 | 1,492 |
| Operating loss carryforwards | 347 | – | (378) | (950) |
| Other | 124 | – | 1 | 93 |
| Future tax asset/liability before valuation allowance | 460 | – | 328 | 983 |
| Valuation allowance for future tax assets | – | – | – | 99 |
| Total | 460 | – | 328 | 1,082 |

| | 1997 | | | |
|---|---|---|---|---|
| | Future income tax asset* | | Future income tax liability* | |
| | Cdn. GAAP | U.S. GAAP | Cdn. GAAP | U.S. GAAP |
| | $ | $ | $ | $ |
| Investments | 151 | – | 169 | 1,100 |
| Actuarial liabilities | (63) | – | 138 | (1,275) |
| Deferred acquisition costs | 87 | – | 163 | 1,228 |
| Operating loss carryforwards | 264 | – | (40) | (391) |
| Other | 68 | – | (143) | 57 |
| Future tax asset/liability before valuation allowance | 507 | – | 287 | 719 |
| Valuation allowance for future tax assets | – | – | – | 87 |
| Total | 507 | – | 287 | 806 |

* U.S. GAAP terminology is deferred income tax.

***(viii) Actuarial liabilities and contract holder deposits:*** Under Cdn. GAAP, actuarial liabilities are calculated in accordance with the policy premium method. This method uses best estimate assumptions for future experience factors adjusted to provide modest margins for adverse deviation in each experience factor. Under U.S. GAAP, actuarial liabilities for participating life policies, except those in the United Kingdom, are computed using a net level premium method with interest and mortality assumptions based primarily upon those assumptions used for establishing the cash surrender values in the contract. For universal life and investment-type contracts, contract holder deposits represent account balances. The account values represent an accumulation of gross deposits received plus credited interest less withdrawals, expenses and mortality charges. Non-participating products, include term, group and disability insurance, as well as participating contracts in the United Kingdom. For these products, a net level premium method is used with assumptions locked in at time of issue, unless the business is in a loss position, in which case, a best estimate gross premium valuation is used.

***(ix) Deferred net realized gains:*** Cdn. GAAP defers and amortizes realized gains and losses on sales of invested assets. Under U.S. GAAP, realized gains and losses are recognized in income immediately.

***(x) Premium revenue, fee income, maturities and surrenders, and interest on claims and deposits:*** Under Cdn. GAAP, premiums for universal life and other investment-type contracts are recorded as revenue, and a liability for future policy benefits is established as a charge to income. Interest accrued on contracts is shown as an increase in actuarial liabilities. Payments to contract holders upon maturity are reflected as an expense with an offsetting reduction to the increase in actuarial liabilities. Under U.S. GAAP, amounts received for universal life and investment-type contracts are not included in the income

**32. SUMMARY OF MATERIAL DIFFERENCES BETWEEN ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN CANADA AND IN THE UNITED STATES (Continued)**

statement but are reported as deposits to contract holder account balances. Revenues from these contracts are limited to amounts assessed against policyholders' account balances for mortality, policy administration and surrender charges, and are included in fee income when earned. Interest accrued on contracts is included in interest on claims and deposits. Payments upon maturity or surrender are reflected as reductions to the contract holder deposits on the balance sheet. Other payments in excess of the account value, such as death claims, are reflected as an expense.

***(xi) Confederation Life goodwill write-off:*** Under Cdn. GAAP, goodwill is amortized on a straight line basis. Under U.S. GAAP, certain components of goodwill are amortized on a gross profits basis. The higher unamortized balance for Confederation Life goodwill was written-off under U.S. GAAP in 1998.

***(xii) Segregated funds*:*** Under Cdn. GAAP, assets and liabilities of segregated funds are shown separately from general assets and liabilities of the Company. U.S. GAAP requires these separate accounts to be included within the financial statements of the Company. Under Cdn. GAAP, the Company's investment in segregated funds are included in other invested assets. Under U.S. GAAP, any excess of the separate account assets over separate account liabilities represents the Company's investment in segregated funds. Under Cdn. GAAP, the Company's segregated fund liabilities to policyholders are measured at surrender value. Under U.S. GAAP, the Company's separate account liabilities to policyholders are carried at an amount equal to the accumulated separate account assets attributable to policyholders.

* U.S. GAAP terminology is separate account.

***(xiii) Extraordinary item – demutualization expense:*** For 1998, under Cdn. GAAP certain demutualization costs were capitalized. Under U.S. GAAP these costs are treated as an extraordinary item, net of tax.

**(c) Statement of cash flow:**

Under Cdn. GAAP, cash flows are reconciled to the balance of cash and short-term securities. Deposits, maturities and withdrawals related to investment-type contracts and universal life contracts are included in operating activities. Increases and decreases in long-term investments are shown net. Under U.S. GAAP, cash flows are reconciled to the balance of cash and cash equivalents. Deposits, maturities and withdrawals are reflected as financing activities, and increases and decreases in long-term investments are not netted; these cash flow items under U.S. GAAP are as follows:

| | 1998 | 1997 |
|---|---|---|
| | $ | $ |
| Deposits and withdrawals reclassified to financing activities: | | |
| Deposit to policyholders' accounts | 1,995 | 1,870 |
| Withdrawals from policyholders' accounts | 3,796 | 3,247 |

| | Proceeds from sale | | Purchases | |
|---|---|---|---|---|
| | 1998 | 1997 | 1998 | 1997 |
| | $ | $ | $ | $ |
| Changes in long-term investments: | | | | |
| Bonds – available for sale | 12,588 | 13,086 | 13,461 | 14,845 |
| Bonds – trading | 624 | 751 | 515 | 766 |
| Mortgages | 2,073 | 2,511 | 2,336 | 1,491 |
| Stocks – available for sale | 1,554 | 1,017 | 770 | 739 |
| Stocks – trading | 944 | 516 | 752 | 774 |
| Real estate | 172 | 264 | 239 | 196 |

**(d) U.S. generally accepted accounting standard not yet adopted by the Company:**

The adoption of this new U.S. standard may or may not give rise to material differences with our current Canadian accounting principles.

SFAS No. 133 "Accounting for Derivative Instruments and Hedging Activities", must be adopted by 2001 for U.S. reporting purposes. This statement includes accounting and reporting standards for derivative instruments and hedging activities. It requires that all derivatives be recognized as either assets or liabilities and measured at fair values. The Company is in the process of evaluating the potential impact of the new standard on this note.

# UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS AT AND FOR THE SIX MONTHS ENDED JUNE 30, 1999

## CHIEF FINANCIAL OFFICER'S REPORT

The Consolidated Balance Sheets of Sun Life Assurance Company of Canada as at June 30, 1999 and 1998 and the Consolidated Statements of the Company's Operations and Surplus and Cash Flow for the six-month periods ended June 30, 1999 and 1998 have not been audited but have, in all material respects, been prepared in accordance with generally accepted accounting principles applicable to the preparation of Consolidated Financial Statements, including the accounting requirements of the Superintendent of Financial Institutions.

Toronto, Canada
September 28, 1999

(Signed) MICHAEL A. HASLEY
Senior Vice-President, Finance
Sun Life Assurance Company of Canada

# UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS AT AND FOR THE SIX MONTHS ENDED JUNE 30, 1999

## CHIEF FINANCIAL OFFICER'S REPORT

The Consolidated Balance Sheets of Sun Life Assurance Company of Canada as at June 30, 1999 and 1998 and the Consolidated Statements of the Company's Operations and Surplus and Cash Flow for the six-month periods ended June 30, 1999 and 1998 have not been audited but have, in all material respects, been prepared in accordance with generally accepted accounting principles applicable to the preparation of Consolidated Financial Statements, including the accounting requirements of the Superintendent of Financial Institutions.

Toronto, Canada
September 28, 1999

(Signed) Michael A. Hasley
Senior Vice-President, Finance
Sun Life Assurance Company of Canada