# UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS

## Summary Consolidated Balance Sheet

| | June 30, 1999 | June 30, 1998 |
|---|---|---|
| | (In millions of Canadian dollars) | |
| **ASSETS** | | |
| Bonds | $24,852 | 24,786 |
| Mortgages | 11,714 | 11,333 |
| Stocks | 4,295 | 4,661 |
| Real Estate | 2,451 | 2,294 |
| Policy Loans | 1,214 | 1,123 |
| Cash and short-term securities | 2,934 | 2,035 |
| Other invested assets | 1,099 | 675 |
| **Invested Assets** | 48,559 | 46,907 |
| Other assets | 4,804 | 4,072 |
| **Total general funds assets** | $53,363 | $50,979 |
| **Segregated funds net assets** | $39,880 | $35,825 |
| **LIABILITIES AND SURPLUS** | | |
| Actuarial liabilities | $33,260 | $32,793 |
| Amounts on deposit | 5,315 | 5,069 |
| Borrowed funds | 408 | 290 |
| Deferred net realized gains | 3,285 | 2,513 |
| Other liabilities | 3,710 | 3,160 |
| **Total general fund liabilities** | 45,978 | 43,825 |
| **Subordinated debt** | 737 | 737 |
| **Cumulative capital securities of a subsidiary** | 876 | 876 |
| **Surplus** | 5,772 | 5,541 |
| **Total general funds liabilities and surplus** | $53,363 | $50,979 |
| **Segregated funds contract liabilities** | $39,880 | $35,825 |

## Summary Unaudited Consolidated Statement of Operations and Surplus

| | Six Months Ended June 30, | |
|---|---|---|
| | 1999 | 1998 |
| | (in millions of Canadian dollars) | |
| **Revenue** | | |
| Premiums | $4,440 | $3,557 |
| Net investment income | 2,046 | 2,074 |
| Fee income | 1,239 | 967 |
| | 7,725 | 6,598 |
| **Policy benefits and expenses** | | |
| Payments to policyholders, beneficiaries and depositors | 3,700 | 3,418 |
| Net transfers to segregated funds | 965 | 781 |
| Increase in actuarial liabilities | 568 | 234 |
| Commissions | 679 | 598 |
| Operating expenses | 1,098 | 961 |
| Interest on borrowings | 43 | 54 |
| Taxes | 179 | 119 |
| | 7,232 | 6,165 |
| **Operating income** | 493 | 433 |
| Policyholder dividends | 405 | 374 |
| Cumulative capital securities dividends | 38 | 37 |
| Confederation Life goodwill write off | – | 260 |
| **Net income** | $ 50 | $ (238) |
| **Statement of surplus** | | |
| Opening surplus, beginning of period | $6,081 | $5,715 |
| Net Income | 50 | (238) |
| Effect of changes in currency exchange rates | (359) | 64 |
| Ending surplus, end of period | $5,772 | $5,541 |

* As restated.

## Unaudited Condensed Consolidated Statement of Cash Flow

| | Six Months Ended June 30, 1999 | Six Months Ended June 30, 1998 |
|---|---|---|
| | (in millions of Canadian dollars) | |
| **Cash Flows provided by Operating Activities** | | |
| Net Income | $ 50 | $ (238) |
| Adjustments for items not affecting cash | 513 | 290 |
| Net cash provided by operating activities | 563 | 52 |
| **Cash Flows provided by (used in) Financing Activities** | | |
| Borrowed Funds | 136 | (168) |
| | 136 | (168) |
| **Cash Flows provided by (used in) Investing Activities** | | |
| Investments | (192) | (509) |
| Dispositions | 35 | - |
| Acquisitions | (48) | (170) |
| | (205) | (679) |
| **Increase (Decrease) in Cash and Cash Equivalents** | 494 | (795) |
| Cash and cash equivalents, beginning of period | 1,465 | 1,841 |
| Changes due to fluctuations in exchange rates | (166) | 38 |
| **CASH AND CASH EQUIVALENTS, end of period** | 1,793 | 1,084 |
| **SHORT TERM INVESTMENTS, end of period** | 1,141 | 951 |
| **CASH AND SHORT-TERM SECURITIES, end of period** | $2,934 | $2,035 |

## CONDENSED NOTES TO THE INTERIM CONSOLIDATED FINANCIAL STATEMENTS

SIX MONTHS ENDED JUNE 30, 1999
(in millions of Canadian dollars)
(Unaudited)

### 1. SEGMENTED INFORMATION

The Company's reportable segments reflect the Company's management structure and internal financial reporting. Each of these segments has its own management. All of these segments operate in the financial services industry. They derive their revenues principally from wealth management operations (mutual funds, investment management, annuities, trust operations and banking) and protection services (life and health insurance). Corporate and other represents amounts not attributed to wealth management and protection. It primarily includes investments of a corporate nature and earnings on capital not attributed to the strategic business units.

Other operations include those operations for which management responsibility resides in head office. Included in this category under protection services are the Company's reinsurance operations. The net income in this category is shown net of certain expenses borne centrally. Transactions occurring between segments consist primarily of internal financing agreements. Inter-segment transactions are measured at market values prevailing when the arrangements were negotiated. Inter-segment revenue consists of interest of $47 in 1999 ($44 in 1998) and fee income of $15 in 1999 ($13 in 1998).

Six months ended June 30, 1999

| | | United States | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Canada | Sun Life | M.F.S. | United Kingdom | Asia Pacific | Other | Consolidation Adjustments | Total |
| | $ | $ | $ | $ | $ | $ | $ | $ |
| **Revenue** | | | | | | | | |
| Wealth management | 746 | 1,636 | 854 | 544 | – | '4 | (15) | 3,769 |
| Protection | 1,122 | 1,211 | – | 804 | 190 | 519 | – | 3,846 |
| Corporate and other | 16 | 48 | – | 10 | – | 83 | (47) | 110 |
| | 1,884 | 2,895 | 854 | 1,358 | 190 | 606 | (62) | 7,725 |
| **Net income (loss)** | | | | | | | | |
| Wealth management | 38 | 35 | 82 | (302) | (1) | 4 | (12) | (156) |
| Protection | 51 | 83 | – | 26 | 34 | (35) | – | 159 |
| Corporate and other | 10 | 12 | – | 39 | – | (26) | 12 | 47 |
| | 99 | 130 | 82 | (237) | 33 | (57) | – | 50 |
| **Assets** | | | | | | | | |
| General fund assets | 18,765 | 16,366 | 1,426 | 13,561 | 1,331 | 3,041 | (1,127) | 53,363 |
| Segregated fund assets | 6,789 | 20,619 | – | 12,472 | – | – | – | 39,880 |
| Other assets under management | 19,770 | 1,944 | 167,990 | 3,472 | – | – | (20,861) | 172,315 |

Six months ended June 30, 1998

| | | United States | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Canada | Sun Life | M.F.S. | United Kingdom | Asia Pacific | Other | Consolidation Adjustments | Total |
| | $ | $ | $ | $ | $ | $ | $ | $ |
| **Revenue** | | | | | | | | |
| Wealth management | 765 | 931 | 603 | 506 | – | (1) | (13) | 2,791 |
| Protection | 1,062 | 1,242 | – | 765 | 150 | 385 | – | 3,604 |
| Corporate and other | 13 | 34 | – | 13 | – | 187 | (44) | 203 |
| | 1,840 | 2,207 | 603 | 1,284 | 150 | 571 | (57) | 6,598 |
| **Net income (loss)** | | | | | | | | |
| Wealth management | 59 | 28 | 46 | (446) | – | (1) | (10) | (324) |
| Protection | 30 | 72 | – | 64 | 18 | (2) | – | 182 |
| Corporate and other | 27 | (6) | – | (198) | – | 71 | 10 | (96) |
| | 116 | 94 | 46 | (580) | 18 | 68 | – | (238) |
| **Assets** | | | | | | | | |
| General fund assets | 18,398 | 16,379 | 1,071 | 11,375 | 991 | 3,200 | (435) | 50,979 |
| Segregated fund assets | 5,942 | 17,344 | – | 12,539 | – | – | – | 35,825 |
| Other assets under management | 18,686 | 2,053 | 128,077 | 3,399 | – | – | (17,226) | 134,989 |

## CONDENSED NOTES TO THE INTERIM CONSOLIDATED FINANCIAL STATEMENTS

(Continued)

SIX MONTHS ENDED JUNE 30, 1999
(in millions of Canadian dollars)
(Unaudited)

**1. SEGMENTED INFORMATION (Continued)**

The reportable segments have changed because of the growth in Massachusetts Financial Services Company (M.F.S.) and changes in the Company's reporting structure. Prior period information has been restated.

**2. CHANGE IN ACCOUNTING POLICY**

The Company has adopted the new standard for Cash Flow Statements, CICA Handbook section 1540.

**3. ACQUISITION AND DISPOSAL**

Effective February 5, 1999, the Company sold its United States individual disability insurance subsidiary, Massachusetts Casualty Insurance Company (MCIC). Proceeds from the sale, net of applicable taxes, recovered MCIC's carrying value.

Effective May 19, 1999, the Company acquired a 50.001% interest in a new marketing and distribution company, a 50% interest in a mutual fund management company, a 50% interest in the trustee of the Birla Mutual Fund, and a 49% interest in a securities brokerage company, all located in India. The acquisition is accounted for by the purchase method and there is additional contingent consideration of $7 payable upon certain criteria being achieved. Results are included in the consolidated statement of operations from the date of acquisition. The acquisition is summarized below:

| | $ |
|---|---|
| Balance sheet assets acquired | 21 |
| Balance sheet liabilities acquired | 13 |
| Net balance sheet assets acquired | 8 |
| Cost of acquisition | 43 |
| Goodwill | 35 |
| Goodwill amortization period | 15 years |

**4. CONTINGENCIES**

*Certain Reinsurance Arrangements*

In 1997, the Company entered into an arrangement to participate in the reinsurance of a risk-sharing pool and related facilities, managed by Unicover Managers, Inc. (Unicover), which provided reinsurance for U.S. workers' compensation benefits. Many other companies are directly or indirectly involved in the entire program, including the insurers, the pool members, the reinsurers and the retrocessionaires. In keeping with its normal practice, the Company had also arranged reinsurance protections for its benefit to manage the Company's exposure to losses.

During 1998, the premium attributable to the underlying workers' compensation policies sold and then partially or wholly reinsured by Unicover materially exceeded expectations. Claims attributable to the entire program are expected to be substantial. Consequently, the Company has undertaken an extensive review of the Unicover program and the Company's reinsurances. In conducting its review, the Company retained the services of independent actuaries, forensic auditors, and legal counsel in the United States, the United Kingdom and Bermuda. The Company believes that most other companies involved are also reviewing the Unicover program.

Based upon its review, and upon the advice of counsel, on July 15, 1999 the Company delivered a notice of arbitration to all participants in the Unicover pool and related facilities seeking rescission of its December 1, 1997 contracts with the Unicover pool and facility members, or damages. If the remedy of rescission were granted in this case, it would have the effect of annulling or voiding the Company's contracts with Unicover. It is possible that the arbitration proceedings will be lengthy and the outcome of those proceedings not known for quite some time. Based on the information known to it at this time, the Company believes that it has strong grounds for rescission.

On April 26, 1999 one of the Company's reinsurers, Allianz Life Insurance Company of North America (Allianz), initiated legal proceedings against the Company (and others) seeking rescission of certain reinsurance treaties with the Company, including the treaty that would provide reinsurance of losses from the Company's contracts with Unicover. Allianz, the Company and the other parties to the litigation have agreed to a temporary "stand-still" of those proceedings.

## CONDENSED NOTES TO THE INTERIM CONSOLIDATED FINANCIAL STATEMENTS
(Continued)

SIX MONTHS ENDED JUNE 30, 1999
(in millions of Canadian dollars)
(Unaudited)

**4. CONTINGENCIES (Continued)**

***Legal Proceedings***

Sun Life and its subsidiaries are engaged in litigation arising in the ordinary course of business. None of this litigation is expected to have a material adverse effect on the consolidated financial position of Sun Life.

***Provisions for Prior Pension Sales***

In the United Kingdom, the life insurance industry is being required to compensate certain policyholders under the Financial Services Authority guidelines on sales of pension products. The compensation is for sales which occurred from 1988 to 1994. These guidelines have been significantly expanded in the past year for the second phase of required compensation, which has required the entire industry to significantly increase its provisions. The Financial Services Authority is continuing to provide more specific guidance for this compensation. The liability has been determined by the use of estimates derived from the regulatory guidance or the Company's prior experience. The Company's future experience may be different from these estimates and consequently there is still uncertainty in measuring its ultimate costs. The Company increased its provisions by $354 in the six-month period ended June 30, 1999 ($237 increase in the six-month period ended June 30, 1998). During the six-month period ended June 30, 1999, the Company paid compensation of $81 ($94 in the six-month period ended June 30, 1998). At June 30, 1999, the Company had provisions of $755 ($484 as at June 30, 1998) for future compensation payments.

# AUDITORS' REPORT

The Board of Directors,
Sun Life of Canada Holdings Corp.

We have audited the Balance Sheet of Sun Life of Canada Holdings Corp. as at September 28, 1999. This financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on this financial statement based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform an audit to obtain reasonable assurance whether the financial statement is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statement. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.

In our opinion, the Balance Sheet presents fairly, in all material respects, the financial position of the Company as at September 28, 1999 in accordance with Canadian generally accepted accounting principles, including the accounting requirements of the Superintendent of Financial Institutions Canada.

Toronto, Canada
September 28, 1999

(Signed) Deloitte & Touche LLP
Chartered Accountants



SL-0554

## BALANCE SHEET OF SUN LIFE OF CANADA HOLDINGS CORP.

| | September 28, 1999 (in millions of Canadian dollars) |
|---|---|
| **ASSETS** | |
| Cash and short-term securities | $10 |
| **LIABILITIES** | $ – |
| **SHAREHOLDER'S EQUITY** | $10 |

On behalf of the Board:

(Signed) ALFRED POWIS
Director

(Signed) WILLIAM W. STINSON
Director

**SUN LIFE OF CANADA HOLDINGS CORP.**
**NOTES TO THE BALANCE SHEET**

**1. Description of Business**

Sun Life of Canada Holdings Corp. was incorporated on August 5, 1999 under the *Insurance Companies Act* (Canada).

**2. Share Capital**

**Common Shares**

| | |
|---|---|
| **Authorised** | Unlimited |
| **Issued** | 1 share, issued on September 28, 1999 |

**Class A Shares**

| | |
|---|---|
| **Authorised** | Unlimited |
| **Issued** | 100,000 shares, issued on September 28, 1999 |

**Class B Shares**

| | |
|---|---|
| **Authorised** | Unlimited |
| **Issued** | Nil |

## PART 2 GLOSSARY

*See the Part I Glossary for an explanation of certain other terms used in this Policyholder Information Circular and not defined in the Part 2 Glossary.*

***"actuarial liabilities"*** (also called **"insurance and annuity reserves"** or **"policy reserves"**) – estimates made by an actuary of amounts which together with future premiums and investment income will be sufficient to pay future benefits, dividends and policy maintenance expenses on insurance and annuity contracts; these reserves are recorded as liabilities on the Company's balance sheet

***"actuary"*** – a fellow of the Canadian Institute of Actuaries, or comparable body, who is professionally qualified in actuarial science including the mathematics and technical aspects of insurance and related fields, particularly in the calculation of premiums, reserves and other values

***"administration services only arrangement"*** – an arrangement under which an insurer does not underwrite any insurance risk, but merely administers a self-insured benefit plan provided by an employer to its employees. As an insurer assumes no insurance risk when providing administration services only, it is not required to provide capital support for such services under the MCCSR

***"Ancillary Sub-Fund"*** – a special sub-fund relating to liabilities other than those associated with individual life insurance policies in each territorial sub-account for SLC Pre-Demutualization Participating Policies

***"annuity"*** – a contract that provides income payments at regular intervals, usually for a specified period (an annuity certain) or for the lifetime of the annuitant (a life annuity). Annuity contracts are offered on both an immediate and a deferred basis. Under immediate annuities, the payment of income commences at, or very shortly after, the date of issue of the contract. Under deferred annuity contracts, the payment of income commences on some specified future date, such as five years after the contract is issued. Annuity contracts can be fixed or variable (also see "guaranteed rate products" and "variable insurance contract")

***"Benefits Canada"*** – a Canadian monthly journal focused on pension fund investment and employee benefit issues

***"Canadian GAAP" or "Cdn. GAAP"*** – Canadian generally accepted accounting principles as promulgated by the Canadian Institute of Chartered Accountants, including the accounting requirements of the Superintendent of Financial Institutions (Canada)

***"career agent"*** – an agent who represents one life insurance company exclusively for the purpose of soliciting applications, collecting initial premiums and servicing insurance contracts

***"cash value"*** (also called **"cash surrender value"**) – the amount which, pursuant to an insurance or annuity contract, is available in cash upon voluntary termination of that contract by its owner before it becomes payable upon death or maturity

***"cede"*** – to transfer an insurance risk from a company originally issuing an insurance policy to another insurance company, typically known as the reinsurer

***"commercial mortgage"*** – a mortgage secured by underlying security such as a commercial office property, industrial property, retail property or a development loan on any of the aforementioned properties

***"CompCorp"*** – Canadian Life and Health Insurance Compensation Corporation, a consumer protection agency established and funded by the Canadian life insurance industry to protect policyholders against losses due to the failure of a Canadian life insurance company

***"compulsory purchase annuity"*** – an annuity which by law must be purchased with the proceeds of a vested defined contribution pension plan

***"CTA"*** – the currency translation account of the Company

***"DALBAR"*** – a U.S. company that provides specialized market research, consulting services and computer systems designs

***"deferred annuity"*** – an annuity that (i) can be paid either with a single premium or a series of instalments and (ii) includes a schedule of periodic income benefits to commence after an accumulation period

***"defined benefit plan"*** – a pension plan that specifies the benefit that the plan promises to pay to a plan participant on retirement

***"defined contribution plan"*** – a pension plan that does not guarantee specific retirement benefits. The amount of the retirement benefit paid depends on the amount of contributions and their earnings performance

***"endowment insurance"*** – a life insurance policy that pays the face value of the policy at the earlier of death or a pre-determined maturity date

***"ERC Frankona"*** – a subsidiary of Employers Re International, an international reinsurer

***"Financial Services Act"*** – means the Financial Services Act 1986 of the United Kingdom

***"FSA"*** – means the Financial Services Authority, which administers the ***Financial Services Act*** and supervises the activities of firms carrying on investment business in the United Kingdom

***"401(k)"*** – a retirement savings plan which has tax preferred treatment under Section 401(k) of the United States Internal Revenue Code of 1986, as amended

***"general account"*** – all the assets and liabilities of an insurance company, other than those allocated to a segregated fund. The insurer bears the investment risk on the invested assets of the general account

***"GIC"*** – see "guaranteed investment contracts"

***"group health insurance"*** – an insurance policy which provides coverage for medical and dental costs, and income replacement for disabilities, to a group of people under a master contract; this type of policy is typically used by employers to provide coverage for their employees

***"group life insurance"*** – a life insurance policy which insures the lives of a group of people under a master contract; this type of policy is typically used by employers to provide coverage for their employees

***"guaranteed investment contracts"*** (or "GICs") – certificates of deposit on which guaranteed interest is payable or compounded annually and which has a specified term to maturity, usually from one to five years

***"guaranteed rate products"*** – products on which returns do not depend on the performance of any underlying assets but rather on specified interest rates stipulated by the policy

***"in force"*** – the total face amount of insurance coverage under contracts that have not expired

***"individual life insurance"*** – a life insurance policy which pays a stipulated sum in the event of the death of a named individual

***"Individual Sub-Fund"*** – a special sub-fund relating to individual life insurance policies in each territorial sub-account for SLC Pre-Demutualization Participating Policies

***"LIMRA"*** – Life Insurance Marketing Research Association, a life insurance industry marketing association

***"Lipper"*** – Lipper Analytical Services Inc., a U.S.-based independent provider of investment data

***"MCCSR"*** – the OSFI guideline for Minimum Continuing Capital Surplus Requirements for federally regulated life insurance companies

***"morbidity rate"*** – the relative incidence of sickness or disability due to disease or physical impairment

***"Morningstar"*** – Morningstar, Inc., a U.S.-based independent publisher of investment data

***"mortality rate"*** – the relative incidence of death of life insureds or annuitants

***"mutual insurance company"*** – an insurance company without shareholders, the management of which is directed by a board of directors, elected in most cases by holders of participating policies

***"NAIC"*** – the National Association of Insurance Commissioners, an association of the chief insurance supervisory officials of each state of the United States, the District of Columbia and the four U.S. territories

***"non-participating insurance"*** – a life insurance policy which does not entitle the policyholder to share in any distributable surplus of the life insurance company

***"PfADS"*** – actuarially determined provisions for adverse deviation

***"PIA"*** – means the Personal Investment Authority, which regulates marketing activities in the investment management industry in the United Kingdom

***"participating permanent endowment insurance"*** – a product that combines life insurance protection with a savings/accumulation feature that offers a guaranteed lump sum with bonuses on maturity

***"participating policy"*** – a life insurance policy which entitles its holder to participate in the profits of the issuing company

***"Participating Policyholders' Account"*** – an account for the benefit of holders of participating policies of Sun Life Assurance, kept separate from the accounts maintained for the benefit of holders of non-participating policies and other businesses of the Company

***"policy loan"*** – a loan made by a life insurance company to a policyholder based on the security of the cash value of a policy

***"policy premium method"*** – the method of calculating actuarial liabilities prescribed in the Canadian Insurance Act and defined by the Canadian Institute of Actuaries

***"policyholder"*** – the person who owns an insurance or annuity policy; although the policyholder is usually the insured, in the case of group insurance the policyholder is typically the employer rather than the employees or members of the group

***"policyholder dividend"*** – a payment to the policyholder of participating life insurance based on any distributable surplus established by a life insurance company's board of directors; policyholder dividends are not guaranteed and are established at the discretion of the board of directors of a life insurance company

***"premium"*** – the payment, or one of the periodic payments, a policyholder is required to make to the insurer under an insurance policy

***"premium offset"*** – an optional payment feature on participating whole life insurance policies which allows policyowners to use dividends and certain cash values associated with a policy as a result of past dividends, rather than cash, to pay premiums at some time in the future

***"reinsurance"*** – the acceptance by one or more insurers, called reinsurers, of a portion of the risk underwritten by another insurer who has directly contracted to provide the coverage; the legal rights of the policyholder are not affected by the reinsurance transaction and the insurer issuing the insurance contract remains primarily liable to the policyholder for payment of policy benefits

***"reserves"*** – liabilities established by insurers that generally represent the estimated discounted present value of the net cost of claims, payments or contract liabilities and the related expenses that the insurer will ultimately be required to pay in respect of insurance or annuities it has written

***"retrocession"*** – the process by which a portion of the risk accepted by a reinsurer is ceded to another reinsurer known as a retrocessionaire

***"retrocessionaire"*** – an institution which provides a form of reinsurance whereby a portion of the risk accepted by a reinsurer is assumed by another reinsurer

***"segregated fund"*** – a fund, having its own portfolio of investments, kept separate from the general funds of a life insurance company in connection with a policy or policies of insurance and annuities under which the company's liability to the policyholders and/or unitholders varies with the performance of the fund

***"SLC Post-Demutualization Participating Policy"*** – a participating policy sold by Sun Life Assurance in Canada, the United States or Bermuda after the date of demutualization

***"SLC Pre-Demutualization Participating Policy"*** – a participating policy sold by Sun Life Assurance in any country other than the United Kingdom, Ireland, the Channel Islands and Hong Kong before the date of demutualization

***"stakeholder pension"*** – a qualifying pension scheme in the United Kingdom under the proposed Welfare Reform and Pensions Bill. It is anticipated that stakeholder pension schemes will be second tier pension schemes intended to supplement current state pensions and which will require regulatory approval and will have to meet certain minimum standards relating to, among other things, charging structure, contribution levels, transfer of funds and annual reporting on individual pension fund values

***"Strategic Insight"*** – a U.S.-based mutual fund industry monitoring organization

***"surplus"*** – the excess of assets over liabilities and other obligations in a mutual life insurance company's financial statements

***"term life insurance"*** – a life insurance policy which pays a stipulated sum on the death of the individual life insured, provided that death occurs within a specified number of years; there is usually no cash surrender value

***"Transferred Participating Policies"*** – participating policies transferred from Sun Life Assurance to Sun Life of Canada (U.K.) or Sun Life of Canada (International)

***"underwriting"*** – the process by which an insurance company assesses the risk inherent in an application for insurance prior to acceptance and issuance of the policy

***"Unicover"*** – Unicover Managers, Inc.

***"Unicover Reinsurers"*** – members of the reinsurance pool and facilities created and managed by Unicover

***"Unicover Treaties"*** – the arrangement to participate in the reinsurance of the reinsurance pool and facilities created and managed by Unicover

***"unit-linked policy"*** – an insurance contract offered in the United Kingdom where the savings portion of the premium earns a return which is based on the investment performance of a unit trust or segregated fund

***"unit trust"*** – the U.K. equivalent of an open-end mutual fund

***"universal life insurance"*** – a life insurance policy in which premiums, less expense charges, are credited to a policy account from which periodic charges for life insurance are deducted and to which interest and investment income are credited; usually, the policyholder can vary the amount and timing of premium payments and change the amount of insurance coverage; universal life insurance accumulates a cash value

***"U.S. GAAP"*** – U.S. generally accepted accounting principles applicable to life insurance companies with share capital

***"VARDs"*** – Variable Annuity Research Data Services, a U.S.-based independent provider of variable annuity sales and asset data, and commentaries about variable annuity trends

***"variable annuity"*** – an annuity in which values and benefits may vary. The value fluctuates in accordance with the investment experience of a separate account. Variable annuity contracts typically include a general account guaranteed interest investment option. At the time of the payment of benefits to the annuitant, the annuitant can generally elect from a number of payment options which provide either fixed or variable benefit payments

***"variable life insurance"*** – life insurance under which the benefits payable upon death or surrender typically vary to reflect the investment experience of the separate account supporting such policies; variable life insurance policies typically include a general account guaranteed interest investment option

***"variable insurance contract"*** (also called a **"variable product"**) – an annuity or life insurance contract for which the reserves and/or benefits may vary in amount with the market value of a specified group of assets held in a separate fund

***"whole life insurance"*** – a permanent life insurance policy payable at the death of the insured, with a fixed premium and accumulating casb values; whole life insurance policies are available in participating or non-participating form

# CERTIFICATE OF SUN LIFE OF CANADA HOLDINGS CORP.

DATED: September 28, 1999

This certificate is provided solely for the benefit of policyholders in Québec pursuant to the provision of the *Securities Act* (Québec). This document, which constitutes a prospectus under the *Securities Act* (Québec), contains no misrepresentation.

| | |
|---|---|
| (Signed) DONALD A. STEWART<br>Chief Executive Officer | (Signed) MICHAEL A. HASLEY<br>Senior Vice-President, Finance |

On behalf of the Board of Directors

| | |
|---|---|
| (Signed) ALFRED POWIS<br>Director | (Signed) WILLIAM W. STINSON<br>Director |



SL-0560

*If you have questions about the proposed demutualization, please call Sun Life of Canada at one of the following numbers:*

| If calling within the country | If calling from outside the country |
|---|---|
| **Canada** | |
| 1 800 SUN-LIFE (1 800 786-5433) | 1 506 862-2197 |
| **United States** | |
| 1 888 891-8145 | 1 617 483-4207 |
| **United Kingdom** | |
| 0845 606 6622 | 44 117 980 7258 |
| **Philippines** | |
| 878-9800 (Metro Manila)<br>1-800-1-888-8786 (Provinces) | 632 878-9800 |
| **Hong Kong** | |
| 2103-8988 | 852 2103-8188 |

You can also send an e-mail to Sun Life of Canada through our Web site at www.sunlifeofcanada.com.

The paper used in this document is manufactured in compliance with the standards SFS-EN ISO 14001 and ISO 9706, and is fully recyclable.
The pulp used comes from sustainable and constantly renewed forests where timber is procured and regenerated on a farmed basis.

Pour vous procurer la version française de la présente circulaire d'information des titulaires de contrats, veuillez communiquer avec le centre de réception des appels de la Sun Life du Canada de votre région, au numéro indiqué en troisième de couverture.

本保單持有人資料通函亦備有中文版。請您致電您本地的加拿大永明人壽轉換體系熱線（封底內頁列有電話號碼）索取保單持有人資料通函的中文版。

Sun Life Assurance Company of Canada

EXPANDING OUR HORIZONS

Sun Life

**News Release**

**FOR IMMEDIATE RELEASE**

# SUN LIFE DEVELOPING DEMUTUALIZATION PLAN

(TORONTO, January 27, 1998) - Sun Life Assurance Company of Canada announced today that its Board of Directors has requested management to develop a plan to convert from a mutual life insurance company into a publicly traded stock company through demutualization.

Management has put in place a full time task force which, together with a worldwide team of actuarial, financial and legal advisers, has begun work. The Board will decide later this year whether to proceed with demutualization, following the completion of the plan. Demutualization would require regulatory and policyholder approval.

"Management believes that demutualization can provide significant benefits to our one million participating policyholders worldwide and would set the stage for Sun Life's continued growth and success into the next century", said John D. McNeil, Chairman and Chief Executive Officer of Sun Life. "Becoming a publicly traded company can provide substantial value for our policyholders and unlock our capital base, allowing the Company to compete effectively in the global financial services marketplace. Participating policyholders would receive shares representing ownership of the Company that could be traded on stock exchanges, and they would retain the contractual benefits of their existing policies. Sun Life would gain the flexibility to raise capital to take advantage of domestic and international opportunities for growth."

"Sun Life has enjoyed great success under its current structure", added Mr. McNeil. "However, as the financial services industry continues to evolve, we need a structure that positions us to respond to the changing needs of our customers and helps us achieve continued prosperity."

Sun Life is a leading international financial services company, currently operating in seven countries and with policyholders in many others. Some of these countries already have well-developed demutualization rules. Canadian regulations enabling the conversion of large mutual life insurance companies are anticipated to be in force by mid-1998. Implementation of demutualization would require the coordinated approval of Canadian and other regulators. If the Board approves the demutualization plan, it would be submitted to voting policyholders for their approval at a meeting, which is expected to be held in 1999.

- more -

DEFENDANT'S EXHIBIT 2

Shares to be issued to eligible policyholders pursuant to the demutualization plan would be allocated on a fair and equitable basis, which will be set out in the plan. Eligible policyholders would be those holding participating policies that are in force on January 27, 1998 and that continue to be in force on a later date to be specified in conjunction with the implementation of the demutualization. Anyone applying for a participating policy after January 27, 1998 would not be paid any material compensation as a result of the demutualization. Full details of eligibility would be finalized in conjunction with other components of the demutualization plan.

"Sun Life is in the enviable position of building for the future from a foundation of a strong balance sheet and profitability, its diversified business mix and geographic scope and its leadership position in many markets. Despite the substantial complexity of developing and implementing an international demutualization plan, our on-going commitment to serving our customers remains paramount," said Mr. McNeil.

Sun Life commenced business in 1871 and has grown to become a diversified global financial services company with total assets under management of $Cdn 174 billion and a surplus of $Cdn 5.5 billion, as at September 30, 1997. Sun Life of Canada's worldwide staff of more than 9,500 and agents and distributors numbering more than 65,000, offer a broad range of financial products to individuals and groups through operations in Canada, the United States, the United Kingdom, Hong Kong, the Philippines, Indonesia and Bermuda.

Sun Life receives the highest rankings for claims paying ability/financial strength from such established rating agencies as Standard & Poor's, A.M. Best and Duff & Phelps Credit Rating Company.

For further information, please contact:

| | | |
|---|---|---|
| **Canada:** | Cynthia A. Martin (English) | (416) 408-7574 |
| | Nathalie Hamel (French) | (514) 866-2561 |
| **United States:** | Paul D. Vaskas | (617) 446-1183 |
| **United Kingdom:** | H. Anthony Heath | 01256 849210 |
| | Brian Morley | 01256 303206 |
| **Philippines:** | Caesar Altarejos | 632-845-87-36 |
| **Hong Kong:** | Tommy Ng | 852-2103-8822 |

STATE OF MICHIGAN
DEPARTMENT OF CONSUMER & INDUSTRY SERVICES
INSURANCE BUREAU

Before the Commissioner of Insurance

| | |
|---|---|
| In the matter of the proposed conversion of Sun Life Assurance Company of Canada from a mutual to a stock insurer | No. 99-169-M |

## STATEMENT OF ROBERT W. WILSON, APPOINTED ACTUARY

Introduction and Background

My name is Robert W. Wilson. I am Vice President and Appointed Actuary of Sun Life Assurance Company of Canada ("Sun Life" or the "Company"). I have been with Sun Life since May, 1971. I have been Vice President and Actuary of Sun Life since 1995 and Appointed Actuary since June 1, 1998. As Vice President and Actuary, my duties include establishing appropriate policy liabilities, recommending appropriate policyholder dividends, solvency testing, financial projections, asset/liability management, and pricing policy. I have been a Fellow of the Canadian Institute of Actuaries since 1975, a fellow of the Society of Actuaries since 1975 and a member of the American Academy of Actuaries since 1995.

I am submitting this statement in support of Sun Life's request that the Commissioner of Insurance of the State of Michigan (the "Commissioner") approve the Conversion Plan (the "Plan"), which was unanimously adopted by Sun Life's Board of Directors (the "Sun Life Board") on September 28, 1999.[1] Under the Plan, the Company proposes to reorganize from a mutual company to a company owned by shareholders by means of

[1] Except as otherwise defined herein, capitalized terms used in this statement have the meanings set forth in my opinion letter, in the Plan, or in the Policyholder Information Circular, which have all been pre-filed and made a part of the record in this proceeding.

DEFENDANT'S EXHIBIT 3

demutualization. The Plan also provides that Sun Life Financial Services of Canada Inc. ("Financial Services")[2] will be the parent holding company of Sun Life after demutualization.

As the Appointed Actuary of Sun Life, I have had the responsibility of supervising the actuarial work involved in developing the Plan. I have also delivered an opinion dated September 28, 1999 addressing various actuarial issues relating to the Plan, a copy of which has been submitted to the Commissioner to be made part of the record of this proceeding.

Allocation of Demutualization Benefits

Upon the conversion of the Company into a company owned by shareholders, the entire value of the Company will be distributed among Eligible Policyholders in the form of Financial Services Shares, cash or Policy Credits. However, every Eligible Policyholder will have Financial Services Shares allocated to him, irrespective of the form of Demutualization Benefits he will ultimately receive. The total number of Financial Services Shares to be allocated to the Eligible Policyholders will be approximately 400 million and will represent the entire value of the Company. The allocation of shares to each Eligible Policyholder will vary based upon the application of the formula explained below. Each Eligible Policyholder has been sent a Share Allocation Statement, which sets forth the number of Financial Services Shares that have been allocated to that policyholder, a list of the policyholder's Eligible Policies, whether Sun Life requires specific information from the policyholder such as a confirmation of the policyholder's address or a United States Tax Identification Number, and any special information that applies to

[2] Financial Services is currently known as Sun Life of Canada Holdings Corp. On November 10, 1999, Financial Services applied to the Minister of Finance of Canada to change its name to Sun Life Financial Services of Canada Inc.

the policyholder, including whether there are any title restrictions affecting the policyholder's Eligible Policies.

Broad Principles Underlying the Allocation Formula

Prior to the determination of the allocation formula itself, the following major principles were established as a foundation for the allocation basis. I consider these principles to be sound.

- The allocation of value among Eligible Policyholders should be fair and equitable (recognizing that there is more than one equitable way of allocating value), and should be perceived to be fair and equitable by as many of those policyholders as practical.
- As far as is practical and consistent with the other principles, the same allocation formula should apply in all countries, for all types of Eligible Policies.
- The allocation of value should comprise a fixed component (i.e., the same amount for all Eligible Policyholders) - to compensate for the loss of voting control in Sun Life as a mutual company; and a variable component - to recognize the loss of any other ownership rights in Sun Life as a mutual company, reflecting the varying financial interests of Eligible Policies, including their size, length of time in force, contribution to the value of the Company, and their differing rights to receive surplus.
- The allocation of value should recognize the Company's history and philosophies of conducting business.
- The allocation formula should be simple, practical to implement and easy to understand.

Determination of the Allocation Formula

In determining the allocation formula, we considered not only that Sun Life is a large company, with business in a number of different countries, but also the types of policies written. Although about 98% of the Eligible Policies are individual life insurance policies, there are also eligible individual health and annuity policies, and eligible pension and group insurance



SL-0132

policies. The nature of the Eligible Policies differs in each country in which the Company does business.

In addition to confirming that the formula met the principles described earlier, a number of tests were made to check that the results of applying the formula are reasonable. While Sun Life did not use the contribution to surplus ("CTS") approach (which has been used as the basis for allocating the variable component of shares in most United States demutualizations), tests were made to examine how the allocation of value compared with the contribution to past and future surplus generated by different groups of individual life policies. This analysis was done in a manner consistent with the United States CTS method. Additional tests of reasonableness which were performed for sample Eligible Policies of differing type, size, duration, dividend options and jurisdiction resulted in no significant inequities. Finally, a test of the allocation of shares by territory was found to be broadly consistent with the distribution of actual surplus in the Company's accounts. I consider these to be satisfactory results that confirm the reasonableness of the allocation formula. Moreover, I believe that the allocation formula fairly and equitably balances the interests of Eligible Policyholders.

Allocation Formula

The allocation formula is made up of two parts, a fixed component and a variable component.

Fixed Component

The fixed component of the allocation is intended to compensate Eligible Policyholders for the loss of voting control of Sun Life as a mutual company. Currently, each Eligible Policyholder is entitled to one vote at meetings of Sun Life, regardless of the number or size of Eligible Policies owned. After demutualization, Sun Life voting policyholders for whom

Sun Life continues to be the insurer will have voting rights, but on most matters Financial Services, the sole shareholder of Sun Life, will control any vote. Each Eligible Policyholder will therefore be allocated 75 Financial Services Shares, regardless of the number, size or type of the policies owned, to recognize this loss of voting control. The total number of Financial Services Shares distributed as the fixed portion of the Demutualization Benefits represents about 20% of the total number of Financial Services Shares allocated to Eligible Policyholders. In other international demutualizations, the proportion of the distribution in respect of the fixed allocation has generally been in the range of 10% to 30%.

Variable Component

The variable allocations determined for Eligible Policies reflect the varying financial interests of Eligible Policies, including their size, length of time in force with Sun Life, contribution to the value of Sun Life and their differing rights to receive surplus.

The variable component in the aggregate makes up approximately 80% of the total allocation of Financial Services Shares.

For each Eligible Policy (other than group insurance policies) in force on January 27, 1998, the share allocation for the variable component is as follows:

- 1.32 Financial Services Shares per Can. $1,000 of cash value times the number of years the policy was in force with Sun Life with the number of years limited to 15 for corporate owned pension policies. Cash value includes dividends on deposit and the cash value of paid up additions, but excludes any amount for special maturity dividends and is not reduced by any policy loan.

- 64 Financial Services Shares per $1,000 of annual premium. Annual premium is the annual premium for the base policy and those riders that attract dividends. Single premiums and premiums for other riders are excluded.

A separate variable allocation formula was established for eligible group insurance policies because the group insurance policies generally have no cash values and,

therefore, the time-weighted cash value element of the formula described above would not recognize how long a group policy has been in force. In addition, group insurance policies do not participate in the same manner as individual Participating Policies. Therefore, the allocation formula for eligible group insurance policies is as follows:

- 4.7 shares for each Can. $1,000 of premium times duration. The definition of premium is generally the 1997 billed premium, excluding any premiums paid for health insurance and accidental death and dismemberment. Duration is the period of continuous participating coverage that a group insurance policyholder has had with Sun Life (subject to a maximum of 15 years) plus five years. The addition of five years gives recognition to the expected future contribution to value. The maximum of 15 years results in a reasonable balance between policies in force for many years and recent issues - consistent with the formula for individual life policies.

Approximately 89% of the total number of Financial Services Shares allocated under the variable allocation will be allocated in respect of individual life insurance policies, approximately 8% will be allocated in respect of group insurance policies, and the remaining approximately 3% will be allocated in respect of individual annuity, group pension and other policies.

About 50% of the total Financial Services Shares will be allocated in proportion to time weighted cash value and about 30% of all Financial Services Shares will be allocated in proportion to annual premiums (including those of group insurance). The remaining approximate 20% represents the fixed component.

It is my opinion, as well as that of the Independent Actuary, Nicholas Bauer of Eckler Partners Ltd., that the allocation formula is fair and equitable to all Eligible Policyholders.

Alternative Allocation Methods Considered

A number of different formulas were considered and tested before selecting the recommended formula. This formula was chosen because it met the allocation principles and it provided the best results when performing the reasonableness tests. In particular, the CTS approach, which has been used as the basis for allocating the variable component of shares in most United States demutualizations, has not been used by Sun Life. This method was not considered to be appropriate for Sun Life because:

- The fairness of the method across different territories is questionable because of the significant differences in the type of products written in various countries.
- It is an extremely complicated method and would have been very difficult to explain to Eligible Policyholders.
- Analysis performed by the Company shows that the contributions made by current Eligible Policyholders to the value of the Company at the end of 1997 is a very small proportion of the total value. In particular, about a third of Eligible Policyholders would have received no variable component if a CTS approach had been used.

Protection of Participating Policyholders' Reasonable Expectations

Under the Plan, Sun Life and its subsidiaries will put in place special arrangements designed to protect reasonable expectations of future policy dividends and other non-guaranteed policy benefits, and to meet contractual obligations, under Participating Policies issued before demutualization. As required by Canadian law, Sun Life maintains separate accounts to record the policies, assets, liabilities and any surplus for participating and non-participating policies. In addition Sun Life maintains such accounts in each major territory in which it does business. After demutualization, Sun Life of Canada will continue to maintain its worldwide participating account and, among others, the Canadian and United States territorial participating accounts. Sun Life will also establish and maintain the "Shareholders' Account,"

which will include the accounts in respect of the Canadian and United States non-participating businesses.

Within each of Sun Life's Canadian and United States territorial participating accounts, Sun Life will establish and maintain two separate sub-accounts:

- A sub-account in respect of pre-demutualization Participating Policies in the Canadian and United States territorial participating accounts, called the "Pre-Conversion Participating Sub-Account;" and
- A sub-account in respect of all post-demutualization Participating Policies in the Canadian and United States territorial participating accounts, called the "Post-Conversion Individual Participating Sub-Account."

Furthermore, within each of the Canadian and United States Pre-Conversion Participating Sub-Accounts, Sun Life will establish and maintain two separate sub-funds as follows:

- A sub-fund to manage and protect reasonable expectations in respect of future dividends on pre-demutualization individual Participating Policies, called the "Pre-Conversion Individual Participating Closed Sub-Fund."
- A sub-fund, called the "Pre-Conversion Ancillary Participating Sub-Fund," in respect of the remaining obligations associated with Participating Policies written prior to demutualization. These include: (i) provisions for adverse deviations on policies in the Pre-Conversion Individual Participating Closed Sub-Fund; (ii) amounts on deposit for policies in the Pre-Conversion Individual Participating Closed Sub-Fund; and (iii) group Participating Policies written prior to demutualization.

The Pre-Conversion Individual Participating Closed Sub-Funds are specially designed to protect future dividend levels. The initial amount of assets to be allocated to the Pre-Conversion Individual Participating Closed Sub-Funds will be determined to be sufficient to provide for all contractual obligations (other than deposit liabilities which are provided for in the Pre-Conversion Ancillary Participating Sub-Funds) and reasonable expectations in respect of future dividends and other non-guaranteed policy benefits on the policies in the sub-funds.

Further, Sun Life has established restrictions to ensure that all profits earned by the Pre-Conversion Individual Participating Closed Sub-Funds will accrue exclusively to the benefit of the policies in those sub-funds. The Company will not be permitted to transfer assets out of the Pre-Conversion Individual Participating Closed Sub-Funds for reasons other than to pay policy benefits, expenses, and taxes of the sub-fund.

As an additional protection, the Plan will stipulate that the Pre-Conversion Individual Participating Closed Sub-Funds not be allowed to fall into a deficit position. Thus, if the Appointed Actuary determines that the best estimate liabilities of a Pre-Conversion Individual Participating Closed Sub-Fund are greater than the assets in the sub-fund, then sufficient assets will be transferred into the sub-fund to make up the difference.

The Plan also sets out the rules for the future allocations of investment income, expenses and taxes to the Pre-Conversion Individual Participating Closed Sub-Funds. The allocation methods are essentially the same as those used prior to the demutualization for investment income, and taxes. Expenses will be set at their pre-demutualization levels and indexed with inflation as measured by an appropriate index. These rules have been developed to ensure that these sub-funds receive a fair and equitable proportion of total Company investment income, expenses and taxes.

After demutualization, provisions for future costs associated with claims under the Market Conduct Settlements will be held in the Shareholders' Account. This ensures that the risk the actual costs are different from estimated costs will be borne by the shareholders, and not the Participating Policyholders.

Assets equal to the actuarial provision for adverse deviations on pre-demutualization individual Participating Policies will be allocated to the Pre-Conversion

Ancillary Participating Sub-Funds. These assets provide an additional layer of protection in the participating account to support the policies in the Pre-Conversion Individual Participating Closed Sub-Funds.

The Plan also contains provisions to support Participating Policies sold by Sun Life after demutualization. The initial amount of assets to be allocated to the Canadian and United States Post-Conversion Individual Participating Sub-Accounts is based on assumptions of future experience (such as mortality, lapses, expenses, dividends, taxes, and investment income) and the estimated level of sales of participating business according to the Company's most recent business plan. Testing shows that the initial amount will be sufficient to support at least five years of new participating business under various realistic scenarios of future experience and future levels of sales.

It is my opinion that the assets which will be allocated to the participating accounts of the Company upon demutualization are expected to be adequate to (i) meet the contractual obligations under the policies in respect of which the participating accounts are maintained, (ii) meet the reasonable expectations of the holders of those policies in respect of future dividends and other non-guaranteed benefits; and (iii) support future Participating Policies expected to be allocated to those accounts.

Future Financial Strength of the Company

As Appointed Actuary, I examined the capital of the Company and the ratio of the Company's available capital to the required capital (the "MCCSR" ratio), as projected over a suitable period under a range of adverse scenarios. Such a review is similar to the annual Dynamic Capital Adequacy Testing ("DCAT") performed by Sun Life, and therefore a good starting point is the most recent DCAT testing performed. The most recent DCAT testing was



SL-0139

presented to the Sun Life Board in December 1998. That testing confirmed that in its current form as a mutual company, Sun Life is a strong, well-capitalized financial institution capable of withstanding significant adversity.

Following the demutualization process, Financial Services will in effect inherit directly or indirectly all the assets and liabilities of Sun Life, and therefore Financial Services will inherit Sun Life's financial strengths and attributes. "Base case" scenario projections of Financial Services were carried out to take into account the effects of the reorganization and conversion. The base case projections show that for the Sun Life group as a whole, financial strength and security will not be materially changed by the conversion.

Demutualization Benefits distributed to Eligible Policyholders will be primarily in the form of Financial Services Shares. This has the advantage of not reducing the Company's surplus, and therefore the issuance of such Financial Services Shares is neutral to the financial strength of the Company and the security of policyholders. For policyholders who will receive Demutualization Benefits in cash or Policy Credits, Financial Services Shares in the amount of their allocation will either be sold directly in the Initial Public Offering or re-purchased by Financial Services with a corresponding amount to be sold in the Initial Public Offering. If there is insufficient demand for those shares in the Initial Public Offering, there are "scale back" rules in the Plan that ensure that the funds required to provide necessary cash payments and Policy Credits do not exceed the cash raised in the Initial Public Offering. The net result is that those cash payments and Policy Credits will not have a material impact on the Company's financial strength and security.

Summary of Opinions

I have previously submitted to Sun Life my "Opinion of Sun Life of Canada's Appointed Actuary." In that opinion, I conclude that:

- the benefits to be provided to Eligible Policyholders and the method used to apportion the value of the Company among Eligible Policyholders are fair and equitable to those policyholders;
- the assets which will be allocated to the participating accounts of the Company upon demutualization are expected to be adequate to (i) meet the contractual obligations under the policies in respect of which the participating accounts are maintained, (ii) meet the reasonable expectations of the holders of those policies in respect of future dividends and other non-guaranteed benefits; and (iii) support future Participating Policies expected to be allocated to those accounts; and
- the future financial strength and vitality of Sun Life and the security of policyholders will not be materially adversely affected by the demutualization.

A copy of my opinion was included in the Policyholder Information Circular, Part 1, dated September 28, 1999 at pages 154-166. Sun Life provided a copy of the Policyholder Information Circular to the Commissioner for review and approval and subsequently sent a copy to each Eligible Policyholder on or about October 20, 1999.

The Independent Actuary, Nicholas Bauer, has reached similar conclusions, which are set forth in his opinion at pages 167-180 of the Policyholder Information Circular, Part 1. It is Mr. Bauer's opinion that the Plan:

- provides for Demutualization Benefits and a method to apportion the value of Sun Life among the Eligible Policyholders which are fair and equitable to Eligible Policyholders;
- allocates assets to each Pre-Conversion Individual Participating Closed Sub-Fund and to each Pre-Conversion Ancillary Participating Sub-Fund which are expected to be adequate to meet both the contractual obligations under the policies in respect of which it is maintained and the reasonable expectations of the policyholders for dividends and other non-guaranteed benefits;

- allocates assets to each Post-Conversion Individual Participating Sub-Account which are adequate to support the Participating Policies expected to be allocated to that Post-Conversion Individual Participating Sub-Account after the Effective Date;
- does not materially adversely affect Sun Life's future financial strength and vitality or the security of its policyholders; and
- provides Policy Credits which, as of the date that the Initial Share Price is determined, will be appropriate substitutes for Financial Services Shares.

I understand that my opinion and the opinion of Mr. Bauer are on file with the Commissioner and will be made part of the record in this proceeding.

Conclusion

For the reasons set forth above, we respectfully request that the Commissioner approve Sun Life's Plan.

STATE OF MICHIGAN
DEPARTMENT OF CONSUMER & INDUSTRY SERVICES
INSURANCE BUREAU

Before the Commissioner of Insurance

---x
In the matter of the proposed conversion :
of Sun Life Assurance Company of Canada : No. 99-169-M
from a mutual to a stock insurer :
---x

## STATEMENT OF DONALD A. STEWART, CHAIRMAN AND CHIEF EXECUTIVE OFFICER

Introduction and Background

My name is Donald A. Stewart. I am Chairman and Chief Executive Officer of Sun Life Assurance Company of Canada ("Sun Life" or the "Company"). I was appointed President and Chief Operating Officer in August 1996, and I became the Chairman and Chief Executive Officer in April 1998.

I am submitting this statement in support of Sun Life's request that the Commissioner of Insurance of the State of Michigan (the "Commissioner") approve the Conversion Plan[1] (the "Plan") which was unanimously adopted by Sun Life's Board of Directors (the "Sun Life Board") on September 28, 1999. Under the Plan, Sun Life will change its organizational structure from a mutual company to a company owned by shareholders by means of demutualization. Speaking on behalf of the Sun Life Board, we believe that demutualization

[1] Except as otherwise defined herein, capitalized terms used in this statement have the meanings set forth in the Plan or in the Policyholder Information Circular, which have been pre-filed and made a part of the record in this proceeding.

DEFENDANT'S EXHIBIT 4

as set forth in the Plan is in the best interests of Sun Life and its policyholders as a whole and will help ensure Sun Life's continuing growth as a leader in the global financial services market place, and its continuing financial strength in this industry. We believe that the Plan is fair and equitable to Sun Life's policyholders.

Overview of the Transaction

The demutualization of Sun Life will result in, among other things, the following events:

1. Sun Life shall cease to be a mutual life insurance company and become a life insurance company with common shares.

2. Sun Life Financial Services of Canada Inc. ("Financial Services") will become the holding company of Sun Life and Sun Life will become a wholly-owned subsidiary of Financial Services.[2] Financial Services, a company incorporated under Canada's Insurance Companies Act (the "ICA"), is currently a wholly-owned subsidiary of Sun Life. Upon the effectiveness of the demutualization, Sun Life shall issue its common shares to Financial Services. Sun Life shall then surrender to Financial Services, and Financial Services shall purchase for cancellation, all of the currently outstanding common and preferred shares of Financial Services held by Sun Life, for consideration equal to the initial issue price of the shares plus any accrued dividends. In addition, Sun Life will transfer its United Kingdom and related life insurance business and its life insurance businesses in the Philippines and Hong Kong to subsidiaries of Sun Life.

---

[2] Financial Services is currently known as Sun Life of Canada Holdings Corp. On November 10, 1999, Financial Services applied to the Minister of Finance of Canada to change its name to Sun Life Financial Services of Canada Inc.

3. All policyholders' rights with respect to, or any interest in, Sun Life as a mutual company, including Ownership Rights, shall cease.

4. Financial Services shall issue Financial Services Shares to Eligible Policyholders who are entitled to receive Financial Services Shares under the Plan, and the other Eligible Policyholders will become entitled to receive cash or Policy Credits. The entire value of Sun Life will thereby be distributed to Eligible Policyholders.

5. Financial Services plans to complete an Initial Public Offering of Financial Services Shares shortly after demutualization. As part of the Initial Public Offering, Financial Services intends to apply to list the Financial Services Shares on stock exchanges in Canada, the United States, the United Kingdom and the Philippines, the four countries in which the largest number of Eligible Policyholders reside. Most Eligible Policyholders receiving Financial Services Shares may choose to keep their shares or to sell them for cash in connection with the Initial Public Offering.

6. Policyholders' interests under their policies will continue to be protected. Policyholders' policy benefits will not be reduced and policy premiums will not be affected by the demutualization. Participating Policyholders will continue to be entitled to receive Policy Dividends as and when declared by the Sun Life Board or the directors of a Sun Life subsidiary. As an additional protection, Sun Life and its subsidiaries will put in place special arrangements designed to protect the reasonable expectations of future Policy Dividends and other non-guaranteed benefits, and to meet contractual obligations, under Participating Policies issued before demutualization.

Overview of Sun Life

Sun Life commenced business in 1871 and began operating in the United States in 1895, with the State of Michigan as the state of entry for its United States branch. Sun Life is a leading international financial services company, providing a wide range of savings, retirement, pension and life and health insurance products and services to individual and corporate customers. The Company operates primarily in Canada, the United States and the United Kingdom and also has operations in Asia and South America. The Company has approximately 11,200 employees worldwide, and an extensive global distribution network of more than 65,000 distributors, including career sales forces in certain countries, independent insurance agents, investment dealers and financial planners.

Sun Life operates in two principal businesses: the Protection Business and the Wealth Management Business. The Protection Business comprises Sun Life's insurance, or protection, operations around the world, including its group life and health insurance businesses in the United States, Canada and the United Kingdom, its individual insurance business in the United States, Canada, the United Kingdom, the Philippines, Hong Kong, Bermuda and Indonesia and the Company's reinsurance operations. The Company's protection products and services include whole life, term life, universal life, variable universal life, unit-linked life and corporate owned life insurance for individuals and life, health and disability insurance for groups. The Wealth Management Business comprises all of Sun Life's asset management, mutual fund, pension, annuity and trust and banking operations. These operations are conducted principally in Canada, the United States and the United Kingdom. Sun Life operates its Wealth Management Business in the United States primarily through its subsidiaries, Massachusetts Financial Services Company and Sun Life Assurance Company of Canada (U.S.).

Sun Life's strategic objective is to be a leading financial services provider with a significant presence in each of its chosen markets, with increasing emphasis on its Wealth Management Business. To achieve this objective, Sun Life intends to pursue the following strategies: (i) aggressively expand the Wealth Management Business; (ii) strategically grow higher return Protection Business lines; (iii) capitalize on distribution strengths; (iv) leverage strong brands across multiple product offerings; (v) pursue expansion in key strategic markets; and (vi) achieve superior shareholder returns while maintaining financial discipline.

Sun Life's Financial Standing

Sun Life is a financially sound company that will be well positioned to compete in the financial services marketplace as a stock company. At September 30, 1999, Sun Life was the largest life insurance company in Canada, based on total assets under management of approximately $264 billion (Canadian), with a surplus of approximately $6 billion (Canadian). At September 30, 1999, its total general fund assets exceeded $54 billion (Canadian). For the year ended December 31, 1998, Sun Life's total premiums were approximately $7.6 billion (Canadian), and its net income was $54 million (Canadian).

Sun Life is among the highest rated Canadian life insurers by various rating agencies. For financial strength, Sun Life is rated A++ by A.M. Best, AA+ by Standard & Poor's, and Aa2 by Moody's. For claims paying ability, Sun Life is rated AAA by Duff & Phelps.

Reasons for Demutualization

The Sun Life Board has concluded that the Plan is in the best interests of the Company and its policyholders as a whole because:

- the entire value of Sun Life will be provided to Eligible Policyholders;
- it continues to protect the interests of policyholders;

- it has advantages that significantly outweigh any disadvantages; and
- it is superior to the other strategic alternatives for the future of the Company.

Benefits of Demutualization for the Company

Sun Life identified a number of benefits for the Company to demutualizing. We noted that the financial services industry in which Sun Life operates is changing rapidly. These changes include:

- globalization of the financial services industry;
- increased competition from other participants in the financial services industry, such as banks, trust companies, mutual funds and money managers;
- changes in demographic trends, including aging populations and increased life expectancy;
- significant growth in wealth management products, including emphasis on retirement planning and savings, and away from traditional participating life insurance products;
- changes in distribution channels, including the use of independent third party brokers and financial planners to sell products and services; and
- advances in technology, which also affect the delivery of products and services to customers.

We believe that it is important to Sun Life's competitive position to be able to address these changes by, among other things, expansion through strategic acquisitions and alliances that can enhance performance and deliver an attractive return on capital. However, as a mutual company, Sun Life's ability to raise capital is limited. Although Sun Life can raise capital by issuing various types of securities, such as debt securities, preferred shares and participating shares, it is not permitted to issue common shares. This prevents Sun Life from creating a capital structure based on an optimal combination of common shares and other securities. Sun Life's capital raising capability is also constrained because it cannot easily control the timing of

increases in capital and so it cannot easily raise capital at the time it is most needed. To enhance value, the Sun Life Board believes that Financial Services should be able to grow, including through acquisitions in the financial services industry. Although Sun Life has considerable financial strength, it could require significant extra capital to finance this growth. It is highly desirable to have the flexibility to offer common shares rather than cash as payment in merger or acquisition transactions, which are often structured on this basis. The use of shares for acquisitions or to fund other business growth in areas such as product development, technology, distribution and marketing will also allow Financial Services to preserve cash for its operating businesses.

Benefits of Demutualization for Policyholders

Demutualization will also benefit policyholders in a number of ways. First, demutualization will provide the entire value of Sun Life to Eligible Policyholders rather than just a portion of it. At the same time, demutualization will preserve Sun Life's capital because Financial Services will issue shares to almost all Eligible Policyholders as their Demutualization Benefits. Although shares provide value to Eligible Policyholders, issuing them does not involve a distribution of Financial Services' assets.

Second, policyholders' interests under their policies will continue to be protected after demutualization. Policyholders' policy benefits will not be reduced and policy premiums will not be affected by the demutualization. Participating Policyholders will continue to be entitled to receive policy dividends as and when declared by the Sun Life Board or the directors of one of its subsidiaries. As an additional protection, Sun Life and its subsidiaries will put in place special arrangements designed to protect the reasonable expectations of future policy

dividends and other non-guaranteed benefits, and to meet contractual obligations, under Participating Policies issued before demutualization.

Third, demutualization will provide Eligible Policyholders who receive Financial Services Shares with a form of ownership that has several advantages over their current form of ownership of Sun Life. The most important of Participating Policyholders' current ownership rights are: (a) the right to vote on matters submitted to Participating Policyholders, such as the election of the Sun Life Board, (b) the right to participate in distributions of profits of Sun Life from all its businesses, (c) the right to participate in the distribution of demutualization benefits, and (d) in the unlikely event of a liquidation if Sun Life were ever to become insolvent, the right to participate in the distribution of any remaining surplus after satisfaction of all obligations. However, as long as Sun Life is a mutual company, these ownership rights cannot be sold separately from the policy, and they terminate when the policyholder's last Participating Policy ends.

Owning Financial Services Shares has many advantages. For example, Eligible Policyholders who keep their Financial Services Shares will have the right to receive shareholder dividends on Financial Services Shares declared from time to time at the discretion of the Financial Services Board and the right to vote on matters submitted to shareholders, such as electing the Financial Services Board. In addition, share ownership has three important advantages over Participating Policyholders' current ownership rights: (1) Financial Services Shares can be sold; (2) the market price of the Financial Services Shares on the Stock Exchanges will establish a clear value for the shares, which can be realized for cash when sold; and (3) shareholder rights continue as long as the Eligible Policyholder holds Financial Services Shares, regardless of whether the Eligible Policyholder's policy ends. Thus, Financial Services Shares

will also provide liquidity that is not currently available. Moreover, even though Eligible Policyholders exchange their Ownership Rights upon demutualization, they retain their policies and their interests under their policies will continue to be protected as described above.

Fourth, demutualization will separate Eligible Policyholders' rights under their insurance contracts ("Contract Rights") from their Ownership Rights. Participating Policyholders currently lose their Ownership Rights when their last Participating Policy terminates for any reason. By providing Eligible Policyholders with Financial Services Shares in exchange for their Ownership Rights, these shares, and thus, Ownership Rights, can be retained even when Contract Rights terminate. This separation will enable Sun Life to better align the interests of its owners with the worldwide business to be conducted by Financial Services. Where most of a mutual insurance company's business relates to participating policies, there is a common interest between the company's owners, who benefit from the profits made on participating policy business, and the company's interest in writing participating policies. Sun Life has experienced considerable growth in its non-participating Protection Business and its Wealth Management Business, but its Participating Policyholders are not benefitting from those businesses. Many of those businesses require the reinvestment of earnings to provide capital for future growth. Those earnings are not then available for distribution to Participating Policyholders. Accordingly, the respective interests of Sun Life and its owners are diverging. After demutualization, the value of Financial Services Shares will reflect the value of Financial Services and its worldwide businesses, including Sun Life and its future prospects. As a result, the interests of shareholders, as owners, will be aligned with the interests of Financial Services.

Fifth, after demutualization, Financial Services will be required to make regular, comprehensive public disclosure of its operations and financial results, which will be scrutinized

by shareholders, the media and financial analysts. Shareholders will have a direct financial interest in Financial Services' performance, dividend payments and share price. While Sun Life currently operates very efficiently, this increased level of scrutiny and interest from new stakeholders should increase management accountability for financial performance, to the benefit of both the policyholders of Sun Life and the shareholders of Financial Services.

In sum, demutualization will provide Sun Life with improved access to capital through Financial Services and will afford increased flexibility for Sun Life and Financial Services to develop and grow and to compete effectively in a changing environment.

Disadvantages and Possible Alternatives to Demutualization

The Sun Life Board recognized that, in the current financial services environment, the principal option for structural change is demutualization. However, in considering demutualization in principle and adopting the Plan, the Sun Life Board considered the advantages and disadvantages of demutualization for Sun Life and its policyholders and compared demutualization with remaining as a mutual company and other alternatives. The advantages of demutualization are summarized immediately above, and are further described on pages 9-12 of the Policyholder Information Circular, Part 1. As set forth on pages 12-15 of the Policyholder Information Circular, Part 1, the possible disadvantages the Sun Life Board considered are (i) loss of mutual structure, (ii) loss of Participating Policyholders' voting control, (iii) challenges in managing the separate interests of policyholders and shareholders, (iv) increased exposure to take-over, (v) additional costs to be incurred as a result of demutualization, and (vi) the potential tax and social benefits consequences to certain Eligible Policyholders. The possible alternatives the Sun Life Board looked at before deciding to recommend demutualization were: (a) retaining the mutual structure without significant change;

(b) retaining the mutual structure and increasing policy dividends; (c) selling Sun Life as a whole; (d) selling Sun Life's entire interest or a minority interest in one or more of its subsidiaries; (e) closing to new business; or (f) creating a mutual holding company. Thesc possible alternatives are analyzed in detail at pages 15-17 of the Policyholder Information Circular, Part 1.

The Sun Life Board approved the Plan upon concluding that the Plan is in the best interests of Sun Life and its policyholders as a whole because, among other things, the advantages of demutualization significantly outweigh any disadvantages, demutualization is superior to other strategic alternatives for the future of Sun Life, and demutualization will deliver the entire value of the Company to Eligible Policyholders.

Process of Demutualization

On January 27, 1998, the Sun Life Board instructed management to prepare a plan for demutualization. In response to this charge, Sun Life's management, together with a multinational team of outside advisors, spent many months working to prepare the Plan. Sun Life's outside advisors in the United States included the law firms of Dykema Gossett PLLC and LeBoeuf, Lamb, Greene & MacRae, L.L.P., the investment banking firm of Morgan Stanley & Co. Incorporated ("Morgan Stanley") and the actuarial firm of Tillinghast-Towers Perrin. On September 28, 1999, the Sun Life Board unanimously adopted the Plan which provides for the conversion of the Company from a mutual life insurance company into a life insurance company with common shares.

The demutualization and corporate reorganization is being implemented in accordance with the ICA and the Mutual Company (Life Insurance) Conversion Regulations made under the ICA (the "Canadian Regulations"). To become effective, the demutualization

must be approved by Sun Life's Eligible Policyholders and certain regulatory approvals must be obtained. Specifically, with respect to policyholder approval, the Plan must be approved by at least two-thirds of the votes cast by Eligible Policyholders voting in person or by proxy at the Special Meeting, which will be held at Roy Thomson Hall, 60 Simcoe Street, Toronto, Ontario, Canada, on December 15, 1999. A Voting Form, which allows Eligible Policyholders to vote for or against the Plan, was enclosed with the Policyholder Information Circular and mailed to such policyholders (after it had been reviewed and approved by the appropriate regulators).

As described at length in the written statement submitted by Thomas A. Bogart, Senior Vice-President and Chief Legal Officer of Sun Life, the demutualization and parts of the corporate reorganization also require the approval of the Minister of Finance of Canada (the "Minister of Finance"). In addition, the Commissioner must approve the Plan and review the aspects of the corporate restructuring of Sun Life that affect policyholders in the United States, after a public hearing scheduled for November 22, 1999. The Office of the Superintendent of Financial Institutions ("OSFI"), the principal insurance regulator in Canada, will recommend to the Minister of Finance whether or not to approve the Plan. Both OSFI and the Michigan Insurance Bureau and their advisors have reviewed the Plan, the Policyholder Information Circular and various related materials, including the written materials sent to Eligible Policyholders.

Eligibility and Demutualization Benefits

Eligible Policyholders have the right to receive Demutualization Benefits under the Plan and to vote on the Plan at the Special Meeting. In general, Eligible Policies are Participating Policies of Sun Life that were in force on January 27, 1998, the Eligibility Day.

When Sun Life demutualizes, Eligible Policyholders will receive Demutualization Benefits in exchange for their Ownership Rights. Demutualization Benefits will take the form of Financial Services Shares, cash, or Policy Credits. Demutualization will provide the entire value of Sun Life to Eligible Policyholders while preserving capital. Under the Plan, the Owners of Eligible Policies issued in the United States will receive approximately 31% of the Demutualization Benefits.

Form of Demutualization Benefits

The form of Demutualization Benefits received will depend primarily on the jurisdiction in which the Eligible Policyholder resides, as well as the type of Eligible Policy the Eligible Policyholder holds. Eligible Policyholders resident in Canada, the United States, the United Kingdom, the Philippines and Bermuda (the "Principal Jurisdictions") will be issued Demutualization Benefits in the form of Financial Services Shares. This means that, in addition to being policyholders of Sun Life, these Eligible Policyholders will also become shareholders of Financial Services. Most of these Eligible Policyholders in Principal Jurisdictions may, however, elect to sell the Financial Services Shares issued to them in connection with the Initial Public Offering.

Eligible Policyholders resident in Hong Kong, Ireland, the Channel Islands and the Isle of Man (the "Secondary Jurisdictions") will be issued Financial Services Shares in the same manner as Eligible Policyholders in the Principal Jurisdictions. However, Eligible Policyholders in the Secondary Jurisdictions will keep their shares only if they make an election to do so. If they do not make the Share Election, their shares will be sold for them in the Initial Public Offering and they will receive the cash proceeds from the sale. In addition, each Eligible

Policyholder resident in a Secondary Jurisdiction must confirm his or her address with Sun Life in order to receive Financial Services Shares or the cash proceeds from the sale thereof.

Eligible Policyholders who are either minors (and do not have a legally appointed guardian) or resident in countries other than Principal and Secondary Jurisdictions (the "Other Jurisdictions") will have the Financial Services Shares issued to them sold on their behalf in connection with the Initial Public Offering, and will receive the cash proceeds from this sale. In deciding whether Eligible Policyholders in any particular jurisdiction would be required to sell the shares issued to them on demutualization, Sun Life took into account the following factors: (a) the costs of compliance with applicable securities laws in the jurisdiction compared with the number of Eligible Policyholders resident there; (b) the ability of Eligible Policyholders in the jurisdiction to trade the shares easily after demutualization; and (c) whether Sun Life is still carrying on an active Protection Business in the jurisdiction. Eligible Policyholders who are minors (and do not have a legally appointed guardian) will receive cash because of the legal difficulty in transferring their shares.

Finally, Eligible Policyholders will receive Policy Credits instead of Financial Services Shares if they hold Eligible Policies that are in force at the time of demutualization and are one of the following types of tax-qualified retirement policies issued in the United States: (1) an individual retirement annuity contract within the meaning of Section 408(b) of the United States Tax Code; or (2) a tax sheltered annuity contract within the meaning of Section 403(b) of the United States Tax Code.

Value of Demutualization Benefits

On demutualization, benefits representing the Company's entire value will be distributed among all of its Eligible Policyholders.

We retained Morgan Stanley and RBC Dominion Securities Inc. to prepare the Valuation Report which is required under the Canadian Regulations. The Valuation Report contains a range of estimated public equity market values for Financial Services (on the basis that this range would be the same for Sun Life) based solely upon the estimated prices at which the Financial Services Shares could have been expected to be offered as of September 24, 1999, the date of valuation, (the "Valuation Date") in an initial public offering of Financial Services Shares conducted in a manner consistent with the Plan, as if the date of demutualization were September 24, 1999. Subject to the assumptions, qualifications and limitations outlined in the Valuation Report, the range estimated was approximately $5.6 billion (Canadian) to $8.4 billion (Canadian), or approximately $3.8 billion to $5.7 billion in United States dollars (calculated at an exchange rate of $1 Canadian = $0.68 U.S.). In the Valuation Report, the financial advisors also estimated that the Initial Share Price for the Financial Services Shares, as at the Valuation Date, would have been between approximately $14 (Canadian) to $21 (Canadian) per share, or approximately $9.52 to $14.28 per share in United States dollars (calculated at an exchange rate of $1 Canadian = $0.68 U.S.), based on Sun Life's advice that approximately 400 million Financial Services Shares would have been outstanding on that date.

The Valuation Report and related opinion do not constitute a recommendation as to (i) how any Eligible Policyholder should vote on the Demutualization Resolution, (ii) whether the Eligible Policyholder should elect to receive cash in lieu of some or all of the Financial Services Shares allocated to that Eligible Policyholder, or (iii) whether the Eligible Policyholder



SL-0087

should buy or sell Financial Services Shares. In addition, in the Policyholder Information Circular, we advised all Eligible Policyholders that this estimate of the range of the Initial Share Price is not a prediction of what the actual Initial Share Price will be on any other date, including the date of demutualization. The Initial Public Offering is not expected to be completed before March 2000, several months after this estimate was made. In the Policyholder Information Circular, Sun Life also advised Eligible Policyholders that this estimate is also not a prediction of the price at which the Financial Services Shares will trade on the Stock Exchanges after completion of the Initial Public Offering.

As noted, in certain circumstances, Eligible Policyholders will be required to receive cash or Policy Credits. Cash payments and Policy Credits are expected to be funded indirectly through the issuance of Financial Services Shares in the Initial Public Offering. Proceeds from the sale of those shares will be invested by Financial Services in Sun Life to enable Sun Life to make the cash payments and fund the Policy Credits.

Allocation of Demutualization Benefits Among Eligible Policyholders

Each Eligible Policyholder's Demutualization Benefits, in whatever form, will be based on an allocation of Financial Services Shares. The amount of cash paid or the value of Policy Credits received will be determined by the number of Financial Services Shares allocated to the Eligible Policyholder multiplied by the Initial Share Price.

On demutualization, each Eligible Policyholder will be allocated a minimum of 75 Financial Services Shares. This is the fixed component of the allocation and is intended to recognize the loss of voting control in Sun Life by Eligible Policyholders upon demutualization. In addition, each Eligible Policyholder will be allocated additional Financial Services Shares based upon a formula applied to each Eligible Policy. These variable allocations determined for

Eligible Policies reflect the varying financial interests of Eligible Policies, including their size, length of time in force with Sun Life, contribution to the value of Sun Life and their differing rights to receive surplus. The written statement submitted by Robert W. Wilson, Sun Life's Appointed Actuary, and the opinion of Nicholas Bauer, Sun Life's Independent Actuary, further describe the reasoning for the fixed and variable components as well as the method of allocation of shares among Eligible Policyholders.

Initial Public Offering

Under the Plan, it is expected that Financial Services Shares will be sold to the public in an Initial Public Offering. Financial Services intends to apply to list the Financial Services Shares on stock exchanges in Canada (Toronto), the United States (New York), the United Kingdom (London) and the Philippines (Manila), the four countries in which the largest number of Eligible Policyholders reside. Financial Services may also apply to list the Financial Services Shares on the Montreal Exchange, depending on the outcome of a proposal to reorganize the exchange. As part of the Initial Public Offering, the Underwriters will conduct a sales and marketing campaign to solicit interest from potential investors in buying Financial Services Shares. Once completed, the Underwriters will agree to purchase the Financial Services Shares at a fixed price, which will be the Initial Share Price, and then offer the Financial Services Shares to the public at the same price.

The Initial Public Offering will help create a market for the Financial Services Shares that will be distributed to Eligible Policyholders. The marketing efforts by Underwriters will increase awareness of Financial Services Shares with investors, especially among large institutional investors such as pension plans and mutual funds, and with stock analysts. These marketing efforts are also designed to create an active trading market after the Initial Public

Offering, which will benefit policyholders who keep their Financial Services Shares and who may want to sell them in the future. After the Initial Public Offering, the general public, including policyholders, will be able to buy and sell Financial Services Shares on the Stock Exchanges.

Financial Services and the Underwriters will decide how many Financial Services Shares will be sold in the Initial Public Offering and the price at which they will be sold. In making this decision, Financial Services and the Underwriters will consider many factors, such as the likely strength of demand for the Financial Services Shares, the number of shares that Eligible Policyholders elect to sell, the market conditions at the time the shares are priced, and the future business prospects of Financial Services, as well as its capital needs. Ultimately, it is up to the Financial Services Board of Directors to determine the size of the Initial Public Offering. As noted, cash payments and Policy Credits provided to Eligible Policyholders under the Plan are expected to be funded indirectly through the issuance and sale by Financial Services of Financial Services Shares in the Initial Public Offering. The Financial Services Board of Directors may decide to raise funds for use by Financial Services for general corporate purposes and payment of expenses of the Initial Public Offering even though this could mean that not all Eligible Policyholders who made the Cash Election or are subject to the Default Cash Election would have their shares sold in connection with the Initial Public Offering. The Financial Services Board may take that course if it decided it was in the best interests of Financial Services to do so.

Policyholder Dividend Protection

After demutualization, policyholders' interests under their policies will continue to be protected. As noted above, policyholders' policy benefits will not be reduced and policy

premiums will not be affected by the demutualization. Participating Policyholders will continue to be entitled to receive Policy Dividends as and when declared by the Sun Life Board or the directors of a Sun Life subsidiary. As an additional protection, Sun Life and its subsidiaries will put in place special arrangements designed to protect the reasonable expectations of future Policy Dividends and other non-guaranteed benefits, and to meet contractual obligations, under Participating Policies issued before demutualization.

Sun Life is required by the ICA to maintain accounts for its Participating Policies which are separate from those for its non-participating policies and other businesses. After demutualization, Sun Life will continue to maintain the worldwide participating account and the Canadian and U.S. territorial participating accounts. Within each of Sun Life's Canadian and United States territorial participating accounts, Sun Life will establish and maintain two separate sub-funds in respect of Participating Policies issued before demutualization. The Pre-Conversion Individual Participating Closed Sub-Fund is specially designed to manage and protect reasonable expectations in respect of future Policy Dividend levels on pre-demutualization individual Participating Policies. The Pre-Conversion Ancillary Participating Sub-Fund is designed to support the remaining obligations associated with Participating Policies written prior to demutualization. Sun Life's Appointed Actuary has opined that the initial amount of assets to be allocated to the Pre-Conversion Individual Participating Closed Sub-Funds will be determined to be sufficient to provide for all contractual obligations (other than deposit liabilities which are provided for in the Pre-Conversion Ancillary Participating Sub-Fund) and reasonable expectations in respect of future dividends and other non-guaranteed policy benefits on the policies in the sub-funds. Sun Life has established restrictions to ensure that all funds in the Pre-Conversion Individual Participating Closed Sub-Funds will accrue exclusively to the benefit of

the policies in those sub-funds. As an additional protection, the Plan will stipulate that the Pre-Conversion Individual Participating Closed Sub-Funds not be allowed to fall into deficit positions. The Plan also sets out rules developed to ensure that these sub-funds receive a fair and equitable proportion of total Company investment income, expenses and taxes.

Compensation of Officers and Employees

Sun Life is prohibited by the Canadian Regulations from providing its directors, officers or employees with a fee, compensation or any other consideration in relation to the demutualization, other than regular compensation in relation to their position and benefits to which they may be entitled as an Eligible Policyholder.

Financial Services intends to establish a stock option plan for key officers and employees of Financial Services and its subsidiaries. The option plan will not become effective until the one year restriction period imposed by the Canadian Regulations has ended. The option plan will be designed to align the interests of shareholders and option plan participants, and will reward participants for creating shareholder value. This in an important consideration for investors, and will facilitate Financial Services' ability to recruit and retain senior management. Shareholder approval of the option plan will be required.

Additionally, Financial Services intends to establish a voluntary employee share purchase plan on demutualization to facilitate employee ownership of Financial Services Shares. Initially, purchases of Financial Services Shares by employees under the purchase plan will not be made with a financial contribution from Financial Services. However, at a date following the one year restriction period imposed by Canadian law, Financial Services may amend the purchase plan to provide for contributions by Financial Services toward the purchase price of Financial Services Shares.

Conclusion

For the reasons described, we believe that demutualization under the Plan will position Sun Life to better compete in today's changing financial services market. Moreover, we believe that the Plan is fair and equitable and will protect the interests of our policyholders. Finally, we believe that the Demutualization Benefits will compensate Eligible Policyholders for the loss of their Ownership Rights. We therefore respectfully request that the Commissioner approve Sun Life's Plan.

CERTIFICATE OF SERVICE

I certify that service of the foregoing Appendix to Memorandum in Support of the Defendant's Cross-motion of the United States for Summary Judgment and in Opposition to the Plaintiffs' Motion for Partial Summary Judgment has, this 20th, day of December, 2005, been made on plaintiffs' counsel by mailing a copy thereof, USPS First Class Mail, to the following address:

Burgess J.W. Raby, Esquire
2164 East Broadway
Suite 280
Tempe, Arizona 85282

U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Station
Washington, D.C. 20044
(202) 307-6440

# United States of America

**Department of the Treasury**
**Internal Revenue Service**

Date: May 23, 2007

## CERTIFICATE OF OFFICIAL RECORD

I certify that the annexed transcript(s) is(are) an exact transcript of the account of the Taxpayer named herein in respect to the taxes specified. It is a true and complete transcript for the period(s) stated of all assessments, abatements, credits, and refunds relating thereto as disclosed by the records of this office as of the date of this certification. It also contains a statement of all unidentified and advanced payments, if any, for the periods(s) stated.

SEYMOUR P NAGAN IRREV TRUST
FISHER EUGENE A TTEE

For tax period(s) December 31, 2000
Form 1041
Certification of Assessment and Payments consisting of 3 page(s)
under the custody of this office.

IN WITNESS WHEREOF, I have hereunto set my hand, and caused the seal of this office to be affixed, on the day and year first above written.

By direction of the Secretary of the Treasury:

Monica Walsh

Susan A. Hansen, Field Director
Cincinnati Submission Processing Center

JOINT EXHIBIT 5
PENGAD-Bayonne, N. J.

Catalog Number 19002E

Form **2866** (Rev. 09-1997)

CERTIFICATE OF ASSESSMENTS, PAYMENTS, AND OTHER SPECIFIED MATTERS

SEYMOUR P NAGAN IRREV TRUST
FISHER EUGENE A TTEE

EIN/SSN: 52-6447317

TYPE OF TAX: U.S. FIDUCIARY INCOME TAX RETURN
FORM: 1041 TAX PERIOD: DEC 2000

| DATE | EXPLANATION OF TRANSACTION | ASSESSMENT, OTHER DEBITS (REVERSAL) | PAYMENT, CREDIT (REVERSAL) | ASSESSMENT DATE (23C, RAC 006 ) |
|---|---|---|---|---|
| | NET TAXABLE INCOME 30,489.00 | | | |
| 04-17-2001 | RETURN FILED 17244-160-27116-1 200126 | 5,725.00 | | 07-09-2001 |
| 04-17-2001 | PAYMENT WITH RETURN | | 5,725.00 | |
| 09-12-2003 | AMENDED RETURN FILED 17244-256-28607-3 | | | |
| 01-05-2004 | CLAIM DISALLOWED 17254-750-99100-3 | | | |
| 02-27-2004 | RECEIVED POA/TIA | | | |
| 04-26-2004 | CLAIM DISALLOWED 17254-493-98100-4 | | | |
| 12-09-2004 | LEGAL SUIT PENDING | | | |
| | ADDITIONAL TAX ASSESSED 49254-690-00100-6 20064308 | 0.00 | | 11-06-2006 |

CERTIFICATE OF ASSESSMENTS, PAYMENTS, AND OTHER SPECIFIED MATTERS

---

SEYMOUR P NAGAN IRREV TRUST
FISHER EUGENE A TTEE

EIN/SSN: 52-6447317

TYPE OF TAX: U.S. FIDUCIARY INCOME TAX RETURN
FORM: 1041 TAX PERIOD: DEC 2000

---

BALANCE 0.00

---

I CERTIFY THAT THE FOREGOING TRANSCRIPT OF THE TAXPAYER NAMED ABOVE IN RESPECT TO THE TAXES SPECIFIED IS A TRUE AND COMPLETE TRANSCRIPT FOR THE PERIOD STATED, AND ALL ASSESSMENTS, ABATEMENTS, CREDITS, REFUNDS, AND ADVANCE OR UNIDENTIFIED PAYMENTS, AND THE ASSESSED BALANCE RELATING THERETO, AS DISCLOSED BY THE RECORDS OF THIS OFFICE AS OF THE ACCOUNT STATUS DATE ARE SHOWN THEREIN. I FURTHER CERTIFY THAT THE OTHER SPECIFIED MATTERS SET FORTH IN THIS TRANSCRIPT APPEAR IN THE OFFICIAL RECORDS OF THE INTERNAL REVENUE SERVICE.

---

SIGNATURE OF CERTIFYING OFFICER: Monica Washington

PRINT NAME: BEVERLY S. NADERMANN

TITLE: OPERATIONS MANAGER, ACCOUNTING CONTROL/SERVICES

DELEGATION ORDER: SC-C 198 (REV. 8)

LOCATION: INTERNAL REVENUE SERVICE

ACCOUNT STATUS DATE 05/21/2007