IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 04-1726 T

(Judge Francis M. Allegra)

EUGENE A. FISHER, Trustee,
SEYMOR P. NAGAN IRREVOCABLE TRUST,
for itself and as Representative of
all similarly situated taxpayers,

Plaintiffs

v.

UNITED STATES,

Defendant

# DEFENDANT'S POST TRIAL MEMORANDUM

Pursuant to this Court's August 8, 2007, Order, defendant, the United States, submits the following post trial memorandum.

## I. SUMMARY OF THE ARGUMENT

The Court's November 15, 2006, Order denied the parties' cross-motions for summary judgment, because the Court viewed "the amount of the premiums that should be attributed to the liquidation and voting rights as a material question of fact" that could not be resolved on summary judgment. 98 A.F.T.R. 2d 2006-7807, 7800. A trial was thereafter held on June 18, 2007. Defendant submits that plaintiff, the Seymour P. Nagan Trust (hereinafter, "Trust"),

failed to present sufficient evidence at trial to establish the amount, if any, of the premiums paid for the Sun Life policy that were attributed to the voting and liquidation rights. Therefore, the Trust's claims should be denied.

The IRS determined that the Trust's basis in the voting and liquidation rights was $0, because those rights had no fair market value when the policy was acquired on June 28, 1990. The Trust has the burden of proving not only that the IRS' determination was erroneous, but also the correct amount of the cost basis of the voting and liquidation rights. *Medlin v. Commissioner*, T.C. Memo. 2003-224, 2003 WL 21743513 at 32 (2003), *aff'd*, 138 Fed. Appx. 298 (11th Cir. 2003), *cert. denied*, 126 S.Ct. 146, 163 L. Ed. 2d. 72 (2005); *Moore v. Commissioner*, 425 F.2d 713, 715 (9th Cir. 1970); *Sleiman v. Commissioner*, 187 F.3d 1352, fn. 21 (11th Cir. 1999); *Fasken v. Commissioner*, 71 T.C. 650, 655 (1979); *Iske v. Commissioner*, T.C. Memo. 1980-61, 1980 WL 3916 at 9 (1980).

"The taxpayer bears the burden of proving her cost basis, regardless of the fact that it may be difficult to determine." *United States v. Vittaly*, 2006 WL 1883330, at 3 (N.D. Cal. 2006); *see also*, *Moore*. "A taxpayer cannot establish error in the determination of the Commissioner when he fails to present evidence to establish *a definite cost basis*." *Biltmore Homes, Inc. v. Commissioner*, 288 F.2d 336, 342 (4th Cir. 1961), *cert. denied*, 368 U.S. 825 (1961)(emphasis supplied). Where the taxpayer fails to present evidence to establish a definite cost basis, it is appropriate for the IRS to assign a $0 cost basis to the asset in question. *Vittaly*; *Moore*. Moreover, whether a taxpayer later realizes a profit on a subsequent sale or exchange of the asset in question plays no part in the determination of the cost basis of that property on the date of acquisition. *Moore*, 425 F.2d at 714.

When an asset consisting of several parts is purchased for a single price, Treas. Reg. § 1.61-6(a) requires that the single price must be allocated to each of the parts based on "the relative *fair market values* of the portions of the larger property at the time of their purchase" (emphasis added). *Medlin*, 2003 WL 21743513 at 31; *see also*, Gladden *v. Commissioner*, 262 F.3d 851, 854 (9th Cir. 2001). The taxpayer has the burden of proving the relative fair market values of each part of the property on the date of acquisition. *Medlin*, 2003 WL 21743513 at 32; *Sleiman*; *Fasken; Iske; Moore*.

To meet its burden of proof in this case, the Trust had to establish both that the voting and liquidation rights had a fair market value on June 28, 1990, and the amount of that fair market value. The evidence the Trust submitted at the trial fell far short of meeting that burden. The only testimony the Trust submitted was that of Mr. Cole, who opined that at the time of the demutualization, in 2000, the voting and liquidation rights "had value but the amount of the value was not discernable." (Cole Tr. 47, l. 8-10.) Mr. Cole did not make any effort to determine whether those rights had any specific value on June 28, 1990, the date the policy in question was issued. (Cole Tr. 63, l. 17-21.) Mr. Cole also acknowledged that whether the voting and liquidation rights had any value depended on whether Sun Life decided to demutualize, and, on whether the policy was in force on the effective date of the demutualization, not on anything inherent in the rights themselves. (Cole Tr. 54, l. 12-18; 64, l. 9-14.)

The Trust contended in its pre-trial brief that the premiums it paid for the policy were for a bundle of rights, which included the voting and liquidation rights. No evidence presented at trial supports the contention that anything was paid for the voting and liquidation rights. If any

portion of the premium was paid for those rights, then one would expect the premium to go down once those rights were severed from the policy by the demutualization. But the premiums here remained unchanged after the demutualization, indicating that no portion of the premium was paid for the voting and liquidation rights. (Scanlon Tr. 177, l. 12-17.) Further, if a portion of the premium was allocable to the voting and liquidation rights, the premium paid for a policy issued by Sun Life on January 28, 1998, which was not eligible to participate in the demutualization, should be less than the premium paid for a policy, with the same policy metrics, issued on January 27, 1998, which was eligible to participate. However, since Sun Life allocated no portion of the premium to the voting and liquidation rights, the premiums charged by Sun Life for both policies would be same. (Scanlon Tr. 167, l. 16-24; 175, l. 16 - 176, l. 20; Penny Tr. 211, l. 7 - 212, l. 5-13.) It follows that no portion of the premium was paid for the right to receive a demutualization benefit.[1] Mr. Cole conceded in response to a question from the Court that this could lead to the conclusion that the voting and liquidation rights had a de minimis value.[2] (Cole Tr. 74, l. 4-16.)

---

[1]Mr. Cole acknowledged that whatever value the voting and liquidation rights might have arose as a result of the demutualization. (Cole Tr. 54, l. 12-18; 64, l. 9-14.) The defendant does not dispute that once the demutualization was finally approved in 2000, that the voting and liquidation rights became monetized, and acquired a market value. However, prior to that time, those rights were not monetized and had no market value. (Scanlon Tr. 193, l. 8 - 195, l. 22.) This is one of the reasons the stock the Trust received in the demutualization constituted a windfall. (Scanlon Tr. 179, l. 6-20; 197, l. 18-24; Reiskytl Tr. 104, l. 21 - 105, l. 11; 153, l. 14 - 154, l. 5.)

[2]The Trust also concludes, without any evidentiary support, that it is impossible to allocate the premium between the various rights and benefits provided by the insurance policy in question. Mr. Scanlon of Sun Life, and Mr. Reiskytl, both testified that in determining the amount of premium to be charged, the insurance company allocates the premium to the rights and benefits provided by the policy. (Scanlon Tr. 167, l. 7-10; Reiskytl Tr. 93, l. 5-23.) While

(continued...)

The evidence at trial establishes that the voting and liquidation rights had no fair market value on June 28, 1990. Mr. Cole agreed with Mr. Penny that there were three accepted approaches for determining the fair market value of an asset. Those are the asset, market, and income approaches. (Cole Tr. 62, l. 19-25; Penny Tr. 209, l. 5-8.) Mr. Penny determined that under each of the three approaches the fair market value of the voting and liquidation rights on June 28, 1998, was $0. (Penny Tr. 210, l. 5 - 211, l. 3; 215, l. 13 - 216, l. 14.) Mr. Cole did not attempt to apply any of the three approaches. He also was unaware of (1) the manner in which Sun Life calculated the premium, (2) whether policies with voting and liquidation rights and those without were priced the same, (3) the terms of the policy, and (4) the reasons why Mr. Scanlon and Mr. Reiskytl characterized the stock the Trust received in the demutualization as a windfall. (Cole Tr. 61, l. 3-13; 62, l. 13-14; 63, l. 13-16.)

## II. FINDINGS OF FACT

### A. *The operation of a mutual company*.

A mutual life insurance company is technically owned by the holders of participating policies. Participating policies are whole life insurance policies, but not other forms of life insurance, such as term policies or universal life policies. The policy issued to the Trust was a permanent, whole life participating policy. (Jx. 6.) It would remain in effect as long as the premiums were paid, until the death of the last named insured on the policy. (Reiskytl Tr. 235, l. 3-23.)

---

[2](...continued)
portions of the premium were allocated to most of the rights and benefits in the policy, such as the death benefit, the cash surrender value, and the right to receive policy dividends, no portion of the premium was allocated to the voting and liquidation rights. (Scanlon Tr. 167, l. 16 - 168, l. 16; Resikytl Tr. 93, l. 24 - 94, l. 11.)



2769157.1

A mutual company seeks to maximize divisible surplus, which is the amount of surplus the company does not need to retain for the future viability of the company. The divisible surplus is returned to policy holders in the form of policy dividends. The goal of a mutual life insurance company is to provide insurance "at cost." (Reiskytl Tr. 85, l. 21 - 88 l. 8.)

In pricing its various lines of business, Sun Life seeks to ensure that each block of business is priced to have a high probability of being self-supporting. Normally, a mutual company sets gross premiums at a level that will ensure at least a 90% chance that the premiums will be sufficient to cover any future adverse conditions that might arise. To the extent Sun Life's actual operating experience (e.g. mortality, investment, or expenses) is more favorable than predicted when premiums were set, the excess premiums would be refunded to the policyholders as dividends (if not needed to ensure the future viability of the company). (Reiskytl Tr. 92, l. 20 - 94, l. 13.)

In determining the premium to be charged for a policy, Sun Life determined the amount necessary to cover the company's obligations under the policy, such as the death or disability benefit, cash surrender value, and dividends to be paid, plus a charge to provide the risk based capital required by the company's regulators. (Scanlon Tr. 167, l. 5-24; Reiskytl, Tr. 92, l. 16 - 94, l. 7.) Sun Life indirectly factors in the dividend to be paid on the policy by setting the premium to a level that is likely to be more than adequate to cover the cost of the benefits provided by the policy. Any excess premium, less an amount determined to be retained by the company, will be refunded to the policyholders as dividends. (Reiskytl, Tr. 93, 13-23.)

No portion of the premium charged by Sun Life, for the policy issued to the Trust, was allocable to the voting and liquidation rights attendant to that policy. (Scanlon 167, l. 16 - 168, l.

3; Reiskytl 93, l. 24 - 94, l. 11.) This is confirmed by the fact that after the demutualization, and the Trust's voting and liquidation rights were surrendered, the premium charged for the Trust's policy remained unchanged. (Scanlon Tr. 177, l. 12-17.) No demutualization benefit would be received by the holder of a policy that lapsed before January 26, 1998, regardless how much previously had been paid in premiums. (Scanlon Tr. 176, l. 21 - 177, l. 11.)

Sun Life determined the portion of earnings it needed to retain as surplus to ensure that the company could meet its future contractual obligations, grow more rapidly, and pursue new lines of business or other strategies. This annual increase in surplus is like any other operating expense of a mutual company. The amount retained as surplus to cover future obligations is based on risks. State regulators establish a minimum amount of surplus needed to cover risks. This amount is known as risk based capital, or RBC. If the company's surplus falls below that level, the State will place the company in receivership. To avoid this happening, companies typically hold two to three times the minimum RBC in surplus. (Reiskytl Tr. 87, l. 15 - 88, l. 8.)

As a result of the annual increases in surplus, a mutual company's current surplus mostly reflects the experience from policies sold over the years, beginning with the date the company began business. Therefore, most of Sun Life's current surplus at the time of the demutualization was related to policies no longer in force, as the policies either have lapsed, or the policyholders have died. (Scanlon Tr. 179, l. 12-20.) The remaining surplus is from earnings on investments and from profits from nonparticipating lines of business. At the time of the demutualization, less than 10% of Sun Life's surplus was related to the premiums paid by current participating policy holders. (Scanlon Tr. 179, l. 22 - 180, l. 11.) This explains why the distribution of the entire value of Sun Life to current participating policy holders in 2000 as part of the demutualization

was a windfall to the policyholders. (Scanlon Tr. 179, l. 6-20; 197, l. 18-24; Reiskytl Tr. 104, l. 21 - 105, l. 11; 153, l. 14 - 154, l. 5.)

B. *Voting and liquidation rights associated with a mutual policy*.

The voting rights of participating policyholders are very limited. They have the right to vote on the Board of Trustees of the company and to approve a proposed demutualization, although historically very few – about 3-5% of policyholders – ever do so. (Reiskytl Tr. 162, l. 1-11; Scanlon Tr. 195, l. 1-22.) Unlike shareholders in a stock company, policyholders do not have any right to vote on other major corporate decisions. Further, each policyholder had only one vote, regardless of the size of his or her policy, or the amount of premiums paid. (Reiskytl Tr. 128, l. 2-15.) At the time of the demutualization, Sun Life had 1,058,243 participating policyholders, so the significance of the Trust's voting right was nominal. (Jx. 1 at 158.)

Participating policyholders also had the right to share in a solvent liquidation of the company. Policyholders, unlike shareholders, cannot force the company to liquidate all or part of its business. If a mutual insurance company does not have sufficient capital to continue operations, it is placed in receivership, and ultimately liquidated for the benefit of its creditors, so there is no residual to distribute to the policyholders. In recent history, there has never been a solvent liquidation of a mutual life insurance company. (Reiskytl Tr. 105, l. 16 - 106, l. 13.)

When the Trust acquired the Sun Life policy in 1990, the likelihood that Sun Life might demutualize in the future was extremely remote and uncertain. At that time, no mutual insurance company had even explored the possibility of demutualization, much less started the lengthy and costly process of putting a plan of demutualization into effect. (Reiskytl Tr. 96, l. 10 - 99, l. 17; 143, l. 24 - 144, l. 10; Scanlon Tr. 195, l. 1-22.) In fact, Canadian law did not allow

demutualization until March, 1999. (Jx. 1 at 160.) There was no evidence produced by plaintiff to indicate that the Trust had any expectation that Sun Life would demutualize at any time in the future when it bought the policy on June 28, 1990. In fact, there was no evidence the Trust ever had any expectation regarding demutualization. The evidence at trial established that it was unlikely any Sun Life policyholder had any such expectation, since the sales of Sun Life's participating policies declined in the years prior to the demutualization. (Reiskytl Tr. 150, l. 4-23; 161, l. 1-11; Scanlon Tr. 191, l. 6-18.)

C. *The Sun Life demutualization*.

On January 27, 1998, Sun Life announced its intention to explore demutualization. (Jx. 2.) At that time, Canadian law did not allow demutualization of a mutual company. (Jx.1 at 160.) The Canadian Demutualization Regulations, allowing Sun Life to demutualize, were adopted in March, 1999. (Jx. 1 at 160.) Sun Life's Board of Trustees approved the plan on September 28, 1999. (Jx. 4 at 73.) On October 20, 1999, Sun Life's participating policyholders approved the demutualization plan.

In the demutualization, Sun Life became a subsidiary of Financial Services. Prior to the demutualization, Financial Services was a subsidiary of Sun Life. (Jx. 4 at 74.) Sun life issued common shares to Financial Services and surrendered to Financial Services for cancellation all of Sun Life's current, outstanding common and preferred stock in Financial Services. (Jx. 4 at 75.) All voting and liquidation rights of Sun Life policyholders ceased and Financial Services issued stock, equal to the then ongoing business value of Sun Life, to the eligible Sun Life policyholders. (Jx. 4 at 75.) The IRS treated the demutualization as a non-taxable reorganization under § 368 by viewing the policyholders as exchanging their voting and

liquidation rights in Sun Life, which reflect all the limited equity that exists in the mutual company, in exchange for Financial Services stock under § 354. LTR 200020048, 2000 WL 19305347 at 14. Prior to the distribution of Financial Services stock in the demutualization, Sun Life policyholders owned no stock in either Sun Life or Financial Services.

Financial Services also completed an Initial Public Offering of its stock shortly after the demutualization. (Jx. 4 at 75.) Policyholders had the option of having the Financial Services stock that was distributed to them in the demutualization sold as part of the IPO. In that event the policyholder would receive the proceeds of the sale, less commission, rather than the shares. (Jx. 4 at 75.) The Trust was entitled to receive 3,892 shares of Financial Services stock, but elected to have those shares sold as part of the IPO. The Trust received $31,759.00 as the net proceeds of the sale of its Financial Services stock. (Px. 1.) Policyholders' interests under their policies remained unchanged as a result of the demutualization. (Jx. 4 at 75.)

Sun Life put in place special arrangements "designed to protect the reasonable expectations of future Policy Dividends and other non-guaranteed benefits, and to meet contractual obligations, under Participating Policies issued before demutualization." (Scanlon Tr.. 172, l. 15 - 173, l. 2; Jx. 4 at 75.) Therefore, the Trust's right to policyholder dividends was unaffected by the demutualization. (Scanlon Tr. 183, l. 15 - 185, l. 19.) The Financial Services stock distributed to the policyholders was not related to any premiums those policyholders had paid. The stock was a windfall for the policyholders, because they paid little or nothing for the right to receive that stock. (Scanlon Tr. 179, l. 11 - 180, l. 11.)

D. *The voting and liquidation rights had no value in 1990.*

Fair market value is "the price at which the property would change hands between a

willing buyer and a willing seller." Rev.Rul. 59-60, 1959-1 C.B. 237. There are three basic approaches to determining value; the asset approach, the market approach, and the income approach. Under the asset, or "cost" approach, value is measured based on the cost to replace the future service capability or utility of the subject property. Under the market approach, comparative valuation benchmarks are developed via comparisons to transactions involving similar property or actual transactions in the subject property. Under the income approach, the value of property is based upon the anticipated future economic benefits. (Px. 1; Dx. 2 at 3-4.)

Defendant's expert, Mr. Penny, provided opinions regarding the value of the voting and liquidation rights in June, 1990, using each of the three valuation approaches. In applying the asset approach, Mr. Penny took into account the fact that Sun Life allocated zero cost to the voting and liquidation rights. As a result, he concluded that the willing seller portion of the definition of fair market value was selling the rights for zero. Therefore, those rights had a fair market value of zero using the asset approach. (Penny Tr. 210, l. 5 - 211, l. 3.)

Mr. Penny next examined the application of the market approach. He considered it significant that the premium Sun Life charged for the Trust's policy remained unchanged after the demutualization, when the voting and liquidation rights had been removed from that policy. Mr. Penny also considered that a policyholder whose policy terminated prior to January 27, 1998, would receive nothing in exchange for the voting or liquidation rights. He also, considered it significant that policy holders who purchased participating policies after January 27, 1998, with the same voting and liquidation rights as the Trust's policy, would receive nothing upon demutualization. (Penny Tr. 211, l. 4 - 213, l. 22.) Those factors led Mr. Penny to conclude that no fair market value was allocable to the voting and liquidation rights under the

market approach. (Penny Tr. 213, l. 12-22.)

Under the income approach, Mr. Penny concluded that the value of the voting and liquidation rights is also zero, because of the numerous contingencies that must occur before a policyholder has any right to receive a demutualization benefit. As Mr. Penny said, "it would be too speculative a calculation to provide any reliable measure of fair market value." (Penny Tr. 214, l. 14-22.) Mr. Penny testified that there was a string of cumulative probabilities present in this case as set forth by Mr. Reiskytl. These uncertainties include; (1) whether Sun Life would demutualize, (2) if it did, whether its regulators would approve its demutualization plan, (3) when the demutualization will occur, (4) the amount of any demutualization benefit that might be paid to the policy holders,[3] (5) whether the named insured on the Trust policy would be alive on January 27, 1998,[4] and, (6) whether the Trust would not have surrendered the policy prior to January 27, 1998, for financial reasons,[5] (Dx. 1 at 13-17.) Mr. Reiskytl testified that when one cumulates the probabilities associated with the nine contingencies he identified in his report any

---

[3]There was significant uncertainty as to the amount the Trust might receive if Sun Life demutualized. All other mutual companies used the contribution to surplus method to allocate the variable portion of the stock distribution. (Resikytl Tr. 99, l. 12-17.) Under the contribution to surplus method, about one third of all Sun Life policyholders would have received only the fixed allocation, 75 shares. (Scanlon Tr. 180, l. 5-11.) Since the Trust's policy had been in effect for 9 years at the time Morgan Stanley valued Sun Life, using the contribution to surplus method of allocation, it is likely the Trust's variable distribution would be very small, if not zero. Therefore, on June 28, 1990, it would have been very uncertain that the Trust would ultimately receive 3.892 shares in a subsequent demutualization.

[4]Seymour P. Nagan was 70 years old when the policy was issued, and his wife was 71. (Jx. 6 at 14.) Therefore, on June 28, 1990, it was far from certain that one of them would survive until January, 1998.

[5]It was not unlikely that the Trust might have decided it could have received a better rate of return in the stock market, given its significant rise during the 1990's. Mr. Reiskytl noted that it was common for policies to be surrendered because of financial circumstances. (Reiskytl Tr. 103, l. 3 - 104, l. 17.)

resulting number would be infinitely small. (Reiskytl Tr. 148, l. 9-21.)

In applying the income approach, a probability has to be computed for each of the uncertainties noted above, each of which would be used to reduce the discounted present value of the future benefit. The Trust received $31,700, in March, 2000. That amount would have to be discounted to arrive at its present value on June 28, 1990. (Penny Tr. 213, l. 13-24.) The resulting discounted present value would then be reduced by applying the cumulative probabilities described above.

In order to arrive at the fair market value using the income approach, the discounted present value of the demutualization benefit, reduced by the cumulative probabilities, would then be subtracted from the amount the Trust had to pay to receive the demutualization benefit. The opportunity cost would be the portion of the premium allocated to the voting and liquidation rights. (Penny Tr. 214, l. 6 - 216, l. 14.) Premiums had to be paid for eight years for the Trust to receive any demutualization benefit. If no portion of the premium was allocated to the voting and liquidation, then the Trust would have no basis in those rights. If one were to assume that even a de minimis amount of the premium was allocated to those rights, say one tenth of one percent, the opportunity cost would be $1,530.00.[6] The end result after applying the cumulative probabilities and the opportunity cost would be a very speculative number and would likely be zero, if not a negative number. (Penny Tr. 214, l. 6 - 216, l. 14.)

In its questions to the witnesses at trial, the Court analogized the voting and liquidation rights to a lottery ticket. Such an analogy also demonstrates that the voting and liquidation rights

[6]The semi-annual premium for the policy was $9,603.00. (Jx. 6.) One tenth of one percent of that amount would $96.00. Sixteen payments of $96.00, from June, 28, 1990 to January 27, 1998, results in a total outlay of $1,530.00.

had no fair market value on June 28, 1990. Given the cumulative probabilities that have to be applied, the likelihood on June 28, 1990, of the Trust receiving $31,700 worth of stock in March, 2000, as a result of the demutualization of Sun Life, was astronomically low. Solely for the sake of illustration, if one were to use even unrealistically high probabilities to compute each of the major contingencies, one still would arrive at odds of at least 1 in 500,000.[7] As noted above, if only one tenth of one percent of the premium was allocated to the voting and liquidation rights, the opportunity cost would be $1,530.00. Certainly, no reasonable and prudent buyer would pay $1,530, for the chance to receive $31,700 ten years later, if the odds of him ever receiving that amount were 1 in 500,000.

While the court is correct that if the future benefit is large enough, an individual is willing to make a payment for a chance to win that benefit. However, in this case, the future benefit is only $31,700, and, it will not be received, if at all, for 10 years. The discounted

---

[7]For this illustration we have assumed that the odds of Sun Life seeking to demutualize were 1 in 100. Mr. Reiskytl's testimony was that the it was far less likely than that, since in 1990 companies had not even begun exploring the possibility of demutualizing. (Reiskytl Tr. 96, l. 21 - 97, l. 14; 143, l. 25 - 144, l. 10; 148, l. 9-21.) Next, we assume the odds of the regulators approving of the demutualization to be 1 in 10. This is also probably too high a chance, since no provisions existed in Canada allowing a demutualization until 1999. Then, we assume that the odds of Sun Life using some method of allocation other than the contribution to surplus method used by all United States insurance companies were 1 in 20. Again that is almost assuredly too high a probability, since all other mutual companies used the contribution to surplus method, and it would be almost impossible to predict that Sun Life would choose some other method. Next, we assume that the odds of either Mr. or Mrs. Nagan surviving until January 27, 1998 were 1 in 5, and the odds of them not surrendering the policy for financial reasons were 1 in 5. Again, given the ages of the Nagans it is probable the odds selected are too favorable to plaintiff. Combining all these probabilities, the resulting chance of the Trust receiving a demutualization benefit when it acquired its policy would be 1 in 500,000. This does not even take into account the four other contingencies noted in Mr. Reiskytl's expert report. (Dx. 1 at 13-15.)

present value of that benefit on June 28, 1990, would be significantly less. In addition, in order to receive that benefit, one has to pay premiums for eight years. In such circumstances, the voting and liquidation rights had no fair market value at the time the policy went into force.

The Trust made no effort to establish the value of the voting and liquidation rights on June 28, 1990. (Cole Tr. 63, l. 17-21.) The Trust's only witness, Mr. Cole, did not know how the premium for the policy was calculated or whether the premium charged for a policy with voting and liquidation rights was the same as the premium charged for a policy without those rights. (Cole Tr. 49, l. 1-5; 63, l. 13-16.) Mr. Cole acknowledged in response to the Court's question that this leads to the conclusion that the voting and liquidation rights had a de minimis value. (Cole Tr. 74, l. 4-16.)

Mr. Cole was unaware whether Sun Life allocated any portion of the premium to the voting and liquidation rights. (Cole Tr. 49, l. 1-5.) Mr. Cole testified that the Sun Life demutualization, and the policyholder being eligible to participate in the demutualization, gave rise to the value of the voting and liquidation rights. (Cole Tr. 54, l. 12-18; 64, l. 4-14.) The demutualization occurred in 2000. The value, if any, of the voting and liquidation rights must be determined, however, as of 1990. If, as Mr. Cole testified, an event in 2000 is necessary to create value, then those rights had no value in 1990. The Trust has failed to present any evidence to meet its burden of establishing that the voting and liquidation rights had a fair market value prior to the demutualization.

## III. LEGAL CONCLUSIONS

### A. *The Trust's burden of proof.*

The Trust has the burden of proving that the IRS' determination is erroneous. *Sleiman*;

*Medlin; Moore; Vittaly*. The IRS determined that no portion of the premium paid by the Trust for the Sun Life policy should be allocated to the voting and liquidation rights surrendered in exchange for the Financial Services stock, because those rights had no fair market value on June 28, 1990, when the policy was purchased. On that basis, the IRS concluded that the Trust's basis in the stock was zero, and the full proceeds of the sale was taxable capital gain. Whether an allocation of basis can be made to the voting and liquidation rights is an issue of fact, as to which the Trust's burden of proof applies. *Iske; Medlin; Moore*.

Section 1012 of the Internal Revenue Code provides that a taxpayer's basis is the amount of cash or other property the taxpayer paid for the asset. Whether an interest acquired value after it is purchased has no bearing on its basis. *Gladden*; *Plow Realty Co. v. Commissioner*, 4 T.C. 600, 609 (1945); *Biltmore Homes*. A taxpayer "must demonstrate the economic outlay necessary . . . to claim basis." *Karara v. Commissioner*, T.C. Memo. 1999-253, 1999 WL 549462 at 4 (1999), *aff'd*, 214 F.3d 1358 (11th Cir. 2000), *cert. denied*, 531 U.S. 980 (2000). The Trust has not presented any evidence to establish that a specific portion of the premium the Trust paid for the policy was for the voting and liquidation rights.

To sustain its burden of proof in this case, the Trust must, first, prove that the voting and liquidation rights had a fair market value on June 28, 1990, and, second, prove the amount of premium that was paid for those rights. *Medlin; Moore*. As explained above, the Trust has failed to meet either burden. Since the Trust failed to prove that the rights had any fair market value when the policy was acquired, or that it paid any specific portion of the premium for those rights, it has not proved it has any basis in those rights. *Karara; Biltmore Homes; Moore*. The Trust accordingly also has not proven that the IRS' determination is erroneous, and the Trust is

not entitled to any of its claimed refund.

B. *Treas. Reg. § 1.61-6(a).*

The allocation of basis when a part of a larger property is sold or exchanged is governed by Treas. Reg. § 1.61-6(a):

> When a part of a larger property is sold, the cost or other basis of the entire property shall be equitably apportioned among the several parts, and gain realized or loss sustained on the part of the entire property sold is the difference between the selling price and the cost or other basis allocated to such part. The sale of each part is treated as a separate transaction and gain or loss shall be computed separately on each part. Thus, gain or loss shall be determined at the time of sale on each part and not deferred until the entire property has been disposed of.

Example 2 of the regulation provides that the allocation of basis called for in the regulation is to be based on the fair market value of each of the pieces of the property at the time the property is purchased. In *Medlin*, the court made it clear that the equitable allocation of basis under Treas. Reg. § 1.61-6(a) should be based on the "relative fair market values of the portions of the larger property at the time of their purchase." 2003 WL 21743513 at 30; *see also*, *Iske*.

When the Trust purchased the policy, the voting and liquidation rights had no market value. No portion of the purchase price for the policy was paid for the voting and liquidation rights. Therefore, under Treas. Reg. § 1.61-6(a), no portion of the purchase price can be allocated to those rights, and the Trust had no basis in those rights.

In *Gladden v. Commissioner*, 262 F.3d 851, 854 (9th Cir. 2001), the court applied the provisions of Treas. Reg. § 1.61-6(a) and held that when real property was purchased with no realistic expectation of receiving future water rights, and no premium was paid for any future water rights, no basis could be allocated to the water rights subsequently granted in relation to the property. The instant case falls within the "easy case" described in *Gladden*. The only way

the voting and liquidation rights could have value was in the event of a future solvent liquidation or demutualization. The Trust had no expectation of either event occurring when it purchased the policy. Further, no portion of the premium was paid for the voting and liquidation rights. Under *Gladden* and Treas. Reg. § 1.61-6(a), no basis can be allocated to those voting and liquidation rights.

In *Moore,* the taxpayer sold his interest in a cattle company for cash and a 30-day option to purchase two ranches. He purchased the two ranches for $325,000.00 five days later. He then immediately sold the ranches for $500,000.00. The taxpayer argued that his basis in the property was $325,000.00, plus $152,376.00, which he contended was the value of the option he received on June 10. However, the Court found that the option had no basis since the taxpayer was unable to establish the value of the option on the date it was acquired and was unable to establish that any amount was paid for the option in excess of the amount paid for the underlying property. 425 F.2d at 715. The fact that the option was subsequently sold for a significant profit did not factor in the question of whether it had basis. 425 F.2d at 714.

The reasoning of *Moore* is directly applicable to this case. At trial, the Trust was unable to establish any value for the voting and liquidation rights on June 28, 1990, the date the policy was acquired and the relevant date for determining basis. *Moore*. The trust did not even ask its expert witness to consider that question, and Mr. Cole testified that the value of those rights arose in March, 2000, when the demutualization of Sun Life occurred. (Cole Tr. 63, l. 17-21; 54, l. 12-18; 64, l. 4-14.) The fact that the rights may acquire value at a later date, in 2000 at the time of the demutualization, does not affect the question of whether those rights had basis. *Moore*. Given the lack of evidence from the Trust regarding the value of the voting and

liquidation rights on the date the policy was acquired, June 28, 1990, and the testimony of the defendant's witnesses that those rights had no fair market value on that date, the IRS determination that the Trust has a basis of $0 in those rights surrendered in the demutualization is correct, and the Trust is not entitled to any refund.

CONCLUSION

For the reasons set forth above, the Court should deny the Trust's claims with prejudice.

Respectfully submitted,

s/Benjamin C. King, Jr.

BENJAMIN C. KING, JR.
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6506

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
STEVEN I. FRAHM
Assistant Chief

s/Steven I. Frahm
Of Counsel

September 28, 2007