**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **EUGENE A. FISHER, Trustee,** | ) | |
| **Seymour P. Nagan Irrevocable Trust,** | ) | |
| **Plaintiff** | ) | **No. 04-1726 T** |
| | ) | |
| **v.** | ) | **Judge Francis M. Allegra** |
| | ) | |
| **THE UNITED STATES OF AMERICA** | ) | |
| **Defendant** | ) | |

**PLAINTIFF'S POST-TRIAL BRIEF**

BURGESS J. W. RABY
Raby Law Office
2164 E. Broadway, Suite 280
Tempe, Arizona 85282
Tel: 480-967-1501
Fax: 480-967-0975

# OUTLINE AND TABLE OF CONTENTS

I. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. When Does Basis Allocation Occur? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*The ownership rights conveyed by the Trust's life insurance contract were inextricably a part of the rest of the contract. Their fair market value could not be determined until they were separated from the rest of the policy contract in the demutualization.*

III. The Government's Zero Basis Position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*There is no support in this record for the government's zero tax basis position except the testimony of Mr. Penny. His testimony on this point is not in accord with the facts and is thus irrelevant to the issue. The evidence and relevant testimony support the conclusion that the fair market value of the ownership rights was indeterminate at all times prior to the demutualization.*

IV. The Trust's Allocation Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Allocation of the tax basis should be made as of the demutualization date because (i) the tax basis to be allocated cannot be determined until then and (ii) the information necessary to make an allocation cannot be determined until then. The allocation itself should use the recovery of basis method, in which case the tax basis allocated to the ownership rights would be the amount of cash received by the Trust in lieu of stock. If recovery of basis is rejected, then allocation should be based on the relative fair market values of (i) the life insurance contract and (ii) the Financial Services stock that incorporated the ownership rights, both determined as of the date of demutualization.*

A. Basis recovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

1. An appropriate approach when it is neither feasible nor practicable to separate the tax basis of a unitary asset between its inseparable components . . . . . . . . . . . . . . . . . . . . . . . . 14

2. The approach of sections 301(a) and 301(d) . . . . . . . . . . . . . . . . . . . . . 19

3. Statutorily mandated for life insurance contracts under section 72(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

B. Allocation Based Upon Relative Fair Market Values at Demutualization . . . . . 22

V. Summary and Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Attachment A

# TABLE OF AUTHORITIES

**Cases**:

*Commissioner v. Phillips*, 275 F. 2d 33 (4th Cir. 1960) . . . . . . . . . . . . . . . . . . . . . 5 (fn. 2)

*Estate of Bright v. United States*, 658 F.2d 999 (5th Cir. 1960) . . . . . . . . . . . . . . . 19 (fn.7)

*Estate of Henry Hill Pierce v. United States*, 99 Ct. Cl. 355, 49 F. Supp. 324 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 16, 17, 25

*Gladden v. Commissioner*, 112 T.C. 209 (1999), *rev'd and remanded* 262 F. 3d 851 (9th Circ. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 18, 19, 20, 25

*Inaja Land Co., Ltd. v. Commissioner*, 9 T.C. 727 (1947) . . . . . . . . . . . . . . . . . . . . 16, 17

*Moseley v. Commissioner*, 72 T.C. 183 (1979) . . . . . . . . . . . . . . . . . . . . . 22, 23 (fn. 11)

*UNUM Corp., et al. v. United States,* 130 F. 3d 501 (1st Cir. 1997), *cert. denied* 525 U.S. 810 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Internal Revenue Code of 1986**:

Sec. 72(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22 (fn. 11), 26

Sec. 301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 25

Sec. 301(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 25

Sec. 305(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

Sec. 307(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

Sec. 355(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

Sec. 358 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 25

**Treasury Regulations (26 C.F.R.):**

Sec. 1.61-6(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Sec. 1.61-6(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Sec. 1.307-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Sec. 1.358-2(a)(iv) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 26

Sec. 20.2031-8(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25 (fn. 12)

**Other**:

*Black's Law Dictionary* 278 (6th ed. West 1990) . . . . . . . . . . . . . . . . . . . . . . . . 19 (fn. 10)

Office Decision 724, 3 C.B. 244 (1920) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5 (fn. 2)

Private Letter Ruling 200020048 . . . . . . . . . . . . . . 3, 5, 20 (fn. 10), 21, 23, 24, Attach. A

Revenue Ruling 70-38, 1970-1 C.B. 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5 (fn. 2)

Revenue Ruling 71-233, 1971-1 C.B. 113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **EUGENE A. FISHER, Trustee,** | ) | |
| **Seymour P. Nagan Irrevocable Trust,** | ) | |
| **Plaintiff,** | ) | **No. 04-1726 T** |
| | ) | |
| **v.** | ) | **Judge Francis M. Allegra** |
| | ) | |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S POST-TRIAL BRIEF**

I. BACKGROUND

In 1990, the Seymour P. Nagan Irrevocable Trust (the **"Trust"**) acquired a second-to-die life insurance policy from Sun Life Assurance Company (**"Sun Life"**), a Canadian mutual life insurance and financial services company. The policy entitled the holder to receive dividends from the company as, if, and when the board of directors declared such. In addition, the policy holder was entitled to distributions from the company in the event of demutualization or liquidation and to vote on the election of directors and certain other matters.

On October 20, 1999, the eligible policyholders of Sun Life, including the Trust, voted to convert the company into a stock company that would be owned by a holding company, Sun Life Financial Services, Inc. (**"Financial Services"**). As part of this "demutualization," Sun Life transferred 100 percent of its newly issued common stock to Financial Services, in exchange for 100 percent of the newly issued common stock of Financial Services. The participating policyholders, in turn, received certain contractual rights in a segregated fund designed to cover all of Sun Life's obligations to them. In addition, they received a distribution of 100 percent of the common stock of Financial Services. Depending on what they had previously elected, the policyholders received their share of that distribution either in the form of the stock itself or as the proceeds from the sale

of their shares in the initial public offering that took place simultaneously with the demutualization. Having made the election, the Trust received its distribution in cash.

The $31,579.00 the Trust received in exchange for the dividend, voting, demutualization and liquidation rights it previously owned (the "**ownership rights**") was reported, unreduced by any tax basis adjustment, on its federal income tax return for 2000. The Trust paid the resulting tax of $5,725.00. On February 11, 2004, the Trust filed a timely claim for refund of the $5,725.00 based on the contention that its tax basis in the ownership rights it gave up was the full $31,579.00. On that claim being denied, it filed the instant suit. On November 15, 2006, this Court issued an Order denying the Trust's motion for partial summary judgment and the defendant's cross-motion for summary judgment.

The Court ordered that the matter proceed to trial to deal with the factual aspects of the case. That trial was held June 16, 2007, in Phoenix, Arizona. Initial post-trial briefs were ordered to be filed by September 28, 2007, by orders dated August 8, 2007 and September 14, 2007. Pursuant to the Court's Order of November 15, 2006, the only factual question dealt with at the trial was whether the rights surrendered by the Trust had a tax basis of zero or had either (1) an indeterminate tax basis or (2) a tax basis that could be determined to be a specific amount. In turn, resolution of that issue requires consideration of the date(s) as of which the tax basis is to be determined as well as the amount of basis determined to be allocable to the rights surrendered.

## II. WHEN DOES BASIS ALLOCATION OCCUR?

*The ownership rights conveyed by the Trust's life insurance contract were inextricably a part of the rest of the contract. Their fair market value could not be determined until they were separated from the rest of the policy contract in the demutualization.*

The life insurance contract herein was a unitary and indivisible asset. PLR 200020048 (Feb. 22, 2000);[1] Cole Tr. 48:2-13; Reyskytl, Def. Ex. 1, p. 11. Semi-annual premium payments were required. Jt. Exh. 6, p. 3. Premiums were payable in advance. If premiums were not paid within 31 days of the due date, the policy would lapse. Jt. Exh. 6, p. 6. The total amount invested in the insurance contract (its tax basis) thus changed with every semi-annual payment. As of the first policy anniversary date, the cash value of the policy was zero. Jt. Exh. 6, p. 4.

Until something happened to change the policy contract itself, its various features or rights did not exist separate and apart from the contract of which they were a part. They could thus neither be bought nor sold separately and they thus had no market and no determinable fair market value. PLR 200020048, Cole Tr. 47:8 - 48:1, Reyskytl,. Def. Exh. 1, p.11.

The something that happened to change the "no determinable value" situation as to the various unitary and indivisible features of the contract was the corporate reorganization of Sun Life (the **"demutualization"**). In the demutualization, the terms of the Trust's life insurance contract, and of the corporate law applicable to it, were changed by Sun Life with the consent of the participating policyholders. As a result, the corporate laws applicable to Sun Life changed from those applying to mutual life insurance companies to those applicable to stock companies. In the demutualization, the Trust's policy contract was changed to drastically reduce voting rights and limit dividend rights. The remaining voting and dividend rights, plus the liquidation rights, were separated from the policy and incorporated into the common stock of a publicly traded holding company. That stock in its entirety, or cash in lieu thereof, was distributed to the Trust and the other participating policyholders. Jt. Ex. 1, pp. 00154, 00156, 00162, 00164, and 0243 - 0304 (Schedule A).

---

[1] See Attachment A to this brief. The PLR has been stipulated to be that which was issued by the IRS in connection with this demutualization – see Jt. Exh. 8, Stip. 9.

Treas. Reg. sec. 1.61-6 (a) provides the general rule that:

> [w]hen a part of a larger property is sold, the cost or other basis of the entire property shall be equitably apportioned among the several parts, and the gain realized or loss sustained on the part of the entire property sold is the difference between the selling price and the cost or other basis allocated to such part. The sale of each part is treated as a separate transaction and gain or loss shall be computed separately on each part.

When does that allocation of basis take place? If it cannot take place prior to the separation of the part from the whole, then it logically should take place at the point of separation, that is when the part of the larger property is sold. If the "sale" is a nontaxable exchange, as was the demutualization of Sun Life, Treas. Reg. sec. 1.61-6(b) provides that the "[g]ain or loss from such sales or exchanges is generally recognized at some later time." That is, the gain is "realized" even though not "recognized" until later. But it is the transaction itself that determines "when" the basis allocation should take place.

Treas. Reg. sec. 1.61-6(a) also directs that the basis of the entire property "shall be equitably apportioned." The tax basis of some types of "larger property," and especially of tangible properties, usually can be allocated among the constituent parts at the time the property is acquired. Treas. Reg. sec. 1.61-6(a) uses the example of a 10-acre tract of land purchased by a real estate dealer and subdivided into 20 lots. The $10,000 cost of the land must be "equitably apportioned among the lots."

The fair market value of the intangible policy contract rights that were being split from the policy contract itself, however, could not be ascertained prior to the demutualization nor could the tax basis of the contract itself even be determined until the demutualization date because that amount changed with each premium payment.[2] Thus the aggregate tax basis of the contract could not be

---

[2] Early on in the life of the income tax, the government issued Office Decision 724, C.B. 3, 244 (1920). In that O.D., the government took the position that the tax basis for a life insurance contract for purposes of calculating gain on disposition was the cumulative net premiums paid. This was reiterated in Rev. Rul. 70-38, 1970-1 C.B. 11, and has been

allocated to its various elements prior to the separation of the rights from the contract in the demutualization distribution. Until then, the policy contract was one asset, unitary and indivisible.

In Private Letter Ruling 200020048, App. A to this brief, the Internal Revenue Service issued a ruling to Sun Life relating to this very demutualization transaction. At p. 13 of that ruling, the Service noted that:

> Any Ownership Rights in a mutual insurance company which arise from the purchase of an insurance contract are inextricably tied to the contract from the time of the purchase. These Ownership Rights are created by operation of law solely as a result of the policyholder's acquisition of the underlying contract from a mutual insurance company and cannot be transferred separately from that contract. Prior to conversion, the Ownership Rights have no determinable value apart from the insurance contract itself [emphasis added].

The key phrase in the above quote is "no determinable value" in the last sentence. The Trust asks the Court to find, as the government itself explained in the PLR, that the ownership rights, inextricably tied to the contract and inseparable from it, had no determinable value prior to the demutualization. The demutualization transaction itself is thus the appropriate time to allocate the pre-demutualization tax basis of the policy contract, an indivisible asset until demutualization, into the two parts into which that previously unitary asset was split in the demutualization. Those two are the post-demutualization policy contract and the cash received in lieu of receiving stock in Financial Services. As the Trust sees the case, the question that then must be decided is that of an equitable way to make that allocation. Before that is discussed, however, the matter of the government's zero basis proof at trial should be analyzed.

## III. THE GOVERNMENT'S ZERO BASIS POSITION

> *There is no support in this record for the government's zero tax basis position except the testimony of Mr. Penny. His testimony on this point is not in accord with the facts and is thus irrelevant to the issue. The evidence and relevant testimony support*

---

generally followed ever since. See, e.g., *Commissioner v. Phillips*, 275 F. 2d 33 (4th Cir. 1960).

> *the conclusion that the fair market value of the ownership rights was indeterminate at all times prior to the demutualization.*

The government, of course, never deals with the allocation question because it sees no need to make any allocation. Its position in its denial of the Trust's refund claim, and again in its cross-motion for summary judgment in this proceeding, and now at trial, was and is that the tax basis of the policy contract allocable to the ownership rights was an actual amount, that that amount was zero, and that it was determined as of the June 22, 1990, date that the policy was issued. That position was initially based on the contention that the controlling law was Rev. Rul. 71-233, 1971-1 C.B. 113. However, the ruling's conclusion on this point was deemed inapplicable to this case by this Court in its unpublished order of November 15, 2006, denying defendant's cross-motion for summary judgment, as to which see fn. 4 of the Order.

At the trial, the government produced a valuation expert, Mr. Penny, to support its position that "the fair market value of the subject ownership rights is best stated as zero during the 1990 calendar year." Def. Exh. 2, p. 5. The Trust's expert witness, Mr. Cole, had testified that "the ownership rights, separate from the policy rights, had value but the amount of the value was not discernible. . . . [U]ntil the demutualization, one would not know the allocation between the ownership rights and the policy rights." Tr. 47:8-10, 24-25; 48:1.

A third expert, Mr. Reiskytl, offered by the government as an industry expert but not a valuation expert (Tr. 85:13-17), also discussed matters relevant to valuation. As contrasted with a stockholder in a stock insurance company, he explained,

> the mutual policyholder's ownership rights are <u>inextricably tied</u> to the underlying insurance contract. In other words, mutual ownership rights cannot be separately purchased, transferred or sold. They begin and end with the purchase and termination of the insurance policy. There is no separate continuing value of these ownership rights. . . . At the time of purchase of the policy, the mutual ownership has no known value. [Emphasis in original.]

Exh. 1, pp. 10-11.

Both Penny and Cole, the two valuation experts, emphasized that the four ownership rights of the policyholders of Sun Life prior to the demutualization consisted of the rights:

- to vote on matters submitted to participating policyholders, such as electing the Sun Life of Canada Board,
- to participate in the distribution of profits of Sun Life of Canada from all its businesses,
- to participate in any distribution of demutualization benefits, and
- in the unlikely event of a liquidation if Sun Life were ever to become insolvent, to participate in the distribution of any remaining surplus after satisfaction of all obligations.

Pl. Exh. 1, p. 2; Def. Exh. 2, p. 2.

As noted above, those four ownership rights are collectively referred to in this brief as the **"ownership rights**."

Mr. Penny agreed with the two other experts that the participating life insurance contract was single, indivisible, and unitary, and that the various elements of that indivisible asset could not be separated from the contract until the demutualization transaction. Def. Exh. 2, p. 3. But Mr. Cole had also added that, given the indivisibility of the policy rights, the various approaches to valuation normally used in arriving at fair market value "are not applicable to the valuation of the 'ownership rights' in this case since the 'ownership rights' are not separable from 'policy rights' and cannot be sold." Pl. Exh. 1, p. 5.

Mr. Penny took a different tack. He proceeded to ignore the inseparability and nontransferability of the various policy rights and instead treated the policy contract as if it consisted of discrete, separable parts. He strained to value the different aspects of the ownership rights by applying cost, income, and market approaches to each. He concluded that since there was no market for the ownership rights and no amount would be received for them upon death of the insureds or surrender of the policy, the value of the ownership rights was zero. Mr. Penny also emphasized that

the ownership rights that were an inextricable part of the policy contract did not cost Sun Life anything. "Since the actual willing seller of the subject ownership rights allocated zero cost to them in the pricing of a policy, the indicated value under the cost approach is zero, in our judgment."[3] Def. Exh. 2, p. 3. He added that "the premiums paid on an insurance policy did not change after demutualization. Thus, if the market price of a policy including the ownership rights was unchanged from the price of a policy after demutualization (when the ownership rights were not included), it is evident that the market price before demutualization assigned to the ownership rights was zero." Def. Exh. 2, p. 4.

But this is not at all what the evidence would indicate. The premium charged on a Sun Life participating policy was a tentative number. As testified to by Mr. Reyskytl,

> you establish the premium at a level such that it will most likely be more than adequate and then you refund the difference, so you don't really build in a dividend scale when you begin the process. The dividends are a natural refund or a byproduct of the gross premium levels that are originally established.

Tr. 93:17-23

In other words, the gross premium figure in the contract would remain unchanged but the net cost of the policy to the policyholder would be reduced by dividends, consistent with the mutual life company goal of providing the insurance coverage at cost. Tr. 85:24 - 87:8. Thus the annual premium was never expected by the company or the participating policyholder to be the net cost of

---

3 This ignores the fact that the cost to any corporation of its common stock (i.e., its ownership rights) is zero or de minimis -- but that fact is completely irrelevant in determining the value of those ownership rights. The out-of-pocket cost to Sun Financial Services of creating the stock issued in the demutualization, had no bearing on its fair market value. Mr. Penny also misstated the way in which Mr. Scanlon testified that policy pricing was determined. Mr. Scanlon testified that "It was based on an actuarial analysis of the benefits to be provided and the expenses that we needed to recover from those products, plus a risk charge or a contribution to permanent surplus. . . . <u>One of the ownership rights that the participating policyholders had was the right to receive distributions in the form of policy dividends. Those would have been included in the benefits that were built into the price of the product and into the determination of the premiums</u> (emphasis added)." Tr. 167:5 - 168:3.

maintaining the policy, as witness the representations made by Sun Life's representatives from time to time to the Trust as to the expected amount of policy dividends for the various years of the policy's existence. Jt. Exh. 8, Stips. 4 and 5.

Finally, as per his testimony in Court, Mr. Penny incorrectly concluded that the policyholders had essentially the same voting and dividend rights after the demutualization as they had had before. The degree of voting power, he said (Tr. 213:9-11) is "essentially unchanged before and after demutualization." The participating policyholders' "expectation for dividends was unchanged by the demutualization." Tr. 214:9-11. But Mr. Penny completely ignored the reality that the minority voting rights in a subsidiary, which is what the policyholders received by the contractual changes in their policies, were almost meaningless compared to the ability of the policyholder group pre-demutualization to elect 100 percent of the directors of the whole of Sun Life. This yielding of policyholder voting rights to shareholders symbolized the shift taking place in the objectives of the company – from being a mutual whose focus was to provide insurance to its policyholder-owners at cost to being a stock company whose focus was to maximize the value of the company for the stockholders. Mr. Reyskytl testified that in an extreme case of mutual company policyholders uniting to get the dividend raised, they could elect board members committed to that action and "if the trustees said that, We want to raise the dividend scale, the dividend scale would be raised." Tr. 111:7 - 112:1. After the demutualization, no such potential existed as to the policyholders qua policyholders. Thus, while the vote of any one policyholder might be of negligible impact, the ability of policyholders as a group to control company policy was of great value in keeping the company focused on its goal of maximizing policyholder benefits – and while the loss of that ability to keep the company focused on policyholders might not be measurable, it was not inconsequential. Mr. Reyskytl pointed out in his Report that "[m]utual companies . . . historically, in most cases, have

provided attractive policy benefits at lower 'cost' than those provided by stock companies." Def. Exh. 1, p. 8.

Mr. Penny not only erred in ignoring the impact of the loss of voting control, he likewise erred when he completely ignored the fact that the policyholders post-demutualization had only a right to share in the earnings of a sub-fund whereas before demutualization they had the right to receive any distributions that were made of the profits of any and all of the far-flung Sun Life empire's activities. Tr. 183:6 - 184:10; Jt. Exh. 1 SL-0161. He ignored, for example, that one of the alternatives to demutualization considered by the Sun Life Board was retaining the mutual structure and increasing the policy dividends.[4] Mr. Penny seemed to ignore that by virtue of demutualization, whatever expectations policyholders might reasonably have had for such dividend increases disappeared. Mr. Reyskytl testified that the policyholders would participate in the income and growth only of the investments contained in the segregated fund set up for them but not in the income and growth of any other assets of Sun Life or in any of the income and growth of Financial Services. Tr. 133:9 - 134:1. Mr. Penny nevertheless stated in his report that "expectations for dividends would be essentially unchanged post-demutuaization" and therefore concluded "from an income approach perspective, we focus on policyholders' expectations vis-a-via liquidation proceeds or demutualization benefits in 1990." Def. Ex. 2, p 4.

The Court is respectfully requested to consider how much the new public stockholders would have paid in the IPO if the only rights they had received had been the right to receive distributions in the event of liquidation or to participate in the benefits to be received in corporate reorganizations.

---

[4] The Policyholder Information Circular explained that "Sun Life of Canada could retain its mutual structure and increase ordinary policy dividends or pay extraordinary policy dividends to its participating policyholders in order to distribute to them a portion of its current surplus." Jt. Exh 1, SL-0167. As Mr. Reyskytl explained, policyholders "want to be with the company that has the highest dividends, all other things being equal." Tr. 115:10 - 116:1-11.

Yet those are the only ownership rights that Mr. Penny considers relevant to his zero fair market value conclusion. Tr. 214:9 - 13 ("A: . . . if we take dividends out of the picture because the expectation for dividends was unchanged by the demutualization, then we're focusing on the likelihood of proceeds from either a liquidation or a demutualization.") Even if an expectation of policy dividends might have remained, as Mr. Scanlon explained in his testimony, that expectation was not that the future dividends were guaranteed to be the same amounts as if no demutualization had taken place. The size of the segregated fund, said Mr. Scanlon, was only intended to cover the contract obligations for death benefits and cash surrender values, plus

> what the regulatory environment refers to as policy-reasonable expectations would be satisfied. <u>That's different from the historical dividends would be guaranteed, if you will, to be paid into the future</u> (emphasis added).

Tr. 183:17-23.

While Mr. Penny apparently concluded somehow that this meant that the amount of dividends to be received by the pre-demutualization policyholders was guaranteed to be continued post-demutualization, that was not at all what Mr. Scanlon meant:

> And I guess the point that I want to try and stress is that, you know, the policyholder dividends are not guaranteed. They're subject to the emerging experience of the company. And one of the key drivers of those things would be the company's investment income. And so to the extent that historically, as of a point of demutualization the company's assets were earning, you know, a certain return, but after demutualization the – the company's opportunity to achieve investment returns was materially different, that would mean that even under satisfied policyholder reasonable expectations the dividends going forward could be materially different as long as they were appropriately consistent given the environment that the company was operating in.

Tr. 185:4-19.

The evidence is that there would be substantial earnings available above corporate needs to justify the payment of dividends on the Financial Services shares, which dividends would be over and above any distributions post-demutualization to the policyholders. Such an assumption was a major factor in the Morgan Stanley Dean Witter/RBC Dominion Securities Valuation Report of

September 28, 1999, submitted to the policyholders. In that report, the investment bankers explained that their "Range of Values" was prepared on the basis that "the dividend yield on the Common Shares will be comparable to the dividend yield of other North American financial services companies. . . . " Jt. Exh. 1, SL-0334. Some part or all of those dividends, if available for distribution to stockholders after the demutualization, would appropriately have been available to the policyholders had there been no demutualization. The earning power and the dividend potential of the new Financial Services stock had been carved out of the policyholder's pre-demutualization ownership rights, and the fact that outside investors were willing to, and did, pay substantial dollars to acquire those rights, is mute testimony that Mr. Penny erred when he concluded that the policyholders gave up nothing in the demutualization.

Based on his application of an inapplicable valuation matrix and his mistaken factual conclusion that the policyholders gave up nothing in the demutualization, Mr. Penny then opined that the ownership rights had a zero fair market value during 1990. The policy as a whole, however, also had a "nil" (nothing) cash surrender and loan value as of its first anniversary date, June 28, 1991. Jt. Exh. 6, Table 2, p. 004. Thus, even if Mr. Penny's logic made sense and his conclusion was supportable, which it is not, the government would have established at best that an undefinable portion of the total tax basis of the "nil" cash surrender value of the policy should be allocated to the ownership rights and an undefinable portion should be allocated to the other rights based, one might assume, on the ratios of the zero fair market values of the ownership rights to the total policy value (rights plus cash surrender value) of zero.[5]

IV. THE TRUST'S ALLOCATION ARGUMENT

---

[5] Multiplication of any positive number by zero produces an answer of zero; division of any number by zero produces an undefined answer (which will register on most calculators as an error message).

*Allocation of the tax basis should be made as of the demutualization date because (1) the tax basis to be allocated cannot be determined until then and (2) the information necessary to make an allocation cannot be determined until then. The allocation itself should use the recovery of basis method, in which case the tax basis allocated to the ownership rights would be the amount of cash received by the Trust in lieu of stock. If recovery of basis is rejected, then allocation should be based on the relative fair market values of (1) the life insurance contract and (2) of the Financial Services stock that incorporated the ownership rights, both determined as of the date of demutualization.*

The Trust submits that it has made a prima facie case that the fair market value of the ownership interests is not zero but rather is indeterminate at any time prior to the demutualization. The Trust knows of no income tax cases that could be described as being "on all fours" with the facts of this case. Nor has the defendant ever cited any tax cases with facts analogous to these facts in which the courts have required that a date of acquisition allocation be made of the tax basis of a unitary intangible asset which subsequently has been split into more than one asset.

The Trust urges the Court to reject the nonsense involved in the 1990 basis determination approach of the defendant. Two alternative approaches then remain that seem to both be equitable and also to have regulatory or case precedent to support them. These are (1) the basis recovery approach and (2) the allocation of basis based upon relative fair market values of the two parts (severed ownership rights and modified policy rights) as of the demutualization date. The next part of this discussion will explore these two approaches.

A. Basis Recovery

Since the fair market value of the ownership rights was not determinable at any time prior to the demutualization, the portion of the tax basis in the policy contract allocable at the time of demutualization to the Financial Services stock received in exchange for those rights is the fair market value of that stock as of the date of the demutualization. Under this basis recovery approach, the simultaneous sale of the stock for this same amount would result in neither gain nor loss. Rather,

the ultimate gain or loss on the life insurance contract, including the severed ownership rights, would be determined on disposition of that contract.

Use of this basis recovery approach is supported by three alternative legal arguments:

1. The basis recovery approach is the proper approach when a unitary asset is acquired with no breakdown of the purchase price between the elements of that asset, under circumstances (admittedly rare) where it is neither feasible nor practicable to ascertain the portion of the purchase price (tax basis) allocable to the separate but inseparable elements, and one of those constituent elements is later sold. The precedent in this Court is *Estate of Henry Hill Pierce v. United States*, 99 Ct. Cl. 355, 49 F. Supp. 324 (1943). In that case, a bank had created a securities company to invest in securities in which the bank itself could not legally invest. Each bank stock certificate contained an endorsement giving bank stockholders interests in the securities company. Interests in the securities company could not be transferred separately from the bank stock, nor could bank stock be transferred without also transferring the related interest in the securities company. Thus the asset acquired was unitary and its components were not separable from each other.

The Court was faced with determining what portion of the tax basis of the bank stock should be allocated to the securities company interests when, due to the requirements of the Federal Banking Act of 1933, the securities company was dissolved and transferable declarations of interest in the distribution of the proceeds of its liquidation were distributed to the bank shareholders. The decedent was one of those shareholders; he sold his declaration of interest the month after he received it. After his death, his executors decided that he had had a deductible loss on that sale but had not claimed it. They filed a refund claim. In due course, it was disallowed. The refund suit followed.

The government argued that the cost of the bank stock was not allocable between the bank stock and the securities stock because the bank stock and the securities stock could not be separated until the law change. Concluded the Court:

> In order to determine, as plaintiffs would have us do, that the interest in the Security Company was sold for less than it cost, it would be necessary to apportion a part of the price plaintiff's testator paid for his bank stock with the Security Company indorsement on it, to the interest in the Security Company represented by the indorsement. We could then say that the interest in the Security Company cost so much. We know how much it sold for in 1934, and could determine the amount of the loss or gain. . . .

49 F. Supp. 367.

The government disagreed with that reasoning, arguing that whether a profit or a loss had been derived from the investment in the bank stock from which the Security Company interest had been severed could not be determined until the interests in both the Security Company and the bank had been sold. The Court then discussed the implications of that argument for the plaintiffs:

> We take this argument [of the government] to mean that no particular value could be assigned to the interest in the Security Company represented by the indorsement of the bank stock, with any degree of assurance that that assignment of value was correct, or even approximately so. If that is true, the apportionment should not be attempted, since the exact answer to the question of profit or loss may be obtained by waiting till the bank stock is sold.

49 F. Supp. 367, 368. Pointing out that other courts had reached the same result in comparable cases, the Court dismissed the plaintiffs' claim for refund.

The basis recovery approach is still accepted by the courts for reporting the gain or loss from the sale of property when it is impracticable or impossible to ascertain the cost or other tax basis of the property that is sold. In *Inaja Land Co., Ltd. v. Commissioner*, 9 T.C. 727 (1947), acq. 1948-1 C..B. 2, for example, the taxpayer was paid an amount by the City of Los Angeles for the grant of certain covenants and easements and the damages caused by the city's diversion of water upstream onto its land. The IRS considered that the total amount was income, but the Tax Court found that there was no gain to be currently recognized, noting in its final opinion paragraph (9 T.C. at 736):

> Apportionment with reasonable accuracy of the amount realized not being possible, and this amount being less than petitioner's cost basis for the property, it can not be determined that petitioner has, in fact, realized gain in any amount. Applying the rule as above set out, no portion of the payments in question should be considered as income, but the full amount must be treated as a return of capital and applied in reduction of petitioner's cost basis. Burnet v. Logan, 283 U.S. 404.

*Inaja Land* is still good law in those rare situations when apportionment is not possible. It was cited as authoritative as recently as *Gladden v. Commissioner*, 262 F. 3d 851 (9th Cir. 2001), a case in which owners of land acquired rights to Colorado River water from the federal government several years after they purchased the land, and for no consideration. The water rights were subsequently reacquired by the federal government. The taxpayers contended that the consideration received for the water rights in that reacquisition should be a recovery of their tax basis in the land and should reduce the tax basis of that land rather than be recognized as current income.

The appeals court remanded *Gladden* to the Tax Court to determine "what portion of the cost of the land may have been a premium paid for the water rights later acquired by the partnership, or whether it is 'impracticable or impossible' to determine what that premium may have been." In the latter situation, the appeals court noted, the pertinent rule would be that of *Inaja Land* where "the taxpayer need not recognize any capital gain until the entire cost of the property has been recovered." 262 F. 3d at 855-856.

The government cites *Gladden* in its pre-trial brief as authority for the proposition that the Trust must have expected that Sun Life would demutualize at the time the policy was issued in order for the basis recovery treatment of *Inaja Land* to apply. It apparently bases this on a misinterpretation of the following language in the 9th Circuit opinion:

> Section 1.61-6(a) would be easy to apply to this case if the water rights had already been vested when the partnership had purchased the land. If this had been true, the facts would closely resemble those of Inaja Land Co., Ltd. v. Commissioner, 9 T.C. 727 (1947). . . . [It] would also be easy to apply if the partnership had purchased the property <u>with no expectation that it would ever be able to acquire Colorado River water rights.</u> If this were the case, we could be sure that none of the original cost of the land was attributable to the water rights, or to any expectancy of water rights. It

would obviously be improper in such a case to allow the partnership to allocate any of the cost of their original land purchase to the sale of the later acquired rights (emphasis added).

We say "misinterpretation" because the right to receive distributions in the event of a Sun Life demutualization has been established as one of the ownership rights possessed by the participating policyholders, including the Trust. In *Inaja Land,* it was irrelevant to the court's decision that neither Inaja nor its members had any expectation when the property was acquired in 1928 that Inaja would receive $50,000 for easements from the City of Los Angeles in 1939; in *Gladden*, the Court of Appeals was not referring to the completely unexpected disposition of the water rights but rather to the actual acquisition of the rights. Receipt of the water rights in Gladden is not analogous to the receipt of the demutualization proceeds in the instant case. The rights involved in the instant case, unlike the potential of acquiring water rights in *Gladden*, flow from the always-existent status of the participating policies as the residual ownership of Sun Life pre-demutualization.

There is no support in the cases for the government's argument that the Trust is not entitled to any allocation of the policy contract's tax basis without first establishing an expectation when the policy was acquired in 1990 that Sun Life would demutualize during the time the contract would be in force. *Gladden* offers no support for this proposition, a statement which may be clearer if we analyze this facet of *Gladden*.

The expectation question first arose in the Tax Court (*Gladden v. Commissioner*, 112 T.C. 209 (1999)). The Gladdens had argued for a recovery of basis approach to the taxation of the $1.1 million they received when the government reacquired the Colorado River water rights from them.[6]

---

[6] For simplicity in discussion, and because it is irrelevant to this issue, the discussion will treat the Gladdens as the purchasers of the land, recipients of the water rights, and surrenderers of the water rights. The land was purchased and owned by a partnership in which the Gladdens had a 50 percent interest, while the water rights were held by the Harquahala Valley Irrigation District for the benefit of the property owners.

They pointed out that the partnership's water rights constituted part of the bundle of rights represented by their land ownership, and that the water rights could neither be bought nor sold separately from the land. As Tax Court Judge Stephen Swift commented, "[b]ecause the water rights were received and sold by the partnership separately from the land, respondent argues that no allocation should be allowed of the partnership's land costs to the funds the partnership received for the water rights." 127 T.C. at 227. Tax Court Judge Swift rejected the Gladden's argument that when they acquired the land in 1976, they had an expectation that they might be able to acquire Colorado River water rights at some time in the future. Note that the expectation in question for when the land was acquired was that the land being acquired would receive rights to acquire Colorado River water, which it did in 1983; the expectation in question was not an expectation that in 1992 the government would buy back rights either explicitly or implicitly already in existence. In fact, it is unlikely that anyone suspected when the 50-year water supply contract was entered into in 1983 that it would be terminated in less than a decade by the government reacquiring the rights.

Absent that buyback by the government itself in 1992, there was no way to sever the right to Colorado River water from the land itself once that water contract had been acquired. The expectation to which the Tax Court (and later the 9th Circuit) referred. was, therefore, the receipt of that contractual right to purchase water as, if, and when that water became available. In the instant case, by contrast, the Trust had the right all along to receive its share of any distributions that might be made by Sun Life, whether in liquidation, demutualization, or as dividends. Thus the expectation to which the government refers must be an expectation that there would be a demutualization of Sun Life. That would be analogous to the buyback in the *Gladden* case, as to which there was no expectation whatsoever. The government is mixing the expectation of receiving rights in *Gladden* with the expectation in this case that the Trust would receive a future distribution pursuant to the rights it already possessed as one of the owners of the residual equity in Sun Life.

Further, the concept of fair market value deals with hypothetical and not specific individuals.[7] The hypothetical individual who acquired the participating policy in 1990 and made regular premium payments thereafter to keep that policy alive is assumed to have knowledge of all relevant information. That relevant information would certainly include, for example, that other mutual life insurance companies had demutualized and still others were considering demutualization. See, e.g., *UNUM Corp., et al. v. United States,* 130 F.3d 501 (1st Cir. 1997), cert. denied 525 U.S. 810 (1998), which involved a 1986 demutualization valued at $522 million.[8]

2. An alternative argument for basis recovery is based on sec. 301.[9] That section provides that distributions of property by a corporation with respect to its stock are valued at their fair market value and any portion of the distribution which is not a dividend is applied to and reduces the basis of the stock upon which it was distributed. Sec. 301(d) provides that the basis of property received in the distribution is the fair market value of that property.

Prior to demutualization, participating life insurance contracts were the common stock of Sun Life.[10] Pursuant to those contracts, and solely as a result of their owning those contracts, stock

---

7 see, e.g., *Estate of Bright v. United States*, 658 F.2d 999, 1005-1006 (5th Cir. 1981).

8 Union Mutual Life Insurance Co. was created in 1848 as a mutual insurance company that wrote various types of life, health, and accident insurance. In 1986, it converted to a stock format in a sequence of steps: (1) Union Mutual's disbursement of $129 million in cash to 105,000 eligible policyholders in exchange for their surrender of membership rights, including voting rights and rights to share in the company's surplus; (2) amendment of Union Mutual's charter to convert to a stock insurer, renamed UNUM Life Insurance Co.; (3) delivery of UNUM Life's newly issued 6 million shares of stock to a new holding company, UNUM Corp.; and (4) the issuance by UNUM Corp., in exchange for the transfer of ownership from the policyholders to UNUM Life, of 20 million shares of UNUM Corp. stock (valued at $522 million) to the remaining eligible Union Mutual policyholders.

9 All section references are to the Internal Revenue Code of 1986, as in effect for the years involved.

10 "Common stock" is defined in *Black's Law Dictionary* 278 (6th ed., West 1990), as that "Class of corporate stock which represents the residual ownership of the corporation." The ownership rights herein involved are the residual ownership of the corporation. Further, those rights have routinely been deemed to be stock by the Internal Revenue Service for

of Financial Services, a separate corporation, was distributed to policyholders. Stock other than of the distributing corporation is property. If the distribution is to be treated as a dividend, then the basis recovery rule of section 72(e) applies and equity requires that, since the insurance contract's tax basis is reduced by the value of the property dividend, that same amount then becomes the tax basis of the property received for purposes of calculating subsequent gain. If the distribution is not treated as a dividend, then the fair market value of the Financial Services stock received becomes its basis under section 301(d).

3. Another alternative argument would acknowledge the economic substance of what occurred. Sun Life did not distribute stock in Sun Financial Services to all policyholders. It gave the United States participating policyholders the election to take cash. This was offered as a policyholder option in the material the company sent to the policyholders preparatory to their vote on the demutualization. See Joint Exhibit 1, SL-0154. Thus, the demutualization transaction was in reality a cash distribution as to the Trust and all other policyholders who elected to take cash – and, if that view is accepted, the cash received in exchange for surrender of the life insurance contract ownership rights (which are rights under the insurance contract) should be treated as a basis recovery under sec. 72(e).

In its order of November 15, 2006, the Court rejected the proposition that the return of capital treatment provided life insurance policy distributions not received as an annuity should apply to the $31,579 received by the Trust as the result of the demutualization of Sun Life. The Court stated that the Trust "received those proceeds upon an entirely unrelated sale of the stock it received in the demutualization." But, with due respect to the Court's statement, the "sale" of the stock was not unrelated to the receipt of the stock. The option to take cash rather than Financial Services

---

federal income tax purposes in issuing both private letter rulings and in published rulings, including the private letter ruling issued in this demutualization, PLR 200020048 (Feb. 22, 2000). Stip. 9, Doc 82.

stock was offered to the Trust as a participating policyholder. Note the distinction in PLR 200020048, Pars. (iv), p. 5, and (v), p. 6, between"Resale Shareholders" and "Retained Share Policyholders." In (v), the ruling states that "Holding [Financial Services] will issue Common Stock ("Retained Shares") to the following Eligible Policyholders ("Retained Share Policyholders") who will retain that stock in connection with the conversion and IPO: (1) Eligible Policyholders who reside in . . . the United States and who do not elect to receive cash. . . . " Thus, once the election to take cash had been made by the Trust, it was never contemplated that the Trust would even receive stock in Financial Services but the cash that the Trust did receive was paid to it in its capacity of an "Eligible Policyholder." The Trust respectfully requests that the Court reconsider its prior conclusion, which was reached without the above information regarding the cash election having been placed squarely before the Court.[11]

---

[11] To recap the section 72(e) issue, the court held in *Moseley v. Commissioner*, 72 T.C. 183 (1979), that "aggregate premiums," for purposes of calculating gain on a life insurance contract, "refers to all premiums paid under the policy, including the portion credited to the special reserve." Thus, "the dividend received under the special reserve provision constituted a partial recovery of the premiums paid for all rights under the policy." The demutualization distribution at issue in this case is analogous to the distribution of the special reserve in *Moseley*. Both are made under rights that are a part of the policy contract and thus it is appropriate that the section 72(e) recovery-of-basis approach be used for the reasons cited by the court in *Moseley*. So long as the cash received by the Trust did not exceed the aggregate of the net premiums that had been paid on the policy, and it did not, there would be no gain on a cash distribution.

The Tax Court in *Moseley* applied section 72(e)(1)(B), which provides that if any amount is received under a life insurance contract and if that amount is not received as an annuity, the amount is included in gross income "only to the extent that it . . . exceeds the aggregate premiums or other consideration paid." The cash received by the Trust was received in exchange for ownership rights which were an inseparable part of the policy contract to that point, and thus were received under that contract. The Tax Court noted in *Moseley* that earlier cases "have construed this cost recovery rule of the predecessor of this section as excluding from income dividends received under a life insurance contract until amounts received under the contract exceed the aggregate premiums paid. *Helvering v. Meredith*, 140 F.2d 973, 974 (8th Cir. 1944), aff'g. per curiam a Memorandum Opinion of this Court; see *Estate of Wong Wing Non v. Commissioner*, 18 T.C. 205, 209 (1952). Sec. 19.22(b)(2)-1, Regs. 103; sec. 29.22(b)(2)-1, Regs. 111."

B. Allocation Based on Relative Fair Market Values at Demutualization

If the Court rejects the applicability of the basis recovery approach, the Trust then respectfully suggests that the proper approach is still not to accept the "zero basis" argument of the defendant. Rather it should be to apply the rules relating to corporate reorganizations and distributions and allocate the tax basis of the policy contract between the two component parts into which it was split in the demutualization based on the relative values of those parts immediately following the demutualization.

Section 358 provides the rules for determining the basis to the distributees in the Sun Life tax-free reorganization. PLR 200020048, Attach. A, Par (7), pp. 17-18. According to the PLR, the tax basis of the Financial Services stock would be "the same as the basis of the Ownership Rights surrendered. . . . " Given that the evidence has established that the tax basis of those ownership rights to the Trust was not even determinable until the point of demutualization, the basis logically would not be allocated until that point was reached. It then would be allocated in an equitable manner between that which was surrendered and that which was retained on the basis of the relative fair market values of the ownership rights incorporated into the Financial Services stock and the fair market value of the policy contract, respectively.

That this is also equitable is supported by the approach taken under section 358 to the allocation of basis in divisive reorganizations. The demutualization is a classic divisive reorganization under section 355(a)(1) since it involves:

---

The law on this point has not changed. The statute, the regulations, and all of the cases refer to the life insurance "contract" and *Moseley* makes clear that the reference is to the entire contract, not merely the insurance features of that contract. The cash received reduces the aggregate premiums previously paid on the policy. Thus, if the aggregate premiums paid on the policy are large enough, as they were in this case, the Trust has no gain on the demutualization transaction.

(A) a distribution by a distributing corporation (Sun Life) to a stockholder (the Trust) of stock (the Financial Services stock) which the distributing corporation controls immediately before the distribution;

(B) not used principally as a "device" for siphoning-off earnings and profits of either of the corporations involved;

(C) involving two corporations (Sun Life and Financial Services) engaged in the active conduct of a trade or business immediately after the reorganization; and

(D) consisting of all of the stock of the controlled corporation.

Post-demutualization, the common stock ownership of Sun Life rests with Sun Financial Services, which is a holding company. In the demutualization reorganization, Financial Services received all of the Sun Life common stock, in exchange for which Financial Services issued all of its own stock then outstanding to Sun Life in the amount necessary to make the required distributions of cash and stock to the Sun Life policyholders. Thus, Sun Life was the distributing corporation for section 355 purposes, while Financial Services was the controlled corporation. Jt. Exh. 1 pp. 0252, 0253.

Treas. Reg. sec. 1.358-2(a)(iv) provides that if a shareholder receives stock in a divisive reorganization, "the basis of each share of stock or security of the distributing corporation . . . shall be allocated between the share of stock or security of the distributing corporation with respect to which the distribution is made (the policy contract, in this case) and the share or shares of stock or security or securities (or allocable portions thereof) received with respect to the share of stock or security of the distributing corporation in proportion to their fair market values."

This use of relative fair market values at the time of the demutualization distribution to allocate basis is not limited to sec. 355 divisive reorganizations. The same result also is in secs. 305(a) and 307(a). Section 305(a) provides that "gross income does not include the amount of any distribution of the stock of a corporation made by such corporation to its shareholders with respect to its stock." Sec. 307(a) provides that if a shareholder of a corporation (the policyholder in Sun

Life) receives stock in a sec. 305(a) distribution, the basis of such stock is determined by allocating between the old and the new the adjusted basis of the old. Treas. Reg. sec. 1.307-1 provides that the allocation is made on the basis of the relative fair market values of each on the date of the distribution.

It is stipulated (Jt. Exh. 8, Stip. 3) that the Trust's total investment in the policy contract through March 22, 2007, was $194,343.00. The evidence in the record sets forth the relative fair market values of the policy contract and the Financial Services stock as of the demutualiztion date, March 22, 1990. It is stipulated (Jt. Exh. 8, Stip. 3) that the cash surrender value of the policy on March 22, 2000, was $185,172.79.[12] The fair market value of the Financial Services stock received by the Trust is stipulated as $31,759.00. Jt. Exh. 8, Stips. 6 and 10. Thus, $27,109.00 of the $194,343.64 would be the tax basis allocated to the Financial Services stock based on relative fair market values, and the gain on its disposition would be $4,650.00. The Trust had paid $5,725.00 of income tax (Jt. Exh. 8, Stip 7) on the $31,759. Its tax on a gain of $4,650.00 would be $837.00. The amount of refund to which it would be entitled would thus be $4,888.00.

## V. SUMMARY AND CONCLUSION

The Trust received cash in exchange for its surrender of certain of its ownership rights in Sun Life in a demutualization reorganization of Sun Life. The rights the Trust surrendered were an inseparable part of a life insurance contract and consisted of voting rights, rights to receive dividends, and rights to receive distributions in liquidation. The question before the Court is:

---

[12] The alternative to cash surrender value as fair market value of a life insurance policy is the calculation set forth in Treas. Reg. sec. 20.2031-8(a)(2): "As valuation of an insurance contract through sale of comparable contracts is not readily ascertainable when . . . the contract has been in force for some time and further premium payments are to be made, the value may be approximated by adding to the interpolated terminal reserve at the date . . . the proportionate part of the gross premium last paid before the date . . . which covers the period extending beyond that date." Jt. Exh. 7 sets forth the fair market value of the policy contract, calculated on that basis, as $205,015.13.

"What portion of the tax basis of the life insurance contract should be allocated to the severed ownership rights and what portion to the reconstituted life insurance contract?"

Viewed as a distribution of a portion of a life insurance contract, the severance from that contract of a hitherto inseparable element of the contract would be viewed as a recovery of premiums paid and not a gain-recognition transaction. The tax basis of what was received for that right, whether cash or stock, would be the amount of its fair market value at the time the ownership rights, in the form of the stock, were separated from the life insurance contract and distributed to the Trust. This result can be reached under three different approaches:

Approach one is that adopted by the predecessor of this Court in *Estate of Pierce*, and in *Gladden* by the Ninth Circuit Court of Appeals, which, as applied to the facts and issue in this case, would require the Court to determine whether the relative fair market values of the ownership rights and the remaining policy rights were reasonably determinable as of the times at which the investments in the policy contract were made.

Approach two focuses on the fact that the ownership rights in the life insurance contract prior to the demutualization made that contract common stock in Sun Life for federal income tax purposes. The distribution of the Financial Services stock then would fall under section 301, with the result that the basis of the Financial Services stock under section 301(d) would be its fair market value when distributed.

Approach three recognizes the economic reality of the transaction and ignores the subterfuge that Sun Life adopted for U.S. tax purposes that it was acting only as an agent of the electing U.S. policyholders in selling their Financial Services stock. The evidence establishes that Sun Life offered the Trust, as a participating policyholder, an election to take cash rather than stock, that the Trust elected to take cash, and that the Trust then received the fair market value of the stock as the result of its election as a policyholder and of Sun Life's resulting disposition of that stock in the

initial public offering. That distribution to the contract holder as the result of ownership of a life insurance contract should be treated as a basis recovery transaction in the amount of the fair market value of that which was distributed under section 72(e).

Even if the basis recovery approach is rejected, the question still remains of the tax basis of the Financial Services stock. If the tax basis of the policy contract cannot be allocated between the ownership rights and policy rights at any earlier point, then the allocation should take place at the point at which the previously indivisible contract is divided. The logical alternative to a basis recovery approach is to allocate the tax basis of the life insurance contract as of the date of demutualization between the life insurance contract stripped of the ownership rights represented by the Financial Services stock and the Financial Services stock itself based on the relative fair market values of the contract and the Financial Services stock at the demutualization date. This would be the approach of Treas. Reg. sec. 1.358-2(a)(iv) for a divisive reorganization, which is what the Sun Life reorganization represented to the Sun Life policyholders. It is the approach of sections 305(a) and 307(a).

The zero basis approach should be rejected, and the recovery of basis approach adopted. The result would be a decision ordering a refund to the Trust of $5,725.00 of income tax for 2000. If the recovery of basis approach is rejected and the allocation of basis is made based upon relative fair market values as of the date of demutualization, then the amount of the refund would be $4,888.00.

Sept. 28, 2007

s/Burgess J. W. Raby
Burgess J. W. Raby
2164 E. Broadway, Suite 280
Tempe, Arizona 85282
Tel: 480-967-1501 Fax: 480-967-0975