**Internal Revenue Service**

Department of the Treasury

Washington, DC 20224

Index Number: 72.00-00, 101.00-00, 403.00-00, 368.00-00, 1502.00-00

Number: **200020048**
Release Date: 5/19/2000

Person to Contact:

Telephone Number:

Refer Reply To:
CC:DOM:CORP:2-PLR-103737-00
Date:
February 22, 2000

Act =

Company =

Country B =

Country C =

Country D =

Country E =

Country F =

Country G =

Country H =

Country I =

Depository =

Holding =

Policies =

Transfer Agent =

| | |
|---|---|
| b | = |
| c | = |
| d | = |
| e | = |
| f | = |
| g | = |
| h | = |
| j | = |
| Date J | = |
| Location K | = |
| Underwriters | = |

This letter is in reply to a letter dated February 11, 1999, and supplemental correspondence, regarding certain federal income tax consequences of a proposed transaction. Specifically, a ruling is requested that the conversion of a mutual insurance company to a stock insurance company will qualify under section 368(a)(1)(E) of the Internal Revenue Code (the "Code").

The information submitted indicates that Company is a mutual life insurance company incorporated in Country B. Company conducts its insurance business in Country B and internationally through branches mainly in the United States and in Country C, Country D, Country E, and Country F. Company also carries on the business of insurance, investment management, mutual fund management, banking, and the provision of trust services through various subsidiaries in Country B, the United States, and other countries. For federal tax purposes, Company's branch operations in the United States are taxable under Part I of Subchapter L of the Code, because

Company’s United States branch would qualify as a life insurance company within the meaning of § 816(a) if it were a domestic corporation. Company's United States branch is an accrual basis calendar year taxpayer in the United States.

As a mutual life insurance company, Company has no capital stock. Instead, the proprietary interests in Company are owned by policyholders of Company who hold participating Policies which entitle them to participate in the profits of Company ("Participating Policyholders"). Company also sells Policies that do not entitle the holders to participate in the profits of Company. In addition to the contractual rights to receive policy benefits common to all policyholders ("Contract Rights"), Participating Policyholders have proprietary rights (“Ownership Rights”) with respect to, and interests in, Company as a mutual company, including voting rights, the right to receive bonuses or dividends if and when declared by Company's Board of Directors, and the right to liquidation proceeds.

Persons in the United States constitute approximately e percent of the total number of Participating Policyholders ("U.S. Policies"). The U. S. Policies include tax-sheltered annuities within the meaning of § 403(b) of the Code ("TSA Contracts"), policies that qualify as individual retirement annuities within the meaning of § 408(b) ("IRAs"), and individual and group policies within the meaning of § 401(a) (collectively, "Tax-Qualified Policies"). Upon its demutualization, described below, all Company's Policies will remain in force as Policies of Company and all Policy premiums, benefits, values, guarantees or other Policy obligations will remain unchanged, except that Policies credited with Policy Credits, as described below, will be enhanced by such Credits. Thus, the Contract Rights of a Policyholder will remain unchanged except for the Policy Credits. However, all Policyholder Ownership Rights will cease upon the Company's demutualization.

For what have been represented as valid business purposes, Company plans to demutualize by converting to a stock life insurance company (the "Conversion"). As part of the proposed transaction, Company incorporated Holding in Country B under the Act to hold the stock of Company following the Conversion. Company contributed $ b to Holding in exchange for one share of common stock and $ c to Holding for d shares of nonvoting preferred stock, taking into account the legal requirements under the Act, including minimum capitalization requirements applicable to Holding. In connection with the Conversion, Company will become a subsidiary of Holding.

Also as part of the proposed transaction, Holding plans to offer shares of its common stock ("Primary Shares") for sale in an initial public offering ("IPO") (“Purchasers”) through underwriters (the "Underwriters") on a firm commitment basis. The IPO is expected to occur in connection with the Conversion. The total amount of Primary Shares to be sold in the IPO will be set by Company, Holding, and the

Underwriters before the IPO. The total amount of Holding stock that Holding will issue in connection with the Conversion and IPO is f shares. The number of Primary Shares Holding will offer for sale in the IPO will be not less than g percent of the total number of shares Holding issues in connection with the Conversion and IPO. The Conversion is to take effect as of the Effective Date as defined in Company's Plan of Conversion ("Plan").

Under Company's Plan, Participating Policyholders who had a Participating Policy in force on Date J or a Participating Policy that otherwise meets specified conditions (the "Eligible Policyholders") are eligible to receive Conversion benefits in exchange for their Ownership Rights in Company. As a result of the Conversion, all of the Eligible Policyholders' Ownership Rights in Company will end. Eligible Policyholders will receive Conversion benefits equal in value to their Ownership Rights in the form of Holding Common Stock, cash, or Policy Credits as described below.

Pursuant to Company's Plan, the following transactions will take place as part of the Conversion:

(i) all policyholders' rights with respect to, or any interest in, Company as a mutual company will cease.

(ii) Company will issue to Holding a number of common shares not greater than the number of shares of Holding Common Stock allocated to Eligible Policyholders under the Plan.

(iii) Holding will issue Holding Common Stock to Eligible Policyholders entitled to receive such stock under the Plan and the other Eligible Policyholders will become entitled to receive Policy Credits or cash in accordance with the Plan.

(iv) Company will surrender to Holding, and Holding will purchase for cancellation, all of the outstanding Holding stock held by Company for consideration equal to the sum of $ b and $ c.

As a consequence of the Conversion, Company will cease to be a mutual company and will become a life insurance company with common shares under the Act.

Holding will issue Common Stock and Company will make cash payments and post Policy Credits (under circumstances described below) to Eligible Policyholders in consideration for the surrender of their Ownership Rights. Conversion benefits will be distributed to Eligible Policyholders as follows.

(i) Policy Credits: Company will post Policy Credits to certain Eligible Policyholders ("Policy Credit Policyholders"). Policy Credits are (1) for an

individual or joint ordinary life insurance Policy, an increase in the dividend accumulation value, if that is the dividend option elected for the Policy, and an increase in the paid-up addition cash value, if any other dividend option has been elected for the Policy; (2) for a Policy which is in force as extended term life insurance pursuant to a non-forfeiture provision of a life insurance Policy, an extension of the coverage expiry date; (3) for a Policy which is a deferred annuity certificate, an increase in the deferred annuity payment (and if the annuity payment is on a life basis, the increase will be on a life annuity with cash refund basis); and (4) for a Policy which is an individual accumulation annuity, an increase in the account value, to which no sales or surrender or similar charge will be applied.

(ii) Direct Cash Payments from Company: Company will make a direct cash payment to the following Eligible Policyholders ("Direct Cash Policyholders"):

(1) Eligible Policyholders who reside in Country B, who elect to receive cash, and who own a group insurance Policy or group pension Policy or who are not shown on Company's records as individuals; and

(2) Eligible Policyholders (other than minors) who reside outside Country B, Country C, Country D, Country E and the United States and who own a title-restricted Policy.

(iii) Buy-back Shares: Holding will issue Common Stock ("Buy-back Shares") to the following Eligible Policyholders ("Buy-back Policyholders") which Holding immediately will repurchase and cancel:

(1) Eligible Policyholders who reside in Country B and who elect to receive cash; and

(2) Eligible Policyholders who reside in Country B and who are minors.

(iv) Resale Shares: Holding Company will issue Common Stock to the following Eligible Policyholders ("Resale Shareholders") who will sell that stock in a Secondary Offering ("Resale Shares"):

(1) Eligible Policyholders who reside in Country F, Country G, Country H, or Country I (other than those who own title-restricted Policies) who make no election to retain Common Stock issued to them;

(2) Eligible Policyholders that are Country C pension plans and that make no election to retain Common Stock;

(3) Eligible Policyholders who reside in Country C, Country D, or Country E or in the United States and who elect to receive cash; and

(4) Eligible Policyholders who are required to sell the Common Stock that is issued to them in the Secondary Offering, including Eligible Policyholders who reside outside Country B, Country C, Country D, Country E, Country F, Country G, Country H, Country I and the United States (other than title-restricted Policies); Eligible Policyholders who are minors and who reside outside Country B; and Lost Policyholders who reside outside Country B, Country C, Country D, Country E and the United States.

(v) Retained Shares: Holding will issue Common Stock ("Retained Shares") to the following Eligible Policyholders ("Retained Share Policyholders") who will retain that stock in connection with the Conversion and IPO:

(1) Eligible Policyholders who reside in Country B, Country C, Country D, or Country E or in the United States and who do not elect to receive cash (other than those who are minors, governments or government agencies, Country C pension plans, or Lost Policyholders, or who own title-restricted Policies);

(2) Eligible Policyholders who reside in Country F, Country G, Country H, or Country I and who elect to retain the Common Stock that is issued to them (other than those who are minors, or Lost Policyholders, or who own title-restricted Policies); and

(3) Eligible Policyholders who own a Country B group insurance Policy or group pension Policy or who are not shown on Company's records as individuals and who do not elect to receive cash.

In connection with the issuance, repurchase, and sale of Common stock in the Conversion, IPO and Secondary Offering, the Underwriters will act directly or through one or more representatives under the terms of the agreements between Holding and the Underwriters.

Holding will issue a direction to the Transfer Agent to create, effective as of the effective date of the Conversion, a share register for Holding for all the Common Stock issued to Eligible Policyholders. The Common Stock will be registered in the names of the initial shareholders or a nominee for those shareholders in (1) book-entry or certificated form on the Holding share register maintained by the Transfer Agent in the case of Retained Shareholders, (2) book-entry form in the case of Resale Shareholders

and (3) book-entry form in the case of Buy-back Shareholders.

Shortly before the closing of the IPO, Holding will repurchase all of the shares of Common Stock issued to the Buy-back Shareholders, and Holding will issue a direction to the Transfer Agent to cancel the shares of Common Stock registered in book-entry form in the names of the Buy-back Shareholders. The Transfer Agent will debit the share register for the canceled shares of Common Stock.

The following will take place at the IPO Closing:

(1) Company will issue directions to the Transfer Agent to increase the Holding Common Stock by issuing to the Underwriters one new global certificate with respect to the Primary Shares of Common Stock that Holding will sell through the Underwriters to investors (" Primary Purchasers"). Holding will contribute some of the proceeds from the sale of Primary Shares to Company.

(2) The ownership of the Resale Shares will transfer from the Resale Shareholders to the Underwriters. (Holding will arrange for payment to the Resale Shareholders after the IPO Closing.)

It is represented that the Underwriters will enter into a written agreement with Holding pursuant to which they will commit not to transfer to a Primary Purchaser more than h Resale Shares for each Primary Share transferred to that Primary Purchaser. There may be Resale Shares in excess of the Resale Shares sold to Primary Purchasers who purchased Primary Shares in the above-stated ratio ("Excess Resale Shares"). The Underwriters will not sell any Excess Resale Shares to any Primary Purchaser. To the extent that the total number of Resale Shares is more than h times the total number of Primary Shares, the Underwriters will transfer those Excess Resale Shares to investors who did not acquire any Primary Shares ("Excess Purchasers").

Pursuant to § 3.01(22) of Rev. Proc. 99-3, 1999-1 I.R.B. 103, 105, the Service will not rule on the application of § 351 of the Code to an exchange of stock in the formation of a holding company. However, the Service has the discretion to rule on significant subissues that must be resolved to determine whether the transaction qualifies under § 351 of the Code. The Service will only rule on such subissues if they are significant and not clearly addressed by a statute, regulation, decision of the Supreme Court, tax treaty, revenue ruling, revenue procedure, notice, or other authority published in the Internal Revenue Bulletin.

Company has made the following representations:

(a) Company represents that, to the best of its knowledge and belief, the deemed transfer by Eligible Policyholders of Company common shares to

Holding in exchange for Retained Shares and the transfer of cash to Holding by Primary Purchasers in the IPO in exchange for Primary Shares (collectively "Tranferors") will qualify as a transfer pursuant to § 351 (hereinafter "§ 351 Exchange"), provided that the § 351 subissue rulings Company has requested are issued.

(b) The Primary Offering and Secondary Offering will end when the Underwriters complete the sale of all of the Primary Shares they bought from Holding and complete the sale of all the Resale Shares they bought from former policyholders of Company, respectively. Through completion of the IPO and Secondary Offering, the Underwriters will sell to a Primary Purchaser no more than h Resale Shares for each Primary Share the Primary Purchaser acquires in the IPO.

(c) There may be Resale Shares in excess of shares sold to Primary Purchasers in the above-stated h to one ratio ("Excess Resale Shares"). The Underwriters will not sell any Excess Resale Shares to any Primary Purchaser.

(d) Excess Resale Shares will not exceed 20 percent of Holding's total number of shares issued in connection with the Conversion and IPO.

(e) Holding issued shares to Company in exchange for cash in advance of the Conversion (as described above). Holding will redeem such same shares for the same amount of cash as was paid to Holding by Company. Company will not receive any interest payment from Holding on any of the cash Company paid to Holding for the Holding shares.

(f) Prior to the demutualization, Company will not have any outstanding stock.

(g) The fair market value of Company common shares deemed to be received by Eligible Policyholders will approximately equal the fair market value of the Ownership Rights treated as transferred in the exchange.

(h) Holding has no plan or intention to dispose of any Company common shares.

(i) Other than as indicated above, Holding has no plan to redeem or otherwise reacquire any of the stock to be issued in the Conversion and IPO.

(j) At the time of the Conversion, Company will not have outstanding any

stock, options, warrants, convertible securities, or any other rights that are convertible into any class of stock or securities of Company.

(k) The Conversion is not part of a plan to increase periodically the proportionate interest of any policyholder or Holding in the assets or earnings and profits of Company.

(l) Following the Conversion, Company will continue as a stock company the same business that it had conducted prior to the Conversion, except that Company plans to transfer to subsidiaries some of the business that it currently conducts through branches.

(m) All of the parties to the Conversion (i.e., Company and Eligible Policyholders) will pay their own expenses, if any, incurred in connection with the Conversion.

(n) Company is not under the jurisdiction of a court in a Title 11 or similar case within the meaning of § 368(a)(3)(A).

(o) No fractional shares in Company or Holding will be issued in the transaction.

(p) In the Conversion, other than Policy Credits, no Eligible Policyholder will receive (or be deemed to receive) any property other than cash or Company common stock.

(q) As part of this transaction, all distributions (or deemed distributions), whether of Company Common Stock, cash, or Policy Credits will be received by the Eligible Policyholders in relinquishment of their Ownership Rights in Company as part of a value for value exchange.

(r) The Plan will be agreed upon before the effective date of the Conversion.

(s) Following the Conversion, Company will be treated under Country B law as the same corporation that existed as a mutual company prior to the Conversion.

(t) Company will not transfer "§ 306 stock" within the meaning of § 306(c) to any person in connection with the Conversion.

(u) Upon completion of the deemed exchange of Ownership Rights for Company common shares and immediately before the purported § 351 exchange, each United States Eligible Policyholder will own less than five

percent of the total voting power and total value of Company's common shares, taking into account the attribution rules of § 318 as modified by § 958(b).

(v) Upon completion of the Conversion and IPO, each United States Eligible Policyholder will own less than five percent of the total voting power and the total value of Holding's Common Stock, taking into account the attribution rules of § 318 as modified by § 958(b) of the Code.

(w) Neither Company nor Holding will have been a controlled foreign corporation ("CFC") under § 957 of the Code during the 5-year period ending at the time of the Conversion.

(x) Approximately e percent of the Eligible Policyholders will be United States residents, and such United States Eligible Policyholders will receive approximately j percent of the total Holding Common Stock issued in connection with the Conversion.

(y) Company currently conducts business directly in the United States through a branch headquartered in Location K, and, after the Conversion and IPO, Company will continue to conduct business in the United States through that United States branch.

(z) Company's U.S. branch operations would qualify as a life insurance company under § 816(a) if it were a domestic corporation.

(aa) No § 882 or § 884 tax implications will result from the Conversion.

Section 403(b)(1) of the Code provides, generally, that amounts contributed by certain tax-exempt employers to an annuity contract purchased from an insurance company by such an employer for an employee shall be excluded from the gross income of the employee for the taxable year of contribution and that the amount actually distributed to any distributee under such a contract shall be taxable to such distributee in the year distributed under § 72. Section 403(b)(2) imposes a limit on the maximum amount which may be contributed to a tax-sheltered annuity described in § 403(b) on behalf of an employee in any taxable year. Section 403(b)(11) provides that the provisions of § 403(b)(1) will not apply to an annuity unless, under the annuity, distributions attributable to contributions made pursuant to a salary reduction agreement may be paid only when the employee attains age 59 ½ , separates from service, dies, or becomes disabled, or in the event of hardship. Distributions in the event of hardship may not include income attributable to salary reduction contributions. The distribution limitations of § 403(b)(11) do not apply to distributions attributable to assets held in the tax-sheltered annuity arrangement described in § 403(b) as of the

close of the last year beginning before January 1, 1989. P.L. 99-514 (the "Tax Reform Act of 1986") § 1123(e)(2), as amended by P.L. 100-647 ("TAMRA") § 1011A(c)(11).

Section 408(a) of the Code defines an IRA account as a trust created or organized in the United States for the exclusive benefit of an individual or his beneficiaries, but only if the governing instrument creating the trust meets the requirements of § 408(a). Section 408(b) defines an IRA annuity as an annuity or endowment contract which is issued by an insurance company and which meets the requirements of § 408(b). Sections 408(a)(6) and 408(b)(3) impose requirements similar to the distribution requirements of § 401(a)(9) on distributions of the entire interest of the contract owner. Section 219 permits an individual taxpayer to deduct from gross income amounts contributed to an IRA, subject to the maximum annual deduction limitations specified in § 219(b). Sections 408(a)(1) and 408(b)(2) establish the annual limit on contributions and premiums to an IRA. Sections 402(c) and 408(d)(3), relating to rollover contributions, permit an individual taxpayer to purchase an IRA using funds distributed from certain other plans, subject to certain requirements relating to the nature and amount of the distribution. Section 408(d)(1) provides that amounts paid or distributed from an IRA shall be included in gross income by the payee or distributee in the manner provided in § 72.

Section 72(a) of the Code generally provides that gross income includes any amount received as an annuity under an annuity, endowment, or life insurance contract. Section 72(e)(2) provides that any amount which is received under an annuity, endowment or life insurance contract and is not received as an annuity, (i) if received on or after the annuity starting date, shall be included in gross income, and (ii) if received before the annuity starting date, shall be included in gross income to the extent allocable to income on the contract and shall not be included in gross income to the extent allocable to the investment in the contract. Section 72(c)(4) defines the annuity starting date, in part, as the first day of the first period for which an amount is received as an annuity under the annuity contract. Section 72(e)(3) provides that an amount shall be treated as allocable to income on the contract to the extent that such amount does not exceed the excess of the cash value of the contract immediately before the amount is received, over the investment in the contract at the time. Section 72(e)(5) provides, in part, that, with certain exceptions, an amount distributed from a trust described in § 401(a), which is exempt from tax under § 501(a), or is received from a contract purchased by a trust described in § 401(a), purchased as part of a plan described in § 403(a) or described in § 403(b), that the proceeds shall be included in gross income, but only to the extent it exceeds the investment in the contract. Section 72(e)(6) provides that the investment in the contract, as of any date, is the aggregate amount of premiums or other consideration paid for the contract as of such date, minus the aggregate amount received under the contract before such date to the extent such amount was excludable from income.

Section 72(t) of the Code provides, in part, that, if any taxpayer receives any amount from a qualified retirement plan (as defined in § 4974(c)) prior to certain dates or the occurrence of certain events specified in § 72(t)(2), the taxpayer's tax for the taxable year shall be increased by an amount equal to 10 percent of the portion of such amount which is includible in gross income.

Section 4973 of the Code imposes an excise tax equal to 6 percent of the amount of any excess contribution to an IRA. This 6 percent tax applies for each taxable year of the IRA owner, during which such excess contributions remain in such IRA, determined as of the end of the taxable year. An excess contribution under § 4973 is defined as a contribution in excess of the maximum amount that may be contributed to an IRA.

Section 4979 of the Code imposes an excise tax equal to 10 percent of the excess aggregate contributions under a tax-sheltered annuity plan described in § 403(b) for a taxable year. Excess aggregate contributions under § 4979 are defined, in part, as the sum of the employer matching contributions and employee contributions, actually made, on behalf of highly compensated employees, within the meaning of § 414(q), for a plan year in excess of the maximum amount of such contributions permitted under the actual contribution percentage test of § 401(m)(2) for such plan year.

Section 401(a)(9) of the Code requires, in part, that the entire interest of an employee under a qualified retirement plan be distributed, beginning no later than April 1 of the calendar year following the later of the calendar year in which the employee attains age 70 ½ or the calendar year in which the employee retires, over the life or life expectancy of the employee (or over the joint lives or joint life expectancy of the employee and a designated beneficiary). Proposed Income Tax Regulations § 1.401(a)(9)-1, provides, in general, that the amount required to be distributed under § 401(a)(9) for each calendar year must be determined each year on the basis of the employee's, and any designated beneficiary's, life expectancy and the value of the employee's benefit. The proposed regulations also provide that in the case of a benefit in the form of an individual account, the benefit used in determining the minimum distribution for a distribution calendar year is the account balance as of the last valuation date in the calendar year immediately preceding the distribution calendar year.

Section 3405 of the Code requires the payor of a "designated distribution," within the meaning of § 3405(e)(1), to withhold certain amounts from such distributions. In general, absent an election under § 3405(b)(2) made by a recipient, § 3405 requires the payor to withhold on distributions from employer deferred compensation plans, IRAs, and commercial annuities. Section 3405(c) provides that in the case of an "eligible rollover distribution", as defined in § 3405(c)(3), the payor of such distribution shall

withhold from such distribution an amount equal to 20 percent of such distribution. Section 3405(e)(1)(B)(ii) provides that the term “designated distribution” does not include any portion of any distribution which it is reasonable to believe is not includible in gross income.

As a general rule, all interest, dividends, capital growth, stock distributions or any other change in the nature of assets, through reorganization, recapitalization or otherwise, are held as part of the tax-deferred solution, i.e., the TSA, the IRA and the qualified plans, until the assets are distributed. Only upon distribution are such increases in account value taxable to the recipient.

Central to our analysis of your submitted ruling requests is the question of whether or not Ownership Rights in a mutual insurance company are within the stated plans.

In this regard, any Ownership Rights in a mutual insurance company which arise from the purchase of an insurance contract are inextricably tied to the contract from the time of the purchase. These Ownership Rights are created by operation of law solely as a result of the policyholder’s acquisition of the underlying contract from a mutual insurance company and cannot be transferred separately from that contract. Prior to conversion, the Ownership Rights have no determinable value apart from the insurance contract itself. Further, if the insurance contract is surrendered by the policyholder or, in the event an insurance contract is terminated by payment of benefits to the contract beneficiary, these Ownership Rights cease to exist, having no continuing value. The Ownership Rights associated with the tax qualified retirement contracts are acquired as a direct result of tax-favored payments to a mutual insurance company. Indeed, these Ownership Rights cannot be obtained by any purchase separate from an insurance contract issued by Company. In view of the foregoing, such interests are part of the tax qualified retirement contracts, created pursuant to §§ 401(a), 403(b), and 408(b) of the Code respectively.

While it has been recognized that consideration received in a demutualization transaction is in exchange for an Ownership Right in a mutual insurance company, and not from or under an insurance contract, such a distinction does not require the detachment of such consideration from the tax qualified retirement contracts, which consists of both the contracts and all other interests which arise with the purchase of such a contract. See, Revenue Ruling 71-233, 1971-1 C.B. 113. Rather, contracts and the related Ownership Rights must be viewed as part of a program of “interrelated contributions and benefits” which are retained within the plans. Cf., Treas. Regs. § 1.72-2(a)(3)(i).

The planned issuance of Policy Credits does not constitute a distribution of such

Credits to the annuitants. The conversion of Ownership Rights in Company to Policy Credits is a mere change in form of one element within the arrangement to another. Since the conversion increases the accumulation value of the annuity contracts, the Policy Credits are treated for purposes of §§ 401(a)(9), 403(b)(10), 403(b)(11), 408(b)(3), and 408(a)(6) of the Code in the same manner as any other return of, or return on, an investment within the arrangements described above, and are not regarded as having been received by the policyholder.

Similarly, under §§ 402(a), 403(b)(1) and 408(d) of the Code, only amounts paid or distributed under the applicable plans will be included in the gross income of the distributee under the rules of § 72. Section 72(e), dealing with the tax treatment of amounts not received as an annuity, provides for the inclusion of such amounts when received by the distributee. As Policy Credits will be issued in exchange for Ownership Rights, such Ownership Rights being held within the applicable plans, no amount is treated as received by, or includible in, the gross income of any policyholder, under such plans, of Company. For purposes of § 72(e)(3), the value of Policy Credits which will be added to the tax-qualified retirement contracts will not be regarded as part of the investment in the contracts, an amount which under § 72(e)(6) consists of the aggregate amount of premiums or other consideration paid for the contract. In addition, as no amount is to be treated as having been distributed as a result of the issuance of Policy Credits, nor received by the tax-qualified retirement policyholders outside the plans, the additional 10 percent tax imposed by § 72(t) does not apply.

Section 4979 of the Code imposes excise taxes on certain excess contributions made to plans described in §§ 401(a) and 403(b). Section 4973 imposes excise taxes on certain excess contributions made to IRAs and to certain tax-sheltered annuity plans described in § 403(b). Because the addition of Policy Credits pursuant to the Conversion occurs within the above arrangements, causing neither a distribution from, nor a contribution to, such annuities, no excess contributions can be attributed to the addition of Policy Credits to the pension annuities. Distributions from plans qualified under § 401(a) must be made pursuant to § 401(a)(9). Sections 403(b)(10), 408(a)(6) and 408(b)(3) require distributions, under the respective plans, in compliance with rules similar to the minimum distribution requirements included in § 401(a)(9) and applicable to qualified plans under § 401(a) of the Code. Section 401(a)(9) and applicable regulations issued thereunder contain the criteria for determining the minimum distribution amount for any year for which such minimum distribution is required. The minimum distribution amount is based in part on the total value of the retirement benefit. As the Policy Credits to be issued by Company will be treated as increasing the value of the tax-qualified retirement funding contracts in the year such Policy Credits are added to the tax-qualified retirement contracts, for purposes of determining the minimum required distributions for any calendar year, the value of the benefits attributable to such Policy Credits will first be required to be taken into account in the year such Policy Credits are added to the tax-qualified contracts.

Similarly, for purposes of determining the applicability of § 403(b)(11) of the Code, the limitation on distributions of amounts attributable to salary reduction contributions, the Policy Credits added to the tax-sheltered annuity arrangements described in § 403(b) issued by Company are treated as income received within the tax-sheltered annuity arrangement.

Section 3405(b) of the Code requires a payor to withhold income taxes on certain "designated distributions," including distributions from or under an employer deferred compensation plan, an individual retirement plan or a commercial annuity. The addition of Policy Credits within the tax-sheltered annuity arrangement described in § 403(b) or IRA arrangement pursuant to the Conversion, does not result in the distribution of any amounts to individual policyholders, within the meaning of § 3405(e)(1)(A), and will not be subject to any requirement to withhold.

Section 3406(f) of the Code provides as follows:

> Confidentiality of Information–
>
> (1) In General. – No person may use any information obtained under this section... except for purposes of meeting any requirements under this section or (subject to the safeguards set forth in section 6103) for purposes permitted under section 6103.

Section 31.3406(f)-1(b) of the regulations sets forth permissible uses of information obtained pursuant to § 3406 of the Code. The regulation states that a payor or broker may transmit such information on a Form W-9, W-8, or other acceptable form relating to withholding to the department, institution or firm (or to any employee therein) responsible for withholding or processing of taxpayer identification numbers, certifications described in § 31.3406(h)-3, or other substitute forms.

The proposed sharing of information between Company and Holding involves the TINs and TIN certifications of the current policyholders, who will become stockholders of Holding. The disclosure is for purposes of meeting the requirements of § 3406 of the Code, and therefore does not violate the confidentiality rules of § 3406(f). Obtaining TINs and certifications are necessary in order to determine whether backup withholding is required with respect to specific payees, in order to comply with the statute and the regulations.

The Underwriters and Transfer Agent involved in the Conversion are agents of Holding. Holding will sell its newly-issued shares to the Underwriters, which the Underwriters will sell to Primary Purchasers as part of the Conversion. The Transfer Agent will be recording the shares and will also transmit dividend payments from Holding to Holding's stockholders. Holding may disclose information regarding TINs

and TIN certifications to the Underwriters and Transfer Agent to the extent necessary for complying with the requirements under § 3406.

Pursuant to § 3406(a)(1)(D) of the Code, payees of reportable interest or dividends are subject to backup withholding if they fail to certify their TINs on Form W-9. No such certification is required in the case of payees of other reportable payments. Therefore, the Policyholders may not have provided TIN certifications, which will now be required because they are stockholders receiving dividends. Nothing in the above ruling, allowing the sharing of information for § 3406 purposes, should be construed to waive the requirement that a valid TIN certification must be provided in order to avoid backup withholding on reportable dividends.

Section 6724 provides for a waiver of penalties under §§ 6721-6723 of the Code, relating to failure to file correct information returns or payee statements, or comply with other information reporting requirements, if the taxpayer establishes such failure is due to reasonable cause and not willful neglect. Under § 301.6724-1 of the regulations, the penalty may be waived if the failure was due to events beyond the filer's control. In addition, the taxpayer must have acted in a reasonable manner. With respect to failures resulting from missing or incorrect TINs, the taxpayer must have made initial and annual solicitations, as set forth in the regulations.

Holding will become the new payor pursuant to the proposed Conversion, and will be responsible for filing information returns with respect to its stockholders, who are currently the Policyholders of Company. Section 35a.9999-3 of the temporary regulations, Q&A 101, indicates that an acquiring payor may rely upon its predecessor's business records and past procedures in order to establish due diligence, for purposes of the penalty for failure to include a correct TIN on an information return. Likewise, Holding may rely on Company's solicitations for purposes of determining whether it has satisfied its obligations under § 6724 of the Code and § 301.6724-1 of the income tax regulations.

Rulings

Based solely on the information submitted and the representations made, we rule as follows:

(1) For U.S. federal income tax purposes, the conversion of Company from a mutual corporation to a stock corporation as described above will be treated as if (a) the Policy Credit Policyholders transferred their Ownership Rights in Company to Company in exchange for Policy Credits, (b) the Direct Cash Policyholders transferred their Ownership Rights in Company to Company in exchange for cash, and (c) the Buy-back Policyholders, the Resale Policyholders and the Retained Share Policyholders transferred

their Ownership Rights in Company to Company in exchange for Company common stock.

(2) For U.S. federal income tax purposes, the formation of Holding will be treated as if, as part of the same plan, (a) the Buy-back Policyholders transferred their deemed shares of Company common stock to Holding in exchange for cash, (b) the Resale Policyholders and the Retained Share Policyholders transferred their Company common stock to Holding in exchange for Holding common stock and the Primary Purchasers transferred cash to Holding in exchange for Holding common stock, and (c) the Resale Policyholders sold all of their shares of Holding common stock in the Secondary Offering in exchange for cash.

(3) Provided that the number of Primary Shares Holding will offer for sale in the IPO will be not less than g percent of the total number of shares Holding issues in connection with the Conversion and IPO, and provided that the number of Resale Shares that any Primary Purchaser acquires in the Secondary Offering does not exceed h times the number of Primary Shares that such Primary Purchaser acquires in the IPO, the Resale Shares that a Primary Purchaser acquires in the Secondary Offering will be included in the number of shares of Common Stock taken into account for purposes of determining whether the Tranferors are in control (as defined in § 368(c)).

(4) For U.S. federal income tax purposes, Holding's issuance of one share of common stock and d shares of nonvoting preferred stock to Company prior to the Conversion in exchange for $b and $c respectively, followed by Company's surrender of such same shares to Holding in exchange for $b and $c, and Holding's cancellation of such same shares will be disregarded for purposes of § 351. Rev. Rul. 78-397, 1978-2 C.B. 150.

(5) The conversion of Company from a mutual to a stock corporation, as described above, will constitute a recapitalization within the meaning of § 368(a)(1)(E). Company will be “a party to a reorganization" within the meaning of § 368(b).

(6) No gain or loss will be recognized by the Eligible Policyholders on the deemed exchange of their Ownership Rights solely for Company stock, as described above. I.R.C.§ 354(a)(1).

(7) The basis of the Company stock deemed received by Eligible Policyholders in the exchange will be the same as the basis of the Ownership Rights surrendered in exchange for such Company stock.

I.R.C. § 358(a)(1). For the purpose of determining the Eligible Policyholders' basis in the Company stock, the basis in the Ownership Rights will be deemed to have been zero.

(8) The holding period of the Company stock deemed to be received by the Eligible Policyholders will include the period during which the Eligible Policyholders held the Ownership Rights surrendered in exchange therefor. I.R.C. § 1223(1).

(9) No gain or loss will be recognized by Company on the deemed exchange of its stock for the Ownership Rights surrendered by the Eligible Policyholders. I.R.C. § 1032(a).

(10) The redemption of the Eligible Policyholders' Ownership Rights in Company will be treated as a distribution in partial or full payment in exchange for stock under I.R.C. § 302(a). For the purposes of determining gain in such redemption, the basis of the Ownership Rights deemed to have been redeemed will be zero.

(11) The tax attributes of Company will remain unchanged as tax attributes of Company upon Conversion to a stock insurance company. Rev. Rul. 54-482, 1954-2 C.B. 148. Accordingly, such attributes as asset basis, holding periods, net operating loss carryovers, capital loss carryovers, earnings and profits, and accounting methods will not be changed by reason of the Conversion.

(12) Pursuant to Treas. Reg. § 1.367(a)-3(a), § 367(a)(1) will not apply to the § 368(a)(1)(E) recapitalization.

(13) Provided there are no United States persons who own 5 percent or more (applying the attribution rules of § 318, as modified by § 958(b)) of either the total voting power or the total value of all stock in Holding upon completion of the above-described Conversion, § 367(a)(1) will not apply to any transfer or deemed transfer of Company common stock from Policyholders to Holding in exchange for Holding stock. (Treas. Reg. § 1.367(a)-3(b)(1)).

(14) The U.S. Eligible Policyholders do not have any reporting obligations under § 6038B with respect to the § 351 exchange.

(15) The Conversion will not cause an actual or deemed distribution under § 403(b)(11) or otherwise disqualify a TSA Contract under § 403(b), and will not constitute a distribution from or a contribution to any § 401(a) plan

contract, TSA or IRA contract.

(16) The Conversion will not result in any transaction that constitutes a distribution and thus will not result in (a) any gross income to the employee or other beneficiary of such a contract as a distribution from a qualified retirement plan under § 72 of the Code, prior to an actual receipt of some amount therefrom by such employee or beneficiary; (b) any 10 percent additional tax under § 72(t) for premature distributions from a qualified retirement plan; (c) any 6 percent or 10 percent excise tax under § 4973 or § 4979 for excess contributions to certain qualified retirement plans; or (d) any designated distribution under § 3405(e)(1)(A) that is subject to withholding under § 3405(b) or (c).

(17) Policy Credits will not be treated for purposes of § 72(c)(1) or § 72(e)(6) as part of the investment in the TSA, but will be treated for purposes of §§ 401(a)(9), 403(b)(10), and 408(b)(3) as investment earnings under the contracts attributable to the year such Policy Credits are made to the contracts.

(18) For purposes of § 403(b)(11) and the effective date provisions applicable thereto, a pro rata portion of the Policy Credits added to a TSA Contract to which such contributions have been made pursuant to a salary reduction agreement will be treated as earnings attributable to such contributions and will be treated as credited under the contracts in the year such Policy Credits are made to the contracts pursuant to the Plan.

(19) Company may share with Holding, solely for taxpayer information reporting purposes, TINs and taxpayer certifications that Company possesses with respect of its policyholders without violating any duty under § 3406(f) of the Code, or the regulations thereunder, to keep such taxpayer information confidential.

(20) Holding may share with the Underwriters and Transfer Agent, solely for taxpayer information reporting purposes, TINs and certifications that Company possesses with respect of its policyholders without violating any duty under § 3406(f) of the Code, or the regulations thereunder, to keep such taxpayer information confidential.

(21) TIN and certification solicitation efforts that Company conducts prior to, and in connection with, the Conversion will be attributed to Holding for purposes of determining whether Holding has made sufficient solicitation efforts to satisfy the “reasonable cause” standard set forth in § 301.6724-1 of the regulations.

(22) Provided that the terms and conditions of the Company Policies remain the same, the Conversion:

(1) will have no effect on the date that each Company Policy was issued, purchased or entered into for purposes of §§ 72(e)(4), 72(e)(5), 72(e)(10), 72(e)(11), 72(q), 72(s), 72(u), 72(v), 101(f), 264(a)(3), 264(a)(4), 7702, and 7702A; and

(2) will not require retesting or the start of a new test period for any Company Policy under §§ 264(c)(1), 7702(f)(7)(B-E), or 7702A(c).

The rulings contained in this letter are based upon information and representations submitted by the taxpayer and accompanied by a penalty of perjury statement executed by an appropriate party. The representations and information furnished to this office form a material basis for the issuance of these rulings. This office has not verified any of the material submitted in support of the request for rulings. Verification of the factual information, representations and other data may be required as part of the audit process.

We express no opinion, other than those above, about whether the deemed contribution of Company stock to Holding will qualify under § 351(a) of the Code.

Our ruling that the Conversion constitutes a reorganization within the meaning of § 368(a)(1)(E) of the Code is conditioned on Company being considered the same entity before and after the Conversion under Country B law.

Except as specifically provided herein, no opinion is expressed or implied concerning the tax consequences of any aspect of any transaction or item discussed or referenced in this letter. No opinion is expressed with respect to whether any or all of the above-described foreign corporations are passive foreign investment companies within the meaning of § 1297(a) and the related regulations to be promulgated. If it is determined that any of the above-described foreign corporations are passive foreign investment companies, no opinion is expressed regarding the application of §§ 1291 through 1298 on the proposed transaction. In particular, in a transaction in which gain is not otherwise recognized, regulations under § 1291(f) may impose gain recognition notwithstanding any other provision of the Code.

The rulings provided herein are based upon the assumption that the plans described are tax-sheltered annuity plans that meet the requirements of § 403(b) of the Code, IRAs that meet the requirements of § 408(b), or plans that meet the requirements of § 401(a).

This ruling is directed only to the taxpayers who requested it. Section 6110(k)(3)

of the Code provides that it may not be used or cited as precedent.

A copy of this letter should be attached to the federal income tax return of the taxpayers for the taxable year in which the transaction covered by this ruling letter is consummated.

Sincerely,

Philip J. Levine
Assistant Chief Counsel

By:____________________
Lewis K Brickates
Assistant to the Branch Chief, Branch 2