***No.04-1726 T***
***(Judge Francis M. Allegra)***

***IN THE UNITED STATES COURT OF FEDERAL CLAIMS***

**EUGENE A. FISHER, Trustee,**
**SEYMOR P. NAGAN IRREVOCABLE TRUST,**
**for itself and as Representative of**
**all similarly situated taxpayers,**

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S POST-TRIAL REPLY BRIEF

RICHARD T. MORRISON
Acting Assistant Attorney General

DAVID GUSTAFSON
STEVEN I. FRAHM
BENJAMIN C. KING, JR.
Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6506

**Page**

## TABLE OF CONTENT

Defendant's Post-Trial Reply Brief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. The Trust has not satisfied its burden of proving the cost basis of the voting and liquidation rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. The Trust failed to prove the voting and liquidation rights were inseparable from the rest of the policy for valuation purposes . . . . . . . . . . . . . . . . . . . . . . . . . 4

III. The voting and liquidation rights had no market value on June 28, 1990 . . . . . . . 7

IV. The Trust's legal arguments have no merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## TABLE OF AUTHORITIES

**Cases:**

*Biltmore Homes, Inc. v. Commissioner*, 288 F.2d 336 (4th Cir. 1961), *cert. denied*, 368 U.S. 825 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Fasken v. Commissioner*, 71 T.C. 650 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Gladden v. Commissioner*, 262 F.3d 851 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 11

*Inaja Land Co., Ltd. v. Commissioner*, 9 T.C. 727 (1947) . . . . . . . . . . . . . . . . . . . . . . . 11

*Iske v. Commissioner*, T.C. Memo 1980-61, 1980 WL. 3916 at 9 (1980) . . . . . . . . . . . . 4

*Karara v. Commissioner*, T.C. Memo 1999-253, 1999 WL. 549462 (1999), *aff'd*, 214 F.3d 1358 (11th Cir. 2000), *cert. denied*, 531 U.S. 980 (2000) . . . . . . . . 4, 7

*Medlin v. Commissioner*, T.C. Memo 2003-224, 2003 WL 21743513, *aff'd*, 138 Fed. Appx. 298 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Moore v. Commissioner*, 425 F.2d 713 (9th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 4

*Naymist v. Commissioner*, 435 F.3d 910 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 3

**Page**

**Cases(Continuation):**

*Estate of Henry Hill Pierce v. United States*, 99 Ct.Cl. 355 (1943) . . . . . . . . . . . . . . . . 11

*Reading Radio, Inc. v. United States*, 299 F. Supp. 616 (D. N.H. 1969) . . . . . . . . . . . 2, 3

*Soelling v. Commissioner*, 70 T.C. 1052 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Vittaly*, 2006 WL. 1883330 (N.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . 2, 3

**STATUTES**

Revenue Code of 1986 (26 U.S.C.):

§ 72 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

§ 301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

§ 358 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**MISCELLANEOUS**

Treasury Regulations (26 C.F.R.):

§ 1.61-6(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 10, 11

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 04-1726 T

(Judge Francis M. Allegra)

EUGENE A. FISHER, Trustee,
SEYMOR P. NAGAN IRREVOCABLE TRUST,
for itself and as Representative of
all similarly situated taxpayers,

Plaintiffs

v.

UNITED STATES,

Defendant

DEFENDANT'S POST-TRIAL REPLY BRIEF

Pursuant to the Court's August 8, 2007, Order, defendant, the United States, hereby submits its post-trial reply brief.

I. The Trust has not satisfied its burden of proving the cost basis of the voting and liquidation rights.

The Trust admits in its post trial brief that the voting and liquidation rights associated with the Sun Life policy had no "determinable value" when it was acquired on June 28, 1990. (P. Brief at 5.) Instead, the Trust asserts that those rights had value but that its amount could not be determined until Sun Life's demutualization ten years later, in March, 2000. (P. Brief 4-5.) Mr. Cole, the Trust's sole witness, testified that the demutualization gave rise to the value of the

voting and liquidation rights. (Cole Tr. 54, l. 12-18; 78, l. 5-10.) The Trust argues that it was impossible to determine the value of those rights on June 28, 1990. (P. Brief 4-5.) Mr. Cole, however, testified at trial in response to the Court's inquiry that it was possible to determine a value as of 1990, but he chose not to do so. (Cole Tr. 72, l. 8 - 73, l. 19.) At most, the evidence presented at trial indicates it was difficult, but not impossible, to determine the value of the voting and liquidation rights on June 28, 1990. "The taxpayer bears the burden of proving cost basis, regardless of the fact that it may be difficult to determine." *United States v. Vittaly*, 2006 WL 1883330 at 3 (N.D. Cal. 2006).

The IRS determined that no basis could be allocated to the voting and liquidation rights, because those rights had no determinable value on June 28, 1990, the date the Sun Life policy was issued to the Trust. The IRS determination is presumed to be correct. *Biltmore Homes, Inc. v. Commissioner*, 288 F.2d 336, 342 (4th Cir. 1961), *cert. denied*, 368 U.S. 825 (1961)*; United States v. Vittaly*, 2006 WL 1883330 at 3 (N.D. Cal. 2006); *Medlin v. Commissioner*, T.C. Memo. 2003-224, 2003 WL 21743513 at 32 (2003), *aff'd*, 138 Fed. Appx. 298 (11th Cir. 2003). Therefore, in this case the Trust has the "double burden" of (a) showing the allocation by the IRS to be incorrect, and (b) "showing affirmatively a correct allocation." *Reading Radio, Inc. v. United States*, 299 F.Supp. 616, 619 (D. N.H. 1969); see also, *Moore v. Commissioner*, 425 F.2d 713, 715 (9th Cir. 1970).

Whether basis can be allocated to the voting and liquidation rights at issue here depends on whether the Trust was able to establish that those rights had a specific fair market value on June 28, 1990, the date the Trust acquired the Sun Life policy. Treas. Reg. § 1.61-6(a), Example 2. If a taxpayer is unable to establish the market value of a subject property on the date of

acquisition, that property has a zero basis. *Biltmore Homes*; *Reading Radio*; *Moore*; *Soelling*; *Vitally*. This is true even when it is established that the property had some value, a fact not present in this case. In *Reading Radio,* even though the property (a lease of a transmitter site) had value, the taxpayer's basis in that property was zero because the taxpayer failed to affirmatively show a specific value. 299 F. Supp. 619. The same result was reached in *Moore* (option to purchase real estate), *Biltmore Homes* (motor lines contract), *Vitally* (stock), and *Naymist v. Commissioner*, 435 F.3d 910, 913 (8th Cir. 2006)(tools).

Fair market value is the price at which a subject property would change hands between a willing buyer and a willing seller. (Penny Tr. 208, l. 17-24.) If one cannot determine the price a willing buyer would pay, or a willing seller would accept, for the subject property, then no basis can be established for that property. *Reading Radio*. Since the Trust concedes that it could not determine any value for the voting and liquidation rights when the policy was acquired, it has failed to meet either of its dual burdens of proving that the IRS determination of a zero basis was incorrect, and affirmatively proving the correct basis. Therefore, the basis of the voting and liquidation is properly zero, and the Trust is not entitled to any refund.

Recognizing that it is unable to prove a specific value for the rights on June 28, 1990, the Trust instead argues, paradoxically, that the cost basis of property can be determined based on events occurring ten years after the property is acquired. The Trust claims that basis should be determined in March, 2000, after Sun Life demutualized and the voting and liquidation rights were severed from the policy. (P. Brief at 4.) Not surprisingly, the Trust cites no authority for the proposition that cost basis can be determined on an asset's disposition date, rather than its acquisition date.

To the contrary, Treas. Reg. § 1.61-6(a), Example 2, specifies that basis is allocated to each piece of property on the basis of the relative fair market value of each of the pieces on the date the property is acquired. It is well established that "the critical date for determining cost basis is the date of acquisition." *Soelling v. Commissioner*, 70 T.C. 1052, 1056 (1978); *see also*, *Moore*, 425 F.2d at 714; *Iske v. Commissioner*, T.C. Memo. 1980-61, 1980 WL 3916 at 9 (1980); *Fasken v. Commissioner*, 71 T.C. 650, 655 (1979). Basis is the economic outlay made by a taxpayer to acquire a piece of property, and the value the property may acquire after acquisition is irrelevant to establish basis. *Karara v. Commissioner*, T.C. Memo. 1999-253, 1999 WL 549462 at 4 (1999), *aff'd*, 214 F.3d 1358 (11th Cir. 2000), *cert. denied*, 531 U.S. 980 (2000); see also, *Moore*.

The Trust has not established a specific market value for the voting and liquidation rights as of June 28, 1990, the acquisition date in this case. Therefore, the trust has failed to establish any cost basis in those rights. The Trust therefore has failed to meet its burden of proving a definite cost basis for the voting and liquidation rights and, as a result, those rights had a zero basis. *Moore*.

## II. The Trust failed to prove the voting and liquidation rights were inseparable from the rest of the policy for valuation purposes.

The Trust attempts to buttress its argument that the determination of the cost basis of the voting and liquidation arguments should be deferred until March, 2000 by arguing that the policy could not be subdivided when issued into bundles of rights that would permit determination of the separate value (if any) of the voting and liquidation rights. (P. Brief at 4-5, 13.) Mr. Cole offered the conclusion that the voting and liquidation rights had an undeterminable market value prior to the demutualization, because they could not be severed from the policy prior to that

event (although he did not deny that a determination of value in 1990 was possible). (Cole Tr. 43, l. 15 - 44, l. 9; 72, l. 8 - 73, l. 19.) The actuarial evidence presented at trial, however, not only shows that such an allocation is possible, but that such allocations are actually done when an insurance company calculates the amount of premium it charges for its policies.

Mr. Scanlon, of Sun Life, and Mr. Reiskytl, an expert actuary, testified that in determining the premium to be charged for a policy, the insurance company performs an actuarial analysis of the costs of providing each of the benefits provided by the policy and then calculates the amount of premium needed to cover each of those costs. Similarly, the company performs an actuarial analysis to determine the cost of anticipated policy dividends and the amount that must be retained as risk based capital and calculates the amount of premium needed with respect to those items. Finally, the company conducts a financial analysis to determine the amount of premium it needs to retain to ensure the continued vitality of the business (hereinafter, "non-risk surplus"). The gross premium paid by the Trust for the policy is the total of the amounts calculated by the company for each of the various parts of the policy. (Reiskytl Tr. 92, l. 20 - 93, l. 23; Scanlon Tr. 167, l. 5-24.) The Trust's assertion that it was impossible to allocate the gross premium between the component parts of the Trust's policy prior to the demutualization is therefore incorrect.

Mr. Reiskytl and Mr. Scanlon both testified that no portion of that premium was allocated to the voting and liquidation rights. (Reiskytl Tr. 93, l. 24 - 94, l. 24; Scanlon Tr. 167, l. 16 - 168, l. 16.) Other evidence presented at trial supports their testimony. Only about 5% of policyholders ever exercise their voting rights, indicating that policyholders did not place much value in those rights. (Reiskytl Tr. 162, l. 1-11; Scanlon Tr. 195, l. 12-22.) The chance of a

policyholder participating in a solvent liquidation is extremely remote, if not impossible. (Reiskytl, Tr. 94, l. 3-11; 105, l. 22 - 106, l. 13.) Similarly, the chance of a policyholder receiving a demutualization benefit was "very highly unlikely." (Reiskytl, Tr. 94, l. 18-24.)

The portions of the premium necessary to cover the cost of providing the benefits in the policy, to establish the risk based capital required by Sun Life's regulators, and to cover dividend obligations certainly could not be allocated to the voting and liquidation rights. Therefore, the only remaining portion of the premium that could possible be allocated to those rights would be part of the premium charged for non-risk surplus. (Reiskytl Tr. 92, l. 20 - 93, l. 23; Scanlon Tr. 167, l. 5-24.) The Trust did not attempt to establish the amount of the premium charged for non-risk surplus or to establish that any part of that portion of the premium could be allocated to the voting and liquidation rights.

When Sun Life demutualized, it distributed Financial Services stock to the participating policyholders so as not to reduce the company's surplus or have any adverse affect on its financial standing.[1] (Jx. 3 at 140.) Therefore, no portion of the premium collected from the Trust for non-risk surplus was distributed in the demutualization. This further demonstrates that no portion of the premium was allocated to voting and liquidation rights. If no portion of the premium was paid for those rights, the Trust did not make the economic outlay necessary to establish basis, regardless of the potential value those rights might later acquire. *Karara; Moore*.

The stock the Trust received in the demutualization, in exchange for voting and liquidation rights, was in fact a windfall, unrelated to any premiums paid by the Trust. (Reiskytl

[1]There were some limited situations where policyholders received cash or policy credits instead of stock, however none of those situations apply to this case. (Jx. 3 at 140.)

Tr. 105, l. 7-15; Scanlon Tr. 179, l. 9-20; 197, l. 18-24.) It was a windfall because Sun Life's current policyholders received stock worth 100% of the value of Sun Life in the demutualization, even the premiums they had paid had contributed to less than 10% of that value. (Scanlon, Tr. 179, l. 6 - 180, l. 11.) Further, about one-third of all eligible policyholders had contributed nothing to Sun Life's surplus at the time of the demutualization. (Scanlon, Tr. 180, l. 8-11; Jx. 1 at 328.) Since the demutualization benefit was not related to the premiums paid by the Trust, there is no basis for allocating any portion of the premium to the unexpected and unearned windfall the Trust received in the demutualization.

III. The voting and liquidation rights had no market value on June 28, 1990.

Defendant presented expert testimony from Mr. Penny that the market value of the voting and liquidation rights when the Trust obtained the Sun Life policy in 1990 was zero. The Trust now argues that Mr. Penny's testimony was contrary to the evidence presented at trial. (P. Brief at 6.) It speculates that policy dividends paid after the demutualization would be less than the dividends that would have been paid had the demutualization not occurred. (P. Brief at 7-11.) The Trust presented no such evidence at trial. Moreover, the Trust's unsupported conjecture regarding dividends after the demutualization is contrary to the testimony of Mr. Scanlon and Sun Life documents that policyholders' expectations regarding future dividends would remain unchanged. (Scanlon Tr. 177, l. 12-17; 184, l. 3-23; Jx. 1 at 156; Jx. 4 at 75, 91.)

The extensive discussion of future dividends in the Trust's brief appears aimed at Mr. Penny's use of the market approach in valuing the voting and liquidation rights, since it is in that part of his testimony that he refers to dividend rights being unchanged. (P. Brief at 7-11.) However, the Trust's dividend argument is irrelevant to Mr. Penny's conclusion that under the

market approach the voting and liquidation rights had a value of zero. Mr. Penny concluded that the value of the voting and liquidation rights was zero, because the premium charged for the policy remained unchanged after the demutualization. (Penny Tr. 211, l. 7 - 214, l. 2.) If, as the Trust contends, the premium is paid for a basket of rights, including the voting and liquidation rights, then when those rights were removed from the basket by the demutualization, one would expect the premium to be reduced, since it would be based on fewer rights. The fact that the premium remained unchanged after the demutualization led Mr. Penny to conclude that no portion of the premium was being paid for the voting and liquidation rights, and, as a result, those rights had no value. (Penny Tr,. 211, l. 7 - 214, l. 2.)

Mr. Penny's market approach analysis was tacitly approved by Mr. Cole, the Trust's expert witness, who admitted that if the premium for a policy with voting and liquidation rights was the same as the premium for a policy without those rights, it would indicate that those rights had a de minimis value. (Cole Tr. 74, l. 4-16.) Therefore, the Trust's hypothesis that the policy dividend would be reduced after the demutualization has nothing to do with Mr. Penny's conclusion under the market approach that the value of the voting and liquidation rights was zero.

The Trust's dividend argument also does not relate to Mr. Penny's use of the income approach to value the voting and liquidation rights. The Trust's only response to Mr. Penny's extensive testimony regarding the income approach to value the voting and liquidation rights, is its argument that the approach could not be applied because the voting and liquidation rights could not be severed from the policy. (P. Br. 4-6, 8-10.) However, those rights were in fact severed from the policy in the demutualization and were exchanged for Financial Services stock

worth about $31,000.00. The inability to separately sell the voting and liquidation rights prior to the demutualization has nothing to with whether the $31,000 benefit received in March 2000, could be discounted to present value on June 28, 1990. Mr. Cole indicated that he could have done the math but chose not to. (Cole Tr. 72, l. 22 - 23, l. 19.)

When the Trust acquired the policy, it acquired a chance to receive an unspecified demutualization benefit, at some unspecified future date, provided numerous contingencies occurred in the right order. When the policy was issued, that chance was very remote and highly unlikely. (Reiskytl, Tr. 94, l. 18-24.) Mr. Cole conceded that the demutualization gave rise to the value of the voting and liquidation rights. (Cole Tr. 63, l. 17-21; 54, l. 12-18; 64, l. 4-14.) Under the income approach, Mr. Penny took the $31,000 demutualization benefit the Trust received in March, 2000, and determined the value of that benefit on June 28, 1990, by discounting it to present value, further reducing the value for the numerous contingencies that must have occurred before the benefit could be received, and finally, by subtracting the opportunity cost. The result of this analysis is that the value of the demutualization benefit on June 28, 1990, was zero, and probably a negative number.[2] (Penny Tr. 214-217.)

The Trust does not dispute the contingencies identified by Mr. Penny and Mr. Reiskytl. Nor did the Trust dispute Mr. Penny's testimony that whatever portion of the premium that was paid for the voting and liquidation rights had to be subtracted as an opportunity cost from the discounted present value of the demutualization benefit. If fact, the Trust does not directly

[2]Given the infinitely small present value of the demutualization benefit after all the contingencies were applied, it is clear that when even a de minimis opportunity cost is taken into account, the result is that the demutualization benefit had a fair market value on June 28, 1990, of zero. (Penny Tr. 214-217.)

attack Mr. Penny's conclusion that the discounted present value on June 28, 1990, of the $31,000 demutualization benefit the Trust received in March, 2000, would be zero. (Penny Tr. 214-217.) Therefore, pursuant to Treas. Reg. § 1.61-6(a), the Trust had no basis in those rights, and is not entitled to any refund.

IV. <u>The Trust's legal arguments have no merit</u>.

In its brief, the Trust repeats the same legal arguments it made in its pre-trial brief and in its briefs in support of its earlier motion for summary judgment. Defendant discussed those arguments in detail in its prior briefs, and, therefore, does not discuss them in detail again here. On pages 20-21 of its brief, the Trust resubmits its arguments regarding the application of § 72 to this case, which were rejected by the Court in its November 15, 2006, opinion. 89 A.F.T.R. 2d 2006-7807. On pages 19-20 and 22-24 of its brief, the Trust reiterates its claims that the demutualization is governed by either § 301 or § 358. As discussed in defendant's prior briefs, those provisions relate to distributions of stock to shareholders of a corporation with respect to their stock. The Trust was not a shareholder prior to receiving the Financial Services stock, so neither § 301, nor § 358 apply.

Similarly, the Trust continues to argue that this case is governed by the decision in *Estate of Henry Hill Pierce v. United States*, 99 Ct.Cl. 355 (1943). (P. Brief at 14-15.) However, the holding in *Pierce*, that the determination of gain on the sale of part of an investment could be deferred until all the property is sold, is contrary to Treas. Reg. § 1.61-6(a), adopted in 1957, that the determination of gain cannot be deferred. The Trust has not cited any basis to conclude that *Pierce* has any continuing validity.

The Trust also continues to cite to *Inaja Land Co., Ltd. v. Commissioner*, 9 T.C. 727 (1947), another decision decided before Treas. Reg. 1.61-6. That case does not address the allocation of basis among parts of a larger property – the issue present here. *Inaja Land* involved an easement payment that could not be allocated to a particular part of a property. Since it was impossible to determine what part of the property the easement applied to, the taxpayer was allowed to defer reporting gain or loss until the entire property was disposed of. While the validity of *Inaja Land* is dubious after the enactment of Treas. Reg. 1.61-6(a), it does not apply to this case in any event.

Finally, the Trust continues to argue that *Gladden v. Commissioner*, 262 F.3d 851 (9th Cir. 2001) supports its recovery of basis argument. However, the court in *Gladden* declined to adopt the recovery of basis argument urged by the taxpayer there, and remanded the case for a determination of the amount of premium that was paid for the water rights in issue there. As noted in its opening brief, *Gladden* actually supports defendant's position that the voting and liquidation rights had no basis. (D. Brief at 17-18.)

## CONCLUSION

For the reasons set forth above, and in the defendant's opening post-trial brief, the Trust's claims should be dismissed with prejudice.

Respectfully submitted,

s/Benjamin C. King, Jr.

BENJAMIN C. KING, JR.
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6506

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
STEVEN I. FRAHM
Assistant Chief

s/Steven I. Frahm
Of Counsel

October 24, 2007