**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **EUGENE A. FISHER, Trustee,** | } | |
| **Seymour P. Nagan Irrevocable Trust,** | } | |
| **Plaintiff,** | } | **No. 04-1726 T** |
| | } | |
| **v.** | } | **Judge Francis M. Allegra** |
| | } | |
| **THE UNITED STATES OF AMERICA,** | } | |
| **Defendant.** | } | |

**PLAINTIFF'S REPLY TO DEFENDANT'S POST-TRIAL BRIEF**

BURGESS J. W. RABY
Raby Law Office
2164 E. Broadway, Suite 280
Tempe, Arizona 85282
Tel: 480-967-1501
Fax: 480-967-0975

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **EUGENE A. FISHER, Trustee,** | } | |
| **Seymour P. Nagan Irrevocable Trust,** | } | |
| **Plaintiff,** | } | **No. 04-1726 T** |
| | } | |
| **v.** | } | **Judge Francis M. Allegra** |
| | } | |
| **THE UNITED STATES OF AMERICA,** | } | |
| **Defendant.** | } | |

**PLAINTIFF'S REPLY TO DEFENDANT'S POST-TRIAL BRIEF**

The Trust disagrees with the two major arguments in defendant's post-trial brief.

A. *Gladden* Expectation Argument

The government cites *Gladden v. Commissioner,* 262 F. 3d 851 (9th Cir. 2001) (in the last paragraph on p. 17 of its post-trial brief) as the basis for its argument that if no realistic expectation of demutualization existed at the time the Trust purchased its life insurance contract, then no tax basis should be allocated to that contract. The flaw in the government's position is that the facts in *Gladden* differ from the instant case and make expectation completely irrelevant here.

The land in *Gladden* had no legal right to Colorado River water through the Central Arizona Project ("CAP") at the time the taxpayer acquired that land. The expectation issue in the *Gladden* case thus involved the taxpayers' understanding that the land they were buying would become entitled to water from CAP at some future date. It had nothing to do with whether those water rights, if obtained, would ever be made separable from the land and thus capable of being sold. In the instant case, the Trust possessed ownership rights from the beginning. They were an inseparable part of the one asset that the Trust acquired, the life insurance contract. Jt. Exh. 6. What the government seems to be arguing is that the Trust should only be entitled to basis for the ownership rights in the

year 2000, at the time of demutualization, if it had been able to anticipate in 1990 the likelihood of Sun Life severing the ownership rights from the rest of the policy contract and making a distribution in marketable form of those ownership rights – and even then that it should only be entitled to an amount of basis equal to the June 28, 1990 fair market value of those rights.

That, however, is not what the law provides. Treas. Reg. sec. 1.61-6(a) provides, in pertinent part:

> When a part of a larger property is sold, the cost or other basis of the entire property shall be equitably apportioned among the several parts, and the gain realized or loss sustained on the part of the entire property sold is the difference between the selling price and the cost or other basis allocated to such part.

Of the two examples in Treas. Reg. sec. 1.61-6(a), the first says nothing about allocation based on fair market value as of the date of purchase, while the second deals with a purchase in one transaction of two separate pieces of real property. In that second example, the purchase price allocation, which equals the fair market values, is known at the time of purchase and determines the allocations. This example is not analogous to the unitary life insurance contract in the instant case.

B. Burden of Proof Argument

The government's second argument, to which it devotes most of its post trial brief, is that the Trust "failed to present sufficient evidence at trial to establish the amount, if any, of the premiums paid for the Sun Life policy that were attributed to the voting and liquidation rights." Both statements are incorrect.

First, the issue in this case is not limited to voting and liquidation rights. The issue before the Court is, or should be, the determination of the tax basis of those attributes of equity ownership that the demutualization reorganization stripped from the policy and made a part of the Financial

Services common stock. The tax basis of the stock under the law is an equitable portion of the tax basis of the life insurance contract. Treas. Reg. sec. 1.61-6(a).

The evidence in the record is that the ownership rights included the right to receive dividends as, if, and when declared; to participate in the earnings of the entire Sun Life enterprise; to elect the entire board of directors; and to receive any distributions of special dividends, demutualization proceeds, or whatever might remain for equity owners on liquidation. Jt. Exh. 1, p. SL-0161; Pl. Exh. 1, p. 2; Def. Exh. 2, p. 2.

Second, the Trust submits that through the facts stipulated by the parties and through the witnesses presented at trial it has gone forward with the relevant evidence, carried its burden of proof, and established a prima facie case. The burden of proof should then shift to the defendant. The government's presumption of correctness is not, in itself, evidence.[1] The government has failed to carry its burden. A review of the Trust's evidence and of the parties' positions may help clarify what has been established by the Trust and what has not been established by the government.

*1. Tax Basis Date*

The first facts that needed to be established were the date as of which the tax basis of the ownership rights was to be determined and the tax basis on that date of the life insurance contract of which the ownership rights were an inseparable part. The stipulated facts show that while the policy was acquired on June 28, 1990, it was not a policy that was paid-up with a single premium payment. Rather, it required periodic payments for the life of the longer-lived of the two insured.

---

[1] "It is a well established principle that in every case . . . the assessment of the Commissioner is presumed to be correct. To be sure, this presumption is not evidence in itself and may be rebutted by competent evidence. It operates merely to place upon the opposing party the burden of going forward with the evidence." *Compton v. United States*, 334 F.2d 212 (4th Cir. 1964), at 216.

Thus, the tax basis of the life insurance contract was not the same amount on the date of demutualization, March 22, 2000, as on June 28, 1990, or at any time during any of the 10 intervening years. June 28, 1990, was, therefore, not an appropriate date for determining the tax basis of the contract nor for making an "equitable" apportionment of that basis between the two pieces into which that previously unitary contract was split in the demutualization reorganization.

On the other hand, it is stipulated that the cumulative total of the premium payments through March 22, 2000, was $194,343.00. Jt. Exh. 8, Stip. 3. The tax basis of the life insurance contract as of March 22, 2000, thus would be $194,343.00. Section 1012.[2] That date then would be the appropriate date to determine the equitable allocation of the tax basis of the contract between the two component parts into which the life insurance contract was split by the demutualization transaction.

The government nevertheless argues that June 28, 1990, is the date as of which the tax basis of the ownership rights must be determined. During the hearing of June 18, 2007, the Court asked Mr. Cole whether he could have determined the value of the ownership rights as of June 28, 1990, in the manner that was done in the Morgan Stanley estimate of the range of possible values if Financial Services became a publicly traded stock. Tr. 72:20. Mr. Cole responded that he could also have used assumptions in the manner that Mr. Bauer of Morgan Stanley had done and based upon the numbers resulting from those assumptions done the arithmetic to determine what would have been the estimated value of the resulting Financial Services stock. Note that the assumptions in the Morgan Stanley Report were not those of Morgan Stanley but were those of Sun Life. Jt. Exh. 12, p. SL-0334. Note also that Morgan Stanley was not functioning as an independent valuation expert

[2] Unless otherwise specified herein, all references to a "section" are to a section of the Internal Revenue Code of 1986, as in effect on the referenced date. See also Rev. Rul. 70-38, 1970-1 C.B. 11; sections 72(c)(1)(A), 72(e)(3)(B), and 72(e)(5)(C); and Treas. Reg. 1.72-1(a) and (b).

but rather as an investment banker who expected to provide investment banking services to Sun Life in connection with the demutualization. Jt. Exh. 1, SL-0337 (under "Other Relationships").

As is clear in Mr. Cole's report, Pl. Exh. 1, p. 6, Mr. Cole was engaged to determine the "fair market value" of the ownership rights separate from the policy contract prior to the demutualization and not the "estimated value" based upon a hypothetical future transaction. He was not provided a set of assumptions within the boundaries of which he was to do his work. He was provided access to the information to which the Trust had access. Within the range of what he was asked to do, which was to determine the "fair market value" of the ownership rights as of June 28, 1990, or as of any other date prior to the date of demutualization, he did his work and concluded that a fair market value for the ownership rights was not determinable prior to the demutualization. Pl. Exh. 1, p. 6. As to the Morgan Stanley fairness opinion, Mr. Cole testified upon recall that if an estimate of value and not an opinion as to fair market value was desired, it would have been possible to make such an estimate as of 1990. Tr. 239:10-19. Such estimates of value might have been useful for convincing the insurance regulators of the feasibility of the demutualization, which was at least one of the purposes of the Morgan Stanley study (Jt. Exh. 1, SL-0333), but they are estimates based on assumptions and not opinions as to fair market value.

*2. Factors in Allocation of Basis*

The severance of the life insurance contract into the reformed contract that existed after the demutualization and the ownership rights that were incorporated into the Financial Services common stock from and after the date of the demutualization was not a transaction comparable to any of the transactions relied upon by the government in its post trial memorandum. The government has cited no cases in that post trial memorandum dealing with life insurance policies, which are an intangible. It has not cited any cases dealing with assets purchased through annual premium payments which

continued for the life of one or more persons. Most of the cases it cites involve real estate transactions. Real estate is a tangible asset, not an intangible. It is customarily purchased as of a date and for a total price set forth in a contract. Payments may be made over time, but the price is determined as of the date of purchase.

As of the date of the demutualization, the tax basis (cost) of the life insurance contract to the Trust was $194,343.00. Until that date, the contract was a unitary and indivisible asset. Until that date, the allocation of the tax basis between the post-demutualization insurance contract rights and the Financial Services common stock ownership rights could not be determined because the ownership rights to be severed from the life insurance contract had not even been determined. There was only one asset until that date and after that date there were two. Until that date, the allocation of the tax basis of that unitary asset between hypothetical components was a meaningless concept not relevant for any income tax purpose. The tax law deals with actual, completed transactions. Treas. Reg. sec. 1.61-6(a).

No one knew nor could have known what modifications might be made in the contract until those modifications were actually made in the demutualization transaction documents, yet the value of the Financial Services common stock that was brought into being in the demutualization reorganization was dependent on which of the ownership rights were retained in the life insurance contract, and to what extent, and which were transferred to the common stock. For example, the participating policyholders were guaranteed that for five years they would receive dividends on the same basis that they had been receiving them. Jt. Exh. 1, 5.12 at pp. SL-0277 and SL-0298. Those policyholder dividends reduced the earnings otherwise available to the common stockholders. Thus, those specific dividend provisions of the post-demutualization life insurance contracts affected the earnings projections and thus the fair market value of the Financial Services common stock, an affect

that would have been different had the dividends been guaranteed for three years instead of five. Similarly with the policyholder voting rights and with every other provision in the affected life insurance contracts. Whatever ownership rights were retained by the participating policyholders meant a reduction in the ownership rights of the new common stock owners of Financial Services and thus were reflected in the fair market value the market put on that common stock.

*3. Record Is Sufficient*

The record in this case contains sufficient facts to support a determination of the Trust's tax liability under either of the two basic legal arguments the Trust made as to the allocation of basis.

(a) The first legal argument involved recovery of basis, and its conclusions were reachable by three different approaches. The first approach was predicated on establishing that it was neither feasible nor practicable to value the inseparable components of the life insurance contract until they were, in fact, separated. At that point, the fair market value of the ownership rights should act as a recovery of the total tax basis of the policy. That tax basis as of March 22, 2000, the demutualization date, was $194,343.00, as previously discussed. The Trust received $31,579.00 for surrendering its ownership rights.[3] That is the market-determined fair market value of those ownership rights. Thus, facts have been established sufficient to carry the Trust's burden of proof as to the factual side of that approach to recovery of basis.

The second approach applies section 301 to the life insurance contract to reach the same conclusion. There is no dispute as to the participating life insurance contracts being the residual equity ownership (i.e., common stock) of the pre-demutualization Sun Life. They are treated as such

---

3 The policyholders were told prior to voting on the demutualization that they were "required to decide in advance of the initial public offering whether you want to sell your Financial Service shares . . . . " Jt.Exh. 1, p. SL-0185, Par. 4 of "How Shares Will be Sold."

by IRS in PLR 200020048.[4] The relevant facts to be established here were again the tax basis of the life insurance contract/common stock and the fair market value of the asset distributed. The necessary data regarding those two as of the March 22, 2000, distribution date was $194,343.00 as total tax basis and $31,579.00 as the fair market value of the distribution. Section 301(d) then treats the fair market value of the distribution received as the tax basis for that separate asset.

The third approach deals with the economic reality of what happened and not just the form. The Trust never received stock and, as of the date of demutualization, had no right to receive stock. It had surrendered that right prior to the date of demutualization. See fn. 3 above. Instead, the trust received a cash distribution on its life insurance contract of $31,579.00 and under section 72(e) that amount acted as a recovery of the premiums paid (i.e., a recovery of basis). Again, the facts to support that conclusion are in the record.

(b) The second (alternative) legal argument made by the Trust focuses on relative fair market values. While the Trust contends that the recovery of basis is the appropriate, practical, and easiest to administer approach to dealing with this life insurance demutualization situation, it recognizes that the Court may not be persuaded. The record, however, also establishes sufficient

---

4 In *Cornwall v. Commissioner*, 48 T.C. 736 (1967), acq. 1968-1 C.B. 2, the Tax Court held that:

> Since Lloyds is considered for Federal tax purposes to be a corporation, its members' interests must be considered as stock. In fact, it is because of this viewing of members' interests as stock of a corporation that distributions with respect thereto are considered dividends. See *Smith* v. *Commissioner*, 69 F. 2d 911 (C.A. 3, 1934), affirming 27 B.T.A. 607 (1933). In numerous cases it has been held that where a trust or other association is taxable as a corporation, it is to be "treated as a corporation for all purposes of the revenue act." *Pierce Oil Corporation*, 32 B.T.A. 403, 429 (1935). It has likewise been recognized that not only is the association taxable as a corporation but that in determining the tax liability of a member or shareholder of an association taxable as a corporation, distributions made by the association to its members or shareholders must be treated as would distributions made by a corporation to its shareholders. *Charles N. Spratt*, 43 B.T.A. 503, 511 (1941), and *Tyrrell* v. *Commissioner*, 91 F. 2d 500 (C.A. 5, 1937), affirming 34 B.T.A. 707 (1936).

facts to allow a decision to be reached based on a different alternative to equitable allocation of basis than the recovery of basis approach discussed above. That would be an allocation based on the relative fair market values of, respectively, the ownership interests represented by the Financial Services stock and of the reconstituted life insurance contract itself, both determined as of the demutualization date of March 22, 2000. This approach applies the rules relating to corporate reorganizations and distributions as discussed at pp. 22-24 of Plaintiff's Post-Trial Brief. The record contains the tax basis of the life insurance contract pre-demutualization ($194,343.00), which is the amount to be allocated between the post-demutualization life insurance contract and the Financial Services stock based upon their respective fair market values. The fair market value of the life insurance contract is its cash surrender value of $185,172.79. Jt.Exh. 8, Stip. 3. The fair market value of the Financial Services stock, as previously discussed, is $31,579.00.

Thus, all the facts are in the record to determine the amount of tax basis to be allocated to the ownership rights represented by the Financial Services stock as of March 22, 2000. The record shows the amount of income tax that the Trust had paid, which is entirely due to treating the $31,579.00 as a taxable capital gain. On a basis recovery approach, the entire $5,725.00 of income tax paid and for which refund is being sought would be refunded. On an approach where basis is allocated based on relative fair market value as of March 22, 2000, the Trust would be entitled to a refund of $4,888.00.

**Conclusion**

The Trust submits that it has carried its burden of proof. If that is so, then the presumption of correctness surrounding the government's determination disappears and it is incumbent on the government to establish its case. The Trust submits that the government has not submitted facts to

show the equitable allocation required by Treas. Reg. sec. 1.61-6(a).

The government has offered no authority for its assumption that the completely hypothetical fair market values of the elements of an indivisible unitary contract should be allocated as of a 1990 date when the tax basis and the facts of a restructuring of that contract into separate pieces are all determined as of 2000. Its evidence to support its 1990 valuations consists of one witness, whose testimony indicated several misconceptions as to the relevant facts. Even if 1990 valuations were accepted, moreover, the record contains nothing to establish their usefulness in making an equitable allocation of the year 2000 tax basis of the contract.

October 29, 2007

s/Burgess J. W. Raby
Burgess J. W. Raby
Raby Law Office
2164 E. Broadway, Suite 280
Tempe, Arizona 85282
Tel: 480-967-1501 Fax: 480-967-0975