# In The United States Court of Federal Claims

No. 04-1726T

(Filed: August 6, 2008)

| | | |
|---|---|---|
| EUGENE A. FISHER, Trustee, SEYMOUR P. NAGAN IRREVOCABLE TRUST,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | * | Trial; Mutual insurance company – participating policyholders; Demutualization; Gain on sale of stock received in exchange for ownership rights; Basis allocation rule – Treas. Reg. § 1.61-6; "Open transaction" doctrine – *Burnet v. Logan*; Limited exception to Treas. Reg. § 1.61-6 where impossible or impractical to value property; *Pierce*, *Inaja Land* and *Warren* construed; Mutual ownership rights found not to be susceptible of valuation; Expert reports on valuation; "Open transaction" exception to Treas. Reg. § 1.61-6 applicable; Refund entitled. |

## OPINION

*Burgess J. W. Raby,* Tempe, Arizona, for plaintiff.

*Benjamin C. King*, *Jr*., Tax Division, United States Department of Justice, Washington, D.C., with whom was *Eileen J. O'Connor*, Assistant Attorney General, for defendant.

**ALLEGRA, Judge:**

Since its infancy, the Federal income tax law has provided that gross income includes gains derived from dealings in property and that such gains generally equal the amount realized less the seller's cost basis in the property sold. Though clear in principle, these rules are not always easily applied – particularly, where the property sold was first acquired, for a lump sum, as part of a larger assemblage, and, especially, where the values of the individual components of that grouping are not readily ascertainable. For generations, courts faced with the scenario just-described have grappled with two possibilities: to treat the property sold as having little or no cost basis, so that most or all the sale proceeds are taxable, or to treat the property as sharing the cost basis of the entire bundle, such that no gain is realized until all the capital represented by that basis is recovered. These are among the possible outcomes in this tax refund suit, which involves insurance policy rights that were acquired as an indivisible package, but then separated and sold as part of a demutualization of the insurance provider.

## I. FINDINGS OF FACT

Trial in this case was conducted in Phoenix, Arizona. Based on the record at trial, including the parties' joint stipulations, the court finds as follows:

Prior to 2000, Sun Life Assurance Company (Sun Life) was a Canadian mutual life insurance and financial services company that conducted business in Canada, the United States and other countries. A mutual insurance company has no shareholders, but instead is owned by its participating policyholders, which possess both ownership rights, such as voting and distribution rights, as well as the more typical contractual insurance rights.[1] Their voting rights differ from those possessed by traditional shareholders in that each policyholder has but a single vote, regardless of how many policies it owns or the amounts thereof. Once the mutual company pays its claims and operating expenses, the profits belong to the policyholders. Typically, some of those profits are returned to the policyholders as dividends, which reduce premium payments, while the remainder is retained as surplus, often accumulating from year to year. Payment of such policy dividends is largely at the discretion of the board elected by the participating policyholders. The ultimate goal of this arrangement is to provide insurance at the lowest possible cost.

On June 28, 1990, the Seymour P. Nagan Irrevocable Trust (the Trust) purchased a life insurance policy from Sun Life on Seymour Nagan and Gloria Hagan. The policy was for $500,000, with annual premiums at $19,763.76 per year. Under this "participating policy," plaintiff's ownership rights included the ability –

> to vote on matters submitted to participating policy holders . . . to participate in the distribution of profits of Sun Life of Canada from all its businesses, to participate in any distribution of demutualization benefits, and in the unlikely event of a liquidation if Sun Life of Canada were ever to become insolvent, to participate in the distribution of any remaining surplus after satisfaction of all obligations.

Plaintiff's right to receive distribution of profits took the form of an annual dividend representing the amount, if any, of profits not retained in surplus. These ownership rights could not be sold separate from the policy and were terminated when the policy ended.

---

[1] Mutual insurance companies have a long provenance in this country, with one of the first established by Benjamin Franklin. *See generally*, Gregory N. Racz, "No Longer Your Piece of the Rock: The Silent Reorganization of Mutual Life Insurance Firms," 73 N.Y.U. L. Rev. 999 (1998); Edward X. Clinton, "The Rights of Policyholders in an Insurance Demutualization," 41 Drake L. Rev. 657 (1992) (hereinafter "Clinton").

On January 27, 1998, the Sun Life Board (the Board) requested the insurer's management to develop a plan to convert the company into a publicly-traded stock company through a so-called "demutualization."[2] On September 28, 1999, the Board voted to recommend that the policyholders approve the demutualization. It perceived that the conversion would permit the reorganized company to provide stock options to its employees, offer more diversified products and obtain, more readily, capital financing for its businesses, including those unrelated to providing insurance.

On October 29, 1999, Sun Life proposed a plan to its policyholders to demutualize. Under the plan, the policyholders would retain their insurance coverage at premiums that would be unaffected by the demutualization, but would receive shares of stock in a new holding company, Sun Life of Canada Holding Corp. (Financial Services), which would become the corporate parent of Sun Life. Those shares were to be exchanged for the ownership rights possessed by the participating policyholders, with approximately 20 percent of the shares being allocated to compensate for the loss of voting control and the remaining 80 percent of the shares being allocated to compensate for the loss of other ownership rights, including the right to receive a liquidating distribution.[3] Under the plan, eligible policyholders – those that had policies in force as of January 27, 1998 – did not have to take stock in exchange for their shares. Those in the United States, for example, could elect to sell the shares issued in connection with a planned initial public offering, an option referred to as the "cash election." If the policyholder took this election, it would receive an amount determined "by multiplying the number of Financial Services Shares sold . . . by the Initial Share Price at which the number of Financial Services Shares are sold in connection with the initial public offering." Policyholders were informed as to how many shares they would be issued in a "share allocation statement."

On December 15, 1999, the Board certified that the demutualization plan had been approved by the eligible policyholders. In early March of 2000, Sun Life began its initial public offerings and received various regulatory approvals to proceed with the demutualization.[4] On May 19, 2000, in response to a request from the company, the Internal Revenue Service (IRS) issued Private Letter Ruling 200020048, which dealt with various tax aspects of the demutualization. In that ruling, the IRS noted that the aforementioned ownership rights "cannot

---

[2] As an alternative to the demutualization, the Board considered paying policyholders a greater percentage of the company's then-existing surplus. As of June 1999, that surplus amounted to approximately $5.7 billion (Canadian).

[3] The plan provided for a fixed allocation of seventy-five Financial Services shares for the loss of voting control. A "time-weighted" variable allocation of shares was provided in exchange for the policyholders' rights to receive surplus distributions. This variable allocation was determined under a formula that considered the cash value of the policy or policies held, the number of years the policy or policies had been in force, and the annual premiums.

[4] The cash surrender value of plaintiff's policy as of this time was $185,172.79. Total policy premiums paid through this time were $194,343.64.

be obtained by any purchase separate from an insurance contract issued by [Sun Life].” It ruled that, under section 354(a)(1) of the Internal Revenue Code of 1986 (26 U.S.C.) (the Code), “[n]o gain or loss will be recognized by the Eligible Policyholders on the deemed exchange of their Ownership Rights solely for Company stock.” It further opined that the “basis of the Company stock deemed received by the Eligible Policyholders in the exchange will be the same as the basis of the Ownership rights surrendered in exchange for such Company Stock,” that is, “zero.” The IRS did not rule on the tax treatment to be afforded the cash received in lieu of shares exchanged for ownership rights.

When the demutualization took effect, plaintiff received 3,892 shares of Financial Services stock in exchange for its voting and liquidation rights. Opting for the “cash election,” plaintiff permitted Sun Life to sell those shares on the open market for $31,759.00. It reported this amount, unreduced by any basis adjustment, on its federal income tax return for 2000 and paid the resulting tax of $5,725.00. On February 11, 2004, plaintiff filed a timely claim seeking a refund of its money, and, upon the denial of that claim, filed the instant suit. On March 14, 2005, plaintiff filed a motion for partial summary judgment; on December 20, 2005, following the completion of discovery, defendant filed a cross-motion for summary judgment. On May 2, 2006, the case was reassigned to the undersigned. After a referral for alternative dispute resolution did not lead to a settlement, the court, on November 15, 2006, denied the pending dispositive motions. It found that the proceeds from the sale of the Financial Services stock could not be deemed a distribution by Sun Life of a policy dividend, or the equivalent thereof, so as to be excluded from gross income as a return of capital under the annuity rules of section 72 of the Code.[5] The court then concluded that it could not resolve, as a matter of law, plaintiff's claim that no capital gain was realized on the sale of the Financial Services Stock because the proceeds were offset by plaintiff's basis in the stock, finding that the claim presented material questions of fact that required a trial.

Trial in this case began on June 18, 2007. At trial, the parties' expert witnesses assigned dramatically different values to the basis of the ownership rights. Plaintiff's expert, Eugene Cole, testified that he could not form an opinion as to the fair market value of the ownership rights because he found the ownership rights to be inextricably tied to the policy; in his view, the ownership rights added value to the policy but never had a separate value. Defendant's expert, Mark Penny, determined that the fair market value of the ownership rights was zero. He emphasized that none of the premiums were specifically dedicated to acquiring the ownership

[5] Section 72 of the Code provides rules governing the reporting of income corresponding to annuities received under annuity, endowment or life insurance contracts. Section 72(e)(2) excludes from gross income certain amounts not received as annuities, among them “any amount received which is in the nature of a dividend or similar distribution,” as defined in section 72(e)(1)(B). In its November 15, 2006, opinion, the court held that the amounts received by plaintiff did not qualify for exclusion under these provisions, finding that plaintiff “received those proceeds upon an entirely unrelated sale of the stock it received in the demutualization.” In its post-trial brief, plaintiff asks the court to reconsider this ruling. The court sees no basis for doing so.

rights, that there was no available market for the ownership rights, and that it was highly unlikely, at the time the policy was acquired, that a demutualization would occur. The latter assertion was also made by defendant's expert on the insurance industry, James Reiskytl.

## II. DISCUSSION

We begin with common ground. Section 61(a)(3) of the Code provides that gross income includes "[g]ains derived from dealings in property." Section 1001(a) indicates that "[t]he gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain." This "language provides a straightforward test for realization" of income, the Supreme Court has stated, *to wit*, "to realize a gain or loss in the value of property, the taxpayer must engage in a 'sale or other disposition of [the] property." *Cottage Sav. Ass'n v. Comm'r of Internal Revenue*, 499 U.S. 554, 559 (1991); *see also Phil. Park Amusement Co. v. United States*, 126 F. Supp. 184, 187-88 (Ct. Cl. 1954). Section 1011(a) states that "adjusted basis" is the basis determined under section 1012, with adjustments not herein relevant, which the latter section generally sets as "the cost of such property." *See United States v. Hill*, 506 U.S. 546, 554-55 (1993).

The rules become a bit more complicated when a taxpayer transfers only a portion of an asset previously-acquired. Then, the basis of the latter asset generally must be apportioned between the portions disposed of and retained. Treas. Reg. § 1.61-6(a) provides –

> When a part of a larger property is sold, the cost or other basis of the entire property shall be equitably apportioned among the several parts, and the gain realized or loss sustained on the part of the entire property sold is the difference between the selling price and the cost or other basis allocated to such part. The sale of each part is treated as a separate transaction and gain or loss shall be computed separately on each part. Thus gain or loss shall be determined at the time of sale of each part and not deferred until the entire property has been disposed of.

Under this regulation, "where property is acquired for a lump sum and interests therein are subsequently disposed of separately, in order to compute the gain or loss from each disposition an allocation or apportionment of the cost or other basis to the several units must be made." *Fasken v. Comm'r of Internal Revenue*, 71 T.C. 650, 656-57 (1979), *acq*. 1979-2 C.B. 1; *see also Gladden v. Comm'r of Internal Revenue*, 262 F.3d 851, 853 (9th Cir. 2001) ("This regulation tells us that when property is acquired in a lump-sum purchase but then divided and sold off in parts, the cost basis of the property should generally be allocated over the several parts.").[6] This

---

[6] The regulation offers the following example:

> B purchases for $25,000 property consisting of a used car lot and adjoining filling station. At the time, the fair market value of the filling station is $15,000 and the fair market value of the used car lot is $10,000. Five years later B sells the filling

apportionment is done by dividing the cost basis of the larger property among its components in proportion to their fair market values at the time they were acquired.[7]

Of course, for this formula to work, one must be able to derive the fair market values of the component parts of the larger property. The regulations presume these values are obtainable, stating that "only in rare and extraordinary cases will property be considered to have no fair market value." Treas. Reg. § 1.1001-1(a); *see also Likins-Foster Honolulu Corp. v. Comm'r of Internal Revenue*, 840 F.2d 642, 650 (9th Cir. 1988).[8] But, what if, despite this regulatory bravado, it proves impractical or impossible to derive the values needed for the basis apportionment formula, at least without engaging in undue speculation? Does that mean that ***none*** of the basis of the originally-acquired property is allocable to the part disposed of or that ***all*** of it is allocable thereto until exhausted? These questions, of course, beg a deeper inquiry as to how, if at all, Treas. Reg. § 1.61-6 applies in such circumstances – whether, for example, conditions not immediately apparent, perhaps those lying in the substructure of the income tax, serve to delimit the regulation? The parties vigorously dispute whether this is the case, with defendant arguing that the regulation, by its terms, is controlling, and plaintiff asseverating that the regulation, in the circumstances of this case, is inapposite. Deciding who is correct requires the court to study the evolution of the regulation, particularly with reference to the concepts of income realization and return of capital, as they have metamorphosed over time.

A.

While the earliest Revenue Acts defined income to include "gains from sales or dealings in property," *see* Revenue Act of 1916, ch. 463, §2(a), 39 Stat. 756, 757 (1916); Tariff Act of 1913, ch. 16, §II(B), 38 Stat. 114, 167-68 (1913), neither they, nor the supporting Treasury Regulations, provided much guidance on how to calculate such gains. Revenue laws in 1918 and

---

> station for $20,000 at a time when $2,000 has been properly allowed as depreciation thereon. B's gain on this sale is $7,000, since $7,000 is the amount by which the selling price of the filling station exceeds the portion of the cost equitably allocable to the filling station at the time of purchase reduced by the depreciation properly allowed.

Treas. Reg. § 1.61-6(a) (Example (2)).

[7] *See Beaver Dam Coal Co. v. United States*, 370 F.2d 414, 416-17 (6th Cir. 1966); *Fairfield Plaza, Inc. v. Comm'r of Internal Revenue*, 39 T.C. 706, 712 (1963), *acq.* 1963-2 C.B. 3; *Ayling v. Comm'r of Internal Revenue*, 32 T.C. 704, 711 (1959), *acq*. 1959-2 C.B. 3; *Cleveland-Sandusky Brewing Corp. v. Comm'r of Internal Revenue*, 30 T.C. 539, 545 (1958), *acq*. 1958-2 C.B. 3; *John D. Byram v. Comm'r of Internal Revenue*, 34 T.C.M. (CCH) 626, 626 (1975); *see also Am. Smelting & Refining Co. v. United States*, 423 F.2d 277, 289 (Ct. Cl. 1970).

[8] In 1934, Judge Learned Hand took issue with the predecessor of this regulation, stating "'fair market value' is not nearly so universal a phenomenon as to justify such a comment, and the implication is misleading." *Helvering v. Walbridge*, 70 F.2d 683, 684 (2d Cir. 1934).

1921 conditioned the realization of income on the receipt of property with a "fair market value, if any."[9] Early regulations interpreted this statutory language as conditioning the occurrence of a taxable event on the receipt of property with a cash equivalency, stating that to "complete or close a transaction from which income may be realized," there must be a "change into the equivalent of cash."[10] Shortly after these regulations were promulgated, the Treasury Department, in 1921, issued the progenitor of Treas. Reg. §1.61-6. That regulation, Treas. Reg. 45, art. 43 (1921), dealt with the subdivision of real estate into lots and provided:

> Where a tract of land is purchased with a view to dividing it into lots or parcels of ground to be sold . . . the cost . . . shall be equitably apportioned to the several lots or parcels . . . to the end that any gain derived from the sale of any such lots or parcels which constitute taxable income may be returned as income for the year in which the sale was made. This rule contemplates that there will be a measure of gain or loss on every lot or parcel sold, and not that the capital invested in the entire tract shall be extinguished before any taxable income shall be returned. . . .

*See also* Treas. Reg, 62, art. 43 (1922); *Heiner v. Mellon*, 304 U.S. 271, 275 (1938) (citing cases applying the early versions of the regulation).

Other regulations promulgated around this same time took a different tack, however. They recognized that apportioning a basis among assets acquired as a bundle might, in some situations, prove impractical, requiring income recognition to be deferred until the original cost of the whole bundle was recovered. One of these, Treas. Reg. 45, art. 39 (1921), applied to common stock "received as a bonus with the purchase of preferred stock or bonds." It provided, generally, for the apportionment of basis between the various securities purchased, but indicated that "if that should be impracticable in any case, no profit on any subsequent sale of any part of the stock or securities will be realized until out of the proceeds of sales shall have been recovered the total cost." *See also* Treas. Reg. 62, art. 39 (1922). Similarly, Treas. Reg. 45, art. 1567 (1921), which dealt with the non-taxable exchanges, provided that where a taxpayer received two kinds of property in such an exchange, the cost of the property originally-possessed had to be apportioned among the new properties. *Id.* But, "[i]f no fair apportionment is practicable," the regulation continued, "no profit on any subsequent sale of any part of the property received in exchange is realized until out of the proceeds of sale shall have been recovered the entire cost of

---

[9] *See* Revenue Act of 1921, Pub. L. No. 98, § 202(c), 42 Stat. 227 (1921); Revenue Act of 1918, Pub. L. No. 254, § 202(b), 40 Stat. 1057, 1060 (1919) ("[w]hen property is exchanged for other property, the property received in exchange shall for the purposes of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any"); *see also* Jeffrey L. Kwall, "Out of the Open-Transaction Doctrine: A New Theory for Taxing Contingent Payment Sales," 81 N.C. L. Rev. 977, 992 (2003) (hereinafter "Kwall").

[10] Treas. Reg. No. 45, art. 1563 (1919); *see also* Loren D. Prescott, Jr., *"Cottage Saving Association v. Commissioner*: Refining the Concept of Realization," 60 Fordham L. Rev. 437, 445-46 (1991).

the original property." *Id.*; *see also* Treas. Reg. 62, art. 1567 (1922); *Green v. Comm'r of Internal Revenue*, 33 B.T.A. 824, 828 (1935) (discussing the evolution of this regulation).

The use of "cash equivalency" principles to govern the realization of income soon proved unworkable. *See* 64 Cong. Rec. 2851 (1923) (stmt. of Rep. Green); Hearings Before the S. Finance Comm., 67th Cong. 199 (1921) (stmt. of Dr. T.S. Adams, Tax Advisor, Treas. Dept.). This led Congress, in 1924, largely to abandon these principles in favor of enacting the predecessor of section 1001(a) of the Code and, with it, the concept of "amount realized" – defined, as it is today, to include the fair market value of property other than money or money equivalents received in a transaction. *See* Revenue Act of 1924, Pub. L. No. 68-176, § 202(c), 43 Stat. 253, 255 (1924); *see also Campbell v. United States*, 661 F.2d 209, 216 (Ct. Cl. 1981); *Warren Jones Co. v. Comm'r of Internal Revenue*, 524 F.2d 788, 791-92 (9th Cir. 1975). The accompanying Committee Reports criticized prior law as being "so indefinite that it can not be applied with accuracy, nor consistency," H.R. Rep. No. 68-179, at 13 (1924), *reprinted in* J.S. Seidman, Legislative History Of Federal Income Tax Laws 1938-1861, at 686 (1938), leading to "[g]reat difficulty . . . in administering" the law, S. Rep. No. 68-398, at 13-14 (1924), *reprinted in* Seidman, *supra*, at 686-87. *See also* Kwall, *supra*, at 994. The implication was clear – Congress desired more certainty in determining the timing and amount of the gains realized upon sales or exchanges. *See* Bradley T. Borden, "Reverse Like-Kind Exchanges: A Principled Approach," 20 Va. Tax Rev. 659, 665-66 (2001).

Into this evolving legal environment was born the so-called "open transaction" doctrine, an accouchement traced to *Burnet v. Logan*, 283 U.S. 404 (1931). In that case, Mrs. Logan sold stock of a closely-held corporation which assets included stock in a second corporation that owned a mine lease. *Id*. at 409. She and the other shareholders, which included her mother, exchanged the stock for cash and a stream of annual payments corresponding to the amount of iron ore extracted from the mine. The IRS argued that, at the time of the sale, the right to receive the mining royalties could be estimated based upon the amount of reserves at the mine and that the transaction should be taxed based upon the value of that estimate. *Id*. at 412.[11] The Supreme Court demurred, holding that Mrs. Logan was entitled to recoup her capital investment in the stock before paying income tax based on the supposed market value of the mineral payments. It reasoned:

> As annual payments on account of extracted ore come in, they can be readily apportioned first as return of capital and later as profit. The liability for income tax ultimately can be fairly determined without resort to mere estimates,

---

[11] As to 1916, the year of sale, the Commissioner acknowledged that "no taxable income had been derived from the sale when made" because that consideration had not exceeded Mrs. Logan's basis of her stock. *Logan v. Comm'r of Internal Revenue*, 42 F.2d 193, 194 (2d Cir. 1930, *aff'd sub nom.*, *Burnet v. Logan*, 283 U.S. 404 (1931). As to later years (1917-1920), however, the Commissioner claimed that a "a portion of each payment under the contract was a return of capital and a portion represented gain." *Logan v. Comm'r of Internal Revenue*, 12 B.T.A. 586, 599-600 (1928), *rev'd*, 42 F.2d 193 (2d Cir. 1930), *aff'd sub nom*., *Burnet v. Logan*, 283 U.S. 404 (1931).

> assumptions, and speculations. When the profit, if any, is actually realized, the taxpayer will be required to respond. The consideration for the sale was $2,200,000 in cash and the promise of future money payments wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty. The promise was in no proper sense equivalent to cash. It had no ascertainable fair market value. The transaction was not a closed one. . . . She properly demanded the return of her capital investment before assessment of any taxable profit based on conjecture.

*Id*. Notably, Mrs. Logan's mother owned stock in the same company and sold it on the same terms. She, however, died and her payments under the same sales agreement were valued for estate tax purposes. *Id*. at 413-14.[12] The Supreme Court, however, summarily dismissed the notion that the valuation of the payment stream for estate tax purposes should be used for income tax purposes, stating "[s]ome valuation – speculative or otherwise – was necessary in order to close the estate. It may never yield as much, it may yield more." *Id.*; *see also* 1 Mertens Law of Fed. Income Tax'n § 5:15 (2008).

As viewed by the *Logan* Court, then, the income tax law did not resolve every doubt in favor of taxation – irreducible values could exist in that world, with the effect of postponing the recognition of income. In the years that followed, the predecessor regulations to Treas. Reg. § 1.61-6 and the "open transaction" doctrine developed like a pavane – intertwined in theory, but rarely touching in the decisional law. A dozen years after *Logan*, in *Pierce v. United States*, 49 F. Supp. 324 (Ct. Cl. 1943), it was not the taxpayer, but the United States, that claimed that a transaction was still open. In that case, the First National Bank of the City of New York, in order to give its stockholders the benefits of investments in securities that could not then be lawfully held by a bank, organized a separate company, First Security Company, to invest in such securities. Each of the certificates of stock in the bank was endorsed with a statement that the stockholder had an interest in the dividends or profits, and, in case of dissolution, in the distribution of capital of the Security Company, ratable with its interest in the bank. *Id*. at 329. Via this arrangement, the shareholders also had limited control over the Security Company, albeit control exercised through the votes of the holders of two-thirds of the bank stock. Neither the bank stock by itself, nor the interest represented by the endorsement, could be transferred separately from the other. Between 1928 and 1932, the plaintiffs' testator bought thirty-five shares of the bank stock with the endorsements. The Banking Act of 1933, however, banned the securities arrangement used by the bank, causing the Security Company to be dissolved; transferable interests in the proceeds of the dissolution were issued to the bank stockholders and the endorsements were removed from the stockholders' certificates of bank stock. The plaintiffs' testator received his interest in the proceeds of the dissolution on December 6, 1933, and

---

[12] In making this estimate, the Commissioner projected the amount of contingent payments the shareholders would receive by examining the mine's capacity, a projected price for the mine's product, and the mine's projected useful life. *Id*. at 411 n.1.

promptly sold them on January 29, 1934, allegedly at a loss, on account of which they sought a refund of income taxes.

The United States contended that –

> the sale by plaintiffs' testator of the declarations of interest in the dissolution of the Security Company may not be treated separately as showing a loss, since his interest in the Security Company was acquired in combination with his stock in the bank, and the answer to the question whether a loss or profit resulted from the transaction cannot be had until the bank stock is sold, so that it may be known how much the combined investment has sold for.

*Id*. at 330. While conceding that "in some instances apportionment of the amount of a single purchase price to several items purchased for that single total price may be had," defendant asseverated that the situation presented was "not a proper case for such an apportionment, since it would not be practicable here." *Id*. The court took the latter contention to mean that "no particular value could be assigned to the interest in the Security Company represented by the indorsement on the bank stock, as of the date of the purchase of the bank stock, with any degree of assurance that that assignment of value was correct, or even approximately so," requiring the "answer to the question of profit or loss" to wait "till the bank stock is sold." *Id.* Readily agreeing with this proposition, the court reasoned that "an attempt here to attribute a certain value to the interests in the Security Company acquired by plaintiffs' testator involves us largely in guess-work." *Id*. Rejecting plaintiffs' attempt to value the endorsement, the court found that "we do not think that the situation calls for such a rough estimate, when by patience the exact answer may be obtained." *Id.*[13] The upshot, the court concluded, was that "the Commissioner acted within his powers in refusing to permit the deduction." *Id*.

The focus of our inquiry next shifts to *Inaja Land Co., Ltd. v. Comm'r of Internal Revenue*, 9 T.C. 727 (1947), *acq*. 1948-1 C.B. 2, an "open transaction" case much debated by the parties here. There, the taxpayer owned about 1,200 acres of land on the banks of a river that it had purchased for $61,000. The land was used for fishing and for grazing. In 1934, the City of Los Angeles began altering the flow of the water in the river; ultimately it paid the taxpayer $50,000 for a perpetual easement to allow water to flow over the land toward the city. A tax dispute arose over the treatment of this money. The Tax Court found that the amount received constituted proceeds from the disposition of an interest in real property, that is, the easement. It concluded, however, that it would be wholly impracticable and impossible to apportion a cost basis to the easement involved because the easement could not be described by metes and bounds

---

[13] The court particularly focused on the fact that the endorsement was not separately sellable from the shares, noting that "the locking device increases the practical difficulty of attributing a correct valuation to either piece of property as of the time of purchase, since the very fact of the restraint usually affects the value of the combination and each of its components in amounts difficult to measure." *Pierce*, 49 F. Supp. at 330.

as the flow of water was likely to change over time and was not predictable. *Id*. at 735. Citing *Logan*, the Tax Court reasoned that "[a]pportionment with reasonable accuracy of the amount received not being possible, and this amount being less than petitioner's cost basis for the property, it can not be determined that petitioner has, in fact, realized gain in any amount." 9 T.C. at 736. It concluded that "[a]pplying the rule . . . , no portion of the payment in question should be considered as income, but the full amount must be treated as a return of capital and applied in reduction of petitioner's cost basis." *Id*.

In *Pierce* and *Inaja Land*, then, the courts made short shrift of basis allocations that lacked a rational foundation. The First Circuit would reach the same result in *Warren v. Comm'r of Internal Revenue*, 193 F.2d 996 (1st Cir. 1952), another case involving hybrid securities. There, the taxpayer purchased preferred stock of a business trust and received, as an endorsement on the stock, a guaranty of the payment of a liquidating dividend. Upon the liquidation of the trust in 1939, the taxpayer exchanged his shares of stock for cash and a claim, evidenced by certificates, against the guarantor of the liquidating dividend. The Commissioner asserted that the latter certificates had a minimal basis and that considerable income was generated when they were sold in 1944. *Id*. at 999. The Tax Court agreed – but, the First Circuit did not. Citing the regulations that would become Treas. Reg. § 1.61-6,[14] the latter court stated that "[n]ormally when a taxpayer acquires an aggregate of assets for a single purchase price, on subsequent sale of any portion he must allocate a part of the price he originally paid to the portion being sold on the basis of its proportionate value at the time of purchase so that gain or loss on the partial sale can be determined. *Id*. at 1001. But, "[i]n some situations," the court noted, "where at the time of the acquisition of the aggregation there was no separate market for the different parts of the aggregate, rational apportionment of the purchase price between the several elements purchased cannot be made." *Id*. Recognizing that this principle derived from the bonus stock regulation which did not apply, by its terms, to the situation presented, the court, nonetheless, observed that "if the regulation enunciates a sound rule, as unquestionably it does, a similar principle ought to govern analogous situations where the price paid for a bundle of assets cannot be allocated among them on a rational basis." *Id*. Remanding the case to the Tax Court, the First Circuit concluded that if "[i]t is wholly impracticable to make such an allocation of the purchase price, proper tax treatment would be to treat the cash disbursement upon liquidation in 1939 as a return of capital going to reduced basis, and to recognize no loss until the last part of the package, the guaranty, was sold in 1944." *Id.*[15]

---

[14] The opinion, indeed, quoted, at length, from Reg. 111, § 29.22(a)-8, dealing with bonus stock, and Reg. 111 § 29.22(a)-11, dealing with the sale of real property in lots.

[15] Further instructive in this regard is *Piper v. Comm'r of Internal Revenue*, 5 T.C. 1104, 1109 (1945), in which the Tax Court held that there was no practical basis upon which to allocate a cost basis between common stock subscription warrants that were acquired by the taxpayer along with shares of common stock. In so concluding, the court stated that "[w]here there is no market value, as in the situation with respect to the warrants, there is no practical basis upon which an allocation can be made and the taxpayer is entitled to recover his entire original basis before gain or loss will be recognized." For other earlier cases applying the "open transaction"

While all these cases were percolating through the system, the Treasury Department periodically reissued the regulations dealing with the sale of real property in lots and bonus stock. These iterations, however, were triggered by the passage of new revenue acts and reflected nothing new by way of substance. *See* Treas. Reg. 118, § 39.22(a)-8 (1953) (bonus stock); *id*. at § 39.22(a)-11 (sale of real property in lots); Treas. Reg. 111, § 29.22(a)-8 (1943) (bonus stock); *id*. at § 29.22(a)-11 (sale of real property in lots); Treas. Reg. 103, § 19.22(a)-8 (1940) (bonus stock); *id*. at § 19.22(a)-11 (sale of real property in lots); Treas. Reg. 94, art. 22(a)-8 (1936) (bonus stock); *id*. at art. 22(a)-11 (sale of real property in lots); Treas. Reg. 86, art. 22(a)-8 (1935) (bonus stock); *id*. at art. 22(a)-11 (sale of real property in lots).[16] During the later 1940s and early 1950s, the Commissioner sometimes saw fit to argue that the apportionment principles reflected in the regulation dealing with real property lots ought to apply, by analogy, to other forms of real and personal property – with varying levels of success. *See*, *e.g.*, *Comm'r of Internal Revenue v. Cedar Park Cemetery Ass'n*, 183 F.2d 553, 557 (7th Cir. 1950); *Atwell v. Comm'r of Internal Revenue*, 17 T.C. 1374, 1379-80 (1952); *W.D. Haden v. Comm'r of Internal Revenue*, 5 T.C.M. (CCH) 250 (1946). In an apparent effort to lessen the need to make such extending analogies, the Treasury Department, in 1957, promulgated Treas. Reg. § 1.61-6 – patterned after the provision previously applied to real property lots, but applicable now to most forms of property. *See* Computation of Taxable Income, 22 Fed. Reg. 9419, 9422 (Nov. 26, 1957).

Nevertheless, even after this new and broader regulation was promulgated, both taxpayers and the Commissioner continued to invoke the "open transaction" doctrine – and, at times, did so successfully. Sometimes, as in *Logan*, the doctrine was pressed by taxpayers claiming that no gain should be realized upon the sale of a portion of a given property until the basis of the entire original property acquired was recovered.[17] In other instances, defendant invoked the doctrine in

---

exception in cases involving proposed basis allocation, *see United Mercantile Agencies, Inc. v. Comm'r of Internal Revenue*, 23 T.C. 1105, 1116-17 (1955), *acq*. 1955-2 C.B. 3 (acquired claims from the liquidators of four banks held to be too speculative to have ascertainable market value); *Axton v. Comm'r of Internal Revenue*, 32 B.T.A. 613, 615 (1935) (types of stock received in exchange for other stock were not susceptible to valuation so as to allow allocation of old basis).

[16] Subsequent regulations did not contain provisions corresponding to article 1567 of Regulations 62 because the article was supplanted by the reorganization provisions adopted in subsequent revenue acts. Nevertheless, in I.T. 2335, VI-1 C.B. 28, the Treasury Department recognized that the basis allocation principles laid down in article 1567 were applicable to the reorganizations under subsequent acts. *See also Green*, 33 B.T.A. at 828; *Sallie Strickland Tricou v. Comm'r of Internal Revenue*, 25 B.T.A. 713, 723 (1932), *aff'd sub nom.*, *Tricou v. Helvering*, 68 F.2d 280 (9th Cir. 1933); *Curtiss v. Comm'r of Internal Revenue*, 21 B.T.A. 629, 636 (1930).

[17] As the Tax Court commented in *Iske v. Comm'r of Internal Revenue*, 39 T.C.M. (CCH) 1161, *aff'd*, 636 F.2d 1225 (8th Cir. 1980) – "[s]ince at least 1945, it has been this court's position that in computing gain or loss from disposition of part of an interest in property, a

seeking either to: (i) postpone income to years in which the statute of limitations on assessments was still open; or (ii) argue that no loss should be deducted upon the sale or exchange of a portion of a property until all the interests comprising the property have been sold or exchanged.[18] So things remained until the scope of the "open transaction" doctrine was tapered by the passage of several amendments to the Code. Principal among these was section 453, enacted by the Installment Sales Revision Act of 1980, Pub. L. No. 96-471, 94 Stat. 2247, which provided a new method of reporting gains on an installment basis, to be applied, unless the taxpayer elects out. *See* 26 U.S.C. § 453(d). Yet, the legislative history of this section confirms that Congress envisioned that the "open transaction" doctrine would still be available, albeit, to

---

taxpayer must utilize only his basis allocable to that portion, except when apportionment of basis is impossible or impractical." For other cases in which the doctrine was successfully invoked by taxpayers *see, e.g.*, *Ayrton Metal Co. v. Comm'r of Internal Revenue*, 299 F.2d 741, 751 (2d Cir. 1962) (contract for commission payments); *Estate of Wiggins v. Comm'r of Internal Revenue*, 72 T.C. 701, 713-14 (1979) (contracts for deeds); *McShain v. Comm'r of Internal Revenue*, 71 T.C. 998, 1005-06, 1011 (1979) (second leasehold mortgage note); *Dorsey v. Comm'r of Internal Revenue*, 49 T.C. 606, 628-30 (1966) (participation certificates in rights to a contract received in a liquidation, noting that valuation may not be based upon "sheer surmise and speculation"); *Liftin v. Comm'r of Internal Revenue*, 36 T.C. 909, 911 (1961), *aff'd*, 317 F.2d 234 (4th Cir. 1963) (second deed of trust notes); *Trunk v. Comm'r of Internal Revenue*, 32 T.C. 1127, 1139 (1959) (conditional right to a condemnation award), *acq.* 1960-2 C.B. 7; *see also Warren v. United States*, 171 F. Supp. 846, 848-49 (Ct. Cl. 1959) (recognizing, though not applying, the doctrine); *Bernice Patton Testament Trust v. United States*, 2001 WL 429809, at *3-5 (Fed. Cl. 2001), *aff'd*, 31 Fed. Appx. 661 (Fed. Cir. 2002) (same); Bruce Kayle, "Realization Without Taxation? The Not-So-Clear Reflection of Income from an Option to Acquire Property," 48 Tax. L. Rev. 233, 262-66 (1994).

[18] *See, e.g.*, *Davis v. Comm'r of Internal Revenue*, 210 F.3d 1346, 1347-48 (11th Cir. 2000) (arguing that income on sale was delayed to later year); *Baumer v. United States*, 685 F.2d 1318, 1321 (11th Cir. 1982) (same); *Am. Smelting & Refining Co.*, 423 F.2d at 290 (seeking to prevent loss deduction); *see also Centel Comm'ns Co. v. Comm'r of Internal Revenue*, 920 F.2d 1335, 1338-39 (7th Cir. 1990) (loss deduction argument made, but not reached); RIA Fed. Tax. Coordinator ¶ P-5025, Allocation of Cost Between Stock of Banks and of Affiliate Security Corporations (2d ed. 2008). For earlier cases to similar effect, *see Wise v. Comm'r of Internal Revenue*, 109 F.2d 614, 614-15 (3d Cir. 1940) (no deduction of loss on sale of stock in bank affiliate security which were "indivisibly annexed" to other bank stock); *DeCoppet v. Helvering*, 108 F.2d 787, 789 (2d Cir.), *cert. denied*, 310 U.S. 646 (1940) (no deduction of loss on sale of stock in bank affiliate security); *Orvilletta, Inc. v. Comm'r of Internal Revenue*, 47 B.T.A. 10, 14-15 (1942) (disallowing loss deduction based on inability to apportion cost basis to stock); *see also Robinette v. Helvering*, 318 U.S. 184, 188-89 (1943) (upholding IRS position that contingent remainder interest could not be valued for gift tax purposes, noting "[a]ctuarial science may have made great strides in appraising the value of that which seems to be unappraisable, but we have no reason to believe from this record that even the actuarial art could do more than guess at the value here in question").

use the words in one report, in "rare and extraordinary" circumstances.[19] And it bears noting that none of these statutes directly addressed the impact of the doctrine on basis allocations – the form of the doctrine pertinent here. Accordingly, while these statutes undoubtedly narrowed the scope of the doctrine,[20] they did not defenestrate it – the doctrine survives, albeit in more limited form, but with its basic rationale unscathed, leaving the courts to apply it as appropriate. *See Gladden v. Comm'r of Internal Revenue*, 262 F.3d 851, 855 (9th Cir. 2001) (recognizing the continuing viability of the doctrine); *Davis*, 210 F.3d at 1348 (same).[21]

---

[19] *See, e.g.*, S. Rep. No. 1000, 96th Cong., 2d Sess. at 24 (1980); *see also* Realization without Taxation?, 48 Tax L. Rev. at 280; Martin D. Ginsburg, Future Payment Sales After The 1980 Revision Act, 39 Inst. on Fed. Tax'n, Vol. 2, 43-1 (1981). Echoing the legislative history, regulations promulgated under this new provision state that, in the case of sales for a contingent payment obligation, the "open transaction" doctrine may be used "[o]nly in those rare and extraordinary cases . . . in which the fair market value of the obligation . . . cannot reasonably be ascertained . . . ." Treas. Reg. § 15a.453-1(d)(2)(iii).

[20] *See, e.g.*, *Garvey, Inc. v. United States*, 726 F.2d 1569, 1573 (Fed. Cir. 1984); *Campbell v. United States*, 661 F.2d 209, 215-26 (Ct. Cl. 1981); *Bernice Patton Testamentary Trust v. United States*, 2001 WL 429809, at *3 (Fed. Cl. 2001).

[21] As noted by Professor Kwall:

> To this day, *Burnet* is invoked by sellers to support the position that a right to contingent payments is not realized in the year of sale . . . . Bound by *Burnet* . . . , the government has always conceded open-transaction treatment in those "rare and unusual cases" where the value of the contingent rights is "unascertainable."

Kwall, *supra,* at 979-80 (citing, *inter alia*, *Linkins-Foster Honolulu Corp. v. Comm'r of Internal Revenue*, 840 F.2d 642, 650 (9th Cir. 1988)); *see also* Matthew A. Lykken, "Mrs. Logan Comes to a Sudden Realization: an Analysis of the Current State of the Open Transaction Doctrine," 42 Okla. L. Rev. 581, 581-82 (1990) (despite the enactment of section 453 and 482 of the Code, "the tree of the Doctrine remains embedded in the tax law") (hereinafter "Lykken"); Mertens, *supra*, at §5:15 (describing the doctrine as having continuing viability); 1 Martin D. Ginsburg & Jack S. Levin, Mergers, Acquisitions, and Buyouts ¶ 203.5.3 (2008) (discussing current advantages offered by the use of the "open transaction" method); Boris I Bittker & Lawrence Lokken, Fed. Tax'n of Income, Estates and Gifts ¶ 41.6.1 (2007) (hereinafter "Bittker & Lokken"); Leigh Mckee "Income Tax Consequences of Dispositions of Development Rights in Property," 97 J. Tax'n 347, 348-49 (2002) (recognizing the limiting effect of the legislation, but noting "[n]evertheless, there are circumstances in which the open transaction doctrine . . . continue[s] to apply").

B.

So what can we deduce from this *tour d'horizon*? One lesson taught, pure and simple, is that the "open transaction" doctrine first enunciated in *Logan* – and the appurtenant method for recovering basis – has long constituted an exception to the general rule requiring, upon the disposition of a portion of an asset, an allocation of basis. The regulation and the doctrine have coexisted for decades, and, despite defendant's claims, they continue to do so. Certainly, the notion, advanced by defendant, that the "open transaction" doctrine met its demise with the promulgation of Treas. Reg. § 1.61-6 in 1957 cannot be squared with the many decisions that have applied the doctrine since. Nor, incidentally, can it be reconciled with the IRS' own rulings. Thus, in Rev. Rul. 77-414, 1977-2 C.B. 299, the IRS described the general requirements of Treas. Reg. § 1.61-6, but then caveated that "when it is impractical or impossible to determine the cost or other basis of the portion of the property sold, the amount realized on such sales should be applied to reduce the basis of the entire property and only the excess over the basis of the entire property is recognized as gain."[22] Indeed, over the last half century, defendant has periodically trotted the doctrine out in seeking to disallow deductions, arguing, as it did for decades prior, that the transactions upon which these deductions were predicated were not closed. *See*, *e.g.*, *Smith v. Comm'r of Internal Revenue*, 78 T.C. 350, 377-78 (1982); *Hutton v. Comm'r of Internal Revenue*, 35 T.C.M. (CCH) 16 (1976); *Grudberg v. Comm'r of Internal Revenue*, 34 T.C.M. (CCH) 669 (1975). Accordingly, the court sees no reason to hesitate in concluding that the "open transaction" doctrine endures as a viable, albeit limited, exception to the general rule enunciated in Treas. Reg. § 1.61-6.

---

[22] Rev. Rul. 77-414 dealt with the sale of a development right that created a conservation easement on the taxpayer's land. Applying the rule in *Inaja Land*, the IRS ruled that –

> Since it is not possible to determine the basis of the development right, the amount received in consideration for the transfer of the development right in the property that is properly allocable to the land should be applied to reduce the taxpayer's basis in such land. . . . The taxpayer must recognize gain on the sale of the development right in the property to the extent the amount realized that is properly allocable to the underlying land exceeds the taxpayer's adjusted basis in such land.

Other rulings – pre- and post-dating the promulgation of Treas. Reg. § 1.61-6 – are to similar effect. *See* Rev. Rul. 79-276, 1979-2 C.B. 200 (noting an exception to Treas. Reg. § 1.61-6 where "it is practically impossible to apportion the cost or other basis to property"); Rev. Rul. 77-413, 1977-2 C.B. 298 (citing Rev. Rul. 77-414 as "an example of the treatment of the basis of a partial interest in real property sold by a taxpayer, when, because of the nature of the property interest conveyed and the property interest retained, the taxpayer is not required to allocate the basis of the property between such interests."); Rev. Rul. 59-121, 1959-1 C.B. 212; Rev. Rul. 58-402, 1958-2 C.B. 15; Rev. Rul. 54-575, 1954-2 C.B. 145, *as modified by* Rev. Rul. 72-433, 1972-2 C.B. 470; *see also* McKee, *supra*, at 349-50.

It remains to trace, more precisely, the contours of this exception – a task complicated by the fact that the "open transaction" doctrine has "flowered into various rather disparate branches." Lykken, 42 Okla. L. Rev. at 581; *see also* Mertens, *supra*, at § 5:15; Bittker & Lokken, *supra*, at ¶ 41.6.1. Some decisions that rely on *Logan* premise "open transaction" treatment on contingencies that impact the value of the compensation received and focus on what amount, if any, should be realized in the year of the sale. The debate in these cases is over income realization. Other cases premise "open transaction" treatment on the inability to separate out the values corresponding to the portions of a previously-acquired asset being sold or retained, and focus on what amount, if any, should be viewed as the basis of the portion sold. The debate in these cases – as here – is on return of capital. Encompassed within this latter category are not only cases in which it is simply impractical or impossible to determine the value of a component of a larger whole, but also, as is illustrated by *Pierce*, a particular species in which the doctrine was triggered because the part disposed of was, when first acquired, inseparable or indivisible from the part retained. Nonetheless, despite the variety of scions that have been engrafted onto the stock of *Logan*, it bears repeating that the "open transaction" exception is still limited, "confined in its application to those situations that present elements of value so speculative in character as to prohibit any reasonably based projection of worth." *Campbell*, 661 F.2d at 215; *see also* Treas. Reg. § 1.1001-1(a).

C.

We return, at last, to the facts. The experts in this case had markedly divergent views not only as to the value of the ownership rights that were transferred under the demutualization, but even as to whether those rights were susceptible of valuation. Plaintiff's valuation expert, Mr. Cole opined that traditional methods could not be used to value the "ownership rights" associated with the policy because those rights were neither separable nor alienable. While convinced these rights added to the value of the policy, he concluded that, prior to the demutualization of Sun Life, their fair market value, separate from the policy itself, was "not determinable." One of defendant's experts, Mr. Reiskytl, previously worked at a mutual insurance company. He confirmed many of the premises underlying Mr. Cole's opinion. Contrasting the ownership rights of mutual policyholders to those of traditional shareholders, Mr. Reiskytl observed that "[u]nlike shareholder ownership rights that are ***separate*** from the contractual rights of the insurance policy, the mutual policyholder's ownership rights are ***inextricably tied*** to the underlying insurance contract." (Emphasis in original). He further noted that the policyholder ownership rights could not be "separately purchased, transferred or sold." and that "[t]here is no separately determinable or identifiable price for these ownership rights at the time of purchase of an insurance policy." Yet, in a somewhat self-contradictory fashion, Mr. Reiskytl proceeded to set a value for these rights, specifically concluding, based upon various factors, that they had "no" value.[23] Defendant's other expert, Mr. Penny, also recognized that "the subject ownership

[23] In particular, Mr. Reiskytl focused on various contingencies that, in his view, severely diminished the value, as of the date of the policy's acquisition, of the policyholder's rights to receive a distribution upon a demutualization. In this regard, he noted that there was uncertainty as to: (i) whether the company would ever decide to demutualize; (ii) whether the necessary

rights could not be purchased nor [sic] sold separate from the purchase of an insurance policy." But, he essentially turned a blind eye to this fact in concluding that the value of the ownership rights was "best stated at zero during the 1990 calendar year." To derive this value, Mr. Penny purportedly used cost- and market-based approaches to valuation, based on his view of the cost of replacing asset and its market value, respectively.[24] Yet, he did so, conspicuously, without considering any comparable properties, serving to highlight the fact that there were neither such comparables, nor, for that matter, any market in which the ownership rights or some derivative could be sold.

All the experts subscribed to the same, basic definition of "fair market value" – essentially, the "price at which the property would change hands between a willing buyer and a willing seller, neither being under a compulsion to buy or to sell and both having reasonable knowledge of the relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551 (1973) (citing Treas. Reg. § 20. 2031-1(b)); *see also Campbell*, 661 F.2d at 221; *Union Pacific R. Co., Inc. v. United States*, 524 F.2d 1343, 1383 (Ct. Cl. 1975); Treas. Reg. § 1.170A-1(c)(2). Yet, in applying that definition, Mr. Cole believed that the circumstances prevented him from determining a value for the ownership rights, while Mr. Penny saw some of the same circumstances as reasons for setting that value at zero. So what caused those differences? It would appear that the experts parted company in deciding whether the nature of the ownership rights made them "impossible or impractical" to value or simply valueless. And that disagreement, in turn, undoubtedly stemmed from unstated differences as to what is meant by the phrase "impossible or impractical" – a phrase that, despite dozens of "open transaction" cases, has received little in the way of direct definition. That the phrase "impossible or impractical" has largely been left undefined almost undoubtedly derives from the fact that most "open transaction" cases are heavily fact-driven. Nonetheless, a synthesis of the decisional law yields several factors that have proven pivotal in deciding whether a rational basis exists for determining fair market value.

The first of these focuses on the marketability of the asset – both in terms of whether it is separately sellable or alienable and, if so, whether an established or private market exists in which to effectuate that sale. Several cases, among them the decisions in *Pierce* and *Warren*, have relied on the fact that an asset is not separately sellable to indicate that it lacks an ascertainable market value, particularly where that inalienability is inherent in the asset itself and

---

regulatory approvals for demutualization would be provided; (iii) when, if authorized, it would occur; (iv) how many policies would share in the demutualization distribution; (v) the formula that would be used to allocate the number of shares to each participating policy; (vi) the amount to be distributed; and (vii) whether the policy would be in force at the time of the announced demutualization.

[24] In his report, Mr. Penny indicated that "[u]nder the asset-based or 'cost' approach, the value of ownership is measured based upon the cost to replace the future service capability or utility of the subject property." He further indicated that "[u]nder a market-based approach, comparative valuation benchmarks are developed via comparisons to transactions involving similar property or actual transactions in the subject property."

not superimposed as a contractual limitation. *See Pierce*, 49 F. Supp. at 330; *Warren*, 193 F.2d at 1001.[25] Likewise, courts frequently highlight the absence of any market in which to sell assets of the type at issue as suggesting that the targeted asset is not susceptible to valuation.[26] A second factor focuses on whether there are any proxies that may be used to estimate the needed value – for example, recent sales or exchanges of assets comparable to the one being valued. Because having such comparables is essential to using the comparable sales or market approach to valuation,[27] the absence thereof not only deprives these methods of any utility, but also

---

[25] *See also Mothe Funeral Homes, Inc. v. United States*, 1995 WL 367939 (E.D. La. 1995) ("bond for deed" contracts received on sale of cemetery lots had no ascertainable fair market value due primarily to lack of marketability; open transaction approach upheld); *Estate of Wiggins*, 72 T.C. at 712-14 ("If, as the evidence indicates, the marketability of a contract for deed essentially is nil without the concomitant transfer of title and satisfaction of prior liens, should this Court in order to find value, set up the market structure in which a value will result? We think not."). The IRS has long taken the position, sustained by the courts, that stock options do not have a readily ascertainable fair market value unless they can legally be transferred. Treas. Reg. § 1.83-7(b)(2) provides in pertinent part:

> When an option is not actively traded on an established market, it does not have a readily ascertainable fair market value unless its fair market value can otherwise be measured with reasonable accuracy. For purposes of this section, if an option is not actively traded on an established market, the option does not have a readily ascertainable fair market value when granted unless the taxpayer can show that . . . [t]he option is transferable by the optionee; . . . .

*See also Pagel, Inc. v. Comm'r of Internal Revenue*, 905 F.2d 1190, 1191 (8th Cir.1990) ("If an option received as compensation is not publicly traded and the optionee is restricted from immediately exercising or disposing of the option, the option has no readily ascertainable fair market value . . . .").

[26] *Warren*, 193 F.2d at 1001 (rational apportionment cannot be made where there is "no separate market for the different parts of the aggregate"); *Estate of Wiggins*, 72 T.C. at 707 (noting that "[t]here was virtually no market for the contracts for deed"); *McShain*, 71 T.C. at 1011 (no market for the note); *Dorsey*, 49 T.C. at 630-31 (no market formula for valuing contract royalties); *cf. Campbell*, 661 F.2d at 215 (noting that the "decisive consideration is not the lack of an established trading market but the lack of any reasonable factual basis from which to determine the probable sum that fair negotiations between a hypothetical buyer and seller could produce").

[27] *See San Nicolas v. United States*, 617 F.2d 246, 251 (Ct. Cl. 1980) ("Reliability of the market data approach to valuation is dependent upon the selection of transactions with comparable data, on the accuracy of adjustment for differences in time, size, and other variables and upon verification of the sales data."); *Cane Tenn., Inc. v. United States*, 71 Fed. Cl. 432, 438 (2005), *aff'd*, 214 Fed. Appx. 978 (Fed. Cir. 2007) ("It is understood that the value of

provides further indication that the value of the asset cannot rationally be ascertained. *See Estate of Wiggins*, 72 T.C. at 712. In similar vein, valuation methods that depend upon some bartering or exchange convention – that the value of an item received in an arms-length transaction is equal to the value of the item given up[28] – are also unavailing if the taxpayer, via the barter, acquired a group of items of which the object to be valued is only part. Finally, an asset is more likely to be deemed insusceptible of valuation if its value is "contingent upon facts and circumstances not possible to foretell with anything like fair certainty." *Logan*, 283 U.S. at 413. Contingencies whose impact cannot be reasonably estimated, in particular, frustrate the use of methodologies that derive the value of an asset based upon the present value of an income stream, *e.g.*, the income capitalization or discounted cash flow approaches.[29] While not all contingencies prevent such present value calculations, it remains that "open transaction" treatment has been applied in "those situations that present elements of value so speculative in character as to prohibit any reasonably based projection of worth." *Campbell*, 661 F.2d at 215.[30]

Logic and experience suggest that the presence *vel non* of the above factors ought to be reflected in the ability (or inability) of an expert to value an asset reliably using accepted valuation methods. *See McCormac*, 424 F.2d at 620. The latter methods, of course, are not intended to produce results with talismanic precision, for it is well-accepted that fair market

---

comparable sales data varies directly with the similarity of the comparable properties to the property [at issue]."); *Snowbank Enters., Inc v. United States*, 6 Cl. Ct. 476, 485 (1984) ("The validity of the comparable sales approach to valuation, however, depends upon the degree of comparability between the subject property and the properties used for comparison.").

[28] *See, e.g., United States v. Davis*, 370 U.S. 65, 73 (1962); *Bankers Trust Co. v. United States*, 518 F.2d 1210, 1219-20 (Ct. Cl. 1975).

[29] Under the income capitalization method, "the value of a particular piece of property is shown by calculating the present value of the income the property could be expected to generate over its useful economic life." *Snowbank Enters.*, 6 Cl. Ct. at 485; *see also Cane Tenn.*, 71 Fed. Cl. at 438. Variations of this method are used to set the value of assets, such as the stock of an unlisted closely-held corporation, that are difficult to value using the market method. *See Central Trust Co. v. United States*, 305 F.2d 393, 398 (Ct. Cl. 1962).

[30] *See also, e.g.*, *Ayrton Metal Co.*, 299 F.2d at 751 ("That [the taxpayer's] contract rights under the 'commission' agreement had no ascertainable fair market value on January 24, 1950 is obvious, since the values of such rights depended upon a series of contingencies of such a character as to make any estimate of fair market value sheer surmise and speculation."); *Estate of Wiggins*, 71 T.C. at 709 ("collections under the contracts were doubtful or highly speculative"); *Liftin v. Comm'r of Internal Revenue*, 36 T.C. at 911 (notes were "highly speculative" and amount of realizable discount gain "uncertain"); *Piper*, 5 T.C. at 111; *Inaja Land*, 9 T.C. at 736; *see also McCormac v. United States*, 424 F.2d 607, 620 (Ct. Cl. 1970) ("open transaction" doctrine did not apply where annuity method of capitalization could value present worth of future income).

value is "incapable of mathematical precision and implicates methods of judgment." *United States v. 1,378 Acres of Land, More or Less, Situate in Vernon County, State of Miss.*, 794 F.2d 1313, 1318-19 (8th Cir. 1986).[31] Yet, empirically-speaking, if an expert lacks any rational basis upon which to value an asset, that ought to be strong indication that the asset is insusceptible of valuation. The burden of demonstrating this, of course, lies squarely upon the one invoking the exception – here the plaintiff – which must show that there was not "enough hard information in place from which willing buyers and willing sellers could construct soundly based equations of value." *Campbell*, 661 F.2d at 215; *see also Bernice Patton Testament Trust*, 2001 WL 429809, at * 2; *Rosenberg v. United States*, 3 Cl. Ct. 432, 437 (1983) (P. Miller, J.). Ultimately, it falls to the court to consider the record evidence bearing on the factors listed above, with particular focus given the expert opinions provided, and to determine, as a factual matter, whether plaintiff has proven that a rational basis for establishing the value of the asset in question is lacking.[32]

D.

With this background, and after carefully weighing the evidence, the court finds that this case presents one of the "rare and extraordinary" situations in which the "open transaction" exception to Treas. Reg. § 1.61-6 should apply. Of the experts who testified, the court is persuaded that Mr. Cole most accurately considered the realities of the circumstances presented here and the limitations on valuation inherent therein. In particular, he focused on the fact that the ownership rights were, at the outset, inextricably tied to the underlying insurance policy and were not separately sellable. Both he and, to a certain extent, Mr. Reiskytl, viewed this fact as an important indication that the ownership rights lacked a determinable fair market value at the time the policy in question was first acquired. Mr. Penny also, of course, was aware of this fact, but he concluded – wrongly, in the court's estimation – that the presence of the limitation meant that the value of the ownership rights was "best set at zero." That conclusion is not only contradicted by many of the "open transaction" cases discussed above, but also clashes with the Supreme Court's observations in *Helvering v. Tex-Penn Co.*, 300 U.S. 481 (1937), a case in which the taxpayers, in a corporate reorganizations, received stock that was restricted against sale for a defined period. The Court there held that "the shares of . . . stock, regard being had to their highly speculative quality and to the terms of a restrictive agreement making a sale thereof

---

[31] *See also United States v. 0.376 Acres of Land*, 838 F.2d 810, 829 (6th Cir. 1988); *Steven Linen Assocs. v. Mastercraft Corp.*, 656 F.2d 11, 14 (2d Cir. 1981); *Morris M. Messing v. Comm'r of Internal Revenue*, 48 T.C. 502, 512 (1967); *Estate of Rabe v. Comm'r of Internal Revenue*, 34 T.C.M. (CCH) 117 (1975), *aff'd*, 566 F.2d 1183 (9th Cir. 1977).

[32] Numerous cases, including those in the Court of Claims, have held that this question presents an issue of fact. *See, e.g.*, *McCormac*, 424 F.2d at 618 ("[w]hether a particular contract containing rights contingent on future income can be valued for income tax purposes is a question of fact, with the burden of proof as to insusceptibility to valuation resting upon the taxpayer"); *United States v. State Street Trust Co.*, 124 F.2d 948, 951 (1st Cir. 1942); *Mothe Funeral Homes*, 1995 WL 367939, at * 2 ("[w]hether the contracts have a fair market value is a factual question").

impossible, did not have a fair market value, capable of being ascertained with reasonable certainty, when they were acquired by the taxpayers." *Id*. at 499; *see also State Street Trust Co.*, 124 F.2d 948, 951 (restricted stock with speculative value had no fair market value); *Mailloux v. Comm'r of Internal Revenue*, 320 F.2d 60, 62 (5th Cir. 1963). Unless the Code specifies otherwise,[33] an appraiser must take an asset as he finds it – the definition of "fair market value" anticipates a "hypothetical" sale not a "hypothetical" asset and does not permit an expert the expediency of squaring a circle that, indeed, is round. Here, one of the critical features that could not be ignored was the fact the ownership rights were indivisible from the insurance policy.

Notably, Mr. Penny readily admitted that there was neither a market upon which to gauge the value of the ownership rights nor any assets that could be deemed comparable to those rights, so as to allow for accurate application of the market method of valuation. Rather, he, and to a lesser extent, Mr. Reiskytl, set the value of the ownership rights at zero because Sun Life had not incurred any costs in establishing those rights – that is, because prior to the demutualization, Sun Life had neither associated any cost with the ownership rights on its books nor accounted for the rights in pricing its policies. But, it is hard to see how either fact is relevant, let alone dispositive here. There is, to be sure, a cost replacement method for appraising the value of an asset – but that method does not establish value based upon the historical costs incurred by the ***seller*** with respect to an asset, but rather relies on the cost to the ***purchaser*** of replacing or reproducing the asset.[34] Indeed, various courts have rejected claims that an asset has a value of zero because the entity or individual creating it did not associate specific past costs or future liabilities with that asset. For example, in *Piper*, *supra*, the Tax Court considered common stock subscription warrants that were acquired by the taxpayer with other stock as part of a reorganization and later sold. The Tax Court viewed the fact that the corporation had not allocated any costs to the warrants as evidence that the warrants were insusceptible of valuation, noting that "[t]hey were not reflected in the capital account of the corporation and did not represent an absolute equitable

---

[33] In certain provisions, Congress has provided that valuations should disregard limitation on the transferability of an asset. *See*, *e.g.*, 26 U.S.C. §§ 83(a)(1) (requiring the value of an option to be "determined without regard to any restriction other than a restriction which by its terms will never lapse"); 83(b)(1)(A) (same); 422 (c)(7) (same); *see also* Treas. Reg. § 15A.453-1(d)(2)(iii). But, there is no such statutory command here. *See Cramer v. Comm'r of Internal Revenue*, 64 F.3d 1406, 1412 (9th Cir. 1995) (refusing to ignore transfer limitations absent specific direction by Congress).

[34] Notably, none of the regulations or revenue rulings that provide guidance on how to value stock suggest that the value should depend whatsoever on whether the company incurred separate costs in establishing the ownership rights represented by the stock. *See, e.g.*, Treas. Reg. § 25.2512-2 (valuing stocks and bond); Rev. Rul. 83-120, 1983-2 C.B. 170 (valuing preferred and common stock of a closely-held corporation); Rev. Rul. 80-213, 1980-2 C.B. 101 (stapled, paired, or "back-to-back" stock); *see also* IRS, Coursebook: Valuation Training for Appeals Officers §§ 9-1 - 9-20, 11-2 - 11-7, 11-4, 12-1 - 12-9 ((CCH) 1998).

ownership therein." 5 T.C. at 1110.[35] This result is consistent with cases suggesting that "open transaction" principles apply where costs are not identifiable to a particular asset, but instead represent investment in the business as a whole – indeed, that argument has been made by the IRS itself in seeking to disallow deductions. *See*, *e.g.*, *Capital Blue Cross v. Comm'r of Internal Revenue*, 431 F.3d 117, 125-27 (3d Cir. 2005); *see also Drybrough v. Comm'r of Internal Revenue*, 45 T.C. 424, 434-35 (1966); Mertens, *supra* at § 5:16. It would seem, then, that the fact that no specific costs were allocated by Sun Life to the ownership rights merely reflects that those rights related to values associated with the business as a whole – the rights to vote for the entire board, to receive proceeds from the company's liquidation and to receive distributions in the case of a demutualization. That no more specific accounting of these rights is available does not support defendant's case, but rather is further indication that the rights are not susceptible to valuation.[36]

---

[35] *See also F.W. Drybrough v. Comm'r of Internal Revenue*, 42 T.C. 1029, 1056-57 (1964), *aff'd in part, rev'd in part, on other grounds*, 376 F.2d 350 (6th Cir. 1967) (rejecting argument that files did not have value because "no consideration was paid by the corporation for the files [and] . . . they were not recorded as an asset on the corporate books of account"); *Axton*, 32 B.T.A. at 615 (applying "open transaction" exception and rejecting the use of "book values" as providing rational basis to value stock). In his seminal treatise on the valuation of property, James C. Bonbright wrote:

> The contrast between 'value' and 'cost' as fundamental concepts is that the former term refers to the advantage that is expected to result from the ownership of a given object of wealth (or to the market price that this advantage will command), whereas the latter term refers to the sacrifice involved in acquiring this object. This distinction is clear in our minds when we ask whether anything or any desirable human achievement "is worth what it costs" . . . Cost, then, is the price that must be paid for value.

James C. Bonbright, The Valuation of Property: A Treatise on the Appraisal of Property for Different Legal Purposes 19 (McGraw-Hill 1938). The decisional law thus merely reflects the commonsense principle that "[w]hile cost may be incurred in acquiring value, value does not necessarily equate to cost." Jay E. Fishman, Shannon P. Pratt & William J. Morrison, Standards of Valuation: Theory and Applications 19 (Wiley 2007). Indeed, an asset's "book value" rarely correlates with its "fair market value." *Id.* at 28; see also *Miss. Power & Light Co. v. Miss. State Tax Comm'n*, 700 So. 2d 1185, 1187 (Miss. App. 1997) ("It must be kept in mind that, in the field of accounting, assets are carried at 'book value' rather than actual or market value.").

[36] In suggesting that the ownership rights were valueless, defendant's experts also emphasized the fact that the premium on the policies did not change after the demutualization, when the ownership rights were no longer included as part of the package. But, this presumes too much. For one thing, it ignores the fact that as part of the plan for demutualization, Sun Life promised its policyholders that it would not change the premiums. That agreement thus accounts for the fact that there was no change in premiums following the demutualization. Moreover, the

Contrary to defendant's experts, that the future financial benefits associated with the ownership rights here were speculative does not mean that those rights should be valued at zero. If that were true then virtually all of the "open transaction" cases, beginning with *Logan* itself, should have been decided differently. Indeed, one of the reasons why the Supreme Court held that Mrs. Logan was not required to recognize gain was because "the promise of future money payments [was] wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty." *Logan,* 283 U.S. at 413; *see also Campbell*, 661 F.2d at 215. At all events, many of the economic assumptions made by defendant's experts in diminishing the value of the ownership rights to zero do not withstand scrutiny. Those experts, for example, ascribed no value to the voting rights associated with the policies, even though those rights allowed the participating policyholders to elect the Board, which, in turn, established the policies under which dividends were paid and initiated the demutualization process. Also part and parcel of the opinions expressed by those same experts was the illogical view that no value should be ascribed to the demutualization or liquidation distribution rights – even though those rights entitled the policyholders to share potentially in a surplus that during the period in question exceeded $5.7 billion (Canadian). The notion, moreover, that any distribution of the value of the company could not have been anticipated here because demutualizations such as that conducted by Sun Life were unprecedented – a view unhesitatingly offered by both of defendant's experts – is flatly contradicted by Sun Life's own plan of demutualization. An actuarial report, dated September 28, 1999, that was attached to the plan of demutualization thus stated that "[i]n the last ten years, there have been several demutualizations in the U.S.A., the U.K. Australia, and, most recently, South Africa," adding that "they are precedents." Other sources also indicate that such demutualizations were commonplace by the time the policy in question was purchased.[37] In

---

record reflects that, prior to the demutualization, the premiums for policies were set primarily with reference to the payment of expected claims. That this was the focus of Sun Life's pricing does not mean that the ownership rights that came with the policies were valueless. Again, the court finds contrary to law and common sense a supposed valuation methodology that blithely equates the seller's cost to create an asset with the estimated market value of the same asset in the hands of a purchaser. *See LaSalle Talman Bank, F.S.B. v. United States*, 45 Fed. Cl. 64, 105 (1999), *aff'd, in part*, *vacated, in part*, *on other grounds*, 317 F.3d 1363 (Fed. Cir. 2003) ("[d]efendant has cited no authority – from either finance or legal treatises, or case law – to support its theory that present value necessarily equates to cost"); *Dykstra v. Comm'r of Internal Revenue*, 44 T.C.M. (CCH) 890 (1982) ("value does not necessarily equate with cost").

[37] *See* 3 Couch on Ins. § 39: 43 (3d ed. 2008) ("Since the 1930s over 200 mutual insurance companies have converted to stock companies, primarily due to the fact that they are unable to sell stock on the equity market and therefore face difficulties in raising capital."); Clinton, *supra* at 658 n. 3 (noting that fourteen such conversion occurred between 1972 and 1982). Indeed, Mr. Reiskytl, who had formerly worked for a mutual insurance company, fully admitted that the economic factors that mitigated in favor of converting mutual insurance companies to stock companies predated plaintiff's purchase of its policy in 1990. These included a U.S. tax regime that dated back to 1959, as well as advantages in corporate compensation (*e.g.* allowing officers to receive stock options), capital formation, and diversification of financial

short, the evidence supports plaintiff's claim that the ownership rights did have value, albeit one that was not derivable.[38]

If nothing else, these facts are antithetical to the claim that the stock distributions made with respect to the ownership rights were a "windfall." Defendant's repeated and pejorative use of that term seemingly proceeds from the notion that, as in Orphic hymns, the value associated with the ownership rights here sprung from the aether, somehow sparked by the demutualization itself. As characterized by Mr. Scanlon, one of defendant's witnesses, these rights were "embedded values" that were not "monetized" until the demutualization occurred. But, if there is any meaningful distinction to be made between "embedded values" that were not previously "monetized" and ownership rights that were "impossible or impractical" to value at the time they were first acquired, it is almost certainly one without a difference.[39] Nor is there the slightest support for the suggestion, again made by one of defendant's witnesses, that the allocation of stock here was a "windfall" because it was mandated by Canadian and state regulatory agencies. A silent premise in this argument, of course, is that those agencies acted arbitrarily or at least with considerable largesse in requiring compensation to be paid for the loss of ownership rights that – in defendant's view – were valueless. But, the court is no more inclined to believe this charge, sans any shred of evidence to support it, than it would be to ascribe similar conduct to Congress and Federal agencies. Without any evidence to the contrary, the more logical conclusion is that such agencies, and the legislatures that empowered them, sincerely believed that the ownership rights had value and that the policyholders were entitled to be compensated for their loss.[40] The "windfall" tag, therefore, lacks evidentiary adhesive and does not stick.

---

products, that all dated back at least until 1990. When challenged on these facts, Mr. Reiskytl admitted that the value of the demutualization rights was "probably . . . something above zero."

[38] That the evidence suggests that the ownership rights had value is not inconsistent with the conclusion that they are not susceptible to valuation. Numerous cases so hold. *See, e.g.*, *Mothe Funeral Home*, 1995 WL 367939, at *3; *Estate of Wiggins*, 72 T.C. at 713-14 ("we are not holding that the contracts were valueless; we simply conclude that it was impossible to determine with fair certainty the market value of the contracts for deed as of the date of sale under the traditional definition of fair market value").

[39] *See* Am. Acad. of Actuaries, Exposure Draft, "Practice Note on Embedded Value (EV) Reporting", at 3 (March 2008) (describing the "embedded value" of an insurance company as the "consolidated value of the shareholders' interests" in the company), available at www.actuary.org/pdf/practnotes/fin_march08.pdf; CFO Forum, "Market Consistent Embedded Value Principles" (June 2008) (the "[m]arket consistent embedded value (MCEV) is a measure of the consolidated value of shareholders' interest in the covered business."), available at www.cfoforum.nl/eev.html.

[40] Many state statutes authorizing demutualizations explicitly require that compensation be paid for the loss of ownership rights. *See*, *e.g.*, Or. Rev. Stat. Ann. § 732.612; N.Y. Ins. Law § 7312(d)(4); Wash. Rev. Code Ann. § 48.09.350(3); Wis. Stat. Ann. § 611.76 (4)(bm). And, it

At all events, the assertion that the ownership rights here ever had a "zero" value is thoroughly rebuffed by the actuarial study provided by Sun Life to its policyholders with the plan for demutualization. That study focused on whether the stock to be provided in the demutualization adequately compensated those policyholders for the ownership rights that were being relinquished. It recognized, as a first principle, that the stock allocation "should fairly compensate for what policyholders lose in the demutualization; namely, voting control of the insurance company and the right to share in the insurance company's residual value if it is wound up." It noted that the demutualization plan "provided for a fixed allocation of 75 Financial Service Shares to each Eligible Policyholder, regardless of the number of policies held, and for a variable allocation to each Eligible Policy of a number of Financial Services Shares which depends on its Cash Value, the number of years it has been in force and its annual premium." The study stated that it –

> regarded the fix allocation as compensation for loss of voting control and the variable allocation as compensation for loss of the right to share in residual value. It is appropriate that the fixed allocation be the same to each Eligible Policyholder, since each has one vote and all the votes should be treated as equal. It is appropriate that the variable allocation differ among Eligible Policyholders because they have different customer attachments to, different financial interest in, and different rights to receive surplus distributions from, Sun Life of Canada.

In concluding that the compensation for the lost ownership rights was "fair," "equitable," and "appropriate," the report cited several other facts that suggest that the ownership rights had value prior to the demutualization, including that: (i) value comparable to that being offered in the Sun Life demutualization had been allocated to voting rights in other prior demutualizations; (ii) the loss of voting control could indirectly impact policy dividends, the payment of which was "largely at the discretion of [Sun Life's] board of directors; and (iii) the "primary historical sources of surplus" for Sun Life had been its "individual participating policies." Finally, and importantly, the report recognized that the distribution of stock was a "zero-sum game," that is to say, that certain policyholders would be harmed if the plan struck the wrong balance between the value of the voting rights and the residual rights. Of course, there would be no such harm – and, concomitantly, no need to strike such a careful balance – if either right properly were characterized as a "windfall."[41]

---

bears noting that some of these statutes, as well as the Michigan statute that impacted Sun Life's demutualization, were enacted well before plaintiff acquired its policy here, further rebutting the notion that demutualizations were an unknown phenomena at the time of that purchase. *See, e.g.*, Mich. Comp. Laws Ann. § 500.5901 (adopted in 1987); Wis. Stat. Ann. § 611.76 (adopted in 1971); La. Rev. Stat. Ann. §§ 22:801-06 (adopted in 1978); *see also* Clinton, *supra* at 674, 676 n. 137 (noting that, beginning in 1959, many states adopted demutualization statutes and that, as of 1992, only eleven had not enacted such statutes).

[41] One of defendant's witnesses, Mr. Scanlon, who was a Vice President at Sun Life,

In sum, based on the record, the court simply cannot credit defendant's "zero" valuation of the ownership rights. The opinions of its experts, "like any other judgment . . . can be no better than the soundness of the reasons that stand in support of them." *Fehrs v. United States*, 620 F.2d 255, 265 (Ct. Cl. 1980); *Campbell*, 661 F.2d at 222. And, the court finds that the premises upon which these opinions were based were faulty and contrary to the facts.[42] The record here instead supports the opinion rendered by plaintiff's valuation expert that the value of the ownership rights was not discernible, leading the court to conclude that plaintiff has borne its burden of proof in this case. That the facts in this case parallel strikingly those in several "open transaction" cases involving stock and other forms of securities, among them *Pierce* (which remains binding precedent in this circuit) and *Warren*, serves only to confirm that this is an appropriate situation in which to apply the "open transaction" exception to Treas. Reg. § 1.61-6. That being the case, and the amount received by plaintiff being less than its cost basis in the insurance policy as a whole, the court finds that plaintiff, in fact, did not realize any income on the sale of the stock in question and, therefore, is entitled to the requested refund.

## III. CONCLUSION

The court need go no further. Some might see this case as a revivification of the "open transaction" doctrine. It is not. It represents, rather, an unusual and unique result – one based on long-standing, though not often-invoked, legal principles, to be sure, but ultimately driven by relatively unique facts. Be that as it may, the court finds that plaintiff has met its burden and is entitled to the refund requested. The Clerk will enter judgment for plaintiff in the amount of $5,725.00, plus such interest as is provided by law.

---

described the demutualization benefits as being a "windfall" because they flowed to "policyholders who happened to have policies in force with Sun Life on the date where we established the eligibility for those demutualization benefits." But, the distributions in respect of the policyholders' ownership rights were no more "windfall" than would be received by a shareholder who happened to own stock that became subject to a takeover offer. In either situation, the receipt of benefits might be viewed as good fortune, but not unrelated to the value of the ownership rights relinquished. *See* Racz, *supra*, at 1008-09 (rejecting policy arguments for not compensating policyholders for the relinquishment of their ownership rights).

[42] To be sure, the opinions of defendant's experts were consistent with the private letter ruling that the IRS provided to Sun Life on the demutualization, which indicated that the basis of the Financial Services stock would be zero. But that ruling merely parroted factual representations made by Sun Life and is of little moment in this case. While Sun Life could rely on that ruling in its dealings with the IRS, the ruling had utterly no binding or precedential impact on the tax treatment entitled by third parties, such as plaintiff here. *See*, *e.g.*, *Wolpaw v. Comm'r of Internal Revenue*, 47 F.3d 787, 792 (6th Cir 1995); *see also* Rev. Proc. 2000-1, 2000-1 C.B. 4 (section 2); *Peerless Corp. v. United States*, 185 F.3d 922, 928 (8th Cir. 1999) (private letter ruling "by its terms is directed only to the taxpayer who requested it").

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge